## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ROLTA INTERNATIONAL, INC., *et al.*[1] | Case No. 20-82282-CRJ11 |
| Debtors. | |

## JUDGMENT CREDITORS' MOTION TO DISMISS
## THE DEBTORS' CHAPTER 11 CASES

KOBRE & KIM LLP

John Han (*Pro Hac Vice*)
Daniel J. Saval (*Pro Hac Vice*)
Josef M. Klazen (*Pro Hac Vice*)
Donna (Dong Ni) Xu (*Pro Hac Vice*)
800 Third Ave.
New York, NY 10022
+212 488 1200
john.han@kobrekim.com
daniel.saval@kobrekim.com
josef.klazen@kobrekim.com
donna.xu@kobrekim.com

Geoffrey J. Derrick (*Pro Hac Vice*)
1919 M Street, NW
Washington, DC 20036
+202 664 1936
geoffrey.derrick@kobrekim.com

CHRISTIAN & SMALL LLP

Daniel D. Sparks
Bill D. Bensinger
505 North 20th Street, Suite 1800
Birmingham, AL 35203
(205) 795-6588
ddsparks@csattorneys.com
bdbensinger@csattorneys.com

*Counsel for Pinpoint Multi-Strategy Master Fund; Value Partners Fixed Income SPC-Value Partners Credit Opportunities Fund SP; and Value Partners Greater China High Yield Income Fund*

---

[1] The Chapter 11 cases of debtors Rolta International, Inc. [Case No. 20-82282-CRJ11], Rolta Middle East FZ-LLC [Case No. 20-82285-CRJ11], and Rolta UK Limited [Case No. 20-82287-CRJ11] are being jointly administered. *See* Final Order Directing Joint Administration of Rolta International, Inc., Rolta Middle East FZ-LLC, and Rolta UK Limited Chapter 11 Cases, *In re Rolta International, Inc.*, Case No. 20-82282-CRJ-11 [Dkt. 93]. This Court denied the Debtors' request to jointly administer Rolta, LLC [Case No. 20-82283-CRJ11], Rolta Global B.V. [Case No. 20-82284-CRJ11], and Rolta Americas LLC [Case No. 20-82286-CRJ11]. *Id.* For ease of reference, all docket entries referenced herein to the Debtors' Chapter 11 cases refer to the docket 20-82282-CRJ11, unless otherwise noted. Because the Motion (as defined below) relates to issues of fact and law that are common across the Debtors, the Judgment Creditors have filed the same Motion in each of these proceedings.

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................. 1

**BACKGROUND** ........................................................................................................ **3**

    I.     The Bond Issuances and the Judgment Creditors' Beneficial Ownership.................... 3

    II.    The Debtors' Defaults................................................................................... 4

    III.   The Judgment Creditors' Pursuit of Repayment of the Bonds ....................... 5

    IV.   These Chapter 11 Cases ............................................................................... 8

**JURISDICTION** ...................................................................................................... **12**

**ARGUMENT** ............................................................................................................ **13**

    I.     The Court Should Dismiss the Chapter 11 Cases For "Cause" Pursuant to Section 1112(b) Because The Debtors Filed Them in Bad Faith........................................................... 13

         A.    The Timing of the Debtors' Chapter 11 Cases Indicates Bad Faith .................... 15

         B.    The Debtors' Chapter 11 Cases Amount to a Two-Party Dispute........................ 16

         C.    These Chapter 11 Cases Serve No Valid Reorganizational Purpose ................... 18

    II.    The Court Should Dismiss the Chapter 11 Cases Pursuant to Section 305(a) of the Bankruptcy Code.................................................................................................................. 22

**CONCLUSION** ........................................................................................................ **25**

# TABLE OF AUTHORITIES

**Cases**

*Colonial Daytona Ltd. P'ship v. Am. Sav. of Florida, F.S.B.*, 152 B.R. 996 (M.D. Fla. 1993).... 21

*In re A.Z. Servs., Inc.*, 208 B.R. 578 (Bankr. S.D. Fla. 1997) ...................................................... 15

*In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984) ............................................. 13, 14, 19

*In re C & C Dev. Grp.*, *LLC*, No. 11-32362-BKC-AJC,
2012 WL 1865422 (Bankr. S.D. Fla. May 21, 2012)…………………………………………..24

*In re Caffey Enterprises, LLC*, No. 09-83573-JAC-11,
2009 WL 5214892 (Bankr. N.D. Ala. Dec. 23, 2009) ............................................................ 18

*In re Club Tower L.P.*, 138 B.R. 307 (Bankr. N.D. Ga. 1991) ...................................................... 18

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ........................................... 20

*In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448 (Bankr. N.D. Fla. 2011)........................ 21

*In re Double W Enterprises, Inc.*, 240 B.R. 450 (Bankr. M.D. Fla. 1999) ............................. 19, 20

*In re FMB Bancshares, Inc.*, 517 B.R. 361 (Bankr. M.D. Ga. 2014) ...................................... 23, 24

*In re Forever Propane Sales & Service, Inc.*, 597 B.R. 696 (Bankr. S.D. Fla. 2019)............ 23, 24

*In re Foster*, No. 11-30021, 2011 WL 3438495 (Bankr. S.D. Ga. June 17, 2011) ...................... 17

*In re Gooding*, 234 B.R. 157 (Bankr. M.D. Fla. 1999)........................................................... 16, 17

*In re Hardigan*, 490 B.R. 437 (Bankr. S.D. Ga. 2013).................................................................. 14

*In re Ironsides, Inc.*, 34 B.R. 337 (Bankr. W.D. Ky. 1983)........................................................... 20

*In re Lotus Investments*, 16 B.R. 592 (Bankr. S.D. Fla. 1981) ...................................................... 14

*In re MacElvain*, 160 B.R. 672 (Bankr. M.D. Ala. 1993) ............................................................ 22

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 3 of 739

*In re Moog*, 159 B.R. 357 (Bankr. S.D. Fla. 1993) ...................................................... 17

*In re Natural Land Corp.,* 825 F.2d 296 (11th Cir. 1987) ............................................. 18

*In re On the Ocean, Inc.*, No. 16-16204-BKC-RBR,
2016 WL 8539791 (Bankr. S.D. Fla. June 6, 2016) ...................................... 16, 17, 20

*In re Pegasus Wireless Corp*, 391 Fed. Appx 802, 2010 WL 3096149 (11th Cir. 2010) ............ 15

*In re Peña*, No. 14–09799 (ESL), 2016 WL 1043736 (Bankr. D.P.R. Mar. 15, 2016) ............... 22

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) ....................................... 13, 16, 18

*In re Piazza*, 719 F.3d 1253 (11th Cir. 2013) ................................................................ 16

*In re Sar-Marco, Inc.*, 70 B.R. 132 (Bankr. M.D. Fla. 1986) ............................................ 14

*In re State St. Houses, Inc.*, 356 F.3d 1345 (11th Cir. 2004) ............................................ 14

*In re Sterling Bluff Inv'rs, LLC*, 515 B.R. 902 (Bankr. S.D. Ga. 2014) ............................... 15

*In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81 (Bankr. S.D. Ga. 2009) ........................... 17, 22

*Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449 (8th Cir. 1978) ...................... 15

*MacElvain v. I.R.S.*, 180 B.R. 670 (Bankr. M.D. Ala. 1995) ................................... passim

*In re C & C Dev. Grp., LLC,* No. 11-32362-BKC-AJC,
2012 WL 1865422 (Bankr. S.D. Fla. May 21, 2012) ...................................................... 24

*P.A. Bldg. Co. v. Silverman*, 298 A.D.2d 327 (1st Dep't. 2002) ....................................... 7

*Singer Furniture Acquisition Corp. v. SSMC, Inc. N.V.*, 254 B.R. 46 (M.D. Fla. 2000) ............. 21

**Statutes**

11 U.S.C. § 305 ................................................................................................ 3, 23

11 USC § 707(a) .............................................................................................. 16

iv

11 U.S.C. § 1112(b) ..................................................................................................... passim

28 U.S.C. § 1334 ........................................................................................................... 13

28 U.S.C. § 1408 ...................................................................................................... 13, 16

28 U.S.C. § 157(b) ........................................................................................................ 13

**Rules**

New York Civil and Practice Law and Rules § 5234(c) .................................................. 7

New York Civil and Practice Law and Rules § 5202(b) ................................................. 7

New York Civil Practice Law and Rules § 5225(a) ....................................................... 6

**Other Authorities**

7 Collier on Bankruptcy (16th ed. 2020)……………………………………………………...21

Creditors Pinpoint Multi-Strategy Master Fund (formerly known as Pinpoint Multi-Strategy Fund) ("Pinpoint"), Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund SP ("VP – Credit"), and Value Partners Greater China High Yield Income Fund ("VP – China" and, together with Pinpoint and VP – Credit, the "Judgment Creditors") hereby submit this motion (the "Motion") to dismiss the Chapter 11 cases filed by Rolta International, Inc. ("Rolta International") [Case No. 20-82282-CRJ11], Rolta, LLC ("Rolta LLC") [Case No. 20-82283-CRJ11], Rolta Global B.V. ("Rolta Global") [Case No. 20-82284-CRJ11], Rolta Middle East FZ-LLC ("Rolta Middle East") [Case No. 20-82285-CRJ11], Rolta Americas LLC ("Rolta Americas") [Case No. 20-82286-CRJ11], and Rolta U.K. Limited ("Rolta UK") [Case No. 20-82287-CRJ11] (collectively, the "Debtors") pursuant to 11 U.S.C. §§ 1112 and 305. In support of the Motion, the Judgment Creditors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these Chapter 11 cases in bad faith.  The crux of these cases is a two-party dispute between the Debtors and the Judgment Creditors.  In the two years leading up to the petition date, the Judgment Creditors pursued enforcement proceedings in New York state court against the Debtors and their ultimate parent corporation, Rolta India Ltd. ("Rolta India"), based on the Debtors' default of approximately $209 million in bond debt and interest owed to the Judgment Creditors.

2.      Tellingly, the Debtors filed their Chapter 11 cases a mere two days after the New York court's deadline for the Debtors to turn over their cash on hand to the Judgment Creditors. Indeed, counsel for the Debtors readily conceded at the first day hearing that the "triggering event" for the Chapter 11 filings was that turnover order.  See Declaration of Geoffrey J. Derrick ("Derrick Decl."), Ex. A at 5:2–7 (Nov. 4, 2020 Hr'g Tr. (hereafter, "First Day Hr'g Tr.")).  Significantly, the Debtors' bond debt had been accelerated over two years prior to the filing, and the Debtors had

1

begun defaulting on the bond debt over four years ago.  Yet, the Debtors waited until the eve of foreclosure to commence these hastily-filed Chapter 11 cases.

3.    Moreover, the Debtors have little operating business to reorganize and rehabilitate—the very purpose for which Chapter 11 exists.  The Debtors have admitted that three of the six filing entities[2] are dormant, have no employees or operations, and perform no contracts or services.  And the remaining three Debtors (two of which are non-U.S. entities)[3] appear to have little ability to fund the Chapter 11 process through their significantly dwindling cash resources, with no mention of debtor-in-possession financing.  Moreover, these Debtors' schedules are bereft of the typical indicia of business operations, such as ongoing contracts with suppliers or customers or interests in intellectual property that have value.

4.    Notably, no other creditors have come forward to actively participate in the Chapter 11 process, and not a single other creditor expressed interest in participating on an unsecured creditors' committee.  And the Debtors' own financial schedules underscore that the Judgment Creditors hold substantially *all* of the non-insider debt owed by almost all the Debtors.  Even assuming the Debtors had an intention to pursue a restructuring in these cases and have businesses capable of a reorganization, they do not even have a collective creditor body with which to engage.

5.    These are not the hallmarks of a legitimate Chapter 11 filing.  Deploying the protections of Chapter 11 to gain leverage in a two-party dispute where the Debtors have little (if any) business to salvage is not the proper, good-faith use of Chapter 11.  Accordingly, and for the additional reasons set forth below, this Court should dismiss the Debtors' cases under Section

---

[2]    These dormant entities are Rolta Americas, Rolta LLC and Rolta Global.

[3]    These entities are Rolta International, Rolta Middle East and Rolta UK, the latter two of which are not U.S. entities.

1112(b) of the Bankruptcy Code for "cause" and, alternatively, under Section 305(a) because abstention is warranted under the facts and circumstances.

## BACKGROUND

### I.    The Bond Issuances and the Judgment Creditors' Beneficial Ownership

6.    Between 2012 and 2014, Debtors Rolta LLC and Rolta Americas each issued a set of bonds, which together totaled $500 million and were secured by the other Debtors and the Debtors' ultimate parent corporation, Rolta India.  Specifically, on May 16, 2013, Debtor Rolta LLC executed an indenture through which it issued $200 million of 10.75% senior notes due in May 2018 ("2018 Notes"), which are guaranteed by Rolta India and three of the Debtors in these Chapter 11 cases:  Rolta International, Rolta UK, and Rolta Middle East.  Derrick Decl., Ex. B at 2–3 (Decision and Order, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Apr. 23 2019) [Dkt. 230]); *see also* Derrick Decl., Ex. C at Schedule I (Indenture (May 16, 2013)).

7.    On July 24, 2014, Debtor Rolta Americas executed an indenture through which it issued $300 million of 8.75% senior notes due in July 2019 ("2019 Notes," and, together with the 2018 Notes, the "Notes"), which are guaranteed by Rolta India and four Debtors:  Rolta International, Rolta UK, Rolta Middle East, and Rolta Global.  Derrick Decl., Ex. B at 2–3; *see also* Derrick Decl., Ex. D at Schedule I (Indenture (July 24, 2014)).

8.    Collectively, the Judgment Creditors are the beneficial owners of US $147,692,000 of the Notes.  Derrick Decl., Ex. E at 2 & n.2 (Decision + Order on Motion, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 16, 2020) [Dkt.

3

387]).[4]

## II.    The Debtors' Defaults

9.    On May 16, 2016, Rolta LLC defaulted on the 2018 Notes by failing to make the required interest payments to noteholders and failing to cure the event of default within 30 days. Derrick Decl., Ex. B at 3.

10.    About two years later, on April 24, 2018, the Judgment Creditors accelerated the remaining principal balance of the 2018 Notes by sending a notice to Rolta LLC and Rolta India. *Id.* at 3–4.  Under Section 6.02 of the indenture for the 2018 Notes, a valid notice of acceleration renders the entire principal and interest immediately due and payable.  *Id.* at 4.  Rolta LLC and Rolta India ignored the notice.  Derrick Decl. ¶ 4.

11.    As of the Chapter 11 petition date, Rolta LLC had not paid the principal and interest it owed to the Judgment Creditors under the 2018 Notes.  Derrick Decl., Ex. B at 3.

12.    The 2019 Notes charted a path similar to that of the 2018 Notes.  On July 24, 2016, Rolta Americas defaulted on the 2019 Notes by failing to make the required interest payments to

---

[4]    Judgment Creditor Pinpoint is the beneficial owner of $12,444,000 of the 2018 Notes and $67,513,000 of the 2019 Notes.  Derrick Decl., Ex. F at 4–5 (Order and Judgment, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Sept. 2, 2020) [Dkt. 350]); s*ee also* Derrick Decl., Ex. G at 13:18–14:9 (Transcript of December 20, 2019 Oral Argument, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Mar. 16, 2020) [Dkt. 338]).  On November 2, 2018, Pinpoint Multi-Strategy Master Fund (formerly known as Pinpoint Multi-Strategy Fund) purchased US $13,313,000 of 2019 Notes from Pala Assets Holdings, Ltd.  Derrick Decl., Ex. E at 2.

Judgment Creditor VP – Credit is the beneficial owner of $6,850,000 of the 2019 Notes. Derrick Decl., Ex. C at 7; Derrick Decl., Ex. G at 35:18–36:2.

Judgment Creditor VP – China is the beneficial owner of $20,800,000 of the 2018 Notes and $40,085,000 of the 2019 Notes.  Derrick Decl., Ex. F at 6–7; *see also* Derrick Decl., Ex. H at 29:4–31:13 (Transcript of February 14, 2020 Oral Argument, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Mar. 16, 2020) [Dkt. 339])

4

noteholders and failing to cure the event of default within 30 days. *Id.* at 4; *see also* Derrick Decl., Ex. E at 5–6.

13.     About two years later, on October 26, 2018, the Judgment Creditors accelerated the remaining principal balance of the 2019 Notes by sending a notice to Rolta Americas and Rolta India. *Id.* Under Section 6.02 of the indenture for the 2019 Notes, a valid notice of acceleration renders the entire principal and interest immediately due and payable. Derrick Decl., Ex. C at 81–82; Derrick Decl., Ex. D at 82. As they did with the notice for the 2018 Notes, Rolta Americas and Rolta India ignored the acceleration notice with respect to the 2019 Notes. Derrick Decl. ¶ 5.

14.     As of the Chapter 11 petition date, Rolta Americas had not paid the principal and interest it owed to the Judgment Creditors under the 2019 Notes. Derrick Decl., Ex. B at 3.

## III.    The Judgment Creditors' Pursuit of Repayment of the Bonds

15.     On June 6, 2018, the Judgment Creditors brought an action in the Supreme Court of the State of New York, New York County, against each of the six Debtors and their non-debtor parent, Rolta India, to recover the defaulted bond debt, in a case captioned *Pala Assets Holdings Ltd et al. v. Rolta International, Inc. et al.*, No. 652798/2018 (Sup. Ct., N.Y. County). On September 2, 2020, the New York Supreme Court entered a judgment in favor of the Judgment Creditors (the "Judgment") in the amount of US $187,098,105 (the "Judgment Amount"), jointly and severally, against Debtors and Rolta India. Derrick Decl., Ex. F at 1. The Court entered a judgment in favor of Pinpoint for US $99,776,370 in favor of VP – China for US $73,256,400; and in favor of VP – Credit for US $10,163,456. *Id.* at 4–8.[5]

---

[5]     VP – Credit's Judgment is against only Rolta Americas, Rolta India, Rolta International, Rolta UK, Rolta Middle East, and Rolta Global (collectively, the "2019 Guarantors"). Derrick Decl., Ex. F at 7–8. Pinpoint and VP – China also have a judgment against the 2019 Guarantors in the amounts of $80,417,421 and $43,153,887, respectively. *Id.* at 5, 7. In addition, Pinpoint and VP – China have judgments in the amounts of $19,358,949 and $30,102,512, respectively,

5

16.     On October 16, 2020, the New York Supreme Court granted a second judgment in the same action in favor of the Judgment Creditors in the amount of US $25,763,000. Derrick Decl., Ex. E at 6-7.

17.     The sum total of the Judgment Amount and the supplemental judgment granted on October 16, 2020 is US $226,175,414.55. However, because the New York Supreme Court clerk had not yet entered the October 16, 2020 supplemental judgment prior to the petition date, the Judgment Creditors had not begun to enforce that judgment as of the date of the bankruptcy filing.[6]

18.     On October 20, 2020, upon the Judgment Creditors' motion, the New York Supreme Court entered an Order (the "Turnover Order"), pursuant to New York Civil Practice Law and Rules ("CPLR") Section 5225(a), requiring the Debtors and Rolta India to deliver directly (or, to "turn over") to the Judgment Creditors all cash on hand and sufficient shares and/or ownership interests in various Rolta subsidiaries to satisfy the Judgment Amount. Derrick Decl., Ex. K at 1–2 (Order, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 20, 2020) [Dkt. 389]).

19.     At the oral argument on these issues earlier that day, the New York court made clear that the turnover of cash was to occur within seven days of the Court's issuance of the

---

against the guarantors of the 2018 Notes: Rolta LLC, Rolta India, Rolta International, Rolta UK, Rolta Middle East. *Id.* at 4, 6.

[6]     Since then, that Court has entered the October 16, 2020 judgment of $39,077,309.55, which includes accrued interest, against the Debtors and Rolta India, Derrick Decl., Ex. I (Supplemental Order and Judgment, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Dec. 1, 2020) [Dkt. 413], after the Debtors filed a suggestion of bankruptcy in the proceeding, *see* Derrick Decl., Ex. J (Notice of Suggestion of Bankruptcy, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 30, 2020) [Dkt. 394]). The Judgment Creditors have taken no action post-petition in relation to the issuance of that judgment against the Debtors, and will be asking the Court to re-issue the judgment as to Rolta India only, without prejudice to the right to reinstate the judgment against the remaining Debtors. Derrick Decl., ¶ 10.

Turnover Order and the turnover of the interests in the Rolta subsidiaries, within 30 days. Derrick Decl., Ex. L at 32–34 (Transcript of October 20, 2020 Oral Argument, *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 26, 2020) [Dkt. 391]).

20.     Under New York law, the Turnover Order gave the Judgment Creditors a priority lien on the property that is the subject of the Order: cash and ownership interests in certain Rolta subsidiaries. *See* CPLR 5202(b) ("Where a judgment creditor has secured an order for delivery of, payment of, or appointment of a receiver of, a debt owed to the judgment debtor or an interest of the judgment debtor in personal property, the judgment creditor's rights in the debt or property are superior to the rights of any transferee of the debt or property, except a transferee who acquired the debt or property for fair consideration and without notice of such order."), 5234(c) ("Where personal property or debt has been ordered delivered, transferred or paid . . . and the order is filed before the property or debt is levied upon, the rights of the judgment creditor who secured the order are superior to those of the judgment creditor entitled to the proceeds of the levy."); *see also P.A. Bldg. Co. v. Silverman*, 298 A.D.2d 327, 328 (1st Dep't 2002) ("[The] petitioner's status as a creditor with a turnover order from the Supreme Court gives it priority over appellant, since appellant did not obtain the property for fair consideration.").[7]

21.     Neither the Debtors nor Rolta India complied with the New York Supreme Court's directive to turn over any cash on hand to the Judgment Creditors by the October 27, 2020 deadline or at any time since. Derrick Decl., ¶ 12. Nor have the Debtors or Rolta India complied with the directive to turn over shares and other ownership interests. *Id.* Instead, just two days after missing

---

[7]     On December 7, 2020, the Debtors initiated an adversary proceeding seeking to avoid the Judgment Creditors' lien. *See generally* Complaint, *Rolta International, Inc., et al. v. Pinpoint Multi-strategy Master Fund*, Adv. Pro. No. 20-80162 [Dkt. 1].

7

the deadline for turnover of the cash, the Debtors filed their Chapter 11 cases in this district, where none are headquartered or have offices.

22.     Rolta India, the Debtors' parent corporation and a guarantor of the Notes, has not filed for Chapter 11 protection and, accordingly, the Judgment Creditors continue to pursue enforcement proceedings against it.  *Id.*  For example, on November 25, 2020, the Judgment Creditors moved the New York Supreme Court for an order to show cause why contempt sanctions should not be issued against Rolta India for its failure to comply with the Turnover Order.  *Id.*

23.     On November 10, 2020, Rolta India filed an action in the High Court of Bombay in India seeking a declaration that the Judgment "cannot be executed by the Plaintiffs against the defendants in India."   Derrick Decl., Ex. M (Rolta India Limited Statement of Unaudited Consolidated Financial Results ¶ 3 (Nov. 11, 2020)).  Rolta India did not immediately provide the Judgment Creditors notice of the action, leaving them to discover it in the company's public filings. Derrick Decl., ¶ 14.  Rolta India only later provided the Judgment Creditors notice at the direction of the Indian court.  *Id.*  The action remains pending.  *Id.*

## IV.     These Chapter 11 Cases

24.     On October 29, 2020, the Debtors filed their Chapter 11 petitions, along with a bare-bones set of papers.  Those papers were both internally contradictory[8] and lacking sufficient detail to provide adequate notice of the relief sought.  *See, e.g.*, Judgment Creditors' Preliminary

---

[8]     *Compare, e.g.*, Decl. of Preetha Pulusani [Dkt. 4] ¶ 8 (asserting the Debtors have 43 employees), *with* Emergency Motions for Order Authorizing and Directing the Honoring of Debtor's Pre-Petition Payroll Checks and Authorizing the Debtor to Pay Pre-Petition Wages and Employee Benefits of Current Employees filed by Rolta International [Dkt. 8] ¶ 5; Rolta, LLC , Case No. 20-82283-CRJ11 [Dkt. 6] ¶ 5; Rolta Global BV, Case No. 20-82284 [Dkt. 6] ¶ 5; Rolta Middle East FZ-LLC, Case No. 20-82285-CRJ11 [Dkt. 6] ¶ 5; Rolta Americas LLC, Case No. 20-82286-CRJ11 [Dkt. 6] ¶ 5; and Rolta UK Limited, Case No. 20-82287-CRJ11 [Dkt. 6] ¶ 5 (each Debtor claiming 8 employees, totaling 48 employees).

8

Response to the Debtors' Chapter 11 Filing and Objection to the Debtors' Motion for Authorization to Use Cash Collateral [Dkt. 22] (hereafter, the "Cash Collateral Opposition") at 6 (noting various issues with the Debtors' lack of disclosure concerning their cash management system and sources of operating cashflow). And the Debtors' three-page first day declaration provides no information whatsoever about any restructuring the Debtors would seek to pursue in their Chapter 11 cases. *See* Decl. of Preetha Pulusani [Dkt. 4] ¶10 (stating that the Debtors "currently intend to propose a plan of reorganization" with no further detail).

25.     At the first day hearing on November 4, 2020, counsel for the Debtors admitted that the purpose of the filings was to circumvent the New York state court's turnover order. *See* First Day Hr'g Tr. at 5:2–7 (stating that the turnover order was the "triggering event" for the Chapter 11 cases).

26.     Soon after the Chapter 11 filing, the Debtors withdrew their request for authorization to use cash collateral at Rolta Global, Rolta Americas, and Rolta LLC. In so doing, the Debtors conceded that these entities were "inactive . . . with no employees, no real property, no contracts or services performed." *See* Motions for Leave to Withdraw Motion for Authorization to Use Cash Collateral, *In re Rolta, LLC*, Case No. 20-82283-CRJ11 [Dkt. 43]; *In re Rolta Americas LLC*, Case No 20-82286 CRJ11 [Dkt. 38]; *In re Rolta Global BV*, Case No. 20-82284-CRJ11 [Dkt. 38].

27.     On November 20, 2020, the Debtors filed their financial schedules. Those schedules revealed that, for almost all of the Debtors, the Judgment Creditors are the *only* meaningful non-insider creditors. *See* List of Creditors Who Have the 20 Largest Unsecured Claims, *In re Rolta, LLC*, Case No. 20-82283-CRJ11 [Dkt. 67] (Judgment Creditors reflect 99.95% of outstanding debt); Schedule E/F, Amended Chapter 11 Petition, *In re Rolta UK Limited*, Case

No 20-82287-CRJ11 [Dkt. 66], at 23–24 (Judgment Creditors are the *only* non-insider creditors);

List of Creditors Who Have the 20 Largest Unsecured Claims, *In re Rolta Global B.V.*, Case No.

20-82284-CRJ11 [Dkt. 63] (Judgment Creditors are the *only* non-insider creditors); List of

Creditors Who Have the 20 Largest Unsecured Claims, *In re Rolta Americas LLC*, Case No. 20-

82286-CRJ11 [Dkt. 63] (Judgment Creditors hold 99.5% of outstanding non-insider debt);

Schedules D and E/F, Amended Chapter 11 Petition, *In re Rolta Middle East FZ-LLC*, Case No.

20-83385-CRJ11 [Dkt. 67], at 25–26 (Judgment Creditors hold 99.00% of outstanding debt).

28.     In addition, the hallmarks of active business operations are conspicuously absent

from the schedules for Rolta UK, Rolta International, and Rolta Middle East, which the Debtors

have characterized as "operating" entities.  *See* Derrick Decl., Ex. N at 20:12–16 (Nov. 17, 2020

Hr'g Tr. (hereafter, "Second Day Hr'g Tr.")).  According to their schedules:

- Rolta UK has no executory contracts or leases, *see* Amended Chapter 11 Petition, *In re Rolta UK Limited*, Case No. 20-82287 [Dkt. 66], at 25, values its intellectual property interests at $0.00, *see id.* at 15, and the majority of its assets are tax net operating losses, *see id.* at 16–17, rather than operating assets.  The only computer equipment for the technology services company appears to be valued at approximately $3,100, less depreciation, *see id.* at 22, and its operating revenues have dwindled to approximately $1.4 million for the year prior to the petition date, *see id.* at 27.

- Rolta Middle East has no executory contracts suggesting ongoing service relationships with customers, *see* Amended Chapter 11 Petition, *In re Rolta Middle East FZ-LLC*, Case No. 82-82285 [Dkt. 67], at 27, nor any interests in intellectual property, *see id.* at 15, and the vast majority of its assets are composed of net operating losses, *see id.*, and questionable receivables from affiliates, *see id.* at 23. Rolta Middle East's operating revenues—like Rolta UK's—have dropped to approximately $1.2 million in the year prior to its bankruptcy filing.  *See id.* at 32.

- Rolta International lists no accounts receivable, *see* Amended Chapter 11 Petition [Dkt. 85], at 13, no service contracts with customers, *see id.* at 24, and no intellectual property of any value, *see id.* at 15, 36–89, and has substantially no assets other than ownership interests in and loans receivables from other Rolta entities, net operating losses, and "goodwill" from a corporate transaction, *see id.* at 14–17.  Moreover, the only leases and executory contracts this Debtor appears to have are a single month-to-month office lease and a lease (with a remaining life of

10

one month) on a postage meter, *see id.* at 24, and the vast majority of its revenues over the past year have not been generated from business operations but instead are the result of dividends from other Rolta entities, *see id.* at 26. Nor does it appear to have compensated its president for the year leading up to the petition date. *See id.* at 27, 34.

29. These disclosures belie the Debtors' assertions that they "are engaged in the business of rendering engineering software services," of "buying, selling, [and] leasing . . . computer products of all types and descriptions" and of "patent[ing], copyright[ing] and otherwise protect[ing] any intellectual property rights acquired by the corporation." Rolta International's Amended Chapter 11 Petition [Dkt. 85], at 7–8; *see also* Derrick Decl., Ex. O at 10:6–7 (Dec. 1, 2020 Hr'g. Tr.) (Court, in response to the Debtors' critical vendor motions [Dkts. 97, 98, 99], noting "[i]f there's no operating business, then how could [a critical vendor] be an essential element necessary to ongoing business?").

30. On November 20, 2020, Debtor Rolta International also filed a declaration concerning a significant source of funding for these Chapter 11 cases—a non-debtor Rolta affiliate, Rolta AdvizeX Technologies, LLC ("AdvizeX"). *See* Decl. Regarding Management Fees Paid by AdvizeX [Dkt. No. 80] (hereafter, the "AdviseX Decl.") at 2; *see also* Cash Collateral Opposition [Dkt. 22] at 6 (noting substantial payments from AdvizeX in Rolta International's cash collateral budget offsetting net operating losses). Rolta International clarified that the "management fee" payments AdvizeX makes to Rolta International are subject to certain conditions related to the availability of excess cash on a line of credit. *See* AdvizeX Decl. [Dkt. 80] at 2. If those conditions are not met, the secured creditor of AdvizeX, Huntington National Bank, can block those payments. *Id.*

11

31.     To date, besides the Judgment Creditors, no other creditors have actively participated in the Chapter 11 process.[9] Of the approximately $507.8 million in outstanding non-insider liabilities owed by the Debtors based on their initial disclosures, *see* List of Creditors Who Have the 20 Largest Unsecured Claims [Dkt. 2],[10] approximately 99% ($500 million) arise from Rolta LLC's and Rolta America's issuances of the Notes. The amended financial schedules the Debtors filed do not alter that fundamental point. And, out of the holders of those Notes, the Judgment Creditors are the *only* ones who have pursued recovery of the defaulted amounts and have appeared in these proceedings.  Indeed, on November 17, 2020, the Bankruptcy Administrator reported that "[a]fter soliciting the List of Creditors Who Have the 20 Largest Unsecured Claims," he was "unable to form a committee of unsecured creditors in view of the fact that an insufficient number of unsecured creditors were willing to serve."  Notice Regarding Unsecured Creditors' Committee [Dkt. 63].  The *sole* creditor that had any interest in sitting on the Committee was one of the Judgment Creditors.[11]  Second Day Hr'g Tr. 17:19–18:1.

## JURISDICTION

32.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

---

[9]     To date, only two other creditors have filed Proofs of Claim, both in Rolta International's Chapter 11 case.  These creditors' claims total only $23,607.77.  Claim Nos. 1-1 (American Express Travel Related Services Company, Inc.), 2-1 (Massachusetts Department of Revenue), *In re Rolta International LLC*, Case No. 20-82282.

[10]     This total amount reflects all of the amounts the Debtors included on the top 20 creditor list except for (a) amounts related to debts owed to other Rolta entities, given that they are insider claims, and (b) the US $187,098,105 identified as arising from the Judgment Creditors' New York state court enforcement proceeding, given that those amounts relate to the Note issuances described above that are already otherwise reflected in the total. As discussed above, for almost all of the Debtors, the Judgment Creditors are the only meaningful non-insider creditor based on the financial schedules the Debtors filed on November 20, 2020.

[11]     While the Judgment Creditors have an equitable lien arising from the Turnover Order, they are nonetheless undersecured because the October 16, 2020 judgment of approximately $25 million that is not covered by that lien.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 17 of 739

This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court.  For purposes of this Motion, venue is proper pursuant to 28 U.S.C. § 1408.

## ARGUMENT

33.    The Debtors filed their Chapter 11 cases in bad faith to circumvent the Turnover Order and avoid paying the Judgment Creditors pursuant to the New York judgment.  More fundamentally, the Debtors have little business operations to rehabilitate through the Chapter 11 process (and by the Debtors' own admissions, half of the Debtors have no business operations).  For these reasons and those set forth below, the Court should dismiss these cases.

**I.    The Court Should Dismiss the Chapter 11 Cases For "Cause" Pursuant to Section 1112(b) Because The Debtors Filed Them in Bad Faith**

34.    Section 1112(b) provides that, except for circumstances inapposite here, "on request of a party in interest, and after notice and a hearing, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added).  Section 1112(b)(4), in turn, provides a non-exhaustive list of grounds for dismissal for cause.

*35.*    While "bad faith" is not specifically enumerated, "[a] case under Chapter 11 may be dismissed for cause pursuant to section 1112 of the Bankruptcy Code if the petition was not filed in good faith."  *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (citing *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)).  "In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions."  *In re Albany Partners*, 749 F.2d at 674.  The presence of "factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured

13

creditors to enforce their rights[]' . . . particularly when there is no realistic possibility of an effective reorganization" means that "dismissal of the petition for lack of good faith is appropriate." *Id.*

36.     Courts have held that the debtor bears the ultimate burden of demonstrating it filed the bankruptcy petition in good faith.  *See In re Sar-Marco, Inc.*, 70 B.R. 132, 139 (Bankr. M.D. Fla. 1986) (placing burden on the debtor); *In re Lotus Investments*, 16 B.R. 592, 595 (Bankr. S.D. Fla. 1981) (same); *cf. In re Hardigan*, 490 B.R. 437, 444 (Bankr. S.D. Ga. 2013) (ruling that in the Chapter 7 context, "[o]nce the movant [for dismissal] puts the debtor's good faith at issue, the burden shifts to the debtor to establish his good faith"), *aff'd*, 517 B.R. 374 (S.D. Ga. 2014).

37.     Courts in the Eleventh Circuit look to several factors to determine good faith, including that: (1) "the debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors"; (2) "the debtor has few employees"; (3) "the debtor's financial problems essentially are a dispute between the debtor and the secured creditors which can be resolved in the pending state court action"; and (4) "the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights."  *In re State St. Houses, Inc.*, 356 F.3d 1345, 1346–47 (11th Cir. 2004).  The inquiry is ultimately fact-intensive, however, and courts must weigh the totality of the "circumstances of each case" to determine whether on the whole they point to a debtor's bad faith. *MacElvain v. I.R.S.*, 180 B.R. 670, 674 (M.D. Ala. 1995) (citing *In re Albany Partners*, 749 F.2d at 674).

38.     Here, the facts and circumstances provide ample "cause" to dismiss the Debtors' Chapter 11 cases.  And while Section 1112(b) requires the Court to consider whether conversion to Chapter 7 or appointment of a trustee are better alternatives to dismissal, those remedies do not

14

benefit creditors where, as here, the cases involve a two-party dispute and the Notes constitute substantially all of the Debtors' liabilities. *See In re Sterling Bluff Inv'rs, LLC*, 515 B.R. 902, 916 (Bankr. S.D. Ga. 2014) (dismissing case where "non-affiliated entities hold a relatively small portion of the unsecured claims," and unsecured creditors' claims "are small in relation to the claims of the secured creditors") (citation and internal quotation marks omitted)  Moreover, conversion to Chapter 7 would not benefit creditors where the Debtors have almost no meaningful assets to liquidate and distribute, nor can the problems with these cases be solved through the appointment of a Chapter 11 trustee.  Indeed, the bulk of the Debtors' claimed assets are net operating losses, *see supra ¶* 28, which would not provide any value for creditors in a liquidation scenario.  *See, e.g.*, *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 453 (8th Cir. 1978) ("We conclude, therefore, that the right to use its net operating loss to gain carryover tax advantage was not an asset of [the insolvent entity] because its value was conditioned on the existence of future income potential of [that entity].").  Simply put, these cases are all about a two-party dispute that should not remain in bankruptcy.

### A.    The Timing of the Debtors' Chapter 11 Cases Indicates Bad Faith

39.    The Debtors filed these Chapter 11 cases a mere two days after they failed to comply with the New York state court's order to turn over their cash on hand to the Judgment Creditors.  Debtors' counsel readily admitted that the Turnover Order was the "triggering event" for the Chapter 11 cases.  First Day Hr'g Tr. at 5:2–7.

40.    "Where the primary purpose of a Chapter 11 filing is as a litigation tactic, the petition may be dismissed for a lack of good faith."  *In re A.Z. Servs., Inc.*, 208 B.R. 578, 581 (Bankr. S.D. Fla. 1997) (citations omitted); *see also In re Pegasus Wireless Corp*, 391 Fed. Appx 802, 2010 WL 3096149, at *2 (11th Cir. 2010) (indicia of bad faith include non-compliance with

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 20 of 739

pre-petition state court order); *cf. In re Piazza*, 719 F.3d 1253, 1262 (11th Cir. 2013) (prepetition

bad faith constitutes "cause" for involuntary dismissal under § 707(a)). "The law requires more

of a Chapter 11 Debtor than the mere desire to stay pending litigation or use the bankruptcy to gain

a tactical litigation advantage." *In re On the Ocean, Inc.*, No. 16-16204-BKC-RBR, 2016 WL

8539791 at *3 (Bankr. S.D. Fla. June 6, 2016).

41.     Here, "[t]he timing of the filing indicates that the filing was merely a litigation

strategy." *In re Gooding*, 234 B.R. 157, 159 (Bankr. M.D. Fla. 1999). That alone is grounds for

dismissal. *See In re On the Ocean, Inc.*, 2016 WL 8539791, at *3 (finding that petition filed "one

day before a key hearing" and "on the day the default judgment was entered" warranted dismissal

on bad faith grounds). Underscoring that the Chapter 11 filings were a litigation tactic, the

Debtors' bond debt had been accelerated for over two years prior to the Chapter 11 filing. If the

Debtors were serious about pursuing a *bona fide* restructuring in Chapter 11, they would not have

waited those two years before filing their bankruptcy petitions.[12]

**B.      The Debtors' Chapter 11 Cases Amount to a Two-Party Dispute**

42.     In addition to the timing of the filing, dismissal is appropriate because the Debtors

filed the petitions to avoid a two-party dispute in New York state court. This strategy is a hallmark

of a bad faith filing. For example, filing Chapter 11 proceedings "on the eve of foreclosure" in

"ongoing litigation between Debtor and [creditor]" is "compelling evidence that th[e] Chapter 11

filing is a mere two-party dispute." *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81, 86, *adhered*

---

[12]     Indeed, the Debtors' litigation tactics are not limited only to the timing of the petition but
also extends to their choice of forum: Alabama, where the Debtors are neither headquartered nor
have offices. This District is simply where two executives of a single Debtor have been working
from their personal residences. *See* Decl. of Preetha Pulusani [Dkt. 4] ¶ 3. "Although perhaps
technically proper" under of Section 1408 of the Bankruptcy Code, "the choice to file the petition
so far from where the property and creditors are located may itself be evidence of bad faith." *In
re Phoenix Piccadilly, Ltd.*, 849 F.2d at 1395.

16

*to on denial of reconsideration*, 419 B.R. 92 (Bankr. S.D. Ga. 2009); *see also In re Gooding*, 234 B.R. 157, 159 (Bankr. M.D. Fla. 1999) (dismissing a Chapter 11 case that was "obviously a two-party dispute" where the non-debtor party moving for dismissal was the only meaningful creditor); *In re Moog*, 159 B.R. 357, 362 (Bankr. S.D. Fla. 1993) (same).

43. Here, the two-party nature of these disputes is evident. Substantially *all* of the Debtors' outstanding liabilities relate to their default on the Notes, *see supra* ¶ 27 (Judgment Creditors hold 99% to 100% of non-insider debt owed by almost all the Debtors), and, of the holders of those Notes, only the Judgment Creditors have pursued the Debtors to recover the bond debt in the two years since the acceleration of that debt. And one of the Judgment Creditors was the *only* creditor with any interest in participating on an unsecured creditors' committee. *See* Notice Regarding Unsecured Creditors' Committee [Dkt. 63] ("After soliciting the List of Creditors Who Have the 20 Largest Unsecured Claims, the Bankruptcy Administrator is unable to form a committee of unsecured creditors in view of the fact that an insufficient number of unsecured creditors were willing to serve."); Second Day Hr'g Tr. at 17:19–18:1.

44. Moreover, the matters concerning the Debtors' default on their Notes "have been pending before the [s]tate [c]ourt for months and are more appropriately resolved in the [s]tate [c]ourt." *In re On the Ocean, Inc.*, No. 16-16204-BKC-RBR, 2016 WL 8539791, at *3 (Bankr. S.D. Fla. June 6, 2016) (dismissing Chapter 11 case where issues before bankruptcy court concerned two-party dispute that had already been litigated elsewhere). Of course, "us[ing] the bankruptcy system to rework the terms of [a prior state court order] . . . is not a proper purpose of the bankruptcy system." *In re Foster*, No. 11-30021, 2011 WL 3438495, at *7 (Bankr. S.D. Ga. June 17, 2011).

45. Here, the New York state court has already determined Debtors' legal obligation to

the Judgment Creditors under the Debtors' default on the Notes—the Judgment Amount of $187,098,105 and the additional October 16, 2020 judgment of $25,763,000. Derrick Decl., Ex. F at 1; Derrick Decl., Ex. E at 6-7. The New York state court determined that the Debtors owe the Judgment Creditors the Judgment Amount in an adversarial proceeding in which the Debtors fully participated. Indeed, the proceeding spanned more than 27 months from the first filing to the Judgment, and the docket now approaches 400 entries. Given this two-party dispute and because the Debtors' defaulted bond debt is the only significant debt they have, *see supra* ¶ 27, the Court should dismiss these Chapter 11 cases as not having been filed in good faith. *See In re Caffey Enterprises, LLC*, No. 09-83573-JAC-11, 2009 WL 5214892, at *7 (Bankr. N.D. Ala. Dec. 23, 2009) (dismissal appropriate where "the debtor's financial problems involve a dispute between the debtor and a secured creditor which can be fully resolved in the underlying state court action").

**C.     These Chapter 11 Cases Serve No Valid Reorganizational Purpose**

46.     Critically, these cases cannot even accomplish the basic function of the Chapter 11 process: to salvage a debtor as a going concern through the reorganization of its financial affairs. The Debtors cannot purge their bad faith filing by eventually proposing a plan of reorganization, *see In re Club Tower L.P.*, 138 B.R. 307, 310 (Bankr. N.D. Ga. 1991),[13] particularly where, as

---

[13]     Indeed, "the possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." *In re Club Tower L.P.*, 138 B.R. at 310 (citing *Phoenix Piccadilly*, 849 F.2d at 1395); *see also In re Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394 ("We hold, as the district court did implicitly, that the prospects of a successful reorganization do not override, as a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary finding."); *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) ("It seems unquestionable to us that the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement."); *MacElvain*, 180 B.R. at 675 (rejecting the argument that "an arguable relationship between the filing of the Chapter 11 case and the reorganization-related purposes of Chapter 11" defeats dismissal on bad faith grounds because "the actual existence of [such] a relationship . . . does not necessarily exclude the presence of bad faith").

18

here, the "economic reality confronting [the debtor] . . . supports the conclusion that the debtor had no realistic chance of successfully reorganizing . . . [a] petition [is] properly dismissed pursuant to § 1112." *In re Albany Partners, Ltd.*, 749 F.2d at 674.

47.     Here, the Debtors have not suggested any path to successfully emerge from the Chapter 11 process or preserve their ability to operate their businesses through reorganizing their financial affairs.  That is for good reason:  the record in these cases reflects that the Debtors have very little ongoing business operations to preserve.  *See supra* ¶ 28 (purported "operating" Debtors have no executory contracts to perform for customers and assets composed predominantly of net operating losses and intercompany loan receivables); *see also In re Double W Enterprises, Inc.*, 240 B.R. 450, 454 (Bankr. M.D. Fla. 1999) (finding bad faith warranting dismissal where, among other things, "the debtor . . . has no significant on-going business operation to preserve").

48.     Indeed, three of the Debtors (Rolta Global, Rolta LLC, and Rolta Americas) are "inactive" and have no employees or offices.  *See* Motions for Leave to Withdraw Motion for Authorization to Use Cash Collateral, *In re Rolta, LLC*, Case No. 20-82283-CRJ11 [Dkt. 43]; *In re Rolta Americas LLC*, Case No 20-82286 CRJ11 [Dkt. 38]; *In re Rolta Global BV*, Case No. 20-82284-CRJ11 [Dkt. 38].  At a minimum, these three Debtors' Chapter 11 cases should be dismissed.  And as discussed above, the "operating" Debtors have no valuable executory contracts, no service contracts with customers, and no intellectual property rights of any value.  Accordingly, none of the Debtors have shown that they have business activity that can be rehabilitated through the Chapter 11 process.

49.     Moreover, the "operating" Debtors' lone assets—principally net operating loss carry-forwards, along with certain inter-company loans and goodwill claimed by Rolta International—cannot plausibly sustain a successful Chapter 11 reorganization.  Contrary to the

19

Debtors' assertions, there is nothing in the record to demonstrate that the "operating" entities have the assets necessary to support a viable Chapter 11 plan. *See MacElvain*, 180 B.R. at 675 ("An arguable relation between the chapter 11 plan and the reorganization purposes that the chapter was designed to serve must exist.").

50.     Importantly, applicable tax rules limit how the value of tax attributes, such as Debtors' carry-forwards, can be preserved in bankruptcy. *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 342 (Bankr. D. Del. 2004) (outlining that the value of the debtor's net operating losses would unlikely survive the Chapter 11 process because tax restrictions under Section 382 of the U.S. Tax Code limit the manner in which they can be deployed if, among other things, there is a change in ownership of the debtor); *In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr. W.D. Ky. 1983) (debtor lacked viable prospects for rehabilitation where principal assets consisted of net operating loss carry-forward, and business was unlikely to generate the profits necessary to realize carry-forward's value).

51.     These factors demonstrate that a Chapter 11 process is not the proper avenue through which the Debtors should deal with their financial affairs. *See In re Double W Enterprises, Inc.*, 240 B.R. at 456 (finding that the debtor's Chapter 11 petition "was not filed in good faith" because "[the debtor] has no income or revenue, no employees, and no body of creditors arising from the operation of any business"); *see also In re On the Ocean, Inc.*, 2016 WL 8539791, at *3 ("The Debtor has no employees and uses only 1099 independent contractors, so reorganizing the business to save jobs is not a consideration in this case.").

52.     Chapter 11 proceedings are appropriately dismissed where, as here, the objective record belies the Debtors' assertions of a salvageable business enterprise. *See, e.g.*, *Singer Furniture Acquisition Corp. v. SSMC, Inc. N.V.*, 254 B.R. 46, 52–53 (M.D. Fla. 2000) (dismissal

20

affirmed "because [debtor], by its own documents, had nothing to reorganize[,] . . . reported no taxes, no accounts receivable, no accounts, no inventory, no bank account, no officer's compensation and no insurance in place"); *Colonial Daytona Ltd. P'ship v. Am. Sav. of Florida, F.S.B.,* 152 B.R. 996, 1003 (M.D. Fla. 1993) (affirming dismissal where debtor did not generate sufficient revenues to service mortgage debt and pay expenses despite "the [d]ebtor's sincere desire to reorganize"); *see also In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 459 (Bankr. N.D. Fla. 2011) (Chapter 11 petition dismissed where debtor was "merely a shell having no business to reorganize, . . . no income, assets, employees, business, or non-insider unsecured creditors"); *cf.* 7 Collier on Bankruptcy, ¶ 1112.04[5][c] (16th ed. 2020) (counseling against "conclu[sion] that consideration of section 1112(b) should begin only after the confirmation process has ended" because "[c]are must be taken so that the court's discretion does not inevitably shelter inefficiency and injustice at the expense of the parties or the chapter 11 process as a whole.").

53.    Moreover, the non-dormant Debtors' cash collateral budgets show that they barely have enough cash to meet their basic financial outlays, let alone fund their Chapter 11 cases. *See* Cash Collateral Opposition [Dkt. 22], at 5–6; Second Day Hr'g Tr. at 29:4–29.[14]  Indeed, the Debtors have failed to explain in any detail how they will generate future cash flow. And a significant source of funding for this Chapter 11 case—non-debtor Rolta affiliate AdvizeX— cannot continue paying the purported "management fees" keeping Rolta International afloat unless Rolta International continues to satisfy certain covenants to third-party Huntington National Bank

---

[14]    While the Debtors later filed further amended cash collateral budgets that reflected the existence of accounts receivable, *see, e.g.*, Amended Motion to Use Cash Collateral, *In re Rolta Middle East FZ-LLC*, Case No. 20-82285-CRJ11 [Dkt. 62], that do not alter this fundamental portrait of the Debtors' cash positions.

21

related to excess availability under a line of credit. *See* AdviseX Decl. [Dkt. 80], at 2; *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. at 90 (holding petition was filed in bad faith because, among other reasons, "Debtor [would] need[] an additional $5 million to fund its Chapter 11 plan, [and] obtaining those funds is speculative and unrealistic").

54.     In short, the Debtors are very likely to be administratively insolvent. This, too, is a sufficient basis to find that the Debtors filed their cases in bad faith. *See In re MacElvain*, 160 B.R. 672, 674 (Bankr. M.D. Ala. 1993), *aff'd sub nom. MacElvain v. I.R.S.*, 180 B.R. 670 (M.D. Ala. 1995) (dismissal under 11 U.S.C. § 1112(b) is warranted where "[t]he debtor does not own sufficient property to nor generate sufficient income to fund a plan of reorganization"). Similarly, the Debtors have not indicated they intend to deploy any reorganizational tools that the Bankruptcy Code affords debtors, such as the rejection of burdensome leases and executory contracts pursuant to Section 365 of the Bankruptcy Code.

55.     For these reasons, the Court should dismiss the Debtors' Chapter 11 cases because they were not filed in good faith, serve no valid reorganizational purpose, and neither conversion to Chapter 7 nor the appointment of a trustee would solve the fundamental and intractable problems with the Chapter 11 cases. This two-party dispute does not belong in a bankruptcy court.[15]

## II.     The Court Should Dismiss the Chapter 11 Cases Pursuant to Section 305(a) of the Bankruptcy Code.

---

[15]     The Judgment Creditors also reserve their rights to move for dismissal of the Debtors' Chapter 11 cases on other grounds. For example, it is far from certain whether the Debtors will be able to stave off a "substantial or continuing loss to or diminution of the estate" and have a "reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A); *see also In re Peña*, No. 14–09799 (ESL), 2016 WL 1043736, at * (Bankr. D.P.R. Mar. 15, 2016) (dismissing Chapter 11 case for cause where "nothing in the record . . . suggests that financial viability for the Debtors is reasonably likely in the near future, or that they will suddenly be able to increase the occupancy rate or average daily room rate in their business under current market conditions").

22

56.     Similarly, and alternatively, the Debtors' Chapter 11 cases boil down to precisely the type of two-party dispute from which the Court should abstain under Section 305(a) of the Bankruptcy Code. That section permits a bankruptcy court to dismiss any bankruptcy case or suspend all proceedings therein where "the interests of creditors and the debtor would be better served by such dismissal . . . ." 11 U.S.C. § 305(a)(1).

57.     While "[t]he Eleventh Circuit has not directly addressed the issue of abstention under § 305[,] . . . courts that have addressed abstention under § 305 consider several factors, including: (1) whether another forum is available or there is already a pending action in another court; (2) whether the creditor and debtor are actively engaged in an out of court workout; (3) the purpose for which bankruptcy jurisdiction has been sought; (4) whether the bankruptcy will unnecessarily interfere with state or federal regulatory schemes; and (5) the effect the bankruptcy proceeding will have on the debtor's business." *In re FMB Bancshares, Inc.*, 517 B.R. 361, 371–72 (Bankr. M.D. Ga. 2014); *see also In re Forever Propane Sales & Service, Inc*., 597 B.R. 696, 697–98 (Bankr. S.D. Fla. 2019). While these factors help guide the analysis, "[w]hich factors to consider and how much weight shall be given to those factors is at the discretion of the [c]ourt and shall be looked at on a case-by-case basis when determining whether abstention is appropriate under § 305(a)." *In re FMB Bancshares, Inc.*, 517 B.R. at 374.

58.     A number of courts in this Circuit have centered their analysis under Section 305(a) on whether the issues the Chapter 11 case deals with reflect merely a two-party dispute, the resolution of which was already underway at the time the petition was filed. For example, in *In re Forever Propane*, the Court held that the Chapter 11 case amounted to "a two-party dispute" because that dispute would "almost certainly proceed" against another defendant in that dispute "whether or not the [] bankruptcy proceeds," concluding that "the efficient use of judicial labor

23

speaks in favor of abstention."  597 B.R. at 699.  Similarly, in *In re C & C Dev. Grp., LLC*—an involuntary Chapter 11 case filed by a creditor—the Court found that it was "evident" that the petitioning creditor filed the case "to avoid the pending" state court action.  No. 11-32362-BKC-AJC, 2012 WL 1865422, at *4 (Bankr. S.D. Fla. May 21, 2012).  As such, the creditor's "attempt[] to use Bankruptcy Court as an alternative to proceeding with [s]tate [c]ourt litigation to resolve what is essentially a two-party dispute" warranted dismissal under Section 305.  *Id.* at *3.

59.     Here, those same factors compel dismissal. Significantly, the state court proceeding against non-debtor Rolta India will proceed in New York court and will continue to move forward during the pendency of these Chapter 11 cases.  In addition, the Notes constitute substantially *all* of the Debtors' liabilities, and the Judgment Creditors are the only creditors who have come forward to actively pursue collection of their claims and participate in the Chapter 11 cases.  The Court should therefore abstain from adjudicating this two-party dispute and dismiss the Debtors' Chapter 11 cases pursuant to Section 305(a).

[*Remainder of the page left intentionally blank.*]

24

## <u>CONCLUSION</u>

For the reasons stated above, the Judgment Creditors respectfully request that this Court

enter an Order (1) dismissing the Chapter 11 cases of the Debtors, and (2) granting the Judgment

Creditors such other and further relief as this Court may deem just and proper.

Date:  December 7, 2020

*/s/ Daniel D. Sparks*
Daniel D. Sparks

CHRISTIAN & SMALL LLP
505 North 20th Street, Suite 1800
Birmingham, AL 35203
(205) 795-6588
ddsparks@csattorneys.com

*Attorney for Pinpoint Multi-Strategy Master Fund; Value Partners Fixed Income SPC-Value Partners Credit Opportunities Fund SP; and Value Partners Greater China High Yield Income Fund*

- AND –

KOBRE & KIM LLP

John Han (*Pro Hac Vice*)
Daniel J. Saval (*Pro Hac Vice*)
Josef M. Klazen (*Pro Hac Vice*)
Donna Xu (*Pro Hac Vice*)

800 Third Ave.
New York, NY 10022
+212 488 1200
daniel.saval@kobrekim.com
josef.klazen@kobrekim.com
donna.xu@kobrekim.com

Geoffrey J. Derrick (*Pro Hac Vice*)
1919 M Street, NW
Washington, DC 20036
+202 664 1936
geoffrey.derrick@kobrekim.com

## <u>CERTIFICATE OF SERVICE</u>

       I do hereby certify that a copy of the above and foregoing instrument was filed with the Court's CM/ECF system, which will send an electronic copy to the Debtors' counsel and all parties who have appeared and requested electronic notice, on this the 7th day of December, 2020.

<u>Via US Mail</u>:

Richard Blythe
Office of the Bankruptcy Administrator
P O Box 3045
Decatur, AL 35602

*/s/ Daniel D. Sparks*
Daniel D. Sparks

1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ROLTA INTERNATIONAL, INC., *et al.*[1] | Case No. 20-82282-CRJ11 |
| Debtors. | |

### DECLARATION OF GEOFFREY J. DERRICK

I, Geoffrey J. Derrick, Esq., hereby affirm under penalty of perjury that the following is true and correct:

1.     I am an attorney of the law firm Kobre & Kim LLP, counsel for Pinpoint Multi-Strategy Master Fund (formerly known as Pinpoint Multi-Strategy Fund), Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund SP, and Value Partners Greater China High Yield Income Fund (collectively, the "Judgment Creditors").

2.     Attached as Exhibit A is a true and correct copy of the November 4, 2020 first day hearing transcript in this matter.

3.     Attached Exhibit B is a true and correct copy of the Decision and Order in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Apr. 23, 2019) [Dkt. 230].

---

[1]     The Chapter 11 cases of debtors Rolta International, Inc. [Case No. 20-82282-CRJ11], Rolta Middle East FZ-LLC [Case No. 20-82285-CRJ11], and Rolta UK Limited [Case No. 20-82287-CRJ11] are being jointly administered. *See* Final Order Directing Joint Administration of Rolta International, Inc., Rolta Middle East FZ-LLC, and Rolta UK Limited Chapter 11 Cases, *In re Rolta International, Inc.*, Case No. 20-82282-CRJ-11 [Dkt. 93]. This Court denied the Debtors' request to jointly administer Rolta, LLC [Case No. 20-82283-CRJ11], Rolta Global B.V. [Case No. 20-82284-CRJ11], and Rolta Americas LLC [Case No. 20-82286-CRJ11]. *Id.* Because this Declaration relates to issues of fact and law that are common across the Debtors, the Judgment Creditors have filed the same Declaration in each of these proceedings.

4.      Attached as Exhibit C is a true and correct copy of the May 16, 2013 indenture that Debtor Rolta LLC executed and through which it issued $200 million of 10.75% senior notes due in May 2018, which are guaranteed by Rolta India Limited and three of the Debtors in these Chapter 11 cases:  Rolta International, Rolta UK, and Rolta Middle East.  When the Judgment Creditors accelerated these notes, Rolta LLC and Rolta India Limited ignored the acceleration notice.

5.      Attached as Exhibit D is a true and correct copy of the July 24, 2014 indenture that Debtor Rolta Americas executed and through which it issued $300 million of 8.75% senior notes due in July 2019, which are guaranteed by Rolta India Limited and four Debtors:  Rolta International, Rolta UK, Rolta Middle East, and Rolta Global.  When the Judgment Creditors accelerated these notes, Rolta Americas and Rolta India Limited ignored the acceleration notice.

6.      Attached as Exhibit E is a true and correct copy of the Decision + Order on Motion in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 16, 2020) [Dkt. 387].

7.      Attached as Exhibit F is a true and correct copy of the Order and Judgment in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Sept. 2, 2020) [Dkt. 350].

8.      Attached as Exhibit G is a true and correct copy of the Transcript of December 20, 2019 Oral Argument in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Mar. 16, 2020) [Dkt. 338].

9.      Attached as Exhibit H is a true and correct copy of the Transcript of February 14, 2020 Oral Argument in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Mar. 16, 2020) [Dkt. 339].

10.     Attached as Exhibit I is a true and correct copy of the Supplemental Order and Judgment in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Dec. 1, 2020) [Dkt. 413]. The Judgment Creditors have taken no post-petition actions regarding in relation to the issuance of this Supplemental Order and Judgment against Rolta International, Inc., Rolta, LLC, Rolta Global B.V., Rolta Middle East FZ-LLC, Rolta Americas LLC, and Rolta U.K. Limited (collectively, the "Debtors"). The Judgment Creditors will be asking the Court to re-issue the judgment as to Rolta India Limited only, without prejudice to the right to reinstate the judgment against the remaining Debtors.

11.     Attached as Exhibit J is a true and correct copy of the Notice of Suggestion of Bankruptcy in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 30, 2020) [Dkt. 394].

12.     Attached as Exhibit K is a true and correct copy of the Order in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 20, 2020) [Dkt. 389]. Neither the Debtors nor Rolta India Limited complied with the New York Supreme Court's directive to turn over any cash on hand to the Judgment Creditors by the October 27, 2020 deadline or at any time since. Nor have the Debtors or Rolta India Limited complied with the directive to turn over shares and other ownership interests. Rolta India Limited, the Debtors' parent corporation and a guarantor of the Notes, has not filed for Chapter 11 protection and, accordingly, the Judgment Creditors continue to pursue enforcement proceedings against it. For example, on November 25, 2020, Judgment Creditors moved the New York Supreme Court for an order to show cause why contempt sanctions should not be issued against Rolta India Limited for its failure to comply with the Turnover Order.

3

13.     Attached as Exhibit L is a true and correct copy of the Transcript of October 20, 2020 Oral Argument in *Pala Assets Holdings, Ltd. et al. v. Rolta, LLC et al.*, Index No. 652798/2018 (Sup. Ct. N.Y. Cnty. Oct. 26, 2020) [Dkt. 391].

14.     Attached as Exhibit M is a true and correct copy of Rolta India Limited's November 11, 2020 Statement of Unaudited Consolidated Financial Results for the Quarter and Six Months Ended September 30, 2020.  Rolta India Limited did not immediately provide the Judgment Creditors notice of its action in the High Court of Bombay in India, leaving them to discover it in the company's public filings.  Rolta India Limited only later provided the Judgment Creditors notice at the direction of the Indian court.  The action remains pending.

15.     Attached as Exhibit N is a true and correct copy of the November 17, 2020 second day hearing transcript in this matter.

16.     Attached as Exhibit O is a true and correct copy of the December 1, 2020 hearing transcript in this matter.

17.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: December 7, 2020
       Washington, D.C.                                     /s/ Geoffrey J. Derrick
                                                          Geoffrey J. Derrick, Esq.
                                                          Kobre & Kim LLP
                                                          1919 M Street NW
                                                          Washington, DC 20036
                                                          +202 664 1936
                                                          geoffrey.derrick@kobrekim.com

4

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing instrument was filed with the Court's CM/ECF system, which will send an electronic copy to the Debtors' counsel and all parties who have appeared and requested electronic notice, on this the 7th day of December, 2020.

Via US Mail:

Richard Blythe
Office of the Bankruptcy Administrator
P O Box 3045
Decatur, AL 35602

*/s/ Daniel D. Sparks*
Daniel D. Sparks

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | . | Case Nos. 20-82282-CRJ-11, |
| | . | 20-82283-CRJ-11, 20-82284-CRJ-11, |
| | . | 20-82285-CRJ-11, 20-82286-CRJ-11, |
| ROLTA INTERNATIONAL, LLC,. | | 20-82287-CRJ-11 |
| ROLTA, LLC, ROLTA GLOBAL | . | |
| B.V., ROLTA MIDDLE EAST | | |
| FZ-LLC, ROLTA AMERICAS, | . | United States Bankruptcy Court |
| LLC, AND ROLTA UK | . | 400 Well Street |
| LIMITED. | . | Decatur, AL 35601 |
| | . | |
| Debtors. | . | November 4, 2020 |
| . . . . . . . . . . . .. | | 12:56 p.m. |


TRANSCRIPT OF STATUS CONFERENCE AND FIRST DAY HEARINGS
BEFORE HONORABLE CLIFTON R. JESSUP, JR.
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtors:           Maples Law Firm, PC
                           By:  STUART M. MAPLES, ESQ.
                                MARY ENA HEATH, ESQ.
                           200 Clinton Avenue W. Suite 1000
                           Huntsville, AL 35801

For the Bankruptcy         Office of the Bankruptcy Administrator
Administrator:             By:  RICHARD BLYTHE, ESQ.
                           400 Well Street
                           Decatur, AL 35602



Audio Operator:            Melissa Brown

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609)587-3599**

TELEPHONIC APPEARANCES (Cont'd):

For Pinpoint and          Christian & Small, LLP
Value Partners:           By:  DANIEL D. SPARKS, ESQ.
                               BILL D. BENSINGER, ESQ.
                          1800 Financial Center
                          505 North 20th Street
                          Birmingham, AL 35203

                          Kobre & Kim, LLP
                          By:  DANIEL J. SAVAL, ESQ.
                               JOSEF M. KLAZEN, ESQ.
                               DONNA (DONG NI) XU, ESQ.
                          800 Third Avenue
                          New York, NY 10022

                          Kobre & Kim, LLP
                          By:  GEOFFREY J. DERRICK, ESQ.
                          1919 M Street NW
                          Washington, DC 20036

For Rolta Advizex         McDonald Hopkins, LLC
Technologies, LLC:        By:  SEAN D. MALLOY, ESQ.
                          600 Superior Avenue, East
                          Suite 2100
                          Cleveland, OH 44114

For Huntington National   Calfee Halter & Griswold, LLP
Bank:                     By:  GUS KALLERGIS, ESQ.
                          1405 E. 6th Street
                          Cleveland, OH 44114

For Intergraph            Maynard Cooper & Gale, PC
Corporation:              By:  RYAN DAVID THOMPSON, ESQ.
                          1901 6th Avenue North, Suite 2400
                          Birmingham, AL 35203

                          - - -

1          THE COURT:  Good afternoon.  We're here on the Rolta

2   International, Inc. and affiliated companies for status

3   conference and first day hearings.  Let me have appearance of

4   counsel.

5          MR. MAPLES:  Stuart Maples for the debtors.  I also

6   have with me today Preetha Pulasani who is the President of

7   Rolta International and Director of International Operations

8   for Rolta, other than in India.

9          THE COURT:  Good afternoon.

10         MR. MAPLES:  Good afternoon.

11         MR. BLYTHE:  Your Honor, Richard Blythe here for the

12  Bankruptcy Administrator.

13         THE COURT:  Good afternoon.

14         MR. BLYTHE:  Good afternoon.

15         MR. SPARKS:  Your Honor, Dan Sparks.  Good morning,

16  again.  From Christian & Small here in Birmingham.  And my

17  partner Bill Bensinger is on the phone with us.  Also are my

18  colleagues from the firm, my colleagues from Kobre & Kim firm,

19  which are Dan Saval, that's S-a-v-a-l, Jeff Klazen, Donna Xu,

20  and Geoff Derrick, and that's G-e-o-f-f-r-e-y, Geoffrey

21  Derrick.  And they are in the New York City and/or DC offices

22  of that firm, respectively.

23         THE COURT:  Okay.  Good afternoon to all.

24         UNIDENTIFIED ATTORNEY:  Good afternoon, Your Honor.

25         THE COURT:  Anyone else?

1          MR. MALLOY:  Your Honor, this is Sean Malloy.  I

2 represent Rolta Advizex Technologies, which is a non-debtor

3 subsidiary of Rolta International.  I'm not here to make

4 argument or appear, just to listen so we can update our

5 customers.  Thank you.

6          THE COURT:  Thank you.  Anyone else?

7          MR. MALLOY:  Thank you, Your Honor.  Gus Kallergis of

8 Calfee, Halter & Griswold.  I represent the Huntington National

9 Bank.  Our borrower is a non-debtor, Rolta Advizex

10 Technologies, but we have a pledge of the membership interest

11 from debtor Rolta International.  And I like Mr. Malloy am here

12 just to listen in and advise my client.

13          THE COURT:  Okay.  Thank you.

14          MS. HEATH:  Your Honor, Mary Ena Heath with Stewart

15 Maples' office.

16          THE COURT:  Good afternoon.

17          MS. HEATH:  Good afternoon.

18          MR. THOMPSON:  Good afternoon, Your Honor.  Ryan

19 Thompson, Maynard Cooper, on behalf of creditor Intergraph.

20 Just listening in.

21          THE COURT:  Okay.  Good afternoon.  Anyone else?

22 Okay.  Let's go straight into the status conference phase

23 before we take up the first day matters.

24          Mr. Maples, tell me about what the case is about.

25          MR. MAPLES:  This case is about certain international

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 41 of 739

1  operations and mostly national companies that are engaged in

2  various industries and services. The triggering event of the

3  filing of this case was a judgment taken in the Southern

4  District of, well, in New York Superior Court in New York City,

5  as well as a turnover order which ordered the turnover of cash

6  from multiple of these entities who are guarantors of bonded

7  indebtedness.

8          Our plan going forward, we have had negotiations as

9  well as the parent organization of International, which is

10  Rolta India Ltd., who is in an insolvency proceeding in India

11  currently with individuals and/or companies, and as those

12  negotiations progress, we would expect then to make the Court

13  aware of that and then engage in potentially a motion to sell

14  or bidding procedures if that comes to fruition.

15          THE COURT: Okay. Let me, before I go into -- I have

16  a list of things I want to ask. Let me start with Mr. Blythe.

17  Mr. Blythe, any issues or questions you'd like to raise at this

18  point at the beginning of the proceeding?

19          MR. BLYTHE: Your Honor, just a couple of things that

20  I would like clarification on. I know the debtors in these

21  cases have filed motions for joint consolidation. No, joint

22  administration, not consolidation.

23          And we are in the process of getting out solicitation

24  for an unsecured creditors' committee. The debtors have not

25  filed to have a consolidated committee. So at this point I

1    would just make the debtor aware that we intend to solicit for

2    each individual debtor, unless something is filed or the Court

3    directs otherwise.

4          THE COURT:  Do you have another comment?  Because

5    that dovetails into something I wanted to raise.  But, Mr.

6    Blythe, anything else you'd like to raise at this point?

7          MR. BLYTHE:  The only other issue, I notice on the

8    list of the 20 largest unsecured creditors that the debtors

9    have filed.  I just want to make sure that the objecting

10    creditor, I didn't see the name of the objecting creditor

11    listed on the 20 largest, unless -- they did list Palta or

12    Palta (pronouncing) (phonetic) Assets Holdings, and I just

13    wonder if that's the same entity that the cash collateral it

14    sought to use.

15          THE COURT:  Let's ask Mr. Sparks.

16          MR. SPARKS:  Your Honor, if I could defer to Mr.

17    Saval on that?  That's his (indiscernible) I think.

18          THE COURT:  Okay.  Mr. Saval?  Sure.

19          MR. SAVAL:  Good afternoon, Your Honor.  First of all

20    I wanted to thank you for allowing me to appear at this first

21    day hearing pending pro hac vice admission.

22          THE COURT:  Not a problem.

23          MR. SAVAL:  It is my understanding that the entity,

24    the Pala entity referenced in the schedules is referring to the

25    debt and the judgment held by our clients.

1          My understanding is that that entity was previously a

2    note holder and had joined with our clients when the bonds went

3    into default and accelerated the pursuit in the New York

4    action.

5          THE COURT:  And as I understand it, counsel, you are

6    now counsel for that entity, not White and Case?

7          MR. SAVAL:  That's correct, Your Honor.

8          THE COURT:  Okay.

9          MR. SAVAL:  We're actually counsel for three entities

10   who we filed as the judgment creditors in our papers.

11         THE COURT:  Okay.  Would you just, for the record

12   we're going to call your clients the judgment creditors, but

13   for the record would you state who those entities are?

14         MR. SAVAL:  Yes.  Those entities are Pinpoint

15   Multi-Strategy Master Fund, Value Partners Fixed Income

16   SPC - Value Partners Credit Opportunities Fund, that's the

17   second creditor, and the third is Value Partners Greater China

18   High Yield Income Fund.

19         THE COURT:  Okay.  Thank you.

20         MR. SAVAL:  And I just wanted to clarify for Your

21   Honor that the Pala entity is not our client.  I can disclose

22   to the Court that our clients have acquired the notes that were

23   held by Pala.

24         THE COURT:  Okay.  So the debtor basically has listed

25   the originating party, but your client is the successor to that

1  entity.

2        MR. SAVAL:  We are the successor to the

3  (indiscernible)  by Pala.  My understanding is that they all

4  filled the notes independently before the purchase.

5        THE COURT:  Okay.

6        MR. SAVAL:  And acquired them through other

7  institutions apart from Pala.

8        THE COURT:  Okay.

9        MR. SPARKS:  And, Your Honor, this is Dan Sparks

10  again.  First of all I apologize for not saying who our clients

11  were when I introduced myself and co-counsel.  But I will add

12  color to that in this regard.

13        Mr. Blythe and I spoke earlier this morning about

14  this and my request to him was to make sure that we were a

15  solicited party for a committee or committees, plural, if

16  that's the way this goes.  Because of that very thing that he

17  pointed out.

18        THE COURT:  Okay.  So I think for the record we have

19  at least from this status conference had it clarified who your

20  client is and we're going to call that entity the judgment

21  creditors for ease and convenience of the hearing.  But it will

22  be the entities that were mentioned by Mr. Saval and it is the

23  successor to Pala Associates Holdings that's listed in the list

24  of 20 largest creditors.

25        Okay.  Mr. Blythe, anything else?

1          MR. BLYTHE:  Your Honor, I don't have anything else

2  in the status conference phase.

3          THE COURT:  Okay.  Thank you.  Let me, Mr. Maples,

4  here is an issue that the Court is concerned about that we're

5  going to have to address, and they are not segregated in one of

6  the different motions, it is sort of permeating the entire

7  case.

8          The first is that the documents that have been filed,

9  at least that I've seen, are duplicative in all six cases which

10  would denote some type of consolidation that has not been

11  approved by the Court.  And that's a concern.  In fact, that's

12  going to be something that will need to be addressed.

13          For instance, let me give you an example of what I'm

14  talking about.  In the motions for approval of employment of

15  your law firm, you list a retainer  that's been issued.  Am I

16  to understand that that retainer is times six?  But I think you

17  said it's a consolidated retainer.  Well a consolidated

18  retainer can't be approved in individual cases.

19          So that issue permeates a lot of what I've seen in

20  the pleadings and we'll get into it individually as we move

21  forward.  But that's an issue.

22          The second is that the Court has noted that you have

23  entities that are creditors of each other listed in the list of

24  20 largest creditors.  And in fact I think, if I'm not mistaken

25  and you can correct me here, that the joint administration

1   motion is to jointly administer entities, some of whom are

2   creditors of others.  That's an issue.

3          MR. MAPLES:  There were intercompany loans that

4   transpired prior to, you know, the filing of this case.

5          THE COURT:  I understand and that's been raising

6   questions under 327 as to whether or not you can do both, not

7   have a conflict and is interested when you're representing a

8   creditor of another entity because the --

9          MR. MAPLES:  And I proposed --

10          THE COURT:  -- individual entities -- go ahead.

11          MR. MAPLES:  My proposal was that if any disputes

12   came up regarding those matters that we would retain conflict

13   counsel to deal with those.

14          THE COURT:  I'm not sure that's the kind of conflict

15   that can be waived or that can be --

16          MR. MAPLES:  Okay.

17          THE COURT:  -- addressed by conflict counsel.  That's

18   another issue that needs to be addressed.  I'm not ruling on

19   it.  I'm just saying I've seen that issue in other cases and

20   it's more than representing someone who may have some other

21   interest that conflicts.

22          You're talking about in the list of creditors you

23   filed here, specifically stating certain entities are major

24   creditors of the debtor and you want me to consolidate.  That's

25   the issue that's going to have to be addressed.

1    And then the third issue is you have non-debtors who
2 are I assume part of the Rolta universe who are providing
3 funding for cash collaterals and provided retainers.  That also
4 raises issues.  When a debtor's counsel receives payment from a
5 non-debtor, there are issues that come into play under 327
6 also.

7    So those are the three things that I looked at that
8 said they need to be addressed.  I don't know, well, we can
9 talk about timing, but those are things that are problems that
10 need to be addressed so that the Court and creditors are
11 comfortable that there aren't problems both administratively
12 and structurally as we go forward in these cases.

13    MR. MAPLES:  Yes, sir.

14    THE COURT:  Okay.  Are there other issues that we're
15 having a general discussion on in the status conference phase
16 of this hearing that would like to be raised by any of the
17 counsel either for the judgment creditors or others?

18    MR. SPARKS:  Judge, this is Dan Sparks.  Would it be
19 appropriate now to tell you that we have an agreement on the
20 motion to extend the deadline to file schedules?

21    THE COURT:  No.

22    MR. SPARKS:  Okay.

23    THE COURT:  Because we're going to get to that in a
24 moment.  Just to be clear, and maybe I should have explained
25 this.  The status conference under 105 says that the Court can

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document     Page 48 of 739

1  hold a conference where the efficient and expeditious

2  resolution of the case is discussed.

3          So you talk about issues, you raise issues, that kind

4  of thing, but we'll get to specific matters in a moment.  This

5  is just the general phase of the case where issues that are

6  germane to the entire panoply of things that we'll discuss in a

7  moment are relevant.

8          Any other issues anyone would like to raise or have

9  discussed at this point?

10          MR. SAVAL:  Your Honor, this is Daniel Saval for the

11  judgment creditors.  If I may be heard briefly?

12          THE COURT:  Yes, you may.

13          MR. SAVAL:  We filed an objection to cash collateral

14  and we filed it this morning and we appreciate Your Honor, you

15  know, considering that even though it was filed this morning.

16          It does raise issues beyond just the use of cash

17  collateral relating to the circumstances in which the debtors

18  filed these cases.  As our papers explained it was filed just

19  days after the debtors were required to comply with the

20  turnover order of the New York State Court and did not do so.

21          And the case was filed in this district where none of

22  the debtors are incorporated, where none of the debtors have

23  their headquarters or principal place of business here.

24          You know we have a number of concerns regarding the

25  case and I just wanted to make, that are reflected in our

1 pleading, and I just wanted to make sure that the Court was
2 aware of those because it may be that in the near future we do
3 seek relief with respect to these cases and arising out of the
4 circumstances in which the filing was made where the major
5 creditors here are bondholders.  Our clients are the largest
6 bondholders.  The bonds have been in default and were
7 accelerated two years ago.  Though it wasn't until the eve of
8 having to actually comply with enforcement orders of the New
9 York Court that the bankruptcy case was filed.
10        THE COURT:  Thank you.  I had sufficient time after
11 my grains this morning to review your pleadings, your
12 objection, and I saw that issue and that's an issue, well,
13 those issues.
14        The first issue you raise about the timing and the
15 good faith allegedly of the filing is something that will be
16 germane if there is an appropriate motion filed.
17        But the second issue you raised was one that I had
18 already been alerted to when I reviewed the pleadings.  And,
19 Mr. Maples, another issue that has been raised by the judgment
20 creditors and the Court is concerned about is 1408 venue.
21        Principal place of business, principal assets,
22 residence or domicile.  I'm not sure which one this is.  And
23 that's an issue that's going to need to be addressed between
24 now and the time we have a continued hearing because it is
25 unusual to have, I think your declaration says the nerve

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 50 of 739

1  center, in the papers?

2          MR. MAPLES:  Yes.

3          THE COURT:  And I'm not sure if you're alleging the

4  nerve center is the principal place of business, the residence,

5  domicile or what.  But that's an issue that I think before we

6  go too far in this proceeding is going to need to be addressed

7  to the satisfaction of the Court, because otherwise you may not

8  be doing a lot here.  Maybe the six needs to be venued

9  someplace else.  But that is not an issue we will take up

10 today.

11         Is there any other issue that we need to put on the

12 table as we discussed, the efficient and economical resolution

13 of this case or these cases as they're before me?  If not,

14 let's take up then in the order that they're on the docket, the

15 matters that are before the Court today.

16         First of all is the debtors' motion for joint

17 administration of cases involving the six related debtors.  Mr.

18 Blythe, you mentioned something about this in the status

19 conference.

20         MR. BLYTHE:  Yes, Your Honor.  Richard Blythe for the

21 Bankruptcy Administrator.

22         We did have questions regarding -- related to the

23 having a creditors' committee, a joint committee or a single

24 committee.

25         And I know Your Honor raised other issues as far as

1 the issue of the intercompany loans and how you could jointly

2 administer cases where they may have those creditors of other

3 debtors and also have problems I guess with counsel.

4          So that is an issue that I think would need to be

5 addressed before the Court allows a joint administration.

6          THE COURT:  And this also goes to the comment I made

7 earlier about all the documents being duplicative.  We have in

8 de facto a substantive consolidation with the pleadings, but

9 it's being requested for a joint administration of the various

10 entities, some of which are creditors of the other creditors.

11          So I'm concerned about the competing interest being

12 jointly administered in the cases.  Mr. Maples, do you want to

13 make any comment with regard to that?  Because what I'm

14 proposing to do, let me just tell you where we're going, I'm

15 going to go through all the matters and the ones that I can't

16 rule on we're going to continue to a hearing next week and

17 between now and then the debtor and other parties will have an

18 opportunity to weigh in on those issues.

19          But this issue on the motion for joint administration

20 is one that I don't believe today I can approve.  But if you

21 have any comments on it you may so provide those now.

22          MR. MAPLES:  Well, Your Honor, we were simply trying

23 to proceed in a manner that would be the most cost effective

24 and promote judicial economy by, you know, jointly, the joint

25 procedural consolidation, not substantive consolidation.  But

1  I'll be happy to address that and brief that.

2          THE COURT:  Okay.  I think that's fair, because that

3  also affects some other things we're going to talk about in a

4  moment.  I mean I almost believe what's going to have to happen

5  between now and when we go forward, if we go forward in this

6  case, is you're going to have to bifurcate or trifurcate or

7  six, whatever the word is for six, the matters.

8          Because right now everything is tied together, cash

9  collateral, your fees, joint administration, everything is tied

10 together in a way that makes granting a motion for joint

11 administration almost superfluous.  And so that's why we've got

12 to address those issues before I can adequately rule on a

13 motion for joint administration.

14         Does anyone else have any comments or things they'd

15 like to raise with regard to that motion?  Okay.  That motion

16 will be continued to the date that we'll talk about in a

17 moment.

18         Let's take up the motion by debtor-in-possession to

19 extend time to file remaining schedules.  Mr. Sparks, you were

20 going to give a statement about that earlier.

21         MR. SPARKS:  Yes, Your Honor.  Thank you for that,

22 for giving me an opportunity.  So I have spoken with debtors'

23 counsel and exchanged e-mails and with Mr. Blythe and we

24 suggested to debtors' counsel that 14 days was too long.  He

25 very quickly and graciously agreed to limit it to seven and I

1 agreed with -- and I reported that to Mr. Blythe, I spoke to

2 him. He had no objection to seven.

3          If it's all right with the Court and it pleases the

4 Court, then we would agree to a consent order that he had seven

5 additional days, which I think is November 19th, and not the 14

6 that he pled for. In all the cases.

7          MR. MAPLES: I think it's the 21st.

8          THE COURT: Is that correct, Mr. Maples?

9          MR. MAPLES: I believe it will be the 21st, but that

10 is correct.

11          MR. SPARKS: Seven additional days, whatever they

12 are.

13          MR. MAPLES: Yes.

14          THE COURT: So that would be the 21st which is a

15 Saturday.

16          MR. SPARKS: I thought you had asked for the 26th in

17 your motion.

18          MR. MAPLES: I mean I guess the 20th which would be

19 that Friday would be fine.

20          THE COURT: Mr. Sparks, any problem with the 20th?

21 I'm comfortable with that.

22          MR. SPARKS: No objection, Your Honor. Thank you

23 very much.

24          THE COURT: Okay. Mr. Blythe?

25          MR. BLYTHE: Your Honor, I have no objection to the

1  20th.

2          THE COURT:  Okay.  Mr. Maples, then I'm going to

3  approve the motion to extend time to file the schedules for

4  approximately seven days to November 20th, but let me state

5  this.  The schedules have to stand on their own.  Every entity

6  if, I'm assuming they're all separate legal entities, you'll

7  have to file --

8          MR. MAPLES:  They are.

9          THE COURT:  -- paperwork that are germane only to

10 that entity, not other entities.  And I understand in a --

11         MR. MAPLES:  Understood.

12         THE COURT:  -- corporate environment like this, some

13 of them will have very little in the schedules.  I understand

14 that.  But they have to be separate so that everyone can take a

15 picture, and have a picture, of what it is that each entity

16 entails so that (indiscernible) --

17         MR. MAPLES:  I understand that completely.

18         THE COURT:  Okay.  Great.  So we will extend that to

19 November 20th.

20         The next matter on the docket is the application by

21 debtor-in-possession to employ Mr. Maples' firm as attorneys

22 for the debtor.

23         Mr. Maples, let me ask you this.  Why was your

24 retainer received from Rolta Advizex Technologies?

25         MR. MAPLES:  Well, because at that moment there was

1  not enough cash to pay my retainer and Rota Advizex, who is a

2  wholly owned subsidiary of Rolta International, was able to do

3  that.  And it's not, you know, that's why.

4        THE COURT:  Okay.  Okay.  And how did the funds get

5  from Rolta Advizex to the debtor or to the debtors?  Was it a

6  loan?  Was it a corporate capital contribution?  Was it a gift?

7  There are issues that come into play when a third party pays

8  fees for a debtor who filed bankruptcy.  And all those issues

9  are present here.

10        I don't know that you can answer them all now.  I

11  think this is one of those we're going to have to continue to a

12  time future.  But the fact that the debtors did not pay the

13  retainer to you, that they got it from a non-debtor entity,

14  raises issues that need to be addressed.

15        MR. MAPLES:  Okay, Your Honor.  Yes, sir.

16        MR. MALLOY:  Your Honor?

17        THE COURT:  Yes?

18        MR. MALLOY:  Your Honor, this is Sean Malloy.  I

19  represent Rolta Advizex.  I can try to answer your question, if

20  you'd like.

21        THE COURT:  I think I'd rather have it in a pleading

22  so that everyone has it.

23        MR. MALLOY:  We can do that.

24        THE COURT:  (Indiscernible) answers.  Yes.  What I

25  would suggest, counsel, is you get with Mr. Maples and provide

1  that information.

2          One of the things I'll note that that also brings

3  into play is I don't know the universe of this particular

4  corporate entity.  And so here is an entity that looks

5  something -- how many others are there out there?  Who is the

6  parent?  Who owns who?  There's no corporate structure that has

7  been provided to the Court to this point that brings me an

8  understanding of how it is that Rolta Advizex again paid the

9  retainer.  It may become apparent once I see that, but right

10 now I don't have any of that information.

11         And then it would also need to be did that entity

12 provide a retainer separately for each debtor or only for

13 International?  Questions that need to be addressed.

14         MR. MAPLES:  Yes, sir.

15         THE COURT:  Okay.  All right?

16         MR. MAPLES:  Yes.

17         THE COURT:  Mr. Blythe, any other issues that you

18 need to have addressed in connection with the application to

19 employ Mr. Maples' firm?

20         MR. BLYTHE:  None at this time that I'm aware of,

21 Your Honor.

22         THE COURT:  Okay.  Mr. Maples, in connection with

23 your application also, you're asking to be employed in all six

24 cases.  That raises the issue again under 327, can you be

25 employed for a creditor of another debtor or a debtor who is

1 owed money by creditors?

2          You have six entities, each of them needs to stand

3 alone.  And then the question becomes do you need separate

4 counsel for some of those entities or not?  That's another

5 issue that needs to be addressed.

6          MR. MAPLES:  I'll be happy to, Your Honor.

7          THE COURT:  Okay.  Let's pick up then the emergency

8 motion for debtor-in-possession order authorizing and directing

9 the honoring of pre-petition payroll checks and the debtor to

10 pay pre-petition wages and employee benefits of current

11 employees.  Mr. Blythe, any questions or issues with regard to

12 that motion?

13          MR. BLYTHE:  Your Honor, I didn't see a listing or

14 breakdown of what the exact pre-petition wages were and whether

15 any of the pre-petition wages were payments to officers or

16 insiders.

17          The amounts that are set forth appear not that large

18 and so I don't have a huge objection or problem with that as

19 far as what they're seeking to do.  But especially when we have

20 six entities and there's really no breakdown of what wages or

21 payments are being made in each individual case.

22          THE COURT:  Okay.  Mr. Maples, let me roll into

23 another issue which I didn't earlier but I saved it for this

24 particular area.  The motions you filed, each of them says that

25 there are eight employees.  The declaration by the principal

1 says that there are 43 employees.  I'm not sure which one is
2 correct and maybe if you aggregate, I guess six times eight is
3 not 43 either.  So there needs to be clarification with regard
4 to what employees of which entities you're asking to pay for.

5        And then as I understand it in looking at the
6 emergency motion, the employees get paid once a month and they
7 were paid at the end of October.  So is there any pre-petition
8 wage issue that we're dealing with on this emergency basis?

9        MR. MAPLES:  Very small.

10        THE COURT:  Okay.  And what does very small mean?

11        MR. MAPLES:  But I'll be very happy to provide the
12 breakdown.

13        THE COURT:  Okay.  Because, actually, let me get
14 right to the bottom line here.  And other parties can weigh in
15 if they have any questions.  Between now and a hearing next
16 week, what amounts need to be paid for any of these items on an
17 emergency basis?

18        MR. MAPLES:  There are -- the only item and it really
19 -- we can defer to next week on the employee motion.  I think
20 one of the next motions we'll talk about is the payment of some
21 pre-petition tax debts, trust fund, back tax.  That one really
22 is due and needs to be made.  But that's the next motion.

23        THE COURT:  That's a different motion, yes.  I'm just
24 dealing right now with the emergency need to take care of
25 pre-petition payroll checks and so on.  If there is no

1  emergency, and I, of course, went straight to how much is owed

2  to the employees because I'm very sensitive to employees not

3  being disrupted too much by the proceeding.

4          But it looked like, I think you did a good job in

5  saying there was zero.  And so if that's the case, then it can

6  wait a week and we can address the other issues here at that

7  time.

8          MR. MAPLES:  We agree with that, Your Honor.

9          THE COURT:  Okay.  Thank you.  Then let's move to the

10 matter that you indicated, the emergency motion by the debtor

11 for ability to pay pre-petition taxes and to honor checks for

12 payment of taxes.  Tell me about that, Mr. Maples.

13         MR. MAPLES:  The one issue that I think we have

14 coming up and it has to do with Rolta UK and it's the value

15 added tax that, you know, the trust fund type tax in the UK.

16 And that tax is due on the 7th and the amount of that is just

17 over $100,000 and that money is in the UK.  It's money that's

18 been collected by UK and it's held for the taxing authority

19 currently.

20         THE COURT:  So it's in that separate entity.  It's

21 not in Rolta International.  It's in UK.

22         MR. MAPLES:  It is not.  It's in UK.

23         THE COURT:  Okay.

24         MR. MAPLES:  It is in UK and it is in UK's bank

25 account.

```
 1          THE COURT:  Okay.  So, and we're sort of doing this
 2  in the Rolta International case right now, but we can steal
 3  over to the others.  What you're telling me is the Rolta
 4  International case does not have a tax obligation that needs to
 5  be handled on an emergency basis.
 6          MR. MAPLES:  Not before next week, that's true, Your
 7  Honor.
 8          THE COURT:  Okay.
 9          MR. MAPLES:  I think we would be running there up
10  probably to the 15th before we would have such tax that would
11  be due.
12          THE COURT:  And we'll have a hearing before the 15th.
13          MR. MAPLES:  Yes, sir.
14          THE COURT:  Okay.  Then let me, it's hard to do this
15  when we have six entities, but you have all of the matters that
16  are similar.  Let me move quickly from the emergency motion in
17  the Rolta International case to the emergency motion regarding
18  pre-petition taxes in the Rolta -- what is the name of the
19  entity?
20          MR. MAPLES:  UK.
21          THE COURT:  Is it Global?
22          MR. MAPLES:  UK.  United Kingdom.  UK.
23          THE COURT:  UK.
24                      (Audio off)
25          MR. MAPLES:  No, it is the Rolta UK, not --
```

1          THE COURT:  UK.

2          MR. MAPLES:  Not --

3                    (Audio off)

4          THE COURT:  It's at the very back of my docket.

5    Okay.  Let's take that up because that seems to be more of an

6    emergency than the others.  So this is in the Rolta UK Limited

7    case, the emergency motion by the debtor for failure to pay

8    pre-petition taxes and to honor checks for payment of taxes.

9          Any objections or comments with regard to the request

10   that's being made by the debtor to pay the tax that's been

11   collected.  Do you know the exact number, Mr. Maples?

12                   (Audio off)

13         UNIDENTIFIED ATTORNEY:  Just give me just a moment.

14         THE COURT:  Sure.  While he's getting that number,

15   does anyone have a comment or objection with regard to the

16   payment of that tax obligation?

17         MR. MAPLES:  $109,000.

18         THE COURT:  And you're telling me that's already

19   sitting in an account segregated and it's money that is owed on

20   the value added taxes or whatever it's called in the UK?

21         MR. MAPLES:  Yes, sir.

22         THE COURT:  Okay.  Mr. Blythe, any comments or

23   objections?

24         MR. BLYTHE:  Your Honor, if that's represented that

25   it is, and I'm not familiar with the UK value added tax, but it

1  sounds like it's similar to withholding taxes here in the

2  United States.  And so the trust fund taxes that actually

3  belong and don't belong to the debtor, so I don't have any

4  objection.

5          THE COURT:  Okay.  Thank you.

6          MR. MAPLES:  More like a sales tax.

7          THE COURT:  Okay.  Mr. Sparks or Mr. Saval?

8          MR. SPARKS:  I think Mr. Saval is going to handle

9  this one, Judge.

10          THE COURT:  Okay.

11          MR. SAVAL:  Your Honor, we don't have an objection

12  per se.  It's my understanding that the $109,000 is subject to

13  the turnover order and when we get to cash collateral we will

14  discuss some of those issues.  But we are not raising an

15  objection to that tax, to the payment of that tax.

16          THE COURT:  Okay.  When you say subject to you mean

17  you complain that that money would go toward the judgment, but

18  you're not going to object if I approve the payment of that?

19          MR. SAVAL:  That's correct, Your Honor.

20          THE COURT:  Okay.  That avoids then having to get

21  into discussions about priority, the New York judgment versus

22  an interest that the UK has, and I think that's probably easier

23  to do.

24          Okay.  Does anyone else have any other comments or

25  objections they'd like to raise in connection with the

1  emergency motion by the debtor to pay the pre-petition taxes in

2  the UK of $109,000?

3          Hearing none, in the Rolta UK Limited case I am

4  approving the payment of the $109,000 to the appropriate taxing

5  authority in the UK for the trust fund taxes that have been

6  discussed today.

7          Mr. Maples, please submit an order with regard to

8  that issue.

9          MR. MAPLES:  I will, Your Honor.

10          THE COURT:  Okay.  I'm going back to the main case,

11  Rolta International, Inc., the issue with regard to other taxes

12  and the issue with regard to other, honoring the payment of

13  those taxes that is contained in the debtors' motion will be

14  continued to the date that we discuss in a moment.

15          Now let's take up the issue of the

16  debtor-in-possession motion for authorization to use cash

17  collateral.  I have reviewed at length the objection by the

18  judgment creditors and let me do this.

19          Mr. Maples, you reviewed it.  I know it came in late,

20  but you probably had a chance to review it as I did.  There are

21  a number of issues that were raised in that particular

22  objection that need to be addressed.  How would you propose to

23  address those issues?

24          MR. MAPLES:  Well, Your Honor, you know, if we could

25  have a budget approved for only immediate necessary payments

1 that would be made through the next week, just very bare bones

2 until we could get to that point, and then I could, you know,

3 I'll be happy to file a response.

4         You know, one of the things that, and I realize it

5 hasn't happened yet and I'm in the process of drafting an, you

6 know, an adversary proceeding, but I believe that the judgment

7 creditors judgments and their statutory liens are due to be set

8 aside, in which case I think there is going to be cash

9 collateral.  Pardon me?

10         THE COURT:  I saw that and I wasn't conversing with

11 what your theory is.  What is the legal basis for the argument

12 that their lien can be avoided?

13         MR. MAPLES:  That is a judgment lien that is due to

14 be avoided because it was taken within 90 days of the petition

15 date, as was the turnover order.  And also the assertion that

16 the statutory lien under New York law is a statutory lien that

17 will also be subject to being set aside under the avoidance

18 powers.

19         THE COURT:  So you're saying under 547 as a

20 preference?

21         MR. MAPLES:  Yes.  Under 547 as a preference.  And I

22 think under 545 to the extent that they assert the statutory

23 liens.

24         THE COURT:  I see.  Okay.  So we'll take that up

25 separately.

1           MR. MAPLES:  Yes.

2           THE COURT:  But for the time being there is a

3 judgment that exists, it has not been avoided, and it needs to

4 be addressed until otherwise ruled on.

5           MR. MAPLES:  Yes.

6           THE COURT:  Mr. Maples, one of the other issues that

7 was raised by the judgment creditors in their objection that

8 the Court noted is that the 13-week budget that's attached to

9 the cash collateral motion shows case receipts of a hundred

10 ninety-five eight hundred and thirteen dollars but operating

11 expenses of $388,368.

12           So in other words it doesn't show the debtor's going

13 to generate sufficient cash to pay its own expenses over the

14 13-week period.

15           MR. MAPLES:  Your Honor, we could revisit that issue.

16           THE COURT:  Well, I prefer (indiscernible) --

17           MR. MAPLES:  (Indiscernible) spend more money than

18 we're taking in.

19           THE COURT:  But you're proposing to replace a lien

20 when there is a negative cash flow attached to the motion to

21 use cash collateral.  That's why it comes up and is relevant

22 here.

23           MR. MAPLES:  Yes, sir.

24           THE COURT:  Let me say this.  I agree if there is a

25 way to provide for use of cash for one week the Court would be

1  amenable to it, but I have to find that the judgment creditors

2  with their current lien are adequately protected, and I'm not

3  -- well, here, let me say it this way.  I don't know what your

4  proposal for adequate protection is.

5          MR. MAPLES:  Well it would be a replacement lien to

6  the extent that their lien attaches on receivables.  And I can

7  revise a budget -- and I'm sitting here with my President

8  right now and --

9          THE COURT:  But when you have a budget that shows a

10  negative operation, there isn't anything to have a replacement

11  lien on is the issue.  That's one issue.  And then the other

12  issue is --

13          MR. MAPLES:  We can defer making any payments between

14  now and next week.  I know that right now.

15          THE COURT:  I think that would be wise.

16          MR. MAPLES:  Okay.

17          THE COURT:  Because right now I'm having trouble

18  seeing where there would be adequate protection.  That's one

19  issue.

20          The other issue with your cash collateral budget is

21  that the income is coming from another entity and I'm not sure

22  what the basis of that money is or that income flow is.  It's

23  coming from Rolta Advizex Technologies.

24          MR. MAPLES:  Yes, Your Honor.

25          THE COURT:  It looks like the funding for the debtor

1   is coming from non-debtor, without any explanation as to how

2   that works.

3        MR. MAPLES:  We'll be happy to provide that

4   information.

5        THE COURT:  Okay.  Mr. Saval or Mr. Sparks, any other

6   questions or issues?  Because we're going to continue this

7   matter until next week also.

8        MR. SALAL:  Your Honor, this is Daniel Saval.  The

9   only thing I would add just generally is that, as I think Your

10  Honor alluded to, is there is an absence of detail about

11  sources of cash, the basis on which cash is coming out from

12  Advizex, the subsidiary.

13       The 13-week forecast is for Rolta International.  I

14  note that there are three foreign entities that are part of

15  these Chapter 11 cases, a Netherlands entity, a UK entity, and

16  an entity in the United Arab Emirates.  We don't have any

17  visibility into the cash position of those entities and we

18  don't have visibility into the other assets of the debtors

19  based on the filings that it made to date.

20       So I think all that makes it difficult to get an

21  understanding about how the debtor is using or proposing to use

22  cash collateral and the terms for use of cash collateral.

23       THE COURT:  I think you're spot on on all those

24  issues.  I think the way you stated it in your objection was

25  there's not sufficient information about the debtors' assets,

1 sources of operating cash, or cash management system.

2          And, Mr. Maples, I think all of those need to be

3 addressed and, once again, they need to be addressed separately

4 because these cases have not been consolidated.

5          MR. MAPLES:  I understand.

6          THE COURT:  What it means, Mr. Maples, and I'm sure

7 this is obvious to you, that there may be some entities that

8 don't need to use cash collateral and others that do.

9          MR. MAPLES:  That's right.  That is in fact correct,

10 yes.

11          THE COURT:  But the motions in front of the Court

12 right now say the same thing and they all have the same

13 contingent operating budget.

14          MR. MAPLES:  Understood.

15          THE COURT:  That's why they need to be separated.

16 Okay?

17          MR. MAPLES:  Yes.  Yes, sir.

18          THE COURT:  All right.  That goes to all of the

19 matters that are currently on the docket for today on an

20 emergency basis.  I would suppose that we, and I hope, Mr.

21 Maples, this doesn't get you in too much of a bind, but I'm

22 sensitive to the need to have these issues resolved as soon as

23 possible.

24          Right now I'm considering or I'm proposing that we

25 have the continued hearing on November the 10th at ten a.m.

1 Does that create a problem for anyone?  I haven't heard

2 anything from anyone.  Mr. Blythe, is that fine with the -- I'm

3 going to go through the list.  Mr. Blythe?

4          MR. BLYTHE:  Yes, Your Honor, I was just looking and

5 it looks like the 10th, that's a Tuesday, and I'm free that

6 day.

7          THE COURT:  And just so everyone understands if

8 you're looking at your calendar.  I would have done it a week

9 from now which is the 11th, but that is Veterans Day, so that's

10 why it won't happen that day.  And then the Court doesn't have

11 any availability the rest of the week.  So if we don't do it on

12 the 10th, it would be the week following the 10th.

13          MR. SPARKS:  And for the benefit of those from the

14 other cities, Your Honor, all times are central, correct?

15          THE COURT:  Yes, I'm sorry.  Yes, we only deal with

16 central time.  Correct.  Ten a.m. central time, or 9:57 to be

17 correct.  Is there anyone who has an objection?  I'm amenable

18 to considering a different date, but that's the proposed date

19 at this point.  Anyone have any problem?  Mr. Saval?

20          MR. SAVAL:  That day and time works for me, Your

21 Honor.

22          THE COURT:  Okay.  Any of the other counsel who were

23 just monitoring who have a tangential interest in these cases,

24 does that create a problem for any of you?

25          MR. MALLOY:  This is Sean Malloy.  It's fine with me,

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 70 of 739

1  Your Honor.  Thank you.

2          THE COURT:  Anyone else?

3          MR. THOMPSON:  Your Honor, this is Ryan Thompson.

4  That doesn't create any issues for me.  Thank you.

5          THE COURT:  Okay.  Thank you.

6          MR. KALLERGIS:  Your Honor, this is Gus Kallergis for

7  Huntington National Bank.  It doesn't create any issues for me

8  either.  Sorry to interrupt.

9          THE COURT:  Thank you.  No, no problem.  Thank you.

10 Mr. Maples?

11         MR. MAPLES:  Although I would like to have some more

12 time, I am available and can make that happen.

13         THE COURT:  Well, and you're the primary person we

14 need to have available.  If we did more time it would be the

15 following week, the (indiscernible) are because of the

16 emergency motions that were filed on behalf of your client.  If

17 we went two weeks instead of one, is that going to create a

18 problem for your client's operation?

19         MR. MAPLES:  No, Your Honor.

20         THE COURT:  So we could make it --

21         MR. MAPLES:  Could I (indiscernible) propose Tuesday

22 the 17th?

23         THE COURT:  Tuesday the 17th?  Okay.  Let me see if

24 that creates a problem for anyone else who's on the phone.  Mr.

25 Blythe?

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 71 of 739

1          MR. BLYTHE:  No problem with the 17th, Your Honor.

2          THE COURT:  Okay.  Mr. Saval?

3          MR. SAVAL:  I have no problem with the 17th, Your

4 Honor.

5          THE COURT:  Okay.  And other counsel who gave me

6 their comments a moment ago, any of you have any problem with

7 ten a.m. central time on November 17th?

8          MR. MALLOY:  Again, Sean Malloy, Your Honor.  No

9 problem.  Thank you.

10          THE COURT:  Okay.

11          MR. THOMPSON:  Your Honor, Ryan Thompson.  That is

12 perfectly fine.  Thank you.

13          THE COURT:  Thank you.

14          MR. KALLERGIS:  Your Honor, Gus Kallergis.  That's

15 perfectly fine with me as well.  Thank you.

16          THE COURT:  Okay.  I understand Mr. Maples is going

17 to need additional time.  I was pushing him, but I was doing

18 that because of the emergency nature.  If we can go to the

19 17th, it does not create a problem with the operations.

20 Everything will still as it is, there won't be any unauthorized

21 use of cash collateral, there won't be any things that happen,

22 Mr. Maples, as you know.  Things will maintain the status quo

23 until November 17th at ten a.m. where we will take up all these

24 other matters again, and in the meantime we will take up

25 anything else, if notice is sufficient, that is filed in the

1  meantime.

2           UNIDENTIFIED ATTORNEY:  Thank you.

3           MR. SPARKS:  Your Honor, could I be heard?  Could I

4  be heard briefly?

5           THE COURT:  Yes, you may.  I'm sorry, who is that?

6           MR. SPARKS:  I don't want to throw a -- it's Dan

7  Sparks, and I'm sorry, Your Honor.  I don't want to throw a fly

8  in the ointment.  I thought I heard Mr. Maples say his client

9  didn't need to expend money until the 15th on payroll issues.

10  If I'm mistaken, I apologize.  But given that's what I heard, I

11  thought I would raise it.

12           THE COURT:  Okay.

13           MR. MAPLES:  I think we can deal with that issue.

14  You know, that's when withholding deposits were due to be made,

15  but I think we could work with it until we deal with that on

16  the 17th.

17           THE COURT:  Okay.  But no, Mr. Sparks, thank you for

18  raising that.  That is an issue that I would have thought of in

19  the middle of the night tonight, so thanks for raising that.

20  And, Mr. Maples, thanks for that response.

21           It sounds like we can safely go to November 17th at

22  ten a.m., take up all these issues.  Mr. Maples, in the

23  meantime you will be providing additional documentation and

24  other information so that when we get to that hearing we will

25  be in a better position to make some definitive rulings, one

1 way or the other, on the matters that are pending.

2        MR. MAPLES:  Yes, sir.  Yes, sir.

3        THE COURT:  Okay.  Before I adjourn this hearing, is

4 there anything else that anyone wants to raise at this point

5 that we have not covered so far?  Hearing none, we are

6 adjourned.

7        ALL ATTORNEYS:  Thank you, Your Honor.

8                  * * * * *

9              **C E R T I F I C A T I O N**

10        I, JANET D. PERSONS, court approved transcriber,

11 certify that the foregoing is a correct transcript from the

12 official electronic sound recording of the proceedings in the

13 above-entitled matter, and to the best of my ability.

14

15 /s/ Janet D. Persons

16 JANET D. PERSONS

17 J&J COURT TRANSCRIBERS, INC.    DATE:  November 16, 2020

18

19

20

21

22

23

24

25

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL PART 48

-------------------------------------------------------------------X

PALA ASSETS HOLDINGS LTD., PINPOINT MULTI-STRATEGY
FUND, VALUE PARTNERS FIXED INCOME SPC - VALUE
PARTNERS CREDIT OPPORTUNITIES FUND, VALUE
PARTNERS GREATER CHINA HIGH YIELD INCOME FUND,

Plaintiffs,

- v -

ROLTA, LLC, ROLTA INDIA LTD, ROLTA INTERNATIONAL
INC., ROLTA UK LTD, ROLTA MIDDLE EAST FZ-LLC, ROLTA
AMERICAS LLC, ROLTA GOLBAL B.V.,

Defendants.

-------------------------------------------------------------------X

INDEX NO.           652798/2018

MOTION DATE _____

MOTION SEQ. NO. _____ 002 _____

**DECISION AND ORDER**

**MASLEY, J.:**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 36, 72, 76, 79, 89, 90, 106, 107, 108, 109, 110, 111, 112, 115, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 175, 177, 178, 188, 193, 194, 195, 196, 197, 198, 199, 203, 204, 205, 208, 209, 223

were read on this motion to/for _____ JUDGMENT - SUMMARY IN LIEU OF COMPLAINT _____

Plaintiff Pala Assets Holdings Ltd. (Pala) first moved, pursuant to CPLR 3212, for

summary judgment in lieu of complaint against defendants on the basis that defendants

defaulted on notes issued under four certain indentures (NYSCEF Doc. No. [Doc] 36

[original notice of motion]; *see* Docs 25-34 [supporting submissions]).

By Notice of Amended Motion for Summary Judgment In Lieu of Complaint (Doc 117

[amended notice]), Pala and additional party entities Value Partners Fixed Income SPC -

Value Partners Credit Opportunities Fund (VP Credit), Value Partners Greater China

High Yield Income Fund (VP China), and Pinpoint MultiStrategy Fund (Pinpoint) now

move, pursuant to CPLR 3213, against the defendants to recover unpaid principal and

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No.  002

Page 1 of 8

interest allegedly arising from defendants' default on notes issued for the same indentures (*see* Doc 117 *et seq.*).[1]

## Background

1. The Notes and Indentures

On May 16, 2013, defendant Rolta, LLC (Rolta) executed an indenture through which it issued certain registered Senior Notes (2018 Notes) bearing interest at the rate of 10.75% due in May 2018 (2018 Indenture) (Docs 120-122). Rolta was permitted to issue the 2018 Notes in the aggregate principal value of $200 million (Doc 120). In July 2014, defendant Rolta Americas LLC (Rolta Americas) executed an indenture through which it issued certain registered Senior Notes (2019 Notes) bearing interest at the rate of 8.75% due in July 2019 (2019 Indenture) (Docs 127-129). Rolta America was authorized to issue the 2019 Notes in the aggregate principal amount of $300 million (Doc 127).

The Holder of Record for the 2018 and 2019 Notes is non-party Cede & Co. (Cede), the nominee of the Depository Trust Company (DTC). Pala, Pinpoint, and VP China allege that they are each Authorized Beneficial Owners of the 2018 Notes pursuant to authorization letters issued by 2018 Indenture Participants Citibank DTC 0908 (Citibank), Morgan Stanley & Co., LLC - #050 (M&S 050), Morgan Stanley & Co. International plc (M&S Intl), and JPMorgan Chase - #01970 (*see* Doc 122-123 [Pala], 134-136 [Pinpoint], 139-140 [VP China]). They allege that they own the 2018 Notes with

---

[1] Apart from adding plaintiffs, the amended motion seeks to recover unpaid principal and interest under the same set of notes and indentures; however, additional sums are sought on the basis that certain sums owed were accelerated pursuant to a notice of default sent during the intervening period between the filing of the original and amended notice of motion for summary judgment in lieu of complaint.

652798/2018 PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 2 of 8

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 77 of 739

principal values as follows: Pala $1,450,000; Pinpoint, $12,444,000; and VP China, $19,350,000.

All plaintiffs assert that they are beneficial owners of the 2019 Notes. Specifically, they assert that the 2019 Notes have the following principal values: Pala, $24,313,000 (Doc 128); Pinpoint, $54,200,000 (Docs 135-136); VP Credit, $6,850,000 (Docs 142-144); and VP China, $29,085,000 (Docs 141-144).

In both the 2018 and 2019 Indentures (together, Indentures), Defendant Rolta India Ltd. (Rolta India) is a Parent Guarantor and defendants Rolta International, Inc. (Rolta Intl.) and Rolta Middle East FZ-LLC (Rolta ME) are Subsidiary Guarantors. Defendant Rolta Global B.V. (Rolta Global) is a Subsidiary Guarantor only under the 2019 Indenture.

2. Default

Plaintiffs assert that defendants defaulted under the 2018 Notes and 2018 Indenture by failing to make a scheduled interest payment on May 16, 2016 and failing to cure that event of default within 30 days; additionally, four subsequent interest payments through May 2018 maturity date were untimely. Defendants do not dispute that the May 2016 interest payment was untimely, nor do they dispute that their failure to pay on time was cured. Plaintiffs allege, and defendants also do not dispute, that the principal and interest owed under the 2018 Indenture was not paid in full as required upon maturation of the 2018 Notes on May 16, 2018.

Plaintiffs submit a Notice of Acceleration, dated April 24, 2018, sent to Rolta by Pinpoint, Pala, nonparty BFAM Asian Opportunities Master Fund LP, and Value Partners Hong Kong Limited as Investment Manager of VP China (together, 2018 Beneficial Holders) under the 2018 Notes (2018 Notice) (Doc 125). The 2018 Notice

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 3 of 8

acknowledges that Cede is the Holder of Record of the 2018 Notes but further states that Cede authorized the 2018 Beneficial Holders to "take any action with respect to the [2018] Notes which Cede & Co., as the Holder of record of the [2018] Notes, is entitled to take under the controlling documents, including the Indenture and the Notes" (*id.*). In the 2018 Notice, the 2018 Beneficial Holders claim that they hold, in the aggregate, at least 25% of the total outstanding principal amount as of the date of the 2018 Notice (*id.*).

In addition to sending the 2018 Notice to Rolta, plaintiffs assert that a demand for payment under the 2018 Notes was also sent to Rolta India as Parent Guarantor on May 24, 2018.

Under § 6.02 the 2018 Indenture, a valid Notice of Acceleration renders the entire principal, applicable premium, and accrued, unpaid interest immediately due and payable; all outstanding principal and interest also became due on the maturity date under the 2018 Indenture (Doc 120).

Plaintiffs also assert that Rolta Americas defaulted under the 2019 Notes and 2019 Indenture by failing to timely make a scheduled interest payment on July 24, 2016 and that default was not cured within 30 days. Plaintiffs further assert that subsequent interest payments were missed without cure and a Notice of Acceleration under the 2019 Indenture was sent on October 26, 2018 (2019 Notice) by Pala, VP Credit, VP China, and Pinpoint (together, 2019 Beneficial Holders) (Doc 131). According to the 2019 Notice, the 2019 Beneficial Holders collectively owned 25% of the 2019 Notes, qualifying them to declare the event of default (*id.*). Attached to the 2019 Notice are four separate authorization letters in which Cede authorized the 2019 Beneficial holders to take any action with respect to the 2019 Notes (*id.*). Three of these letters were signed

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 4 of 8

by John D. Faith, "Partner" of Cede and the fourth by Kurt Holineger[2] on behalf of Cede

(*id.*). Plaintiffs assert that a demand letter was also sent to Rolta India, as Parent

Guarantor, on October 29, 2018.

Plaintiffs now move, pursuant to CPLR 3213, for summary judgment in lieu of

complaint to recover unpaid principal and interest under the 2018 and 2019 Notes and

Indentures.

## Discussion

CPLR 3213 provides for accelerated judgment where an instrument sued upon is

for the payment of money alone; the court must be able to ascertain the right to payment

from the face of the document without consideration of extrinsic evidence "other than

simple proof of nonpayment or a similar de minimis deviation from the face of the

document" (*Financials Restructuring Partners III v Crescent Banking Co.*, 2015 NY Slip

Op 30500[U], *5 [Sup Ct, NY County 2015], quoting *Weissman v Sinorm Deli, Inc.*, 88

NY2d 437, 444 [1996]). The standards applicable to conventional summary judgment

motions made pursuant to CPLR 3212 apply to those in lieu of complaint under CPLR

3213. Generally, an instrument, such as a promissory note, together with evidence of

failure to make payments in accordance with its terms, constitutes a prima facie case for

summary judgment, then shifting the burden to the defendant to raise a material issue of

triable fact (*see* CPLR 3213; *see* *Matas v Alpargatas S.A.I.C.*, 274 AD2d 327, 328 [1st

Dept 2000]). "A document does not qualify for CPLR 3213 treatment if the court must

consult other materials besides the bare document and proof of nonpayment, or if it

---

[2] The spelling of this last name is not clear from the document.

**652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC**
**Motion No. 002**

Page 5 of 8

must make a more than de minimis deviation from the face of the document" (*PDL Biopharma, Inc. v Wohlstadter*, 147 AD3d 494, 495 [1st Dept 2017] [citation omitted]).

While the instruments here—the 2018 and 2019 Notes and the Indentures—are within the scope of CPLR 3213, plaintiffs' moving papers do not establish prima facie entitlement to summary judgment under CPLR 3213 as their submissions do not eliminate all factual issues and uncertainties as to each plaintiff's individual beneficial ownership interest in the Notes, the circumstances surrounding the acceleration of amounts due and payable under the Indentures, and the amounts due and payable under each Note.

Apart from their own affidavits/affirmations, plaintiffs' support their claimed beneficial ownership interest in the Notes through various unsworn letters from their brokers; however, none of the brokers are parties to this action, and there is no affidavit from a person with knowledge, such as a representative of the brokers, to corroborate the broker letters. Further, there are no documents demonstrating the transaction(s) by which each plaintiff obtained its interest in each Note.

While plaintiffs submit authorization letters issued by Cede as the nominee of DTC in support of their moving papers, those letters were not sworn and do not eliminate the above issues. Cede states in those letters that it was "informed" by the Participant broker that plaintiffs are beneficial interest holders, but the gap in plaintiffs' acquisition of such interest is not eliminated. On the eve of oral argument, plaintiffs further submitted, attached to their reply affirmation, an affidavit of a Cede custodian/managing director, John Faith, who states that the Cede authorization letters annexed to Faith's affidavit are true and correct copies of Cede letters from October 2018 which were made or maintained by Cede in its ordinary course of business (Doc

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 6 of 8

209). Thus, while the Cede authorization letters support each plaintiffs' authorization to act under the Indentures to obtain payment –to commence this action, for instance–the letters do not provide an ample basis upon which the court can conclude with certainty that each plaintiff is the beneficial holder of the interest in the Notes that they claim.

Further, there is no submission that establishes what outstanding principal balance remained on each Note at the time the acceleration letters were sent to the respective defendants, or what percentage of that outstanding balance each party to the notice letter held. In fact, one of those entities, BFAM Asian Opportunities Master Fund LP, is not a party to this action (Doc 125 [concerning the 2018 Notes and Indenture]). Absent a more complete record with respect to the acceleration of both Notes– particularly the 2019 Note, which does not mature until July 2019–the dates on which amounts became due and payable, the total sums owed under each Note, and the calculation of interest for any such amounts cannot be ascertained with certainty on this record.

Accordingly, the court finds that plaintiffs have not established prima facie entitlement to payment on the face of the 2018 and 2019 Notes and Indentures, and the abundant documents extrinsic to those instruments that have been submitted do not close the gaps as to each plaintiff's beneficial ownership interest in each of the respective Notes, and certain narrow issues as to the authorization to commence suit and acceleration of sums due and payable under the Indentures remain. Thus, the court denies Motion 002, converts this accelerated action under CPLR 3213 to a conventional plenary action, deems the moving and opposition papers traditional pleadings, and directs expedited limited discovery to resolve these issues.

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 7 of 8

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 82 of 739

The court has considered plaintiffs' remaining arguments and they do not compel an alternative result. In light of the above determination, the court need not address defendants' additional contentions in opposition to this motion.

Accordingly, it is

ORDERED that Plaintiffs' amended motion for summary judgment in lieu of complaint, Motion Sequence Number 002, is denied without prejudice to file a new motion following limited discovery as will be directed by the court at the next status conference; and it is further

ORDERED that the Plaintiffs' moving papers in support of their amended motion for summary judgment in lieu of complaint, consisting of those documents filed to NYSCEF under Motion Sequence Number 002 in support of that amended motion, are deemed the complaint in this action and the defendant's answering papers, consisting of those submitted in opposition to the amended motion for summary judgment in lieu of complaint under Motion Sequence Number 002 are deemed the answer; and it is further

ORDERED that counsel are directed to appear for a preliminary conference in Part 48, Room 242 at 60 Centre Street, on May 2̲9̲, 2019 at 2̲:̲3̲0̲ a.m./p.m., to set an expedited schedule for the limited discovery contemplated in the decision above.

_____
4/22/2019
DATE

_____
ANDREA MASLEY, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | GRANTED | X | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 002

Page 8 of 8

# EXHIBIT C

EXECUTION VERSION

**ROLTA, LLC**

and

**ROLTA INDIA LIMITED**
as Parent Guarantor

and

**THE ENTITIES LISTED ON SCHEDULE I HERETO**
as Subsidiary Guarantors

and

**DB TRUSTEES (HONG KONG) LIMITED**
as Trustee and Security Agent

and

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
as Paying and Transfer Agent and Registrar

---

**Indenture**

**Dated as of May 16, 2013**

---

**10.75% Senior Notes**

**Due 2018**

---

(HK) 06562/183/INDENTURE/Raptor Indenture docx

## TABLE OF CONTENTS

### ARTICLE 1
#### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions* ........................................................................1
Section 1.02. *Rules of Construction* ...........................................................30

### ARTICLE 2
#### ISSUE, EXECUTION, FORM AND REGISTRATION OF NOTES

Section 2.01. *Authentication and Delivery of Notes and Note Guarantees* .....................31
Section 2.02. *Execution of Notes and Note Guarantees* ....................................31
Section 2.03. *Certificate of Authentication* ..............................................32
Section 2.04. *Form, Denomination and Date of Notes; Payments* ............................32
Section 2.05. *Registration, Transfer and Exchange* .......................................35
Section 2.06. *Book-entry Provisions for Global Notes* ....................................37
Section 2.07. *Special Transfer Provisions* ...............................................38
Section 2.08. *Mutilated, Defaced, Destroyed, Stolen and Lost Notes* ......................41
Section 2.09. *Further Issues* ............................................................41
Section 2.10. *Cancellation of Notes; Disposition Thereof* ................................42
Section 2.11. *Open Market Purchases and Cancellation of Notes* ...........................42
Section 2.12. *CUSIP, ISIN or Common Code Numbers* ........................................43

### ARTICLE 3
#### REDEMPTION

Section 3.01. *Redemption for Taxation Reasons* ...........................................43
Section 3.02. *Optional Redemption* .......................................................44
Section 3.03. *Method and Effect of Redemption* ...........................................45

### ARTICLE 4
#### COVENANTS

Section 4.01. *Payment of Notes* ..........................................................46
Section 4.02. *Maintenance of Office or Agency* ...........................................48
Section 4.03. *Governmental Approvals and Licenses; Compliance with Law* ..................49
Section 4.04. *Payment of Taxes and other Claims* .........................................49
Section 4.05. *Limitation on Indebtedness* ................................................50
Section 4.06. *Limitation on Restricted Payments* .........................................54
Section 4.07. *Limitation on Liens* .......................................................58
Section 4.08. *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries* ...............................................................58

i

Table of Contents
(continued)

Page

Section 4.09. *Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries* ..................................................................................................60
Section 4.10. *Limitation on Issuances of Guarantees by Restricted Subsidiaries* ...........61
Section 4.11. *Limitation on Sale and Leaseback Transactions* ....................................61
Section 4.12. *Repurchase of Notes Upon a Change of Control* ....................................62
Section 4.13. *Limitation on Asset Sales* ..................................................................62
Section 4.14. *Limitation on Transactions with Shareholders and Affiliates* ..................64
Section 4.15. *Limitation on Business Activities* ........................................................66
Section 4.16. *Use of Proceeds* ...............................................................................66
Section 4.17. *Maintenance of Insurance* .................................................................66
Section 4.18. *Designation of Restricted and Unrestricted Subsidiaries* .........................66
Section 4.19. *Anti-Layering* ..................................................................................68
Section 4.20. *Provision of Financial Statements and Reports* ....................................68
Section 4.21. *Additional Amounts* ..........................................................................71
Section 4.22. *No Payments for Consents* .................................................................73
Section 4.23. *Suspension of Certain Covenants* .......................................................74
Section 4.24. *Limitation on the Issuer* ....................................................................74
Section 4.25. *Currency Indemnity* ..........................................................................76
Section 4.26. *Amendments to or Prepayments of the Intercompany Loans* ....................77
Section 4.27. *Waiver of Stay, Extension or Usury Laws* .............................................77

ARTICLE 5
CONSOLIDATION, MERGER AND SALE OF ASSETS

Section 5.01. *Consolidation, Merger and Sale of Assets* ............................................78

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01. *Events of Default* ..............................................................................80
Section 6.02. *Acceleration* ....................................................................................81
Section 6.03. *Other Remedies* ...............................................................................82
Section 6.04. *Waiver of Past Defaults* .....................................................................82
Section 6.05. *Control by Majority* ...........................................................................82
Section 6.06. *Limitation on Suits* ...........................................................................82
Section 6.07. *Rights of Holders to Receive Payment* .................................................83
Section 6.08. *Compliance Certificate* ......................................................................83
Section 6.09. *Collection Suit by Trustee* ..................................................................83
Section 6.10. *Trustee May File Proofs of Claim* ........................................................84
Section 6.11. *Priorities* .........................................................................................84
Section 6.12. *Restoration of Rights and Remedies* ...................................................84
Section 6.13. *Undertaking for Costs* .......................................................................85
Section 6.14. *Rights and Remedies Cumulative* ........................................................85
Section 6.15. *Delay or Omission Not Waiver* ...........................................................85

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Table of Contents
(continued)

Page

ARTICLE 7
THE TRUSTEE AND THE AGENTS

Section 7.01. *General* .................................................................................85
Section 7.02. *Certain Rights of Trustee and Agents* .................................86
Section 7.03. *Individual Rights of Trustee* ...............................................89
Section 7.04. *Trustee's Disclaimer* ..........................................................89
Section 7.05. *Notice of Default* ................................................................89
Section 7.06. *Compensation and Indemnity* .............................................89
Section 7.07. *Replacement of Trustee* ......................................................90
Section 7.08. *Successor Trustee by Consolidation, Merger, Conversion or Transfer* .....91
Section 7.09. *Money Held in Trust* ...........................................................91
Section 7.10. *Paying Agent in EU* ............................................................91

ARTICLE 8
DEFEASANCE AND DISCHARGE AND SATISFACTION AND DISCHARGE

Section 8.01. *Defeasance and Discharge of Indenture*..............................91
Section 8.02. *Covenant Defeasance*..........................................................93
Section 8.03. *Application of Trust Money* .................................................93
Section 8.04. *Repayment to Issuer* ...........................................................94
Section 8.05. *Reinstatement* ......................................................................94
Section 8.06. *Satisfaction and Discharge* .................................................94

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01. *Amendments without Consent of Holders* ............................95
Section 9.02. *Amendments with Consent of Holders* .................................96
Section 9.03. *Effect of Consent* .................................................................97
Section 9.04. *Trustee's and Agents' Rights and Obligations* ...................98

ARTICLE 10
PARENT GUARANTEE

Section 10.01. *Parent Guarantee*...............................................................98
Section 10.02. *Guarantee Unconditional* ..................................................98
Section 10.03. *Discharge; Reinstatement*..................................................99
Section 10.04. *Waiver by the Parent Guarantor* .......................................99
Section 10.05. *Subrogation*.......................................................................99
Section 10.06. *Stay of Acceleration* ..........................................................99
Section 10.07. *Ranking of Parent Guarantee* ...........................................100
Section 10.08. *Execution and Delivery of Parent Guarantee*.....................100
Section 10.09. *Release of the Parent Guarantee* .......................................100

iii

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 88 of 739

Table of Contents
(continued)

Page

Section 10.10. *Limitation of the Parent Guarantee* .......................................................101

ARTICLE 11
SUBSIDIARY GUARANTEES

Section 11.01. *The Subsidiary Guarantees* ..................................................................101
Section 11.02. *Guarantee Unconditional* ....................................................................101
Section 11.03. *Discharge; Reinstatement* ...................................................................102
Section 11.04. *Waiver by Each Subsidiary Guarantor* ..................................................102
Section 11.05. *Subrogation and Contribution* .............................................................102
Section 11.06. *Stay of Acceleration* ..........................................................................103
Section 11.07. *Limitation on Amount of Subsidiary Guarantee* .....................................103
Section 11.08. *Ranking of Subsidiary Guarantees* .......................................................103
Section 11.09. *Further Subsidiary Guarantors* ............................................................103
Section 11.10. *Execution and Delivery of Subsidiary Guarantee* ...................................104
Section 11.11. *Release of the Subsidiary Guarantees* ..................................................104

ARTICLE 12
SECURITY TO BE GRANTED

Section 12.01. *Security to be Granted* .......................................................................105
Section 12.02. *Certificates* ......................................................................................107
Section 12.03. *Intercompany Loans* ..........................................................................107
Section 12.04. *Authorization of Actions to be Taken by the Security Agent Under
   the Security Documents* .......................................................................107
Section 12.05. *Authorization of Receipt of Funds by the Security Agent Under the
   Security Documents* .............................................................................108
Section 12.06. *Release of Security* .............................................................................108

ARTICLE 13
MISCELLANEOUS

Section 13.01. *Ranking* ............................................................................................109
Section 13.02. *Trust Indenture Act Controls* ...............................................................109
Section 13.03. *Notices* .............................................................................................109
Section 13.04. *Certificate and Opinion as to Conditions Precedent* ...............................110
Section 13.05. *Statements Required in Certificate or Opinion* .......................................111
Section 13.06. *Payment Date Other Than a Business Day* .............................................111
Section 13.07. *Governing Law, Consent to Jurisdiction; Waiver of Jury Trial,
   Waiver of Immunities* ...........................................................................111
Section 13.08. *No Adverse Interpretation of Other Agreements* .....................................113
Section 13.09. *Successors* ........................................................................................113
Section 13.10. *Duplicate Originals* ............................................................................113
Section 13.11. *Separability* .......................................................................................113

iv

Table of Contents
(continued)

Page

Section 13.12. *Table of Contents and Headings* ........................................................... 113

Section 13.13. *No Personal Liability of Incorporators, Stockholders, Officers, Directors or Employees* ....................................................... 113

Section 13.14. *Force Majeure* ....................................................................................... 113

Section 13.15. *USA Patriot Act* ..................................................................................... 113

Section 13.16. *Anti-Money Laundering and Terrorism* ................................................ 114

## SCHEDULES AND EXHIBITS

SCHEDULE I    *List of Initial Subsidiary Guarantors*

EXHIBIT A    *Form of Certificated Note*

EXHIBIT B    *Form of Transfer Notice*

EXHIBIT C    *Form of Restricted Global Note*

EXHIBIT D    *Form of Regulation S Global Note*

EXHIBIT E-1    *Form of Issuer Authorization Certificate*

EXHIBIT E-2    *Form of Note Guarantor Authorization Certificate*

EXHIBIT F    *Form of Paying and Transfer Agent Appointment Letter*

EXHIBIT G    *Form of Certificate to be Delivered in Connection with Transfers Pursuant to Regulation S*

EXHIBIT H    *Form of Certificate to be Delivered in Connection with Transfers to QIBs*

EXHIBIT I    *Form of Supplemental Indenture*

EXHIBIT J    *Form of Compliance Certificate*

EXHIBIT K    *Trustee, Security Agent, Paying and Transfer Agent and Registrar*

EXHIBIT L    *Form of Notation of Parent Guarantee*

EXHIBIT M    *Form of Notation of Subsidiary Guarantee*

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 90 of 739

INDENTURE, dated as of May 16, 2013, among (i) Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), (ii) Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), (iii) the entities listed in Schedule I hereto collectively as the initial Subsidiary Guarantors (and together with the Parent Guarantor the "**Note Guarantors**") and (iv) DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar.

## RECITALS

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of up to US$200,000,000 in aggregate principal amount of the Issuer's 10.75% Senior Notes Due 2018 and, if and when issued, any Additional Notes as provided herein (collectively, the "**Notes**"). All things necessary to make this Indenture a valid agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by or on behalf of the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

WHEREAS, each Note Guarantor has duly authorized the execution and delivery of this Indenture as guarantor of the Notes. All things necessary to make this Indenture a valid agreement of each initial Note Guarantor, in accordance with its terms, have been done, and each initial Note Guarantor has done all things necessary to make the Note Guarantees, when the Notes are executed by the Issuer and authenticated and delivered by or on behalf of the Trustee and duly issued by the Issuer, the valid obligations of such initial Note Guarantor as hereinafter provided.

WHEREAS, pursuant to the Security Documents (as defined below), the Issuer has agreed to grant a security interest in the Collateral (as defined below) to the Trustee and the Security Agent, as the case may be, in order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees.

## THIS INDENTURE WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.  *Definitions.*

"**Acquired Indebtedness**" means Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Indebtedness of the Parent Guarantor or a Restricted Subsidiary assumed in connection with an Asset Acquisition by the Parent Guarantor or such Restricted Subsidiary whether or not Incurred in connection with, or in contemplation of, the Person merging with or into the Parent Guarantor or a Restricted Subsidiary or becoming a Restricted Subsidiary.

"**Additional Notes**" has the meaning assigned to such term in Section 2.09.

"**Adjusted Treasury Rate**" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

"**Affiliate**" means, with respect to any Person, any other Person (1) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; (2) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (1) of this definition; or (3) who is a spouse or any person cohabiting as a spouse, child, parent, brother, sister, parent-in-law, grandchild, grandparent, uncle, aunt, nephew or niece of a Person described in clause (1) or (2). For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlling,**" "**controlled by**" and "**under common control with**"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Transaction**" has the meaning assigned to such term in Section 4.14.

"**Agent**" means any Security Agent, Registrar, Paying and Transfer Agent or Authenticating Agent.

"**Agent Members**" has the meaning assigned to such term in Section 2.06.

"**Applicable Premium**" means, with respect to a Note at any redemption date, the greater of (1) 1.00% of the principal amount of such Note and (2) the excess of (A) the present value at such redemption date of the redemption price of such Note at May 16, 2016, plus all required remaining scheduled interest payments due on such Note (but excluding accrued and unpaid interest to the redemption date) through May 16, 2016, computed using a discount rate equal to the Adjusted Treasury Rate plus 50 basis points, over (B) the principal amount of such Note on such redemption date.

"**Asset Acquisition**" means (1) an investment by the Parent Guarantor or any Restricted Subsidiary in any other Person pursuant to which such Person shall become a Restricted Subsidiary or shall be merged into or consolidated with the Parent Guarantor or any Restricted Subsidiary; or (2) an acquisition by the Parent Guarantor or any Restricted Subsidiary of the property and assets of any Person other than the Parent

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Guarantor or any Restricted Subsidiary that constitute substantially all of a division or line of business of such Person.

"**Asset Disposition**" means the sale or other disposition by the Parent Guarantor or any Restricted Subsidiary (other than to the Parent Guarantor or another Restricted Subsidiary) of (1) all or substantially all of the Capital Stock of any Significant Subsidiary; or (2) all or substantially all of the assets that constitute a division or line of business of the Parent Guarantor or any Significant Subsidiary.

"**Asset Sale**" means any sale, transfer or other disposition (including by way of merger, consolidation or Sale and Leaseback Transaction) of any of its property or assets (including any sale of Capital Stock of a Subsidiary or any issuance of Capital Stock of a Restricted Subsidiary) in one transaction or a series of related transactions by the Parent Guarantor or any Restricted Subsidiary to any Person; *provided* that "**Asset Sale**" shall not include:

(1)     sales or other dispositions of inventory, receivables and other current assets in the ordinary course of business;

(2)     sales, transfers or other dispositions of assets constituting a Permitted Investment or Restricted Payment permitted to be made under Section 4.06;

(3)     sales, transfers or other dispositions of assets with a Fair Market Value not in excess of US$1.0 million (or the Dollar Equivalent thereof) in any transaction or series of related transactions;

(4)     any sale, transfer, assignment or other disposition of any property or equipment that has become damaged, worn out, obsolete or otherwise unsuitable for use in connection with the business of the Parent Guarantor or the Restricted Subsidiaries;

(5)     any transfer, assignment or other disposition deemed to occur in connection with creating or granting any Permitted Lien;

(6)     a transaction covered under Section 5.01(a); and

(7)     a sale, transfer or other disposition to the Parent Guarantor or a Restricted Subsidiary, including, without limitation, an issuance of Capital Stock by a Restricted Subsidiary to the Parent Guarantor or to another Restricted Subsidiary.

"**Attributable Indebtedness**" means, in respect of a Sale and Leaseback Transaction, the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"**Authenticating Agent**" refers to a Person engaged to authenticate the Notes in the stead of the Trustee.  As of the date of this Indenture, Deutsche Bank Trust Company Americas has been named as the Authenticating Agent.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

"**Authorization Certificate**" has the meaning assigned to such term in Section 2.02(a).

"**Authorized Officer**" means, with respect to the Issuer, the Parent Guarantor or a Subsidiary Guarantor, as applicable, any one person, officer or director, who, in each case, is authorized to represent the Issuer, the Parent Guarantor or a Subsidiary Guarantor, as the case may be, as designated in the Authorization Certificate furnished to the Trustee.

"**Average Life**" means, at any date of determination with respect to any Indebtedness, the quotient obtained by dividing (1) the sum of the products of (a) the number of years from such date of determination to the dates of each successive scheduled principal payment of such Indebtedness and (b) the amount of such principal payment by (2) the sum of all such principal payments.

"**Board of Directors**" means the board of directors elected or appointed by the stockholders of the Parent Guarantor to manage the business of the Parent Guarantor or any committee of such board duly authorized to take the action purported to be taken by such committee.

"**Board Resolution**" means any resolution of the Board of Directors taking an action which it is authorized to take and adopted at a meeting duly called and held at which a quorum of disinterested members (if so required) was present and acting throughout or adopted by written resolution executed by every member of the Board of Directors.

"**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in The City of New York, London and Singapore (or in any other place in which payments on the Notes are to be made) are authorized or required by law or governmental regulation to close.

"**Capitalized Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) which, in conformity with GAAP, is required to be capitalized on the balance sheet of such Person.

"**Capitalized Lease Obligations**" means the discounted present value of the rental obligations under a Capitalized Lease.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) in equity of such Person, whether outstanding on the Original Issue Date or issued thereafter, including, without limitation, all Common Stock and Preferred Stock.

"**Certificated Notes**" means the Notes, in certificated, registered form, executed and delivered by the Issuer and authenticated by or on behalf of the Trustee in exchange for the Global Notes, upon the occurrence of the events set forth in the second sentence of Section 2.04(e).

4

"**Change of Control**" means the occurrence of one or more of the following events:

(1)     the merger, amalgamation or consolidation of the Parent Guarantor with or into another Person or the merger or amalgamation of another Person with or into the Parent Guarantor, or the direct or indirect sale of all or substantially all the consolidated assets of the Parent Guarantor to another Person;

(2)     (a) Mr. Kamal K. Singh is the beneficial owner (as such term is used in Rule 13d-3 of the Exchange Act) of less than 26.0% of the total voting power of the Voting Stock of the Parent Guarantor, or (b) any "**person**" or "**group**" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) is or becomes the "**beneficial owner**" (as such term is used in Rule 13d-3 of the Exchange Act), directly or indirectly, of the total voting power of the Voting Stock of the Parent Guarantor greater than such total voting power held beneficially by the individual identified in sub-clause (a) of this clause (2);

(3)     individuals who on the Original Issue Date constituted the Board of Directors, together with any new directors whose election to the Board of Directors was approved by a vote of at least two-thirds of the directors then still in office who were either directors on the Original Issue Date or whose election was previously so approved, cease for any reason to constitute a majority of the Board of Directors then in office; or

(4)     the adoption of a plan relating to the liquidation or dissolution of the Parent Guarantor or the Issuer.

"**Change of Control Offer**" has the meaning assigned to such term in Section 4.12.

"**Clearstream**" means Clearstream Banking, *société anonyme*, Luxembourg.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all collateral securing, or purported to be securing, directly or indirectly, the Notes or any Note Guarantee pursuant to the Security Documents, and shall initially consist of a security interest in the Issuer's rights under the Intercompany Loans and the security interests over the Issuer's rights and claims with respect to the Interest Reserve Account.

"**Commodity Hedging Agreement**" means any spot, forward or option commodity price protection agreements or other similar agreement or arrangement designed to protect against fluctuations in commodity prices.

"**Common Stock**" means, with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock or ordinary shares, whether or not outstanding at the date of this Indenture, and includes, without limitation, all series and classes of such common stock or ordinary shares.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

"**Comparable Treasury Issue**" means the U.S. Treasury security having a maturity comparable to May 16, 2016 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities with a maturity comparable to May 16, 2016.

"**Comparable Treasury Price**" means, with respect to any redemption date (1) the average of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) on the third Business Day preceding such redemption date, as set forth in the daily statistical release (or any successor release) published by the Federal Reserve Bank of New York and designated "**Composite 3:30 p.m. Quotations for U.S. Government Securities**"; or (2) if such release (or any successor release) is not published or does not contain such prices on such Business Day, (a) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (b) if fewer than three such Reference Treasury Dealer Quotations are available, the average of all such quotations.

"**Consolidated EBITDA**" means, with respect to any Person for any period, Consolidated Net Income of such Person for such period plus, to the extent such amount was deducted in calculating such Consolidated Net Income:

      (1)     Consolidated Interest Expense;

      (2)     income taxes (other than income taxes attributable to extraordinary and non-recurring gains (or losses) or sales of assets); and

      (3)     depreciation expense, amortization expense and all other non-cash items reducing Consolidated Net Income (other than non-cash items in a period which reflect cash expenses paid or to be paid in another period), less all non-cash items increasing Consolidated Net Income;

all as determined on a consolidated basis for such Person and its Subsidiaries (excluding Unrestricted Subsidiaries) in conformity with GAAP; *provided* that (i) if any Restricted Subsidiary is not a Wholly Owned Restricted Subsidiary, Consolidated EBITDA shall be reduced (to the extent not otherwise reduced in accordance with GAAP) by an amount equal to (A) the amount of the Consolidated Net Income attributable to such Restricted Subsidiary multiplied by (B) the percentage ownership interest in the income of such Restricted Subsidiary not owned on the last day of such period by the Parent Guarantor or any of the Restricted Subsidiaries; and (ii) notwithstanding the preceding, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of a Person will be added to the Consolidated Net Income to compute Consolidated EBITDA of such person only to the extent that a corresponding amount would not be prohibited at the date of determination to be dividended to such person by such Restricted Subsidiary under the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

"**Consolidated Fixed Charges**" means, with respect to any Person for any period, the sum (without duplication) of (1) Consolidated Interest Expense for such period and (2) all cash and non-cash dividends paid, declared, accrued or accumulated during such period on any Disqualified Stock or Preferred Stock of such Person or any of its Subsidiaries (other than Unrestricted Subsidiaries) held by Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary, except for dividends payable in the Parent Guarantor's Capital Stock (other than Disqualified Stock).

"**Consolidated Interest Expense**" means, with respect to any Person for any period, the amount that would be included in gross interest expense on a consolidated income statement prepared in accordance with GAAP for such period of such Person and its Restricted Subsidiaries, plus, to the extent not included in such gross interest expense, and to the extent incurred, accrued or payable during such period by such Person and its Restricted Subsidiaries, without duplication, (1) interest expense attributable to Capitalized Lease Obligations, (2) amortization of debt issuance costs and original issue discount expense and non-cash interest payments in respect of any Indebtedness, (3) the interest portion of any deferred payment obligation, (4) all commissions, discounts and other fees and charges with respect to letters of credit or similar instruments issued for financing purposes or in respect of any Indebtedness, (5) the net costs associated with Hedging Obligations (including the amortization of fees), (6) interest accruing on Indebtedness of any other Person that is Guaranteed by, or secured by a Lien on any asset of, such Person or any of its Restricted Subsidiaries and (7) any capitalized interest; *provided* that interest expense attributable to interest on any Indebtedness bearing a floating interest rate will be computed on a *pro forma* basis as if the rate in effect on the date of determination had been the applicable rate for the entire relevant period.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in conformity with GAAP; *provided* that the following items shall be excluded in computing Consolidated Net Income (without duplication):

(1)     the net income (or loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting except that:

(a)     subject to the exclusion contained in clause (5) below, the Parent Guarantor's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Parent Guarantor or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary, to the limitations contained in clause (3) below); and

(b)     the Parent Guarantor's equity in a net loss of any such Person for such period will be included in determining such Consolidated Net Income to

the extent funded with cash or other assets of the Parent Guarantor or Restricted Subsidiaries;

(2)     the net income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Parent Guarantor or any of the Restricted Subsidiaries or all or substantially all of the property and assets of such Person are acquired by the Parent Guarantor or any of the Restricted Subsidiaries;

(3)     the net income (but not loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter, articles of association or other constitutive document or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary;

(4)     the cumulative effect of a change in accounting principles;

(5)     any net after tax gains (but not losses) realized on the sale or other disposition of (a) any property or asset of the Parent Guarantor or any Restricted Subsidiary that is not sold in the ordinary course of its business or (b) any Capital Stock of any Person (including any gains by the Parent Guarantor or a Restricted Subsidiary realized on sales of Capital Stock of the Parent Guarantor or of any Restricted Subsidiary);

(6)     any translation gains and losses due solely to fluctuations in currency values and related tax effects; and

(7)     any net after-tax extraordinary or non-recurring gains (but not losses).

"**Consolidated Net Worth**" means, at any date of determination, (i) with respect to the Issuer, stockholders' equity as set forth on the most recently available quarterly or annual consolidated balance sheet of the Issuer and its Restricted Subsidiaries, less any amounts attributable to Disqualified Stock or any equity security convertible into or exchangeable for Indebtedness, the cost of treasury stock and the principal amount of any promissory notes receivable from the sale of the Capital Stock of the Issuer or any of its Restricted Subsidiaries, each item to be determined in conformity with GAAP and (ii) with respect to the Parent Guarantor, stockholders' equity as set forth on the most recently available quarterly or annual consolidated balance sheet of the Parent Guarantor and the Restricted Subsidiaries, plus, to the extent not included, any Preferred Stock of the Parent Guarantor, less any amounts attributable to Disqualified Stock or any equity security convertible into or exchangeable for Indebtedness, the cost of treasury stock and the principal amount of any promissory notes receivable from the sale of the Capital Stock of the Parent Guarantor or any of the Restricted Subsidiaries, each item to be determined in conformity with GAAP.

"**Consolidated Priority Indebtedness Leverage Ratio**" means, on any Transaction Date, the ratio of (x) the aggregate principal amount of Priority Indebtedness outstanding on such Transaction Date, to (y) the aggregate amount of Total Assets.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is principally administered, which at the date of this Indenture is located at DB Trustees (Hong Kong) Limited, Level 52, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong. Attention: Managing Director.

"**Currency Hedging Agreement**" means any currency swap agreement, currency cap agreement, currency floor agreement, currency futures agreement, commodity option agreement or any other similar agreement or arrangement which may consist of one or more of the foregoing agreements, designed to protect against fluctuations in currency prices.

"**Custodian**" means Deutsche Bank Trust Company Americas, as custodian with respect to the Notes in global form.

"**Default**" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Disqualified Stock**" means any class or series of Capital Stock of any Person that by its terms or otherwise is (1) required to be redeemed prior to the date that is 183 days after the Stated Maturity of the Notes, (2) redeemable at the option of the holder of such class or series of Capital Stock at any time prior to the date that is 183 days after the Stated Maturity of the Notes or (3) convertible into or exchangeable for Capital Stock referred to in clause (1) or (2) above or Indebtedness having a scheduled maturity prior to the date that is 183 days after the Stated Maturity of the Notes; *provided* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "**asset sale**" or "**change of control**" occurring prior to the date that is 183 days after the Stated Maturity of the Notes shall not constitute Disqualified Stock if the "**asset sale**" or "**change of control**" provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Section 4.12 and Section 4.13 and such Capital Stock specifically provides that such Person will not repurchase or redeem any such stock pursuant to such provision prior to the Issuer's repurchase of such Notes as are required to be repurchased pursuant to Section 4.12 and Section 4.13.

"**Dollar Equivalent**" means, with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the noon buying rate for U.S. dollars in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York on the date of determination.

"**DTC**" means The Depository Trust Company and its successors.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

"**Equity Offering**" means an underwritten primary public offering, after the Original Issue Date, of Common Stock of the Parent Guarantor; *provided* that (i) the aggregate gross cash proceeds received by the Parent Guarantor as a result of such offering will be no less than US$20.0 million (or the Dollar Equivalent thereof) and (ii) any such offering shall result in such Capital Stock being listed and eligible for dealing on a Recognized Exchange.

"**Euroclear**" means Euroclear Bank S.A./N.V.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Proceeds**" has the meaning assigned to such term in Section 4.13(c).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Board of Directors, whose determination shall be conclusive if evidenced by a Board Resolution.

"**Final Maturity Date**" means May 16, 2018.

"**Fitch**" means Fitch Inc., a subsidiary of Fimalac, S.A., and its successors.

"**Fixed Charge Coverage Ratio**" means, on any Transaction Date, the ratio of (1) the aggregate amount of Consolidated EBITDA for the then most recent four fiscal quarters prior to such Transaction Date for which consolidated financial statements of the Parent Guarantor are available (which may be internal consolidated financial statements) (the "**Four Quarter Period**") to (2) the aggregate Consolidated Fixed Charges during such Four Quarter Period. In making the foregoing calculation:

(A)     *pro forma* effect shall be given to any Indebtedness Incurred, repaid or redeemed during the period (the "**Reference Period**") commencing on and including the first day of the Four Quarter Period and ending on and including the Transaction Date (other than Indebtedness Incurred or repaid under a revolving credit or similar arrangement (or under any predecessor revolving credit or similar arrangement) in effect on the last day of such Four Quarter Period), in each case as if such Indebtedness had been Incurred, repaid or redeemed on the first day of such Reference Period; *provided* that, in the event of any such repayment or redemption, Consolidated EBITDA for such period will be calculated as if the Parent Guarantor or such Restricted Subsidiary had not earned any interest income actually earned during such period in respect of the funds used to repay or redeem such Indebtedness;

(B)     Consolidated Interest Expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a *pro forma* basis and bearing a floating interest rate will be computed as if the rate in effect on the Transaction Date (taking into account any Interest Rate Hedging Agreement applicable to such

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Indebtedness if such Interest Rate Hedging Agreement has a remaining term in excess of 12 months or, if shorter, at least equal to the remaining term of such Indebtedness) had been the applicable rate for the entire period;

(C)    *pro forma* effect will be given to the creation, designation or redesignation of Restricted Subsidiaries and Unrestricted Subsidiaries as if such creation, designation or redesignation had occurred on the first day of such Reference Period;

(D)    *pro forma* effect will be given to Asset Dispositions and Asset Acquisitions (including giving *pro forma* effect to the application of proceeds of any Asset Disposition) that occur during such Reference Period as if they had occurred and such proceeds had been applied on the first day of such Reference Period; and

(E)    *pro forma* effect will be given to asset dispositions and asset acquisitions (including giving *pro forma* effect to the application of proceeds of any asset disposition) that have been made by any Person that has become a Restricted Subsidiary or has been merged with or into the Parent Guarantor or any Restricted Subsidiary during such Reference Period and that would have constituted Asset Dispositions or Asset Acquisitions had such transactions occurred when such Person was a Restricted Subsidiary as if such asset dispositions or asset acquisitions were Asset Dispositions or Asset Acquisitions that occurred on the first day of such Reference Period;

*provided* that to the extent that clause (D) or (E) of this definition requires that *pro forma* effect be given to an Asset Acquisition or Asset Disposition (or asset acquisition or asset disposition), such *pro forma* calculation will be based upon the four full fiscal quarters immediately preceding the Transaction Date of the Person, or division or line of business of the Person, that is acquired or disposed for which financial information is available.

"**Future Subsidiary Guarantor**" has the meaning assigned to such term in Section 11.09.

"**GAAP**" means generally accepted accounting principles in India as in effect from time to time. All ratios and computations contained or referred to in this Indenture shall be computed in conformity with GAAP applied on a consistent basis.

"**Global Notes**" has the meaning assigned to such term in Section 2.04.

"**Government Securities**" means securities that are direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay,

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 101 of 739

or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning. The term "Guarantor" means a Person who has provided a Guarantee.

"**Guarantee Period**" has the meaning assigned to such term in Section 10.09(c).

"**Guaranteed Indebtedness**" has the meaning assigned to such term in Section 4.10.

"**Hedging Obligation**" of any Person means the obligations of such Person pursuant to any Commodity Hedging Agreement, Currency Hedging Agreement or Interest Rate Hedging Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Note register.

"**IFRS**" means the International Financial Reporting Standards.

"**Incur**" means, with respect to any Indebtedness or Disqualified Stock, to incur, create, issue, assume, Guarantee or otherwise become liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness or Disqualified Stock; *provided* that (1) any Indebtedness and Disqualified Stock of a Person existing at the time such Person becomes a Restricted Subsidiary will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and (2) the accretion of original issue discount shall not be considered an Incurrence of Indebtedness. The terms "**Incurrence**," "**Incurred**" and "**Incurring**" have meanings correlative with the foregoing.

"**Indebtedness**" means, with respect to any Person at any date of determination (without duplication):

(1)      all indebtedness of such Person for borrowed money;

(2)      all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)      all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments;

(4)      all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except Trade Payables;

(5)      all Capitalized Lease Obligations and Attributable Indebtedness;

12

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(6) all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided* that the amount of such Indebtedness shall be the lesser of (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness;

(7) all Indebtedness of other Persons Guaranteed by such Person to the extent such Indebtedness is Guaranteed by such Person;

(8) to the extent not otherwise included in this definition, Hedging Obligations;

(9) all Disqualified Stock issued by such Person valued at the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price plus accrued dividends; and

(10) any Preferred Stock issued by (a) such Person, if such Person is a Restricted Subsidiary or (b) any Restricted Subsidiary of such Person valued at the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price plus accrued dividends.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation; *provided*

(1) that the amount outstanding at any time of any Indebtedness issued with original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP;

(2) that money borrowed and set aside at the time of the Incurrence of any Indebtedness in order to prefund the payment of the interest on such Indebtedness shall not be deemed to be "**Indebtedness**" so long as such money is held to secure the payment of such interest; and

(3) that the amount of Indebtedness with respect to any Hedging Obligation shall be equal to the net amount payable if the Commodity Hedging Agreement, Currency Hedging Agreement or Interest Rate Hedging Agreement giving rise to such Hedging Obligation terminated at that time due to default by such Person.

For the avoidance of doubt, customer deposits and advance payments received in the ordinary course of business from customers for goods or services purchased in the ordinary course of business will not constitute Indebtedness.

"**Indenture**" means this indenture (including all Exhibits hereto) as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

"**India**" means the Republic of India.

"**Initial Non-Guarantor Subsidiaries**" means Rolta Thales Limited, Rolta Canada Ltd., Rolta Asia Pacific Pty Ltd., Rolta Benelux N.V., AT Solutions Group, LLC, Rolta Deutschland GmbH Germany and Rolta Saudi Arabia Ltd.

"**Initial Subsidiary Guarantors**" means Rolta International, Inc., Rolta Middle East FZ-LLC and Rolta U.K. Limited.

"**Intercompany Loans**" means each of (i) the intercompany note dated as of May 16, 2013 issued by Rolta International, Inc. to the Issuer, (ii) the intercompany note dated as of May 16, 2013 issued by Rolta U.K. Limited to the Issuer, (iii) the intercompany note dated as of May 16, 2013 issued by Rolta Middle East FZ-LLC to the Issuer, (iv) any intercompany note issued by a Subsidiary Guarantor to the Issuer evidencing the obligations of such Subsidiary Guarantor to repay advances made to it by the Issuer and (v) any loan extended by the Issuer in U.S. Dollars with the Issuer as obligee, to lend the proceeds of the offering of the Notes or any Additional Notes to a Subsidiary Guarantor as obligor pursuant to intercompany loans (and any novation thereof), which will be at all times in the aggregate at a minimum for the aggregate principal amount of the Notes or Additional Notes then outstanding.

"**Interest Payment Date**" means May 16 and November 16 of each year, commencing November 16, 2013.

"**Interest Rate Hedging Agreement**" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement designed to protect against fluctuations in interest rates.

"**Interest Record Date**" means the date specified as the interest record date in the forms of the Notes attached hereto as Exhibits A, C and D.

"**Interest Reserve Account**" means the designated account in the name of the Issuer, held at Deutsche Bank Trust Company Americas, and maintained in U.S. dollars for the benefit of holders of any Notes, in respect of which the Issuer charged to the Security Agent on the Original Issue Date in order to secure the obligations of the Issuer under the Notes and this Indenture and of the Note Guarantors under the Note Guarantees and all of its right, title and interest in such account.

"**Interest Reserve Agreement**" means that certain agreement dated as of May 16, 2013, among Rolta, LLC, the Trustee, the Security Agent and Deutsche Bank Trust Company Americas.

"**Investment**" means:

(1)      any direct or indirect advance, loan or other extension of credit to another Person;

14

(2)     any capital contribution to another Person (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others);

(3)     any purchase or acquisition of Capital Stock (or options, warrants or other rights to acquire such Capital Stock), Indebtedness, bonds, notes, debentures or other similar instruments or securities issued by another Person; or

(4)     any Guarantee of any obligation of another Person.

For the purposes of the provisions of Sections 4.06 and 4.18, (1) the Parent Guarantor will be deemed to have made an Investment in an Unrestricted Subsidiary in an amount equal to the Fair Market Value of the Parent Guarantor's proportionate interest in the assets (net of the liabilities owed to any Person other than the Parent Guarantor or a Restricted Subsidiary and that are not Guaranteed by the Parent Guarantor or a Restricted Subsidiary) of a Restricted Subsidiary that is designated an Unrestricted Subsidiary calculated as of the time of such designation; (2) if the Parent Guarantor or any Subsidiary of the Parent Guarantor sells or otherwise disposes of any Investment of any direct or indirect Subsidiary of the Parent Guarantor such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Parent Guarantor, the Parent Guarantor will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Parent Guarantor's Investments in such Subsidiary that were not sold or disposed of; (3) the acquisition by the Parent Guarantor or any Subsidiary of the Parent Guarantor of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Parent Guarantor or such Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person; and (4) any property transferred to or from any Person shall be valued at its Fair Market Value at the time of such transfer, as determined in good faith by the Board of Directors.

 "**Investment Grade**" means a rating of "AAA," "AA," "A" or "BBB," as modified by a "+" or "-" indication, or an equivalent rating representing one of the four highest rating categories, by S&P or any of its successors or assigns, or a rating of "Aaa," or "Aa," "A" or "Baa," as modified by a "1," "2" or "3" indication, or an equivalent rating representing one of the four highest rating categories, by Moody's or any of its successors or assigns, or a rating of "AAA," "AA," "A," "BBB," as modified by a "+" or "–" indication, or an equivalent rating representing one of the four highest rating categories, by Fitch or any of its successors or assigns, or the equivalent ratings of any internationally recognized rating agency or agencies, as the case may be, which shall have been designated by the Parent Guarantor as having been substituted for S&P, Moody's or Fitch or two or three of them, as the case may be.

 "**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to this Indenture.

 "**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Maximum Guaranteed Amount**" has the meaning assigned to such term in Section 10.10.

"**Moody's**" means Moody's Investors Service, Inc., a subsidiary of Moody's Corporation, and its successors.

"**Net Cash Proceeds**" means:

(1)    with respect to any Asset Sale (other than the issuance or sale of Capital Stock), the proceeds of such Asset Sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of:

(a)    brokerage commissions and other fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

(b)    provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(c)    payments made to repay Indebtedness or any other obligation outstanding at the time of such Asset Sale that either (x) is secured by a Lien on the property or assets sold or (y) is required to be paid as a result of such sale; and

(d)    appropriate amounts to be provided by the Parent Guarantor or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with GAAP and reflected in an Officers' Certificate delivered to the Trustee; and

(2)    with respect to any issuance or sale of Capital Stock, the proceeds of such issuance or sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

"**Non-Guarantor Subsidiaries**" means the Initial Non-Guarantor Subsidiaries together with any future Restricted Subsidiary that does not provide a Subsidiary Guarantee.

"**Non-U.S. Person**" means a Person that is not a U.S. person, as defined in Regulation S.

"**Note Guarantee**" means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Note Guarantor.

"**Note Guarantors**" means the Parent Guarantor together with the Subsidiary Guarantors.

"**Notes**" has the meaning assigned to such term in the Recitals of this Indenture.

"**Offer to Purchase**" means an offer to purchase Notes by the Issuer from the Holders commenced by the Issuer mailing a notice by first class mail, postage prepaid, to the Trustee and each Holder at its last address appearing in the Note register stating:

(1)     the provision in this Indenture pursuant to which the offer is being made and that all Notes validly tendered will be accepted for payment on a pro rata basis;

(2)     the purchase price and the date of purchase (which shall be a Business Day no earlier than 30 days nor later than 60 days from the date such notice is mailed) (the "**Offer to Purchase Payment Date**");

(3)     that any Note not tendered will continue to accrue interest pursuant to its terms;

(4)     that, unless the Issuer defaults in the payment of the purchase price, any Note accepted for payment pursuant to the Offer to Purchase shall cease to accrue interest on and after the Offer to Purchase Payment Date;

(5)     that Holders electing to have a Note purchased pursuant to the Offer to Purchase will be required to surrender the Note, together with the form entitled "**Option of the Holder to Elect Purchase**" on the reverse side of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the Business Day immediately preceding the Offer to Purchase Payment Date;

(6)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the third Business Day immediately preceding the Offer to Purchase Payment Date, a facsimile transmission or letter setting forth the name of such Holder, the principal amount of Notes delivered for purchase and a statement that such Holder is withdrawing his election to have such Notes purchased; and

(7)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes

17

surrendered; *provided* that each Note purchased and each new Note issued shall be in a principal amount of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000.

One Business Day prior to the Offer to Purchase Payment Date, the Issuer shall deposit with the Paying Agent money sufficient to pay the purchase price of all Notes or portions thereof to be accepted by the Issuer for payment on the Offer to Purchase Payment Date. On the Offer to Purchase Payment Date, the Issuer shall (a) accept for payment on a *pro rata* basis Notes or portions thereof tendered pursuant to an Offer to Purchase; and (b) deliver, or cause to be delivered, to the Trustee all Notes or portions thereof so accepted together with an Officers' Certificate specifying the Notes or portions thereof accepted for payment by the Issuer. The Paying Agent shall promptly mail to the Holders of Notes so accepted payment in an amount equal to the purchase price, and upon receipt of written order of the Issuer signed by an Officer, the Trustee shall promptly authenticate and mail to such Holders a new Note equal in principal amount to any unpurchased portion of the Note surrendered; *provided* that each Note purchased and each new Note issued shall be in a principal amount of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000. The Issuer will publicly announce the results of an Offer to Purchase as soon as practicable after the Offer to Purchase Payment Date. The Issuer will comply with Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable, in the event that the Issuer is required to repurchase Notes pursuant to an Offer to Purchase.

The offer is required to contain or incorporate by reference information concerning the business of the Parent Guarantor and its Subsidiaries which the Parent Guarantor in good faith believes will assist such Holders to make an informed decision with respect to the Offer to Purchase, including a brief description of the events requiring the Issuer to make the Offer to Purchase, and any other information required by applicable law to be included therein. The offer is required to contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Offer to Purchase.

"**Officer**" means one of the executive officers of the Parent Guarantor or, in the case of a Restricted Subsidiary, one of the directors or officers of such Restricted Subsidiary.

"**Officers' Certificate**" means a certificate signed by two Officers; *provided* that, with respect to any Subsidiary Guarantor having only one Officer, an "**Officers' Certificate**" means a certificate signed by such Officer.

"**Opinion of Counsel**" means a written opinion from external legal counsel selected by the Parent Guarantor, *provided* that such counsel will be acceptable to the Trustee in its sole discretion.

"**Original Issue Date**" means the date on which the Notes are originally issued under this Indenture.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 108 of 739

"**outstanding**" when used with respect to the Notes means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(1)    Notes theretofore cancelled by the Paying and Transfer Agent or accepted by the Paying and Transfer Agent for cancellation;

(2)    Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying and Transfer Agent in trust for the Holders of such Notes; *provided* that, if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor reasonably satisfactory to the Trustee has been made; and

(3)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

A Note does not cease to be outstanding because the Issuer or any Affiliate of the Issuer holds the Note; *provided* that in determining whether the Holders of the requisite amount of outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, Notes owned by the Issuer or any Affiliate of the Issuer or beneficially held for the Issuer or an Affiliate of the Issuer shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such request, demand, authorization, direction, notice, consent or waiver, only Notes for which the Trustee has received an Officers' Certificate from the Issuer or an Affiliate of the Issuer evidencing such ownership or beneficial holding shall be so disregarded. Notes so owned or beneficially held that have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the reasonable satisfaction of the Trustee the pledgee's right to act with respect to such Notes and that the pledgee is not the Issuer or an Affiliate of the Issuer.

"**Parent Guaranteed Amount**" has the meaning assigned to such term in Section 10.10.

"**Paying and Transfer Agent**" shall mean Deutsche Bank Trust Company Americas.

"**Payment Date**" has the meaning assigned to such term in Section 4.01(a).

"**Permitted Businesses**" means any business which is the same as or ancillary or complementary to any of the businesses of the Parent Guarantor and the Restricted Subsidiaries on the Original Issue Date.

"**Permitted Indebtedness**" has the meaning assigned to such term in Section 4.05(b).

"**Permitted Investment**" means:

19

(1)     any Investment in the Issuer or a Note Guarantor that is primarily engaged in a Permitted Business or a Person which will, upon the making of such Investment, become a Note Guarantor that is primarily engaged in a Permitted Business or will be merged or consolidated with or into, or transfer or convey all or substantially all its assets to, the Issuer or a Note Guarantor that is primarily engaged in a Permitted Business;

(2)     cash or Temporary Cash Investments;

(3)     payroll, travel and similar advances made in the ordinary course of business to cover matters that are expected at the time of such advances ultimately to be treated as expenses in accordance with GAAP;

(4)     stock, obligations or securities received in satisfaction of judgments;

(5)     any Investment pursuant to a Hedging Obligation designed solely to protect any Note Guarantor against fluctuations in commodity prices, interest rates or foreign currency exchange rates;

(6)     receivables, trade credits or other current assets owing to the Parent Guarantor or any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(7)     Investments consisting of consideration received in connection with an Asset Sale under Section 4.13(a)(iv)(B), and made in compliance with, Section 4.13;

(8)     pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "**Permitted Liens**";

(9)     purchases and acquisitions of inventory, supplies, material or equipment from suppliers or vendors in the ordinary course of the Permitted Business;

(10)     Investments in existence on the Original Issue Date; and

(11)     repurchases of the Notes.

"**Permitted Liens**" means:

(1)     Liens for taxes, assessments, governmental charges or claims that are being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made;

(2)     statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal or administrative proceedings promptly

20

instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made;

(3)    Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money);

(4)    leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(5)    Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person (i) becomes a Restricted Subsidiary or (ii) is merged with or into or consolidated with the Parent Guarantor or any Restricted Subsidiary; *provided* that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets of such Person (if such Person becomes a Restricted Subsidiary) or the property or assets acquired by the Parent Guarantor or such Restricted Subsidiary (if such Person is merged with or into or consolidated with the Parent Guarantor or such Restricted Subsidiary); *provided further* that such Liens were not created in contemplation of or in connection with the transactions or series of transactions pursuant to which such Person became a Restricted Subsidiary;

(6)    Liens in favor of the Issuer or any Note Guarantor;

(7)    Liens arising from the rendering of a final judgment or order against the Parent Guarantor or any Restricted Subsidiary that do not give rise to an Event of Default;

(8)    Liens securing reimbursement obligations with respect to letters of credit, performance and surety bonds and completion guarantees that encumber documents and other property relating to such letters of credit and the products and proceeds thereof;

(9)    Liens existing on the Original Issue Date;

(10)    Liens securing Indebtedness which is Incurred to refinance Secured Indebtedness which is permitted to be Incurred under Section 4.05(b)(iv), *provided* that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

(11)    Liens securing Hedging Obligations permitted to be Incurred under Section 4.05(b)(v), *provided* that (i) Indebtedness relating to any such Hedging Obligation is, and is permitted under the covenant described under Section 4.07 to be, secured by a Lien on the same property securing such Hedging Obligation or (ii) such Liens are encumbering customary initial deposits or margin deposits or are otherwise

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

within the general parameters customary in the industry and incurred in the ordinary course of business;

(12)    Liens securing Attributable Indebtedness permitted to be Incurred under this Indenture;

(13)    Liens securing indebtedness permitted to be Incurred under Section 4.05(b)(xii), *provided* that (a) any such Lien is created prior to, at the time of or within 30 days after entering into the agreement underlying such Indebtedness and (b) the aggregate book of property and assets (as reflected in the most recently available consolidated financial statements of the Parent Guarantor or, if any such property and assets have been acquired since the date of such financial statements, the cost of such property and assets) subject to Liens incurred pursuant to this clause (13) does not exceed the aggregate principal amount of Indebtedness Incurred pursuant to Section 4.05(b)(xii);

(14)    Liens securing Indebtedness permitted under Section 4.05(b)(xvi), *provided* that (i) such Liens extend to or cover only the equipment, property or asset whose purchase, or the personal property whose development, construction or improvement, is to be financed with such Indebtedness, as the case may be; (ii) such Liens are Incurred in the ordinary course of business of the Parent Guarantor and its Restricted Subsidiaries; (iii) such Liens are created no later than 90 days after the acquisition of such equipment, property or asset or the completion of development, construction or improvement of such personal property, as the case may be; and (iv) the aggregate book value of property and assets (as reflected in the most recently available consolidated financial statements of the Parent Guarantor, or, if any such property and assets have been acquired since the date of such financial statements, the cost of such property and assets) subject to Liens Incurred pursuant to this clause (14) does not exceed the aggregate principal amount of Indebtedness Incurred pursuant to Section 4.05(b)(xvi);

(15)    Liens under the Security Documents;

(16)    Liens securing Permitted Priority Indebtedness;

(17)    survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, leases, sewers, electric lines, gas lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(18)    security given in the ordinary course of business (and not in connection with the borrowing of money or the obtaining of credit) to a public utility or any municipality or governmental or other public authority when required by such utility or municipality or governmental or other authority in connection with the operations of the Parent Guarantor and its Restricted Subsidiaries;

(HK) 06562/183/INDENTURE/Raptor Indenture docx

(19)    Liens incurred or pledges or deposits made in the ordinary course of the Permitted Business in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits;

(20)    Liens arising out of conditional sale, title retention consignment or similar arrangements for the sale of goods entered into by the Parent Guarantor or any of its Restricted Subsidiaries in the ordinary course of the Permitted Business in accordance with past practice;

(21)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by the Parent Guarantor granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts, netting arrangements or sweep accounts; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (directly or indirectly) the repayment of any Indebtedness;

(22)    Liens relating to purchase orders and other agreements entered into with customers of the Parent Guarantor or any of its Restricted Subsidiaries in the ordinary course of business;

(23)    leases and licenses of intellectual property that do not materially interfere with the ordinary course of the Permitted Business of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(24)    Liens on Capital Stock or other securities or assets of any Unrestricted Subsidiary that secure obligations of such Unrestricted Subsidiary;

(25)    the filing of UCC financing statements solely as a precautionary measure;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)    Liens on equipment of the Parent Guarantor or any Restricted Subsidiary and located on the premises of any client or supplier in the ordinary course of the Permitted Business;

(28)    Liens on assets or securities deemed to arise in connection with and solely as a result of the execution, delivery or performance of contracts to sell such assets or securities if such sale is otherwise permitted by this Indenture;

(29)    Liens in connection with any disposition of Capital Stock of a Restricted Subsidiary pursuant to Indian regulatory or shareholding requirements, including, without limitation, the ability to invest proceeds received from the disposition of such Capital Stock to create an escrow account, the ability to pass the control of such escrow account to a third party and the entry into put or call arrangements with third parties;

23

(HK) 06562/183/INDENTURE/Raptor Indenture docx

(30)    Liens of a collection bank arising under Section 4-210 of the New York Uniform Commercial Code on items in the course of collection in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) within general parameters customary in the banking industry;

(31)    Liens on assets pursuant to merger agreements, stock or asset purchase agreements and similar agreements in respect of the disposition of such assets;

(32)    Liens in connection with the defeasance, discharge or redemption of Indebtedness of the Parent Guarantor or any of its Restricted Subsidiaries;

(33)    Liens securing the Interest Reserve Account; and

(34)    Liens securing obligations in an aggregate principal amount not to exceed US$2.5 million (or the Dollar Equivalent thereof) at any one time outstanding,

*provided* that, with respect to the Collateral, "**Permitted Liens**" will refer only to the Liens described in clauses (1), (2), (9), (10), (15) and (17) of this definition.

"**Permitted Priority Indebtedness**" means any Priority Indebtedness; *provided* that, on the date of Incurrence of such Indebtedness, and after giving effect thereto and the application of the proceeds thereof, the Consolidated Priority Indebtedness Leverage Ratio would be no greater than (i) 0.5 to 1.0 with respect to any Incurrence of Indebtedness on or prior to May 16, 2014, (ii) 0.45 to 1.0 with respect to any Incurrence of Indebtedness following May 16, 2014 and on or prior to May 16, 2016 and (iii) 0.40 to 1.0 with respect to any Incurrence of Indebtedness thereafter.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Pledge and Security Agreement**" means that certain agreement dated as of May 16, 2013, among Rolta, LLC, Rolta International, Inc., Rolta U.K. Limited, Rolta Middle East FZ-LLC, the Trustee and the Security Agent.

"**Preferred Stock**" as applied to the Capital Stock of any Person means Capital Stock of any class or classes that by its term is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"**Principal Office**" means the office of the principal Paying and Transfer Agent at which the business of the principal Paying and Transfer Agent is principally administered, which at the date of this Indenture is located at Deutsche Bank Trust Company Americas, 60 Wall Street, 27th Floor, New York, New York 10005, United States of America.

"**principal**" of any Indebtedness means the principal amount of such Indebtedness (or if such Indebtedness was issued with original issue discount, the face amount of such

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 114 of 739

Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness), together with, unless the context otherwise indicates, any premium then payable on such Indebtedness.

"**Priority Indebtedness**" means any Indebtedness (a) of any Restricted Subsidiary (other than a Subsidiary Guarantor or the Issuer) other than Indebtedness Incurred under Section 4.05(b)(iii) that continues to be classified under such clause of Section 4.05 and (b) any Secured Indebtedness of the Issuer or a Note Guarantor, other than the Notes (including any Additional Notes) and Indebtedness Incurred under Section 4.05(b)(iii) that continues to be classified under such clause of Section 4.05.

"**QIB**" has the meaning assigned to such term in Section 2.04(c).

"**Rating Agencies**" means (1) S&P, (2) Moody's and (3) Fitch; *provided* that if S&P, Moody's, Fitch, two of any of the three or all three of them shall not make a rating of the Notes publicly available, one or more nationally recognized statistical rating organizations (as defined in Section 3(a)(62) under the Exchange Act), as the case may be, selected by the Parent Guarantor, which shall be substituted for S&P, Moody's, Fitch, two of any of the three or all three of them, as the case may be.

"**Rating Category**" means (1) with respect to S&P, any of the following categories: "BB," "B," "CCC," "CC," "C" and "D" (or equivalent successor categories); (2) with respect to Moody's, any of the following categories: "Ba," "B," "Caa," "Ca," "C" and "D" (or equivalent successor categories); (3) with respect to Fitch, any of the following categories: "BB," "B," "CCC," "CC," "C" and "D" (or equivalent successor categories); and (4) the equivalent of any such category of S&P, Moody's or Fitch used by another Rating Agency. In determining whether the rating of the Notes has decreased by one or more gradations, gradations within Rating Categories ("+" and "-" for S&P; and "1," "2" and "3" for Moody's; "+" and "-" for Fitch; or the equivalent gradations for another Rating Agency) will be taken into account (e.g., with respect to S&P, a decline in a rating from "BB+" to "BB," as well as from "BB-" to "B+," will constitute a decrease of one gradation).

"**Rating Date**" means in connection with actions contemplated under Section 5.01 that date which is 90 days prior to the earlier of (x) the occurrence of any such actions as set forth therein and (y) a public notice of the occurrence of any such actions.

"**Rating Decline**" means in connection with actions contemplated under Section 5.01 the notification by any of the Rating Agencies that such proposed actions will result in any of the events listed below:

(a)     in the event the Notes are rated by all three of the Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by any two of the three Rating Agencies will be below Investment Grade;

(b)     in the event the Notes are rated by any two, but not all three, of the three Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by any of such two Rating Agencies will be below Investment Grade;

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(c)     in the event the Notes are rated by one, and only one, of the three Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by such Rating Agency will be below Investment Grade; or

(d)     in the event the Notes are rated below Investment Grade by all three of the Rating Agencies on the Rating Date, the rating of the Notes by any Rating Agency will be decreased by one or more gradations (including gradations within Rating Categories as well as between Rating Categories).

"**RBI**" means the Reserve Bank of India.

"**Recognized Exchange**" means the Bombay Stock Exchange Limited, National Stock Exchange of India Limited, the London Stock Exchange, the New York Stock Exchange and the Nasdaq National Market.

"**Reference Treasury Dealer**" means each of any three investment banks of recognized standing that is a primary U.S. Government securities dealer in The City of New York, selected by the Parent Guarantor in good faith.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any redemption date, the average as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Trustee by such Reference Treasury Dealer at 5:00 p.m. (New York City Time) on the third Business Day preceding such redemption date.

"**Register**" has the meaning assigned to such term in Section 2.05.

"**Registrar**" has the meaning assigned to such term in Section 2.05.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Global Note**" has the meaning assigned to such term in Section 2.04(c).

"**Relevant Jurisdiction**" has the meaning assigned to such term in Section 4.21(a).

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 4.21(a).

"**Replacement Assets**" has the meaning assigned to such term in Section 4.13(b)(ii).

"**Restricted Certificated Note**" has the meaning assigned to such term in Section 2.04(d).

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

"**Restricted Global Note**" has the meaning assigned to such term in Section 2.04(c).

"**Restricted Payments**" has the meaning assigned to such term in Section 4.06.

"**Restricted Subsidiary**" means any Subsidiary of the Parent Guarantor other than an Unrestricted Subsidiary.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**SGX-ST**" has the meaning assigned to such term in Section 4.02(c).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"**Sale and Leaseback Transaction**" means any direct or indirect arrangement relating to property (whether real, personal or mixed), now owned or hereafter acquired whereby the Parent Guarantor or any Restricted Subsidiary transfers such property to another Person and the Parent Guarantor or any Restricted Subsidiary leases it from such Person.

"**Secured Indebtedness**" means any Indebtedness of the Parent Guarantor or a Restricted Subsidiary secured by a Lien.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" has the meaning assigned to such term in Section 2.04(d).

"**Security Agent**" means a security agent appointed by the Trustee to hold the Collateral on its behalf and on behalf of the Holders under the Security Documents pursuant to the terms thereof, the appointment of which is authorized by the Holders hereunder, which shall initially be DB Trustees (Hong Kong) Limited.

"**Security Documents**" means the Pledge and Security Agreement, the Interest Reserve Agreement and all security agreements, pledge agreements, assignments, mortgages, deeds of trust, security trustee, intercreditor or collateral agency agreements, control agreements or other grants or transfers of security executed and delivered by the Issuer, the Note Guarantors or any other Pledgor creating (or purporting to create) a Lien upon the Collateral in favor of the Security Agent, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "**significant subsidiary**" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated under the Securities Act, as such regulation is in effect on the Original Issue Date.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 117 of 739

"**Stated Maturity**" means, (1) with respect to any Indebtedness, the date specified in such debt security as the fixed date on which the final installment of principal of such Indebtedness is due and payable as set forth in the documentation governing such Indebtedness and (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness.

"**Subordinated Indebtedness**" means any Indebtedness of the Issuer or any Note Guarantor that is contractually subordinated or junior in right of payment to the Notes or to any Note Guarantee, as applicable, pursuant to a written agreement to such effect.

"**Subsidiary**" means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person.

"**Subsidiary Guarantee**" means any Guarantee of the obligations of the Issuer under this Indenture and the Notes by any Subsidiary Guarantor.

"**Subsidiary Guarantor**" means the Initial Subsidiary Guarantors and any other Restricted Subsidiary that Guarantees the obligations of the Issuer under this Indenture and the Notes; *provided* that "**Subsidiary Guarantor**" does not include any Person whose Subsidiary Guarantee has been released in accordance with this Indenture and the Notes.

"**Surviving Person**" has the meaning assigned to such term in Section 5.01(a).

"**Tax Redemption Date**" has the meaning assigned to such term in Section 3.01.

"**Temporary Cash Investment**" means any of the following:

(1)     United States dollars, Indian rupees, Euros or, in the case of any Restricted Subsidiary, local currencies held by such Restricted Subsidiaries from time to time in the ordinary course of the Permitted Business;

(2)     direct obligations of the United States of America, Canada, a member of the European Union or the Republic of India or, in each case, any agency of either of the foregoing or obligations fully and unconditionally Guaranteed by the United States of America or any agency of either of the foregoing, in each case maturing within one year;

(3)     demand or time deposit accounts, certificates of deposit and money market deposits maturing within 365 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, the United Kingdom or India and which bank or trust company has capital, surplus and undivided profits aggregating in excess of US$100.0 million (or the Dollar Equivalent thereof) and has outstanding debt which is rated "**A**" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Section 3(a)(62) under the Exchange Act);

28

(4)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (2) above entered into with a bank or trust company meeting the qualifications described in clause (3) above;

(5)     commercial paper, maturing not more than 180 days after the date of acquisition thereof, issued by a corporation (other than an Affiliate of the Parent Guarantor) organized and in existence under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P or Fitch;

(6)     securities with maturities of six months or less from the date of acquisition thereof, issued or fully and unconditionally Guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "**A**" by S&P, Moody's or Fitch;

(7)     any money market fund that has at least 95.0% of its assets continuously invested in investments of the types described in clauses (1) through (5) above; and

(8)     demand or time deposit accounts, certificates of deposit and money market deposits with (i) State Bank of India, ICICI Bank or Axis Bank, (ii) Union Bank of India, (iii) any other bank or trust company organized under the laws of the India whose long-term debt is rated by Moody's, S&P or Fitch as high or higher than any of those banks listed in clause (i) of this paragraph or (iv) any other bank organized under the laws of the India; *provided* that, in the case of clause (iv), such deposits do not exceed US$2.5 million (or the Dollar Equivalent thereof) with any single bank or US$5.0 million (or the Dollar Equivalent thereof) in the aggregate, at any date of determination thereafter.

"**Total Assets**" means, as of any date, the total consolidated assets of the Parent Guarantor and its Restricted Subsidiaries measured in accordance with GAAP as of the last date of the most recent fiscal quarter for which consolidated financial statements of the Parent Guarantor (which the Parent Guarantor will use its best efforts to compile in a timely manner) are available (which may be internal consolidated financial statements).

"**Trade Payables**" means, with respect to any Person, any accounts payable or any other indebtedness or monetary obligation to trade creditors created, assumed or Guaranteed by such Person or any of its Subsidiaries arising in the ordinary course of business in connection with the acquisition of goods or services and payable within 90 Business Days.

"**Transaction Date**" means, with respect to the Incurrence of any Indebtedness, the date such Indebtedness is to be Incurred and, with respect to any Restricted Payment, the date such Restricted Payment is to be made.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**Trust Indenture Act**" has the meaning assigned to such term in Section 13.02.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

"**Unrestricted Subsidiary**" means (1) any Subsidiary of the Parent Guarantor that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided in this Indenture and (2) any Subsidiary of an Unrestricted Subsidiary.

"**U.S. Government Obligations**" means securities that are (1) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally Guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof at any time prior to the Stated Maturity of the Notes, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Obligation or a specific payment of interest on or principal of any such U.S. Government Obligation held by such custodian for the account of the holder of a depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of interest on or principal of the U.S. Government Obligation evidenced by such depository receipt.

"**U.S. Person**" has the meaning assigned to such term in Regulation S.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"**Wholly Owned**" means, with respect to any Restricted Subsidiary, the ownership of all of the outstanding Capital Stock of such Subsidiary (other than any director's qualifying shares or Investments by foreign nationals mandated by applicable law) by the Parent Guarantor or one or more Wholly Owned Subsidiaries of the Parent Guarantor.

Section 1.02. *Rules of Construction.* Unless the context otherwise requires or except as otherwise expressly provided,

(a) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(b) "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(c) all references to any Person include the successors and permitted assigns of that Person;

(d) all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated; and

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(e)    references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended, modified or supplemented from time to time (or to successor statutes and regulations).

ARTICLE 2

ISSUE, EXECUTION, FORM AND REGISTRATION OF NOTES

Section 2.01.  *Authentication and Delivery of Notes and Note Guarantees*.  Upon the execution and delivery of this Indenture, or from time to time thereafter, Notes may be executed and delivered by the Issuer in an aggregate principal amount outstanding of not more than US$200,000,000 (other than Notes issued pursuant to Section 2.08 or Section 2.09) to the Trustee or an Authenticating Agent for authentication, accompanied by an Officers' Certificate of the Issuer directing such authentication and specifying the amount of Notes to be authenticated, the applicable rate at which interest will accrue on such Notes, the date on which the original issuance of such Notes is to be authenticated, the date from which interest will begin to accrue, the date or dates on which interest on such Notes will be payable and the date on which the principal of such Notes will be payable and other terms relating to such Notes and the Note Guarantees.  The Trustee or an Authenticating Agent shall thereupon authenticate and deliver such Notes to or upon the written order of the Issuer (as set forth in such Officers' Certificate) signed by two Authorized Officers.

The Trustee and the Authenticating Agent shall have the right to decline to authenticate and deliver any Notes under this Section if the Trustee reasonably determines that such action may not lawfully be taken or if the Trustee reasonably determines that such action would expose the Trustee or the Authenticating Agent to personal liability, unless indemnity and/or security satisfactory to the Trustee or the Authenticating Agent, as applicable, against such liability is provided to the Trustee or the Authenticating Agent, as applicable.

Section 2.02.  *Execution of Notes and Note Guarantees*.  (a) The Notes shall be executed by or on behalf of the Issuer by the signature of an Authorized Officer of the Issuer. Each Note Guarantor shall execute its Note Guarantee by the signature of an Authorized Officer of such Note Guarantor.  Such signatures may be the manual or facsimile signature of the present or any future Authorized Officers. With the delivery of this Indenture, the Issuer and each initial Note Guarantor is furnishing, and from time to time thereafter, the Issuer and each Note Guarantor may furnish to both the Trustee and the Authenticating Agent, a certificate substantially in the form of Exhibits E-1 and E-2 (an "**Authorization Certificate**") identifying and certifying the incumbency and specimen (or facsimile) signatures of the Authorized Officers. Until the Trustee and the Authenticating Agent receive a subsequent Authorization Certificate, the Trustee and the Authenticating Agent shall be entitled to conclusively rely on the last Authorization Certificate delivered to them for purposes of determining the Authorized Officers. Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note which has been duly authenticated and delivered by or on behalf of the Trustee.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(b)  In case the Authorized Officers who shall have signed any of the Notes or any of the Note Guarantees, as applicable, shall cease to be such Authorized Officers before the Note shall be authenticated and delivered by or on behalf of the Trustee or disposed of by or on behalf of the Issuer, such Note and Note Guarantee nevertheless may be authenticated and delivered or disposed of as though the Persons who signed such Note and the Note Guarantees had not ceased to be such Authorized Officers; and any Note may be signed on behalf of the Issuer, and any Note Guarantee may be signed on behalf of the Note Guarantors, by such Persons as, at the actual date of the execution of such Note and Note Guarantee, shall be Authorized Officers, although at the date of the execution and delivery of this Indenture any such Persons were not Authorized Officers.

Section 2.03.  *Certificate of Authentication.*  Only such Notes as shall bear thereon a certification of authentication substantially as set forth in the forms of the Notes in Exhibits A, C and D hereto, executed by the Trustee or an Authenticating Agent by manual signature of one of its authorized signatories, shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certification by the Trustee or an Authenticating Agent upon any Note executed by or on behalf of the Issuer shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits of this Indenture.

Section 2.04.  *Form, Denomination and Date of Notes; Payments.*  (a) The Notes, the Note Guarantees and the certificates of authentication shall be substantially in the form set forth in Exhibits A, C, D, M and N hereof.  On the Original Issue Date, the Notes shall be issued in the form provided in Section 2.04(c). The Notes shall be numbered, lettered, or otherwise distinguished in such manner or in accordance with the instructions set forth in the applicable Officers' Certificate and delivered by the Authorized Officers of the Issuer executing the same with the approval of the Trustee.

The Notes may be issued with appropriate insertions, omissions, substitutions and variations, and may have imprinted or otherwise reproduced thereon such legend or legends, not inconsistent with the provisions of this Indenture, as may be required to comply with any law or with any rules or regulations pursuant thereto, with the rules of any securities market in which the Notes are admitted to trading, or to conform to general usage.

(b)  Each Note shall be dated the date of its authentication.  Each Note shall bear interest from the date of issuance thereof or from the most recent Interest Payment Date to which interest has been paid or duly provided for and shall be payable on the dates specified on the face of the form of Note set forth as Exhibits A, C and D hereto.  Interest on the Notes shall be calculated on the basis of a 360-day year comprised of twelve 30-day months.

(c)  On the Original Issue Date, an appropriate Authorized Officer will execute and deliver to the Trustee or the Authenticating Agent (i) for Notes sold within the United States to "qualified institutional buyers" as defined in and pursuant to Rule 144A (each, a "**QIB**"), one or more restricted global Notes (each, a "**Restricted Global Note**"),

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

in definitive, fully registered form without interest coupons, in a denomination of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000, substantially in the form of Exhibit C hereto; and (ii) for Notes sold outside the United States in offshore transactions in reliance on Regulation S, one or more Regulation S global Notes (each, a "**Regulation S Global Note**" and, together with the Restricted Global Note(s), "**Global Notes**"), in definitive, fully registered form without interest coupons, in a denomination of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000, substantially in the form of Exhibit D hereto. All such Global Notes so executed and delivered to the Trustee or the Authenticating Agent pursuant to clauses (i) and (ii) of this subsection (c) shall be in an aggregate principal amount that shall equal the aggregate principal amount of the Notes that are to be issued on the Original Issue Date. The aggregate principal amount of the Restricted Global Notes and the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Custodian for the Depositary or its nominee, as hereinafter provided.

(d)     Each Restricted Global Note, each restricted Certificated Note issued in exchange for interests in the Restricted Global Note ("**Restricted Certificated Note**") shall bear the legends as set forth below, unless such Note has been sold pursuant to a registration statement that has been declared effective under the Securities Act:

The Restricted Global Note shall bear the following legend (the "**Securities Act Legend**") on the face thereof:

"THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL

33

NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS."

Each Global Note (i) shall be delivered by or on behalf of the Trustee to DTC acting as the Depositary or, pursuant to DTC's instructions, shall be delivered by or on behalf of the Trustee on behalf of DTC to and deposited with the Custodian, and in either case shall be registered in the name of Cede & Co., or such other name as DTC shall specify, and (ii) shall also bear a legend substantially to the following effect:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY
REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART
MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH
DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED
CIRCUMSTANCES DESCRIBED IN THE INDENTURE."

Global Notes may be deposited with such other Depositary that is a clearing
agency registered under the Exchange Act as the Issuer may from time to time designate
in writing to the Trustee, and shall bear such legend as may be appropriate.

(e)     If at any time the Depositary notifies the Issuer that it is unwilling or unable
to continue as Depositary for such Global Notes or if at any time the Depositary shall no
longer be a clearing agency registered under the Exchange Act, the Issuer shall appoint a
successor Depositary with respect to such Global Notes. If (i) a successor Depositary for
such Global Notes is not appointed by the Issuer within 90 days after the Issuer receives
such notice or becomes aware of such ineligibility, or (ii) an Event of Default has
occurred and is continuing with respect to the Notes, the Issuer will execute, and the
Trustee or an Authenticating Agent, upon receipt by the Trustee or an Authenticating
Agent of an Officers' Certificate of the Issuer directing the authentication and delivery
thereof, will authenticate and deliver, Certificated Notes (which may bear the Securities
Act Legend) in any authorized denominations in an aggregate principal amount equal to
the principal amount of such Global Notes in exchange for such Global Notes. Persons
exchanging interests in the Global Notes for Certificated Notes will be required to
provide to the Registrar, through the relevant clearing system, written instructions and
other information required by the Issuer and the Registrar to complete, execute and
deliver such Certificated Notes.

(f)     Global Notes shall in all respects be entitled to the same benefits under this
Indenture as Certificated Notes authenticated and delivered hereunder.

(g)     The Person in whose name any Note is registered at the close of business on
any Interest Record Date with respect to any Interest Payment Date shall be entitled to
receive the interest, if any, payable on such Interest Payment Date notwithstanding any
transfer or exchange of such Note subsequent to the Interest Record Date and prior to
such Interest Payment Date.

Section 2.05.   *Registration, Transfer and Exchange*.  The Notes are issuable only
in registered form.  The Issuer will keep at the office or agency to be maintained for the
purpose as provided in Section 4.02 (the "**Registrar**"), a register (the "**Register**") in
which, subject to such reasonable regulations as it may prescribe, it will register, and will
register the transfers of, Notes as provided in this Article 2.  Deutsche Bank Trust
Company Americas has been appointed as the initial Registrar.  The name and address of
the registered holder of each Note and the amount of each Note will be recorded in the
Register.  Such Register shall be in written form in the English language or in any other
form capable of being converted into such form within a reasonable time.  Such Register
shall be open for inspection by or on behalf of the Trustee during normal business hours

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 125 of 739

upon prior written request. The Registrar shall provide a copy of the updated Register every quarter to the Issuer.

Upon due presentation for registration of transfer of any Note, the Issuer shall execute and the Trustee or an Authenticating Agent shall authenticate and deliver in the name of the transferee or transferees a new Note or Notes in authorized denominations for a like aggregate principal amount.

A Holder may register the transfer of a Note only by written application to the Registrar stating the name of the proposed transferee and otherwise complying with the terms of this Indenture.  No such registration of transfer shall be effected until, and such transferee shall succeed to the rights of a Holder only upon, final acceptance and registration of the transfer by the Registrar in the Register.  Prior to the registration of any transfer by a Holder as provided herein, the Issuer, the Trustee and any agent of any of them shall treat the Person in whose name the Note is registered as the owner thereof for all purposes whether or not the Note shall be overdue, and neither the Issuer, the Trustee, nor any such agent shall be affected by notice to the contrary.  Furthermore, any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by the Depositary, Euroclear and Clearstream and that ownership of a beneficial interest in the Note shall be required to be reflected in a book entry.  At the option of such Holder, Notes may be exchanged for other Notes of any authorized denomination and of a like aggregate principal amount, upon surrender of the Notes to be exchanged to the Registrar.  When Notes are presented to the Registrar with a request to register the transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or make the exchange as requested if the requirements for such transactions set forth herein are met.  To permit registrations of transfers and exchanges, the Issuer and each Note Guarantor shall execute and the Trustee or an Authenticating Agent shall authenticate Notes at the Registrar's request.

Every Note presented or surrendered for registration of transfer or for exchange shall (if so required by the Issuer or the Registrar) be duly endorsed, or be accompanied by a written instrument of transfer duly executed, by the Holder thereof or his attorney duly authorized in writing in a form satisfactory to the Issuer and the Registrar.

The Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any exchange or registration of transfer of Notes (other than any such transfer taxes or other similar governmental charge payable upon exchanges).  No service charge to any Holder shall be made for any such transaction.

The Issuer shall not be required to exchange or register a transfer of (1) any Notes for a period of 15 days immediately preceding the first mailing of notice of redemption of Notes to be redeemed or (2) any Notes called or being called for redemption.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

All Notes issued upon any transfer or exchange of Notes shall be valid obligations of the Issuer, evidencing the same debt and entitled to the same benefits under this Indenture, as the Notes surrendered upon such transfer or exchange.

Claims against the Issuer for the payment of principal of, premium, if any, or interest on the Notes will become void unless presentation for payment is made as required in this Indenture within a period of six years.

Section 2.06. *Book-entry Provisions for Global Notes*. (a) Each Restricted Global Note initially shall (i) be registered in the name of a nominee of the Depositary, (ii) be delivered to the Custodian on behalf of the Depositary and (iii) bear the Securities Act Legend. Each Regulation S Global Note initially shall (i) be registered in the name of a nominee for the Depositary and (ii) be delivered to the Custodian on behalf of the Depositary. Interests in the Regulation S Global Notes may be held by any member of, or participants in, the Depositary, including Euroclear and Clearstream (collectively, the "**Agent Members**").

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, or the Custodian, or under the Global Notes, and the Depositary may be treated by the Issuer, the Trustee and any agent of any of them as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of any of them, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

(b)      Except as provided in Section 2.07, transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to the Depositary, its successors or their respective nominees. Interests of beneficial owners in a Global Note may be transferred, and transfers increasing or decreasing the aggregate principal amount of Global Notes may be conducted only in accordance with the rules and procedures of the Depositary and, to the extent relevant, the provisions of Section 2.07. In addition, Certificated Notes shall be transferred to all beneficial owners in exchange for their beneficial interests in any Restricted Global Note or Regulation S Global Note, respectively, only under the circumstances set forth in Section 2.04(e).

(c)      Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(d)      In connection with the transfer of an entire Restricted Global Note or Regulation S Global Note to beneficial owners pursuant to Section 2.06(b), the Restricted Global Note or Regulation S Global Note, as the case may be, shall be deemed to be

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee or an Authenticating Agent shall authenticate and deliver, to each beneficial owner identified by the Depositary in exchange for its beneficial interest in such Restricted Global Note or Regulation S Global Note, as the case may be, an equal aggregate principal amount of Certificated Notes of authorized denominations.

(e)     Any Certificated Note delivered in exchange for an interest in a Restricted Global Note pursuant to Section 2.06(b) or (d) shall, except as otherwise provided by Section 2.07(d), bear the legends in accordance with Section 2.07(d).

(f)     The registered holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

Section 2.07.   *Special Transfer Provisions*.  Unless and until the Securities Act Legend is removed from a Certificated Note or Restricted Global Note pursuant to Section 2.07(d) below, the following additional provisions shall apply to the proposed transfer, exchange or replacement of Certificated Notes or, to the extent relevant to the Trustee, the Paying and Transfer Agent, the Registrar or the Depositary, any beneficial interest in a Global Note:

(a)     Transfers to Qualified Institutional Buyers.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note (or interest in a Global Note) to a QIB:

(i)     The Registrar shall register the transfer of any Certificated Note containing the Securities Act Legend if (x) the requested transfer is after the time period referred to in Rule 144 under the Securities Act as in effect with respect to such transfer or (y) such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Issuer, the Paying and Transfer Agent and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the transfer notice provided for on the form of Note in substantially the form of Exhibit B.

(ii)     If the Note to be transferred is a Certificated Note containing the Securities Act Legend and the proposed transferee is an Agent Member holding such interest on behalf of a QIB, upon receipt by the Registrar of (x) the documents referred to in Section 2.07(a)(i) above (if such transfer is pursuant to clause (y) of Section 2.07(a)(i) above) and (y) instructions given in accordance with the Depositary's and the Registrar's procedures, the Registrar shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Restricted Global Note in an amount equal to the principal amount of the Certificated Note to be transferred and the Paying and Transfer Agent shall cancel the Certificated Note so transferred.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(iii)     Subject to the rules and procedures of the Depositary, if the proposed interest to be transferred is an interest in the Restricted Global Note, (x) such transfer may be effected only through the book-entry system maintained by the Depositary in compliance with the applicable provisions of the Securities Act Legend and (y) the transferee is required to hold such interest through an Agent Member.

(iv)     Subject to the rules and procedures of the Depositary, an interest in the Regulation S Global Note proposed to be transferred to a QIB transferee shall be required to be held on behalf of such transferee through Agent Members and upon receipt by the Registrar of certificates by the transferor and the transferee in substantially the form of Exhibit H, the Registrar shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Restricted Global Note in an amount equal to the principal amount of the beneficial interest in the Regulation S Global Note to be transferred, and shall decrease the Regulation S Global Note in a like amount.

(b)     *Transfers of Interests in a Regulation S Global Note to Other U.S. Persons*. Subject to the rules and procedures of the Depositary, an interest in a Regulation S Global Note proposed to be transferred to any U.S. Person transferee shall be required to be held on behalf of such other U.S. Person transferee through Agent Members.

(c)     *Transfers to Non-U.S. Persons*. The following provisions shall apply with respect to registration of transfers of a Note (or interest in a Global Note) to a Non-U.S. Person:

(i)     The Registrar shall register the transfer of any Certificated Note containing the Securities Act Legend to a Non-U.S. Person upon receipt by the Registrar from the transferor of a transfer notice provided for on the form of Note or in substantially the form of Exhibit B.

(ii)     If the proposed transferor is an Agent Member holding a beneficial interest in the Restricted Global Note, upon receipt by the Registrar of (x) a certificate by the transferor in substantially the form of Exhibit G and (y) instructions in accordance with the Depositary's and the Registrar's procedures, the Registrar shall reflect on its books and records the date of such transfer and a decrease in the principal amount of the Restricted Global Note in an amount equal to the principal amount of the beneficial interest in the Restricted Global Note to be transferred, and shall increase the Regulation S Global Note in a like amount.

(iii)     If the proposed transferor is a holder of a Certificated Note and the proposed transferee is an Agent Member, upon receipt by the Registrar of the documents required by Section 2.07(c)(i) above and instructions given in accordance with the Depositary's and the Registrar's procedures, the Registrar shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Regulation S Global Note, as the case may be, in an amount equal to the principal amount of the Certificated Note to be transferred,

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

and the Paying and Transfer Agent shall cancel the Certificated Note so transferred.

(iv)    Subject to the rules and procedures of the Depositary, an interest in the Regulation S Global Note shall be required to be held through Agent Members.

(d)    *Securities Act Legend.*  Upon the registration of transfer, exchange or replacement of Notes bearing the Securities Act Legend, the Registrar shall deliver only Notes that bear the Securities Act Legend unless (i) the requested transfer, exchange or replacement is after the time period referred to in Rule 144 under the Securities Act as in effect with respect to such transfer, exchange or replacement and the transferee is not an Affiliate of the Issuer and has not been an Affiliate for three months prior to such transfer, (ii) is made in connection with a transfer under sub-clause (i) of Section 2.07(c) above or (iii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.  Upon the registration of transfer, exchange or replacement of Notes not bearing the Securities Act Legend, the Registrar shall deliver Notes that do not bear the Securities Act Legend.

(e)    *General.*  By its acceptance of any Note bearing the Securities Act Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Securities Act Legend and agrees that it will transfer such Note only as provided in this Indenture.  The Registrar shall not register a transfer of any Note unless such transfer complies with the restrictions on transfer of such Note set forth in this Indenture.  In connection with any transfer of Notes, each Holder agrees by its acceptance of the Notes to furnish the Registrar or the Issuer such certifications, legal opinions or other information as either of them may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or a transaction not subject to, the registration requirements of the Securities Act; *provided* that the Registrar shall not be required to determine (but may rely on a determination made by the Issuer with respect to) the sufficiency of any such certifications, legal opinions or other information.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to Section 2.06 or this Section 2.07 in accordance with its customary procedures.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

(f)    The Trustee, the Paying and Transfer Agent and the Registrar shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine

the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.08. *Mutilated, Defaced, Destroyed, Stolen and Lost Notes.* (a) The Issuer shall execute and deliver to the Trustee Certificated Notes in such amounts and at such times as to enable the Trustee to fulfill its responsibilities under this Indenture and the Notes.

(b) In case any Note shall become mutilated, defaced or be apparently destroyed, lost or stolen, upon the request of the registered holder thereof, the Issuer in its discretion may execute, and, upon the written request of Authorized Officers of the Issuer, the Trustee or an Authenticating Agent shall authenticate and deliver, a new Note bearing a number not contemporaneously outstanding, in exchange and substitution for the mutilated or defaced Note, or in lieu of and substitution for the Note so apparently destroyed, lost or stolen. In every case the applicant for a substitute Note shall furnish to the Issuer, the Note Guarantors and the Trustee, and any agent of the Issuer, the Note Guarantors or the Trustee such security and/or indemnity as may be required by each of them to indemnify and defend and to save each of them harmless and, in every case of destruction, loss or theft, evidence to their satisfaction of the apparent destruction, loss or theft of such Note and of the ownership thereof. Upon the issuance of any substitute Note, such Holder, if so requested by the Issuer, the Note Guarantors or the Trustee, or any agent thereof, will pay a sum sufficient to cover any stamp duty, tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee or its agent(s)) connected with the preparation and issuance of the substitute Note. The Trustee is hereby authorized, in accordance with and subject to the foregoing conditions in this clause (b), to authenticate and deliver, or cause the authentication and delivery of, from time to time, Notes in exchange for or in lieu of Notes, respectively, which become mutilated, defaced, destroyed, stolen or lost. Each Note delivered in exchange for or in lieu of any Note shall carry all the rights to principal, premium (if any), interest (including rights to accrued and unpaid interest and Additional Amounts) which were carried by such Note.

(c) Mutilated or defaced Certificated Notes must be surrendered before replacements will be issued. In the event any such mutilated, defaced, destroyed, lost or stolen certificate has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new certificate, pay such Notes.

Section 2.09. *Further Issues.* The Issuer may, from time to time, without notice to or the consent of the Holders, create and issue Additional Notes having the same terms and conditions as the Notes (including the benefit of the Note Guarantees and the Collateral) in all respects (or in all respects except for the issue date, issue price and the first interest period and, to the extent necessary, certain temporary securities law transfer restrictions) so that such Additional Notes may be consolidated and form a single class with the previously outstanding Notes and vote together as one class on all matters with respect to the Notes; *provided* that the issuance of any such Additional Notes is permitted under Section 4.05 and the other provisions of this Indenture and that any such Additional Notes will not be issued under the same CUSIP, ISIN or other identifying

41

numbers as the outstanding Notes unless such Additional Notes are fungible with the outstanding Notes for U.S. federal income tax purposes.

In addition, the issuance of any Additional Notes by the Issuer will be subject to the following conditions:

(a)     all obligations with respect to the Additional Notes will be secured and guaranteed under this Indenture, the Note Guarantees and the Security Documents to the same extent and on the same basis as the Notes outstanding on the date the Additional Notes are issued;

(b)     on the issue date of any Additional Notes, the Issuer will lend the proceeds of the offering of the Additional Notes to a Subsidiary Guarantor pursuant to an Intercompany Loan and each relevant Subsidiary Guarantor is permitted to Incur the Indebtedness represented by such additional borrowings under Section 4.05;

(c)     the Parent Guarantor and the Issuer have delivered to the Trustee an Officers' Certificate, in form and substance reasonably satisfactory to the Trustee, confirming that the issuance of the Additional Notes complies with this Indenture; and

(d)     the Parent Guarantor and the Issuer have delivered to the Trustee one or more Opinions of Counsel, in form reasonably satisfactory to the Trustee, confirming, among other things, that the issuance of the Additional Notes does not conflict with applicable law and that, after giving effect to the issuance of the Additional Notes and any transactions related thereto, the Lien or Liens created under the Security Documents, as amended, extended, renewed, restated, supplemented or otherwise modified or replaced pursuant to such transaction, are valid and perfected Liens not otherwise subject to any limitation, imperfection or new hardening or preference period, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to the issuance of such Additional Notes and such amendment, extension, renewal, restatement, supplement, modification or replacement.

Section 2.10.   *Cancellation of Notes; Disposition Thereof*.  All Notes surrendered for payment, redemption, registration of transfer or exchange, if surrendered to the Issuer or any agent of the Issuer or the Trustee, shall be delivered to the Registrar for cancellation; and no Notes shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture.  The Registrar shall dispose of canceled Notes held by it in accordance with its customary procedures, and (upon the written request of the Issuer) deliver a certificate of disposition to the Issuer.  If the Issuer shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Notes unless and until the same are delivered to the Registrar for cancellation.

Section 2.11.   *Open Market Purchases and Cancellation of Notes*.  The Issuer or any Note Guarantor may purchase Notes in the open market or by tender or by any other means at any price, so long as such acquisition does not otherwise violate the terms of this Indenture. All Notes that are purchased or otherwise redeemed by the Issuer will be

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 132 of 739

cancelled and any Notes purchased or otherwise redeemed by the Issuer or any Note Guarantor will not be reissued or resold to any Person other than the Issuer or a Note Guarantor.

Section 2.12. *CUSIP, ISIN or Common Code Numbers.* The Issuer in issuing the Notes may use "CUSIP, ISIN or Common Code" numbers (if then generally in use) and, if so, the Trustee and the Paying and Transfer Agent shall use for the Notes "CUSIP, ISIN or Common Code" numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer will promptly notify the Trustee and the Paying and Transfer Agent of any change in the "CUSIP, ISIN or Common Code" numbers.

## ARTICLE 3
### REDEMPTION

Section 3.01. *Redemption for Taxation Reasons.* (a) The Notes may be redeemed, at the option of the Issuer or a Surviving Person with respect to the Issuer, as a whole but not in part, upon giving not less than 30 days' nor more than 60 days' notice to the Holders and the Trustee (which notice shall be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest (including any Additional Amounts), if any, to the date fixed by the Issuer or the Surviving Person, as the case may be, for redemption (the "**Tax Redemption Date**") if, as a result of:

(i) any change in, or amendment to, the statutes, regulations or official administrative guidance having the force of law, of the Issuer's or a Surviving Person's Relevant Taxing Jurisdiction, affecting taxation; or

(ii) any change in the existing official position regarding the application or interpretation of such statutes, regulations or official administrative guidance (including a holding, judgment or order by a court of competent jurisdiction),

which change or amendment becomes effective or, in the case of an official position, is announced (A) with respect to the Issuer, on or after the Original Issue Date, or (B) with respect to a Surviving Person organized or resident for tax purposes in a jurisdiction that is not the Issuer's Relevant Taxing Jurisdiction as of the Original Issue Date, on or after the date such Surviving Person becomes a Surviving Person, with respect to any payment due or to become due under the Notes, the Issuer or a Surviving Person, as the case may be, is, or on the next Interest Payment Date would be, required to pay Additional Amounts, and such requirement cannot be avoided by the taking of reasonable measures by the Issuer, Surviving Person or any Note Guarantor, as the case may be; *provided* that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or a Surviving Person, as the case may be,

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

would be obligated to pay such Additional Amounts if a payment in respect of the Notes were then due; and *provided further* that where any such requirement to pay Additional Amounts is due to taxes imposed by India or any political subdivision or taxing authority thereof or therein, the Issuer or the Surviving Person shall be permitted to redeem the Notes in accordance with the provisions hereof only if the rate of withholding or deduction in respect of which Additional Amounts are required is in excess of 20% (plus applicable surcharge and cess).

(b)     Prior to the mailing of any notice of redemption of the Notes pursuant to Section 3.01(a), the Issuer or a Surviving Person, as the case may be, will deliver to the Trustee at least 30 days but not more than 60 days before a redemption date:

(i)     an Officers' Certificate stating that such change or amendment referred to in Section 3.01(a) has occurred, describing the facts related thereto and stating that such requirement cannot be avoided by the Issuer, a Surviving Person or any Note Guarantor, as the case may be, taking reasonable measures; and

(ii)     an Opinion of Counsel of recognized standing with respect to tax matters of the Issuer's or a Surviving Person's Relevant Taxing Jurisdiction, stating that the requirement to pay such Additional Amounts results from such change or amendment referred to in Section 3.01(a).

The Trustee is entitled to accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent described above, in which event it shall be conclusive and binding on the Holders.

Section 3.02.     *Optional Redemption.*

(a)     On or after May 16, 2016, the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on May 16 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
|------|------------------|
| 2016 | 105.3750% |
| 2017 | 102.6875% |

(b)     The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to May 16, 2016, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

(c)     At any time and from time to time prior to May 16, 2016, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes (including

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

any Additional Notes) with the Net Cash Proceeds of one or more sales of Common Stock of the Parent Guarantor in an Equity Offering at a redemption price of 110.75% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

(d)     The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(i)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(ii)     if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

(e)     A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

(f)     If the Issuer elects to redeem the Notes pursuant to the optional redemption provisions of Section 3.02 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(i)     the clause of this Indenture pursuant to which the redemption shall occur;

(ii)     the redemption date;

(iii)     the principal amount of the Notes to be redeemed; and

(iv)     the redemption price.

Section 3.03.     *Method and Effect of Redemption.*  (a) The notice of redemption will identify the Notes to be redeemed and will include or state the following:

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(i)     the clause of this Indenture pursuant to which the redemption shall occur;

(ii)     the redemption date;

(iii)     the redemption price, including the portion thereof representing any accrued interest;

(iv)     the place or places where Notes are to be surrendered for redemption;

(v)     Notes called for redemption must be so surrendered in order to collect the redemption price;

(vi)     on the redemption date the redemption price will become due and payable on Notes called for redemption, and interest on Notes called for redemption will cease to accrue on and after the redemption date; and

(vii)     if any Note contains a CUSIP, ISIN or Common Code number, no representation is being made as to the correctness of the CUSIP, ISIN or Common Code number either as printed on the Notes or as contained in the notice of redemption and that the Holder should rely only on the other identification numbers printed on the Notes.

(b)     Once notice of redemption is sent to the Holders, Notes called for redemption become due and payable at the redemption price on the redemption date, and upon surrender of the Notes called for redemption, the Issuer shall redeem such Notes at the redemption price. On and after the redemption date, interest will cease to accrue on the Notes or portions of them called for redemption.  Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

ARTICLE 4

COVENANTS

Section 4.01.  *Payment of Notes*.  (a) The Issuer will pay the principal of, any premium on (if any) and interest, and Additional Amounts, if any, on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 9:00 a.m. (New York City time) on the date which is one Business Day prior to the Interest Payment Date, the due date of any principal on any Notes, the Tax Redemption Date pursuant to Section 3.01 or the redemption date pursuant to Section 3.02 (each a **"Payment Date"**), the Issuer will pay or cause to be paid to the account of the Paying and Transfer Agent at the Principal Office, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, in immediately available funds, an amount which shall be sufficient to pay the aggregate amount of principal, interest or premium or all of such amounts, as the case may be, becoming due in respect of the Notes on such Payment Date; *provided* that if the Issuer or any Affiliate of the Issuer is acting as Paying and Transfer Agent, it shall, on or

46

before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of money sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture. In each case the Issuer shall promptly notify the Trustee and the Paying and Transfer Agent of its compliance with this Section 4.01(a). The Issuer shall procure that, before 9:00 a.m. (New York City time) on the third Business Day before each Payment Date, the bank effecting payment for it has confirmed by tested telex or authenticated SWIFT message to the Paying and Transfer Agent the payment instructions relating to such payment. The Paying and Transfer Agent shall not be bound to make any payment until it has received the full amount due to be paid to it pursuant to this Section 4.01. The Trustee (or the principal Paying and Transfer Agent) shall not be liable to account for interest on money paid to it by the Issuer.

(b)     An installment of principal, premium or interest will be considered paid on the date due if the Paying and Transfer Agent, other than the Issuer or any Affiliate of the Issuer, holds on that date money designated for and sufficient to pay the installment. If the Issuer or any Affiliate of the Issuer acts as Paying and Transfer Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

(c)     The Paying and Transfer Agent, which will include the Issuer or any Affiliate of the Issuer if it is acting as Paying and Transfer Agent, will make payments in respect of the Notes represented by the Global Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Global Notes. With respect to Certificated Notes, the Paying and Transfer Agent will make all payments by wire transfer of immediately available funds to the accounts specified by the Holders thereof or, if no such account is specified, by mailing (at the expense of the Issuer) a check to each Holder's registered address; *provided* that if the Issuer or any Affiliate of the Issuer is acting as Paying and Transfer Agent, it shall make such payment to the Holders as specified above.

(d)     At least three Business Days prior to the first Payment Date and, if there has been any change with respect to the matters set forth in the below-mentioned certificate, at least three Business Days prior to each Payment Date thereafter, the Issuer shall furnish the Paying and Transfer Agent with an Officers' Certificate instructing the Paying and Transfer Agent as to any circumstances in which payments of principal of, or interest or premium on, the Notes due on such date shall be subject to deduction or withholding for, or on account of, any Taxes described in Section 4.21, and the rate of any such deduction or withholding. If any such deduction or withholding shall be required and if the Issuer therefore becomes liable to pay Additional Amounts, if any, pursuant to Section 4.21 then at least three Business Days prior to each Payment Date, the Issuer shall furnish the Paying and Transfer Agent with a certificate which specifies the amount required to be withheld on such payment to Holders of the Notes, and the Additional Amounts, if any, due to the Holders of the Notes, and at least one Business Day prior to such Payment Date, will pay to the Paying and Transfer Agent such Additional Amounts, if any, as shall be required to be paid to such Holders.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(e)     Whenever the Issuer appoints a Paying and Transfer Agent other than a Person who is also acting as the Trustee for the purpose of paying amounts due in respect of the Notes, it will cause such Paying and Transfer Agent to execute and deliver to the Trustee an instrument substantially in the form of Exhibit F hereof in which such agent shall agree with the Issuer, among other things, to be bound by and observe the provisions of this Indenture (including the Notes). The Issuer shall cause each Paying and Transfer Agent other than a Person who is also acting as the Trustee to execute and deliver to the Trustee an instrument in which such Paying and Transfer Agent shall agree with the Trustee,

(i)     that it will hold all sums received by it as such Paying and Transfer Agent for the payment of the principal of, or premium or interest on, the Notes (whether such sums have been paid to it by or on behalf of the Issuer or by any other obligor on the Notes or the Note Guarantee) in trust for the benefit of the Holders or of the Trustee;

(ii)     that it will as soon as possible give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Notes or the Note Guarantee) to make any payment of the principal of, or premium or interest on, the Notes and any other payments to be made by or on behalf of the Issuer under this Indenture, when the same shall be due and payable; and

(iii)     that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of a failure referred to in clause (ii) above.

Anything in this Section 4.01 to the contrary notwithstanding, the Issuer may at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held in trust by the Issuer or any Paying and Transfer Agent hereunder, as required by this Section 4.01 and such sums shall be held by the Trustee upon the trusts herein contained.  If the Paying and Transfer Agent shall pay all sums held in trust to the Trustee as required under this Section 4.01, the Paying and Transfer Agent shall have no further liability for the money so paid over to the Trustee.

Anything in this Section 4.01 to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section 4.01 are subject to the provisions of Section 8.04.

Section 4.02.  *Maintenance of Office or Agency.*  (a) The Issuer will maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially designates the Principal Office as such office of the Issuer.  The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 138 of 739

with the address thereof, such presentations, surrenders, notices and demands may be made or served to the Trustee.

(b)     The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations; *provided, however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency in each place where principal of, and interest or premium on, any Notes are payable.  The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c)     So long as the Notes are listed on the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") and the SGX-ST so requires, there will be a Paying and Transfer Agent in Singapore. The Issuer will give to the Trustee written notice of the location of any such office or agency and of any change of location thereof.  The Issuer has initially appointed the Trustee, the Paying and Transfer Agent and the Registrar listed in Exhibit K.

(d)     So long as any of the Notes remain outstanding, each of the Subsidiary Guarantors will maintain in the Borough of Manhattan, the City of New York an office or agency where notices and demands to or upon each of the Note Guarantors in respect of the Notes and the Note Guarantee or this Indenture may be served.  Each of the Note Guarantors hereby initially designates the Principal Office as the office or agency for each such purpose.  In case any of the Note Guarantors shall fail to maintain any such office or agency or shall fail to give notice of the location or of any change in the location thereof, presentations and demands may be made and notices may be served at the Trustee's office.

Section 4.03.   *Governmental Approvals and Licenses; Compliance with Law.* The Parent Guarantor will, and will cause each Restricted Subsidiary to, (a) obtain and maintain in full force and effect all governmental approvals, authorizations, consents, permits, concessions and licenses as are necessary to engage in the Permitted Businesses, (b) preserve and maintain good and valid title to its properties and assets (including land-use rights) free and clear of any Liens other than Permitted Liens; and (c) comply with all laws, regulations, orders, judgments and decrees of any governmental body.

Section 4.04.   *Payment of Taxes and other Claims*.  The Parent Guarantor will pay or discharge, and cause each of its Subsidiaries to pay or discharge before the same become delinquent (a) all material taxes, assessments and governmental charges levied or imposed upon the Parent Guarantor or any Subsidiary or its income or profits or property and (b) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Parent Guarantor or any Subsidiary, other than any such tax, assessment, charge or claim the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

49

Section 4.05.  *Limitation on Indebtedness*.  (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, Incur any Indebtedness (including Acquired Indebtedness), *provided* that the Parent Guarantor and any Restricted Subsidiary may Incur Indebtedness (including Acquired Indebtedness) if, after giving effect to the Incurrence of such Indebtedness and the receipt and application of the proceeds therefrom, (x) no Default has occurred and is continuing, (y) the Fixed Charge Coverage Ratio would not be less than 3.0 to 1.0 with respect to any Incurrence of Indebtedness and (z) if such Indebtedness constitutes Priority Indebtedness, such Indebtedness constitutes Permitted Priority Indebtedness. Notwithstanding the foregoing, the Parent Guarantor will not permit any Restricted Subsidiary to Incur any Disqualified Stock (other than Disqualified Stock held by the Issuer or a Note Guarantor, so long as it is so held).

(b)      Notwithstanding the foregoing, the Parent Guarantor and any Restricted Subsidiary may Incur, to the extent provided below, each and all of the following (**"Permitted Indebtedness"**):

(i)      Indebtedness of the Issuer under the Notes (excluding any Additional Notes) and each Note Guarantee, the Parent Guarantor and any Subsidiary Guarantor under the Intercompany Loans extended with respect to the gross proceeds from the offering of the Notes on the Original Issue Date;

(ii)      Indebtedness of the Parent Guarantor or any Restricted Subsidiary outstanding on the Original Issue Date excluding Indebtedness permitted under Section 4.05(b)(i) and Section 4.05(b)(iii);

(iii)      Indebtedness of the Parent Guarantor or any Restricted Subsidiary owed to the Parent Guarantor or any Restricted Subsidiary; *provided* that (A) any event which results in (x) any Restricted Subsidiary to which such Indebtedness is owed ceasing to be a Restricted Subsidiary or (y) any subsequent transfer of such Indebtedness (other than to the Parent Guarantor or any Restricted Subsidiary) shall be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this Section 4.05(b)(iii) and (B) if the Issuer is the obligor on such Indebtedness, such Indebtedness must expressly be subordinated in right of payment to the Notes, and if any Note Guarantor is the obligor on such Indebtedness (and it is not owed to the Issuer or a Note Guarantor), such Indebtedness must be expressly subordinated in right of payment to the Note Guarantee of such Note Guarantor and (C) if the Indebtedness is owed to the Issuer or any Note Guarantor, such Indebtedness must be evidenced by an unsubordinated promissory note or a similar instrument under applicable law (with respect to any obligor thereunder other than the Issuer or a Note Guarantor);

(iv)      Indebtedness (**"Permitted Refinancing Indebtedness"**) of the Parent Guarantor or any Restricted Subsidiary issued in exchange for, or the net proceeds of which are used to refinance or refund, replace, exchange, renew, repay, redeem, defease, discharge or extend (collectively, "refinance" and "refinances" and "refinanced" shall have a correlative meaning), then outstanding Indebtedness Incurred under the proviso of Section 4.05(a) or Section 4.05(b)(i),

50

Section 4.05(b)(ii), Section 4.05(b)(iv), Section 4.05(b)(x), Section 4.05(b)(xv) or Section 4.05(b)(xvi) and any refinancings thereof in an amount not to exceed the amount so refinanced or refunded (plus premiums, accrued interest, fees and expenses); *provided* that (A) Indebtedness the proceeds of which are used to refinance or refund the Notes or Indebtedness that is *pari passu* with, or subordinated in right of payment to, the Notes or any Note Guarantee shall only be permitted under this Section 4.05(b)(iv) if (1) in case the Notes are refinanced in part or the Indebtedness to be refinanced is *pari passu* with the Notes or any Note Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made *pari passu* with, or subordinate in right of payment to, the remaining Notes or such Note Guarantee, as the case may be, or (2) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes or any Note Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes or such Note Guarantee, as the case may be, at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes or such Note Guarantee, as the case may be, (B) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced or refunded, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced or refunded, and (C) in no event may Indebtedness of the Issuer or any Note Guarantor be refinanced pursuant to this clause by means of any Indebtedness of any Restricted Subsidiary that is not the Issuer or a Note Guarantor;

(v)     Indebtedness Incurred by the Issuer or any Note Guarantor pursuant to Hedging Obligations entered into in the ordinary course of business and designed solely to protect the Parent Guarantor or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities and not for speculation;

(vi)     the Guarantee by the Parent Guarantor or any of its Restricted Subsidiaries of Indebtedness of the Parent Guarantor or any of its Restricted Subsidiaries permitted to be Incurred by another provision of this Section 4.05;

(vii)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently, except in the case of daylight overdrafts, drawn against insufficient funds in the ordinary course of business; *provided, however,* that this Indebtedness is extinguished within five Business Days;

(viii)     Indebtedness of the Parent Guarantor or any Restricted Subsidiary in respect of workers' compensation claims and claims arising under similar legislation, or in connection with self-insurance or similar requirements, in each case in the ordinary course of business;

51

(ix)     Indebtedness of the Parent Guarantor or any Restricted Subsidiary incurred in the ordinary course of business in connection with cash pooling arrangements, cash management and other Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections and similar arrangements;

(x)     Indebtedness of any Person acquired by or merged into the Parent Guarantor or any of its Restricted Subsidiaries; *provided* that (A) such Indebtedness is not incurred in contemplation of such acquisition or merger and (B) after giving effect to such acquisition or merger, either (1) the Parent Guarantor would be permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of this covenant or (2) the Fixed Charge Coverage Ratio of the Parent Guarantor would not be lower than immediately prior to such acquisition or merger;

(xi)     Indebtedness consisting of the financing of insurance premiums, including Indebtedness representing installment insurance premiums, incurred in the ordinary course of business

(xii)     Indebtedness in respect of self-insurance obligations, performance, indemnity, surety, judgment, appeal, advance payment, statutory, customs, return-of-money, value added or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties provided by the Parent Guarantor or any of its Restricted Subsidiaries or relating to liabilities, obligations or guarantees Incurred in the ordinary course of business;

(xiii)     Indebtedness arising from agreements of the Parent Guarantor or a Restricted Subsidiary providing for indemnification, adjustment of purchase price, earn-out or other similar obligations, in each case Incurred or assumed in connection with the disposition of any business, assets of the Parent Guarantor or of a Restricted Subsidiary, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of any of the Parent Guarantor's or a Restricted Subsidiary's business or assets for the purpose of financing an acquisition; *provided, however*, that the maximum assumable liability in respect of all this Indebtedness shall at no time exceed the gross proceeds actually received by the Parent Guarantor and/or the relevant Restricted Subsidiary in connection with the disposition;

(xiv)     obligations with respect to trade letters of credit, performance and surety bonds and completion guarantees provided by the Parent Guarantor or any of its Restricted Subsidiaries securing obligations, entered into in the ordinary course of business, to the extent the letters of credit, bonds or guarantees are not drawn upon or, if and to the extent drawn upon is honored in accordance with its terms and, if to be reimbursed, is reimbursed no later than 30 days following receipt of a demand for reimbursement following payment on the letter of credit, bond or guarantee;

(HK) 06562/183/INDENTURE/Raptor Indenture docx

(xv)    Indebtedness of the Parent Guarantor or a Restricted Subsidiary with a maturity of one year or less and used by the Parent Guarantor or such Restricted Subsidiary for working capital purposes in an aggregate principal amount at any time outstanding (together with any refinancings thereof) not to exceed US$10.0 million (or the Dollar Equivalent thereof);

(xvi)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary:

    (i)    constituting purchase money Indebtedness Incurred to finance all or any part of the purchase price of equipment, property or assets of the Parent Guarantor or a Restricted Subsidiary to be used by the Parent Guarantor or a Restricted Subsidiary in the Permitted Business; or

    (ii)    Incurred to finance all or any part of the cost of development, construction or improvement of personal property of the Parent Guarantor or a Restricted Subsidiary to be used by the Parent Guarantor or a Restricted Subsidiary in the Permitted Business;

*provided* that (A) the aggregate principal amount of such Indebtedness will not exceed the purchase price of such equipment, property or assets so acquired or the cost of development, construction or improvement of such personal property, as the case may be, and (B) such Indebtedness will be Incurred no later than 90 days after the acquisition of such equipment, property or assets or the completion of development, construction or improvement of such personal property, as the case may be; and *provided further* that the aggregate principal amount at any time outstanding of all such Indebtedness Incurred pursuant to this clause (p) (together with any refinancings thereof) does not exceed US$10.0 million (or the Dollar Equivalent thereof) less the aggregate amount of all Net Proceeds of Asset Sales applied by the Parent Guarantor or any Restricted Subsidiary to permanently repay any such Indebtedness pursuant to Section 4.13; and

(xvii)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary not otherwise specifically permitted under clauses (i) through (xvi) above in an aggregate principal amount at any time outstanding not to exceed US$5.0 million (or the Dollar Equivalent thereof);

*provided* that, if any Indebtedness Incurred under this Section 4.05(b) constitutes Priority Indebtedness, on the date of the Incurrence of such Indebtedness and after giving effect thereto, such Indebtedness constitutes Permitted Priority Indebtedness.

(c)    For purposes of determining compliance with this Section 4.05, in the event that an item of Indebtedness meets the criteria of more than one of the types of Permitted

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 143 of 739

Indebtedness, or of Indebtedness described in the proviso in Section 4.05(a) and one or more types of Permitted Indebtedness, the Parent Guarantor, in its sole discretion, shall classify, and from time to time may reclassify, such item of Indebtedness and only be required to include the amount of such Indebtedness as one of such types.

Section 4.06. *Limitation on Restricted Payments*. (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments or any other actions described in clauses (i) through (iv) below being collectively referred to as "**Restricted Payments**"):

(i)     declare or pay any dividend or make any distribution on or with respect to the Parent Guarantor's or any of the Restricted Subsidiaries' Capital Stock (other than dividends or distributions payable solely in shares of Capital Stock of the Parent Guarantor (other than Disqualified Stock or Preferred Stock) or in options, warrants or other rights to acquire shares of such Capital Stock) held by Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary;

(ii)     purchase, call for redemption or redeem, retire or otherwise acquire for value any shares of Capital Stock (including options, warrants or other rights to acquire such shares of Capital Stock) of the Parent Guarantor or any direct or indirect parent of the Parent Guarantor held by any Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary or of any Restricted Subsidiary held by any Affiliate of the Parent Guarantor (other than a Restricted Subsidiary);

(iii)     make any voluntary or optional principal payment, or voluntary or optional redemption, repurchase, defeasance, or other voluntary or optional acquisition or retirement for value, of Subordinated Indebtedness (excluding any (A) Intercompany Loan or (B) intercompany Indebtedness between or among the Parent Guarantor and any Restricted Subsidiary); or

(iv)     make any Investment, other than a Permitted Investment;

if, at the time of, and after giving effect to, the proposed Restricted Payment:

(A)     a Default has occurred and is continuing or would occur as a result of such Restricted Payment;

(B)     immediately after giving *pro forma* effect to such transaction, the Parent Guarantor could not Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a); or

(C)     such Restricted Payment, together with the aggregate amount of all Restricted Payments made by the Parent Guarantor and the Restricted Subsidiaries after the Original Issue Date, shall exceed the sum of:

54

(1)      50% of the aggregate amount of the Consolidated Net Income of the Parent Guarantor (or, if the Consolidated Net Income is a loss, minus 100% of the amount of such loss) accrued on a cumulative basis during the period (taken as one accounting period) beginning on the first day of the fiscal quarter commencing after the Original Issue Date and ending on the last day of the Parent Guarantor's most recently ended fiscal quarter for which consolidated financial statements of the Parent Guarantor (which the Parent Guarantor will use its best efforts to compile in a timely manner and which may be internal financial statements) are available; *plus*

(2)      100% of the aggregate Net Cash Proceeds received by the Parent Guarantor after the Original Issue Date as a capital contribution to its common equity by, or from the issuance and sale of its Capital Stock (other than Disqualified Stock) to a Person who is not a Subsidiary of the Parent Guarantor, including any such Net Cash Proceeds received upon the exercise by a Person who is not a Subsidiary of the Parent Guarantor of any options, warrants or other rights to acquire Capital Stock of the Parent Guarantor (other than Disqualified Stock), in each case after deducting the amount of any such Net Cash Proceeds used to redeem, repurchase, defease or otherwise acquire or retire for value any Subordinated Indebtedness or Capital Stock of the Parent Guarantor or any Restricted Subsidiary; *plus*

(3)      the amount by which Indebtedness of the Parent Guarantor is reduced on the Parent Guarantor's balance sheet upon the conversion or exchange (other than by a Subsidiary of the Parent Guarantor) subsequent to the Original Issue Date of any Indebtedness of the Parent Guarantor convertible or exchangeable for Capital Stock (other than Disqualified Stock) of the Parent Guarantor (less the amount of any cash, or the Fair Market Value of any other property, distributed by the Parent Guarantor upon such conversion or exchange); *provided, however*, that the foregoing amount shall not exceed the net cash proceeds received by the Parent Guarantor from the Incurrence of such Indebtedness; *plus*

(4)      an amount equal to the net reduction in Investments (other than reductions in Permitted Investments) that were made after the Original Issue Date in any Person resulting from (A) payments of interest on Indebtedness, dividends or repayments of loans or advances by such Person, in each case to the Parent Guarantor or any Restricted Subsidiary (except, in each case, to the extent any such payment or proceeds are

55

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 145 of 739

included in the calculation of Consolidated Net Income), or (B) the unconditional release of a Guarantee provided by the Parent Guarantor or a Restricted Subsidiary after the Original Issue Date of an obligation of another Person, (C) to the extent that an Investment made after the Original Issue Date is sold or otherwise liquidated or repaid for cash, the lesser of (x) cash return of capital with respect to such Investment (less the cost of disposition, if any) and (y) the initial amount of such Investment, or (D) from redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, not to exceed, in each case, the amount of Investments (other than Permitted Investments) made by the Parent Guarantor or a Restricted Subsidiary after the Original Issue Date in any such Person.

(b)     The foregoing provision shall not be violated by reason of:

(i)     the payment of any dividend or redemption of any Capital Stock within 60 days after the related date of declaration or call for redemption if, at said date of declaration or call for redemption, such payment or redemption would comply with Section 4.06(a);

(ii)     the redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Indebtedness of the Issuer or any Note Guarantor with the Net Cash Proceeds of, or in exchange for, a substantially concurrent Incurrence of Permitted Refinancing Indebtedness;

(iii)     the redemption, repurchase or other acquisition of Capital Stock of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock) in exchange for, or out of the net cash proceeds of a substantially concurrent capital contribution or sale (other than to a Subsidiary of the Parent Guarantor) of, shares of Capital Stock (other than Disqualified Stock) of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from Section 4.06(a)(iv)(C)(2);

(iv)     the redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Indebtedness of the Issuer or any Note Guarantor in exchange for, or out of the net cash proceeds of, a substantially concurrent capital contribution or sale (other than to a Subsidiary of the Parent Guarantor) of, shares of the Capital Stock (other than Disqualified Stock) of the Issuer or any Note Guarantor (or options, warrants or other rights to acquire such Capital Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from Section 4.06(a)(iv)(C)(2);

(v)     the payment of any dividends or distributions declared, paid or made by a Restricted Subsidiary payable, on a *pro rata* basis or on a basis more

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

favorable to the Parent Guarantor, to all holders of any class of Capital Stock of such Restricted Subsidiary, at least a majority of which is held, directly or indirectly through Restricted Subsidiaries, by the Parent Guarantor;

(vi)     the declaration and payment by the Parent Guarantor of the annual dividend in respect of its Capital Stock for the fiscal year ended June 30, 2013 in an amount under this clause (vi) not to exceed US$10.0 million (or the Dollar Equivalent thereof);

(vii)     the repurchase, redemption or other acquisition or retirement for value of any Capital Stock of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock) held by any future, current or former officer, director or employee of the Parent Guarantor or any Restricted Subsidiaries (or any such Person's assigns, estates or heirs) pursuant to any equity subscription agreement, stock option agreement or similar plans or other contractual arrangements or agreements; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Capital Stock may not exceed US$1.0 million (or the Dollar Equivalent thereof) in any fiscal year and may not exceed US$2.5 million (or the Dollar Equivalent thereof) in the aggregate;

(viii)     the repurchase of Capital Stock deemed to occur upon the exercise of options, warrants or other rights in respect thereof if such Capital Stock represents all or a portion of the exercise price thereof;

(ix)     the declaration and payment of dividends to holders of any class or series of Disqualified Stock of the Parent Guarantor or any preferred stock of a Restricted Subsidiary of the Parent Guarantor issued on or after the date of this Indenture that was permitted to be issued pursuant to Section 4.05.

(x)     the distribution, as a dividend or otherwise, of Capital Stock (or options, warrants or other rights to acquire such Capital Stock) of or other Investments in any Unrestricted Subsidiary (unless the Unrestricted Subsidiary's principal asset is cash or Temporary Cash Investments);

(xi)     payments by the Parent Guarantor of cash in lieu of the issuance of fractional shares upon (A) the exercise of options or warrants, (B) the conversion or exchange of Capital Stock of the Parent Guarantor or (C) stock dividends, splits or business combinations; *provided, however*, that any such cash payment shall not be for the purpose of evading the limitation of this Section 4.06 (as determined in good faith by the Board of Directors); or

(xii)     other Restricted Payments in an aggregate amount not to exceed US$2.0 million (or the Dollar Equivalent thereof) since the Original Issue Date;

*provided* that, in the case of clauses (ii), (iii), (iv), (vi), (vii) and (xii) of this Section 4.06(b), no Default shall have occurred and be continuing or would occur as a consequence of the actions or payments set forth therein.  Each Restricted Payment made pursuant to clause (i), (vi), (vii) and (xi) of this Section 4.06(b) shall be included in

57

(HK) 06562/183/INDENTURE/Raptor Indenture docx

calculating whether the conditions of Section 4.06(a)(iv)(C) have been met with respect to any subsequent Restricted Payments.

The amount of any Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Parent Guarantor or the Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The value of any assets or securities that are required to be valued by this Section 4.06 will be the Fair Market Value. The Board of Directors' determination of the Fair Market Value of any assets (including securities) other than cash in a Restricted Payment or a series of related Restricted Payments must be based upon an opinion or an appraisal issued by an appraisal or investment banking firm of recognized international standing if the Fair Market Value exceeds US$5.0 million (or the Dollar Equivalent thereof).

Not later than the date of making any Restricted Payment in excess of US$5.0 million (or the Dollar Equivalent thereof), the Parent Guarantor will deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.06 were computed, together with a copy of any fairness opinion or appraisal required by this Indenture.

Section 4.07. *Limitation on Liens*. The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur, assume or permit to exist any Lien on the Collateral (other than Permitted Liens). The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur, assume or permit to exist any Lien (other than Permitted Liens) of any nature whatsoever on any of its assets or properties of any kind (other than the Collateral), whether owned at the Original Issue Date or thereafter acquired, unless the Notes are (or, in respect of any Lien on any Subsidiary Guarantor's property or assets, any Subsidiary Guarantee of such Restricted Subsidiary is) equally and ratably secured by such Lien.

Section 4.08. *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*. (a) Except as provided below, the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)     pay dividends or make any other distribution on any Capital Stock of such Restricted Subsidiary owned by the Parent Guarantor or any other Restricted Subsidiary;

(ii)    pay any Indebtedness or other obligation owed to the Parent Guarantor or any other Restricted Subsidiary;

(iii)   make loans or advances to the Parent Guarantor or any other Restricted Subsidiary; or

(iv)    sell, lease or transfer any of its property or assets to the Parent Guarantor or any other Restricted Subsidiary.

58

(b)     The provisions of Section 4.08(a) do not apply to any encumbrances or restrictions:

(i)     existing in agreements as in effect on the Original Issue Date, or in the Notes, the Note Guarantees, this Indenture or the Security Documents, or any extensions, refinancings, renewals or replacements of any of the foregoing agreements; *provided* that the encumbrances and restrictions in any such extension, refinancing, renewal or replacement, taken as a whole, are no more restrictive to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(ii)     existing under or by reason of applicable law, rule, regulation or order;

(iii)     existing with respect to any Person or the property or assets of such Person acquired by the Issuer or any Note Guarantor, at the time of such acquisition and not incurred in contemplation thereof, which encumbrances or restrictions are not applicable to any Person or the property or assets of any Person other than such Person or the property or assets of such Person so acquired, and any extensions, refinancings, renewals or replacements thereof; *provided* that the encumbrances and restrictions in any such extension, refinancing, renewal or replacement, taken as a whole, are no more restrictive to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(iv)     that otherwise would be prohibited under Section 4.08(a)(iv) if they arise, or are agreed to, in the ordinary course of business, and (A) restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease or license, (B) exist by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of the Parent Guarantor or any Restricted Subsidiary not otherwise prohibited by this Indenture or (C) do not relate to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of the Parent Guarantor or any Restricted Subsidiary in any manner material to the Parent Guarantor or any Restricted Subsidiary;

(v)     with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, such Restricted Subsidiary that is permitted by Section 4.09, Section 4.05 and Section 4.13;

(vi)     with respect to any Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the Incurrence of Indebtedness permitted under Section 4.05(b)(xv) or Section 4.05(b)(xvi) if, as determined by the Board of Directors, the encumbrances or restrictions are (A) customary for such type of agreement and (B) would not, at the time agreed to, be expected to

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 149 of 739

materially and adversely affect the ability of the Issuer to make required payments on the Notes;

(vii)    purchase money obligations for property acquired in the ordinary course of business that impose restrictions on the property purchased or leased of the nature described in Section 4.08(a)(iv);

(viii)    customary non-assignment provisions in contracts and licenses entered into in the ordinary course of the Permitted Business;

(ix)    provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale and leaseback agreements, stock sale agreements and other similar agreements entered into with the approval of the Board of Directors, if (as determined by the Board of Directors) the encumbrances or restrictions would not, at the time agreed to, be expected to materially adversely affect the ability of the Issuer and the Note Guarantors to make required payments on the Notes; which limitation is applicable only to the assets that are the subject of such agreements;

(x)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of the Permitted Business;

(xi)    customary restrictions imposed on the transfer of, or in licenses related to, copyrights, patents or other intellectual property and contained in agreements entered into in the ordinary course of the Permitted Business; or

(xii)    Permitted Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the debt being refinanced.

Section 4.09.   *Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries*.  The Parent Guarantor will not sell, and will not permit any Restricted Subsidiary, directly or indirectly, to issue or sell, any shares of Capital Stock of a Restricted Subsidiary (including in each case options, warrants or other rights to purchase shares of such Capital Stock) except:

(a)    to the Parent Guarantor or a Wholly Owned Restricted Subsidiary, or, in the case of a Restricted Subsidiary that is not Wholly-Owned, pro rata to its shareholders or incorporators;

(b)    to the extent such Capital Stock represents director's qualifying shares or is required by applicable law to be held by a Person other than the Parent Guarantor or a Wholly Owned Restricted Subsidiary;

(HK) 06562/183/INDENTURE/Raptor Indenture docx

(c)     the issuance or sale of Capital Stock of a Restricted Subsidiary (which remains a Restricted Subsidiary after any such issuance or sale); *provided* that the Parent Guarantor or such Restricted Subsidiary applies the Net Cash Proceeds of such issuance or sale in accordance with Section 4.13; and

(d)     the issuance or sale of Capital Stock of a Restricted Subsidiary if, immediately after giving effect to such issuance or sale, such Restricted Subsidiary would no longer be a Restricted Subsidiary and any remaining Investment in such Person would have been permitted to be made under Section 4.06 if made on the date of such issuance or sale and *provided* that the Parent Guarantor complies with Section 4.13.

Section 4.10.  *Limitation on Issuances of Guarantees by Restricted Subsidiaries*. (a) The Parent Guarantor will not permit any Restricted Subsidiary (other than the Issuer) that is not a Subsidiary Guarantor, directly or indirectly, to Guarantee any Indebtedness (“**Guaranteed Indebtedness**”) of the Issuer or any Note Guarantor, unless (x) such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for an unsubordinated Subsidiary Guarantee of payment of the Notes by such Restricted Subsidiary and (y) such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Parent Guarantor or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Subsidiary Guarantee until the Notes have been paid in full.

(b)     If the Guaranteed Indebtedness (i) ranks *pari passu* in right of payment with the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness will rank *pari passu* in right of payment with, or subordinated to, the Subsidiary Guarantee or (ii) is subordinated in right of payment to the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness will be subordinated in right of payment to the Subsidiary Guarantee at least to the extent that the Guaranteed Indebtedness is subordinated to the Notes or the Subsidiary Guarantee.

Section 4.11.  *Limitation on Sale and Leaseback Transactions*.  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction; *provided* that the Parent Guarantor or a Restricted Subsidiary may enter into a Sale and Leaseback Transaction if:

(a)     the Parent Guarantor or such Restricted Subsidiary, as the case may be, could have (i) Incurred Indebtedness in an amount equal to the Attributable Indebtedness relating to such Sale and Leaseback Transaction under Section 4.05 and (ii) incurred a Lien to secure such Indebtedness pursuant to Section 4.07, in which case, the corresponding Indebtedness will be deemed Incurred and the corresponding Lien will be deemed incurred pursuant to those provisions;

(b)     the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of such Sale and Leaseback Transaction; and

61

(c) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Parent Guarantor or such Restricted Subsidiary, as the case may be, applies the proceeds of such transaction in compliance with, Section 4.13.

Section 4.12. *Repurchase of Notes Upon a Change of Control.* (a) Not later than 30 days following a Change of Control, the Issuer will make an Offer to Purchase all outstanding Notes (a "**Change of Control Offer**") at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the Offer to Purchase Payment Date (as defined in clause (2) of the definition of "**Offer to Purchase**").

(b) The Issuer will timely repay all Indebtedness or obtain consents as necessary under, or terminate, agreements or instruments that would otherwise prohibit a Change of Control Offer required to be made pursuant to this Section 4.12.

Section 4.13. *Limitation on Asset Sales.* (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, consummate any Asset Sale, unless:

(i) no Default shall have occurred and be continuing or would occur as a result of such Asset Sale;

(ii) the consideration received by the Parent Guarantor or such Restricted Subsidiary, as the case may be, is at least equal to the Fair Market Value of the assets sold or disposed of;

(iii) in the case of an Asset Sale that constitutes an Asset Disposition, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a) after giving *pro forma* effect to such Asset Disposition; and

(iv) at least 75% of the consideration received consists of cash, Temporary Cash Investments or Replacement Assets (as defined below); *provided* that in the case of an Asset Sale in which the Parent Guarantor or such Restricted Subsidiary receives Replacement Assets involving aggregate consideration in excess of US$10.0 million (or the Dollar Equivalent thereof), the Parent Guarantor shall deliver to the Trustee an opinion as to the fairness to the Parent Guarantor or such Restricted Subsidiary of such Asset Sale from a financial point of view issued by an accounting, appraisal or investment banking firm of recognized international standing. For purposes of this provision, each of the following will be deemed to be cash:

(A) any liabilities, as shown on the Parent Guarantor's most recent consolidated balance sheet, of the Parent Guarantor or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary assumption, assignment, novation or similar agreement that releases the

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Parent Guarantor or such Restricted Subsidiary, as the case may be, from further liability; and

(B)     any securities, notes or other obligations received by the Parent Guarantor or any Restricted Subsidiary from such transferee that are promptly, but in any event within 30 days of closing, converted by the Parent Guarantor or such Restricted Subsidiary, as the case may be, into cash, to the extent of the cash received in that conversion.

(b)     Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Parent Guarantor or the applicable Restricted Subsidiary, as the case may be, may apply such Net Cash Proceeds to:

(i)     permanently repay unsubordinated Indebtedness of the Parent Guarantor or a Subsidiary Guarantor or any Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor (and, if such unsubordinated Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) in each case owing to a Person other than the Parent Guarantor or a Restricted Subsidiary; or

(ii)     acquire properties and assets (other than current assets) that will be used in the Permitted Businesses ("**Replacement Assets**"); *provided, however*, that any such reinvestment in Replacement Assets made pursuant to a definitive binding agreement or a commitment approved by the Board of Directors of the Parent Guarantor that is executed or approved within such time will satisfy this requirement, so long as such investment is consummated within 180 days after such 365th day;

*provided* that, pending the application of Net Cash Proceeds in accordance with Section 4.13(b)(i) or (ii) above, such Net Cash Proceeds may be temporarily invested only in cash or Temporary Cash Investments.

(c)     Any Net Cash Proceeds from Asset Sales that are not applied or invested as provided in Section 4.13(b) will constitute "**Excess Proceeds.**" Excess Proceeds of less than US$10.0 million (or the Dollar Equivalent thereof) will be carried forward and accumulated. When accumulated Excess Proceeds exceed US$10.0 million (or the Dollar Equivalent thereof), within five days thereof, the Issuer must make an Offer to Purchase Notes having a principal amount equal to:

(i)     accumulated Excess Proceeds, multiplied by

(ii)     a fraction (A) the numerator of which is equal to the outstanding principal amount of the Notes and (B) the denominator of which is equal to the outstanding principal amount of the Notes and all *pari passu* Indebtedness similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale,

(iii)     rounded down to the nearest US$1,000.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(d)     The offer price in any Offer to Purchase will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of purchase, and will be payable in cash.

(e)     If any Excess Proceeds remain after consummation of an Offer to Purchase, the Parent Guarantor or any Restricted Subsidiary may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of Notes (and any other *pari passu* Indebtedness) tendered in such Offer to Purchase exceeds the amount of Excess Proceeds, the Trustee will select the Notes to be purchased on a *pro rata* basis based on the principal amount of the Notes and such other *pari passu* Indebtedness tendered. Upon completion of each Offer to Purchase, the amount of Excess Proceeds will be reset at zero.

(f)     Notwithstanding the provisions of this Section 4.13, the Issuer and the Parent Guarantor shall not, and shall not permit any Restricted Subsidiary to, sell any Intercompany Loan.

Section 4.14.   *Limitation on Transactions with Shareholders and Affiliates*.  (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement (or series of related transactions or arrangements) (including, without limitation, the purchase, sale, lease or exchange of property or assets, or the rendering of any service) involving aggregate payments or consideration in excess of US$100,000 (or the Dollar Equivalent thereof) with (x) any holder (or any Affiliate of such holder) of 5.0% or more of any class of Capital Stock of the Parent Guarantor or (y) any Affiliate of the Parent Guarantor (each an "**Affiliate Transaction**"), unless:

(i)     the Affiliate Transaction is on fair and reasonable terms that are no less favorable to the Parent Guarantor or the relevant Restricted Subsidiary, as the case may be, than those that would have been obtained in a comparable transaction by the Parent Guarantor or the relevant Restricted Subsidiary with a Person that is not an Affiliate of the Parent Guarantor; and

(ii)     the Parent Guarantor delivers to the Trustee:

(A)     with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$2.5 million (or the Dollar Equivalent thereof), a Board Resolution set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this covenant and such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

(B)     with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$5.0 million (or the Dollar Equivalent thereof), in addition to the Board Resolution required in Section 4.14(a)(ii)(A) above, an opinion as

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 154 of 739

to the fairness to the Parent Guarantor or such Restricted Subsidiary, as the case may be, of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of recognized international standing.

(b)     The limitation set forth in Section 4.14(a) above, does not limit, and shall not apply to:

(i)     any employment or compensation agreement (whether based in cash or securities), officer or director indemnification agreement, severance or termination agreement or any similar arrangement entered into by the Parent Guarantor or any of its Restricted Subsidiaries and payments pursuant thereto and any transactions pursuant to stock option plans, stock ownership plans and employee benefit plans or similar arrangements in each case in the ordinary course of business;

(ii)     the payment of reasonable and customary fees and reimbursement of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of the Parent Guarantor or any of its Restricted Subsidiaries;

(iii)     transactions between or among the Parent Guarantor and any Wholly Owned Restricted Subsidiary or between or among Wholly Owned Restricted Subsidiaries;

(iv)     any Restricted Payment of the type described in clauses (i) or (ii) of Section 4.06(a) if permitted by Section 4.06;

(v)     any sale of Capital Stock (other than Disqualified Stock) of the Parent Guarantor;

(vi)     loans or advances to employees in the ordinary course of business not to exceed, in the aggregate, US$1.0 million (or the Dollar Equivalent thereof) at any one time outstanding;

(vii)     any agreement between any Person and an Affiliate of such Person existing at the time such Person is acquired by or merged into the Parent Guarantor or any of its Restricted Subsidiaries; *provided* that such agreement was not entered into in contemplation of such acquisition or merger;

(viii)     any purchases by the Parent Guarantor's Affiliates of Indebtedness or Disqualified Stock of the Parent Guarantor or any of its Restricted Subsidiaries the majority of which Indebtedness or Disqualified Stock is purchased by Persons who are not Affiliates of the Parent Guarantor; *provided* that such purchases by the Parent Guarantor's Affiliates are on the same terms as such purchases by such Persons who are not Affiliates of the Parent Guarantor; and

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(ix)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, derivatives or insurance or leases or lessees or providers of employees or other labor or property, in the ordinary course of business and that are fair or on terms at least as favorable as arm's length as determined by the Board of Directors.

In addition, the requirements of Section 4.14(a)(ii) shall not apply to (A) Investments (other than Permitted Investments) not prohibited by Section 4.06; (B) transactions pursuant to agreements in effect on the Original Issue Date and described in the offering memorandum of the Issuer dated May 9, 2013, or any amendment or modification or replacement thereof, so long as such amendment, modification or replacement is not more disadvantageous to the Parent Guarantor and its Restricted Subsidiaries than the original agreement in effect on the Original Issue Date and (C) any transaction between or among the Parent Guarantor, any Wholly Owned Restricted Subsidiary and any Restricted Subsidiary that is not a Wholly Owned Restricted Subsidiary; *provided* that in the case of clause (3), (A) such transaction is entered into in the ordinary course of business and (B) none of the minority shareholders or minority partners of or in such Restricted Subsidiary is a Person described in clause (x) or (y) of Section 4.14(a).

Section 4.15.   *Limitation on Business Activities*.  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, engage in any business other than Permitted Businesses.

Section 4.16.   *Use of Proceeds*.  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, use the net proceeds from the sale of the Notes issued and sold on the Original Issue Date, in any amount, for any purpose other than (a) as specified under the caption "**Use of Proceeds**" in the offering memorandum of the Issuer dated May 9, 2013; and (b) pending the application of all of such net proceeds in such manner, to invest the portion of such net proceeds not yet so applied in cash or Temporary Cash Investments.

Section 4.17.   *Maintenance of Insurance*.  The Parent Guarantor will, and will cause its Restricted Subsidiaries to, maintain insurance with reputable and financially sound carriers against such risks and in such amounts as is customarily carried by similarly situated businesses, including, without limitation, property and casualty insurance.

Section 4.18.   *Designation of Restricted and Unrestricted Subsidiaries*.  (a) The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary; *provided* that:

(i)    no Default shall have occurred and be continuing at the time of or after giving effect to such designation;

(ii)    such Restricted Subsidiary does not own any Disqualified Stock of the Issuer or any Note Guarantor or Disqualified or Preferred Stock of the Parent

66

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document        Page 156 of 739

Guarantor or a Restricted Subsidiary that is not a Subsidiary Guarantor or hold any Indebtedness of, or any Lien on any property of, the Parent Guarantor or any Restricted Subsidiary, if such Disqualified or Preferred Stock or Indebtedness could not be Incurred under Section 4.05 or such Lien would violate Section 4.07;

(iii) such Restricted Subsidiary does not own any Voting Stock of another Restricted Subsidiary, and all of its Subsidiaries are Unrestricted Subsidiaries or are being concurrently designated to be Unrestricted Subsidiaries in accordance with this Section 4.18(a);

(iv) such Restricted Subsidiary has no outstanding Indebtedness that could trigger a cross-default to the Indebtedness of the Parent Guarantor or any other Restricted Subsidiary and none of the Parent Guarantor or any Restricted Subsidiary Guarantees or provides credit support for the Indebtedness of such Restricted Subsidiary; and

(v) the Investment deemed to have been made thereby in such newly designated Unrestricted Subsidiary and each other newly designated Unrestricted Subsidiary being concurrently redesignated would be permitted to be made under Section 4.06.

(b) None of the Parent Guarantor nor any Restricted Subsidiary will at any time:

(i) provide a guarantee of, or similar credit support to, any Indebtedness of an Unrestricted Subsidiary (including of any undertaking, agreement or instrument evidencing such Indebtedness);

(ii) be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary; or

(iii) be directly or indirectly liable for any other Indebtedness that provides that the holder thereof may (upon giving notice, the lapse of time or both) declare a default thereof (or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity) upon the occurrence of a default with respect to any other Indebtedness that is Indebtedness of an Unrestricted Subsidiary (including any corresponding right to take enforcement action against such Unrestricted Subsidiary.

(c) The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that:

(i) no Default shall have occurred and be continuing at the time of or after giving effect to such designation;

(ii) any Indebtedness of such Unrestricted Subsidiary outstanding at the time of such designation which will be deemed to have been Incurred by such

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

newly designated Restricted Subsidiary as a result of such designation would be permitted to be Incurred under Section 4.05;

(iii)    any Lien on the property of such Unrestricted Subsidiary at the time of such designation which shall be deemed to have been incurred by such newly designated Restricted Subsidiary as a result of such designation would be permitted to be incurred under Section 4.07;

(iv)    such Unrestricted Subsidiary is not a Subsidiary of another Unrestricted Subsidiary (that is not concurrently being designated as a Restricted Subsidiary); and

(v)    if such Restricted Subsidiary is not designated as a Non-Guarantor Subsidiary, such Restricted Subsidiary will upon such designation execute and deliver to the Trustee a supplemental indenture to this Indenture by which such Restricted Subsidiary will become a Subsidiary Guarantor.

Section 4.19.    *Anti-Layering*.  Each of the Parent Guarantor and the Issuer will not Incur, and will not permit any Subsidiary Guarantor to Incur, any Indebtedness if such Indebtedness is contractually subordinated in right of payment to any other Indebtedness of the Parent Guarantor, the Issuer or any Subsidiary Guarantor, as the case may be, unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the Note Guarantees, on substantially identical terms; *provided* that this requirement does not apply to distinctions between categories of Indebtedness that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Indebtedness.

Section 4.20.    *Provision of Financial Statements and Reports*.  (a) For so long as any Notes are outstanding, the Parent Guarantor will provide to the Trustee the following reports, in the English language:

(i)    within 90 days after the end of the Parent Guarantor's fiscal year beginning with the first fiscal year ending after the Original Issue Date, annual reports containing, to the extent applicable, and in a level of detail that is comparable to that included in the offering memorandum of the Issuer dated May 9, 2013, the following information: (A) audited consolidated balance sheets of the Parent Guarantor of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Parent Guarantor for the two most recent fiscal years, including complete footnotes to such financial statements and the audit report of a member firm of an internationally recognized firm or independent accountants on the financial statements; (B) unaudited *pro forma* consolidated income statement information and balance sheet information of the Parent Guarantor (which, for the avoidance of doubt, will not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year; (C) an operating

68

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 158 of 739

and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, EBITDA and liquidity and capital resources of the Parent Guarantor, and a discussion of material commitments and contingencies and critical accounting policies; (D) description of the business, management and shareholders of the Parent Guarantor (on a consolidated basis), all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; (E) a description of material risk factors and material recent developments; and (F) an income statement and balance sheet for the Note Guarantors and Issuer, on a combined basis;

(ii)     within 60 days following the end of the first three fiscal quarters in each fiscal year of the Parent Guarantor beginning with the quarter ending March 31, 2013, all quarterly reports of the Parent Guarantor containing the following information: (A) an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the most recent quarter year-to-date period ending on the unaudited condensed balance sheet date, and the comparable prior year periods, together with condensed footnote disclosure reviewed by a member firm of an internationally recognized firm or independent accountants together with the review report thereon; (B) unaudited *pro forma* income statement information and balance sheet information of the Parent Guarantor, together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the relevant quarter; (C) an operating and financial review of the unaudited financial statements, including a discussion of the results of operations, financial condition, EBITDA and material changes in liquidity and capital resources of the Parent Guarantor, and a discussion of material changes not in the ordinary course of business in commitments and contingencies since the most recent report; (D) material recent developments; and (E) an income statement and balance sheet for the Note Guarantors and Issuer, on a combined basis; and

(iii)     promptly after the occurrence of (A) any material acquisition or disposition or restructuring, (B) any senior executive officer changes at the Parent Guarantor or change in auditors of the Parent Guarantor or (C) any other material event not in the ordinary course of business, solely with respect to this sub-clause (C), that the Parent Guarantor announces publicly, a report containing a description of such event and, in the event of the occurrence of any material acquisition or disposition, within 75 days following the occurrence of such material acquisition or disposition, unaudited *pro forma* consolidated income statement information and balance sheet information of the Parent Guarantor, together with explanatory footnotes, for any such material acquisition or disposition; and

(iv)     as soon as they are available, but in any event not more than 10 days after they are filed with the relevant exchange(s) on which the Parent Guarantor's common shares are at any time listed for trading, true and correct copies of any financial or other report filed with such exchange.

69

(b)     So long as any Note remains outstanding, the Parent Guarantor will provide to the Trustee (A) within 90 days after the close of each fiscal year, an Officers' Certificate stating each of the Fixed Charge Coverage Ratio and the Consolidated Priority Indebtedness Leverage Ratio with respect to the four most recent fiscal quarters and most recent fiscal quarter, respectively, and showing in reasonable detail the calculation of each such ratio, including the arithmetic computations of each component of each such ratio, with a certificate from the Parent Guarantor's external auditors verifying the accuracy and correctness of the calculation and arithmetic computation; and (B) as soon as possible and in any event within 10 days after the Parent Guarantor becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Parent Guarantor proposes to take with respect thereto.

(c)     All financial statement and *pro forma* financial information shall be prepared in accordance with GAAP as in effect on the date of such report or financial statement (or otherwise on the basis of GAAP as then in effect) and on a consistent basis for the periods presented; *provided, however*, that the reports set forth in Section 4.20(a)(i), (ii) and (iii) above may, in the event of a change in applicable GAAP, present earlier periods on a basis that applied to such periods; and *provided further* that the audited financial statements set forth in Section 4.20(a)(i)(A) will be prepared in accordance with both GAAP and International Financial Reporting Standards until such time as GAAP has converged with International Financial Reporting Standards.

(d)     At any time that any of the Parent Guarantor's Subsidiaries are Unrestricted Subsidiaries and any such Unrestricted Subsidiary or group of Unrestricted Subsidiaries, if taken together as one Subsidiary, constitutes a Significant Subsidiary of the Parent Guarantor, then the annual and quarterly financial information required by the first two clauses of this covenant shall include either (A) a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Parent Guarantor and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Parent Guarantor or (B) stand-alone audited or unaudited reviewed financial statements, as the case may be, of such Unrestricted Subsidiary or Unrestricted Subsidiaries (as a group or otherwise) together with an unaudited reconciliation to the financial information of the Parent Guarantor and its Subsidiaries, which reconciliation will include the following items: revenue, EBITDA, net income, cash, total assets, total debt, shareholders equity, capital expenditures and interest expense.

(e)     Substantially concurrently with the issuance to the Trustee of the reports specified in Section 4.20(a)(i), (ii) and (iii) above, the Parent Guarantor shall also post copies of such reports on such confidential website as may be then maintained by the Parent Guarantor.

(f)     Further, the Issuer and each Note Guarantor have agreed that, for as long as any Notes are "**restricted securities**" within the meaning of Rule 144(a)(3) under the Securities Act, during any period in which the Issuer or such Note Guarantor is neither subject to Section 13 or 15(d) of the Exchange Act, nor exempt from reporting pursuant

to Rule 12g3-2(b) thereunder, the Issuer or such Note Guarantor, as the case may be, shall supply to (i) any Holder or beneficial owner of a Note or (ii) a prospective purchaser of a Note or a beneficial interest therein designated by such Holder or beneficial owner, the information specified in, and meeting the requirements of Rule 144A(d)(4) under the Securities Act upon the request of any Holder or beneficial owner of a Note.

Section 4.21.  *Additional Amounts*.  (a) All payments of principal of, and premium (if any) and interest on the Notes or under the Note Guarantees will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within the United States, India or any other jurisdiction in which the Issuer, a Surviving Person or an applicable Note Guarantor is organized or resident for tax purposes or any political subdivision or taxing authority thereof or therein (each, as applicable, a "**Relevant Taxing Jurisdiction**") or any jurisdiction through which payment is made by or on behalf of the Issuer, a Surviving Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein (together with the Relevant Taxing Jurisdictions, the "**Relevant Jurisdictions**"), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Surviving Person or the applicable Note Guarantor, as the case may be, will pay such additional amounts ("**Additional Amounts**") as will result in receipt by the Holder of each Note, of such amounts as would have been received by such Holder had no such withholding or deduction been required, except that no Additional Amounts shall be payable:

(i)      for or on account of:

(A)      any tax, duty, assessment or governmental charge that would not have been imposed but for:

(1)      the existence of any present or former connection between the Holder or beneficial owner of such Note, and the Relevant Jurisdiction other than merely holding such Note or the receipt of payments thereunder or under a Note Guarantee, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(2)      the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any, and interest on, such Note became due and payable pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such

71

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 161 of 739

Additional Amounts if it had presented such Note for payment on any date within such 30-day period;

(3)     the failure of the Holder or beneficial owner to comply with a timely request of the Issuer, a Surviving Person or any Note Guarantor addressed to the Holder, to provide information concerning such Holder's or beneficial owner's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request is required under the statutes, regulations or official administrative guidance having a force of law of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder; or

(4)     the Holder or beneficial owner being a direct, indirect or constructive owner of 10% or more of the total combined voting power of all classes of stock entitled to vote of Rolta International, Inc., or a "controlled foreign corporation" for U.S. federal income tax purpose related (within the meaning of section 864(d)(4) of the Code) to Rolta International, Inc.

(B)     any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

(C)     any withholding or deduction that is imposed or levied pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directives;

(D)     any tax, duty, assessment or other governmental charge to the extent such tax, duty, assessment or other governmental charge results from the presentation of the Note (where presentation is required) for payment and the payment can be made without such withholding or deduction by the presentation of the Note for payment elsewhere; or

(E)     any combination of taxes, duties, assessments or governmental charges referred to in the preceding clauses (A), (B), (C) and (D); or

(ii)     to a Holder that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor, with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will (i) make such withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will make reasonable efforts to obtain original tax receipts or certified copies thereof evidencing the payment of any taxes, duties, assessment or governmental charges so deducted or withheld and paid to the Relevant Jurisdiction. The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will furnish to the Holders and the Trustee, within 60 days after the date the payment of any taxes, duties, assessment or governmental charges so deducted or withheld is due pursuant to applicable law, either original tax receipts or certified copies thereof evidencing such payment or, if such receipts are not obtainable, other evidence of such payments.

At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable, if the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will be obligated to pay Additional Amounts with respect to such payment, the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will deliver to the Trustee an Officers' Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable the Paying Agent to pay such Additional Amounts to the Holders on such payment date.

In addition, the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will pay any stamp, issue, registration, documentary, value added or other similar taxes and other duties (including interest and penalties) payable in any Relevant Jurisdiction in respect of the creation, issue, offering, execution or enforcement of the Notes, the Note Guarantees, or any documentation with respect thereto.

(b)     Whenever there is mentioned in any context the payment of principal of, and any premium or interest on, any Note or under any Note Guarantee, such mention shall be deemed to include payment of Additional Amounts provided for in this Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

Section 4.22.  *No Payments for Consents*.  The Parent Guarantor will not, and will not permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture, the Notes or any Note Guarantee unless such consideration is offered to be paid or is paid to all Holders that consent, waive or agree to amend such term or provision within the time period set forth in the solicitation documents relating to such consent, waiver or amendment.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 163 of 739

Section 4.23. *Suspension of Certain Covenants*. (a) If on any date following the date of this Indenture, the Notes have a rating of Investment Grade from any two of the three Rating Agencies and no Default or Event of Default has occurred and is continuing, then, beginning on that day and continuing until such time, if any, at which the Notes cease to have a rating of Investment Grade from at least two of the three Rating Agencies (such period, the "**Suspension Period**"), the following provisions of this Indenture shall be suspended:

(i)     Section 4.05,

(ii)    Section 4.06,

(iii)   Section 4.08,

(iv)    Section 4.09,

(v)     Section 4.10,

(vi)    Section 4.11,

(vii)   Section 4.13,

(viii)  Section 5.01(a)(iv); and

(ix)    Section 5.01(b)(iv).

(b)     During any period that the foregoing covenants have been suspended, the Board of Directors may not designate any of the Restricted Subsidiaries as Unrestricted Subsidiaries pursuant to Section 4.18 or the definition of "Unrestricted Subsidiary."

(c)     Such covenants will be reinstituted and apply according to their terms as of and from the first day on which a Suspension Period ceases to be in effect. Such covenants will not, however, be of any effect with regard to actions of the Parent Guarantor or any Restricted Subsidiary properly taken in compliance with the provisions of this Indenture during the continuance of the Suspension Period, and following reinstatement (i) the calculations under Section 4.06 will be made as if such covenant had been in effect since the date of this Indenture except that no Default will be deemed to have occurred solely by reason of a Restricted Payment made while that covenant was suspended and (ii) all Indebtedness incurred, or Disqualified Stock issued, during the Suspension Period will be classified to have been incurred or issued pursuant to Section 4.05(b)(ii). Upon the occurrence of a Suspension Period, the amount of Excess Proceeds shall be reset at the amount in effect at the beginning of the Suspension Period.

(d)     There can be no assurance that the Notes will ever achieve a rating of Investment Grade or that any such rating will be maintained.

Section 4.24. *Limitation on the Issuer*.

74

(a)     The Issuer will at all times remain a direct Wholly Owned Restricted Subsidiary of Rolta International, Inc. and an indirect Wholly Owned Restricted Subsidiary of the Parent Guarantor.

(b)     Notwithstanding anything contained in this Indenture to the contrary, the Issuer will not engage in any business activity or undertake any other activity, except any activity (A) relating to the offering, sale or issuance of the Notes, the incurrence of Indebtedness represented by the Notes or any Additional Notes issued under this Indenture (including lending the proceeds thereof to the Parent Guarantor or certain Restricted Subsidiaries under the terms of the Intercompany Loans), and any other activities in connection therewith, (B) undertaken with the purpose of fulfilling any obligations under the Notes, the Guarantees, this Indenture, the Security Documents or for purposes of consent solicitations or tenders for the Notes or refinancing of the Notes, (C) directly related to the establishment and/or maintenance of the Issuer's corporate existence, or (D) for the purpose of providing application outsource services and conducting such other business operations as may be approved by the Issuer's management committee.

(c)     The Issuer will not (A) issue any Capital Stock other than to Rolta International, Inc. or (B) acquire or receive any property or assets (including, without limitation, any Capital Stock or Indebtedness of any Person), other than (x) the Intercompany Loans or (y) cash for ongoing corporate activities of the Issuer described in the preceding paragraph.

(d)     Neither the Issuer nor Rolta International, Inc. will at any time while the Notes are outstanding make any election for the Issuer to be treated as other than a disregarded entity of Rolta International, Inc. for U.S. federal income tax purposes.

(e)     The Issuer will not create, incur, assume or suffer to exist any Lien (except for Permitted Liens of the Issuer) of any kind against or upon any of its property or assets, or any proceeds therefrom other than under the Security Documents.

(f)     Except as necessary to permit timely delivery to the Paying Agent of sums sufficient to pay principal and interest when so becoming due under the Notes, the Issuer will not at any time maintain cash balances in amounts greater than the minimum amounts required by applicable law or regulation or in order to pay taxes which may be applicable to or payable by the Issuer, the Parent Guarantor or certain Restricted Subsidiaries in respect of the Intercompany Loans or the Notes. Whenever the Issuer receives a payment or prepayment under any of the Intercompany Loans, it will use the funds received solely to satisfy its obligations (to the extent of the amount owing in respect of such obligations) under the Notes and this Indenture.

(g)     For so long as any Notes are outstanding, none of the Issuer, Rolta International, Inc. or the Parent Guarantor will commence or take any action to cause a winding-up or liquidation of the Issuer except that the Issuer may be wound up or liquidated subsequent to a consolidation, merger or transfer of assets conducted in accordance with Section 5.01(a).

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(h)      Except as provided in this Indenture, the Issuer will not, and the Parent Guarantor will procure that the Issuer does not, assign or novate its rights under any Intercompany Loan.

Section 4.25.  *Currency Indemnity*.  (a) The U.S. Dollar is the sole currency of account and payment for all sums payable by the Issuer and the Note Guarantors under the Notes and the Note Guarantees (the "**Contractual Currency**"). Any amount received or recovered in currency other than the Contractual Currency in respect of the Notes or the Note Guarantees (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up, liquidation or dissolution of the Parent Guarantor, any Subsidiary or otherwise) by the Holder in respect of any sum expressed to be due to it from the Issuer or a Note Guarantor shall constitute a discharge of the Issuer or the Note Guarantor, as the case may be, only to the extent of the Contractual Currency amount which the recipient is able to purchase with the amount so received or recovered in other currency on the date of that receipt or recovery (or, if it is not possible to make that purchase on that date, on the first date on which it is possible to do so). If that purchased amount is less than the Contractual Currency amount expressed to be due to the recipient under any Note, the Issuer and the Note Guarantors shall indemnify the recipient against any loss sustained by it as a result. For the purposes of this indemnity, it will be sufficient for the Holder to certify (indicating the sources of information used) that it would have suffered a loss had the actual purchase of Contractual Currency been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of Contractual Currency on such date had not been possible, on the first date on which it would have been possible).

(b)      Each of the above indemnities will, to the extent permitted by law:

(i)      constitute a separate and independent obligation from the other obligations of the Issuer or the Note Guarantors;

(ii)      give rise to a separate and independent cause of action;

(iii)      apply irrespective of any waiver granted by any Holder; and

(iv)      continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment or order.

(c)      Approval of the RBI will be required in respect of any indemnity payment(s) to be made by the Parent Guarantor, if it is in respect of its direct indemnity obligation, or if aggregate amounts paid in respect of the Guarantee of the Parent Guarantor exceed the Parent Guaranteed Amount, in each case, that may be required to be made to, or for the credit of, any person resident outside India, in rupees or foreign currency, before any such payment is made.  No RBI approval will be required for payments in respect of claims under the Parent Guarantee up to the Parent Guaranteed Amount in the event of the Issuer's failure to indemnify the Holders in respect of the Notes under its currency indemnity.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Section 4.26.  *Amendments to or Prepayments of the Intercompany Loans.*  (a) Without the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding, the Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, (A) prepay or otherwise reduce or permit the prepayment or reduction of any Intercompany Loan or (B) amend, modify or alter any Intercompany Loan in any manner adverse to the Holders; *provided* that, without the consent of each Holder affected thereby, the Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, amend, modify or alter any Intercompany Loan to:

(i)    other than as permitted by a majority of the Holders pursuant to (A) above, change the Stated Maturity of the principal of, or any installment of interest on such loan;

(ii)    reduce the rate of interest on such loan;

(iii)    change the currency for payment of principal or interest on such loan;

(iv)    reduce the above-stated percentage of Notes the consent of whose Holders is necessary to modify or amend such loans;

(v)    waive a default in the payment of any amount under such loan; or

(vi)    sell or transfer such loan other than pursuant to its terms.

(b)    Notwithstanding the foregoing, without the consent of any Holder, any Intercompany Loan may be amended solely to provide for the issuance of Additional Notes, and may be prepaid or reduced to facilitate or otherwise accommodate or reflect a redemption, repurchase or exchange of outstanding Notes in accordance with the terms of this Indenture or through any tender offer or exchange offer.

(c)    The Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, sell any Intercompany Loan or to, directly or indirectly, incur, assume or permit to exist any Lien on any Intercompany Loan, other than pursuant the Security Documents.

Section 4.27.  *Waiver of Stay, Extension or Usury Laws.*  Each of the Issuer and Note Guarantors covenants, to the extent that it may lawfully do so, that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or such Note Guarantor, as the case may be, from paying all or any portion of the principal of, or premium or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture. Each of the Issuer and Note Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it shall not hinder, delay or impede the execution of any

77

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 167 of 739

power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE 5
### CONSOLIDATION, MERGER AND SALE OF ASSETS

Section 5.01. *Consolidation, Merger and Sale of Assets.* (a) The Issuer will not consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of the properties and assets of the Issuer and its Restricted Subsidiaries (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions) unless each of the following conditions is satisfied:

(i) the Issuer shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger, or with or into which the Issuer consolidated or merged, or that acquired or leased such property and assets (the "**Surviving Person**") shall be Rolta International, Inc., or any direct subsidiary of Rolta International, Inc. treated as a disregarded entity for U.S. federal income tax purposes, organized and validly existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof and will expressly assume, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Issuer under this Indenture and the Notes, as the case may be, including the obligation to pay Additional Amounts with respect to any jurisdiction in which it is organized or resident for tax purposes or through which it makes payments, and this Indenture and the Notes shall remain in full force and effect;

(ii) immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(iii) immediately after giving effect to such transaction on a *pro forma* basis, the Issuer or the Surviving Person, as the case may be, will have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of Rolta International, Inc. immediately prior to such transaction;

(iv) immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a);

(v) the Issuer shall deliver to the Trustee (x) an Officers' Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (iii) and (iv) of this Section 5.01(a)) and (y) an Opinion of Counsel, in each case stating that such consolidation, merger or transfer and the relevant supplemental indenture complies with this Section 5.01(a) and that all conditions precedent provided for in this Indenture relating to such transaction have been complied with;

78

(vi)    (1) each Note Guarantor shall execute and deliver a supplemental indenture to this Indenture confirming that its Note Guarantee shall apply to the obligations of the Issuer or the Surviving Person, as the case may be, in accordance with the Notes and this Indenture and (2) the confirmation by the Parent Guarantor of its Parent Guarantee pursuant to this clause (v) shall not result in any reduction of the Parent Guaranteed Amount; and

(vii)    no Rating Decline shall have occurred.

(b)    No Note Guarantor shall consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of the properties and assets of the Parent Guarantor and its Restricted Subsidiaries (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions) to another Person (other than the Issuer or a Note Guarantor) unless each of the following conditions is met:

(i)    (1) such Note Guarantor shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger, or with or into which the Note Guarantor consolidated or merged, or that acquired or leased such property and assets shall be the Issuer, another Note Guarantor or shall become a Note Guarantor concurrently with the transaction in accordance with this Indenture and (2) with respect to the Parent Guarantor and the Parent Guarantee, such transaction shall not result in any reduction of the Parent Guaranteed Amount;

(ii)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(iii)    immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor will have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Parent Guarantor immediately prior to such transaction;

(iv)    immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a);

(v)    the Issuer shall deliver to the Trustee (x) an Officers' Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (iii) and (iv) of this Section 5.01(b)) and (y) an Opinion of Counsel, in each case stating that such consolidation, merger or transfer and the relevant supplemental indenture complies with this provision and that all conditions precedent provided for in this Indenture relating to such transaction have been complied with; and

(vi)    no Rating Decline shall have occurred,

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

*provided* that this Section 5.01(b) shall not apply to any sale or other disposition that complies with Section 4.13 or any Subsidiary Guarantor whose Subsidiary Guarantee is unconditionally released in accordance with Section 11.11.

## ARTICLE 6
### DEFAULT AND REMEDIES

Section 6.01. *Events of Default.* Each of the following events is an "**Event of Default**":

(a)     default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)     default in the payment of interest or Additional Amounts on any Note when the same becomes due and payable, and such default continues for a period of 30 days;

(c)     default in the performance or breach of the provisions of Article 5 or the failure by the Issuer to make or consummate an Offer to Purchase in the manner described under Section 4.12 or Section 4.13;

(d)     the Parent Guarantor or any Restricted Subsidiary defaults in the performance of or breaches any other covenant or agreement in this Indenture or under the Notes (other than a default specified in Section 6.01(a), (b), (c), or (j)) and such default or breach continues for a period of 45 consecutive days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Notes;

(e)     there occurs with respect to any Indebtedness of the Parent Guarantor or any Restricted Subsidiary having an outstanding principal amount of US$10.0 million (or the Dollar Equivalent thereof) or more in the aggregate for all such Indebtedness of all such Persons, whether such Indebtedness now exists or shall hereafter be created, (a) an event of default that results in such Indebtedness being due and payable prior to its Stated Maturity and/or (b) a default in payment of principal of, or interest or premium on, or any other amounts in respect of, such Indebtedness when the same becomes due and payable;

(f)     one or more final judgments or orders for the payment of money are rendered against the Parent Guarantor or any Restricted Subsidiary and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed US$10.0 million (or the Dollar Equivalent thereof) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(g)     an involuntary case or other proceeding is commenced against the Parent Guarantor or any Restricted Subsidiary with respect to it or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar

(HK) 06562/183/INDENTURE/Raptor Indenture docx

official of the Parent Guarantor or any Restricted Subsidiary or for any substantial part of the property and assets of the Parent Guarantor or any Restricted Subsidiary, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 consecutive days; or an order for relief is entered against the Parent Guarantor or any Restricted Subsidiary under any applicable bankruptcy, insolvency or other similar law as now or hereafter in effect;

(h)     the Parent Guarantor or any Restricted Subsidiary (i) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Restricted Subsidiary or for all or substantially all of the property and assets of the Parent Guarantor or any Restricted Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(i)     any Note Guarantor denies or disaffirms its obligations under its Note Guarantee or, except as permitted by this Indenture, any Note Guarantee is determined to be unenforceable or invalid or shall for any reason cease to be in full force and effect;

(j)     the failure by the Issuer to establish the Interest Reserve Account or to maintain the Interest Reserve Amount in the Interest Reserve Account;

(k)     any default by the Parent Guarantor or any obligor under the Security Documents in the performance of any of its obligations under the Security Documents or this Indenture, which adversely affects the enforceability, validity, perfection or priority of the applicable Lien on the Collateral or which adversely affects the condition or value of the Collateral, taken as a whole, in any material respect; or

(l)     the Parent Guarantor or any Restricted Subsidiary denies or disaffirms its obligations under any Security Document or, other than in accordance with this Indenture and the Security Documents, any Security Document ceases to be or is not in full force and effect or the Security Agent or the Trustee, as applicable, ceases to have a first priority security interest in the Collateral (subject to any Permitted Liens).

Section 6.02.   *Acceleration*.  If an Event of Default (other than an Event of Default specified in Section 6.01(g) or 6.01(h) above) occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by written notice to the Issuer (and to the Trustee if such notice is given by the Holders), may, and the Trustee at the written direction of such Holders (subject to it being indemnified or secured to its satisfaction) shall declare the principal of, premium, if any, and accrued and unpaid interest on the Notes to be immediately due and payable. Upon a declaration of acceleration, such principal of, premium, if any, and accrued and unpaid interest shall be immediately due and payable. If an Event of Default specified in Section 6.01(g) or 6.01(h) above occurs with respect to the Parent Guarantor or any Restricted Subsidiary, the principal of, premium, if any, and accrued and unpaid interest on the Notes then outstanding shall automatically become and be immediately

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

due and payable without any declaration or other act on the part of the Trustee or any Holder.

Section 6.03. *Other Remedies*. If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or, to enforce the performance of any provision of the Notes or this Indenture, including, but not limited to, directing a foreclosure on the Collateral in accordance with the terms of the Security Documents and take such further action on behalf of the Holders with respect to the Collateral in accordance with such Holders' instruction and the relevant Security Documents. The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04. *Waiver of Past Defaults*. The Holders of at least a majority in principal amount of the outstanding Notes by written notice to the Issuer and to the Trustee may on behalf of all the Holders waive all past defaults and rescind and annul a declaration of acceleration and its consequences if: (a) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived, and (b) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction. Upon such waiver, the Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05. *Control by Majority*. The Holders of at least a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders. In addition, the Trustee will not be required to expend its own funds in following such direction if it does not reasonably believe that reimbursement or satisfactory indemnification is assured to it.

Section 6.06. *Limitation on Suits*. A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes unless:

(a)     the Holder has previously given the Trustee written notice of a continuing Event of Default;

(b)     the Holders of at least 25% in aggregate principal amount of outstanding Notes make a written request to the Trustee to pursue the remedy;

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(c)      such Holder or Holders offer the Trustee and the Security Agent indemnity reasonably satisfactory to the Trustee and the Security Agent against any costs, liability or expense, to be incurred in compliance with such request;

(d)      the Trustee does not comply with the request within (x) 60 days after receipt of the written request pursuant to Section 6.06(b) or (y) 60 days after the receipt of the offer of indemnity pursuant to Section 6.06(c), whichever occurs later; and

(e)      during such 60-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request.

Section 6.07.    *Rights of Holders to Receive Payment*.  Notwithstanding anything to the contrary in this Article 6, the right of any Holder of a Note to receive payment of the principal of, premium, if any, or interest on, such Note or any payment under any Note Guarantee, or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes, shall not be impaired or affected without the consent of such Holder.

Section 6.08.    *Compliance Certificate*.  The Parent Guarantor shall submit an Officers' Certificate to the Trustee, in substantially the form attached hereto as Exhibit J, on or before a date not more than 90 days after the end of each fiscal year, that a review has been conducted of the activities of the Parent Guarantor and the Restricted Subsidiaries and the Parent Guarantor's and the Restricted Subsidiaries' performance under this Indenture, the Notes and the Security Documents, and that the Parent Guarantor and each Restricted Subsidiary have fulfilled all of their respective obligations hereunder, or, if there has been a default in the fulfillment of any such obligation, specifying each such default and the nature and status thereof.  The Parent Guarantor shall also be obligated to notify the Trustee in writing of any default or defaults in the performance of any covenants or agreements under this Indenture.

If any Default occurs and is continuing and is known or has been notified to the Trustee, the Trustee will send notice of the Default to each holder within 90 days after it occurs, unless the Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as the board of directors, the executive committee or a trust committee of directors of the Trustee in good faith determine that withholding the notice is in the interest of the Holders.

Section 6.09.    *Collection Suit by Trustee*.  If an Event of Default in payment specified in Section 6.01(a) or Section 6.01(b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount remaining unpaid, together with interest on overdue principal or premium and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances

(HK) 06562/183/INDENTURE/Raptor Indenture docx

of the Trustee, its agents and counsel and any other amounts due to the Trustee hereunder.

Section 6.10. *Trustee May File Proofs of Claim*. The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer or any Note Guarantor or their respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims. Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee hereunder. Nothing in this Indenture shall be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.11. *Priorities*. Subject to the Security Documents, if the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

*First*, to the Trustee and the Agents to the extent necessary to reimburse the Trustee or Agents for any expenses (including reasonable expenses of its counsel) incurred in connection with the enforcement of any rights or remedies under this Indenture or the Note Guarantees or the collection or distribution of such amounts held or realized and any fees and expenses incurred in connection with carrying out its functions under this Indenture (including properly incurred legal fees);

*Second*, to the Trustee for the benefit of Holders for amounts due and unpaid on the Notes for the principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

*Third*, any surplus remaining after such payments shall be paid to the Issuer, or the Note Guarantors or to whomever may be lawfully entitled thereto.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

Section 6.12. *Restoration of Rights and Remedies*. If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, any Note Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, any Note Guarantors, the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.13. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.13 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates, or a suit by Holders of more than 10% in principal amount of the outstanding Notes.

Section 6.14. *Rights and Remedies Cumulative*. No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or exercise of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.15. *Delay or Omission Not Waiver*. No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

ARTICLE 7

THE TRUSTEE AND THE AGENTS

Section 7.01. *General*. (a) The duties and responsibilities of the Trustee are as set forth herein. Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article 7.

(b)     Except during the continuance of an Event of Default, the Trustee shall perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee. In case an Event of Default has occurred and is continuing and the Trustee has received written notification thereof pursuant to Section 7.05, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

circumstances in the conduct of such person's own affairs. During the continuance of an Event of Default, the Trustee shall act upon the written direction of the Holders of at least 25% of the aggregate principal amount of the Notes then outstanding, subject to its receiving indemnity and/or security to its reasonable satisfaction.

(c)     Should the Trustee become a creditor of the Issuer or any of the Note Guarantors, rights of the Trustee to obtain payment of claims in certain cases or to realize on certain property received by the Trustee in respect of any such claims as security or otherwise shall be limited. The Trustee is permitted to engage in other transactions. The Issuer hereby irrevocably waives, in favor of the Trustee, any conflict of interest which may arise by virtue of the Trustee acting in various capacities under this Indenture or for other customers of the Trustee. The Issuer acknowledges that the Trustee and its affiliates may have interests in, or may be providing or may in the future provide financial or other services to other parties with interests which the Issuer may regard as conflicting with its interests and may possess information (whether or not material to the Issuer), other than as a result of the Trustee acting as Trustee hereunder, that the Trustee may not be entitled to share with the Issuer. Consistent with its long-standing policy to hold in confidence the affairs of its customers, the Trustee will not disclose confidential information obtained from the Issuer without the Issuer's written consent in each instance to any of the Trustee's other customers. Without prejudice to the foregoing, the Issuer agrees that the Trustee may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of this Indenture.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.02 or 6.05.

(e)     Notwithstanding anything herein to the contrary, the Trustee shall not be responsible for recitals, statements, warranties or representations of any party contained in this Indenture or any other agreement or other document, entered into in connection herewith or therewith and shall assume the accuracy and correctness thereof and shall not be responsible for the execution, legality, effectiveness, adequacy, genuineness, validity or enforceability or admissibility in evidence of any such agreement or other document or any trust thereby constituted or evidenced. Notwithstanding the generality of the foregoing, each Holder shall be solely responsible for making its own independent appraisal of and investigation into the financial condition, creditworthiness, condition, affairs, status and nature of the Issuer and any Note Guarantor, and the Trustee shall not at any time have any responsibility for the same and each Holder shall not rely on the Trustee in respect thereof.

Section 7.02.  *Certain Rights of Trustee and Agents.*  Subject to Section 7.01:

(a)     In the absence of bad faith on its part, the Trustee may conclusively rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate,

86

statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document, but, in the case of any document which is specifically required to be furnished to the Trustee pursuant to any provision hereof, the Trustee shall examine the document to determine whether it conforms to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein). The Trustee, in its discretion, may make further inquiry or investigation into such facts or matters as it sees fit and shall do so if requested in writing to do so by the Holders of at least 25% of the aggregate principal amount of Notes then outstanding; *provided*, *however*, that if any payment to be made to the Trustee within a reasonable time in respect of any loss, action, proceeding, claim, penalty, damages, costs, expense, disbursement or other liability likely to be suffered or incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require indemnity and/or security satisfactory to the Trustee against such loss, action, proceeding, claim, penalty, damages, cost, expense, disbursement or other liability as a condition to taking any such action.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel prepared and delivered at the cost of the Issuer conforming to Sections 13.04 and 13.05 and the Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any attorney or agent appointed with due care by it hereunder. To the extent an agent has been named by the Trustee in connection with this Indenture, the parties hereto shall cooperate to ensure that such agent can perform the duties for which it was appointed. Upon an Event of Default, the Trustee shall be entitled to require all agents to act solely in accordance with its directions.

(d)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security or indemnity reasonably satisfactory to it against any loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expenses that might be suffered or incurred by it in compliance with such request or direction.

(e)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.02 or 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(f)     The Trustee may consult with counsel or other professional advisors of its selection, and the written advice of such counsel or advisors or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives security and indemnity satisfactory to it against any loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense.

(h)     If any Note Guarantor is substituted to make payments on behalf of the Issuer pursuant to Article 10 and/or Article 11 hereof, the Issuer shall promptly notify the Trustee and any clearing house through which the Notes are traded of such substitution.

(i)     The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate.

(j)     In connection with the exercise by it of its trusts, powers, authorities or discretions (in including, without limitation, any modification, waiver, authorization or determination), the Trustee shall have regard to the general interests of the Holders as a class but shall not have regard to any interests arising from circumstances particular to individual Holders (whatever their number) and in particular, but without limitation, shall not have regard to the consequences of the exercise of its trusts, powers, authorities or discretions for individual Holders (whatever their number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any country, state or territory and a Holder shall not be entitled to require, nor shall any Holder be entitled to claim, from the Issuer, the Trustee or any other Person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Holders except to the extent already provided in Section 4.21 and/or any undertaking given in addition to, or in substitution for, Section 4.21 pursuant to this Indenture.

(k)     The Trustee shall not be liable for errors in judgment made by it in good faith unless it is proved that the Trustee was negligent in ascertaining the pertinent facts.

(l)     The Trustee shall have no obligation to monitor the financial performance of the Issuer or any Note Guarantor.

(m)     The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any of the Covenants contained in Article 4.  The Trustee shall not be responsible for the creditworthiness or solvency of the Issuer or any Note Guarantor.

(n)     The Trustee is not obliged to do or omit to do anything which in its opinion would or may be illegal or would result in the Trustee or any Agent being in breach of

(HK) 06562/183/INDENTURE/Raptor Indenture docx

any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Trustee or Agent is subject.

Section 7.03. *Individual Rights of Trustee.* The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not the Trustee and nothing herein shall obligate the Trustee to account for any profits earned from any business or transactional relationship. Any Agent may do the same with like rights.

Section 7.04. *Trustee's Disclaimer.* The Trustee (a) makes no representation as to the validity or adequacy of this Indenture, the Notes or the Note Guarantee of any Note Guarantor, (b) is not accountable for the Issuer's use or application of the proceeds from the Notes, (c) is not responsible for any statement in the Notes other than its certificate of authentication and (d) shall not have any responsibility for the Issuer's or any Holder's compliance with any state or U.S. federal securities law or any other applicable law in connection with the Notes. Under no circumstance will the Trustee or any Agent be liable to any party for any special, indirect, punitive or consequential loss or damage even if the Trustee or any Agent, as applicable, has been advised of such loss or damage and regardless of whether the claim for loss or damage is made in negligence, for breach of contract or otherwise. This provision shall remain in full force and effect notwithstanding the discharge of the Notes and or the resignation or replacement or removal of the Trustee or Agent.

Section 7.05. *Notice of Default.* If any Default occurs and is continuing and is known to the Trustee, the Trustee shall send notice of the Default to each Holder within 30 days after it occurs, or, if later, within 15 days after it is known to the Trustee unless the Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or premium or interest on any Note, the Trustee may withhold the notice if and so long as the board of directors, the executive committee or a trust committee of the Trustee in good faith determines that withholding the notice is in the interest of the Holders. The Trustee shall not be deemed to have knowledge of a Default or Event of Default unless and until it obtains actual knowledge of such Default or Event of Default through written notification describing the circumstances of such, and identifying the circumstances constituting such Default or Event of Default.

Section 7.06. *Compensation and Indemnity.* (a) Each of the Issuer and the Note Guarantors agrees to be jointly and severally responsible for and shall pay the Trustee and each Agent compensation as agreed upon in writing for its services. The compensation of the Trustee and each Agent is not limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee and each Agent upon request for all reasonable out-of-pocket expenses, disbursements and advances (including costs of collection) incurred or made by the Trustee and each Agent, including the reasonable compensation, expenses and disbursements of the agents and counsel of each Agent and the Trustee and other Persons not regularly within their respective employ.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(b)    Each of the Issuer and the Note Guarantors agrees to be jointly and severally responsible for and shall indemnify the Trustee and each Agent or any predecessor Trustee or Agent and their respective agents, employees, officers and directors for, and hold it harmless against, any obligations, taxes, judgments, suits, loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture and its duties under this Indenture and the Notes, including (i) the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes and (ii) the compensation, expenses and disbursements of the agents and counsel of each Agent and the Trustee and other Persons not regularly within their respective employ.

(c)    To secure the Issuer's payment obligations in this Section 7.06, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest on particular Notes.

(d)    This Section 7.06 shall survive the redemption or maturity of the Notes, the termination of this Indenture, and the resignation or termination of the appointment of the Trustee.

Section 7.07.   *Replacement of Trustee*.  (a) (i) The Trustee may resign at any time by 30 days prior written notice to the Issuer.

(ii)    The Holders of a majority in principal amount of the outstanding Notes may remove the Trustee by 30 days prior written notice to the Trustee.

(iii)    The Issuer may remove the Trustee if: (A) the Trustee is adjudged a bankrupt or an insolvent; (B) a receiver or other public officer takes charge of the Trustee or its property; or (C) the Trustee becomes incapable of acting.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.07.

(b)    If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee, *provided* that, in the case of a resignation of the Trustee in connection with a bankruptcy of the Issuer, the Trustee will have the right to appoint a successor Trustee if no successor Trustee is appointed within 10 Business Days of notice of such resignation.  If the successor Trustee does not deliver its written acceptance within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in the aggregate principal amount of the outstanding

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall transfer all money or property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06, (ii) the resignation or removal of the retiring Trustee shall become effective and (iii) the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer and each Note Guarantor shall execute any and all instruments for fully vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)     Notwithstanding replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

Section 7.08.  *Successor Trustee by Consolidation, Merger, Conversion or Transfer*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets (including the administration of the trust created by this Indenture) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act shall be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.09.  *Money Held in Trust*.  The Trustee will not be liable for interest on any money received by it except as it may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law and except for money held in trust under Article 8.

Section 7.10.  *Paying Agent in EU*.  If the Issuer maintains a Paying and Transfer Agent in a European Union member state, it shall maintain such an agent in a European Union member state that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directives.

ARTICLE 8
DEFEASANCE AND DISCHARGE AND SATISFACTION AND DISCHARGE

Section 8.01.  *Defeasance and Discharge of Indenture*.  (a) The Issuer will be deemed to have paid, and will be discharged from any and all obligations in respect of the Notes, on the 183rd day after the deposit referred to in clause (i) of this Section 8.01(a) has been made, and the provisions of this Indenture will no longer be in effect with

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

respect to the Notes (and the Trustee, at the expense of the Issuer, shall execute proper instruments acknowledging the same), except as to (1) rights of registration of transfer and exchange of the Notes; (2) substitution of apparently mutilated, defaced, destroyed, lost or stolen Notes; (3) obligations to maintain paying agencies; and (4) the rights of the Holders as beneficiaries hereof with respect to the monies so deposited with the Trustee payable to all or any of them; *provided* that the following conditions shall have been satisfied:

(i)     the Issuer (A) has deposited with the Trustee, in trust, cash in U.S. dollars, U.S. Government Obligations or a combination thereof that, through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of this Indenture and the Notes and (B) has delivered to the Trustee an Opinion of Counsel or a certificate of an internationally recognized firm of independent accountants to the effect that the amount deposited by the Issuer is sufficient to provide payment for the principal of, premium, if any, and accrued interest on, the Notes on the Stated Maturity of such payment in accordance with the terms of this Indenture and an Opinion of Counsel to the effect that the Holders have a valid, perfected, exclusive Lien over such trust;

(ii)     the Issuer has delivered to the Trustee (A) either (x) an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters that is based on a change in applicable U.S. federal income tax law occurring after the Original Issue Date to the effect that beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the Issuer's exercise of its option under this Section 8.01 and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same time as would have been the case if such deposit, defeasance and discharge had not occurred or (y) a ruling directed to the Issuer or the Trustee received from the U.S. Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel and (B) an Opinion of Counsel of recognized international standing to the effect that the creation of the defeasance trust does not violate the U.S. Investment Company Act of 1940, as amended, and after the passage of 123 days following the deposit, the trust fund will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law;

(iii)     the Issuer shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by it with the intent of preferring the Holders over any other of its creditors or with the intent of defeating, hindering, delaying or defrauding any other of its creditors or others; and

(iv)     immediately after giving effect to such deposit on a *pro forma* basis, no Event of Default, or event that after the giving of notice or lapse of time or both would become an Event of Default, shall have occurred and be continuing on the date of such deposit or during the period ending on the 183rd day after the

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document      Page 182 of 739

date of such deposit, and such defeasance shall not result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Parent Guarantor or any of the Restricted Subsidiaries is a party or by which the Parent Guarantor or any of the Restricted Subsidiaries is bound.

(b)    In the case of either discharge or defeasance of the Notes, each of the Subsidiary Guarantees will terminate.

Section 8.02.    *Covenant Defeasance*.  The Issuer may omit to comply with any term, provision or condition set forth in, and this Indenture shall no longer be in effect with respect to Section 5.01(a)(iii), Section 5.01(a)(iv), Section 5.01(b)(iii) and Section 5.01(b)(iv), Section 4.05, Section 4.06, Section 4.07, Section 4.08, Section 4.09, Section 4.10, Section 4.11, Section 4.13, Section 4.14, Section 4.15, Section 4.16, Section 4.17, Section 4.18, Section 6.01(c) with respect to Section 5.01(a)(iii), Section 5.01(a)(iv), Section 5.01(b)(iii) and Section 5.01(b)(iv), Section 6.01(d) with respect to other provisions under Section 5.01(a) and Section 5.01(b), and Section 6.01(e), Section 6.01(f), Section 6.01(g) and Section 6.01(h) shall be deemed not to be Events of Default; provided the following conditions have been satisfied:

(a)    The Issuer has deposited with the Trustee, in trust, of cash in U.S. dollars, U.S. Government Obligations or a combination thereof that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of this Indenture and the Notes;

(b)    The Issuer has delivered to the Trustee an Opinion of Counsel of recognized standing to the effect that the creation of the defeasance trust does not violate the U.S. Investment Company Act of 1940, as amended, and after the passage of 123 days following the deposit, the trust fund will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law; and

(c)    The Issuer has delivered to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters to the effect that beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance of certain covenants and Events of Default and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same time as would have been the case if such deposit and defeasance had not occurred.

Section 8.03.    *Application of Trust Money*.  Subject to Section 8.04, the Trustee shall hold in trust, the money or, U.S. Government Obligations deposited with it pursuant to Section 8.01 or 8.02, and apply the deposited money and the proceeds from deposited U.S. Government Obligations to the payment of principal of and premium or interest on the Notes in accordance with the Notes and this Indenture.  Such money and U.S. Government Obligations shall be segregated from other funds.

93

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 183 of 739

Section 8.04.   *Repayment to Issuer*.  Subject to Sections 6.11, 7.06, 8.01 and 8.02, the Trustee shall promptly pay to the Issuer upon written request by the Issuer in the form of an Officers' Certificate any excess money held by the Trustee at any time and thereupon be relieved from all liability with respect to such money.  The Trustee shall pay to the Issuer upon written request by the Issuer in the form of an Officers' Certificate any money held for payment with respect to the Notes that remains unclaimed for two years, *provided* that before making such payment the Trustee may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such money, notice that the money remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money shall be repaid to the Issuer.  After payment to the Issuer, Holders entitled to such money must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee with respect to such money shall cease.

Section 8.05.   *Reinstatement*.  If and for so long as the Trustee is unable to apply any money or U.S. Government Obligations held in trust pursuant to Sections 8.01 or 8.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes shall be reinstated as though no such deposit in trust had been made.  If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held in trust.

Section 8.06.   *Satisfaction and Discharge*.  This Indenture will be discharged and will cease to be of further effect as to all Notes issued thereunder, when:

(a)     the Issuer has paid or caused to be paid all sums payable by it under this Indenture;

(b)     either: (i) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation, or (ii) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(c)     in respect of Section 8.06(b)(ii), above, the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document       Page 184 of 739

Issuer or any Note Guarantor is a party or by which the Issuer or any Note Guarantor is bound (other than with respect to the borrowing of funds to be applied concurrently to make the deposit required to effect such satisfaction and discharge and any similar concurrent deposit relating to other Indebtedness, and in each case the granting of Liens to secure such borrowings);

(d)     the Parent Guarantor has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be; and

(e)     the Parent Guarantor has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## ARTICLE 9
### AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments without Consent of Holders*.  (a) The Issuer, the Note Guarantors and the Trustee may amend or supplement this Indenture, the Notes or the Note Guarantees without the consent of any Holder, to:

(i)     cure any ambiguity, defect, omission or inconsistency in this Indenture, the Notes, the Note Guarantees or any Security Document;

(ii)     comply with Article 5;

(iii)     evidence and provide for the acceptance of appointment by a successor Trustee or Security Agent;

(iv)     provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture;

(v)     in any other case where a supplemental indenture to this Indenture is required or permitted to be entered into pursuant to the provisions of this Indenture without the consent of any Holder;

(vi)     effect any changes to this Indenture in a manner necessary to comply with the procedures of the relevant clearing system;

(vii)     add additional Collateral to secure the Notes or the Note Guarantees;

(viii)     add any Subsidiary Guarantor or any Subsidiary Guarantee or release any Subsidiary Guarantor from any Subsidiary Guarantee as provided or permitted by the terms of this Indenture;

(ix)     conform the text of this Indenture, the Notes, the Note Guarantees or the Security Documents to any provision of the "**Description of the Notes**"

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 185 of 739

section of the offering memorandum of the Issuer relating to the Notes dated May 9, 2013 to the extent that such provision in the "**Description of the Notes**" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Note Guarantees or the Security Documents; or

(x) to make any other change that does not adversely affect the rights of any Holder.

Section 9.02. *Amendments with Consent of Holders*. (a) Amendments, supplements or other modifications of this Indenture or any Security Document may be made by the Issuer, the Note Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the outstanding Notes, and the Holders of a majority in principal amount of the outstanding Notes may waive future compliance by the Issuer and the Note Guarantors with any provision of this Indenture or the Notes; *provided, however*, that no such amendment, supplement, modification, or waiver may, without the consent of each Holder affected thereby:

(i) change the Stated Maturity of the principal of, or any installment of interest on, any Note;

(ii) reduce the principal amount of, or premium, if any, or interest on, any Note;

(iii) change the place, currency or time of payment of principal of, or premium, if any, or interest on, any Note;

(iv) impair the right to institute suit for the enforcement of any payment on or after the Stated Maturity (or, in the case of a redemption, on or after the redemption date) of any Note or any Note Guarantee;

(v) reduce the above-stated percentage of outstanding Notes the consent of whose Holders is necessary to modify or amend this Indenture;

(vi) waive a default in the payment of principal of, premium, if any, or interest on the Notes;

(vii) reduce the percentage or aggregate principal amount of outstanding Notes the consent of whose Holders is necessary for waiver of compliance with certain provisions of this Indenture or for waiver of certain defaults;

(viii) release any Note Guarantor from its Note Guarantee, except as provided in this Indenture;

(ix) amend, change or modify any Note Guarantee in a manner that adversely affects the Holders;

(x) reduce the amount payable upon a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale or change the time

(HK) 06562/183/INDENTURE/Raptor Indenture docx

or manner by which a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale may be made or by which the Notes must be repurchased pursuant to a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale;

(xi)     change the redemption date or the redemption price of the Notes from that stated in Section 3.01 or Section 3.02(a);

(xii)     amend, change or modify the obligation of the Issuer or any Note Guarantor to pay Additional Amounts;

(xiii)     release any Collateral, except as provided in this Indenture and the Security Documents;

(xiv)     amend, change or modify any provision of the Security Documents relating to the Collateral, or any provision of this Indenture relating to the Collateral, in a manner that adversely affects the Holders, except in accordance with the other provisions of the Security Documents or this Indenture; or

(xv)     amend, change or modify any provision of this Indenture or the related definition affecting the ranking of the Notes or any Note Guarantee in a manner which adversely affects the Holders.

(b)     It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but is sufficient if their consent approves the substance thereof.

(c)     An amendment, supplement or waiver under this Section 9.02 shall become effective on receipt by the Trustee of written consents from the Holders of the requisite percentage in principal amount of the outstanding Notes.  After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall send to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver.  The Issuer shall send supplemental indentures to Holders upon request.  Any failure of the Issuer to send such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture or waiver.

Section 9.03.  *Effect of Consent.*  (a) After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver shall bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)     If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 187 of 739

of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.04. *Trustee's and Agents' Rights and Obligations.* Each of the Trustee and the Agents is entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of any amendment, supplement or waiver authorized pursuant to this Article is authorized or permitted by this Indenture and that such amendment, supplement or waiver constitutes the legal, valid and binding obligations of the party or parties executing such amendment, supplement or waiver, and an Officers' Certificate stating that all conditions precedent have been complied with. If the Trustee or the Agents, as the case may be, has received such an Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Agents, as the case may be. Each of the Trustee and the Agents may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's or the Agents' own rights, duties or immunities under this Indenture. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated and indemnified are extended to, and shall be enforceable by, Deutsche Bank Trust Company Americas in each of its capacities under this Indenture.


# ARTICLE 10
## PARENT GUARANTEE

Section 10.01. *Parent Guarantee.* Subject to the provisions of this Article 10, the Parent Guarantor hereby Guarantees, jointly and severally, as principal obligor to each Holder of a Note authenticated by the Trustee or the Authenticating Agent and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and this Indenture.

Section 10.02. *Guarantee Unconditional.* The obligations of the Parent Guarantor hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

(b)     any modification or amendment of or supplement to this Indenture or any Note;

(c)     any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 188 of 739

(d)  the existence of any claim, set off or other rights which the Parent Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)  any invalidity, irregularity, or unenforceability relating to or against the Issuer or any Subsidiary Guarantor for any reason of this Indenture or any Note; or

(f)  any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to such Parent Guarantor's obligations hereunder.

Section 10.03. *Discharge; Reinstatement.*  The Parent Guarantor's obligations hereunder will remain in full force and effect until the Parent Guarantee is released pursuant to Section 10.09 hereof.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Parent Guarantor's obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.  All payments under the Parent Guarantee will be made in U.S. dollars.

Section 10.04. *Waiver by the Parent Guarantor.*  The Parent Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  In particular, the Parent Guarantor irrevocably waives its right to require the Trustee to pursue or exhaust the Trustee's legal or equitable remedies against the Issuer prior to exercising the Trustee's rights under the Parent Guarantee.

Section 10.05. *Subrogation.*  Upon making any payment with respect to any obligation of the Issuer under this Article 10, the Parent Guarantor will be subrogated to the rights of the payee against the Issuer with respect to such obligation, *provided* that the Parent Guarantor may not enforce any right of subrogation, or any right to receive payment in the nature of contribution or otherwise, from any other Note Guarantor, with respect to such payment so long as any amount payable by the Issuer hereunder or under the Notes remains unpaid.

Section 10.06. *Stay of Acceleration.*  If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Parent Guarantor hereunder forthwith on demand by the Trustee or the Holders.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Section 10.07. *Ranking of Parent Guarantee.* The Parent Guarantee is (a) a senior obligation of the Parent Guarantor; (b) senior in right of payment to all existing and future obligations of the Parent Guarantor expressly subordinated in right of payment to the Parent Guarantee; and (c) at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of the Parent Guarantor (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law).

Section 10.08. *Execution and Delivery of Parent Guarantee.* (a) To evidence its Parent Guarantee set forth in Section 10.01, the Parent Guarantor hereby agrees that the Parent Guarantee substantially in the form attached as Exhibit L hereto will be endorsed by an Officer or a director of the Parent Guarantor and delivered to the Trustee for attachment to each Note authenticated and delivered by the Trustee.

(b)     The Parent Guarantor hereby agrees that its Parent Guarantee set forth in Section 10.01 will remain in full force and effect notwithstanding any failure to endorse or attach to each Note such Parent Guarantee.

(c)     If an Officer or director whose signature is on the Parent Guarantee no longer holds that office at the time the Trustee authenticates the Note to which the Parent Guarantee is attached, the Parent Guarantee will be valid nonetheless.

Section 10.09. *Release of the Parent Guarantee.* (a) The Parent Guarantee given by the Parent Guarantor will be released upon,

(i)     repayment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Issuer; or

(ii)     a defeasance as provided in Section 8.01.

(b)     No release and discharge of the Parent Guarantee will be effective against the Trustee, any Agent or the Holders of Notes if a Default or Event of Default shall have occurred and be continuing under this Indenture as of the time of such proposed release and discharge until such time as such Default or Event of Default is cured or waived and until the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent provided for in this Indenture relating to such release and discharge have been complied with and that such release and discharge is authorized and permitted under this Indenture. At the request of the Issuer, the Trustee will execute and deliver an instrument evidencing such release and discharge and do all other things necessary to release the Parent Guarantor from its obligations hereunder.

(c)     The Parent Guarantee will be in effect for the period commencing on (and including) the Original Issue Date and ending on (and including) the sixth anniversary of the Maturity Date (the "**Guarantee Period**"), if not earlier released. For the avoidance of doubt, any rights of the Holders and any liability of the Parent Guarantor that have arisen or accrued under the Parent Guarantee during the Guarantee Period will continue after the Guarantee Period and will survive any release.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 190 of 739

Section 10.10. *Limitation of the Parent Guarantee*. Notwithstanding anything in this Indenture to the contrary, as at the Original Issue Date, the Parent Guarantor's potential liability under the Parent Guarantee is capped at an amount equal to 200 percent of the total initial aggregate principal amount of the Notes being US$400,000,000 (the "**Parent Guaranteed Amount**"). The Parent Guaranteed Amount will be reduced by any amounts paid by the Parent Guarantor under the Parent Guarantee from time to time. The Parent Guaranteed Amount may be increased by the Parent Guarantor from time to time up to a maximum of 200 percent of the then outstanding total aggregate principal amount of the Notes (the "**Maximum Guaranteed Amount**"). In the event that, on any anniversary of the Original Issue Date, the Parent Guaranteed Amount is less than the Maximum Guaranteed Amount, the Parent Guarantor shall give notice thereof to the Holders and to the Trustee and shall not:

> (i)    declare or pay any dividends, interest or make any other payment on, and will procure that no dividend, interest or other payment is made on any class of its Capital Stock (including preference shares) or Subordinated Indebtedness; or

> (ii)    redeem, reduce, cancel, buy-back or otherwise acquire for any consideration any of its share capital or its Subordinated Indebtedness;

until the earlier of (A) the next calendar day on which the Parent Guaranteed Amount is increased to be equal to the Maximum Guaranteed Amount; and (B) the 183rd day after the date on which all of the Notes have been redeemed in full.

## ARTICLE 11
### SUBSIDIARY GUARANTEES

Section 11.01. *The Subsidiary Guarantees*. Subject to the provisions of this Article 11, each of the Subsidiary Guarantors (whether originally a signatory hereto or added pursuant to a supplemental indenture) hereby, jointly and severally, guarantees as principal obligor to each Holder of a Note authenticated by the Trustee or the Authenticating Agent and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and this Indenture.

Section 11.02. *Guarantee Unconditional*. The obligations of each Subsidiary Guarantor hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

(b)    any modification or amendment of or supplement to this Indenture or any Note;

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 191 of 739

(c)     any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(d)     the existence of any claim, set off or other rights which the Subsidiary Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)     any invalidity, irregularity, or unenforceability relating to or against the Issuer or any other Note Guarantor for any reason of this Indenture or any Note; or

(f)     any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this Section 11.02, constitute a legal or equitable discharge of or defense to such Subsidiary Guarantor's obligations hereunder.

Section 11.03. *Discharge; Reinstatement.*  Each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Issuer under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, each Subsidiary Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.  All payments under the Subsidiary Guarantees shall be made in U.S. dollars.

Section 11.04. *Waiver by Each Subsidiary Guarantor.*  Each Subsidiary Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  In particular, each Subsidiary Guarantor irrevocably waives its right to require the Trustee to pursue or exhaust the Trustee's legal or equitable remedies against the Issuer prior to exercising the Trustee's rights under the Subsidiary Guarantee.

Section 11.05. *Subrogation and Contribution.*  Upon making any payment with respect to any obligation of the Issuer under this Article 11, the Subsidiary Guarantor making such payment shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided* that the Subsidiary Guarantor may not enforce either any right of subrogation, or any right to receive payment in the nature of contribution, or otherwise, from any other Note Guarantor, with respect to such payment so long as any amount payable by the Issuer hereunder or under the Notes remains unpaid.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Section 11.06. *Stay of Acceleration.* If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Subsidiary Guarantors hereunder forthwith on demand by the Trustee or the Holders.

Section 11.07. *Limitation on Amount of Subsidiary Guarantee.* Notwithstanding anything to the contrary in this Article, each Note Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Subsidiary Guarantee of such Subsidiary Guarantor not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable law of any other jurisdiction. To effectuate that intention, the Trustee, the Holders and the Subsidiary Guarantors hereby irrevocably agree that the obligations of each Subsidiary Guarantor under its Subsidiary Guarantee are limited in an amount not to exceed the maximum amount that can be guaranteed by the applicable Subsidiary Guarantor without rendering the Subsidiary Guarantee, as it relates to such Subsidiary Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 11.08. *Ranking of Subsidiary Guarantees.* The Subsidiary Guarantee of each Subsidiary Guarantor: (a) is a senior obligation of such Subsidiary Guarantor; (b) is senior in right of payment to all existing and future obligations of such Subsidiary Guarantor expressly subordinated in right of payment to its Subsidiary Guarantee; and (c) ranks at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of such Subsidiary Guarantor (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law).

Section 11.09. *Further Subsidiary Guarantors.* (a) The Parent Guarantor will cause each of its future Restricted Subsidiaries (other than Persons designated as a Non-Guarantor Subsidiary), promptly upon becoming a Restricted Subsidiary, to execute and deliver to the Trustee a supplemental indenture to this Indenture pursuant to which it will Guarantee the payment of the Notes.

(b) The Parent Guarantor may designate any future Restricted Subsidiaries as a Non-Guarantor Subsidiary (together with the Initial Non-Guarantor Subsidiaries, the "**Non-Guarantor Subsidiaries**"); *provided* that any such newly designated Non-Guarantor Subsidiary (together with its Restricted Subsidiaries), together with all other Non-Guarantor Subsidiaries (and their respective Restricted Subsidiaries), in the aggregate, does not account for more than 10.0% of the Parent Guarantor's consolidated revenue for the most recent fiscal quarter or Total Assets as of the last date of the most recent fiscal quarter for which consolidated financial statements are available (which the Parent Guarantor will use its best efforts to compile in a timely manner). In the event that the Non-Guarantor Subsidiaries (and their respective Restricted Subsidiaries), in the aggregate, account for more than 10.0% of the Parent Guarantor's consolidated revenue for the most recent fiscal quarter or Total Assets as of the last date of the most recent fiscal quarter for which consolidated financial statements are available (which the Parent

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Guarantor will use its best efforts to compile in a timely manner), the Parent Guarantor will promptly upon such financial statements becoming available, procure that one or more Non-Guarantor Subsidiaries execute and deliver to the Trustee a supplemental indenture to this Indenture pursuant to which they will Guarantee the payment of the Notes so that the remaining Non-Guarantor Subsidiaries (together with their respective Restricted Subsidiaries) do not account for more than 10.0% of the Parent Guarantor's consolidated revenue for such fiscal quarter or Total Assets as of the last date of such fiscal quarter.

(c)     Each Restricted Subsidiary that Guarantees the Notes after the Original Issue Date is referred to as a "**Future Subsidiary Guarantor**" and, upon execution of the applicable supplemental indenture to this Indenture, will be a "**Subsidiary Guarantor.**" Any Non-Guarantor Subsidiary that after the Original Issue Date provides a Subsidiary Guarantee will cease to be a Non-Guarantor Subsidiary upon providing such Subsidiary Guarantee.

Section 11.10. *Execution and Delivery of Subsidiary Guarantee.* (a) To evidence its Subsidiary Guarantee set forth in Section 11.01, each Subsidiary Guarantor hereby agrees that (i) such Subsidiary Guarantee substantially in the form attached as Exhibit M hereto will be endorsed by an Officer or a director of such Subsidiary Guarantor and delivered to the Trustee for attachment to each Note authenticated and delivered by the Trustee and (ii) a Supplemental Indenture substantially in the form attached as Exhibit I hereto will be executed on behalf of such Subsidiary Guarantor by one of its Officers or directors.

(b)     Each Subsidiary Guarantor hereby agrees that its Subsidiary Guarantee set forth in Section 11.01 will remain in full force and effect notwithstanding any failure to endorse or attach to each Note such Subsidiary Guarantee.

(c)     If an Officer or director whose signature is on any Supplemental Indenture or on the Subsidiary Guarantee no longer holds that office at the time the Trustee authenticates the Note to which a Subsidiary Guarantee is attached, the Subsidiary Guarantee will be valid nonetheless.

(d)     Upon execution of this Indenture or a Supplemental Indenture, as applicable, the delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Subsidiary Guarantee set forth in this Indenture on behalf of the Subsidiary Guarantor.

(e)     The Parent Guarantor shall cause any Restricted Subsidiary so required by Section 4.18, to execute a Supplemental Indenture in the form of Exhibit I to this Indenture and a notation of Subsidiary Guarantee in the form of Exhibit M to this Indenture in accordance with Section 4.18 and this Article 11.

Section 11.11. *Release of the Subsidiary Guarantees.* (a) A Subsidiary Guarantee given by a Subsidiary Guarantor shall automatically and unconditionally be released upon:

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(i)     repayment in full of the Notes;

(ii)    a defeasance or satisfaction and discharge of the Notes as provided in Section 8.01;

(iii)   the designation by the Parent Guarantor of a Subsidiary Guarantor as an Unrestricted Subsidiary in compliance with the terms of this Indenture; or

(iv)    the sale, merger or other transfer of a Subsidiary Guarantor in compliance with the terms of this Indenture (including Sections 4.09, 4.13 and 5.01) resulting in such Subsidiary Guarantor no longer being a Restricted Subsidiary, *provided* that (1) such Subsidiary Guarantor is simultaneously released from its obligations in respect of any of the Parent Guarantor's other Indebtedness or any Indebtedness of any other Restricted Subsidiary and (2) the proceeds from such sale or disposition are used for the purposes permitted or required by this Indenture.

(b)     No release and discharge of the Subsidiary Guarantor from its Subsidiary Guarantee shall be effective against the Trustee, any Agent or the Holders of Notes (i) if a Default or Event of Default shall have occurred and be continuing under this Indenture as of the time of such proposed release and discharge until such time as such Default or Event of Default is cured or waived and (ii) until the Parent Guarantor shall have delivered to the Trustee an Officers' Certificate stating that all conditions precedent provided for in this Indenture relating to such release and discharge have been complied with and that such release and discharge is authorized and permitted under this Indenture. At the request of the Parent Guarantor, the Trustee shall execute and deliver an instrument evidencing such release and discharge and do all such other acts and things necessary to release the Subsidiary Guarantor from its obligations hereunder.

## ARTICLE 12
### SECURITY TO BE GRANTED

Section 12.01. *Security to be Granted.*  (a) The obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the respective Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees will be secured on a first priority basis (subject to any Permitted Liens) by a Lien on the Collateral, which shall consist of:

(i)     a security interest in the Issuer's rights, title and interest in each Intercompany Loan and in the rights of the Issuer in connection therewith, as further provided in the Pledge and Security Agreement; and

(ii)    security interests in the Issuer's rights and claims with respect to the Interest Reserve Account, as further provided in the Interest Reserve Agreement.

105

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 195 of 739

(b)    In order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees, the Issuer and the Subsidiary Guarantors will, for the benefit of the Holders of the Notes:

(i)    execute one or more Security Documents granting to the Trustee and the Security Agent, for the benefit of the Holders of the Notes, first priority Liens (collectively, the "**First Priority Lien**") on the Collateral (subject to any Permitted Liens);

(ii)    take all requisite steps under applicable laws and undertake other customary procedures in connection with the granting and perfection (if relevant) of the First Priority Lien on the Collateral (subject to any Permitted Liens) including making all filings necessary to maintain the security interest by the Security Documents; and

(iii)    promptly deliver to the Trustee an Officers' Certificate stating that entry into the Security Documents has been duly and validly authorized and an Opinion of Counsel to the effect that (A) in the opinion of such counsel, such action has been taken with respect to the recording, registering and filing of or with respect to this Indenture and the Security Documents and all other instruments of further assurance as is necessary to make effective the First Priority Lien (subject to Permitted Liens) created by the Security Documents in the Collateral referenced in this clause (b) and referencing the details of such action; or (B) in the opinion of such counsel, no such action is necessary to make such First Priority Lien (subject to Permitted Liens) effective.

(c)    The Trustee and each Holder, by accepting the Notes and the Note Guarantees, acknowledges that the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders under the Security Documents, and that the Lien granted under this Indenture and the Security Documents in respect of the Trustee and the Holders is subject to and qualified and limited in all respects by the Security Documents and actions that may be taken thereunder.

(d)    Each Holder, by its acceptance thereof, consents and agrees to the terms of the Security Documents (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes the Trustee to appoint a security agent to hold the Collateral on its behalf, which security agent shall be DB Trustees (Hong Kong) Limited on the Original Issue Date; each Holder authorizes the Trustee to direct the Security Agent to enter into the Security Documents and to perform its obligations and exercise its rights thereunder in accordance therewith.

(e)    Notwithstanding (i) anything to the contrary contained in this Indenture, the Security Documents, the Notes or any other instrument governing, evidencing or relating to any Indebtedness, (ii) the time, order or method of attachment of any Liens, (iii) the

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral, (iv) the time of taking possession or control over any Collateral or (v) the rules for determining priority under the New York Uniform Commercial Code or any other law of any relevant jurisdiction governing relative priorities of secured creditors, the Issuer, the Parent Guarantor and the Subsidiary Guarantors will ensure that:

> (A)    the Liens granted pursuant to the Security Documents will rank at least equally and ratably with all other valid, enforceable and perfected Liens, whenever granted upon any present or future Collateral, but only to the extent such other Liens are permitted under this Indenture to exist and to rank equally and ratably with the Notes and the Note Guarantees; and

> (B)    all proceeds of the Collateral applied under the Security Documents shall be allocated and distributed as set forth in Section 6.11.

Section 12.02. *Certificates*. (a) On or before a date not more than 90 days after the end of each fiscal year, as required by Section 6.08 hereof, the Parent Guarantor shall furnish to the Trustee a Compliance Certificate in the form of Exhibit J hereto.

(b)    The Issuer and the Parent Guarantor shall furnish to the Security Agent and the Trustee on or prior to any proposed release of the Collateral by the Issuer an Officers' Certificate certifying, and an Opinion of Counsel, stating that such release will comply with the terms of this Indenture and the relevant Security Documents.

Section 12.03. *Intercompany Loans*. The Issuer will, on the Original Issue Date and from time to time as any of the Intercompany Loans may be novated in accordance with the terms of this Indenture, grant or cause to be granted to the Trustee, for the benefit of the Holders of the Notes, a first priority Lien on the Issuer's rights under the Intercompany Loans to the Trustee in order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees.

Section 12.04. *Authorization of Actions to be Taken by the Security Agent Under the Security Documents*. (a) The Security Agent shall be the representative on behalf of the Holders of the Notes and shall act upon the written direction of the Holders of the Notes with regard to all voting, consent and other rights granted to the Holders of the Notes under the Security Documents.

(b)    Subject to the terms of the Security Documents, the Trustee may, in its sole discretion and without the consent of the Holders of the Notes, on behalf of the Holders of the Notes, take all actions it deems necessary or appropriate in order to direct the Security Agent to (A) enforce any of its rights or any of the rights of the Holders of the Notes under the Security Documents and (B) receive any and all amounts payable from

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

the Security Agent in respect of the obligations of the Issuer and the Note Guarantors hereunder.

(c)     Subject to the terms of the Security Documents and Section 7.02(d), the Trustee shall have the power to institute and to instruct the Security Agent to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Documents or this Indenture, and such suits and proceedings as the Security Agent may deem expedient to preserve or protect its interest and the interests of the Holders of the Notes in the Collateral (including power to instruct the Security Agent to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of the Notes or the Security Agent). The Trustee is hereby irrevocably authorized by each Holder of the Notes to instruct the Security Agent to effect any release of Liens or the Collateral contemplated by Section 12.06 hereof or by the terms of the Security Documents. The Trustee and the Security Agent shall not be deemed to have knowledge of any acts that may be unlawful or in violation of the Security Documents or this Indenture unless and until it obtains actual knowledge of such unlawful acts or violation through written notification describing the circumstances of such, and identifying the circumstances constituting such unlawful acts or violation.

(d)     The Trustee will not be responsible for the adequacy of the Collateral in respect of the obligations of the Issuer and the Note Guarantors hereunder.

Section 12.05. *Authorization of Receipt of Funds by the Security Agent Under the Security Documents*.  The Security Agent is authorized to receive and distribute any funds for the benefit of the Holders of the Notes under the Security Documents, and to make further distributions of such funds to the Holders of the Notes according to the provisions of this Indenture and the Security Documents.

Section 12.06. *Release of Security*.  (a)The security created in respect of the Collateral granted under the Security Documents may be released in certain circumstances, including any of the following:

(i)     upon repayment in full of the Notes; and

(ii)     upon defeasance and discharge of the Notes as provided above under Section 8.01.

(b)     Any release of the Collateral made in compliance with this Section 12.06 shall not be deemed to impair the Lien under the Security Documents or the Collateral thereunder in contravention of the provisions of this Indenture or the Security Documents.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(c)     Upon repayment in full of the Notes as provided under (a)(i) above or upon defeasance and discharge of the Notes as provided under (a)(ii) above, the Issuer shall notify the Trustee of such event as soon as reasonably practicable.

## ARTICLE 13
### MISCELLANEOUS

Section 13.01. *Ranking*.  The Notes are (a) senior obligations of the Issuer; (b) senior in right of payment to any existing and future obligations of the Issuer expressly subordinated in right of payment to the Notes; (c) guaranteed by the Note Guarantors on a senior basis, subject to the limitations set forth in Article 10 and Article 11; (d) at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of the Issuer (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law); and (e) effectively subordinated to all existing and future obligations of the Non-Guarantor Subsidiaries.

Section 13.02. *Trust Indenture Act Controls*.  If this Indenture is, at any time, required to be qualified under the United States Trust Indenture Act of 1939, as amended (the "**Trust Indenture Act**") and any provision of this Indenture limits, qualifies or conflicts with another provision that is required to be included in this Indenture by the Trust Indenture Act, the required provision shall control.  The Issuer shall provide notice to the Trustee prior to qualification of this Indenture pursuant to the Trust Indenture Act as soon as practicable. The Trustee shall reserve the right to resign (subject to Section 7.07(a)(i)) upon such qualification or receipt of notice thereof. If the Trustee exercises its right to resign, it will use its reasonable best efforts to assist the Issuer in the appointment of a successor trustee.

Section 13.03. *Notices*.  (a) All notices or demands required or permitted by the terms of the Notes or this Indenture to be given to or by the Holders are required to be in writing and may be given or served by being sent by prepaid courier or by being deposited, first-class postage prepaid, in the United States mail, if intended for the Issuer or any Note Guarantor, as the case may be, mailed, delivered or faxed to Rolta, LLC, 5865 North Point Parkway, Alpharetta, Georgia 30022, USA, Fax: +1-678-942-5001; if intended for the Trustee, addressed to the Trustee at the corporate trust office of the Trustee at DB Trustees (Hong Kong) Limited, Level 52, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong, Facsimile No.: +852-2203-7320/7323, Attention: Managing Director; if intended for the Paying and Transfer Agent or the Registrar, addressed to Deutsche Bank Trust Company Americas, Trust and Agency Services, 60 Wall Street, 27th Floor, MS NYC60-2710, New York, New York 10005, USA, Fax: 732-578-4635, Attention:  Corporates Team – Rolta, LLC, with a copy to Deutsche Bank Trust Company Americas, c/o Deutsche Bank National Trust Company, Trust and Agency Services, 100 Plaza One, Mailstop JCY03-0699, Jersey City, New Jersey 07311, USA, Fax:  732-578-4635, Attention:  Corporates Team – Rolta, LLC; and, if intended for any Holder, addressed to such Holder at such Holder's last address as it appears in the Note register (or otherwise delivered to such Holders in accordance with applicable DTC, Euroclear or Clearstream procedures). Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee at the

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

same time.  Defect in mailing a notice or communication to any particular Holder shall not affect its sufficiency with respect to other Holders.

(b)     Any notice or demand shall be deemed to have been sufficiently given or served when so sent or deposited and, if to the Holders, when delivered in accordance with the applicable rules and procedures of the Depositary.  Any such notice shall be deemed to have been delivered on the day such notice is delivered to the Depositary or if by mail, when so sent or deposited.  Any notice to the Trustee shall be effective only upon receipt.

(c)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver shall be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

Section 13.04. *Certificate and Opinion as to Conditions Precedent.*  (a) Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Issuer shall furnish to the Trustee at the Trustee's request:

(i)     an Officers' Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with;

(ii)     an Opinion of Counsel stating that all such conditions precedent have been complied with; and

(iii)     an incumbency certificate giving the names and specimen signatures of Authorized Officers for any such Authorized Officers who have not previously provided specimen signatures to the Trustee.

(b)     In any case where several matters are required to be certified by, or covered by an Opinion of Counsel of, any specified Person, it is not necessary that all such matters be certified by, or covered by the Opinion of Counsel of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an Opinion of Counsel with respect to some matters and one or more such Persons as to other matters, and any such Person may certify or give an Opinion of Counsel as to such matters in one or several documents.

(c)     Any certificate of an Officer of the Issuer or any Note Guarantor may be based, insofar as it relates to legal matters, upon an Opinion of Counsel, unless such Officer knows, or in the exercise of reasonable care should know, that such Opinion of Counsel with respect to the matters upon which his certificate is based are erroneous.  Any Opinion of Counsel may be based, and may state that it is so based, insofar as it relates to factual matters, upon a certificate of, or representations by, an officer or officers of the Issuer or a Note Guarantor stating that the information with respect to such factual matters is in the possession of the Issuer or such Note Guarantor, as the case may be,

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 200 of 739

unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or representations with respect to such matters are erroneous.

(d)     Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 13.05. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(a)     a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(c)     a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)     a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials with respect to matters of fact.

Section 13.06. *Payment Date Other Than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption or purchase of any Note) is due on a day which is not a Business Day in the relevant place of payment or in the place of business of the Trustee, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest shall accrue for the intervening period.

Section 13.07. *Governing Law, Consent to Jurisdiction; Waiver of Jury Trial, Waiver of Immunities*.  (a) Each of the Notes, the Note Guarantees and this Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)     The Issuer and each of the Note Guarantors hereby irrevocably and unconditionally submits to the non-exclusive, personal jurisdiction of any New York state or United States federal court located in the Borough of Manhattan, The City of New York in connection with any suit, action or proceeding arising out of or relating to this Indenture, any Note or any Note Guarantee or any transaction contemplated hereby or thereby.  The Issuer and each of the Note Guarantors irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection which it may now

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each of the parties hereto irrevocably and unconditionally waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Indenture or the transactions contemplated hereby. To the extent that the Issuer or any Note Guarantor, as the case may be, has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect to itself or its property, the Issuer or such Note Guarantor, as the case may be, irrevocably waives such immunity in respect of its obligations hereunder or under any Note or any Note Guarantee, as applicable. The Issuer and each of the Note Guarantors agree that final judgment in any such suit, action or proceeding, brought in such a court shall be conclusive and binding upon the Issuer or the Note Guarantor, as the case may be, and, to the extent permitted by applicable law, may be enforced in any court to the jurisdiction of which the Issuer or any of the Note Guarantors, as the case may be, is subject by a suit upon such judgment or in any manner provided by law, *provided* that service of process is effected upon the Issuer or any of the Note Guarantors, as the case may be, in the manner specified in the following subsection or as otherwise permitted by applicable law.

(c)     As long as any of the Notes remain outstanding, the Issuer and each of the Note Guarantors shall at all times have an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture, any Note or any Note Guarantee. Service of process upon such agent and written notice of such service mailed or delivered to the Issuer or any Note Guarantor, as the case may be, shall to the fullest extent permitted by applicable law be deemed in every respect effective service of process upon the Issuer or such Note Guarantor, as the case may be, in any such legal action or proceeding. The Issuer and each of the Note Guarantors hereby appoint CT Corporation System as its agent for such purpose, and covenants and agrees that service of process in any suit, action or proceeding may be made upon it at the office of such agent at 111 Eighth Avenue, New York, New York 10011. Notwithstanding the foregoing, the Issuer or any Note Guarantor may, with prior written notice to the Trustee, terminate the appointment of CT Corporation System and appoint another agent for the above purposes so that the Issuer and the Note Guarantors shall at all times have an agent for the above purposes in the City of New York. The Issuer and each of the Note Guarantors hereby agree to take any and all action as may be necessary to maintain the designation and appointment of an agent in full force and effect until the Final Maturity Date (or earlier, if the Notes are prepaid in full).

(d)     The Issuer and each of the Note Guarantors hereby irrevocably waive, to the fullest extent permitted by applicable law, any requirement or other provision of law, rule, regulation or practice which requires or otherwise establishes as a condition to the institution, prosecution or completion of any suit, action or proceeding (including appeals) arising out of or relating to this Indenture or any Note or any Note Guarantee, the posting of any bond or the furnishing, directly or indirectly, of any other security.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 202 of 739

Section 13.08. *No Adverse Interpretation of Other Agreements*. This Indenture may not be used to interpret another indenture or loan or debt agreement of the Parent Guarantor or any Subsidiary of the Parent Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture. In addition, no other agreement or document may be used to interpret this Indenture with regard to any rights, duties or obligations of the Trustee created hereunder.

Section 13.09. *Successors*. All agreements of the Issuer and any Note Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successor.

Section 13.10. *Duplicate Originals*. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.11. *Separability*. In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.12. *Table of Contents and Headings*. The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 13.13. *No Personal Liability of Incorporators, Stockholders, Officers, Directors or Employees*. No recourse for the payment of the principal of, premium, if any, or interest on any of the Notes or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Issuer or any Note Guarantor in this Indenture, or in any of the Notes or the Note Guarantees or because of the creation of any Indebtedness represented thereby, shall be had against any incorporator, stockholder, officer, director, employee or controlling person of the Issuer or any Note Guarantor or of any successor Person thereof. Each Holder, by accepting the Notes, waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes and the Note Guarantees.

Section 13.14. *Force Majeure*. The Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 13.15. *USA Patriot Act*. The parties hereto acknowledge that in order to help the United States government fight the funding of terrorism and money laundering activities, pursuant to Federal regulations that became effective on October 1, 2003

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(Section 326 of the USA PATRIOT Act), all financial institutions are required to obtain, verify, record and update information that identifies each person establishing a relationship or opening an account. The parties to this Indenture agree that they will provide to the Agents such information as it may request, from time to time, in order for the Agents to satisfy the requirements of the USA PATRIOT Act, including but not limited to the name, address, tax identification number and other information that will allow it to identify the individual or entity who is establishing the relationship or opening the account and may also ask for formation documents such as articles of incorporation or other identifying documents to be provided.

Section 13.16. *Anti-Money Laundering and Terrorism*.  Each of the Trustee and the Paying and Transfer Agent may take and instruct any delegate to take any action which they in their discretion (acting properly in accordance with applicable laws and the Trustee's and the Paying and Transfer Agent's internal policies and guidelines) consider necessary so as to comply with any applicable law, regulation, request of a public or regulatory authority which relates to the prevention of fraud, money laundering, terrorism or other criminal activities or the provision of financial and other services to sanctioned persons or entities. Such action may include but is not limited to the interception and investigation of transactions on the Issuer's accounts (particularly those involving the international transfer of funds) including the source of the intended recipient of funds paid into or out of the Issuer's accounts. To the extent permitted by law and regulation and if reasonably practicable, the Trustee or the Paying and Transfer Agent, as the case may be, shall notify the Issuer as early as possible of the existence of any such circumstance prior to taking any action, *provided* that if such notification is not possible or reasonably practicable to be made prior to the taking of such action, as soon as possible or reasonably practicable thereafter if permitted by law and regulation.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 204 of 739

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

Very Truly Yours,

**ROLTA, LLC**, as Issuer

By: _Mark Woelke_ _____
    Name: _MARK WOELKE_
    Title: _INTERNATIONAL CFO_

**ROLTA INDIA LIMITED**, as Parent Guarantor

By: _____
    Name:
    Title:

**Signed for on behalf of each of the Subsidiary Guarantors named in Schedule I hereto**

By: _Mark Woelke_ _____
    Name: _MARK WOELKE_
    Title: _INTERNATIONAL CFO_

[Indenture]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

Very Truly Yours,

**ROLTA, LLC**, as Issuer

By: _____
     Name:
     Title:

**ROLTA INDIA LIMITED**, as Parent Guarantor

By: _____
     Name:
     Title:

**Signed for on behalf of each of the Subsidiary Guarantors named in Schedule I hereto**

By: _____
     Name: _Hiranya Ashar_
     Title: _AUTHORISED SIGNATORY_

[Indenture]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

Very Truly Yours,

**ROLTA, LLC**, as Issuer

By: _____
      Name:
      Title:

**ROLTA INDIA LIMITED**, as Parent Guarantor

By: _____
      Name: HIRANYA ASHAR
      Title: DIRECTOR FINANCE & CFO.

**Signed for on behalf of each of the Subsidiary Guarantors named in Schedule I hereto**

By: _____
      Name:
      Title:

[Indenture]

Very Truly Yours,

**DB TRUSTEES (HONG KONG) LIMITED,** as Trustee and Security Agent

By: _____

Name:
Title: Stuart Harding
Authorised Signatory

By: _____

Name:
Title: Pauline Lee
Authorised Signatory

**DEUTSCHE BANK TRUST COMPANY AMERICAS,** as Paying and Transfer Agent and Registrar

By: Deutsche Bank National Trust Company

By: _____

Name:
Title:

By: _____

Name:
Title:

[Indenture]

Very Truly Yours,

**DB TRUSTEES (HONG KONG)
LIMITED,** as Trustee and Security Agent

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**DEUTSCHE BANK TRUST COMPANY
AMERICAS,** as Paying and Transfer Agent
and Registrar

By: Deutsche Bank National Trust
       Company

By: _Linda Reale_____
       Name:    **Linda Reale**
       Title:     **Vice President**

By: _Wanda Camacho_____
       Name:    Wanda Camacho
       Title:     Vice President

[Indenture]

**SCHEDULE I**

<u>List of Initial Subsidiary Guarantors</u>

| **Name of Subsidiary Guarantor** | **Jurisdiction of Incorporation** |
|---|---|
| Rolta International, Inc. | Delaware |
| Rolta U.K. Limited | United Kingdom |
| Rolta Middle East FZ-LLC | United Arab Emirates |

**EXHIBIT A**

FORM OF FACE OF CERTIFICATED NOTE

**ROLTA, LLC**

[*INSERT IF ISSUED IN EXCHANGE FOR A BENEFICIAL INTEREST IN RESTRICTED GLOBAL NOTE:* THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX

(HK) 06562/183/INDENTURE/Raptor Indenture docx

SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS.]

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**No.**

US$

**ROLTA, LLC**

**10.75% SENIOR NOTES DUE 2018**

Certificated Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantees hereto

Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to _____ or registered assigns, upon surrender hereof the principal sum of _____ (US$_____) as set forth on the books and records of the Trustee, on May 16, 2018, or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate: 10.75% per annum.

Interest Payment Dates: May 16 and November 16 of each year, commencing November 16, 2013.

Interest Record Dates: May 1 and November 1.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee or an Authenticating Agent acting under the Indenture.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date:

ROLTA, LLC

By: _____
Name:
Title:

A-4

CERTIFICATE OF AUTHENTICATION

This is one of the 10.75% Senior Notes Due 2018 described in the Indenture referred to in this Note.

DEUTSCHE BANK TRUST COMPANY AMERICAS, as Authenticating Agent

By:   Deutsche Bank National Trust Company

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

A-5

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

FORM OF REVERSE OF CERTIFICATED NOTE

ROLTA, LLC
10.75% Senior Notes Due 2018

1.    Principal and Interest.

The Issuer promises to pay the principal of this Note on May 16, 2018.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 10.75% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on May 1 or November 1 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing November 16, 2013.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day. Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.    Indenture; Note Guarantees.

This is one of the Notes issued under an Indenture, dated as of May 16, 2013 (as amended from time to time, the "**Indenture**"), among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed in Schedule I thereto (and together with the Parent Guarantor, the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar. Capitalized terms used herein are used as defined in the Indenture unless otherwise

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 216 of 739

indicated.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.  The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms.  To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer.  The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to Incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create any Liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3.     Optional Redemption.

On or after May 16, 2016, the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on May 16 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
| --- | --- |
| 2016................................................................................ | 105.3750% |
| 2017................................................................................ | 102.6875% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to May 16, 2016, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to May 16, 2016, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 110.75% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)     if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate unless otherwise required by law or by applicable stock exchange or clearing system requirements.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.     Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof.  A Holder may register the transfer or exchange of Notes in accordance with the Indenture.  The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.     Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

A-8

6.      Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes.  Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.      Authentication.

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on the other side of this Note.

8.      Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.      Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

(HK) 06562/183/INDENTURE/Raptor Indenture docx

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

<u>Insert Taxpayer Identification No.</u>

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[<u>Check One</u>]

❑   (a)   this Note is being transferred to the Issuer;

❑   (b)   this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑   (c)   this Note is being transferred pursuant to and in accordance with Regulation S and:

(A)   the offer of this Note was not made to a Person in the United States; and

(B)   either:

(i)   at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

A-10

      (ii)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C)     no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

❑    (d)     this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

❑    (e)     the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____       _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____                    _____

NOTICE:  To be executed by an executive officer

(HK) 06562/183/INDENTURE/Raptor Indenture docx

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❑

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                          ]

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

_____

[1] Signatures must be guaranteed by an **"eligible guarantor institution"** meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program (**"STAMP"**) or such other **"signature guarantee program"** as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

TRUSTEE, SECURITY AGENT PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

DB Trustees (Hong Kong) Limited
Level 52, International Commerce Centre
1 Austin Road West
Kowloon, Hong Kong

<u>Paying and Transfer Agent and Registrar</u>

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MSNYC 60-2710
New York, New York 10005
United States of America

A-14

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**EXHIBIT B**

## FORM OF TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

<u>Insert Taxpayer Identification No.</u>

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[<u>Check One</u>]

❑　　(a)　　this Note is being transferred to the Issuer;

❑　　(b)　　this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑　　(c)　　this Note is being transferred pursuant to and in accordance with Regulation S and:

　　　　(A)　　the offer of this Note was not made to a Person in the United States; and

　　　　(B)　　either:

　　　　　　(i)　　at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(ii) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

☐ (d) this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

☐ (e) the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____          _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a **"qualified institutional buyer"** within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding

B-2

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 226 of 739

the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____        _____

NOTICE:  To be executed by an executive officer

B-3

**EXHIBIT C**

FORM OF RESTRICTED GLOBAL NOTE

ROLTA, LLC

THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF

C-1

SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

No. R-1

CUSIP: 775793 AA0
Common Code: 093317220
ISIN Number: US775793AA06

## ROLTA, LLC

### RESTRICTED GLOBAL NOTE

Principal amount US$33,098,000, as revised by the
Schedule of Exchanges of Notes attached hereto

ROLTA, LLC

10.75% SENIOR NOTES DUE 2018

Restricted Global Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantee hereto

Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon surrender hereof the principal sum of THIRTY-THREE MILLION AND NINETY-EIGHT THOUSAND UNITED STATES DOLLARS (US$33,098,000), as revised by the Schedule of Exchanges of Notes attached hereto, on May 16, 2018, or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate: 10.75% per annum.

Interest Payment Dates: May 16 and November 16 of each year, commencing November 16, 2013.

Interest Record Dates: May 1 and November 1.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee or an Authenticating Agent acting under the Indenture.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 230 of 739

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date: May 16, 2013

ROLTA, LLC

By: _____
    Name:
    Title:

C-4

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

CERTIFICATE OF AUTHENTICATION

This is one of the 10.75% Senior Notes Due 2018 described in the Indenture referred to in this Note.

DEUTSCHE BANK TRUST COMPANY AMERICAS, as Authenticating Agent

By:  Deutsche Bank National Trust Company

By:  _____
     Name:
     Title:

By:  _____
     Name:
     Title:

C-5

FORM OF REVERSE OF RESTRICTED GLOBAL NOTE

ROLTA, LLC
10.75% Senior Notes Due 2018

1.    Principal and Interest.

The Issuer promises to pay the principal of this Note on May 16, 2018.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 10.75% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on May 1 or November 1 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing November 16, 2013.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day.  Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.    Indenture; Note Guarantee.

This is one of the Notes issued under an Indenture, dated as of May 16, 2013 (as amended from time to time, the "**Indenture**"), among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I thereto (and together with the Parent Guarantor the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar. Capitalized terms used herein are used as defined in the Indenture unless otherwise

C-6

indicated. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer. The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3. Optional Redemption.

On or after May 16, 2016 the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on May 16 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
|------|------------------|
| 2016................................................................................ | 105.3750% |
| 2017................................................................................ | 102.6875% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to May 16, 2016 at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to May 16, 2016, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 110.75% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

C-7

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)      if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)      if the Notes are not listed on any national securities exchange, on a *pro rata* basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.      Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof.  A Holder may register the transfer or exchange of Notes in accordance with the Indenture.  The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

6.      Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes.  Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.      Authentication.

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on the other side of this Note.

8.      Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.      Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 236 of 739

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[Check One]

❑    (a)    this Note is being transferred to the Issuer;

❑    (b)    this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑    (c)    this Note is being transferred pursuant to and in accordance with Regulation S and:

(A)    the offer of this Note was not made to a Person in the United States; and

(B)    either:

(i)    at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

(ii)    the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C)    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

❑    (d)    this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

❑    (e)    the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____      _____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a **"qualified institutional buyer"** within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 238 of 739

FILED: NEW YORK COUNTY CLERK 06/12/2018 02:00 PM
NYSCEF DOC. NO. 11
INDEX NO. 652798/2018
RECEIVED NYSCEF: 06/12/2018

the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____          _____

NOTICE:  To be executed by an executive officer

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 239 of 739

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❏

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                                    ]

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[2]:_____

---

[2] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

SCHEDULE OF EXCHANGES OF NOTES

The following changes in the aggregate principal amount of Notes represented by this Global Note have been made:

| Date of Decrease/ Increase | Amount of decrease in aggregate principal amount of Notes | Amount of increase in aggregate principal amount of Notes | Outstanding Balance | Signature |
|---|---|---|---|---|
| | | | | |

C-14

(HK) 06562/183/INDENTURE/Raptor Indenture docx

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

DB Trustees (Hong Kong) Limited
Level 52, International Commerce Centre
1 Austin Road West
Kowloon, Hong Kong

<u>Paying and Transfer Agent and Registrar</u>

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MSNYC 60-2710
New York, New York 10005
United States of America

(HK) 06562/183/INDENTURE/Raptor Indenture docx

**EXHIBIT D**

FORM OF REGULATION S GLOBAL NOTE

**ROLTA, LLC**

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 243 of 739

No. S-1

CUSIP: U77587 AA8
Common Code: 093317238
ISIN Number: USU77587AA83

**ROLTA, LLC**

**REGULATION S GLOBAL NOTE**

Principal amount US$166,902,000, as revised by the
Schedule of Exchanges of Notes attached hereto

ROLTA, LLC

10.75% SENIOR NOTES DUE 2018

Regulation S Global Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantee hereto

Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon surrender hereof the principal sum of ONE HUNDRED SIXTY-SIX MILLION NINE HUNDRED AND TWO THOUSAND UNITED STATES DOLLARS (US$166,902,000), as revised by the Schedule of Exchanges of Notes attached hereto, on May 16, 2018, or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate: 10.75% per annum.

Interest Payment Dates: May 16 and November 16 of each year, commencing November 16, 2013.

Interest Record Dates: May 1 and November 1.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee or an Authenticating Agent acting under the Indenture.

D-2

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date: May 16, 2013

ROLTA, LLC

By: _____
     Name:
     Title:

[Regulation S Global Security]

D-3

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

CERTIFICATE OF AUTHENTICATION

This is one of the 10.75% Senior Notes Due 2018 described in the Indenture referred to in this Note.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Authenticating Agent

By:  Deutsche Bank National Trust
Company

By:  _____
Name:
Title:

By:  _____
Name:
Title:

[Regulation S Global Security – Subsidiary Guarantee]

D-4

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

FORM OF REVERSE OF REGULATION S GLOBAL NOTE

ROLTA, LLC
10.75% Senior Notes Due 2018

1.      Principal and Interest.

The Issuer promises to pay the principal of this Note on May 16, 2018.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 10.75% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on May 1 or November 1 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing November 16, 2013.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day.  Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.      Indenture; Note Guarantee.

This is one of the Notes issued under an Indenture, dated as of May 16, 2013 (as amended from time to time, the "**Indenture**"), among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I thereto (and together with the Parent Guarantor the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar. Capitalized terms used herein are used as defined in the Indenture unless otherwise

D-5

indicated. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer. The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3.      Optional Redemption.

On or after May 16, 2016 the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on May 16 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
| --- | --- |
| 2016.................................................................................... | 105.3750% |
| 2017.................................................................................... | 102.6875% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to May 16, 2016 at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to May 16, 2016, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 110.75% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)     if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.     Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof.  A Holder may register the transfer or exchange of Notes in accordance with the Indenture.  The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.     Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

6.      Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes.  Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.      Authentication.

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on the other side of this Note.

8.      Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.      Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____
attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[Check One]

❑    (a)    this Note is being transferred to the Issuer;

❑    (b)    this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑    (c)    this Note is being transferred pursuant to and in accordance with Regulation S and:

     (A)    the offer of this Note was not made to a Person in the United States; and

     (B)    either:

         (i)    at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

         (ii)    the transaction was executed in, on or through the facilities of a designated offshore securities market

D-9

and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C)    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

☐    (d)    this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

☐    (e)    the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____    _____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the

D-10

undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____      _____

NOTICE:  To be executed by an executive officer

D-11

(HK) 06562/183/INDENTURE/Raptor Indenture docx

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❑

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                                        ]

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[3]: _____

---

[3] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

## SCHEDULE OF EXCHANGES OF NOTES

The following changes in the aggregate principal amount of Notes represented by this Global Note have been made:

| Date of Decrease/ Increase | Amount of decrease in aggregate principal amount of Notes | Amount of increase in aggregate principal amount of Notes | Outstanding Balance | Signature |
| --- | --- | --- | --- | --- |

D-13

(HK) 06562/183/INDENTURE/Raptor Indenture docx

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

DB Trustees (Hong Kong) Limited
Level 52, International Commerce Centre
1 Austin Road West
Kowloon, Hong Kong

<u>Paying and Transfer Agent and Registrar</u>

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MSNYC 60-2710
New York, New York 10005
United States of America

(HK) 06562/183/INDENTURE/Raptor Indenture docx

EXHIBIT E-1

FORM OF ISSUER AUTHORIZATION CERTIFICATE

[*Date*]

I, [*Name*], [*Title*], acting on behalf of Rolta, LLC, hereby certify that:

(A)     the persons listed on Schedule I hereto are (i) Authorized Officers of the Issuer (as defined below) for purposes of the Indenture dated as of May 16, 2013 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar; and (ii) the duly authorized person who executed or will execute the Notes (as defined under the Indenture) by his manual or facsimile signature or signature in scanned format delivered through e-mail was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name;

(B)     each signature appearing on Schedule I hereto is the person's genuine signature; and

(C)     attached hereto as Schedule II is a true, correct and complete specimen of the certificates representing the Notes.

[*Signature Page Follows*]

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 257 of 739

IN WITNESS WHEREOF, I have hereunto signed my name as of the date first written above.

ROLTA, LLC

By: _____
    Name:
    Title:

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**Schedule I**

SPECIMENS OF SIGNATURES

| **Name** | **Title** | **Signature** |
| --- | --- | --- |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**Schedule II**

**SPECIMENS OF THE
144A GLOBAL NOTE
AND THE REGULATION S GLOBAL NOTE**

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 260 of 739

EXHIBIT E-2

[FORM OF NOTE GUARANTOR AUTHORIZATION CERTIFICATE]

[*Date*]

I, [*Name*], [*Title*], of [the Parent Guarantor/a Subsidiary Guarantor listed in Schedule I], acting on behalf of [the Parent Guarantor/a Subsidiary Guarantor listed in Schedule I] to the Indenture (as defined below) (the "**Parent Guarantor**"/"**Subsidiary Guarantor**"), hereby certify that:

(A)     the persons listed on Schedule I hereto are (i) Authorized Officers of the [*Parent Guarantor/Subsidiary Guarantor*] for purposes of the Indenture dated as of May 16, 2013 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar; and (ii) the duly authorized person who executed or will execute the Note Guarantee (as defined under the Indenture) endorsed on the Notes (as defined under the Indenture) by his manual or facsimile signature or signature in scanned format delivered through e-mail was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name;

(B)     each signature appearing on Schedule I hereto is the person's genuine signature; and

(C)     attached hereto as Schedule II is a true, correct and complete specimen of the certificates representing the Notes.

*[Signature Page Follows]*

E-2-1

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 261 of 739

IN WITNESS WHEREOF, I have hereunto signed my name as of the date first written above.

[PARENT GUARANTOR/SUBSIDIARY GUARANTOR]

By: _____

Name:

Title:

E-2-2

(HK) 06562/183/INDENTURE/Raptor Indenture docx

**Schedule I**

SPECIMENS OF SIGNATURES

| Name | Company | Signature | Signature |
|------|---------|-----------|-----------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

E-2-3

**Schedule II**

**SPECIMENS OF THE**
**144A GLOBAL NOTE**
**AND THE REGULATION S GLOBAL NOTE**

E-2-4

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**EXHIBIT F**

FORM OF PAYING AND TRANSFER AGENT APPOINTMENT LETTER

[*Date*]

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MSNYC 60-2710
New York, New York 10005
United States of America

Re: 10.75% Senior Notes Due 2018 of Rolta, LLC

Reference is hereby made to the Indenture dated as of May 16, 2013 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor, the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee (the "**Trustee**") and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar.  Terms used herein are used as defined in the Indenture.

The Issuer hereby appoints Deutsche Bank Trust Company Americas as the paying agent, authenticating agent, registrar and transfer agent (the "**Agent**") with respect to the Notes and the Agent hereby accepts such appointment. By accepting such appointment, the Agent agrees to be bound by and to perform the services with respect to itself set forth in the terms and conditions set forth in the Indenture and the Notes, as well as the following terms and conditions to all of which the Issuer agrees and to all of which the rights of the holders from time to time of the Notes shall be subject:

(a) The Agent shall be entitled to the compensation to be agreed upon in writing with the Issuer and the Note Guarantors, jointly and severally, for all services rendered by it under the Indenture, and the Issuer and the Note Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse the Agent upon request for all reasonable out-of-pocket expenses, disbursements and advances (including costs of collection) incurred or made by the Agent, including the reasonable compensation, expenses and disbursements of such agents, counsels and other Persons not regularly within its employ, in connection with the services rendered by it under the Indenture.  The Issuer and the Note Guarantors jointly and severally hereby agree to indemnify the Agent and its officers, directors, agents and employees and any successors thereto for, and to hold it harmless against, any obligations, taxes, judgments, suits, loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with its acting as Agent under the Indenture and the Notes, including (1)

F-1

the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under the Indenture and the Notes and (2) the compensation, expenses and disbursements of such agents, counsels and other Persons not regularly within the its employ. The obligations of the Issuer and the Note Guarantors under this paragraph (a) shall survive the payment of the Notes, the termination or expiry of the Indenture or this letter and the resignation or removal of the Agent. Under no circumstance will the Agent be liable to any party for any special, indirect, punitive or consequential loss or damage, even if it has been advised of such loss or damage. This provision shall remain in full force and effect notwithstanding the discharge of the Notes and or the resignation or replacement or removal of the Agent.

(b)     In acting under the Indenture and in connection with the Notes, the Agent is acting solely as agent of the Issuer and does not assume any obligation towards or relationship of agency or trust for or with any of the owners or holders of the Notes, except that all funds held by the Agent for the payment of principal interest or other amounts (including Additional Amounts) on, the Notes shall, subject to the provisions of the Indenture, be held in trust by the Agent and applied as set forth in the Indenture and in the Notes, but need not be segregated from other funds held by the Agent, except as required by law.

(c)     The Agent may consult with counsel satisfactory to it and any advice or written opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it under the Indenture in good faith and in accordance with such advice or opinion.

(d)     The Agent shall be fully protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties.

(e)     The Agent and any of its Affiliates, in its individual capacity or any other capacity, may become the owner of, or acquire any interest in, any Notes or other obligations of the Issuer with the same rights that it would have if it were not the Paying and Transfer Agent, and may engage or be interested in any financial or other transaction with the Issuer, and may act on, or as depository, Trustee or agent for, any committee or body of holders of Notes or other obligations of the Issuer, as freely as if it were not the Agent.

(f)     The Agent shall give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Notes or the Note Guarantees) to make any payment of the principal, or premium or interest on, the Notes and any other payments to be made on behalf of the Issuer under the Indenture, when the same shall be due and payable and at any time during the continuance of any such failure the Agent will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request.

(HK) 06562/183/INDENTURE/Raptor Indenture docx

(g)     The Agent shall not be under any liability for interest on any monies received by it pursuant to any of the provisions of the Indenture or the Notes.

(h)     The Agent shall be obligated to perform such duties and only such duties as are in the Indenture and the Notes specifically set forth, and no implied duties or obligation shall be read into the Indenture or the Notes against the Agent. The Agent shall not be under any obligation to take any action under the Indenture which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its opinion, assured to it.  The Agent shall have no obligation to expend its own funds or otherwise incur any financial liability in the performance of its obligations hereunder or under the Indenture.  Notwithstanding anything contained herein to the contrary, the obligations of the Agents under this Agent Appointment Letter are several and not, and shall under no circumstances be deemed to be, joint.

(i)     The Agent may at any time resign by giving written notice of its resignation to the Issuer and the Trustee and specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept shorter notice. Upon receiving such notice of resignation, if required by the Indenture the Issuer shall promptly appoint a successor [paying agent, authenticating agent, registrar and transfer agent] (the "**Successor Agent**") by written instrument substantially in the form hereof in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent, one copy to the Successor Agent and one copy to the Trustee.  Upon the effectiveness of the appointment of a successor paying agent, the Agent shall have no further obligations under this letter or the Indenture.

Such resignation shall become effective upon the earlier of (i) the effective date of such resignation and (ii) the acceptance of appointment by the Successor Agent, as provided below. The Issuer may, at any time and for any reason, remove the Agent and appoint a successor paying agent, by written instrument in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed, one copy to the Successor Agent and one copy to the Trustee. Any removal of the Agent and any appointment of a Successor Agent shall become effective upon acceptance of appointment by the Successor Agent as provided below. Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation for the services rendered hereunder and to the reimbursement of all properly incurred out-of-pocket expenses in connection with the services rendered by it hereunder.

The Issuer shall remove the Agent and appoint a Successor Agent if the Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 267 of 739

or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.

Any Successor Agent appointed as provided herein shall execute and deliver to its predecessor and to the Issuer and the Trustee an instrument accepting such appointment (which may be in the form of an acceptance signature to the letter of the Issuer appointing such Successor Agent) and thereupon such Successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Agent and such predecessor shall pay over to such successor agent all monies or other property at the time held by it hereunder.

(j)      Notwithstanding anything contained herein to the contrary, each of the Issuer and the Note Guarantors hereby irrevocably agrees that any and all of the rights and obligations of any Agent and, to the extent applicable, the obligations of the Issuer and the Note Guarantors toward any Agent set forth in the Indenture shall be deemed to have been included in this letter.

(k)      Each Agent shall at all times be a responsible financial institution which is authorized by law to exercise its respective powers and duties hereunder and under the Indenture and the Notes.

(l)      If an Event of Default occurs and is continuing, the Trustee shall be entitled to require all Agents to, and each Agent shall be required to, act solely in accordance with the Trustee's directions.

(m)      Each Agent shall comply with all applicable withholding, information reporting and backup withholding tax requirements under the U.S. Internal Revenue Code of 1986, as amended, and the Treasury regulations issued thereunder in respect of any payment on, or in respect of, a Note or under the Note Guarantee (including the collection of IRS Form W-8 ECI, IRS Form W-8 BEN and IRS Form W-9, as the case may be, and the filing of IRS Form 1099 and IRS Form 1096).

(n)      Any notice or communication to the Agent will be deemed given when sent by facsimile transmission, with transmission confirmed.  Any notice to the Agent will be effective only upon receipt.  The notice or communication should be addressed to the Agent at:

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MS NYC60-2710
New York, New York 10005
Fax:  732-578-4635
Attn:  Corporates Team – Rolta, LLC

F-4

With a copy to:

Deutsche Bank National Trust Company
Trust and Agency Services
100 Plaza One, Mailstop JCY03-0699
Jersey City, New Jersey 07311
Fax: 732-578-4635
Attn: Corporates Team – Rolta, LLC

Any notice to the Issuer or the Trustee shall be given as set forth in the Indenture.

(o)     Any corporation into which the Agent may be merged or converted or any corporation with which the Agent may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Agent shall be a party or any corporation succeeding to the business of the Agent shall be the successor to such Agent hereunder (*provided* that such corporation shall be qualified as aforesaid) without the execution or filing of any document or any further act on the part of any of the parties hereto.

(p)     Any amendment, supplement or waiver under Sections 9.01 and 9.02 of the Indenture that adversely affects the Agent shall not affect the Agent's rights, powers, obligations, duties or immunities, unless the Agent has consented thereto.

(q)     The Issuer and the Note Guarantors agree that the provisions of Section 7.01(e), Section 7.02(d), Section 7.02(e), Section 7.05 and Section 13.07 of the Indenture shall apply hereto, *mutatis mutandis*.

[*Signature Page Follows*]

F-5

(HK) 06562/183/INDENTURE/Raptor Indenture docx

The agreement set forth in this letter shall be construed in accordance with and governed by the laws of the State of New York.

ROLTA, LLC

By: _____
     Name:
     Title:

ROLTA INDIA LIMITED
As Parent Guarantor

By: _____
     Name:
     Title:

[SUBSIDIARY GUARANTOR]
As Subsidiary Guarantor

By: _____
     Name:
     Title:

F-6

Agreed and accepted:

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Paying and Transfer Agent
and Registrar

By: Deutsche Bank National Trust
Company

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Acknowledged:

DB TRUSTEES (HONG KONG)
LIMITED, as Trustee and Security Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

F-7

**EXHIBIT G**

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[*Date*]

Deutsche Bank Trust Company Americas,
   as Registrar and Paying and Transfer Agent

Rolta, LLC,
   as Issuer

and

The Note Guarantors (as defined below)

Re:    Rolta, LLC
       10.75% Senior Notes Due 2018 (the "**Notes**")

Dear Sirs:

Reference is hereby made to the Indenture, dated as of May 16, 2013 (the "**Indenture**"), among , Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed in Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee (the "**Trustee**") and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to US$          principal amount of Notes which are evidenced by one or more Restricted Global Notes (CUSIP No. 775793 AA0; ISIN No. US775793AA06; Common Code 093317220) and held with the Depositary in the name of [insert name of transferor] (the "**Transferor**"). The Transferor has requested a transfer of such beneficial interest in the Notes to a Person who will take delivery thereof in the form of an equal principal amount of Notes evidenced by one or more Regulation S Global Notes (CUSIP No. U77587 AA8; ISIN No. USU77587AA83; Common Code 093317238).

In connection with such request and in respect of such Notes, we hereby certify that such sale has been effected pursuant to and in accordance with either Rule 903 or Rule 904 of Regulation S or Rule 144 under the United States Securities Act of 1933, as amended (the "**Securities Act**"), and accordingly we hereby further certify that:

(1)     if the transfer has been effected pursuant to Rule 903 or Rule 904:

G-1

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 272 of 739

    (A)    the offer of the Notes was not made to a Person in the United States;

    (B)    either:

        (i)    at the time the buy order was originated, the transferee was outside the United States or we and any Person acting on our behalf reasonably believed that the transferee was outside the United States, or

        (ii)    the transaction was executed in, on or through the facilities of a designated offshore securities market and neither we nor any Person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

    (C)    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

    (D)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; or

    (2)    if the transfer has been effected pursuant to Rule 144, the Securities have been transferred in a transaction permitted by Rule 144.

*[Signature Page Follows]*

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

You, the Issuer and the Note Guarantors are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby. Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,
[Name of Transferor]

By: _____
    Authorized Signature

3

(HK) 06562/183/INDENTURE/Raptor Indenture docx

**EXHIBIT H**

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS TO QIBs

[*Date*]

Deutsche Bank Trust Company Americas,
  as Registrar and Paying and Transfer Agent

Rolta, LLC,
  as Issuer

and

The Note Guarantors (as defined below)

      Re:    Rolta, LLC (the "**Issuer**")
             10.75% Senior Notes Due 2018 (the "**Notes**")

    Dear Sirs:

    Reference is hereby made to the Indenture (as amended, modified or supplemented from time to time, the "**Indenture**") dated as of May 16, 2013 among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**"), DB Trustees (Hong Kong) Limited, as Trustee (the "**Trustee**") and Security Agent, and Deutsche Bank Trust Company Americas, as Paying and Transfer Agent and Registrar.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

    This letter relates to US$_____ million principal amount of Notes which are evidenced by one or more Regulation S Global Notes (CUSIP No. U77587 AA8; ISIN No. USU77587AA83; Common Code 093317238) and held with the Depositary through [Euroclear] [Clearstream] in the name of [insert name of transferor] (the "**Transferor**").  The Transferor has requested that a transfer of such beneficial interest in the Notes to a Person who will take delivery thereof (the "**Transferee**") in the form of an equal principal amount of Notes evidenced by one or more Restricted Global Notes (CUSIP No. 775793 AA0; ISIN No. US775793AA06; Common Code 093317220).

[Check One]

    ❑    In connection with such request and in respect of such Notes, the Transferee does hereby certify that (i) it is a "**qualified institutional buyer**" ("**QIB**") as defined in and pursuant to Rule 144A ("**Rule 144A**") under the Securities Act, purchasing the Notes for its own account (or for the account of one or more QIBs over which account it exercises sole

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 275 of 739

investment discretion) and (ii) the transfer was made in a transaction meeting the requirements of Rule 144A.

❑ The Transferor did not purchase such Notes as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption from the registration requirements of the Securities Act and the Transferor has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence the Issuer, the Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

You, the Issuer and the Note Guarantors are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,
[Name of Transferee or Transferor]

[Name of DTC participant holding such position on behalf of beneficial owner]

By: _____
       Authorized Signature

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**EXHIBIT I**

**SUPPLEMENTAL INDENTURE**

**dated as of _____, ____**

**among**

**ROLTA, LLC**
**as the Issuer**

**and**

**ROLTA INDIA LIMITED**
**as the Parent Guarantor**

**and**

**The entities listed on Schedule I hereto**
**as the Subsidiary Guarantors**

**and**

**DB TRUSTEES (HONG KONG) LIMITED**
**as Trustee and Security Agent**

**and**

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
**as Paying and Transfer Agent and Registrar**

**10.75% Senior Notes Due 2018**

I-1

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 277 of 739

THIS SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**"), entered into as of _____, ____, among, Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I hereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**") and [*insert each new Guarantor executing this Supplemental Indenture and its jurisdiction of incorporation*] (each an "**Undersigned**") and DB Trustees (Hong Kong) Limited, as trustee (the "**Trustee**") and security agent, and Deutsche Bank Trust Company Americas, as paying and transfer agent and registrar. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture (as defined below).

## RECITALS

WHEREAS, the Issuer, the Note Guarantors party thereto, the Trustee and certain other parties thereto entered into the Indenture, dated as of May 16, 2013 (as amended or supplemented to the date hereof, the "**Indenture**"), relating to the Issuer's 10.75% Senior Notes Due 2018 (the "**Notes**").

WHEREAS, pursuant to Sections 11.09 and 11.10 of the Indenture each new Subsidiary Guarantor (other than Persons designated as a Non-Guarantor Subsidiary) is required to enter into a supplemental indenture which supplemental indenture may be entered into without the consent of the Holders pursuant to Section 9.01(a)(viii).

WHEREAS, as a condition to the Trustee entering into the Indenture and the purchase of the Notes by the Holders, the Parent Guarantor agreed pursuant to the Indenture to cause any future Restricted Subsidiaries (other than Persons designated as a Non-Guarantor Subsidiary) to provide Subsidiary Guarantees.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and intending to be legally bound, the parties to this Supplemental Indenture hereby agree as follows:

Section 1. Capitalized terms used herein and not otherwise defined herein are used as defined in the Indenture.

Section 2. Each Undersigned, by its execution of this Supplemental Indenture, agrees to be a Subsidiary Guarantor under the Indenture and to be bound by all the terms of the Indenture applicable to Subsidiary Guarantors, including, but not limited to, Article 11 thereof. To evidence its Guarantee set forth in this Indenture, the Subsidiary Guarantor hereby agrees that a notation of such Guarantee, substantially in the form of Exhibit M, shall be endorsed by an authorized officer of such Subsidiary Guarantor on each Note authenticated and delivered by the Trustee prior to (and continuing to be outstanding), on or after the date thereof.

I-2

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Section 3.  This Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

Section 4.  This Supplemental Indenture may be signed in various counterparts which together will constitute one and the same instrument.

Section 5.  This Supplemental Indenture is an amendment supplemental to the Indenture and the Indenture and this Supplemental Indenture will henceforth be read together.

Section 6.  The recitals contained herein shall be taken as the statements of the Issuer, the Note Guarantors and the Undersigned, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity or sufficiency of this Supplemental Indenture.

Section 7.  Notwithstanding anything contained herein, nothing in this Supplemental Indenture shall relieve the Issuer, the Note Guarantors or the Trustee of any of their obligations under the Indenture, as amended and supplemented by this Supplemental Indenture, and the Notes.  The Trustee shall not be responsible and shall have no liability for the validity or efficiency of this Supplemental Indenture.  The Issuer and the Note Guarantors acknowledge and agree that the indemnification and other provisions of Section 7.06 of the Indenture shall apply to this Supplemental Indenture and the transactions contemplated therein as if set forth herein.

Section 8.  All of the provisions of the Indenture shall remain in full force and effect as set forth therein.

*[Signature Page Follows]*

(HK) 06562/183/INDENTURE/Raptor Indenture docx

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

ROLTA, LLC

By: _____
    Name:
    Title:

ROLTA INDIA LIMITED
As Parent Guarantor

By: _____
    Name:
    Title:

[SUBSIDIARY GUARANTOR]
As Subsidiary Guarantor

By: _____
    Name:
    Title:

[NEW GUARANTOR]
As Subsidiary Guarantor

By: _____
    Name:
    Title:

I-4

Very Truly Yours,

DB TRUSTEES (HONG KONG)
LIMITED, as Trustee and Security Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Paying and Transfer Agent
and Registrar

By:  Deutsche Bank National Trust
     Company

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 281 of 739

**SCHEDULE I**
**TO EXHIBIT I**

LIST OF SUBSIDIARY GUARANTORS[4]

1.    Rolta International, Inc.

2.    Rolta U.K. Limited

3.    Rolta Middle East FZ-LLC

---

[4] To be updated as of the date of any Supplemental Indenture.

I-6

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**EXHIBIT J**

FORM OF COMPLIANCE CERTIFICATE

[*Date*]

This Compliance Certificate is delivered pursuant to Section 6.08 of the Indenture, dated as of May 16, 2013, as amended, supplemented or modified from time to time (the "**Indenture**"), among Rolta, LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and, together with the Parent Guarantor, the "**Note Guarantors**") and DB Trustees (Hong Kong) Limited, as trustee (the "**Trustee**") and security agent, and Deutsche Bank Trust Company Americas, as paying and transfer agent and registrar. Terms defined in the Indenture are used herein as therein defined.

Each of the undersigned hereby certifies to the Trustee as follows:

1. I am the duly elected, qualified and acting [title] or [title], as the case may be, of the Issuer.

2. I have reviewed and am familiar with the contents of this Compliance Certificate.

3. I have reviewed the terms of the Indenture and the Security Documents and have made or caused to be made under my supervision, a review in reasonable detail of the Collateral and the condition of the Collateral. Such review did not disclose the existence during or at the end of the annual period covered by this Compliance Certificate, and I have no knowledge of the existence as of the date of this Compliance Certificate, of any condition or event which would impair the perfected security interest created by the Indenture and the Security Documents with at least the priority of such security interest on the Original Issue Date[, except as set forth below].

4. Based upon the advice of counsel, all action has been taken with respect to the recording, registering, filing, re-recording, registering and refiling of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as may be necessary to maintain the Liens granted pursuant to the Security Documents to the extent required by the Security Documents, if any [and, if necessary, reciting the details of such action].

5. Since the Original Issue Date:

   (a) none of the Issuer nor any Note Guarantor has changed its jurisdiction of organization, name, identity or corporate structure to such an extent that any financing statement or other Security Document filed by or on behalf of the Security Agent would become misleading;

J-1

Case 20-82282-CRJ11 Doc 126 Filed 12/07/20 Entered 12/07/20 23:29:08 Desc Main Document Page 283 of 739

(b)      the Issuer has performed any re-filing, re-recording or continuation of documentation with respect to the Collateral as necessary to maintain such security interest in the Collateral in favor of the Security Agent on behalf of the Holders of Notes,

except, in each case, (i) any of the foregoing that has been previously disclosed to the Security Agent in accordance with the Indenture and any relevant Security Document and in respect of which the Issuer and each Note Guarantor have delivered to the Security Agent all required documents and other filings required to maintain the perfection and priority of the Security Agent's security interest in the Collateral after giving effect to such event, in each case as required by the Indenture and the relevant Security Documents and (ii) any of the foregoing described in Attachment 1 hereto in respect of which the Issuer or the Note Guarantor is delivering to the Security Agent herewith all required statements and other filings required to maintain the perfection and priority of the Security Agent's security interest in the Collateral after giving effect to such event, in each case, as required by the Indenture and the relevant Security Documents.

6.      That a review has been conducted of the activities of the Parent Guarantor and the Restricted Subsidiaries and the Parent Guarantor's and the Restricted Subsidiaries' performance under the Indenture, in each case since the Original Issue Date, [and that the Issuer and each Restricted Subsidiary have been since the Original Issue Date and are in compliance with of their respective all obligations under the Indenture]/[if there has been a default in the fulfillment of any obligation under the Indenture, specifying each such default and the nature and status thereof.]

*[Signature Page Follows]*

(HK) 06562/183/INDENTURE/Raptor Indenture docx

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date first written above.

ROLTA INDIA LIMITED

By: _____

Name:

Title:

(HK) 06562/183/INDENTURE/Raptor Indenture docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 285 of 739

**EXHIBIT K**

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

DB Trustees (Hong Kong) Limited
Level 52, International Commerce Centre
1 Austin Road West
Kowloon, Hong Kong

<u>Paying and Transfer Agent and Registrar</u>

Deutsche Bank Trust Company Americas
Trust and Agency Services
60 Wall Street, 27th Floor
MSNYC 60-2710
New York, New York 10005
United States of America

K-1

(HK) 06562/183/INDENTURE/Raptor Indenture docx

**EXHIBIT L**

FORM OF NOTATION OF PARENT GUARANTEE

For value received, the undersigned (the "**Parent Guarantor**") hereby, jointly and severally, Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee or the Authenticating Agent and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and the Indenture. The obligations of the Parent Guarantor are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by: (1) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under the Indenture or any Note, by operation of law or otherwise; (2) any modification or amendment of or supplement to the Indenture or any Note; (3) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in the Indenture or any Note; (4) the existence of any claim, set off or other rights which the Parent Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with the Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim; (5) any invalidity, irregularity, or unenforceability relating to or against the Issuer for any reason of the Indenture or any Note; or (6) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Parent Guarantor's obligations hereunder.

This Parent Guarantee will not be discharged with respect to any Note except by payment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable, in respect of the Parent Guarantor, as otherwise contemplated in the Indenture. In case of the failure of the Issuer punctually to pay any such principal of, premium, if any, and interest on the Notes and all other amounts payable, the Parent Guarantor hereby agrees to cause any such payment to be made punctually when and as the same shall become due and payable, whether at the stated maturity, by acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

Subject to certain exceptions as set forth in the Indenture, the Parent Guarantor hereby further agrees that all payments of, or in respect of, principal of, and premium (if any) and interest on the Notes or under a Note Guarantee will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Surviving Person (as defined in the Indenture) or any Note Guarantor is organized or resident for tax purposes (or any political subdivision or taxing authority thereof or therein) or any jurisdiction through which payment is made by or behalf of the Issuer, a Surviving Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein, unless such withholding or deduction is

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Surviving Person, the Parent Guarantor or the Subsidiary Guarantors, as the case may be, will pay such Additional Amounts as will result in receipt by the holder of this Parent Guarantee of such amounts as would have been received by such holder had no such withholding or deduction been required.

Notwithstanding the foregoing, as at the Original Issue Date, the Parent Guarantor's potential liability under the Parent Guarantee is capped at an amount equal to 200 percent of the total initial aggregate principal amount of the Notes being US$400,000,000 (the "**Parent Guaranteed Amount**"). The Parent Guaranteed Amount will be reduced by any amounts paid by the Parent Guarantor under the Parent Guarantee from time to time up to a maximum of 200 percent of the then outstanding total aggregate Principal Amount of the Notes (the "**Maximum Guaranteed Amount**").

The obligations of the Parent Guarantor to the holder of this Note and to the Trustee pursuant to this Parent Guarantee and the Indenture are expressly set forth in Article 10 of the Indenture, and reference is hereby made to such Article and Indenture for the precise terms of the Parent Guarantee.

This Parent Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Parent Guarantee is endorsed shall have been executed by the Trustee under the Indenture by manual signature of one of its authorized officers.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

Date: _____

ROLTA INDIA LIMITED

By: _____
     Name:
     Title:

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

**EXHIBIT M**

FORM OF NOTATION OF SUBSIDIARY GUARANTEE

For value received, each of the undersigned (the "**Subsidiary Guarantors**") hereby, jointly and severally, Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee or the Authenticating Agent and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and the Indenture.  The obligations of each Subsidiary Guarantor are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by: (1) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under the Indenture or any Note, by operation of law or otherwise; (2) any modification or amendment of or supplement to the Indenture or any Note; (3) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in the Indenture or any Note; (4) the existence of any claim, set off or other rights which the Subsidiary Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with the Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim; (5) any invalidity, irregularity, or unenforceability relating to or against the Issuer for any reason of the Indenture or any Note; or (6) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to such Subsidiary Guarantor's obligations hereunder.

This Subsidiary Guarantee will not be discharged with respect to any Note except by payment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable, in respect of any Subsidiary Guarantor, or as otherwise contemplated in the Indenture.  In case of the failure of the Issuer punctually to pay any such principal of, premium, if any, and interest on the Notes and all other amounts payable, each of the Subsidiary Guarantors hereby agrees to cause any such payment to be made punctually when and as the same shall become due and payable, whether at the stated maturity, by acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

Subject to certain exceptions as set forth in the Indenture, each of the Subsidiary Guarantors hereby further agrees that all payments of, or in respect of, principal of, and premium (if any) and interest in respect of this Subsidiary Guarantee will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Surviving Person (as defined in the Indenture) or the applicable Subsidiary Guarantor is organized or resident for tax purposes (or any political subdivision or taxing authority thereof or therein) or any jurisdiction through which payment is made by or behalf of the Issuer, a Surviving

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 289 of 739

Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein, unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, each Subsidiary Guarantor severally agrees to pay such Additional Amounts as will result in receipt by the holder of this Subsidiary Guarantee of such amounts as would have been received by such holder had no such withholding or deduction been required.

The obligations of the Subsidiary Guarantors to the holder of this Note and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article 11 of the Indenture, and reference is hereby made to such Article and Indenture for the precise terms of the Subsidiary Guarantee.

This Subsidiary Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Subsidiary Guarantee is endorsed shall have been executed by the Trustee or an Authenticating Agent under the Indenture by manual signature of one of its authorized officers.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

Date: _____

ROLTA INTERNATIONAL, INC.

By: _____
    Name:
    Title:

ROLTA U.K. LIMITED

By: _____
    Name:
    Title:

ROLTA MIDDLE EAST FZ-LLC

By: _____
    Name:
    Title:

M-2

(HK) 06562/183/INDENTURE/Raptor Indenture.docx

# EXHIBIT D

Execution Version

**ROLTA AMERICAS LLC**

and

**ROLTA INDIA LIMITED**
as Parent Guarantor

and

**THE ENTITIES LISTED ON SCHEDULE I HERETO**
as Subsidiary Guarantors

and

**CITICORP INTERNATIONAL LIMITED**
as Trustee and Security Agent

and

**CITIBANK, N.A., LONDON BRANCH**
as Paying and Transfer Agent

and

**CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG**
as Registrar

———————————————

**Indenture**

**Dated as of July 24, 2014**

———————————————

**8.875% Senior Notes**

**Due 2019**

———————————————

## TABLE OF CONTENTS

PAGE

### ARTICLE 1
### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions* ..................................................................................1
Section 1.02. *Rules of Construction* ..................................................................30

### ARTICLE 2
### ISSUE, EXECUTION, FORM AND REGISTRATION OF NOTES

Section 2.01. *Authentication and Delivery of Notes and Note Guarantees* ......................31
Section 2.02. *Execution of Notes and Note Guarantees* ....................................31
Section 2.03. *Certificate of Authentication* ......................................................32
Section 2.04. *Form, Denomination and Date of Notes; Payments* ....................32
Section 2.05. *Registration, Transfer and Exchange* .........................................35
Section 2.06. *Book-entry Provisions for Global Notes* .....................................37
Section 2.07. *Special Transfer Provisions* ........................................................38
Section 2.08. *Mutilated, Defaced, Destroyed, Stolen and Lost Notes* ..............41
Section 2.09. *Further Issues* ............................................................................41
Section 2.10. *Cancellation of Notes; Disposition Thereof* ...............................42
Section 2.11. *Open Market Purchases and Cancellation of Notes* ...................43
Section 2.12. *CUSIP, ISIN or Common Code Numbers* ....................................43

### ARTICLE 3
### REDEMPTION

Section 3.01. *Redemption for Taxation Reasons* ..............................................43
Section 3.02. *Optional Redemption* ..................................................................44
Section 3.03. *Method and Effect of Redemption* ..............................................46

### ARTICLE 4
### COVENANTS

Section 4.01. *Payment of Notes* ........................................................................46
Section 4.02. *Maintenance of Office or Agency* ...............................................48
Section 4.03. *Governmental Approvals and Licenses; Compliance with Law* ................49
Section 4.04. *Payment of Taxes and other Claims* ...........................................49
Section 4.05. *Limitation on Indebtedness* .........................................................50
Section 4.06. *Limitation on Restricted Payments* .............................................54
Section 4.07. *Limitation on Liens* .....................................................................58
Section 4.08. *Limitation on Dividend and Other Payment Restrictions Affecting
Restricted Subsidiaries* ................................................................58

i

Table of Contents
(continued)

Page

Section 4.09. *Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries* ...........................................................................60
Section 4.10. *Limitation on Issuances of Guarantees by Restricted Subsidiaries* ...........61
Section 4.11. *Limitation on Sale and Leaseback Transactions* ...................................61
Section 4.12. *Repurchase of Notes Upon a Change of Control* ..................................62
Section 4.13. *Limitation on Asset Sales* ...................................................................62
Section 4.14. *Limitation on Transactions with Shareholders and Affiliates* ..................64
Section 4.15. *Limitation on Business Activities* ........................................................66
Section 4.16. *Use of Proceeds* ...............................................................................66
Section 4.17. *Maintenance of Insurance* .................................................................66
Section 4.18. *Designation of Restricted and Unrestricted Subsidiaries* ......................66
Section 4.19. *Anti-Layering* ...................................................................................68
Section 4.20. *Provision of Financial Statements and Reports* ....................................68
Section 4.21. *Additional Amounts* ..........................................................................71
Section 4.22. *No Payments for Consents* .................................................................73
Section 4.23. *Suspension of Certain Covenants* .......................................................74
Section 4.24. *Limitation on the Issuer* ....................................................................75
Section 4.25. *Currency Indemnity* ..........................................................................76
Section 4.26. *Amendments to or Prepayments of the Intercompany Loans* ...................77
Section 4.27. *Waiver of Stay, Extension or Usury Laws* .............................................77
Section 4.28. *Taxes* ...............................................................................................78

ARTICLE 5
CONSOLIDATION, MERGER AND SALE OF ASSETS

Section 5.01. *Consolidation, Merger and Sale of Assets* .............................................78

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01. *Events of Default* ...............................................................................80
Section 6.02. *Acceleration* ......................................................................................82
Section 6.03. *Other Remedies* .................................................................................82
Section 6.04. *Waiver of Past Defaults* ......................................................................82
Section 6.05. *Control by Majority* ............................................................................82
Section 6.06. *Limitation on Suits* .............................................................................83
Section 6.07. *Rights of Holders to Receive Payment* ..................................................83
Section 6.08. *Compliance Certificate* .......................................................................83
Section 6.09. *Collection Suit by Trustee* ...................................................................84
Section 6.10. *Trustee May File Proofs of Claim* .........................................................84
Section 6.11. *Priorities* ...........................................................................................84
Section 6.12. *Restoration of Rights and Remedies* .....................................................85
Section 6.13. *Undertaking for Costs* .........................................................................85
Section 6.14. *Rights and Remedies Cumulative* .........................................................85

ii

Table of Contents
(continued)

Page

Section 6.15. *Delay or Omission Not Waiver* ....................................................85

ARTICLE 7
THE TRUSTEE AND THE AGENTS

Section 7.01. *General* ....................................................86
Section 7.02. *Certain Rights of Trustee and Agents* ....................................................87
Section 7.03. *Individual Rights of Trustee* ....................................................89
Section 7.04. *Trustee's Disclaimer* ....................................................89
Section 7.05. *Notice of Default* ....................................................90
Section 7.06. *Compensation and Indemnity* ....................................................90
Section 7.07. *No Personal Liability of any Director, Officer, Agent or Employee of the Trustee* ....................................................91
Section 7.08. *Information Sharing* ....................................................91
Section 7.09. *Taxes* ....................................................92
Section 7.10. *Replacement of Trustee* ....................................................92
Section 7.11. *Successor Trustee by Consolidation, Merger, Conversion or Transfer* .....93
Section 7.12. *Money Held in Trust* ....................................................93
Section 7.13. *Paying Agent in EU* ....................................................93
Section 7.14. *Rights of the Trustee and the Security Agent in other roles* ....................................................93

ARTICLE 8
DEFEASANCE AND DISCHARGE AND SATISFACTION AND DISCHARGE

Section 8.01. *Defeasance and Discharge of Indenture* ....................................................93
Section 8.02. *Covenant Defeasance* ....................................................95
Section 8.03. *Application of Trust Money* ....................................................95
Section 8.04. *Repayment to Issuer* ....................................................96
Section 8.05. *Reinstatement* ....................................................96
Section 8.06. *Satisfaction and Discharge* ....................................................96

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01. *Amendments without Consent of Holders* ....................................................97
Section 9.02. *Amendments with Consent of Holders* ....................................................98
Section 9.03. *Effect of Consent* ....................................................99
Section 9.04. *Trustee's and Agents' Rights and Obligations* ....................................................100

ARTICLE 10
PARENT GUARANTEE

Section 10.01. *Parent Guarantee* ....................................................100
Section 10.02. *Guarantee Unconditional* ....................................................100

iii

Table of Contents
(continued)

Page

Section 10.03. *Discharge; Reinstatement* ........................................................101
Section 10.04. *Waiver by the Parent Guarantor* ...........................................101
Section 10.05. *Subrogation* ............................................................................101
Section 10.06. *Stay of Acceleration* ...............................................................102
Section 10.07. *Ranking of Parent Guarantee* ................................................102
Section 10.08. *Execution and Delivery of Parent Guarantee* ........................102
Section 10.09. *Release of the Parent Guarantee* ............................................102
Section 10.10. *Limitation of the Parent Guarantee* .......................................103

ARTICLE 11
SUBSIDIARY GUARANTEES

Section 11.01. *The Subsidiary Guarantees* ....................................................103
Section 11.02. *Guarantee Unconditional* .......................................................103
Section 11.03. *Discharge; Reinstatement* .......................................................104
Section 11.04. *Waiver by Each Subsidiary Guarantor* ..................................104
Section 11.05. *Subrogation and Contribution* ...............................................104
Section 11.06. *Stay of Acceleration* ...............................................................105
Section 11.07. *Limitation on Amount of Subsidiary Guarantee* ....................105
Section 11.08. *Ranking of Subsidiary Guarantees* ........................................105
Section 11.09. *Further Subsidiary Guarantors* ..............................................105
Section 11.10. *Execution and Delivery of Subsidiary Guarantee* ..................106
Section 11.11. *Release of the Subsidiary Guarantees* ....................................107

ARTICLE 12
SECURITY TO BE GRANTED

Section 12.01. *Security to be Granted* ...........................................................107
Section 12.02. *Certificates* .............................................................................109
Section 12.03. *Intercompany Loans* ...............................................................109
Section 12.04. *Authorization of Actions to be Taken by the Security Agent Under the Security Documents* ..................................................................109
Section 12.05. *Authorization of Receipt of Funds by the Security Agent Under the Security Documents* ..................................................................110
Section 12.06. *Release of Security* .................................................................110

ARTICLE 13
MISCELLANEOUS

Section 13.01. *Ranking* ..................................................................................111
Section 13.02. *Trust Indenture Act Controls* .................................................111
Section 13.03. *Notices* ....................................................................................111
Section 13.04. *Certificate and Opinion as to Conditions Precedent* .............112
Section 13.05. *Statements Required in Certificate or Opinion* ......................113

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 296 of 739

Table of Contents
(continued)

Page

Section 13.06. *Payment Date Other Than a Business Day*................................113
Section 13.07. *Governing Law, Consent to Jurisdiction; Waiver of Jury Trial,
   Waiver of Immunities* ..............................................................113
Section 13.08. *No Adverse Interpretation of Other Agreements* ....................115
Section 13.09. *Successors* ................................................................115
Section 13.10. *Duplicate Originals* ...................................................115
Section 13.11. *Separability*..............................................................115
Section 13.12. *Table of Contents and Headings*....................................115
Section 13.13. *No Personal Liability of Incorporators, Stockholders, Officers,
   Directors or Employees* ..........................................................115
Section 13.14. *Force Majeure* ..........................................................115
Section 13.15. *USA Patriot Act*.........................................................115
Section 13.16. *Anti-Money Laundering and Terrorism*............................116

## SCHEDULES AND EXHIBITS

SCHEDULE I        *List of Initial Subsidiary Guarantors*

EXHIBIT A         *Form of Certificated Note*

EXHIBIT B         *Form of Transfer Notice*

EXHIBIT C         *Form of Restricted Global Note*

EXHIBIT D         *Form of Regulation S Global Note*

EXHIBIT E-1       *Form of Issuer Authorization Certificate*

EXHIBIT E-2       *Form of Note Guarantor Authorization Certificate*

EXHIBIT F         *Form of Paying and Transfer Agent Appointment Letter*

EXHIBIT G         *Form of Certificate to be Delivered in Connection with Transfers
                  Pursuant to Regulation S*

EXHIBIT H         *Form of Certificate to be Delivered in Connection with Transfers to
                  QIBs*

EXHIBIT I         *Form of Supplemental Indenture*

EXHIBIT J         *Form of Compliance Certificate*

EXHIBIT K         *Trustee, Paying and Transfer Agent and Registrar*

v

Table of Contents
(continued)

Page

EXHIBIT L        *Form of Notation of Parent Guarantee*

EXHIBIT M        *Form of Notation of Subsidiary Guarantee*

vi

INDENTURE, dated as of July 24, 2014, among (i) Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), (ii) Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), (iii) the entities listed in Schedule I hereto collectively as the initial Subsidiary Guarantors (and together with the Parent Guarantor the "**Note Guarantors**") and (iv) Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent, and Citigroup Global Markets Deutschland AG, as Registrar.

## RECITALS

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of up to US$300,000,000 in aggregate principal amount of the Issuer's 8.875% Senior Notes Due 2019 and, if and when issued, any Additional Notes as provided herein (collectively, the "**Notes**"). All things necessary to make this Indenture a valid agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by or on behalf of the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

WHEREAS, each Note Guarantor has duly authorized the execution and delivery of this Indenture as guarantor of the Notes. All things necessary to make this Indenture a valid agreement of each initial Note Guarantor, in accordance with its terms, have been done, and each initial Note Guarantor has done all things necessary to make the Note Guarantees, when the Notes are executed by the Issuer and authenticated and delivered by or on behalf of the Trustee and duly issued by the Issuer, the valid obligations of such initial Note Guarantor as hereinafter provided.

WHEREAS, pursuant to the Security Documents (as defined below), the Issuer has agreed to grant a security interest in the Collateral (as defined below) to the Trustee and the Security Agent, as the case may be, in order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees.

### THIS INDENTURE WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

### ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions.*

"**2013 Notes**" means the 10.75% Senior Notes due 2018 issued by Rolta, LLC on May 16, 2013.

"**Acquired Indebtedness**" means Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Indebtedness of the Parent Guarantor or a Restricted Subsidiary assumed in connection with an Asset Acquisition by the Parent Guarantor or such Restricted Subsidiary whether or not Incurred in connection with, or in contemplation of, the Person merging with or into the Parent Guarantor or a Restricted Subsidiary or becoming a Restricted Subsidiary.

"**Additional Notes**" has the meaning assigned to such term in Section 2.09.

"**Adjusted Treasury Rate**" with respect to any redemption date, (i) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519)" or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities", for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three (3) months before or after July 24, 2017, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined and the Adjusted Treasury Rate shall be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month) or (ii) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, in each case calculated on the third Business Day immediately preceding the redemption date.

"**Affiliate**" means, with respect to any Person, any other Person (1) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; (2) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (1) of this definition; or (3) who is a spouse or any person cohabiting as a spouse, child, parent, brother, sister, parent-in-law, grandchild, grandparent, uncle, aunt, nephew or niece of a Person described in clause (1) or (2). For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlling**," "**controlled by**" and "**under common control with**"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Transaction**" has the meaning assigned to such term in Section 4.14.

"**Agent**" means any Security Agent, Registrar or Paying and Transfer Agent.

"**Agent Members**" has the meaning assigned to such term in Section 2.06.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 300 of 739

"**Applicable Law**" means any law or regulation including, but not limited to: (a) any domestic or foreign statute or regulation; (b) rule or practice of any Authority, stock exchange or self-regulatory organisation with which the Trustee or any Agent is bound or accustomed to comply; and (c) agreement entered into by the Trustee or any Agent and any authority or between any two or more authorities.

"**Applicable Premium**" means, with respect to a Note at any redemption date, the greater of (1) 1.00% of the principal amount of such Note and (2) the excess of (A) the present value at such redemption date of the redemption price of such Note at July 24, 2017, plus all required remaining scheduled interest payments due on such Note (but excluding accrued and unpaid interest to the redemption date) through July 24, 2017, computed using a discount rate equal to the Adjusted Treasury Rate plus 50 basis points, over (B) the principal amount of such Note on such redemption date.

"**Asset Acquisition**" means (1) an investment by the Parent Guarantor or any Restricted Subsidiary in any other Person pursuant to which such Person shall become a Restricted Subsidiary or shall be merged into or consolidated with the Parent Guarantor or any Restricted Subsidiary; or (2) an acquisition by the Parent Guarantor or any Restricted Subsidiary of the property and assets of any Person other than the Parent Guarantor or any Restricted Subsidiary that constitute substantially all of a division or line of business of such Person.

"**Asset Disposition**" means the sale or other disposition by the Parent Guarantor or any Restricted Subsidiary (other than to the Parent Guarantor or another Restricted Subsidiary) of (1) all or substantially all of the Capital Stock of any Significant Subsidiary; or (2) all or substantially all of the assets that constitute a division or line of business of the Parent Guarantor or any Significant Subsidiary.

"**Asset Sale**" means any sale, transfer or other disposition (including by way of merger, consolidation or Sale and Leaseback Transaction) of any of its property or assets (including any sale of Capital Stock of a Subsidiary or any issuance of Capital Stock of a Restricted Subsidiary) in one transaction or a series of related transactions by the Parent Guarantor or any Restricted Subsidiary to any Person; *provided* that "**Asset Sale**" shall not include:

(1)     sales or other dispositions of inventory, receivables and other current assets in the ordinary course of business;

(2)     sales, transfers or other dispositions of assets constituting a Permitted Investment or Restricted Payment permitted to be made under Section 4.06;

(3)     sales, transfers or other dispositions of assets with a Fair Market Value not in excess of US$1.0 million (or the Dollar Equivalent thereof) in any transaction or series of related transactions;

3

(4)      any sale, transfer, assignment or other disposition of any property or equipment that has become damaged, worn out, obsolete or otherwise unsuitable for use in connection with the business of the Parent Guarantor or the Restricted Subsidiaries;

(5)      any transfer, assignment or other disposition deemed to occur in connection with creating or granting any Permitted Lien;

(6)      a transaction covered under Section 5.01(a); and

(7)      a sale, transfer or other disposition to the Parent Guarantor or a Restricted Subsidiary, including, without limitation, an issuance of Capital Stock by a Restricted Subsidiary to the Parent Guarantor or to another Restricted Subsidiary.

"**Attributable Indebtedness**" means, in respect of a Sale and Leaseback Transaction, the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"**Authority**" means any competent regulatory, tax, prosecuting or governmental authority, whether domestic or foreign.

"**Authorization Certificate**" has the meaning assigned to such term in Section 2.02(a).

"**Authorized Officer**" means, with respect to the Issuer, the Parent Guarantor or a Subsidiary Guarantor, as applicable, any one person, officer or director, who, in each case, is authorized to represent the Issuer, the Parent Guarantor or a Subsidiary Guarantor, as the case may be, as designated in the Authorization Certificate furnished to the Trustee.

"**Average Life**" means, at any date of determination with respect to any Indebtedness, the quotient obtained by dividing (1) the sum of the products of (a) the number of years from such date of determination to the dates of each successive scheduled principal payment of such Indebtedness and (b) the amount of such principal payment by (2) the sum of all such principal payments.

"**Board of Directors**" means the board of directors elected or appointed by the stockholders of the Parent Guarantor to manage the business of the Parent Guarantor or any committee of such board duly authorized to take the action purported to be taken by such committee.

"**Board Resolution**" means any resolution of the Board of Directors taking an action which it is authorized to take and adopted at a meeting duly called and held at which a quorum of disinterested members (if so required) was present and acting throughout or adopted by written resolution executed by every member of the Board of Directors.

4

"**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in The City of New York, London and Singapore (or in any other place in which payments on the Notes are to be made) are authorized or required by law or governmental regulation to close.

"**Capitalized Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) which, in conformity with GAAP, is required to be capitalized on the balance sheet of such Person.

"**Capitalized Lease Obligations**" means the discounted present value of the rental obligations under a Capitalized Lease.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) in equity of such Person, whether outstanding on the Original Issue Date or issued thereafter, including, without limitation, all Common Stock and Preferred Stock.

"**Certificated Notes**" means the Notes, in certificated, registered form, executed and delivered by the Issuer and authenticated by or on behalf of the Trustee in exchange for the Global Notes, upon the occurrence of the events set forth in the second sentence of Section 2.04(e).

"**Change of Control**" means the occurrence of one or more of the following events:

(1) the merger, amalgamation or consolidation of the Parent Guarantor with or into another Person or the merger or amalgamation of another Person with or into the Parent Guarantor, or the direct or indirect sale of all or substantially all the consolidated assets of the Parent Guarantor to another Person;

(2) (a) Mr. Kamal K. Singh is the beneficial owner (as such term is used in Rule 13d-3 of the Exchange Act) of less than 26.0% of the total voting power of the Voting Stock of the Parent Guarantor, or (b) any "**person**" or "**group**" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) is or becomes the "**beneficial owner**" (as such term is used in Rule 13d-3 of the Exchange Act), directly or indirectly, of the total voting power of the Voting Stock of the Parent Guarantor greater than such total voting power held beneficially by the individual identified in sub-clause (a) of this clause (2);

(3) individuals who on the Original Issue Date constituted the Board of Directors, together with any new directors whose election to the Board of Directors was approved by a vote of at least two-thirds of the directors then still in office who were either directors on the Original Issue Date or whose election was previously so approved, cease for any reason to constitute a majority of the Board of Directors then in office; or

(4) the adoption of a plan relating to the liquidation or dissolution of the Parent Guarantor or the Issuer.

5

"**Change of Control Offer**" has the meaning assigned to such term in Section 4.12.

"**Clearstream**" means Clearstream Banking, *société anonyme*, Luxembourg.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all collateral securing, or purported to be securing, directly or indirectly, the Notes or any Note Guarantee pursuant to the Security Documents, and shall initially consist of a security interest in the Issuer's rights under the Intercompany Loans.

"**Commodity Hedging Agreement**" means any spot, forward or option commodity price protection agreements or other similar agreement or arrangement designed to protect against fluctuations in commodity prices.

"**Common Stock**" means, with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock or ordinary shares, whether or not outstanding at the date of this Indenture, and includes, without limitation, all series and classes of such common stock or ordinary shares.

"**Comparable Treasury Issue**" means the U.S. Treasury security having a maturity comparable to July 24, 2017 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities with a maturity comparable to July 24, 2017.

"**Comparable Treasury Price**" means, with respect to any redemption date, if clause (ii) of the Adjusted Treasury Rate is applicable, the average of three, or such lesser number as is obtained by the Trustee, Reference Treasury Dealer Quotations for such redemption date.

"**Consolidated EBITDA**" means, with respect to any Person for any period, Consolidated Net Income of such Person for such period plus, to the extent such amount was deducted in calculating such Consolidated Net Income:

(1)     Consolidated Interest Expense;

(2)     income taxes (other than income taxes attributable to extraordinary and non-recurring gains (or losses) or sales of assets); and

(3)     depreciation expense, amortization expense and all other non-cash items reducing Consolidated Net Income (other than non-cash items in a period which reflect cash expenses paid or to be paid in another period), less all non-cash items increasing Consolidated Net Income;

all as determined on a consolidated basis for such Person and its Subsidiaries (excluding Unrestricted Subsidiaries) in conformity with GAAP; *provided* that (i) if any

6

Restricted Subsidiary is not a Wholly Owned Restricted Subsidiary, Consolidated EBITDA shall be reduced (to the extent not otherwise reduced in accordance with GAAP) by an amount equal to (A) the amount of the Consolidated Net Income attributable to such Restricted Subsidiary multiplied by (B) the percentage ownership interest in the income of such Restricted Subsidiary not owned on the last day of such period by the Parent Guarantor or any of the Restricted Subsidiaries; and (ii) notwithstanding the preceding, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of a Person will be added to the Consolidated Net Income to compute Consolidated EBITDA of such person only to the extent that a corresponding amount would not be prohibited at the date of determination to be dividended to such person by such Restricted Subsidiary under the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders.

"**Consolidated Fixed Charges**" means, with respect to any Person for any period, the sum (without duplication) of (1) Consolidated Interest Expense for such period and (2) all cash and non-cash dividends paid, declared, accrued or accumulated during such period on any Disqualified Stock or Preferred Stock of such Person or any of its Subsidiaries (other than Unrestricted Subsidiaries) held by Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary, except for dividends payable in the Parent Guarantor's Capital Stock (other than Disqualified Stock).

"**Consolidated Interest Expense**" means, with respect to any Person for any period, the amount that would be included in gross interest expense on a consolidated income statement prepared in accordance with GAAP for such period of such Person and its Restricted Subsidiaries, plus, to the extent not included in such gross interest expense, and to the extent incurred, accrued or payable during such period by such Person and its Restricted Subsidiaries, without duplication, (1) interest expense attributable to Capitalized Lease Obligations, (2) amortization of debt issuance costs and original issue discount expense and non-cash interest payments in respect of any Indebtedness, (3) the interest portion of any deferred payment obligation, (4) all commissions, discounts and other fees and charges with respect to letters of credit or similar instruments issued for financing purposes or in respect of any Indebtedness, (5) the net costs associated with Hedging Obligations (including the amortization of fees), (6) interest accruing on Indebtedness of any other Person that is Guaranteed by, or secured by a Lien on any asset of, such Person or any of its Restricted Subsidiaries and (7) any capitalized interest; *provided* that interest expense attributable to interest on any Indebtedness bearing a floating interest rate will be computed on a *pro forma* basis as if the rate in effect on the date of determination had been the applicable rate for the entire relevant period.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in conformity with GAAP; *provided* that the following items shall be excluded in computing Consolidated Net Income (without duplication):

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 305 of 739

(1)     the net income (or loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting except that:

(a)     subject to the exclusion contained in clause (5) below, the Parent Guarantor's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Parent Guarantor or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary, to the limitations contained in clause (3) below); and

(b)     the Parent Guarantor's equity in a net loss of any such Person for such period will be included in determining such Consolidated Net Income to the extent funded with cash or other assets of the Parent Guarantor or Restricted Subsidiaries;

(2)     the net income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Parent Guarantor or any of the Restricted Subsidiaries or all or substantially all of the property and assets of such Person are acquired by the Parent Guarantor or any of the Restricted Subsidiaries;

(3)     the net income (but not loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter, articles of association or other constitutive document or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary;

(4)     the cumulative effect of a change in accounting principles;

(5)     any net after tax gains (but not losses) realized on the sale or other disposition of (a) any property or asset of the Parent Guarantor or any Restricted Subsidiary that is not sold in the ordinary course of its business or (b) any Capital Stock of any Person (including any gains by the Parent Guarantor or a Restricted Subsidiary realized on sales of Capital Stock of the Parent Guarantor or of any Restricted Subsidiary);

(6)     any translation gains and losses due solely to fluctuations in currency values and related tax effects; and

(7)     any net after-tax extraordinary or non-recurring gains (but not losses).

"**Consolidated Net Worth**" means, at any date of determination, (i) with respect to the Issuer, stockholders' equity as set forth on the most recently available quarterly or annual consolidated balance sheet of the Issuer and its Restricted Subsidiaries, less any amounts attributable to Disqualified Stock or any equity security convertible into or exchangeable for Indebtedness, the cost of treasury stock and the principal amount of any

promissory notes receivable from the sale of the Capital Stock of the Issuer or any of its Restricted Subsidiaries, each item to be determined in conformity with GAAP and (ii) with respect to the Parent Guarantor, stockholders' equity as set forth on the most recently available quarterly or annual consolidated balance sheet of the Parent Guarantor and the Restricted Subsidiaries, plus, to the extent not included, any Preferred Stock of the Parent Guarantor, less any amounts attributable to Disqualified Stock or any equity security convertible into or exchangeable for Indebtedness, the cost of treasury stock and the principal amount of any promissory notes receivable from the sale of the Capital Stock of the Parent Guarantor or any of the Restricted Subsidiaries, each item to be determined in conformity with GAAP.

"**Consolidated Priority Indebtedness Leverage Ratio**" means, on any Transaction Date, the ratio of (x) the aggregate principal amount of Priority Indebtedness outstanding on such Transaction Date, to (y) the aggregate amount of Total Assets.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is principally administered, which at the date of this Indenture is located at Citicorp International Limited, 39/F Citibank Tower, Citibank Plaza, 3 Garden Road, Central, Hong Kong. Attention: Managing Director.

"**Currency Hedging Agreement**" means any currency swap agreement, currency cap agreement, currency floor agreement, currency futures agreement, commodity option agreement or any other similar agreement or arrangement which may consist of one or more of the foregoing agreements, designed to protect against fluctuations in currency prices.

"**Custodian**" means Citibank, N.A., London Branch, as custodian with respect to the Notes in global form.

"**Default**" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Disqualified Stock**" means any class or series of Capital Stock of any Person that by its terms or otherwise is (1) required to be redeemed prior to the date that is 183 days after the Stated Maturity of the Notes, (2) redeemable at the option of the holder of such class or series of Capital Stock at any time prior to the date that is 183 days after the Stated Maturity of the Notes or (3) convertible into or exchangeable for Capital Stock referred to in clause (1) or (2) above or Indebtedness having a scheduled maturity prior to the date that is 183 days after the Stated Maturity of the Notes; *provided* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "**asset sale**" or "**change of control**" occurring prior to the date that is 183 days after the Stated Maturity of the Notes shall not constitute Disqualified Stock if the "**asset sale**" or "**change of control**" provisions applicable to

9

such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Section 4.12 and Section 4.13 and such Capital Stock specifically provides that such Person will not repurchase or redeem any such stock pursuant to such provision prior to the Issuer's repurchase of such Notes as are required to be repurchased pursuant to Section 4.12 and Section 4.13.

"**Dollar Equivalent**" means, with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the noon buying rate for U.S. dollars in New York City for cable transfers as certified for customs purposes by the Federal Reserve Bank of New York on the date of determination.

"**DTC**" means The Depository Trust Company and its successors.

"**Equity Offering**" means an underwritten primary public offering, after the Original Issue Date, of Common Stock of the Parent Guarantor; *provided* that (i) the aggregate gross cash proceeds received by the Parent Guarantor as a result of such offering will be no less than US$20.0 million (or the Dollar Equivalent thereof) and (ii) any such offering shall result in such Capital Stock being listed and eligible for dealing on a Recognized Exchange.

"**Euroclear**" means Euroclear Bank S.A./N.V.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Proceeds**" has the meaning assigned to such term in Section 4.13(c).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Board of Directors, whose determination shall be conclusive if evidenced by a Board Resolution.

"**Final Maturity Date**" means July 24, 2019.

"**Fitch**" means Fitch Inc., a subsidiary of Fimalac, S.A., and its successors.

"**Fixed Charge Coverage Ratio**" means, on any Transaction Date, the ratio of (1) the aggregate amount of Consolidated EBITDA for the then most recent four fiscal quarters prior to such Transaction Date for which consolidated financial statements of the Parent Guarantor are available (which may be internal consolidated financial statements) (the "**Four Quarter Period**") to (2) the aggregate Consolidated Fixed Charges during such Four Quarter Period. In making the foregoing calculation:

10

(A)     *pro forma* effect shall be given to any Indebtedness Incurred, repaid or redeemed during the period (the "**Reference Period**") commencing on and including the first day of the Four Quarter Period and ending on and including the Transaction Date (other than Indebtedness Incurred or repaid under a revolving credit or similar arrangement (or under any predecessor revolving credit or similar arrangement) in effect on the last day of such Four Quarter Period), in each case as if such Indebtedness had been Incurred, repaid or redeemed on the first day of such Reference Period; *provided* that, in the event of any such repayment or redemption, Consolidated EBITDA for such period will be calculated as if the Parent Guarantor or such Restricted Subsidiary had not earned any interest income actually earned during such period in respect of the funds used to repay or redeem such Indebtedness;

(B)     Consolidated Interest Expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a *pro forma* basis and bearing a floating interest rate will be computed as if the rate in effect on the Transaction Date (taking into account any Interest Rate Hedging Agreement applicable to such Indebtedness if such Interest Rate Hedging Agreement has a remaining term in excess of 12 months or, if shorter, at least equal to the remaining term of such Indebtedness) had been the applicable rate for the entire period;

(C)     *pro forma* effect will be given to the creation, designation or redesignation of Restricted Subsidiaries and Unrestricted Subsidiaries as if such creation, designation or redesignation had occurred on the first day of such Reference Period;

(D)     *pro forma* effect will be given to Asset Dispositions and Asset Acquisitions (including giving *pro forma* effect to the application of proceeds of any Asset Disposition) that occur during such Reference Period as if they had occurred and such proceeds had been applied on the first day of such Reference Period; and

(E)     *pro forma* effect will be given to asset dispositions and asset acquisitions (including giving *pro forma* effect to the application of proceeds of any asset disposition) that have been made by any Person that has become a Restricted Subsidiary or has been merged with or into the Parent Guarantor or any Restricted Subsidiary during such Reference Period and that would have constituted Asset Dispositions or Asset Acquisitions had such transactions occurred when such Person was a Restricted Subsidiary as if such asset dispositions or asset acquisitions were Asset Dispositions or Asset Acquisitions that occurred on the first day of such Reference Period;

*provided* that to the extent that clause (D) or (E) of this definition requires that *pro forma* effect be given to an Asset Acquisition or Asset Disposition (or asset acquisition or asset disposition), such *pro forma* calculation will be based upon the four full fiscal quarters immediately preceding the Transaction Date of the Person, or division or line of business of the Person, that is acquired or disposed for which financial information is available.

"**Future Subsidiary Guarantor**" has the meaning assigned to such term in Section 11.09.

11

"**GAAP**" means generally accepted accounting principles in India as in effect from time to time. All ratios and computations contained or referred to in this Indenture shall be computed in conformity with GAAP applied on a consistent basis.

"**Global Notes**" has the meaning assigned to such term in Section 2.04.

"**Government Securities**" means securities that are direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning. The term "Guarantor" means a Person who has provided a Guarantee.

"**Guarantee Period**" has the meaning assigned to such term in Section 10.09(c).

"**Guaranteed Indebtedness**" has the meaning assigned to such term in Section 4.10.

"**Hedging Obligation**" of any Person means the obligations of such Person pursuant to any Commodity Hedging Agreement, Currency Hedging Agreement or Interest Rate Hedging Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Note register.

"**IFRS**" means the International Financial Reporting Standards.

"**Incur**" means, with respect to any Indebtedness or Disqualified Stock, to incur, create, issue, assume, Guarantee or otherwise become liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness or Disqualified Stock; *provided* that (1) any Indebtedness and Disqualified Stock of a Person existing at the time such Person becomes a Restricted Subsidiary will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and (2) the accretion of original issue discount shall not be considered an Incurrence of Indebtedness. The terms "**Incurrence,**" "**Incurred**" and "**Incurring**" have meanings correlative with the foregoing.

12

"**Indebtedness**" means, with respect to any Person at any date of determination (without duplication):

(1)  all indebtedness of such Person for borrowed money;

(2)  all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)  all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments;

(4)  all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except Trade Payables;

(5)  all Capitalized Lease Obligations and Attributable Indebtedness;

(6)  all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided* that the amount of such Indebtedness shall be the lesser of (a) the Fair Market Value of such asset at such date of determination and (b) the amount of such Indebtedness;

(7)  all Indebtedness of other Persons Guaranteed by such Person to the extent such Indebtedness is Guaranteed by such Person;

(8)  to the extent not otherwise included in this definition, Hedging Obligations;

(9)  all Disqualified Stock issued by such Person valued at the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price plus accrued dividends; and

(10)  any Preferred Stock issued by (a) such Person, if such Person is a Restricted Subsidiary or (b) any Restricted Subsidiary of such Person valued at the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price plus accrued dividends.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation; *provided*

(1)  that the amount outstanding at any time of any Indebtedness issued with original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP;

(2)  that money borrowed and set aside at the time of the Incurrence of any Indebtedness in order to prefund the payment of the interest on such Indebtedness shall

13

not be deemed to be "**Indebtedness**" so long as such money is held to secure the payment of such interest; and

     (3)    that the amount of Indebtedness with respect to any Hedging Obligation shall be equal to the net amount payable if the Commodity Hedging Agreement, Currency Hedging Agreement or Interest Rate Hedging Agreement giving rise to such Hedging Obligation terminated at that time due to default by such Person.

For the avoidance of doubt, customer deposits and advance payments received in the ordinary course of business from customers for goods or services purchased in the ordinary course of business will not constitute Indebtedness.

"**Indenture**" means this indenture (including all Exhibits hereto) as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof.

"**India**" means the Republic of India.

"**Initial Non-Guarantor Subsidiaries**" means Rolta Thales Limited, Rolta Canada Ltd., Rolta Asia Pacific Pty Ltd., Rolta Benelux N.V., AT Solutions Group, LLC, Rolta Deutschland GmbH Germany and Rolta Saudi Arabia Ltd.

"**Initial Subsidiary Guarantors**" means Rolta Global B.V., Rolta International, Inc., Rolta Middle East FZ-LLC and Rolta U.K. Limited.

"**Intercompany Loans**" means each of (i) an intercompany note dated as of July 24, 2014 issued by Rolta Global B.V. to the Issuer, an intercompany note dated as of July 24, 2014 issued by Rolta International, Inc. to the Issuer, an intercompany note dated as of July 24, 2014 issued by Rolta U.K. Limited to the Issuer, and an intercompany note dated as of July 24, 2014 issued by Rolta Middle East FZ-LLC to the Issuer and (ii) any loan extended by the Issuer in U.S. Dollars with the Issuer as obligee, to lend the proceeds of the offering of the Notes or any Additional Notes to a Subsidiary Guarantor as obligor pursuant to intercompany loans (and any novation thereof), which will be at all times in the aggregate at a minimum for the aggregate principal amount of the Notes or Additional Notes then outstanding.

"**Interest Payment Date**" means January 24 and July 24 of each year, commencing January 24, 2015.

"**Interest Rate Hedging Agreement**" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement designed to protect against fluctuations in interest rates.

"**Interest Record Date**" means the date specified as the interest record date in the forms of the Notes attached hereto as Exhibits A, C and D.

14

"**Investment**" means:

(1)     any direct or indirect advance, loan or other extension of credit to another Person;

(2)     any capital contribution to another Person (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others);

(3)     any purchase or acquisition of Capital Stock (or options, warrants or other rights to acquire such Capital Stock), Indebtedness, bonds, notes, debentures or other similar instruments or securities issued by another Person; or

(4)     any Guarantee of any obligation of another Person.

For the purposes of the provisions of Sections 4.06 and 4.18, (1) the Parent Guarantor will be deemed to have made an Investment in an Unrestricted Subsidiary in an amount equal to the Fair Market Value of the Parent Guarantor's proportionate interest in the assets (net of the liabilities owed to any Person other than the Parent Guarantor or a Restricted Subsidiary and that are not Guaranteed by the Parent Guarantor or a Restricted Subsidiary) of a Restricted Subsidiary that is designated an Unrestricted Subsidiary calculated as of the time of such designation; (2) if the Parent Guarantor or any Subsidiary of the Parent Guarantor sells or otherwise disposes of any Investment of any direct or indirect Subsidiary of the Parent Guarantor such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Parent Guarantor, the Parent Guarantor will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Parent Guarantor's Investments in such Subsidiary that were not sold or disposed of; (3) the acquisition by the Parent Guarantor or any Subsidiary of the Parent Guarantor of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Parent Guarantor or such Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person; and (4) any property transferred to or from any Person shall be valued at its Fair Market Value at the time of such transfer, as determined in good faith by the Board of Directors.

"**Investment Grade**" means a rating of "AAA," "AA," "A" or "BBB," as modified by a "+" or "-" indication, or an equivalent rating representing one of the four highest rating categories, by S&P or any of its successors or assigns, or a rating of "Aaa," or "Aa," "A" or "Baa," as modified by a "1," "2" or "3" indication, or an equivalent rating representing one of the four highest rating categories, by Moody's or any of its successors or assigns, or a rating of "AAA," "AA," "A," "BBB," as modified by a "+" or "−" indication, or an equivalent rating representing one of the four highest rating categories, by Fitch or any of its successors or assigns, or the equivalent ratings of any internationally recognized rating agency or agencies, as the case may be, which shall have been designated by the Parent Guarantor as having been substituted for S&P, Moody's or Fitch or two or three of them, as the case may be.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to this Indenture.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Maximum Guaranteed Amount**" has the meaning assigned to such term in Section 10.10.

"**Measurement Date**" means May 16, 2013.

"**Moody's**" means Moody's Investors Service, Inc., a subsidiary of Moody's Corporation, and its successors.

"**Net Cash Proceeds**" means:

(1)     with respect to any Asset Sale (other than the issuance or sale of Capital Stock), the proceeds of such Asset Sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of:

(a)     brokerage commissions and other fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

(b)     provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(c)     payments made to repay Indebtedness or any other obligation outstanding at the time of such Asset Sale that either (x) is secured by a Lien on the property or assets sold or (y) is required to be paid as a result of such sale; and

(d)     appropriate amounts to be provided by the Parent Guarantor or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with GAAP and reflected in an Officers' Certificate delivered to the Trustee; and

(2)     with respect to any issuance or sale of Capital Stock, the proceeds of such issuance or sale in the form of cash or cash equivalents, including payments in respect of

16

deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"**Non-Guarantor Subsidiaries**" means the Initial Non-Guarantor Subsidiaries together with any future Restricted Subsidiary that does not provide a Subsidiary Guarantee.

"**Non-U.S. Person**" means a Person that is not a U.S. person, as defined in Regulation S.

"**Note Guarantee**" means any guarantee of the obligations of the Issuer under this Indenture and the Notes by any Note Guarantor.

"**Note Guarantors**" means the Parent Guarantor together with the Subsidiary Guarantors.

"**Notes**" has the meaning assigned to such term in the Recitals of this Indenture.

"**Offer to Purchase**" means an offer to purchase Notes by the Issuer from the Holders commenced by the Issuer mailing a notice by first class mail, postage prepaid, to the Trustee and each Holder at its last address appearing in the Note register stating:

(1)     the provision in this Indenture pursuant to which the offer is being made and that all Notes validly tendered will be accepted for payment on a pro rata basis;

(2)     the purchase price and the date of purchase (which shall be a Business Day no earlier than 30 days nor later than 60 days from the date such notice is mailed) (the "**Offer to Purchase Payment Date**");

(3)     that any Note not tendered will continue to accrue interest pursuant to its terms;

(4)     that, unless the Issuer defaults in the payment of the purchase price, any Note accepted for payment pursuant to the Offer to Purchase shall cease to accrue interest on and after the Offer to Purchase Payment Date;

(5)     that Holders electing to have a Note purchased pursuant to the Offer to Purchase will be required to surrender the Note, together with the form entitled "**Option of the Holder to Elect Purchase**" on the reverse side of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the Business Day immediately preceding the Offer to Purchase Payment Date;

(6)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the third Business Day immediately

preceding the Offer to Purchase Payment Date, a facsimile transmission or letter setting forth the name of such Holder, the principal amount of Notes delivered for purchase and a statement that such Holder is withdrawing his election to have such Notes purchased; and

(7)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered; *provided* that each Note purchased and each new Note issued shall be in a principal amount of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000.

One Business Day prior to the Offer to Purchase Payment Date, the Issuer shall deposit with the Paying Agent money sufficient to pay the purchase price of all Notes or portions thereof to be accepted by the Issuer for payment on the Offer to Purchase Payment Date. On the Offer to Purchase Payment Date, the Issuer shall (a) accept for payment on a *pro rata* basis Notes or portions thereof tendered pursuant to an Offer to Purchase; and (b) deliver, or cause to be delivered, to the Trustee all Notes or portions thereof so accepted together with an Officers' Certificate specifying the Notes or portions thereof accepted for payment by the Issuer. The Paying Agent shall promptly mail to the Holders of Notes so accepted payment in an amount equal to the purchase price, and upon receipt of written order of the Issuer signed by an Officer, the Trustee shall promptly authenticate and mail to such Holders a new Note equal in principal amount to any unpurchased portion of the Note surrendered; *provided* that each Note purchased and each new Note issued shall be in a principal amount of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000. The Issuer will publicly announce the results of an Offer to Purchase as soon as practicable after the Offer to Purchase Payment Date. The Issuer will comply with Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable, in the event that the Issuer is required to repurchase Notes pursuant to an Offer to Purchase.

The offer is required to contain or incorporate by reference information concerning the business of the Parent Guarantor and its Subsidiaries which the Parent Guarantor in good faith believes will assist such Holders to make an informed decision with respect to the Offer to Purchase, including a brief description of the events requiring the Issuer to make the Offer to Purchase, and any other information required by applicable law to be included therein. The offer is required to contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Offer to Purchase.

"**Officer**" means one of the executive officers of the Parent Guarantor or, in the case of a Restricted Subsidiary, one of the directors or officers of such Restricted Subsidiary.

"**Officers' Certificate**" means a certificate signed by two Officers; *provided* that, with respect to any Subsidiary Guarantor having only one Officer, an "**Officers' Certificate**" means a certificate signed by such Officer.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 316 of 739

"**Opinion of Counsel**" means a written opinion from external legal counsel selected by the Parent Guarantor, *provided* that such counsel will be acceptable to the Trustee in its sole discretion.

"**Original Issue Date**" means the date on which the Notes are originally issued under this Indenture.

"**outstanding**" when used with respect to the Notes means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(1)     Notes theretofore cancelled by the Paying and Transfer Agent or accepted by the Paying and Transfer Agent for cancellation;

(2)     Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying and Transfer Agent in trust for the Holders of such Notes; *provided* that, if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor reasonably satisfactory to the Trustee has been made; and

(3)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

A Note does not cease to be outstanding because the Issuer or any Affiliate of the Issuer holds the Note; *provided* that in determining whether the Holders of the requisite amount of outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, Notes owned by the Issuer or any Affiliate of the Issuer or beneficially held for the Issuer or an Affiliate of the Issuer shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such request, demand, authorization, direction, notice, consent or waiver, only Notes for which the Trustee has received an Officers' Certificate from the Issuer or an Affiliate of the Issuer evidencing such ownership or beneficial holding shall be so disregarded. Notes so owned or beneficially held that have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the reasonable satisfaction of the Trustee the pledgee's right to act with respect to such Notes and that the pledgee is not the Issuer or an Affiliate of the Issuer.

"**Parent Guaranteed Amount**" has the meaning assigned to such term in Section 10.10.

"**Paying and Transfer Agent**" shall mean Citibank, N.A., London Branch.

"**Payment Date**" has the meaning assigned to such term in Section 4.01(a).

"**Permitted Businesses**" means any business which is the same as or ancillary or complementary to any of the businesses of the Parent Guarantor and the Restricted Subsidiaries on the Original Issue Date.

19

"**Permitted Indebtedness**" has the meaning assigned to such term in Section 4.05(b).

"**Permitted Investment**" means:

(1)    any Investment in the Issuer or a Note Guarantor that is primarily engaged in a Permitted Business or a Person which will, upon the making of such Investment, become a Note Guarantor that is primarily engaged in a Permitted Business or will be merged or consolidated with or into, or transfer or convey all or substantially all its assets to, the Issuer or a Note Guarantor that is primarily engaged in a Permitted Business;

(2)    cash or Temporary Cash Investments;

(3)    payroll, travel and similar advances made in the ordinary course of business to cover matters that are expected at the time of such advances ultimately to be treated as expenses in accordance with GAAP;

(4)    stock, obligations or securities received in satisfaction of judgments;

(5)    any Investment pursuant to a Hedging Obligation designed solely to protect any Note Guarantor against fluctuations in commodity prices, interest rates or foreign currency exchange rates;

(6)    receivables, trade credits or other current assets owing to the Parent Guarantor or any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(7)    Investments consisting of consideration received in connection with an Asset Sale under Section 4.13(a)(iv)(B), and made in compliance with, Section 4.13;

(8)    pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "**Permitted Liens**";

(9)    purchases and acquisitions of inventory, supplies, material or equipment from suppliers or vendors in the ordinary course of the Permitted Business;

(10)    Investments in existence on the Measurement Date; and

(11)    repurchases of the Notes.

"**Permitted Liens**" means:

(1)    Liens for taxes, assessments, governmental charges or claims that are being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made;

(2)     statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made;

(3)     Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money);

(4)     leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(5)     Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person (i) becomes a Restricted Subsidiary or (ii) is merged with or into or consolidated with the Parent Guarantor or any Restricted Subsidiary; *provided* that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets of such Person (if such Person becomes a Restricted Subsidiary) or the property or assets acquired by the Parent Guarantor or such Restricted Subsidiary (if such Person is merged with or into or consolidated with the Parent Guarantor or such Restricted Subsidiary); *provided further* that such Liens were not created in contemplation of or in connection with the transactions or series of transactions pursuant to which such Person became a Restricted Subsidiary;

(6)     Liens in favor of the Issuer or any Note Guarantor;

(7)     Liens arising from the rendering of a final judgment or order against the Parent Guarantor or any Restricted Subsidiary that do not give rise to an Event of Default;

(8)     Liens securing reimbursement obligations with respect to letters of credit, performance and surety bonds and completion guarantees that encumber documents and other property relating to such letters of credit and the products and proceeds thereof;

(9)     Liens existing on the Original Issue Date;

(10)     Liens securing Indebtedness which is Incurred to refinance Secured Indebtedness which is permitted to be Incurred under Section 4.05(b)(iv), *provided* that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 319 of 739

(11)     Liens securing Hedging Obligations permitted to be Incurred under Section 4.05(b)(v), *provided* that (i) Indebtedness relating to any such Hedging Obligation is, and is permitted under the covenant described under Section 4.07 to be, secured by a Lien on the same property securing such Hedging Obligation or (ii) such Liens are encumbering customary initial deposits or margin deposits or are otherwise within the general parameters customary in the industry and incurred in the ordinary course of business;

(12)     Liens securing Attributable Indebtedness permitted to be Incurred under this Indenture;

(13)     Liens securing indebtedness permitted to be Incurred under Section 4.05(b)(xii), *provided* that (a) any such Lien is created prior to, at the time of or within 30 days after entering into the agreement underlying such Indebtedness and (b) the aggregate book of property and assets (as reflected in the most recently available consolidated financial statements of the Parent Guarantor or, if any such property and assets have been acquired since the date of such financial statements, the cost of such property and assets) subject to Liens incurred pursuant to this clause (13) does not exceed the aggregate principal amount of Indebtedness Incurred pursuant to Section 4.05(b)(xii);

(14)     Liens securing Indebtedness permitted under Section 4.05(b)(xvi), *provided* that (i) such Liens extend to or cover only the equipment, property or asset whose purchase, or the personal property whose development, construction or improvement, is to be financed with such Indebtedness, as the case may be; (ii) such Liens are Incurred in the ordinary course of business of the Parent Guarantor and its Restricted Subsidiaries; (iii) such Liens are created no later than 90 days after the acquisition of such equipment, property or asset or the completion of development, construction or improvement of such personal property, as the case may be; and (iv) the aggregate book value of property and assets (as reflected in the most recently available consolidated financial statements of the Parent Guarantor, or, if any such property and assets have been acquired since the date of such financial statements, the cost of such property and assets) subject to Liens Incurred pursuant to this clause (14) does not exceed the aggregate principal amount of Indebtedness Incurred pursuant to Section 4.05(b)(xvi);

(15)     Liens under the Security Documents;

(16)     Liens securing Permitted Priority Indebtedness;

(17)     survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, leases, sewers, electric lines, gas lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(18)     security given in the ordinary course of business (and not in connection with the borrowing of money or the obtaining of credit) to a public utility or any

22

municipality or governmental or other public authority when required by such utility or municipality or governmental or other authority in connection with the operations of the Parent Guarantor and its Restricted Subsidiaries;

(19) Liens incurred or pledges or deposits made in the ordinary course of the Permitted Business in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits;

(20) Liens arising out of conditional sale, title retention consignment or similar arrangements for the sale of goods entered into by the Parent Guarantor or any of its Restricted Subsidiaries in the ordinary course of the Permitted Business in accordance with past practice;

(21) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by the Parent Guarantor granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts, netting arrangements or sweep accounts; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (directly or indirectly) the repayment of any Indebtedness;

(22) Liens relating to purchase orders and other agreements entered into with customers of the Parent Guarantor or any of its Restricted Subsidiaries in the ordinary course of business;

(23) leases and licenses of intellectual property that do not materially interfere with the ordinary course of the Permitted Business of the Parent Guarantor and the Restricted Subsidiaries, taken as a whole;

(24) Liens on Capital Stock or other securities or assets of any Unrestricted Subsidiary that secure obligations of such Unrestricted Subsidiary;

(25) the filing of UCC financing statements solely as a precautionary measure;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27) Liens on equipment of the Parent Guarantor or any Restricted Subsidiary and located on the premises of any client or supplier in the ordinary course of the Permitted Business;

(28) Liens on assets or securities deemed to arise in connection with and solely as a result of the execution, delivery or performance of contracts to sell such assets or securities if such sale is otherwise permitted by this Indenture;

23

(29)    Liens in connection with any disposition of Capital Stock of a Restricted Subsidiary pursuant to Indian regulatory or shareholding requirements, including, without limitation, the ability to invest proceeds received from the disposition of such Capital Stock to create an escrow account, the ability to pass the control of such escrow account to a third party and the entry into put or call arrangements with third parties;

(30)    Liens of a collection bank arising under Section 4-210 of the New York Uniform Commercial Code on items in the course of collection in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) within general parameters customary in the banking industry;

(31)    Liens on assets pursuant to merger agreements, stock or asset purchase agreements and similar agreements in respect of the disposition of such assets;

(32)    Liens in connection with the defeasance, discharge or redemption of Indebtedness of the Parent Guarantor or any of its Restricted Subsidiaries; and

(33)    Liens securing obligations in an aggregate principal amount not to exceed US$2.5 million (or the Dollar Equivalent thereof) at any one time outstanding,

*provided* that, with respect to the Collateral, "**Permitted Liens**" will refer only to the Liens described in clauses (1), (2), (9), (10), (15) and (17) of this definition.

"**Permitted Priority Indebtedness**" means any Priority Indebtedness; *provided* that, on the date of Incurrence of such Indebtedness, and after giving effect thereto and the application of the proceeds thereof, the Consolidated Priority Indebtedness Leverage Ratio would be no greater than  (i) 0.45 to 1.0 with respect to any Incurrence of Indebtedness prior to May 16, 2016 and (iii) 0.40 to 1.0 with respect to any Incurrence of Indebtedness thereafter.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Pledge and Security Agreement**" means that certain agreement dated as of July 24, 2014, among Rolta Americas LLC, Rolta International, Inc., Rolta U.K. Limited, Rolta Middle East FZ-LLC, Rolta Global B.V. the Trustee and the Security Agent.

"**Preferred Stock**" as applied to the Capital Stock of any Person means Capital Stock of any class or classes that by its term is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"**Principal Office**" means the office of the principal Paying and Transfer Agent at which the business of the principal Paying and Transfer Agent is principally administered, which at the date of this Indenture is located at Citibank, N.A., London Branch c/o Citibank, N.A., Dublin Branch, One North Wall Quay, Dublin 1, Ireland.

24

"**principal**" of any Indebtedness means the principal amount of such Indebtedness (or if such Indebtedness was issued with original issue discount, the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness), together with, unless the context otherwise indicates, any premium then payable on such Indebtedness.

"**Priority Indebtedness**" means any Indebtedness (a) of any Restricted Subsidiary (other than a Subsidiary Guarantor or the Issuer) other than Indebtedness Incurred under Section 4.05(b)(iii) that continues to be classified under such clause of Section 4.05,(b) Indebtedness (only in the form of bonds, notes or other similar instruments that are issued in the capital markets) of the Issuer or a Note Guarantor secured only be a Lien on intercompany loans of the proceeds of such Indebtedness and (c) any Secured Indebtedness of the Issuer or a Note Guarantor, other than the Notes (including any Additional Notes) and Indebtedness Incurred under Section 4.05(b)(iii) that continues to be classified under such clause of Section 4.05, *provided* that Priority Indebtedness shall not include the 2013 Notes.

"**QIB**" has the meaning assigned to such term in Section 2.04(c).

"**Rating Agencies**" means (1) S&P, (2) Moody's and (3) Fitch; *provided* that if S&P, Moody's, Fitch, two of any of the three or all three of them shall not make a rating of the Notes publicly available, one or more nationally recognized statistical rating organizations (as defined in Section 3(a)(62) under the Exchange Act), as the case may be, selected by the Parent Guarantor, which shall be substituted for S&P, Moody's, Fitch, two of any of the three or all three of them, as the case may be.

"**Rating Category**" means (1) with respect to S&P, any of the following categories: "BB," "B," "CCC," "CC," "C" and "D" (or equivalent successor categories); (2) with respect to Moody's, any of the following categories: "Ba," "B," "Caa," "Ca," "C" and "D" (or equivalent successor categories); (3) with respect to Fitch, any of the following categories: "BB," "B," "CCC," "CC," "C" and "D" (or equivalent successor categories); and (4) the equivalent of any such category of S&P, Moody's or Fitch used by another Rating Agency. In determining whether the rating of the Notes has decreased by one or more gradations, gradations within Rating Categories ("+" and "-" for S&P; and "1," "2" and "3" for Moody's; "+" and "-" for Fitch; or the equivalent gradations for another Rating Agency) will be taken into account (e.g., with respect to S&P, a decline in a rating from "BB+" to "BB," as well as from "BB-" to "B+," will constitute a decrease of one gradation).

"**Rating Date**" means in connection with actions contemplated under Section 5.01 that date which is 90 days prior to the earlier of (x) the occurrence of any such actions as set forth therein and (y) a public notice of the occurrence of any such actions.

"**Rating Decline**" means in connection with actions contemplated under Section 5.01 the notification by any of the Rating Agencies that such proposed actions will result in any of the events listed below:

(a)    in the event the Notes are rated by all three of the Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by any two of the three Rating Agencies will be below Investment Grade;

(b)    in the event the Notes are rated by any two, but not all three, of the three Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by any of such two Rating Agencies will be below Investment Grade;

(c)    in the event the Notes are rated by one, and only one, of the three Rating Agencies on the Rating Date as Investment Grade, the rating of the Notes by such Rating Agency will be below Investment Grade; or

(d)    in the event the Notes are rated below Investment Grade by all three of the Rating Agencies on the Rating Date, the rating of the Notes by any Rating Agency will be decreased by one or more gradations (including gradations within Rating Categories as well as between Rating Categories).

"**RBI**" means the Reserve Bank of India.

"**Recognized Exchange**" means the Bombay Stock Exchange Limited, National Stock Exchange of India Limited, the London Stock Exchange, the New York Stock Exchange and the Nasdaq National Market.

"**Reference Treasury Dealer**" means each of any three investment banks of recognized standing that is a primary U.S. Government securities dealer in The City of New York, selected by the Parent Guarantor in good faith.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any redemption date, the average as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Trustee by such Reference Treasury Dealer at 5:00 p.m. (New York City Time) on the third Business Day preceding such redemption date.

"**Register**" has the meaning assigned to such term in Section 2.05.

"**Registrar**" has the meaning assigned to such term in Section 2.05.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Global Note**" has the meaning assigned to such term in Section 2.04(c).

"**Relevant Jurisdiction**" has the meaning assigned to such term in Section 4.21(a).

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 4.21(a).

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 324 of 739

"**Replacement Assets**" has the meaning assigned to such term in Section 4.13(b)(ii).

"**Restricted Certificated Note**" has the meaning assigned to such term in Section 2.04(d).

"**Restricted Global Note**" has the meaning assigned to such term in Section 2.04(c).

"**Restricted Payments**" has the meaning assigned to such term in Section 4.06.

"**Restricted Subsidiary**" means any Subsidiary of the Parent Guarantor other than an Unrestricted Subsidiary.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**SGX-ST**" has the meaning assigned to such term in Section 4.02(c).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"**Sale and Leaseback Transaction**" means any direct or indirect arrangement relating to property (whether real, personal or mixed), now owned or hereafter acquired whereby the Parent Guarantor or any Restricted Subsidiary transfers such property to another Person and the Parent Guarantor or any Restricted Subsidiary leases it from such Person.

"**Secured Indebtedness**" means any Indebtedness of the Parent Guarantor or a Restricted Subsidiary secured by a Lien.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" has the meaning assigned to such term in Section 2.04(d).

"**Security Agent**" means a security agent appointed by the Trustee to hold the Collateral on its behalf and on behalf of the Holders under the Security Documents pursuant to the terms thereof, the appointment of which is authorized by the Holders hereunder, which shall initially be Citicorp International Limited.

"**Security Documents**" means the Pledge and Security Agreement and all security agreements, pledge agreements, assignments, mortgages, deeds of trust, security trustee, intercreditor or collateral agency agreements, control agreements or other grants or transfers of security executed and delivered by the Issuer, the Note Guarantors or any other Pledgor creating (or purporting to create) a Lien upon the Collateral in favor of the Security Agent, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "**significant subsidiary**" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated under the Securities Act, as such regulation is in effect on the Original Issue Date.

"**Stated Maturity**" means, (1) with respect to any Indebtedness, the date specified in such debt security as the fixed date on which the final installment of principal of such Indebtedness is due and payable as set forth in the documentation governing such Indebtedness and (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness.

"**Subordinated Indebtedness**" means any Indebtedness of the Issuer or any Note Guarantor that is contractually subordinated or junior in right of payment to the Notes or to any Note Guarantee, as applicable, pursuant to a written agreement to such effect.

"**Subsidiary**" means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person.

"**Subsidiary Guarantee**" means any Guarantee of the obligations of the Issuer under this Indenture and the Notes by any Subsidiary Guarantor.

"**Subsidiary Guarantor**" means the Initial Subsidiary Guarantors and any other Restricted Subsidiary that Guarantees the obligations of the Issuer under this Indenture and the Notes; *provided* that "**Subsidiary Guarantor**" does not include any Person whose Subsidiary Guarantee has been released in accordance with this Indenture and the Notes.

"**Surviving Person**" has the meaning assigned to such term in Section 5.01(a).

"**Tax Redemption Date**" has the meaning assigned to such term in Section 3.01.

"**Taxes**" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities.

"**Temporary Cash Investment**" means any of the following:

(1)     United States dollars, Indian rupees, Euros or, in the case of any Restricted Subsidiary, local currencies held by such Restricted Subsidiaries from time to time in the ordinary course of the Permitted Business;

(2)     direct obligations of the United States of America, Canada, a member of the European Union or the Republic of India or, in each case, any agency of either of the foregoing or obligations fully and unconditionally Guaranteed by the United States of America or any agency of either of the foregoing, in each case maturing within one year;

(3)    demand or time deposit accounts, certificates of deposit and money market deposits maturing within 365 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, the United Kingdom or India and which bank or trust company has capital, surplus and undivided profits aggregating in excess of US$100.0 million (or the Dollar Equivalent thereof) and has outstanding debt which is rated "**A**" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Section 3(a)(62) under the Exchange Act);

(4)    repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (2) above entered into with a bank or trust company meeting the qualifications described in clause (3) above;

(5)    commercial paper, maturing not more than 180 days after the date of acquisition thereof, issued by a corporation (other than an Affiliate of the Parent Guarantor) organized and in existence under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P or Fitch;

(6)    securities with maturities of six months or less from the date of acquisition thereof, issued or fully and unconditionally Guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "**A**" by S&P, Moody's or Fitch;

(7)    any money market fund that has at least 95.0% of its assets continuously invested in investments of the types described in clauses (1) through (5) above; and

(8)    demand or time deposit accounts, certificates of deposit and money market deposits with (i) State Bank of India, ICICI Bank or Axis Bank, (ii) Union Bank of India, (iii) any other bank or trust company organized under the laws of the India whose long-term debt is rated by Moody's, S&P or Fitch as high or higher than any of those banks listed in clause (i) of this paragraph or (iv) any other bank organized under the laws of the India; *provided* that, in the case of clause (iv), such deposits do not exceed US$2.5 million (or the Dollar Equivalent thereof) with any single bank or US$5.0 million (or the Dollar Equivalent thereof) in the aggregate, at any date of determination thereafter.

"**Total Assets**" means, as of any date, the total consolidated assets of the Parent Guarantor and its Restricted Subsidiaries measured in accordance with GAAP as of the last date of the most recent fiscal quarter for which consolidated financial statements of the Parent Guarantor (which the Parent Guarantor will use its best efforts to compile in a timely manner) are available (which may be internal consolidated financial statements).

"**Trade Payables**" means, with respect to any Person, any accounts payable or any other indebtedness or monetary obligation to trade creditors created, assumed or Guaranteed by such Person or any of its Subsidiaries arising in the ordinary course of

business in connection with the acquisition of goods or services and payable within 90 Business Days.

"**Transaction Date**" means, with respect to the Incurrence of any Indebtedness, the date such Indebtedness is to be Incurred and, with respect to any Restricted Payment, the date such Restricted Payment is to be made.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**Trust Indenture Act**" has the meaning assigned to such term in Section 13.02.

"**Unrestricted Subsidiary**" means (1) any Subsidiary of the Parent Guarantor that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided in this Indenture and (2) any Subsidiary of an Unrestricted Subsidiary.

"**U.S. Government Obligations**" means securities that are (1) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally Guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof at any time prior to the Stated Maturity of the Notes, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Obligation or a specific payment of interest on or principal of any such U.S. Government Obligation held by such custodian for the account of the holder of a depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of interest on or principal of the U.S. Government Obligation evidenced by such depository receipt.

"**U.S. Person**" has the meaning assigned to such term in Regulation S.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"**Wholly Owned**" means, with respect to any Restricted Subsidiary, the ownership of all of the outstanding Capital Stock of such Subsidiary (other than any director's qualifying shares or Investments by foreign nationals mandated by applicable law) by the Parent Guarantor or one or more Wholly Owned Subsidiaries of the Parent Guarantor.

Section 1.02. *Rules of Construction.* Unless the context otherwise requires or except as otherwise expressly provided,

(a)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(b)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(c)    all references to any Person include the successors and permitted assigns of that Person;

(d)    all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated; and

(e)    references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended, modified or supplemented from time to time (or to successor statutes and regulations).

## ARTICLE 2
### ISSUE, EXECUTION, FORM AND REGISTRATION OF NOTES

Section 2.01.    *Authentication and Delivery of Notes and Note Guarantees*.  Upon the execution and delivery of this Indenture, or from time to time thereafter, Notes may be executed and delivered by the Issuer in an aggregate principal amount outstanding of not more than US$300,000,000 (other than Notes issued pursuant to Section 2.08 or Section 2.09) to the Trustee for authentication, accompanied by an Officers' Certificate of the Issuer directing such authentication and specifying the amount of Notes to be authenticated, the applicable rate at which interest will accrue on such Notes, the date on which the original issuance of such Notes is to be authenticated, the date from which interest will begin to accrue, the date or dates on which interest on such Notes will be payable and the date on which the principal of such Notes will be payable and other terms relating to such Notes and the Note Guarantees.  The Trustee shall thereupon authenticate and deliver such Notes to or upon the written order of the Issuer (as set forth in such Officers' Certificate) signed by two Authorized Officers.

The Trustee shall have the right to decline to authenticate and deliver any Notes under this Section if the Trustee reasonably determines that such action may not lawfully be taken or if the Trustee reasonably determines that such action would expose the Trustee to personal liability, unless indemnity and/or security satisfactory to the Trustee, as applicable, against such liability is provided to the Trustee, as applicable.

Section 2.02.    *Execution of Notes and Note Guarantees*.  (a) The Notes shall be executed by or on behalf of the Issuer by the signature of an Authorized Officer of the Issuer. Each Note Guarantor shall execute its Note Guarantee by the signature of an Authorized Officer of such Note Guarantor.  Such signatures may be the manual or facsimile signature of the present or any future Authorized Officers. With the delivery of this Indenture, the Issuer and each initial Note Guarantor is furnishing, and from time to time thereafter, the Issuer and each Note Guarantor may furnish to both the Trustee, a certificate substantially in the form of Exhibits E-1 and E-2 (an "**Authorization**

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 329 of 739

**Certificate**") identifying and certifying the incumbency and specimen (or facsimile) signatures of the Authorized Officers. Until the Trustee receives a subsequent Authorization Certificate, the Trustee shall be entitled to conclusively rely on the last Authorization Certificate delivered to them for purposes of determining the Authorized Officers. Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note which has been duly authenticated and delivered by or on behalf of the Trustee.

(b)     In case the Authorized Officers who shall have signed any of the Notes or any of the Note Guarantees, as applicable, shall cease to be such Authorized Officers before the Note shall be authenticated and delivered by or on behalf of the Trustee or disposed of by or on behalf of the Issuer, such Note and Note Guarantee nevertheless may be authenticated and delivered or disposed of as though the Persons who signed such Note and the Note Guarantees had not ceased to be such Authorized Officers; and any Note may be signed on behalf of the Issuer, and any Note Guarantee may be signed on behalf of the Note Guarantors, by such Persons as, at the actual date of the execution of such Note and Note Guarantee, shall be Authorized Officers, although at the date of the execution and delivery of this Indenture any such Persons were not Authorized Officers.

Section 2.03.   *Certificate of Authentication*.  Only such Notes as shall bear thereon a certification of authentication substantially as set forth in the forms of the Notes in Exhibits A, C and D hereto, executed by the Trustee by manual signature of one of its authorized signatories, shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certification by the Trustee upon any Note executed by or on behalf of the Issuer shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits of this Indenture.

Section 2.04.   *Form, Denomination and Date of Notes; Payments*.  (a) The Notes, the Note Guarantees and the certificates of authentication shall be substantially in the form set forth in Exhibits A, C, D, M and N hereof.  On the Original Issue Date, the Notes shall be issued in the form provided in Section 2.04(c). The Notes shall be numbered, lettered, or otherwise distinguished in such manner or in accordance with the instructions set forth in the applicable Officers' Certificate and delivered by the Authorized Officers of the Issuer executing the same with the approval of the Trustee.

The Notes may be issued with appropriate insertions, omissions, substitutions and variations, and may have imprinted or otherwise reproduced thereon such legend or legends, not inconsistent with the provisions of this Indenture, as may be required to comply with any law or with any rules or regulations pursuant thereto, with the rules of any securities market in which the Notes are admitted to trading, or to conform to general usage.

(b)     Each Note shall be dated the date of its authentication.  Each Note shall bear interest from the date of issuance thereof or from the most recent Interest Payment Date to which interest has been paid or duly provided for and shall be payable on the dates specified on the face of the form of Note set forth as Exhibits A, C and D hereto.  Interest

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 330 of 739

on the Notes shall be calculated on the basis of a 360-day year comprised of twelve 30-day months.

(c)     On the Original Issue Date, an appropriate Authorized Officer will execute and deliver to the Trustee (i) for Notes sold within the United States to "qualified institutional buyers" as defined in and pursuant to Rule 144A (each, a "**QIB**"), one or more restricted global Notes (each, a "**Restricted Global Note**"), in definitive, fully registered form without interest coupons, in a denomination of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000, substantially in the form of Exhibit C hereto; and (ii) for Notes sold outside the United States in offshore transactions in reliance on Regulation S, one or more Regulation S global Notes (each, a "**Regulation S Global Note**" and, together with the Restricted Global Note(s), "**Global Notes**"), in definitive, fully registered form without interest coupons, in a denomination of US$200,000 or any amount in excess thereof which is an integral multiple of US$1,000, substantially in the form of Exhibit D hereto. All such Global Notes so executed and delivered to the Trustee pursuant to clauses (i) and (ii) of this subsection (c) shall be in an aggregate principal amount that shall equal the aggregate principal amount of the Notes that are to be issued on the Original Issue Date.  The aggregate principal amount of the Restricted Global Notes and the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Custodian for the Depositary or its nominee, as hereinafter provided.

(d)     Each Restricted Global Note, each restricted Certificated Note issued in exchange for interests in the Restricted Global Note ("**Restricted Certificated Note**") shall bear the legends as set forth below, unless such Note has been sold pursuant to a registration statement that has been declared effective under the Securities Act:

The Restricted Global Note shall bear the following legend (the "**Securities Act Legend**") on the face thereof:

"THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH

33

RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS."

Each Global Note (i) shall be delivered by or on behalf of the Trustee to DTC acting as the Depositary or, pursuant to DTC's instructions, shall be delivered by or on behalf of the Trustee on behalf of DTC to and deposited with the Custodian, and in either case shall be registered in the name of Cede & Co., or such other name as DTC shall specify, and (ii) shall also bear a legend substantially to the following effect:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE."

Global Notes may be deposited with such other Depositary that is a clearing agency registered under the Exchange Act as the Issuer may from time to time designate in writing to the Trustee, and shall bear such legend as may be appropriate.

(e)     If at any time the Depositary notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Notes or if at any time the Depositary shall no longer be a clearing agency registered under the Exchange Act, the Issuer shall appoint a successor Depositary with respect to such Global Notes. If (i) a successor Depositary for such Global Notes is not appointed by the Issuer within 90 days after the Issuer receives such notice or becomes aware of such ineligibility, or (ii) an Event of Default has occurred and is continuing with respect to the Notes, the Issuer will execute, and the Trustee, upon receipt by the Trustee of an Officers' Certificate of the Issuer directing the authentication and delivery thereof, will authenticate and deliver, Certificated Notes (which may bear the Securities Act Legend) in any authorized denominations in an aggregate principal amount equal to the principal amount of such Global Notes in exchange for such Global Notes. Persons exchanging interests in the Global Notes for Certificated Notes will be required to provide to the Registrar, through the relevant clearing system, written instructions and other information required by the Issuer and the Registrar to complete, execute and deliver such Certificated Notes.

(f)     Global Notes shall in all respects be entitled to the same benefits under this Indenture as Certificated Notes authenticated and delivered hereunder.

(g)     The Person in whose name any Note is registered at the close of business on any Interest Record Date with respect to any Interest Payment Date shall be entitled to receive the interest, if any, payable on such Interest Payment Date notwithstanding any transfer or exchange of such Note subsequent to the Interest Record Date and prior to such Interest Payment Date.

Section 2.05.  *Registration, Transfer and Exchange*.  The Notes are issuable only in registered form.  The Issuer will keep at the office or agency to be maintained for the purpose as provided in Section 4.02 (the "**Registrar**"), a register (the "**Register**") in which, subject to such reasonable regulations as it may prescribe, it will register, and will register the transfers of, Notes as provided in this Article 2.  Citigroup Global Markets Deutschland AG has been appointed as the initial Registrar.  The name and address of the

35

registered holder of each Note and the amount of each Note will be recorded in the Register. Such Register shall be in written form in the English language or in any other form capable of being converted into such form within a reasonable time. Such Register shall be open for inspection by or on behalf of the Trustee during normal business hours upon prior written request. The Registrar shall provide a copy of the updated Register every quarter to the Issuer.

Upon due presentation for registration of transfer of any Note, the Issuer shall execute and the Trustee shall authenticate and deliver in the name of the transferee or transferees a new Note or Notes in authorized denominations for a like aggregate principal amount.

A Holder may register the transfer of a Note only by written application to the Registrar stating the name of the proposed transferee and otherwise complying with the terms of this Indenture. No such registration of transfer shall be effected until, and such transferee shall succeed to the rights of a Holder only upon, final acceptance and registration of the transfer by the Registrar in the Register. Prior to the registration of any transfer by a Holder as provided herein, the Issuer, the Trustee and any agent of any of them shall treat the Person in whose name the Note is registered as the owner thereof for all purposes whether or not the Note shall be overdue, and neither the Issuer, the Trustee, nor any such agent shall be affected by notice to the contrary. Furthermore, any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by the Depositary, Euroclear and Clearstream and that ownership of a beneficial interest in the Note shall be required to be reflected in a book entry. At the option of such Holder, Notes may be exchanged for other Notes of any authorized denomination and of a like aggregate principal amount, upon surrender of the Notes to be exchanged to the Registrar. When Notes are presented to the Registrar with a request to register the transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or make the exchange as requested if the requirements for such transactions set forth herein are met. To permit registrations of transfers and exchanges, the Issuer and each Note Guarantor shall execute and the Trustee shall authenticate Notes at the Registrar's request.

Every Note presented or surrendered for registration of transfer or for exchange shall (if so required by the Issuer or the Registrar) be duly endorsed, or be accompanied by a written instrument of transfer duly executed, by the Holder thereof or his attorney duly authorized in writing in a form satisfactory to the Issuer and the Registrar.

The Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any exchange or registration of transfer of Notes (other than any such transfer taxes or other similar governmental charge payable upon exchanges). No service charge to any Holder shall be made for any such transaction.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 334 of 739

The Issuer shall not be required to exchange or register a transfer of (1) any Notes for a period of 15 days immediately preceding the first mailing of notice of redemption of Notes to be redeemed or (2) any Notes called or being called for redemption.

All Notes issued upon any transfer or exchange of Notes shall be valid obligations of the Issuer, evidencing the same debt and entitled to the same benefits under this Indenture, as the Notes surrendered upon such transfer or exchange.

Claims against the Issuer for the payment of principal of, premium, if any, or interest on the Notes will become void unless presentation for payment is made as required in this Indenture within a period of six years.

Section 2.06. *Book-entry Provisions for Global Notes*. (a) Each Restricted Global Note initially shall (i) be registered in the name of a nominee of the Depositary, (ii) be delivered to the Custodian on behalf of the Depositary and (iii) bear the Securities Act Legend. Each Regulation S Global Note initially shall (i) be registered in the name of a nominee for the Depositary and (ii) be delivered to the Custodian on behalf of the Depositary. Interests in the Regulation S Global Notes may be held by any member of, or participants in, the Depositary, including Euroclear and Clearstream (collectively, the "**Agent Members**").

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, or the Custodian, or under the Global Notes, and the Depositary may be treated by the Issuer, the Trustee and any agent of any of them as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of any of them, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

(b)     Except as provided in Section 2.07, transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to the Depositary, its successors or their respective nominees. Interests of beneficial owners in a Global Note may be transferred, and transfers increasing or decreasing the aggregate principal amount of Global Notes may be conducted only in accordance with the rules and procedures of the Depositary and, to the extent relevant, the provisions of Section 2.07. In addition, Certificated Notes shall be transferred to all beneficial owners in exchange for their beneficial interests in any Restricted Global Note or Regulation S Global Note, respectively, only under the circumstances set forth in Section 2.04(e).

(c)     Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(d)     In connection with the transfer of an entire Restricted Global Note or Regulation S Global Note to beneficial owners pursuant to Section 2.06(b), the Restricted Global Note or Regulation S Global Note, as the case may be, shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by the Depositary in exchange for its beneficial interest in such Restricted Global Note or Regulation S Global Note, as the case may be, an equal aggregate principal amount of Certificated Notes of authorized denominations.

(e)     Any Certificated Note delivered in exchange for an interest in a Restricted Global Note pursuant to Section 2.06(b) or (d) shall, except as otherwise provided by Section 2.07(d), bear the legends in accordance with Section 2.07(d).

(f)     The registered holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

Section 2.07.  *Special Transfer Provisions*.  Unless and until the Securities Act Legend is removed from a Certificated Note or Restricted Global Note pursuant to Section 2.07(d) below, the following additional provisions shall apply to the proposed transfer, exchange or replacement of Certificated Notes or, to the extent relevant to the Trustee, the Paying and Transfer Agent, the Registrar or the Depositary, any beneficial interest in a Global Note:

(a)     Transfers to Qualified Institutional Buyers.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note (or interest in a Global Note) to a QIB:

(i)     The Registrar shall register the transfer of any Certificated Note containing the Securities Act Legend if (x) the requested transfer is after the time period referred to in Rule 144 under the Securities Act as in effect with respect to such transfer or (y) such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Issuer, the Paying and Transfer Agent and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the transfer notice provided for on the form of Note in substantially the form of Exhibit B.

(ii)     If the Note to be transferred is a Certificated Note containing the Securities Act Legend and the proposed transferee is an Agent Member holding such interest on behalf of a QIB, upon receipt by the Registrar of (x) the documents referred to in Section 2.07(a)(i) above (if such transfer is pursuant to clause (y) of Section 2.07(a)(i) above) and (y) instructions given in accordance with the Depositary's and the Registrar's procedures, the Registrar shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Restricted Global Note in an amount equal to the principal amount

38

of the Certificated Note to be transferred and the Paying and Transfer Agent shall cancel the Certificated Note so transferred.

(iii) Subject to the rules and procedures of the Depositary, if the proposed interest to be transferred is an interest in the Restricted Global Note, (x) such transfer may be effected only through the book-entry system maintained by the Depositary in compliance with the applicable provisions of the Securities Act Legend and (y) the transferee is required to hold such interest through an Agent Member.

(iv) Subject to the rules and procedures of the Depositary, an interest in the Regulation S Global Note proposed to be transferred to a QIB transferee shall be required to be held on behalf of such transferee through Agent Members and upon receipt by the Registrar of certificates by the transferor and the transferee in substantially the form of Exhibit H, the Registrar shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Restricted Global Note in an amount equal to the principal amount of the beneficial interest in the Regulation S Global Note to be transferred, and shall decrease the Regulation S Global Note in a like amount.

(b)  *Transfers of Interests in a Regulation S Global Note to Other U.S. Persons*. Subject to the rules and procedures of the Depositary, an interest in a Regulation S Global Note proposed to be transferred to any U.S. Person transferee shall be required to be held on behalf of such other U.S. Person transferee through Agent Members.

(c)  *Transfers to Non-U.S. Persons*.  The following provisions shall apply with respect to registration of transfers of a Note (or interest in a Global Note) to a Non-U.S. Person:

(i) The Registrar shall register the transfer of any Certificated Note containing the Securities Act Legend to a Non-U.S. Person upon receipt by the Registrar from the transferor of a transfer notice provided for on the form of Note or in substantially the form of Exhibit B.

(ii) If the proposed transferor is an Agent Member holding a beneficial interest in the Restricted Global Note, upon receipt by the Registrar of (x) a certificate by the transferor in substantially the form of Exhibit G and (y) instructions in accordance with the Depositary's and the Registrar's procedures, the Registrar shall reflect on its books and records the date of such transfer and a decrease in the principal amount of the Restricted Global Note in an amount equal to the principal amount of the beneficial interest in the Restricted Global Note to be transferred, and shall increase the Regulation S Global Note in a like amount.

(iii) If the proposed transferor is a holder of a Certificated Note and the proposed transferee is an Agent Member, upon receipt by the Registrar of the documents required by Section 2.07(c)(i) above and instructions given in accordance with the Depositary's and the Registrar's procedures, the Registrar

39

shall reflect on its books and records the date of such transfer and an increase in the principal amount of the Regulation S Global Note, as the case may be, in an amount equal to the principal amount of the Certificated Note to be transferred, and the Paying and Transfer Agent shall cancel the Certificated Note so transferred.

(iv)    Subject to the rules and procedures of the Depositary, an interest in the Regulation S Global Note shall be required to be held through Agent Members.

(d)    *Securities Act Legend.*  Upon the registration of transfer, exchange or replacement of Notes bearing the Securities Act Legend, the Registrar shall deliver only Notes that bear the Securities Act Legend unless (i) the requested transfer, exchange or replacement is after the time period referred to in Rule 144 under the Securities Act as in effect with respect to such transfer, exchange or replacement and the transferee is not an Affiliate of the Issuer and has not been an Affiliate for three months prior to such transfer, (ii) is made in connection with a transfer under sub-clause (i) of Section 2.07(c) above or (iii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.  Upon the registration of transfer, exchange or replacement of Notes not bearing the Securities Act Legend, the Registrar shall deliver Notes that do not bear the Securities Act Legend.

(e)    *General.*  By its acceptance of any Note bearing the Securities Act Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Securities Act Legend and agrees that it will transfer such Note only as provided in this Indenture.  The Registrar shall not register a transfer of any Note unless such transfer complies with the restrictions on transfer of such Note set forth in this Indenture.  In connection with any transfer of Notes, each Holder agrees by its acceptance of the Notes to furnish the Registrar or the Issuer such certifications, legal opinions or other information as either of them may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or a transaction not subject to, the registration requirements of the Securities Act; *provided* that the Registrar shall not be required to determine (but may rely on a determination made by the Issuer with respect to) the sufficiency of any such certifications, legal opinions or other information.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to Section 2.06 or this Section 2.07 in accordance with its customary procedures.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

(f)    The Trustee, the Paying and Transfer Agent and the Registrar shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary

40

participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.08. *Mutilated, Defaced, Destroyed, Stolen and Lost Notes*. (a) The Issuer shall execute and deliver to the Trustee Certificated Notes in such amounts and at such times as to enable the Trustee to fulfill its responsibilities under this Indenture and the Notes.

(b) In case any Note shall become mutilated, defaced or be apparently destroyed, lost or stolen, upon the request of the registered holder thereof, the Issuer in its discretion may execute, and, upon the written request of Authorized Officers of the Issuer, the Trustee shall authenticate and deliver, a new Note bearing a number not contemporaneously outstanding, in exchange and substitution for the mutilated or defaced Note, or in lieu of and substitution for the Note so apparently destroyed, lost or stolen. In every case the applicant for a substitute Note shall furnish to the Issuer, the Note Guarantors and the Trustee, and any agent of the Issuer, the Note Guarantors or the Trustee such security and/or indemnity as may be required by each of them to indemnify and defend and to save each of them harmless and, in every case of destruction, loss or theft, evidence to their satisfaction of the apparent destruction, loss or theft of such Note and of the ownership thereof. Upon the issuance of any substitute Note, such Holder, if so requested by the Issuer, the Note Guarantors or the Trustee, or any agent thereof, will pay a sum sufficient to cover any stamp duty, tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee or its agent(s)) connected with the preparation and issuance of the substitute Note. The Trustee is hereby authorized, in accordance with and subject to the foregoing conditions in this clause (b), to authenticate and deliver, or cause the authentication and delivery of, from time to time, Notes in exchange for or in lieu of Notes, respectively, which become mutilated, defaced, destroyed, stolen or lost. Each Note delivered in exchange for or in lieu of any Note shall carry all the rights to principal, premium (if any), interest (including rights to accrued and unpaid interest and Additional Amounts) which were carried by such Note.

(c) Mutilated or defaced Certificated Notes must be surrendered before replacements will be issued. In the event any such mutilated, defaced, destroyed, lost or stolen certificate has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new certificate, pay such Notes.

Section 2.09. *Further Issues*. The Issuer may, from time to time, without notice to or the consent of the Holders, create and issue Additional Notes having the same terms and conditions as the Notes (including the benefit of the Note Guarantees and the Collateral) in all respects (or in all respects except for the issue date, issue price and the first interest period and, to the extent necessary, certain temporary securities law transfer restrictions) so that such Additional Notes may be consolidated and form a single class with the previously outstanding Notes and vote together as one class on all matters with

41

respect to the Notes; *provided* that the issuance of any such Additional Notes is permitted under Section 4.05 and the other provisions of this Indenture and that any such Additional Notes will not be issued under the same CUSIP, ISIN or other identifying numbers as the outstanding Notes unless such Additional Notes are fungible with the outstanding Notes for U.S. federal income tax purposes.

In addition, the issuance of any Additional Notes by the Issuer will be subject to the following conditions:

(a)     all obligations with respect to the Additional Notes will be secured and guaranteed under this Indenture, the Note Guarantees and the Security Documents to the same extent and on the same basis as the Notes outstanding on the date the Additional Notes are issued;

(b)     on the issue date of any Additional Notes, the Issuer will lend the proceeds of the offering of the Additional Notes to a Subsidiary Guarantor pursuant to an Intercompany Loan and each relevant Subsidiary Guarantor is permitted to Incur the Indebtedness represented by such additional borrowings under Section 4.05;

(c)     the Parent Guarantor and the Issuer have delivered to the Trustee an Officers' Certificate, in form and substance reasonably satisfactory to the Trustee, confirming that the issuance of the Additional Notes complies with this Indenture; and

(d)     the Parent Guarantor and the Issuer have delivered to the Trustee one or more Opinions of Counsel, in form reasonably satisfactory to the Trustee, confirming, among other things, that the issuance of the Additional Notes does not conflict with applicable law and that, after giving effect to the issuance of the Additional Notes and any transactions related thereto, the Lien or Liens created under the Security Documents, as amended, extended, renewed, restated, supplemented or otherwise modified or replaced pursuant to such transaction, are valid and perfected Liens not otherwise subject to any limitation, imperfection or new hardening or preference period, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to the issuance of such Additional Notes and such amendment, extension, renewal, restatement, supplement, modification or replacement.

Section 2.10.   *Cancellation of Notes; Disposition Thereof.*  All Notes surrendered for payment, redemption, registration of transfer or exchange, if surrendered to the Issuer or any agent of the Issuer or the Trustee, shall be delivered to the Registrar for cancellation; and no Notes shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture.  The Registrar shall dispose of canceled Notes held by it in accordance with its customary procedures, and (upon the written request of the Issuer) deliver a certificate of disposition to the Issuer.  If the Issuer shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Notes unless and until the same are delivered to the Registrar for cancellation.

Section 2.11.  *Open Market Purchases and Cancellation of Notes*.  The Issuer or any Note Guarantor may purchase Notes in the open market or by tender or by any other means at any price, so long as such acquisition does not otherwise violate the terms of this Indenture. All Notes that are purchased or otherwise redeemed by the Issuer will be cancelled and any Notes purchased or otherwise redeemed by the Issuer or any Note Guarantor will not be reissued or resold to any Person other than the Issuer or a Note Guarantor.

Section 2.12.  *CUSIP, ISIN or Common Code Numbers*.  The Issuer in issuing the Notes may use "CUSIP, ISIN or Common Code" numbers (if then generally in use), and, if so, the Trustee and the Paying and Transfer Agent shall use for the Notes "CUSIP, ISIN or Common Code" numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer will promptly notify the Trustee and the Paying and Transfer Agent of any change in the "CUSIP, ISIN or Common Code" numbers.

## ARTICLE 3

### REDEMPTION

Section 3.01.  *Redemption for Taxation Reasons*.  (a) The Notes may be redeemed, at the option of the Issuer or a Surviving Person with respect to the Issuer, as a whole but not in part, upon giving not less than 30 days' nor more than 60 days' notice to the Holders and the Trustee (which notice shall be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest (including any Additional Amounts), if any, to the date fixed by the Issuer or the Surviving Person, as the case may be, for redemption (the "**Tax Redemption Date**") if, as a result of:

(i)  any change in, or amendment to, the statutes, regulations or official administrative guidance having the force of law, of the Issuer's or a Surviving Person's Relevant Taxing Jurisdiction, affecting taxation; or

(ii)  any change in the existing official position regarding the application or interpretation of such statutes, regulations or official administrative guidance (including a holding, judgment or order by a court of competent jurisdiction),

which change or amendment becomes effective or, in the case of an official position, is announced (A) with respect to the Issuer, on or after the Original Issue Date, or (B) with respect to a Surviving Person organized or resident for tax purposes in a jurisdiction that is not the Issuer's Relevant Taxing Jurisdiction as of the Original Issue Date, on or after the date such Surviving Person becomes a Surviving Person, with respect to any payment due or to become due under the Notes, the Issuer or a Surviving Person, as the case may be, is, or on the next Interest Payment Date would be, required to

pay Additional Amounts, and such requirement cannot be avoided by the taking of reasonable measures by the Issuer, Surviving Person or any Note Guarantor, as the case may be; *provided* that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or a Surviving Person, as the case may be, would be obligated to pay such Additional Amounts if a payment in respect of the Notes were then due; and *provided further* that where any such requirement to pay Additional Amounts is due to taxes imposed by India or any political subdivision or taxing authority thereof or therein, the Issuer or the Surviving Person shall be permitted to redeem the Notes in accordance with the provisions hereof only if the rate of withholding or deduction in respect of which Additional Amounts are required is in excess of 20% (plus applicable surcharge and cess).

(b)     Prior to the mailing of any notice of redemption of the Notes pursuant to Section 3.01(a), the Issuer or a Surviving Person, as the case may be, will deliver to the Trustee at least 30 days but not more than 60 days before a redemption date:

(i)     an Officers' Certificate stating that such change or amendment referred to in Section 3.01(a) has occurred, describing the facts related thereto and stating that such requirement cannot be avoided by the Issuer, a Surviving Person or any Note Guarantor, as the case may be, taking reasonable measures; and

(ii)     an Opinion of Counsel of recognized standing with respect to tax matters of the Issuer's or a Surviving Person's Relevant Taxing Jurisdiction, stating that the requirement to pay such Additional Amounts results from such change or amendment referred to in Section 3.01(a).

The Trustee is entitled to accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent described above, in which event it shall be conclusive and binding on the Holders.

Section 3.02.     *Optional Redemption.*

(a)     On or after July 24, 2017 the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on July 24 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
| --- | --- |
| 2017................................................................................. | 104.438% |
| 2018................................................................................. | 102.219% |

(b)     The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to July 24, 2017, at a redemption price equal to 100% of the principal

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 342 of 739

amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

(c)     At any time and from time to time prior to July 24, 2017, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes (including any Additional Notes) with the Net Cash Proceeds of one or more sales of Common Stock of the Parent Guarantor in an Equity Offering at a redemption price of 108.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

(d)     The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(i)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(ii)     if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

(e)     A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

(f)     If the Issuer elects to redeem the Notes pursuant to the optional redemption provisions of Section 3.02 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(i)     the clause of this Indenture pursuant to which the redemption shall occur;

(ii)     the redemption date;

(iii)     the principal amount of the Notes to be redeemed; and

(iv)     the redemption price.

Section 3.03.  *Method and Effect of Redemption*.  (a) The notice of redemption will identify the Notes to be redeemed and will include or state the following:

(i)     the clause of this Indenture pursuant to which the redemption shall occur;

(ii)    the redemption date;

(iii)   the redemption price, including the portion thereof representing any accrued interest;

(iv)    the place or places where Notes are to be surrendered for redemption;

(v)     Notes called for redemption must be so surrendered in order to collect the redemption price;

(vi)    on the redemption date the redemption price will become due and payable on Notes called for redemption, and interest on Notes called for redemption will cease to accrue on and after the redemption date; and

(vii)   if any Note contains a CUSIP, ISIN or Common Code number, no representation is being made as to the correctness of the CUSIP, ISIN or Common Code number either as printed on the Notes or as contained in the notice of redemption and that the Holder should rely only on the other identification numbers printed on the Notes.

(b)     Once notice of redemption is sent to the Holders, Notes called for redemption become due and payable at the redemption price on the redemption date, and upon surrender of the Notes called for redemption, the Issuer shall redeem such Notes at the redemption price. On and after the redemption date, interest will cease to accrue on the Notes or portions of them called for redemption.  Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

ARTICLE 4

Covenants

Section 4.01.  *Payment of Notes*.  (a) The Issuer will pay the principal of, any premium on (if any) and interest, and Additional Amounts, if any, on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 9:00 a.m. (New York City time) on the date which is one Business Day prior to the Interest Payment Date, the due date of any principal on any Notes, the Tax Redemption Date pursuant to Section 3.01 or the redemption date pursuant to Section 3.02 (each a "**Payment Date**"), the Issuer will pay or cause to be paid to the account of the Paying and Transfer Agent at the Principal Office, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, in immediately available funds, an amount which shall be sufficient to pay

46

the aggregate amount of principal, interest or premium or all of such amounts, as the case may be, becoming due in respect of the Notes on such Payment Date; *provided* that if the Issuer or any Affiliate of the Issuer is acting as Paying and Transfer Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of money sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture. In each case the Issuer shall promptly notify the Trustee and the Paying and Transfer Agent of its compliance with this Section 4.01(a). The Issuer shall procure that, before 9:00 a.m. (New York City time) on the third Business Day before each Payment Date, the bank effecting payment for it has confirmed by tested telex or authenticated SWIFT message to the Paying and Transfer Agent the payment instructions relating to such payment. The Paying and Transfer Agent shall not be bound to make any payment until it has received the full amount due to be paid to it pursuant to this Section 4.01. The Trustee (or the principal Paying and Transfer Agent) shall not be liable to account for interest on money paid to it by the Issuer.

(b)     An installment of principal, premium or interest will be considered paid on the date due if the Paying and Transfer Agent, other than the Issuer or any Affiliate of the Issuer, holds on that date money designated for and sufficient to pay the installment. If the Issuer or any Affiliate of the Issuer acts as Paying and Transfer Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

(c)     The Paying and Transfer Agent, which will include the Issuer or any Affiliate of the Issuer if it is acting as Paying and Transfer Agent, will make payments in respect of the Notes represented by the Global Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Global Notes. With respect to Certificated Notes, the Paying and Transfer Agent will make all payments by wire transfer of immediately available funds to the accounts specified by the Holders thereof or, if no such account is specified, by mailing (at the expense of the Issuer) a check to each Holder's registered address; *provided* that if the Issuer or any Affiliate of the Issuer is acting as Paying and Transfer Agent, it shall make such payment to the Holders as specified above.

(d)     At least three Business Days prior to the first Payment Date and, if there has been any change with respect to the matters set forth in the below-mentioned certificate, at least three Business Days prior to each Payment Date thereafter, the Issuer shall furnish the Paying and Transfer Agent with an Officers' Certificate instructing the Paying and Transfer Agent as to any circumstances in which payments of principal of, or interest or premium on, the Notes due on such date shall be subject to deduction or withholding for, or on account of, any Taxes described in Section 4.21, and the rate of any such deduction or withholding. If any such deduction or withholding shall be required and if the Issuer therefore becomes liable to pay Additional Amounts, if any, pursuant to Section 4.21 then at least three Business Days prior to each Payment Date, the Issuer shall furnish the Paying and Transfer Agent with a certificate which specifies the amount required to be withheld on such payment to Holders of the Notes, and the Additional Amounts, if any, due to the Holders of the Notes, and at least one Business Day prior to

such Payment Date, will pay to the Paying and Transfer Agent such Additional Amounts, if any, as shall be required to be paid to such Holders.

(e)    Whenever the Issuer appoints a Paying and Transfer Agent other than a Person who is also acting as the Trustee for the purpose of paying amounts due in respect of the Notes, it will cause such Paying and Transfer Agent to execute and deliver to the Trustee an instrument substantially in the form of Exhibit F hereof in which such agent shall agree with the Issuer, among other things, to be bound by and observe the provisions of this Indenture (including the Notes). The Issuer shall cause each Paying and Transfer Agent other than a Person who is also acting as the Trustee to execute and deliver to the Trustee an instrument in which such Paying and Transfer Agent shall agree with the Trustee,

(i)    that it will hold all sums received by it as such Paying and Transfer Agent for the payment of the principal of, or premium or interest on, the Notes (whether such sums have been paid to it by or on behalf of the Issuer or by any other obligor on the Notes or the Note Guarantee) in trust for the benefit of the Holders or of the Trustee;

(ii)    that it will as soon as possible give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Notes or the Note Guarantee) to make any payment of the principal of, or premium or interest on, the Notes and any other payments to be made by or on behalf of the Issuer under this Indenture, when the same shall be due and payable; and

(iii)    that it will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of a failure referred to in clause (ii) above.

Anything in this Section 4.01 to the contrary notwithstanding, the Issuer may at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held in trust by the Issuer or any Paying and Transfer Agent hereunder, as required by this Section 4.01 and such sums shall be held by the Trustee upon the trusts herein contained.  If the Paying and Transfer Agent shall pay all sums held in trust to the Trustee as required under this Section 4.01, the Paying and Transfer Agent shall have no further liability for the money so paid over to the Trustee.

Anything in this Section 4.01 to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section 4.01 are subject to the provisions of Section 8.04.

Section 4.02.    *Maintenance of Office or Agency*.  (a) The Issuer will maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially designates the Principal Office as

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 346 of 739

such office of the Issuer. The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served to the Trustee.

(b) The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations; *provided, however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency in each place where principal of, and interest or premium on, any Notes are payable. The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c) So long as the Notes are listed on the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") and the SGX-ST so requires, there will be a Paying and Transfer Agent in Singapore. The Issuer will give to the Trustee written notice of the location of any such office or agency and of any change of location thereof. The Issuer has initially appointed the Trustee, the Paying and Transfer Agent and the Registrar listed in Exhibit K.

(d) So long as any of the Notes remain outstanding, each of the Subsidiary Guarantors will maintain in the Borough of Manhattan, the City of New York an office or agency where notices and demands to or upon each of the Note Guarantors in respect of the Notes and the Note Guarantee or this Indenture may be served. Each of the Note Guarantors hereby initially designates the Principal Office as the office or agency for each such purpose. In case any of the Note Guarantors shall fail to maintain any such office or agency or shall fail to give notice of the location or of any change in the location thereof, presentations and demands may be made and notices may be served at the Trustee's office.

Section 4.03. *Governmental Approvals and Licenses; Compliance with Law*. The Parent Guarantor will, and will cause each Restricted Subsidiary to, (a) obtain and maintain in full force and effect all governmental approvals, authorizations, consents, permits, concessions and licenses as are necessary to engage in the Permitted Businesses, (b) preserve and maintain good and valid title to its properties and assets (including land-use rights) free and clear of any Liens other than Permitted Liens; and (c) comply with all laws, regulations, orders, judgments and decrees of any governmental body.

Section 4.04. *Payment of Taxes and other Claims*. The Parent Guarantor will pay or discharge, and cause each of its Subsidiaries to pay or discharge before the same become delinquent (a) all material taxes, assessments and governmental charges levied or imposed upon the Parent Guarantor or any Subsidiary or its income or profits or property and (b) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Parent Guarantor or any Subsidiary, other than any such tax, assessment, charge or claim the amount, applicability or validity of

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 347 of 739

which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

Section 4.05. *Limitation on Indebtedness*. (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, Incur any Indebtedness (including Acquired Indebtedness), *provided* that the Parent Guarantor and any Restricted Subsidiary may Incur Indebtedness (including Acquired Indebtedness) if, after giving effect to the Incurrence of such Indebtedness and the receipt and application of the proceeds therefrom, (x) no Default has occurred and is continuing, (y) the Fixed Charge Coverage Ratio would not be less than 2.5 to 1.0 with respect to any Incurrence of Indebtedness and (z) if such Indebtedness constitutes Priority Indebtedness, such Indebtedness constitutes Permitted Priority Indebtedness. Notwithstanding the foregoing, the Parent Guarantor will not permit any Restricted Subsidiary to Incur any Disqualified Stock (other than Disqualified Stock held by the Issuer or a Note Guarantor, so long as it is so held).

(b) Notwithstanding the foregoing, the Parent Guarantor and any Restricted Subsidiary may Incur, to the extent provided below, each and all of the following ("**Permitted Indebtedness**"):

(i) Indebtedness of the Issuer under the Notes (excluding any Additional Notes) the Parent Guarantor and any Subsidiary Guarantor under each Note Guarantee and the Intercompany Loans extended with respect to the gross proceeds from the offering of the Notes on the Original Issue Date;

(ii) Indebtedness of the Parent Guarantor or any Restricted Subsidiary outstanding on the Original Issue Date excluding Indebtedness permitted under Section 4.05(b)(i) and Section 4.05(b)(iii);

(iii) Indebtedness of the Parent Guarantor or any Restricted Subsidiary owed to the Parent Guarantor or any Restricted Subsidiary; *provided* that (A) any event which results in (x) any Restricted Subsidiary to which such Indebtedness is owed ceasing to be a Restricted Subsidiary or (y) any subsequent transfer of such Indebtedness (other than to the Parent Guarantor or any Restricted Subsidiary) shall be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this Section 4.05(b)(iii) and (B) if the Issuer is the obligor on such Indebtedness, such Indebtedness must expressly be subordinated in right of payment to the Notes, and if any Note Guarantor is the obligor on such Indebtedness (and it is not owed to the Issuer or a Note Guarantor), such Indebtedness must be expressly subordinated in right of payment to the Note Guarantee of such Note Guarantor and (C) if the Indebtedness is owed to the Issuer or any Note Guarantor, such Indebtedness must be evidenced by an unsubordinated promissory note or a similar instrument under applicable law (with respect to any obligor thereunder other than the Issuer or a Note Guarantor);

(iv) Indebtedness ("**Permitted Refinancing Indebtedness**") of the Parent Guarantor or any Restricted Subsidiary issued in exchange for, or the net proceeds of which are used to refinance or refund, replace, exchange, renew,

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 348 of 739

repay, redeem, defease, discharge or extend (collectively, "refinance" and "refinances" and "refinanced" shall have a correlative meaning), then outstanding Indebtedness Incurred under the proviso of Section 4.05(a) or Section 4.05(b)(i), Section 4.05(b)(ii), Section 4.05(b)(iv), Section 4.05(b)(x), Section 4.05(b)(xv) or Section 4.05(b)(xvi) and any refinancings thereof in an amount not to exceed the amount so refinanced or refunded (plus premiums, accrued interest, fees and expenses); *provided* that (A) Indebtedness the proceeds of which are used to refinance or refund the Notes or Indebtedness that is *pari passu* with, or subordinated in right of payment to, the Notes or any Note Guarantee shall only be permitted under this Section 4.05(b)(iv) if (1) in case the Notes are refinanced in part or the Indebtedness to be refinanced is *pari passu* with the Notes or any Note Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made *pari passu* with, or subordinate in right of payment to, the remaining Notes or such Note Guarantee, as the case may be, or (2) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes or any Note Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes or such Note Guarantee, as the case may be, at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes or such Note Guarantee, as the case may be, (B) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced or refunded, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced or refunded, and (C) in no event may Indebtedness of the Issuer or any Note Guarantor be refinanced pursuant to this clause by means of any Indebtedness of any Restricted Subsidiary that is not the Issuer or a Note Guarantor;

(v) Indebtedness Incurred by the Issuer or any Note Guarantor pursuant to Hedging Obligations entered into in the ordinary course of business and designed solely to protect the Parent Guarantor or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities and not for speculation;

(vi) the Guarantee by the Parent Guarantor or any of its Restricted Subsidiaries of Indebtedness of the Parent Guarantor or any of its Restricted Subsidiaries permitted to be Incurred by another provision of this Section 4.05;

(vii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently, except in the case of daylight overdrafts, drawn against insufficient funds in the ordinary course of business; *provided, however*, that this Indebtedness is extinguished within five Business Days;

51

(viii)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary in respect of workers' compensation claims and claims arising under similar legislation, or in connection with self-insurance or similar requirements, in each case in the ordinary course of business;

(ix)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary incurred in the ordinary course of business in connection with cash pooling arrangements, cash management and other Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections and similar arrangements;

(x)    Indebtedness of any Person acquired by or merged into the Parent Guarantor or any of its Restricted Subsidiaries; *provided* that (A) such Indebtedness is not incurred in contemplation of such acquisition or merger and (B) after giving effect to such acquisition or merger, either (1) the Parent Guarantor would be permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of this covenant or (2) the Fixed Charge Coverage Ratio of the Parent Guarantor would not be lower than immediately prior to such acquisition or merger;

(xi)    Indebtedness consisting of the financing of insurance premiums, including Indebtedness representing installment insurance premiums, incurred in the ordinary course of business

(xii)    Indebtedness in respect of self-insurance obligations, performance, indemnity, surety, judgment, appeal, advance payment, statutory, customs, return-of-money, value added or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties provided by the Parent Guarantor or any of its Restricted Subsidiaries or relating to liabilities, obligations or guarantees Incurred in the ordinary course of business;

(xiii)    Indebtedness arising from agreements of the Parent Guarantor or a Restricted Subsidiary providing for indemnification, adjustment of purchase price, earn-out or other similar obligations, in each case Incurred or assumed in connection with the disposition of any business, assets of the Parent Guarantor or of a Restricted Subsidiary, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of any of the Parent Guarantor's or a Restricted Subsidiary's business or assets for the purpose of financing an acquisition; *provided, however*, that the maximum assumable liability in respect of all this Indebtedness shall at no time exceed the gross proceeds actually received by the Parent Guarantor and/or the relevant Restricted Subsidiary in connection with the disposition;

(xiv)    obligations with respect to trade letters of credit, performance and surety bonds and completion guarantees provided by the Parent Guarantor or any of its Restricted Subsidiaries securing obligations, entered into in the ordinary

course of business, to the extent the letters of credit, bonds or guarantees are not drawn upon or, if and to the extent drawn upon is honored in accordance with its terms and, if to be reimbursed, is reimbursed no later than 30 days following receipt of a demand for reimbursement following payment on the letter of credit, bond or guarantee;

(xv)    Indebtedness of the Parent Guarantor or a Restricted Subsidiary with a maturity of one year or less and used by the Parent Guarantor or such Restricted Subsidiary for working capital purposes in an aggregate principal amount at any time outstanding (together with any refinancings thereof) not to exceed US$10.0 million (or the Dollar Equivalent thereof);

(xvi)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary:

(i)    constituting purchase money Indebtedness Incurred to finance all or any part of the purchase price of equipment, property or assets of the Parent Guarantor or a Restricted Subsidiary to be used by the Parent Guarantor or a Restricted Subsidiary in the Permitted Business; or

(ii)    Incurred to finance all or any part of the cost of development, construction or improvement of personal property of the Parent Guarantor or a Restricted Subsidiary to be used by the Parent Guarantor or a Restricted Subsidiary in the Permitted Business;

*provided* that (A) the aggregate principal amount of such Indebtedness will not exceed the purchase price of such equipment, property or assets so acquired or the cost of development, construction or improvement of such personal property, as the case may be, and (B) such Indebtedness will be Incurred no later than 90 days after the acquisition of such equipment, property or assets or the completion of development, construction or improvement of such personal property, as the case may be; and *provided further* that the aggregate principal amount at any time outstanding of all such Indebtedness Incurred pursuant to this clause (p) (together with any refinancings thereof) does not exceed US$10.0 million (or the Dollar Equivalent thereof) less the aggregate amount of all Net Proceeds of Asset Sales applied by the Parent Guarantor or any Restricted Subsidiary to permanently repay any such Indebtedness pursuant to Section 4.13; and

(xvii)    Indebtedness of the Parent Guarantor or any Restricted Subsidiary not otherwise specifically permitted under clauses (i) through (xvi) above in an aggregate principal amount at any time outstanding not to exceed US$5.0 million (or the Dollar Equivalent thereof);

53

*provided* that, if any Indebtedness Incurred under this Section 4.05(b) constitutes Priority Indebtedness, on the date of the Incurrence of such Indebtedness and after giving effect thereto, such Indebtedness constitutes Permitted Priority Indebtedness.

(c)     For purposes of determining compliance with this Section 4.05, in the event that an item of Indebtedness meets the criteria of more than one of the types of Permitted Indebtedness, or of Indebtedness described in the proviso in Section 4.05(a) and one or more types of Permitted Indebtedness, the Parent Guarantor, in its sole discretion, shall classify, and from time to time may reclassify, such item of Indebtedness and only be required to include the amount of such Indebtedness as one of such types.

Section 4.06.   *Limitation on Restricted Payments.*  (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments or any other actions described in clauses (i) through (iv) below being collectively referred to as **"Restricted Payments"**):

(i)     declare or pay any dividend or make any distribution on or with respect to the Parent Guarantor's or any of the Restricted Subsidiaries' Capital Stock (other than dividends or distributions payable solely in shares of Capital Stock of the Parent Guarantor (other than Disqualified Stock or Preferred Stock) or in options, warrants or other rights to acquire shares of such Capital Stock) held by Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary;

(ii)     purchase, call for redemption or redeem, retire or otherwise acquire for value any shares of Capital Stock (including options, warrants or other rights to acquire such shares of Capital Stock) of the Parent Guarantor or any direct or indirect parent of the Parent Guarantor held by any Persons other than the Parent Guarantor or any Wholly Owned Restricted Subsidiary or of any Restricted Subsidiary held by any Affiliate of the Parent Guarantor (other than a Restricted Subsidiary);

(iii)     make any voluntary or optional principal payment, or voluntary or optional redemption, repurchase, defeasance, or other voluntary or optional acquisition or retirement for value, of Subordinated Indebtedness (excluding any (A) Intercompany Loan or (B) intercompany Indebtedness between or among the Parent Guarantor and any Restricted Subsidiary); or

(iv)     make any Investment, other than a Permitted Investment;

if, at the time of, and after giving effect to, the proposed Restricted Payment:

(A)     a Default has occurred and is continuing or would occur as a result of such Restricted Payment;

(B)     immediately after giving *pro forma* effect to such transaction, the Parent Guarantor could not Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a); or

(C)      such Restricted Payment, together with the aggregate amount of all Restricted Payments made by the Parent Guarantor and the Restricted Subsidiaries after the Measurement Date, shall exceed the sum of:

(1)      50% of the aggregate amount of the Consolidated Net Income of the Parent Guarantor (or, if the Consolidated Net Income is a loss, minus 100% of the amount of such loss) accrued on a cumulative basis during the period (taken as one accounting period) beginning on the first day of the fiscal quarter commencing after the Measurement Date and ending on the last day of the Parent Guarantor's most recently ended fiscal quarter for which consolidated financial statements of the Parent Guarantor (which the Parent Guarantor will use its best efforts to compile in a timely manner and which may be internal financial statements) are available; *plus*

(2)      100% of the aggregate Net Cash Proceeds received by the Parent Guarantor after the Measurement Date as a capital contribution to its common equity by, or from the issuance and sale of its Capital Stock (other than Disqualified Stock) to a Person who is not a Subsidiary of the Parent Guarantor, including any such Net Cash Proceeds received upon the exercise by a Person who is not a Subsidiary of the Parent Guarantor of any options, warrants or other rights to acquire Capital Stock of the Parent Guarantor (other than Disqualified Stock), in each case after deducting the amount of any such Net Cash Proceeds used to redeem, repurchase, defease or otherwise acquire or retire for value any Subordinated Indebtedness or Capital Stock of the Parent Guarantor or any Restricted Subsidiary; *plus*

(3)      the amount by which Indebtedness of the Parent Guarantor is reduced on the Parent Guarantor's balance sheet upon the conversion or exchange (other than by a Subsidiary of the Parent Guarantor) subsequent to the Measurement Date of any Indebtedness of the Parent Guarantor convertible or exchangeable for Capital Stock (other than Disqualified Stock) of the Parent Guarantor (less the amount of any cash, or the Fair Market Value of any other property, distributed by the Parent Guarantor upon such conversion or exchange); *provided, however*, that the foregoing amount shall not exceed the net cash proceeds received by the Parent Guarantor from the Incurrence of such Indebtedness; *plus*

(4)      an amount equal to the net reduction in Investments (other than reductions in Permitted Investments) that

55

were made after the Measurement Date in any Person resulting from (A) payments of interest on Indebtedness, dividends or repayments of loans or advances by such Person, in each case to the Parent Guarantor or any Restricted Subsidiary (except, in each case, to the extent any such payment or proceeds are included in the calculation of Consolidated Net Income), or (B) the unconditional release of a Guarantee provided by the Parent Guarantor or a Restricted Subsidiary after the Measurement Date of an obligation of another Person, (C) to the extent that an Investment made after the Measurement Date is sold or otherwise liquidated or repaid for cash, the lesser of (x) cash return of capital with respect to such Investment (less the cost of disposition, if any) and (y) the initial amount of such Investment, or (D) from redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, not to exceed, in each case, the amount of Investments (other than Permitted Investments) made by the Parent Guarantor or a Restricted Subsidiary after the Measurement Date in any such Person.

(b)     The foregoing provision shall not be violated by reason of:

(i)     the payment of any dividend or redemption of any Capital Stock within 60 days after the related date of declaration or call for redemption if, at said date of declaration or call for redemption, such payment or redemption would comply with Section 4.06(a);

(ii)     the redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Indebtedness of the Issuer or any Note Guarantor with the Net Cash Proceeds of, or in exchange for, a substantially concurrent Incurrence of Permitted Refinancing Indebtedness;

(iii)     the redemption, repurchase or other acquisition of Capital Stock of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock) in exchange for, or out of the net cash proceeds of a substantially concurrent capital contribution or sale (other than to a Subsidiary of the Parent Guarantor) of, shares of Capital Stock (other than Disqualified Stock) of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from Section 4.06(a)(iv)(C)(2);

(iv)     the redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Indebtedness of the Issuer or any Note Guarantor in exchange for, or out of the net cash proceeds of, a substantially concurrent capital contribution or sale (other than to a Subsidiary of the Parent Guarantor) of, shares of the Capital Stock (other than Disqualified Stock) of the Issuer or any Note Guarantor (or options, warrants or other rights to acquire such Capital Stock); *provided* that the amount of any such net cash proceeds that are

utilized for any such Restricted Payment will be excluded from Section 4.06(a)(iv)(C)(2);

(v)     the payment of any dividends or distributions declared, paid or made by a Restricted Subsidiary payable, on a *pro rata* basis or on a basis more favorable to the Parent Guarantor, to all holders of any class of Capital Stock of such Restricted Subsidiary, at least a majority of which is held, directly or indirectly through Restricted Subsidiaries, by the Parent Guarantor;

(vi)     the repurchase, redemption or other acquisition or retirement for value of any Capital Stock of the Parent Guarantor (or options, warrants or other rights to acquire such Capital Stock) held by any future, current or former officer, director or employee of the Parent Guarantor or any Restricted Subsidiaries (or any such Person's assigns, estates or heirs) pursuant to any equity subscription agreement, stock option agreement or similar plans or other contractual arrangements or agreements; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Capital Stock may not exceed US$1.0 million (or the Dollar Equivalent thereof) in any fiscal year and may not exceed US$2.5 million (or the Dollar Equivalent thereof) in the aggregate;

(vii)     the repurchase of Capital Stock deemed to occur upon the exercise of options, warrants or other rights in respect thereof if such Capital Stock represents all or a portion of the exercise price thereof;

(viii)     the declaration and payment of dividends to holders of any class or series of Disqualified Stock of the Parent Guarantor or any preferred stock of a Restricted Subsidiary of the Parent Guarantor issued on or after the date of this Indenture that was permitted to be issued pursuant to Section 4.05.

(ix)     the distribution, as a dividend or otherwise, of Capital Stock (or options, warrants or other rights to acquire such Capital Stock) of or other Investments in any Unrestricted Subsidiary (unless the Unrestricted Subsidiary's principal asset is cash or Temporary Cash Investments);

(x)     payments by the Parent Guarantor of cash in lieu of the issuance of fractional shares upon (A) the exercise of options or warrants, (B) the conversion or exchange of Capital Stock of the Parent Guarantor or (C) stock dividends, splits or business combinations; *provided, however*, that any such cash payment shall not be for the purpose of evading the limitation of this Section 4.06 (as determined in good faith by the Board of Directors); or

(xi)     other Restricted Payments in an aggregate amount not to exceed US$2.0 million (or the Dollar Equivalent thereof) since the Measurement Date;

*provided* that, in the case of clauses (ii), (iii), (iv), (vi) and (xi) of this Section 4.06(b), no Default shall have occurred and be continuing or would occur as a consequence of the actions or payments set forth therein.  Each Restricted Payment made pursuant to

57

clause (i), (vi) and (x) of this Section 4.06(b) shall be included in calculating whether the conditions of Section 4.06(a)(iv)(C) have been met with respect to any subsequent Restricted Payments.

The amount of any Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Parent Guarantor or the Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The value of any assets or securities that are required to be valued by this Section 4.06 will be the Fair Market Value. The Board of Directors' determination of the Fair Market Value of any assets (including securities) other than cash in a Restricted Payment or a series of related Restricted Payments must be based upon an opinion or an appraisal issued by an appraisal or investment banking firm of recognized international standing if the Fair Market Value exceeds US$5.0 million (or the Dollar Equivalent thereof).

Not later than the date of making any Restricted Payment in excess of US$5.0 million (or the Dollar Equivalent thereof), the Parent Guarantor will deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.06 were computed, together with a copy of any fairness opinion or appraisal required by this Indenture.

Section 4.07. *Limitation on Liens*. The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur, assume or permit to exist any Lien on the Collateral (other than Permitted Liens). The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur, assume or permit to exist any Lien (other than Permitted Liens) of any nature whatsoever on any of its assets or properties of any kind (other than the Collateral), whether owned at the Original Issue Date or thereafter acquired, unless the Notes are (or, in respect of any Lien on any Subsidiary Guarantor's property or assets, any Subsidiary Guarantee of such Restricted Subsidiary is) equally and ratably secured by such Lien.

Section 4.08. *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*. (a) Except as provided below, the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i) pay dividends or make any other distribution on any Capital Stock of such Restricted Subsidiary owned by the Parent Guarantor or any other Restricted Subsidiary;

(ii) pay any Indebtedness or other obligation owed to the Parent Guarantor or any other Restricted Subsidiary;

(iii) make loans or advances to the Parent Guarantor or any other Restricted Subsidiary; or

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 356 of 739

(iv)     sell, lease or transfer any of its property or assets to the Parent Guarantor or any other Restricted Subsidiary.

(b)     The provisions of Section 4.08(a) do not apply to any encumbrances or restrictions:

(i)     existing in agreements as in effect on the Original Issue Date, or in the Notes, the Note Guarantees, this Indenture or the Security Documents, or any extensions, refinancings, renewals or replacements of any of the foregoing agreements; *provided* that the encumbrances and restrictions in any such extension, refinancing, renewal or replacement, taken as a whole, are no more restrictive to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(ii)     existing under or by reason of applicable law, rule, regulation or order;

(iii)     existing with respect to any Person or the property or assets of such Person acquired by the Issuer or any Note Guarantor, at the time of such acquisition and not incurred in contemplation thereof, which encumbrances or restrictions are not applicable to any Person or the property or assets of any Person other than such Person or the property or assets of such Person so acquired, and any extensions, refinancings, renewals or replacements thereof; *provided* that the encumbrances and restrictions in any such extension, refinancing, renewal or replacement, taken as a whole, are no more restrictive to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(iv)     that otherwise would be prohibited under Section 4.08(a)(iv) if they arise, or are agreed to, in the ordinary course of business, and (A) restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease or license, (B) exist by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of the Parent Guarantor or any Restricted Subsidiary not otherwise prohibited by this Indenture or (C) do not relate to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of the Parent Guarantor or any Restricted Subsidiary in any manner material to the Parent Guarantor or any Restricted Subsidiary;

(v)     with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, such Restricted Subsidiary that is permitted by Section 4.09, Section 4.05 and Section 4.13;

(vi)     with respect to any Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the Incurrence of Indebtedness permitted under Section 4.05(b)(xv) or Section 4.05(b)(xvi) if, as determined by

59

the Board of Directors, the encumbrances or restrictions are (A) customary for such type of agreement and (B) would not, at the time agreed to, be expected to materially and adversely affect the ability of the Issuer to make required payments on the Notes;

(vii)     purchase money obligations for property acquired in the ordinary course of business that impose restrictions on the property purchased or leased of the nature described in Section 4.08(a)(iv);

(viii)     customary non-assignment provisions in contracts and licenses entered into in the ordinary course of the Permitted Business;

(ix)     provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale and leaseback agreements, stock sale agreements and other similar agreements entered into with the approval of the Board of Directors, if (as determined by the Board of Directors) the encumbrances or restrictions would not, at the time agreed to, be expected to materially adversely affect the ability of the Issuer and the Note Guarantors to make required payments on the Notes; which limitation is applicable only to the assets that are the subject of such agreements;

(x)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of the Permitted Business;

(xi)     customary restrictions imposed on the transfer of, or in licenses related to, copyrights, patents or other intellectual property and contained in agreements entered into in the ordinary course of the Permitted Business; or

(xii)     Permitted Refinancing Indebtedness; *provided* that the encumbrances and restrictions contained in the agreements governing that Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the debt being refinanced.

Section 4.09.   *Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries*.  The Parent Guarantor will not sell, and will not permit any Restricted Subsidiary, directly or indirectly, to issue or sell, any shares of Capital Stock of a Restricted Subsidiary (including in each case options, warrants or other rights to purchase shares of such Capital Stock) except:

(a)     to the Parent Guarantor or a Wholly Owned Restricted Subsidiary, or, in the case of a Restricted Subsidiary that is not Wholly-Owned, pro rata to its shareholders or incorporators;

(b)     to the extent such Capital Stock represents director's qualifying shares or is required by applicable law to be held by a Person other than the Parent Guarantor or a Wholly Owned Restricted Subsidiary;

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 358 of 739

(c)     the issuance or sale of Capital Stock of a Restricted Subsidiary (which remains a Restricted Subsidiary after any such issuance or sale); *provided* that the Parent Guarantor or such Restricted Subsidiary applies the Net Cash Proceeds of such issuance or sale in accordance with Section 4.13; and

(d)     the issuance or sale of Capital Stock of a Restricted Subsidiary if, immediately after giving effect to such issuance or sale, such Restricted Subsidiary would no longer be a Restricted Subsidiary and any remaining Investment in such Person would have been permitted to be made under Section 4.06 if made on the date of such issuance or sale and *provided* that the Parent Guarantor complies with Section 4.13.

Section 4.10.   *Limitation on Issuances of Guarantees by Restricted Subsidiaries.* (a) The Parent Guarantor will not permit any Restricted Subsidiary (other than the Issuer) that is not a Subsidiary Guarantor, directly or indirectly, to Guarantee any Indebtedness ("**Guaranteed Indebtedness**") of the Issuer or any Note Guarantor, unless (x) such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for an unsubordinated Subsidiary Guarantee of payment of the Notes by such Restricted Subsidiary and (y) such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Parent Guarantor or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Subsidiary Guarantee until the Notes have been paid in full.

(b)     If the Guaranteed Indebtedness (i) ranks *pari passu* in right of payment with the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness will rank *pari passu* in right of payment with, or subordinated to, the Subsidiary Guarantee or (ii) is subordinated in right of payment to the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness will be subordinated in right of payment to the Subsidiary Guarantee at least to the extent that the Guaranteed Indebtedness is subordinated to the Notes or the Subsidiary Guarantee.

Section 4.11.   *Limitation on Sale and Leaseback Transactions.*  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction; *provided* that the Parent Guarantor or a Restricted Subsidiary may enter into a Sale and Leaseback Transaction if:

(a)     the Parent Guarantor or such Restricted Subsidiary, as the case may be, could have (i) Incurred Indebtedness in an amount equal to the Attributable Indebtedness relating to such Sale and Leaseback Transaction under Section 4.05 and (ii) incurred a Lien to secure such Indebtedness pursuant to Section 4.07, in which case, the corresponding Indebtedness will be deemed Incurred and the corresponding Lien will be deemed incurred pursuant to those provisions;

(b)     the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of such Sale and Leaseback Transaction; and

(c)     the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Parent Guarantor or such Restricted Subsidiary, as the case may be, applies the proceeds of such transaction in compliance with, Section 4.13.

Section 4.12.  *Repurchase of Notes Upon a Change of Control.*  (a) Not later than 30 days following a Change of Control, the Issuer will make an Offer to Purchase all outstanding Notes (a "**Change of Control Offer**") at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the Offer to Purchase Payment Date (as defined in clause (2) of the definition of "**Offer to Purchase**").

(b)     The Issuer will timely repay all Indebtedness or obtain consents as necessary under, or terminate, agreements or instruments that would otherwise prohibit a Change of Control Offer required to be made pursuant to this Section 4.12.

Section 4.13.  *Limitation on Asset Sales.*  (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, consummate any Asset Sale, unless:

(i)     no Default shall have occurred and be continuing or would occur as a result of such Asset Sale;

(ii)     the consideration received by the Parent Guarantor or such Restricted Subsidiary, as the case may be, is at least equal to the Fair Market Value of the assets sold or disposed of;

(iii)     in the case of an Asset Sale that constitutes an Asset Disposition, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a) after giving *pro forma* effect to such Asset Disposition; and

(iv)     at least 75% of the consideration received consists of cash, Temporary Cash Investments or Replacement Assets (as defined below); *provided* that in the case of an Asset Sale in which the Parent Guarantor or such Restricted Subsidiary receives Replacement Assets involving aggregate consideration in excess of US$10.0 million (or the Dollar Equivalent thereof), the Parent Guarantor shall deliver to the Trustee an opinion as to the fairness to the Parent Guarantor or such Restricted Subsidiary of such Asset Sale from a financial point of view issued by an accounting, appraisal or investment banking firm of recognized international standing. For purposes of this provision, each of the following will be deemed to be cash:

(A)     any liabilities, as shown on the Parent Guarantor's most recent consolidated balance sheet, of the Parent Guarantor or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary assumption, assignment, novation or similar agreement that releases the

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 360 of 739

Parent Guarantor or such Restricted Subsidiary, as the case may be, from further liability; and

(B)  any securities, notes or other obligations received by the Parent Guarantor or any Restricted Subsidiary from such transferee that are promptly, but in any event within 30 days of closing, converted by the Parent Guarantor or such Restricted Subsidiary, as the case may be, into cash, to the extent of the cash received in that conversion.

(b)  Within 365 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Parent Guarantor or the applicable Restricted Subsidiary, as the case may be, may apply such Net Cash Proceeds to:

(i)  permanently repay unsubordinated Indebtedness of the Parent Guarantor or a Subsidiary Guarantor or any Indebtedness of a Restricted Subsidiary that is not a Subsidiary Guarantor (and, if such unsubordinated Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) in each case owing to a Person other than the Parent Guarantor or a Restricted Subsidiary; or

(ii)  acquire properties and assets (other than current assets) that will be used in the Permitted Businesses ("**Replacement Assets**"); *provided, however*, that any such reinvestment in Replacement Assets made pursuant to a definitive binding agreement or a commitment approved by the Board of Directors of the Parent Guarantor that is executed or approved within such time will satisfy this requirement, so long as such investment is consummated within 180 days after such 365th day;

*provided* that, pending the application of Net Cash Proceeds in accordance with Section 4.13(b)(i) or (ii) above, such Net Cash Proceeds may be temporarily invested only in cash or Temporary Cash Investments.

(c)  Any Net Cash Proceeds from Asset Sales that are not applied or invested as provided in Section 4.13(b) will constitute "**Excess Proceeds.**" Excess Proceeds of less than US$10.0 million (or the Dollar Equivalent thereof) will be carried forward and accumulated. When accumulated Excess Proceeds exceed US$10.0 million (or the Dollar Equivalent thereof), within five days thereof, the Issuer must make an Offer to Purchase Notes having a principal amount equal to:

(i)  accumulated Excess Proceeds, multiplied by

(ii)  a fraction (A) the numerator of which is equal to the outstanding principal amount of the Notes and (B) the denominator of which is equal to the outstanding principal amount of the Notes and all *pari passu* Indebtedness similarly required to be repaid, redeemed or tendered for in connection with the Asset Sale,

(iii)  rounded down to the nearest US$1,000.

(d)     The offer price in any Offer to Purchase will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of purchase, and will be payable in cash.

(e)     If any Excess Proceeds remain after consummation of an Offer to Purchase, the Parent Guarantor or any Restricted Subsidiary may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of Notes (and any other *pari passu* Indebtedness) tendered in such Offer to Purchase exceeds the amount of Excess Proceeds, the Trustee will select the Notes to be purchased on a *pro rata* basis based on the principal amount of the Notes and such other *pari passu* Indebtedness tendered. Upon completion of each Offer to Purchase, the amount of Excess Proceeds will be reset at zero.

(f)     Notwithstanding the provisions of this Section 4.13, the Issuer and the Parent Guarantor shall not, and shall not permit any Restricted Subsidiary to, sell any Intercompany Loan.

Section 4.14.  *Limitation on Transactions with Shareholders and Affiliates.*  (a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement (or series of related transactions or arrangements) (including, without limitation, the purchase, sale, lease or exchange of property or assets, or the rendering of any service) involving aggregate payments or consideration in excess of US$100,000 (or the Dollar Equivalent thereof) with (x) any holder (or any Affiliate of such holder) of 5.0% or more of any class of Capital Stock of the Parent Guarantor or (y) any Affiliate of the Parent Guarantor (each an "**Affiliate Transaction**"), unless:

(i)     the Affiliate Transaction is on fair and reasonable terms that are no less favorable to the Parent Guarantor or the relevant Restricted Subsidiary, as the case may be, than those that would have been obtained in a comparable transaction by the Parent Guarantor or the relevant Restricted Subsidiary with a Person that is not an Affiliate of the Parent Guarantor; and

(ii)     the Parent Guarantor delivers to the Trustee:

(A)     with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$2.5 million (or the Dollar Equivalent thereof), a Board Resolution set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this covenant and such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

(B)     with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$5.0 million (or the Dollar Equivalent thereof), in addition to the Board Resolution required in Section 4.14(a)(ii)(A) above, an opinion as

64

to the fairness to the Parent Guarantor or such Restricted Subsidiary, as the case may be, of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of recognized international standing.

(b)　The limitation set forth in Section 4.14(a) above, does not limit, and shall not apply to:

(i)　any employment or compensation agreement (whether based in cash or securities), officer or director indemnification agreement, severance or termination agreement or any similar arrangement entered into by the Parent Guarantor or any of its Restricted Subsidiaries and payments pursuant thereto and any transactions pursuant to stock option plans, stock ownership plans and employee benefit plans or similar arrangements in each case in the ordinary course of business;

(ii)　the payment of reasonable and customary fees and reimbursement of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of the Parent Guarantor or any of its Restricted Subsidiaries;

(iii)　transactions between or among the Parent Guarantor and any Wholly Owned Restricted Subsidiary or between or among Wholly Owned Restricted Subsidiaries;

(iv)　any Restricted Payment of the type described in clauses (i) or (ii) of Section 4.06(a) if permitted by Section 4.06;

(v)　any sale of Capital Stock (other than Disqualified Stock) of the Parent Guarantor;

(vi)　loans or advances to employees in the ordinary course of business not to exceed, in the aggregate, US$1.0 million (or the Dollar Equivalent thereof) at any one time outstanding;

(vii)　any agreement between any Person and an Affiliate of such Person existing at the time such Person is acquired by or merged into the Parent Guarantor or any of its Restricted Subsidiaries; *provided* that such agreement was not entered into in contemplation of such acquisition or merger;

(viii)　any purchases by the Parent Guarantor's Affiliates of Indebtedness or Disqualified Stock of the Parent Guarantor or any of its Restricted Subsidiaries the majority of which Indebtedness or Disqualified Stock is purchased by Persons who are not Affiliates of the Parent Guarantor; *provided* that such purchases by the Parent Guarantor's Affiliates are on the same terms as such purchases by such Persons who are not Affiliates of the Parent Guarantor; and

65

(ix)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, derivatives or insurance or lessors or lessees or providers of employees or other labor or property, in the ordinary course of business and that are fair or on terms at least as favorable as arm's length as determined by the Board of Directors.

In addition, the requirements of Section 4.14(a)(ii) shall not apply to (A) Investments (other than Permitted Investments) not prohibited by Section 4.06; (B) transactions pursuant to agreements in effect on the Original Issue Date and described in the offering memorandum of the Issuer dated July 17, 2014, or any amendment or modification or replacement thereof, so long as such amendment, modification or replacement is not more disadvantageous to the Parent Guarantor and its Restricted Subsidiaries than the original agreement in effect on the Original Issue Date and (C) any transaction between or among the Parent Guarantor, any Wholly Owned Restricted Subsidiary and any Restricted Subsidiary that is not a Wholly Owned Restricted Subsidiary; *provided* that in the case of clause (3), (A) such transaction is entered into in the ordinary course of business and (B) none of the minority shareholders or minority partners of or in such Restricted Subsidiary is a Person described in clause (x) or (y) of Section 4.14(a).

Section 4.15.   *Limitation on Business Activities*.  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, engage in any business other than Permitted Businesses.

Section 4.16.   *Use of Proceeds*.  The Issuer will transfer the proceeds from the sale of the Notes issued and sold on the Original Issue Date to the Parent Guarantor and other Restricted Subsidiaries in the manner set forth under "Summary – Corporate Structure" and in the offering memorandum of the Issuer dated July 17, 2014. The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, use the net proceeds from the sale of the Notes issued and sold on the Original Issue Date, in any amount, for any purpose other than (a) as specified under the caption "**Use of Proceeds**" in the offering memorandum of the Issuer dated July 17, 2014; and (b) pending the application of all of such net proceeds in such manner, to invest the portion of such net proceeds not yet so applied in cash or Temporary Cash Investments.

Section 4.17.   *Maintenance of Insurance*.  The Parent Guarantor will, and will cause its Restricted Subsidiaries to, maintain insurance with reputable and financially sound carriers against such risks and in such amounts as is customarily carried by similarly situated businesses, including, without limitation, property and casualty insurance.

Section 4.18.   *Designation of Restricted and Unrestricted Subsidiaries*.  (a) The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary; *provided* that:

(i)    no Default shall have occurred and be continuing at the time of or after giving effect to such designation;

66

(ii)    such Restricted Subsidiary does not own any Disqualified Stock of the Issuer or any Note Guarantor or Disqualified or Preferred Stock of the Parent Guarantor or a Restricted Subsidiary that is not a Subsidiary Guarantor or hold any Indebtedness of, or any Lien on any property of, the Parent Guarantor or any Restricted Subsidiary, if such Disqualified or Preferred Stock or Indebtedness could not be Incurred under Section 4.05 or such Lien would violate Section 4.07;

(iii)    such Restricted Subsidiary does not own any Voting Stock of another Restricted Subsidiary, and all of its Subsidiaries are Unrestricted Subsidiaries or are being concurrently designated to be Unrestricted Subsidiaries in accordance with this Section 4.18(a);

(iv)    such Restricted Subsidiary has no outstanding Indebtedness that could trigger a cross-default to the Indebtedness of the Parent Guarantor or any other Restricted Subsidiary and none of the Parent Guarantor or any Restricted Subsidiary Guarantees or provides credit support for the Indebtedness of such Restricted Subsidiary; and

(v)    the Investment deemed to have been made thereby in such newly designated Unrestricted Subsidiary and each other newly designated Unrestricted Subsidiary being concurrently redesignated would be permitted to be made under Section 4.06.

(b)    None of the Parent Guarantor nor any Restricted Subsidiary will at any time:

(i)    provide a guarantee of, or similar credit support to, any Indebtedness of an Unrestricted Subsidiary (including of any undertaking, agreement or instrument evidencing such Indebtedness);

(ii)    be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary; or

(iii)    be directly or indirectly liable for any other Indebtedness that provides that the holder thereof may (upon giving notice, the lapse of time or both) declare a default thereof (or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity) upon the occurrence of a default with respect to any other Indebtedness that is Indebtedness of an Unrestricted Subsidiary (including any corresponding right to take enforcement action against such Unrestricted Subsidiary.

(c)    The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that:

(i)    no Default shall have occurred and be continuing at the time of or after giving effect to such designation;

(ii)     any Indebtedness of such Unrestricted Subsidiary outstanding at the time of such designation which will be deemed to have been Incurred by such newly designated Restricted Subsidiary as a result of such designation would be permitted to be Incurred under Section 4.05;

(iii)     any Lien on the property of such Unrestricted Subsidiary at the time of such designation which shall be deemed to have been incurred by such newly designated Restricted Subsidiary as a result of such designation would be permitted to be incurred under Section 4.07;

(iv)     such Unrestricted Subsidiary is not a Subsidiary of another Unrestricted Subsidiary (that is not concurrently being designated as a Restricted Subsidiary); and

(v)     if such Restricted Subsidiary is not designated as a Non-Guarantor Subsidiary, such Restricted Subsidiary will upon such designation execute and deliver to the Trustee a supplemental indenture to this Indenture by which such Restricted Subsidiary will become a Subsidiary Guarantor.

Section 4.19.  *Anti-Layering.*  Each of the Parent Guarantor and the Issuer will not Incur, and will not permit any Subsidiary Guarantor to Incur, any Indebtedness if such Indebtedness is contractually subordinated in right of payment to any other Indebtedness of the Parent Guarantor, the Issuer or any Subsidiary Guarantor, as the case may be, unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the Note Guarantees, on substantially identical terms; *provided* that this requirement does not apply to distinctions between categories of Indebtedness that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Indebtedness.

Section 4.20.  *Provision of Financial Statements and Reports.*  (a) For so long as any Notes are outstanding, the Parent Guarantor will provide to the Trustee the following reports, in the English language:

(i)     within 90 days after the end of the Parent Guarantor's fiscal year beginning with the first fiscal year ending after the Original Issue Date, annual reports containing, to the extent applicable, and in a level of detail that is comparable to that included in the offering memorandum of the Issuer dated July 17, 2014, the following information: (A) audited consolidated balance sheets of the Parent Guarantor of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Parent Guarantor for the two most recent fiscal years, including complete footnotes to such financial statements and the audit report of a member firm of an internationally recognized firm or independent accountants on the financial statements; (B) unaudited *pro forma* consolidated income statement information and balance sheet information of the Parent Guarantor (which, for the avoidance of doubt, will not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes,

68

for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year; (C) an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, EBITDA and liquidity and capital resources of the Parent Guarantor, and a discussion of material commitments and contingencies and critical accounting policies; (D) description of the business, management and shareholders of the Parent Guarantor (on a consolidated basis), all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; (E) a description of material risk factors and material recent developments; and (F) an income statement and balance sheet for the Note Guarantors and Issuer, on a combined basis;

(ii)     within 60 days following the end of the first three fiscal quarters in each fiscal year of the Parent Guarantor beginning with the quarter ending June 30, 2014, all quarterly reports of the Parent Guarantor that are filed with the relevant exchange(s) on which the Parent Guarantor's common shares are at such time listed for trading, *provided* that, if at any time the Parent Guarantor's common shares are not listed for trading on a recognized stock exchange, the Parent Guarantor shall instead provide a quarterly report containing the following information: (A) an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the most recent quarter year-to-date period ending on the unaudited condensed balance sheet date, and the comparable prior year periods, together with condensed footnote disclosure reviewed by a member firm of an internationally recognized firm or independent accountants together with the review report thereon; (B) unaudited *pro forma* income statement information and balance sheet information of the Parent Guarantor, together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the relevant quarter; (C) an operating and financial review of the unaudited financial statements, including a discussion of the results of operations, financial condition, EBITDA and material changes in liquidity and capital resources of the Parent Guarantor, and a discussion of material changes not in the ordinary course of business in commitments and contingencies since the most recent report; (D) material recent developments; and (E) an income statement and balance sheet for the Note Guarantors and Issuer, on a combined basis; and

(iii)     promptly after the occurrence of (A) any material acquisition or disposition or restructuring, (B) any senior executive officer changes at the Parent Guarantor or change in auditors of the Parent Guarantor or (C) any other material event not in the ordinary course of business, solely with respect to this sub-clause (C), that the Parent Guarantor announces publicly, a report containing a description of such event and, in the event of the occurrence of any material acquisition or disposition, within 75 days following the occurrence of such material acquisition or disposition, unaudited *pro forma* consolidated income statement information and balance sheet information of the Parent Guarantor, together with explanatory footnotes, for any such material acquisition or disposition; and

(iv)   as soon as they are available, but in any event not more than 10 days after they are filed with the relevant exchange(s) on which the Parent Guarantor's common shares are at any time listed for trading, true and correct copies of any financial or other report filed with such exchange.

(b)    So long as any Note remains outstanding, the Parent Guarantor will provide to the Trustee (A) within 90 days after the close of each fiscal year, an Officers' Certificate stating each of the Fixed Charge Coverage Ratio and the Consolidated Priority Indebtedness Leverage Ratio with respect to the four most recent fiscal quarters and most recent fiscal quarter, respectively, and showing in reasonable detail the calculation of each such ratio, including the arithmetic computations of each component of each such ratio, with a certificate from the Parent Guarantor's external auditors verifying the accuracy and correctness of the calculation and arithmetic computation; and (B) as soon as possible and in any event within 10 days after the Parent Guarantor becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Parent Guarantor proposes to take with respect thereto.

(c)    All financial statement and *pro forma* financial information shall be prepared in accordance with GAAP as in effect on the date of such report or financial statement (or otherwise on the basis of GAAP as then in effect) and on a consistent basis for the periods presented; *provided, however*, that the reports set forth in Section 4.20(a)(i), (ii) and (iii) above may, in the event of a change in applicable GAAP, present earlier periods on a basis that applied to such periods; and *provided further* that the audited financial statements set forth in Section 4.20(a)(i)(A) will be prepared in accordance with both GAAP and International Financial Reporting Standards until such time as GAAP has converged with International Financial Reporting Standards.

(d)    At any time that any of the Parent Guarantor's Subsidiaries are Unrestricted Subsidiaries and any such Unrestricted Subsidiary or group of Unrestricted Subsidiaries, if taken together as one Subsidiary, constitutes a Significant Subsidiary of the Parent Guarantor, then the annual and quarterly financial information required by the first two clauses of this covenant shall include either (A) a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Parent Guarantor and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Parent Guarantor or (B) stand-alone audited or unaudited reviewed financial statements, as the case may be, of such Unrestricted Subsidiary or Unrestricted Subsidiaries (as a group or otherwise) together with an unaudited reconciliation to the financial information of the Parent Guarantor and its Subsidiaries, which reconciliation will include the following items: revenue, EBITDA, net income, cash, total assets, total debt, shareholders equity, capital expenditures and interest expense.

(e)    Substantially concurrently with the issuance to the Trustee of the reports specified in Section 4.20(a)(i), (ii) and (iii) above, the Parent Guarantor shall also post copies of such reports on such confidential website as may be then maintained by the Parent Guarantor.

(f)     Further, the Issuer and each Note Guarantor have agreed that, for as long as any Notes are "**restricted securities**" within the meaning of Rule 144(a)(3) under the Securities Act, during any period in which the Issuer or such Note Guarantor is neither subject to Section 13 or 15(d) of the Exchange Act, nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, the Issuer or such Note Guarantor, as the case may be, shall supply to (i) any Holder or beneficial owner of a Note or (ii) a prospective purchaser of a Note or a beneficial interest therein designated by such Holder or beneficial owner, the information specified in, and meeting the requirements of Rule 144A(d)(4) under the Securities Act upon the request of any Holder or beneficial owner of a Note.

Section 4.21.  *Additional Amounts*.  (a) All payments of principal of, and premium (if any) and interest on the Notes or under the Note Guarantees will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within the United States, India or any other jurisdiction in which the Issuer, a Surviving Person or an applicable Note Guarantor is organized or resident for tax purposes or any political subdivision or taxing authority thereof or therein (each, as applicable, a "**Relevant Taxing Jurisdiction**") or any jurisdiction through which payment is made by or on behalf of the Issuer, a Surviving Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein (together with the Relevant Taxing Jurisdictions, the "**Relevant Jurisdictions**"), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Surviving Person or the applicable Note Guarantor, as the case may be, will pay such additional amounts ("**Additional Amounts**") as will result in receipt by the Holder of each Note, of such amounts as would have been received by such Holder had no such withholding or deduction been required, except that no Additional Amounts shall be payable:

(i)     for or on account of:

(A)     any tax, duty, assessment or governmental charge that would not have been imposed but for:

(1)     the existence of any present or former connection between the Holder or beneficial owner of such Note, and the Relevant Jurisdiction other than merely holding such Note or the receipt of payments thereunder or under a Note Guarantee, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(2)     the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any,

and interest on, such Note became due and payable pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such Additional Amounts if it had presented such Note for payment on any date within such 30-day period;

(3)     the failure of the Holder or beneficial owner to comply with a timely request of the Issuer, a Surviving Person or any Note Guarantor addressed to the Holder, to provide information concerning such Holder's or beneficial owner's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request is required under the statutes, regulations or official administrative guidance having a force of law of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder; or

(4)     the Holder or beneficial owner being a direct, indirect or constructive owner of 10% or more of the total combined voting power of all classes of stock entitled to vote of Rolta International, Inc., or a "controlled foreign corporation" for U.S. federal income tax purpose related (within the meaning of section 864(d)(4) of the Code) to Rolta International, Inc.

(B)     any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

(C)     any withholding or deduction that is imposed or levied pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directives;

(D)     any tax, duty, assessment or other governmental charge to the extent such tax, duty, assessment or other governmental charge results from the presentation of the Note (where presentation is required) for payment and the payment can be made without such withholding or deduction by the presentation of the Note for payment elsewhere; or

(E)     any combination of taxes, duties, assessments or governmental charges referred to in the preceding clauses (A), (B), (C) and (D); or

(ii)     to a Holder that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be

72

required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor, with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will (i) make such withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will make reasonable efforts to obtain original tax receipts or certified copies thereof evidencing the payment of any taxes, duties, assessment or governmental charges so deducted or withheld and paid to the Relevant Jurisdiction. The Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will furnish to the Holders and the Trustee, within 60 days after the date the payment of any taxes, duties, assessment or governmental charges so deducted or withheld is due pursuant to applicable law, either original tax receipts or certified copies thereof evidencing such payment or, if such receipts are not obtainable, other evidence of such payments.

At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable, if the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will be obligated to pay Additional Amounts with respect to such payment, the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will deliver to the Trustee an Officers' Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable the Paying Agent to pay such Additional Amounts to the Holders on such payment date.

In addition, the Issuer, Surviving Person or applicable Note Guarantor, as the case may be, will pay any stamp, issue, registration, documentary, value added or other similar taxes and other duties (including interest and penalties) payable in any Relevant Jurisdiction in respect of the creation, issue, offering, execution or enforcement of the Notes, the Note Guarantees, or any documentation with respect thereto.

(b)     Whenever there is mentioned in any context the payment of principal of, and any premium or interest on, any Note or under any Note Guarantee, such mention shall be deemed to include payment of Additional Amounts provided for in this Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

Section 4.22.  *No Payments for Consents*.  The Parent Guarantor will not, and will not permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture, the Notes or any Note Guarantee unless such consideration is offered to be paid or is paid to all Holders that consent, waive or agree to amend such term or

provision within the time period set forth in the solicitation documents relating to such consent, waiver or amendment.

Section 4.23. *Suspension of Certain Covenants.* (a) If on any date following the date of this Indenture, the Notes have a rating of Investment Grade from any two of the three Rating Agencies and no Default or Event of Default has occurred and is continuing, then, beginning on that day and continuing until such time, if any, at which the Notes cease to have a rating of Investment Grade from at least two of the three Rating Agencies (such period, the "**Suspension Period**"), the following provisions of this Indenture shall be suspended:

      (i)    Section 4.05,

      (ii)    Section 4.06,

      (iii)    Section 4.08,

      (iv)    Section 4.09,

      (v)    Section 4.10,

      (vi)    Section 4.11,

      (vii)    Section 4.13,

      (viii)    Section 5.01(a)(iv); and

      (ix)    Section 5.01(b)(iv).

(b)    During any period that the foregoing covenants have been suspended, the Board of Directors may not designate any of the Restricted Subsidiaries as Unrestricted Subsidiaries pursuant to Section 4.18 or the definition of "Unrestricted Subsidiary."

(c)    Such covenants will be reinstituted and apply according to their terms as of and from the first day on which a Suspension Period ceases to be in effect. Such covenants will not, however, be of any effect with regard to actions of the Parent Guarantor or any Restricted Subsidiary properly taken in compliance with the provisions of this Indenture during the continuance of the Suspension Period, and following reinstatement (i) the calculations under Section 4.06 will be made as if such covenant had been in effect since the date of this Indenture except that no Default will be deemed to have occurred solely by reason of a Restricted Payment made while that covenant was suspended and (ii) all Indebtedness incurred, or Disqualified Stock issued, during the Suspension Period will be classified to have been incurred or issued pursuant to Section 4.05(b)(ii). Upon the occurrence of a Suspension Period, the amount of Excess Proceeds shall be reset at the amount in effect at the beginning of the Suspension Period.

(d)    There can be no assurance that the Notes will ever achieve a rating of Investment Grade or that any such rating will be maintained.

Section 4.24.  *Limitation on the Issuer.*

(a)     The Issuer will at all times remain a direct Wholly Owned Restricted Subsidiary of Rolta International, Inc. and an indirect Wholly Owned Restricted Subsidiary of the Parent Guarantor.

(b)     Notwithstanding anything contained in this Indenture to the contrary, the Issuer will not engage in any business activity or undertake any other activity, except any activity (A) relating to the offering, sale or issuance of Indebtedness, which proceeds thereof may be on-lent to the Parent Guarantor or any company controlled, directly or indirectly, by the Parent Guarantor (including lending the proceeds from the sale of the Notes to the Parent Guarantor or certain Restricted Subsidiaries under the terms of the Intercompany Loans), and any other activities in connection therewith, (B) undertaken with the purpose of fulfilling any obligations under such Indebtedness or for purposes of consent solicitations or tenders for such Indebtedness or refinancing of such Indebtedness, (C) directly related to the establishment and/or maintenance of the Issuer's corporate existence, or (D) for the purpose of providing information technology products and services and conducting such other business operations as may be approved by the Issuer's management committee.

(c)     The Issuer will not (A) issue any Capital Stock other than to Rolta International, Inc. or (B) acquire or receive any property or assets (including, without limitation, any Capital Stock or Indebtedness of any Person), other than (x) the Intercompany Loans, (y) intercompany loans of the proceeds of Indebtedness issued by the Issuer to the Parent Guarantor or any company directly or indirectly controlled by the Parent Guarantor or (z) cash for ongoing corporate activities of the Issuer described in the preceding paragraph.

(d)     Neither the Issuer nor Rolta International, Inc. will at any time while the Notes are outstanding make any election for the Issuer to be treated as other than a disregarded entity of Rolta International, Inc. for U.S. federal income tax purposes.

(e)     The Issuer will not create, incur, assume or suffer to exist any Lien (except for Permitted Liens of the Issuer) of any kind against or upon any of its property or assets, or any proceeds therefrom other than under the Security Documents.

(f)     Except as necessary to permit timely delivery to the Paying Agent of sums sufficient to pay principal and interest when so becoming due under the Notes, the Issuer will not at any time maintain cash balances in amounts greater than the minimum amounts required by applicable law or regulation or in order to pay taxes which may be applicable to or payable by the Issuer, the Parent Guarantor or certain Restricted Subsidiaries in respect of the Intercompany Loans or the Notes. Whenever the Issuer receives a payment or prepayment under any of the Intercompany Loans, it will use the funds received solely to satisfy its obligations (to the extent of the amount owing in respect of such obligations) under the Notes and this Indenture.

(g)    For so long as any Notes are outstanding, none of the Issuer, Rolta International, Inc. or the Parent Guarantor will commence or take any action to cause a winding-up or liquidation of the Issuer except that the Issuer may be wound up or liquidated subsequent to a consolidation, merger or transfer of assets conducted in accordance with Section 5.01(a).

(h)    Except as provided in this Indenture, the Issuer will not, and the Parent Guarantor will procure that the Issuer does not, assign or novate its rights under any Intercompany Loan.

Section 4.25.  *Currency Indemnity*.  (a) The U.S. Dollar is the sole currency of account and payment for all sums payable by the Issuer and the Note Guarantors under the Notes and the Note Guarantees (the "**Contractual Currency**"). Any amount received or recovered in currency other than the Contractual Currency in respect of the Notes or the Note Guarantees (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up, liquidation or dissolution of the Parent Guarantor, any Subsidiary or otherwise) by the Holder in respect of any sum expressed to be due to it from the Issuer or a Note Guarantor shall constitute a discharge of the Issuer or the Note Guarantor, as the case may be, only to the extent of the Contractual Currency amount which the recipient is able to purchase with the amount so received or recovered in other currency on the date of that receipt or recovery (or, if it is not possible to make that purchase on that date, on the first date on which it is possible to do so). If that purchased amount is less than the Contractual Currency amount expressed to be due to the recipient under any Note, the Issuer and the Note Guarantors shall indemnify the recipient against any loss sustained by it as a result. For the purposes of this indemnity, it will be sufficient for the Holder to certify (indicating the sources of information used) that it would have suffered a loss had the actual purchase of Contractual Currency been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of Contractual Currency on such date had not been possible, on the first date on which it would have been possible).

(b)    Each of the above indemnities will, to the extent permitted by law:

(i)    constitute a separate and independent obligation from the other obligations of the Issuer or the Note Guarantors;

(ii)    give rise to a separate and independent cause of action;

(iii)    apply irrespective of any waiver granted by any Holder; and

(iv)    continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment or order.

(c)    Approval of the RBI will be required in respect of any indemnity payment(s) to be made by the Parent Guarantor, if it is in respect of its direct indemnity obligation, or if aggregate amounts paid in respect of the Guarantee of the Parent Guarantor exceed the Parent Guaranteed Amount, in each case, that may be required to

76

be made to, or for the credit of, any person resident outside India, in rupees or foreign currency, before any such payment is made. No RBI approval will be required for payments in respect of claims under the Parent Guarantee up to the Parent Guaranteed Amount in the event of the Issuer's failure to indemnify the Holders in respect of the Notes under its currency indemnity.

Section 4.26. *Amendments to or Prepayments of the Intercompany Loans.* (a) Without the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding, the Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, (A) prepay or otherwise reduce or permit the prepayment or reduction of any Intercompany Loan or (B) amend, modify or alter any Intercompany Loan in any manner adverse to the Holders; *provided* that, without the consent of each Holder affected thereby, the Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, amend, modify or alter any Intercompany Loan to:

(i)     other than as permitted by a majority of the Holders pursuant to (A) above, change the Stated Maturity of the principal of, or any installment of interest on such loan;

(ii)     reduce the rate of interest on such loan;

(iii)     change the currency for payment of principal or interest on such loan;

(iv)     reduce the above-stated percentage of Notes the consent of whose Holders is necessary to modify or amend such loans;

(v)     waive a default in the payment of any amount under such loan; or

(vi)     sell or transfer such loan other than pursuant to its terms.

(b)     Notwithstanding the foregoing, without the consent of any Holder, any Intercompany Loan may be amended solely to provide for the issuance of Additional Notes, and may be prepaid or reduced to facilitate or otherwise accommodate or reflect a redemption, repurchase or exchange of outstanding Notes in accordance with the terms of this Indenture or through any tender offer or exchange offer.

(c)     The Issuer and the Parent Guarantor will not, and will not permit any Restricted Subsidiary to, sell any Intercompany Loan or to, directly or indirectly, incur, assume or permit to exist any Lien on any Intercompany Loan, other than pursuant the Security Documents.

Section 4.27. *Waiver of Stay, Extension or Usury Laws.* Each of the Issuer and Note Guarantors covenants, to the extent that it may lawfully do so, that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or such Note Guarantor, as the case may be, from paying all or any

portion of the principal of, or premium or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture. Each of the Issuer and Note Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.28. *Taxes*. (a) The Issuer undertakes to provide to the Trustee and the Agents all documentation or information required by the Trustee or the Agents to comply with any Applicable Law.

(b)     The Issuer covenants with the Trustee that it will notify the Trustee in writing within 30 days of becoming aware of any change that affects its Tax status pursuant to any Applicable Law.

## ARTICLE 5
### CONSOLIDATION, MERGER AND SALE OF ASSETS

Section 5.01. *Consolidation, Merger and Sale of Assets*. (a) The Issuer will not consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of the properties and assets of the Issuer and its Restricted Subsidiaries (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions) unless each of the following conditions is satisfied:

(i)     the Issuer shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger, or with or into which the Issuer consolidated or merged, or that acquired or leased such property and assets (the "**Surviving Person**") shall be Rolta International, Inc., or any direct subsidiary of Rolta International, Inc. treated as a disregarded entity for U.S. federal income tax purposes, organized and validly existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof and will expressly assume, by a supplemental indenture to this Indenture, executed and delivered to the Trustee, all the obligations of the Issuer under this Indenture and the Notes, as the case may be, including the obligation to pay Additional Amounts with respect to any jurisdiction in which it is organized or resident for tax purposes or through which it makes payments, and this Indenture and the Notes shall remain in full force and effect;

(ii)     immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(iii)     immediately after giving effect to such transaction on a *pro forma* basis, the Issuer or the Surviving Person, as the case may be, will have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of Rolta International, Inc. immediately prior to such transaction;

78

(iv)     immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a);

(v)     the Issuer shall deliver to the Trustee (x) an Officers' Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (iii) and (iv) of this Section 5.01(a)) and (y) an Opinion of Counsel, in each case stating that such consolidation, merger or transfer and the relevant supplemental indenture complies with this Section 5.01(a) and that all conditions precedent provided for in this Indenture relating to such transaction have been complied with;

(vi)     (1) each Note Guarantor shall execute and deliver a supplemental indenture to this Indenture confirming that its Note Guarantee shall apply to the obligations of the Issuer or the Surviving Person, as the case may be, in accordance with the Notes and this Indenture and (2) the confirmation by the Parent Guarantor of its Parent Guarantee pursuant to this clause (v) shall not result in any reduction of the Parent Guaranteed Amount; and

(vii)     no Rating Decline shall have occurred.

(b)     No Note Guarantor shall consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of the properties and assets of the Parent Guarantor and its Restricted Subsidiaries (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions) to another Person (other than the Issuer or a Note Guarantor) unless each of the following conditions is met:

(i)     (1) such Note Guarantor shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger, or with or into which the Note Guarantor consolidated or merged, or that acquired or leased such property and assets shall be the Issuer, another Note Guarantor or shall become a Note Guarantor concurrently with the transaction in accordance with this Indenture and (2) with respect to the Parent Guarantor and the Parent Guarantee, such transaction shall not result in any reduction of the Parent Guaranteed Amount;

(ii)     immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(iii)     immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor will have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Parent Guarantor immediately prior to such transaction;

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 377 of 739

(iv)     immediately after giving effect to such transaction on a *pro forma* basis, the Parent Guarantor could Incur at least US$1.00 of Indebtedness under the proviso in Section 4.05(a);

(v)     the Issuer shall deliver to the Trustee (x) an Officers' Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (iii) and (iv) of this Section 5.01(b)) and (y) an Opinion of Counsel, in each case stating that such consolidation, merger or transfer and the relevant supplemental indenture complies with this provision and that all conditions precedent provided for in this Indenture relating to such transaction have been complied with; and

(vi)     no Rating Decline shall have occurred,

*provided* that this Section 5.01(b) shall not apply to any sale or other disposition that complies with Section 4.13 or any Subsidiary Guarantor whose Subsidiary Guarantee is unconditionally released in accordance with Section 11.11.

## ARTICLE 6
### DEFAULT AND REMEDIES

Section 6.01.     *Events of Default*.  Each of the following events is an "**Event of Default**":

(a)     default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)     default in the payment of interest or Additional Amounts on any Note when the same becomes due and payable, and such default continues for a period of 30 days;

(c)     default in the performance or breach of the provisions of Article 5 or the failure by the Issuer to make or consummate an Offer to Purchase in the manner described under Section 4.12 or Section 4.13;

(d)     the Parent Guarantor or any Restricted Subsidiary defaults in the performance of or breaches any other covenant or agreement in this Indenture or under the Notes (other than a default specified in Section 6.01(a), (b) or (c)) and such default or breach continues for a period of 45 consecutive days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Notes;

(e)     there occurs with respect to any Indebtedness of the Parent Guarantor or any Restricted Subsidiary having an outstanding principal amount of US$10.0 million (or the Dollar Equivalent thereof) or more in the aggregate for all such Indebtedness of all such Persons, whether such Indebtedness now exists or shall hereafter be created, (a) an event of default that results in such Indebtedness being due and payable prior to its Stated

80

Maturity and/or (b) a default in payment of principal of, or interest or premium on, or any other amounts in respect of, such Indebtedness when the same becomes due and payable;

(f)     one or more final judgments or orders for the payment of money are rendered against the Parent Guarantor or any Restricted Subsidiary and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed US$10.0 million (or the Dollar Equivalent thereof) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(g)     an involuntary case or other proceeding is commenced against the Parent Guarantor or any Restricted Subsidiary with respect to it or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Restricted Subsidiary or for any substantial part of the property and assets of the Parent Guarantor or any Restricted Subsidiary, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 consecutive days; or an order for relief is entered against the Parent Guarantor or any Restricted Subsidiary under any applicable bankruptcy, insolvency or other similar law as now or hereafter in effect;

(h)     the Parent Guarantor or any Restricted Subsidiary (i) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Restricted Subsidiary or for all or substantially all of the property and assets of the Parent Guarantor or any Restricted Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(i)     any Note Guarantor denies or disaffirms its obligations under its Note Guarantee or, except as permitted by this Indenture, any Note Guarantee is determined to be unenforceable or invalid or shall for any reason cease to be in full force and effect;

(j)     any default by the Parent Guarantor or any obligor under the Security Documents in the performance of any of its obligations under the Security Documents or this Indenture, which adversely affects the enforceability, validity, perfection or priority of the applicable Lien on the Collateral or which adversely affects the condition or value of the Collateral, taken as a whole, in any material respect; or

(k)     the Parent Guarantor or any Restricted Subsidiary denies or disaffirms its obligations under any Security Document or, other than in accordance with this Indenture and the Security Documents, any Security Document ceases to be or is not in full force and effect or the Security Agent or the Trustee, as applicable, ceases to have a first priority security interest in the Collateral (subject to any Permitted Liens).

81

Section 6.02.    *Acceleration.*  If an Event of Default (other than an Event of Default specified in Section 6.01(g) or 6.01(h) above) occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by written notice to the Issuer (and to the Trustee if such notice is given by the Holders), may, and the Trustee at the written direction of such Holders (subject to it being indemnified or secured to its satisfaction) shall declare the principal of, premium, if any, and accrued and unpaid interest on the Notes to be immediately due and payable. Upon a declaration of acceleration, such principal of, premium, if any, and accrued and unpaid interest shall be immediately due and payable. If an Event of Default specified in Section 6.01(g) or 6.01(h) above occurs with respect to the Parent Guarantor or any Restricted Subsidiary, the principal of, premium, if any, and accrued and unpaid interest on the Notes then outstanding shall automatically become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

Section 6.03.    *Other Remedies.*  If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or, to enforce the performance of any provision of the Notes or this Indenture, including, but not limited to, directing a foreclosure on the Collateral in accordance with the terms of the Security Documents and take such further action on behalf of the Holders with respect to the Collateral in accordance with such Holders' instruction and the relevant Security Documents.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.    *Waiver of Past Defaults.*  The Holders of at least a majority in principal amount of the outstanding Notes by written notice to the Issuer and to the Trustee may on behalf of all the Holders waive all past defaults and rescind and annul a declaration of acceleration and its consequences if: (a) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived, and (b) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.  Upon such waiver, the Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.    *Control by Majority.*  The Holders of at least a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders. In addition, the Trustee will not be required to expend its own funds in

82

following such direction if it does not reasonably believe that reimbursement or satisfactory indemnification is assured to it.

Section 6.06. *Limitation on Suits*. A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes unless:

(a)     the Holder has previously given the Trustee written notice of a continuing Event of Default;

(b)     the Holders of at least 25% in aggregate principal amount of outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)     such Holder or Holders offer the Trustee and the Security Agent indemnity reasonably satisfactory to the Trustee and the Security Agent against any costs, liability or expense, to be incurred in compliance with such request;

(d)     the Trustee does not comply with the request within (x) 60 days after receipt of the written request pursuant to Section 6.06(b) or (y) 60 days after the receipt of the offer of indemnity pursuant to Section 6.06(c), whichever occurs later; and

(e)     during such 60-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request.

Section 6.07. *Rights of Holders to Receive Payment*. Notwithstanding anything to the contrary in this Article 6, the right of any Holder of a Note to receive payment of the principal of, premium, if any, or interest on, such Note or any payment under any Note Guarantee, or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes, shall not be impaired or affected without the consent of such Holder.

Section 6.08. *Compliance Certificate*. The Parent Guarantor shall submit an Officers' Certificate to the Trustee, in substantially the form attached hereto as Exhibit J, on or before a date not more than 90 days after the end of each fiscal year, that a review has been conducted of the activities of the Parent Guarantor and the Restricted Subsidiaries and the Parent Guarantor's and the Restricted Subsidiaries' performance under this Indenture, the Notes and the Security Documents, and that the Parent Guarantor and each Restricted Subsidiary have fulfilled all of their respective obligations hereunder, or, if there has been a default in the fulfillment of any such obligation, specifying each such default and the nature and status thereof. The Parent Guarantor shall also be obligated to notify the Trustee in writing of any default or defaults in the performance of any covenants or agreements under this Indenture.

If any Default occurs and is continuing and is known or has been notified to the Trustee, the Trustee will send notice of the Default to each holder within 90 days after it occurs, unless the Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any Note, the Trustee may withhold the

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 381 of 739

notice if and so long as the board of directors, the executive committee or a trust committee of directors of the Trustee in good faith determine that withholding the notice is in the interest of the Holders.

Section 6.09. *Collection Suit by Trustee*. If an Event of Default in payment specified in Section 6.01(a) or Section 6.01(b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount remaining unpaid, together with interest on overdue principal or premium and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and any other amounts due to the Trustee hereunder.

Section 6.10. *Trustee May File Proofs of Claim*. The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer or any Note Guarantor or their respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims. Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due to the Trustee hereunder. Nothing in this Indenture shall be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.11. *Priorities*. Subject to the Security Documents, if the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

*First*, to the Trustee and the Agents to the extent necessary to reimburse the Trustee or Agents for any expenses (including reasonable expenses of its counsel) incurred in connection with the enforcement of any rights or remedies under this Indenture or the Note Guarantees or the collection or distribution of such amounts held or realized and any fees and expenses incurred in connection with carrying out its functions under this Indenture (including properly incurred legal fees);

*Second*, to the Trustee for the benefit of Holders for amounts due and unpaid on the Notes for the principal and interest, ratably, without preference or priority of any

84

kind, according to the amounts due and payable on the Notes for principal and interest; and

*Third*, any surplus remaining after such payments shall be paid to the Issuer, or the Note Guarantors or to whomever may be lawfully entitled thereto.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

Section 6.12. *Restoration of Rights and Remedies*. If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, any Note Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, any Note Guarantors, the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.13. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.13 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates, or a suit by Holders of more than 10% in principal amount of the outstanding Notes.

Section 6.14. *Rights and Remedies Cumulative*. No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or exercise of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.15. *Delay or Omission Not Waiver*. No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

# ARTICLE 7

## THE TRUSTEE AND THE AGENTS

Section 7.01. *General.* (a) The duties and responsibilities of the Trustee are as set forth herein. Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article 7.

(b)     Except during the continuance of an Event of Default, the Trustee shall perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee. In case an Event of Default has occurred and is continuing and the Trustee has received written notification thereof pursuant to Section 7.05, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. During the continuance of an Event of Default, the Trustee shall (subject to Section 7.02(d)) act upon the written direction of the Holders of at least 25% of the aggregate principal amount of the Notes then outstanding, subject to its receiving indemnity and/or security to its reasonable satisfaction.

(c)     Should the Trustee become a creditor of the Issuer or any of the Note Guarantors, rights of the Trustee to obtain payment of claims in certain cases or to realize on certain property received by the Trustee in respect of any such claims as security or otherwise shall be limited. The Trustee is permitted to engage in other transactions. The Issuer hereby irrevocably waives, in favor of the Trustee, any conflict of interest which may arise by virtue of the Trustee acting in various capacities under this Indenture or for other customers of the Trustee. The Issuer acknowledges that the Trustee and its affiliates may have interests in, or may be providing or may in the future provide financial or other services to other parties with interests which the Issuer may regard as conflicting with its interests and may possess information (whether or not material to the Issuer), other than as a result of the Trustee acting as Trustee hereunder, that the Trustee may not be entitled to share with the Issuer. Consistent with its long-standing policy to hold in confidence the affairs of its customers, the Trustee will not disclose confidential information obtained from the Issuer without the Issuer's written consent in each instance to any of the Trustee's other customers. Without prejudice to the foregoing, the Issuer agrees that the Trustee may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of this Indenture.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.02 or 6.05.

86

(e)     Notwithstanding anything herein to the contrary, the Trustee shall not be responsible for recitals, statements, warranties or representations of any party contained in this Indenture or any other agreement or other document, entered into in connection herewith or therewith and shall assume the accuracy and correctness thereof and shall not be responsible for the execution, legality, effectiveness, adequacy, genuineness, validity or enforceability or admissibility in evidence of any such agreement or other document or any trust thereby constituted or evidenced.  Notwithstanding the generality of the foregoing, each Holder shall be solely responsible for making its own independent appraisal of and investigation into the financial condition, creditworthiness, condition, affairs, status and nature of the Issuer and any Note Guarantor, and the Trustee shall not at any time have any responsibility for the same and each Holder shall not rely on the Trustee in respect thereof.

Section 7.02.    *Certain Rights of Trustee and Agents*.  Subject to Section 7.01:

(a)     In the absence of bad faith on its part, the Trustee may conclusively rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document, but, in the case of any document which is specifically required to be furnished to the Trustee pursuant to any provision hereof, the Trustee shall examine the document to determine whether it conforms to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).  The Trustee, in its discretion, may make further inquiry or investigation into such facts or matters as it sees fit and (subject to Section 7.02(d)) shall do so if requested in writing to do so by the Holders of at least 25% of the aggregate principal amount of Notes then outstanding; *provided*, *however*, that if any payment to be made to the Trustee within a reasonable time in respect of any loss, action, proceeding, claim, penalty, damages, costs, expense, disbursement or other liability likely to be suffered or incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require indemnity and/or security satisfactory to the Trustee against such loss, action, proceeding, claim, penalty, damages, cost, expense, disbursement or other liability as a condition to taking any such action.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel prepared and delivered at the cost of the Issuer conforming to Sections 13.04 and 13.05 and the Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any attorney or agent appointed with due care by it hereunder.  To the extent an agent has been named by the Trustee in connection with this Indenture, the parties hereto shall cooperate to ensure that such agent can

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 385 of 739

perform the duties for which it was appointed. Upon an Event of Default, the Trustee shall be entitled to require all agents to act solely in accordance with its directions.

(d)     The Trustee shall be under no obligation to act or to exercise any of the rights or powers vested in it by this Indenture (whether or not such acting or exercising of any such rights or powers is at the request or direction of any of the Holders) unless (i) the Trustee has been offered by the Holders security or indemnity reasonably satisfactory to it against any loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expenses that might be suffered or incurred by it as a result of such act or exercise and (ii) the Trustee is satisfied that the act or exercise of any of the rights or powers vested in it by this Indenture will not result in any of its directors, officers, employees or agents incurring personal liability.

(e)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.02 or 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)     The Trustee may consult with counsel or other professional advisors of its selection, and the written advice of such counsel or advisors or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives security and indemnity satisfactory to it against any loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense.

(h)     If any Note Guarantor is substituted to make payments on behalf of the Issuer pursuant to Article 10 and/or Article 11 hereof, the Issuer shall promptly notify the Trustee and any clearing house through which the Notes are traded of such substitution.

(i)     The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate.

(j)     In connection with the exercise by it of its trusts, powers, authorities or discretions (including, without limitation, any modification, waiver, authorization or determination), the Trustee shall have regard to the general interests of the Holders as a class but shall not have regard to any interests arising from circumstances particular to individual Holders (whatever their number) and in particular, but without limitation, shall not have regard to the consequences of the exercise of its trusts, powers, authorities or discretions for individual Holders (whatever their number) resulting from their being for

88

any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any country, state or territory and a Holder shall not be entitled to require, nor shall any Holder be entitled to claim, from the Issuer, the Trustee or any other Person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Holders except to the extent already provided in Section 4.21 and/or any undertaking given in addition to, or in substitution for, Section 4.21 pursuant to this Indenture.

(k)     The Trustee shall not be liable for errors in judgment made by it in good faith unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts.

(l)     The Trustee shall have no obligation to monitor the financial performance of the Issuer or any Note Guarantor.

(m)     The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any of the Covenants contained in Article 4. The Trustee shall not be responsible for the creditworthiness or solvency of the Issuer or any Note Guarantor. Unless the Trustee receives prior written notice from the Issuer, the Trustee shall be entitled to assume, without any further inquiry, that the Issuer and each Note Guarantor has duly performed all of its obligations in accordance with this Indenture, including each of the exhibits attached hereto.

(n)     The Trustee is not obliged to do or omit to do anything which in its opinion would or may be illegal or would result in the Trustee or any Agent being in breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Trustee or Agent is subject.

(o)     Notwithstanding any other provision in this Indenture, upon delivery of a prior written notice to the Issuer, the Trustee and any of the Agents may assign its respective rights and liabilities under this indenture to any branches, subsidiaries, representative offices, affiliates and agents of the Trustee or any of the Agents (as the case may be), as the Trustee or any of the Agents (as the case may be) (or such assignee as the case may be) may consider necessary in order to comply with any Applicable Law.

Section 7.03.   *Individual Rights of Trustee.*   The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not the Trustee and nothing herein shall obligate the Trustee to account for any profits earned from any business or transactional relationship. Any Agent may do the same with like rights.

Section 7.04.   *Trustee's Disclaimer.*   The Trustee (a) makes no representation as to the validity or adequacy of this Indenture, the Notes or the Note Guarantee of any Note Guarantor, (b) is not accountable for the Issuer's use or application of the proceeds from the Notes, (c) is not responsible for any statement in the Notes other than its certificate of

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 387 of 739

authentication and (d) shall not have any responsibility for the Issuer's or any Holder's compliance with any state or U.S. federal securities law or any other applicable law in connection with the Notes. Under no circumstance will the Trustee or any Agent be liable to any party for any special, indirect, punitive or consequential loss or damage even if the Trustee or any Agent, as applicable, has been advised of such loss or damage and regardless of whether the claim for loss or damage is made in negligence, for breach of contract or otherwise. This provision shall remain in full force and effect notwithstanding the discharge of the Notes and or the resignation or replacement or removal of the Trustee or Agent.

Section 7.05. *Notice of Default*. If any Default occurs and is continuing and is known to the Trustee, the Trustee shall send notice of the Default to each Holder within 30 days after it occurs, or, if later, within 15 days after it is known to the Trustee unless the Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or premium or interest on any Note, the Trustee may withhold the notice if and so long as the board of directors, the executive committee or a trust committee of the Trustee in good faith determines that withholding the notice is in the interest of the Holders. The Trustee shall not be deemed to have knowledge of a Default or Event of Default unless and until it obtains actual knowledge of such Default or Event of Default through written notification describing the circumstances of such, and identifying the circumstances constituting such Default or Event of Default.

Section 7.06. *Compensation and Indemnity*. (a) Each of the Issuer and the Note Guarantors agrees to be jointly and severally responsible for and shall pay the Trustee and each Agent compensation as agreed upon in writing for its services. The compensation of the Trustee and each Agent is not limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee and each Agent upon request for all reasonable out-of-pocket expenses, disbursements and advances (including costs of collection) incurred or made by the Trustee and each Agent, including the reasonable compensation, expenses and disbursements of the agents and counsel of each Agent and the Trustee and other Persons not regularly within their respective employ.

(b)     If a Default or an Event of Default shall have occurred or if the Trustee finds it expedient or necessary or is requested by the Issuer and/or the Holders to undertake duties which are of an exceptional nature or otherwise outside the scope of the Trustee's normal duties and obligations under this Indenture, each of the Issuer and the Note Guarantors agrees to be jointly and severally responsible for and shall pay to the Trustee such additional remuneration as the Issuer and the Trustee may separately agree in writing.

(c)     Each of the Issuer and the Note Guarantors agrees to be jointly and severally responsible for and shall indemnify the Trustee and each Agent or any predecessor Trustee or Agent and their respective agents, employees, officers and directors for, and hold it harmless against, any obligations, taxes, judgments, suits, loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense incurred by it without gross negligence or willful misconduct on its part arising out of or

in connection with the acceptance or administration of this Indenture and its duties under this Indenture and the Notes, including (i) the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes and (ii) the compensation, expenses and disbursements of the agents and counsel of each Agent and the Trustee and other Persons not regularly within their respective employ.

(d)     To secure the Issuer's payment obligations in this Section 7.06, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest on particular Notes.

(e)     This Section 7.06 shall survive the redemption or maturity of the Notes, the termination of this Indenture, and the resignation or termination of the appointment of the Trustee.

Section 7.07.   *No Personal Liability of any Director, Officer, Agent or Employee of the Trustee.*  (a) To the extent permitted by law, each of the Issuer and the Parent Guarantor covenants with the Trustee that it shall not (and covenants that it shall procure that none of (i) its respective directors, officers, agents or employees or (ii) its respective affiliates or subsidiaries or any of their respective directors, officers, agents or employees shall) take any proceedings which may arise out of or in connection with this Indenture (including any dispute relating to any non-contractual obligations arising out of or in connection with this Indenture) against any director, officer, agent or employee of the Trustee. The Issuer, the Parent Guarantor and the Trustee agree that this subclause (a) is for the benefit of, and may be enforced by, any director, officer, agent or employee of the Trustee so affected.

(b)     Each of the Issuer and the Parent Guarantor hereby agrees to jointly and severally indemnify and hold harmless each and any director, officer, agent or employee of the Trustee against any Liability incurred by such person as a result of any breach of the covenant in subclause (a).

Section 7.08.   *Information Sharing.*  (a) The Trustee and the Agents shall treat information provided hereunder as confidential, but (unless consent is prohibited by law) each of the Issuer and the Note Guarantors hereby consent to the transfer and disclosure by the Trustee and the Agents of any information relating to it provided hereunder to and between branches, subsidiaries, representative offices, affiliates and agents of the Trustee and the Agents and third parties selected by any of them, wherever situated, for confidential use (including without limitation in connection with the provision of any service and for data processing, statistical and risk analysis purposes). The Trustee and the Agents and any such branch, subsidiary, representative office, affiliate, agent or third party may transfer and disclose any such information as required by any Applicable Law, court, legal process or regulator or Authority, auditor or otherwise (whether government or otherwise) including any auditor thereof of a party and may use (and its performance

91

will be subject to the rules of) any communications, clearing or payment systems, intermediary bank or other system.

(b)     In the event that the consent of a third party is required in order to use, transfer or disclose information pursuant to subclause (a), the Issuer shall procure such consent from such third party.

Section 7.09.  *Taxes*.  (a) The Trustee and the Agents shall make payments free of withholdings or deductions on account of Taxes unless required by any Applicable Law.

(b)     The Trustee and the Agents shall be entitled to deduct Taxes, and shall have no obligation to gross-up any payment hereunder or to pay any additional amount as a result of such Taxes.

(c)     In the event that Taxes become payable by the Trustee or any of the Agents in respect of any prior credit to the Issuer by the Trustee or any of the Agents, the Trustee or any of the Agents, as the case may be, shall have the right to debit any balances held by the Trustee or any of the Agents, as the case may be, in satisfaction of such Taxes and the Issuer shall remain liable for any deficiencies thereof.

Section 7.10.  *Replacement of Trustee*.  (a) (i) The Trustee may resign at any time by 30 days prior written notice to the Issuer.

(ii)     The Holders of a majority in principal amount of the outstanding Notes may remove the Trustee by 30 days prior written notice to the Trustee.

(iii)     The Issuer may remove the Trustee if: (A) the Trustee is adjudged a bankrupt or an insolvent; (B) a receiver or other public officer takes charge of the Trustee or its property; or (C) the Trustee becomes incapable of acting.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.10.

(b)     If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee, *provided* that, in the case of a resignation of the Trustee in connection with a bankruptcy of the Issuer, the Trustee will have the right to appoint a successor Trustee if no successor Trustee is appointed within 10 Business Days of notice of such resignation.  If the successor Trustee does not deliver its written acceptance within 30 days after the retiring Trustee delivers its notice of resignation or receives notice of its removal, the retiring Trustee may itself (at the expense of the Issuer) appoint a Successor Trustee, or the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in the aggregate principal amount of the outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

92

(c)     Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee shall transfer all money or property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06, (ii) the resignation or removal of the retiring Trustee shall become effective and (iii) the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer and each Note Guarantor shall execute any and all instruments for fully vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer shall give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)     Notwithstanding replacement of the Trustee pursuant to this Section 7.10, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

Section 7.11.   *Successor Trustee by Consolidation, Merger, Conversion or Transfer*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets (including the administration of the trust created by this Indenture) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act shall be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.12.   *Money Held in Trust*.  The Trustee will not be liable for interest on any money received by it except as it may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law and except for money held in trust under Article 8.

Section 7.13.   *Paying Agent in EU*.  If the Issuer maintains a Paying and Transfer Agent in a European Union member state, it shall maintain such an agent in a European Union member state that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directives.

Section 7.14.   *Rights of the Trustee and the Security Agent in other roles*.  All rights, power and indemnities contained in Section 4.28 and this Article 7 shall apply, *mutatis mutandis*, to the Trustee and the Security Agent, in each case, in their other respective roles hereunder and under the Security Documents.

ARTICLE 8

DEFEASANCE AND DISCHARGE AND SATISFACTION AND DISCHARGE

Section 8.01.   *Defeasance and Discharge of Indenture*.  (a) The Issuer will be deemed to have paid, and will be discharged from any and all obligations in respect of the

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document       Page 391 of 739

Notes, on the 183rd day after the deposit referred to in clause (i) of this Section 8.01(a) has been made, and the provisions of this Indenture will no longer be in effect with respect to the Notes (and the Trustee, at the expense of the Issuer, shall execute proper instruments acknowledging the same), except as to (1) rights of registration of transfer and exchange of the Notes; (2) substitution of apparently mutilated, defaced, destroyed, lost or stolen Notes; (3) obligations to maintain paying agencies; and (4) the rights of the Holders as beneficiaries hereof with respect to the monies so deposited with the Trustee payable to all or any of them; *provided* that the following conditions shall have been satisfied:

(i)     the Issuer (A) has deposited with the Trustee, in trust, cash in U.S. dollars, U.S. Government Obligations or a combination thereof that, through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of this Indenture and the Notes and (B) has delivered to the Trustee an Opinion of Counsel or a certificate of an internationally recognized firm of independent accountants to the effect that the amount deposited by the Issuer is sufficient to provide payment for the principal of, premium, if any, and accrued interest on, the Notes on the Stated Maturity of such payment in accordance with the terms of this Indenture and an Opinion of Counsel to the effect that the Holders have a valid, perfected, exclusive Lien over such trust;

(ii)     the Issuer has delivered to the Trustee (A) either (x) an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters that is based on a change in applicable U.S. federal income tax law occurring after the Original Issue Date to the effect that beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the Issuer's exercise of its option under this Section 8.01 and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same time as would have been the case if such deposit, defeasance and discharge had not occurred or (y) a ruling directed to the Issuer or the Trustee received from the U.S. Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel and (B) an Opinion of Counsel of recognized international standing to the effect that the creation of the defeasance trust does not violate the U.S. Investment Company Act of 1940, as amended, and after the passage of 123 days following the deposit, the trust fund will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law;

(iii)     the Issuer shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by it with the intent of preferring the Holders over any other of its creditors or with the intent of defeating, hindering, delaying or defrauding any other of its creditors or others; and

(iv)     immediately after giving effect to such deposit on a *pro forma* basis, no Event of Default, or event that after the giving of notice or lapse of time

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 392 of 739

or both would become an Event of Default, shall have occurred and be continuing on the date of such deposit or during the period ending on the 183rd day after the date of such deposit, and such defeasance shall not result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Parent Guarantor or any of the Restricted Subsidiaries is a party or by which the Parent Guarantor or any of the Restricted Subsidiaries is bound.

(b)     In the case of either discharge or defeasance of the Notes, each of the Subsidiary Guarantees will terminate.

Section 8.02.   *Covenant Defeasance*.  The Issuer may omit to comply with any term, provision or condition set forth in, and this Indenture shall no longer be in effect with respect to Section 5.01(a)(iii), Section 5.01(a)(iv), Section 5.01(b)(iii) and Section 5.01(b)(iv), Section 4.05, Section 4.06, Section 4.07, Section 4.08, Section 4.09, Section 4.10, Section 4.11, Section 4.13, Section 4.14, Section 4.15, Section 4.16, Section 4.17, Section 4.18, Section 6.01(c) with respect to Section 5.01(a)(iii), Section 5.01(a)(iv), Section 5.01(b)(iii) and Section 5.01(b)(iv), Section 6.01(d) with respect to other provisions under Section 5.01(a) and Section 5.01(b), and Section 6.01(e), Section 6.01(f), Section 6.01(g) and Section 6.01(h) shall be deemed not to be Events of Default; provided the following conditions have been satisfied:

(a)     The Issuer has deposited with the Trustee, in trust, of cash in U.S. dollars, U.S. Government Obligations or a combination thereof that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of this Indenture and the Notes;

(b)     The Issuer has delivered to the Trustee an Opinion of Counsel of recognized standing to the effect that the creation of the defeasance trust does not violate the U.S. Investment Company Act of 1940, as amended, and after the passage of 123 days following the deposit, the trust fund will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law; and

(c)     The Issuer has delivered to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters to the effect that beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance of certain covenants and Events of Default and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same time as would have been the case if such deposit and defeasance had not occurred.

Section 8.03.   *Application of Trust Money*.  Subject to Section 8.04, the Trustee shall hold in trust, the money or, U.S. Government Obligations deposited with it pursuant to Section 8.01 or 8.02, and apply the deposited money and the proceeds from deposited

U.S. Government Obligations to the payment of principal of and premium or interest on the Notes in accordance with the Notes and this Indenture. Such money and U.S. Government Obligations shall be segregated from other funds.

Section 8.04. *Repayment to Issuer*. Subject to Sections 6.11, 7.06, 8.01 and 8.02, the Trustee shall promptly pay to the Issuer upon written request by the Issuer in the form of an Officers' Certificate any excess money held by the Trustee at any time and thereupon be relieved from all liability with respect to such money. The Trustee shall pay to the Issuer upon written request by the Issuer in the form of an Officers' Certificate any money held for payment with respect to the Notes that remains unclaimed for two years, *provided* that before making such payment the Trustee may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such money, notice that the money remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money shall be repaid to the Issuer. After payment to the Issuer, Holders entitled to such money must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee with respect to such money shall cease.

Section 8.05. *Reinstatement*. If and for so long as the Trustee is unable to apply any money or U.S. Government Obligations held in trust pursuant to Sections 8.01 or 8.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes shall be reinstated as though no such deposit in trust had been made. If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held in trust.

Section 8.06. *Satisfaction and Discharge*. This Indenture will be discharged and will cease to be of further effect as to all Notes issued thereunder, when:

(a)    the Issuer has paid or caused to be paid all sums payable by it under this Indenture;

(b)    either: (i) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Trustee for cancellation, or (ii) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the

Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(c)     in respect of Section 8.06(b)(ii), above, the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Issuer or any Note Guarantor is a party or by which the Issuer or any Note Guarantor is bound (other than with respect to the borrowing of funds to be applied concurrently to make the deposit required to effect such satisfaction and discharge and any similar concurrent deposit relating to other Indebtedness, and in each case the granting of Liens to secure such borrowings);

(d)     the Parent Guarantor has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be; and

(e)     the Parent Guarantor has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## ARTICLE 9
### AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments without Consent of Holders*.  (a) The Issuer, the Note Guarantors and the Trustee may amend or supplement this Indenture, the Notes or the Note Guarantees without the consent of any Holder, to:

(i)     cure any ambiguity, defect, omission or inconsistency in this Indenture, the Notes, the Note Guarantees or any Security Document;

(ii)     comply with Article 5;

(iii)     evidence and provide for the acceptance of appointment by a successor Trustee or Security Agent;

(iv)     provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture;

(v)     in any other case where a supplemental indenture to this Indenture is required or permitted to be entered into pursuant to the provisions of this Indenture without the consent of any Holder;

(vi)     effect any changes to this Indenture in a manner necessary to comply with the procedures of the relevant clearing system;

(vii)     add additional Collateral to secure the Notes or the Note Guarantees;

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 395 of 739

(viii)    add any Subsidiary Guarantor or any Subsidiary Guarantee or release any Subsidiary Guarantor from any Subsidiary Guarantee as provided or permitted by the terms of this Indenture;

(ix)    conform the text of this Indenture, the Notes, the Note Guarantees or the Security Documents to any provision of the "**Description of the Notes**" section of the offering memorandum of the Issuer relating to the Notes dated July 17,214 to the extent that such provision in the "**Description of the Notes**" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Note Guarantees or the Security Documents; or

(x)    to make any other change that does not adversely affect the rights of any Holder.

Section 9.02.   *Amendments with Consent of Holders*.  (a) Amendments, supplements or other modifications of this Indenture or any Security Document may be made by the Issuer, the Note Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the outstanding Notes, and the Holders of a majority in principal amount of the outstanding Notes may waive future compliance by the Issuer and the Note Guarantors with any provision of this Indenture or the Notes; *provided*, *however*, that no such amendment, supplement, modification, or waiver may, without the consent of each Holder affected thereby:

(i)    change the Stated Maturity of the principal of, or any installment of interest on, any Note;

(ii)    reduce the principal amount of, or premium, if any, or interest on, any Note;

(iii)    change the place, currency or time of payment of principal of, or premium, if any, or interest on, any Note;

(iv)    impair the right to institute suit for the enforcement of any payment on or after the Stated Maturity (or, in the case of a redemption, on or after the redemption date) of any Note or any Note Guarantee;

(v)    reduce the above-stated percentage of outstanding Notes the consent of whose Holders is necessary to modify or amend this Indenture;

(vi)    waive a default in the payment of principal of, premium, if any, or interest on the Notes;

(vii)    reduce the percentage or aggregate principal amount of outstanding Notes the consent of whose Holders is necessary for waiver of compliance with certain provisions of this Indenture or for waiver of certain defaults;

(viii)    release any Note Guarantor from its Note Guarantee, except as provided in this Indenture;

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 396 of 739

(ix)    amend, change or modify any Note Guarantee in a manner that adversely affects the Holders;

(x)    reduce the amount payable upon a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale or change the time or manner by which a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale may be made or by which the Notes must be repurchased pursuant to a Change of Control Offer or an Offer to Purchase with the Excess Proceeds from an Asset Sale;

(xi)    change the redemption date or the redemption price of the Notes from that stated in Section 3.01 or Section 3.02(a);

(xii)    amend, change or modify the obligation of the Issuer or any Note Guarantor to pay Additional Amounts;

(xiii)    release any Collateral, except as provided in this Indenture and the Security Documents;

(xiv)    amend, change or modify any provision of the Security Documents relating to the Collateral, or any provision of this Indenture relating to the Collateral, in a manner that adversely affects the Holders, except in accordance with the other provisions of the Security Documents or this Indenture; or

(xv)    amend, change or modify any provision of this Indenture or the related definition affecting the ranking of the Notes or any Note Guarantee in a manner which adversely affects the Holders.

(b)    It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but is sufficient if their consent approves the substance thereof.

(c)    An amendment, supplement or waiver under this Section 9.02 shall become effective on receipt by the Trustee of written consents from the Holders of the requisite percentage in principal amount of the outstanding Notes. After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall send to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. The Issuer shall send supplemental indentures to Holders upon request. Any failure of the Issuer to send such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture or waiver.

Section 9.03.    *Effect of Consent.* (a) After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it is of the type requiring the consent of each Holder affected. If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver shall bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)     If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.04.   *Trustee's and Agents' Rights and Obligations*.  Each of the Trustee and the Agents is entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of any amendment, supplement or waiver authorized pursuant to this Article is authorized or permitted by this Indenture and that such amendment, supplement or waiver constitutes the legal, valid and binding obligations of the party or parties executing such amendment, supplement or waiver, and an Officers' Certificate stating that all conditions precedent have been complied with.  If the Trustee or the Agents, as the case may be, has received such an Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Agents, as the case may be.  Each of the Trustee and the Agents may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's or the Agents' own rights, duties or immunities under this Indenture.  The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated and indemnified are extended to, and shall be enforceable by, Citibank, N.A., London Branch and Citicorp Global Markets Deutschland AG in their respective capacities under this Indenture.

ARTICLE 10

PARENT GUARANTEE

Section 10.01. *Parent Guarantee*.  Subject to the provisions of this Article 10, the Parent Guarantor hereby Guarantees, jointly and severally, as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and this Indenture.  The Parent Guarantor further Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of all amounts due under the Subsidiary Guarantee of the Notes by Rolta International, Inc.

Section 10.02. *Guarantee Unconditional*.  The obligations of the Parent Guarantor hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

100

(b)    any modification or amendment of or supplement to this Indenture or any Note;

(c)    any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(d)    the existence of any claim, set off or other rights which the Parent Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)    any invalidity, irregularity, or unenforceability relating to or against the Issuer or any Subsidiary Guarantor for any reason of this Indenture or any Note; or

(f)    any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to such Parent Guarantor's obligations hereunder.

Section 10.03. *Discharge; Reinstatement.*  The Parent Guarantor's obligations hereunder will remain in full force and effect until the Parent Guarantee is released pursuant to Section 10.09 hereof.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Parent Guarantor's obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.  All payments under the Parent Guarantee will be made in U.S. dollars.

Section 10.04. *Waiver by the Parent Guarantor.*  The Parent Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  In particular, the Parent Guarantor irrevocably waives its right to require the Trustee to pursue or exhaust the Trustee's legal or equitable remedies against the Issuer prior to exercising the Trustee's rights under the Parent Guarantee.

Section 10.05. *Subrogation.*  Upon making any payment with respect to any obligation of the Issuer under this Article 10, the Parent Guarantor will be subrogated to the rights of the payee against the Issuer with respect to such obligation, *provided* that the Parent Guarantor may not enforce any right of subrogation, or any right to receive payment in the nature of contribution or otherwise, from any other Note Guarantor, with respect to such payment so long as any amount payable by the Issuer hereunder or under the Notes remains unpaid.

101

Section 10.06. *Stay of Acceleration.* If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Parent Guarantor hereunder forthwith on demand by the Trustee or the Holders.

Section 10.07. *Ranking of Parent Guarantee.* The Parent Guarantee is (a) a senior obligation of the Parent Guarantor; (b) senior in right of payment to all existing and future obligations of the Parent Guarantor expressly subordinated in right of payment to the Parent Guarantee; and (c) at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of the Parent Guarantor (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law).

Section 10.08. *Execution and Delivery of Parent Guarantee.* (a) To evidence its Parent Guarantee set forth in Section 10.01, the Parent Guarantor hereby agrees that the Parent Guarantee substantially in the form attached as Exhibit L hereto will be endorsed by an Officer or a director of the Parent Guarantor and delivered to the Trustee for attachment to each Note authenticated and delivered by the Trustee.

(b)     The Parent Guarantor hereby agrees that its Parent Guarantee set forth in Section 10.01 will remain in full force and effect notwithstanding any failure to endorse or attach to each Note such Parent Guarantee.

(c)     If an Officer or director whose signature is on the Parent Guarantee no longer holds that office at the time the Trustee authenticates the Note to which the Parent Guarantee is attached, the Parent Guarantee will be valid nonetheless.

Section 10.09. *Release of the Parent Guarantee.* (a) The Parent Guarantee given by the Parent Guarantor will be released upon,

(i)     repayment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Issuer; or

(ii)     a defeasance as provided in Section 8.01.

(b)     No release and discharge of the Parent Guarantee will be effective against the Trustee, any Agent or the Holders of Notes if a Default or Event of Default shall have occurred and be continuing under this Indenture as of the time of such proposed release and discharge until such time as such Default or Event of Default is cured or waived and until the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent provided for in this Indenture relating to such release and discharge have been complied with and that such release and discharge is authorized and permitted under this Indenture. At the request of the Issuer, the Trustee will execute and deliver an instrument evidencing such release and discharge and do all other things necessary to release the Parent Guarantor from its obligations hereunder.

(c)     The Parent Guarantee will be in effect for the period commencing on (and including) the Original Issue Date and ending on (and including) the sixth anniversary of

102

the Maturity Date (the "**Guarantee Period**"), if not earlier released. For the avoidance of doubt, any rights of the Holders and any liability of the Parent Guarantor that have arisen or accrued under the Parent Guarantee during the Guarantee Period will continue after the Guarantee Period and will survive any release.

Section 10.10. *Limitation of the Parent Guarantee.* Notwithstanding anything in this Indenture to the contrary, as at the Original Issue Date, the Parent Guarantor's potential liability under the Parent Guarantee is capped at an amount equal to 150 percent of the total initial aggregate principal amount of the Notes being US$450,000,000 (the "**Parent Guaranteed Amount**"). The Parent Guaranteed Amount will be reduced by any amounts paid by the Parent Guarantor under the Parent Guarantee from time to time. The Parent Guaranteed Amount may be increased by the Parent Guarantor from time to time up to a maximum of 150 percent of the then outstanding total aggregate principal amount of the Notes (the "**Maximum Guaranteed Amount**"). In the event that, on any anniversary of the Original Issue Date, the Parent Guaranteed Amount is less than the Maximum Guaranteed Amount, the Parent Guarantor shall give notice thereof to the Holders and to the Trustee and shall not:

      (i)    declare or pay any dividends, interest or make any other payment on, and will procure that no dividend, interest or other payment is made on any class of its Capital Stock (including preference shares) or Subordinated Indebtedness; or

      (ii)    redeem, reduce, cancel, buy-back or otherwise acquire for any consideration any of its share capital or its Subordinated Indebtedness;

until the earlier of (A) the next calendar day on which the Parent Guaranteed Amount is increased to be equal to the Maximum Guaranteed Amount; and (B) the 183rd day after the date on which all of the Notes have been redeemed in full.

## ARTICLE 11
### SUBSIDIARY GUARANTEES

Section 11.01. *The Subsidiary Guarantees.* Subject to the provisions of this Article 11, each of the Subsidiary Guarantors (whether originally a signatory hereto or added pursuant to a supplemental indenture) hereby, jointly and severally, guarantees as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and this Indenture.

Section 11.02. *Guarantee Unconditional.* The obligations of each Subsidiary Guarantor hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 401 of 739

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

(b)     any modification or amendment of or supplement to this Indenture or any Note;

(c)     any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(d)     the existence of any claim, set off or other rights which the Subsidiary Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)     any invalidity, irregularity, or unenforceability relating to or against the Issuer or any other Note Guarantor for any reason of this Indenture or any Note; or

(f)     any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this Section 11.02, constitute a legal or equitable discharge of or defense to such Subsidiary Guarantor's obligations hereunder.

Section 11.03. *Discharge; Reinstatement.*  Each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Issuer under this Indenture have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, each Subsidiary Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.  All payments under the Subsidiary Guarantees shall be made in U.S. dollars.

Section 11.04. *Waiver by Each Subsidiary Guarantor.*  Each Subsidiary Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.  In particular, each Subsidiary Guarantor irrevocably waives its right to require the Trustee to pursue or exhaust the Trustee's legal or equitable remedies against the Issuer prior to exercising the Trustee's rights under the Subsidiary Guarantee.

Section 11.05. *Subrogation and Contribution.*  Upon making any payment with respect to any obligation of the Issuer under this Article 11, the Subsidiary Guarantor

104

making such payment shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided* that the Subsidiary Guarantor may not enforce either any right of subrogation, or any right to receive payment in the nature of contribution, or otherwise, from any other Note Guarantor, with respect to such payment so long as any amount payable by the Issuer hereunder or under the Notes remains unpaid.

Section 11.06. *Stay of Acceleration.* If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Subsidiary Guarantors hereunder forthwith on demand by the Trustee or the Holders.

Section 11.07. *Limitation on Amount of Subsidiary Guarantee.* Notwithstanding anything to the contrary in this Article, each Note Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Subsidiary Guarantee of such Subsidiary Guarantor not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code or any comparable law of any other jurisdiction. To effectuate that intention, the Trustee, the Holders and the Subsidiary Guarantors hereby irrevocably agree that the obligations of each Subsidiary Guarantor under its Subsidiary Guarantee are limited in an amount not to exceed the maximum amount that can be guaranteed by the applicable Subsidiary Guarantor without rendering the Subsidiary Guarantee, as it relates to such Subsidiary Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 11.08. *Ranking of Subsidiary Guarantees.* The Subsidiary Guarantee of each Subsidiary Guarantor: (a) is a senior obligation of such Subsidiary Guarantor; (b) is senior in right of payment to all existing and future obligations of such Subsidiary Guarantor expressly subordinated in right of payment to its Subsidiary Guarantee; and (c) ranks at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of such Subsidiary Guarantor (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law).

Section 11.09. *Further Subsidiary Guarantors.* (a) The Parent Guarantor will cause each of its future Restricted Subsidiaries (other than Persons designated as a Non-Guarantor Subsidiary), promptly upon becoming a Restricted Subsidiary, to execute and deliver to the Trustee a supplemental indenture to this Indenture pursuant to which it will Guarantee the payment of the Notes.

(b)     The Parent Guarantor may designate any future Restricted Subsidiaries as a Non-Guarantor Subsidiary (together with the Initial Non-Guarantor Subsidiaries, the "**Non-Guarantor Subsidiaries**"); *provided* that any such newly designated Non-Guarantor Subsidiary (together with its Restricted Subsidiaries), together with all other Non-Guarantor Subsidiaries (and their respective Restricted Subsidiaries), in the aggregate, does not account for more than 10.0% of the Parent Guarantor's consolidated

Case 20-82282-CRJ11     Doc 126     Filed 12/07/20     Entered 12/07/20 23:29:08     Desc
Main Document     Page 403 of 739

revenue for the most recent fiscal quarter or Total Assets as of the last date of the most recent fiscal quarter for which consolidated financial statements are available (which the Parent Guarantor will use its best efforts to compile in a timely manner). In the event that the Non-Guarantor Subsidiaries (and their respective Restricted Subsidiaries), in the aggregate, account for more than 10.0% of the Parent Guarantor's consolidated revenue for the most recent fiscal quarter or Total Assets as of the last date of the most recent fiscal quarter for which consolidated financial statements are available (which the Parent Guarantor will use its best efforts to compile in a timely manner), the Parent Guarantor will promptly upon such financial statements becoming available, procure that one or more Non-Guarantor Subsidiaries execute and deliver to the Trustee a supplemental indenture to this Indenture pursuant to which they will Guarantee the payment of the Notes so that the remaining Non-Guarantor Subsidiaries (together with their respective Restricted Subsidiaries) do not account for more than 10.0% of the Parent Guarantor's consolidated revenue for such fiscal quarter or Total Assets as of the last date of such fiscal quarter.

(c)     Each Restricted Subsidiary that Guarantees the Notes after the Original Issue Date is referred to as a "**Future Subsidiary Guarantor**" and, upon execution of the applicable supplemental indenture to this Indenture, will be a "**Subsidiary Guarantor.**" Any Non-Guarantor Subsidiary that after the Original Issue Date provides a Subsidiary Guarantee will cease to be a Non-Guarantor Subsidiary upon providing such Subsidiary Guarantee.

Section 11.10. *Execution and Delivery of Subsidiary Guarantee.* (a) To evidence its Subsidiary Guarantee set forth in Section 11.01, each Subsidiary Guarantor hereby agrees that (i) such Subsidiary Guarantee substantially in the form attached as Exhibit M hereto will be endorsed by an Officer or a director of such Subsidiary Guarantor and delivered to the Trustee for attachment to each Note authenticated and delivered by the Trustee and (ii) a Supplemental Indenture substantially in the form attached as Exhibit I hereto will be executed on behalf of such Subsidiary Guarantor by one of its Officers or directors.

(b)     Each Subsidiary Guarantor hereby agrees that its Subsidiary Guarantee set forth in Section 11.01 will remain in full force and effect notwithstanding any failure to endorse or attach to each Note such Subsidiary Guarantee.

(c)     If an Officer or director whose signature is on any Supplemental Indenture or on the Subsidiary Guarantee no longer holds that office at the time the Trustee authenticates the Note to which a Subsidiary Guarantee is attached, the Subsidiary Guarantee will be valid nonetheless.

(d)     Upon execution of this Indenture or a Supplemental Indenture, as applicable, the delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Subsidiary Guarantee set forth in this Indenture on behalf of the Subsidiary Guarantor.

(e)     The Parent Guarantor shall cause any Restricted Subsidiary so required by Section 4.18, to execute a Supplemental Indenture in the form of Exhibit I to this Indenture and a notation of Subsidiary Guarantee in the form of Exhibit M to this Indenture in accordance with Section 4.18 and this Article 11.

Section 11.11. *Release of the Subsidiary Guarantees.*  (a) A Subsidiary Guarantee given by a Subsidiary Guarantor shall automatically and unconditionally be released upon:

(i)     repayment in full of the Notes;

(ii)     a defeasance or satisfaction and discharge of the Notes as provided in Section 8.01;

(iii)     the designation by the Parent Guarantor of a Subsidiary Guarantor as an Unrestricted Subsidiary in compliance with the terms of this Indenture; or

(iv)     the sale, merger or other transfer of a Subsidiary Guarantor in compliance with the terms of this Indenture (including Sections 4.09, 4.13 and 5.01) resulting in such Subsidiary Guarantor no longer being a Restricted Subsidiary, *provided* that (1) such Subsidiary Guarantor is simultaneously released from its obligations in respect of any of the Parent Guarantor's other Indebtedness or any Indebtedness of any other Restricted Subsidiary and (2) the proceeds from such sale or disposition are used for the purposes permitted or required by this Indenture.

(b)     No release and discharge of the Subsidiary Guarantor from its Subsidiary Guarantee shall be effective against the Trustee, any Agent or the Holders of Notes (i) if a Default or Event of Default shall have occurred and be continuing under this Indenture as of the time of such proposed release and discharge until such time as such Default or Event of Default is cured or waived and (ii) until the Parent Guarantor shall have delivered to the Trustee an Officers' Certificate stating that all conditions precedent provided for in this Indenture relating to such release and discharge have been complied with and that such release and discharge is authorized and permitted under this Indenture. At the request of the Parent Guarantor, the Trustee shall execute and deliver an instrument evidencing such release and discharge and do all such other acts and things necessary to release the Subsidiary Guarantor from its obligations hereunder.

ARTICLE 12

SECURITY TO BE GRANTED

Section 12.01. *Security to be Granted.*  (a) The obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the respective Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees will be secured on a first priority basis (subject to any Permitted Liens) by a Lien on the Collateral, which shall consist of a security interest in the Issuer's rights, title and interest in each

107

Intercompany Loan and in the rights of the Issuer in connection therewith, as further provided in the Pledge and Security Agreement; and

(b)    In order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees, the Issuer and the Subsidiary Guarantors will, for the benefit of the Holders of the Notes:

(i)    execute one or more Security Documents granting to the Trustee and the Security Agent, for the benefit of the Holders of the Notes, first priority Liens (collectively, the "**First Priority Lien**") on the Collateral (subject to any Permitted Liens);

(ii)    take all requisite steps under applicable laws and undertake other customary procedures in connection with the granting and perfection (if relevant) of the First Priority Lien on the Collateral (subject to any Permitted Liens) including making all filings necessary to maintain the security interest by the Security Documents; and

(iii)    promptly deliver to the Trustee an Officers' Certificate stating that entry into the Security Documents has been duly and validly authorized and an Opinion of Counsel to the effect that (A) in the opinion of such counsel, such action has been taken with respect to the recording, registering and filing of or with respect to this Indenture and the Security Documents and all other instruments of further assurance as is necessary to make effective the First Priority Lien (subject to Permitted Liens) created by the Security Documents in the Collateral referenced in this clause (b) and referencing the details of such action; or (B) in the opinion of such counsel, no such action is necessary to make such First Priority Lien (subject to Permitted Liens) effective.

(c)    The Trustee and each Holder, by accepting the Notes and the Note Guarantees, acknowledges that the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders under the Security Documents, and that the Lien granted under this Indenture and the Security Documents in respect of the Trustee and the Holders is subject to and qualified and limited in all respects by the Security Documents and actions that may be taken thereunder.

(d)    Each Holder, by its acceptance thereof, consents and agrees to the terms of the Security Documents (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes the Trustee to appoint a security agent to hold the Collateral on its behalf, which security agent shall be Citicorp International Limited on the Original Issue Date; each Holder authorizes the Trustee to direct the Security Agent to enter into the Security Documents and to perform its obligations and exercise its rights thereunder in accordance therewith.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 406 of 739

(e)     Notwithstanding (i) anything to the contrary contained in this Indenture, the Security Documents, the Notes or any other instrument governing, evidencing or relating to any Indebtedness, (ii) the time, order or method of attachment of any Liens, (iii) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral, (iv) the time of taking possession or control over any Collateral or (v) the rules for determining priority under the New York Uniform Commercial Code or any other law of any relevant jurisdiction governing relative priorities of secured creditors, the Issuer, the Parent Guarantor and the Subsidiary Guarantors will ensure that:

(A)     the Liens granted pursuant to the Security Documents will rank at least equally and ratably with all other valid, enforceable and perfected Liens, whenever granted upon any present or future Collateral, but only to the extent such other Liens are permitted under this Indenture to exist and to rank equally and ratably with the Notes and the Note Guarantees; and

(B)     all proceeds of the Collateral applied under the Security Documents shall be allocated and distributed as set forth in Section 6.11.

Section 12.02. *Certificates*.  (a) On or before a date not more than 90 days after the end of each fiscal year, as required by Section 6.08 hereof, the Parent Guarantor shall furnish to the Trustee a Compliance Certificate in the form of Exhibit J hereto.

(b)     The Issuer and the Parent Guarantor shall furnish to the Security Agent and the Trustee on or prior to any proposed release of the Collateral by the Issuer an Officers' Certificate certifying, and an Opinion of Counsel, stating that such release will comply with the terms of this Indenture and the relevant Security Documents.

Section 12.03. *Intercompany Loans*.  The Issuer will, on the Original Issue Date and from time to time as any of the Intercompany Loans may be novated in accordance with the terms of this Indenture, grant or cause to be granted to the Trustee, for the benefit of the Holders of the Notes, a first priority Lien on the Issuer's rights under the Intercompany Loans to the Trustee in order to secure the obligations of the Issuer with respect to the Notes, the obligations of the Note Guarantors under the Note Guarantees and the performance of all other obligations of the Issuer and the Note Guarantors under this Indenture, the Notes and the Note Guarantees.

Section 12.04. *Authorization of Actions to be Taken by the Security Agent Under the Security Documents*.  (a) The Security Agent shall be the representative on behalf of the Holders of the Notes and shall act upon the written direction of the Holders of the Notes with regard to all voting, consent and other rights granted to the Holders of the Notes under the Security Documents.

(b)     Subject to the terms of the Security Documents, the Trustee may, in its sole discretion and without the consent of the Holders of the Notes, on behalf of the Holders of the Notes, take all actions it deems necessary or appropriate in order to direct the

Security Agent to (A) enforce any of its rights or any of the rights of the Holders of the Notes under the Security Documents and (B) receive any and all amounts payable from the Security Agent in respect of the obligations of the Issuer and the Note Guarantors hereunder.

(c)     Subject to the terms of the Security Documents and Section 7.02(d), the Trustee shall have the power to institute and to instruct the Security Agent to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Documents or this Indenture, and such suits and proceedings as the Security Agent may deem expedient to preserve or protect its interest and the interests of the Holders of the Notes in the Collateral (including power to instruct the Security Agent to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of the Notes or the Security Agent). The Trustee is hereby irrevocably authorized by each Holder of the Notes to instruct the Security Agent to effect any release of Liens or the Collateral contemplated by Section 12.06 hereof or by the terms of the Security Documents. The Trustee and the Security Agent shall not be deemed to have knowledge of any acts that may be unlawful or in violation of the Security Documents or this Indenture unless and until it obtains actual knowledge of such unlawful acts or violation through written notification describing the circumstances of such, and identifying the circumstances constituting such unlawful acts or violation.

(d)     The Trustee will not be responsible for the adequacy of the Collateral in respect of the obligations of the Issuer and the Note Guarantors hereunder.

Section 12.05. *Authorization of Receipt of Funds by the Security Agent Under the Security Documents*.  The Security Agent is authorized to receive and distribute any funds for the benefit of the Holders of the Notes under the Security Documents, and to make further distributions of such funds to the Holders of the Notes according to the provisions of this Indenture and the Security Documents.

Section 12.06. *Release of Security*.  (a)The security created in respect of the Collateral granted under the Security Documents may be released in certain circumstances, including any of the following:

(i)     upon repayment in full of the Notes; and

(ii)     upon defeasance and discharge of the Notes as provided above under Section 8.01.

(b)     Any release of the Collateral made in compliance with this Section 12.06 shall not be deemed to impair the Lien under the Security Documents or the Collateral thereunder in contravention of the provisions of this Indenture or the Security Documents.

110

(c)    Upon repayment in full of the Notes as provided under (a)(i) above or upon defeasance and discharge of the Notes as provided under (a)(ii) above, the Issuer shall notify the Trustee of such event as soon as reasonably practicable.

## ARTICLE 13
### MISCELLANEOUS

Section 13.01. *Ranking*.  The Notes are (a) senior obligations of the Issuer; (b) senior in right of payment to any existing and future obligations of the Issuer expressly subordinated in right of payment to the Notes; (c) guaranteed by the Note Guarantors on a senior basis, subject to the limitations set forth in Article 10 and Article 11; (d) at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of the Issuer (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law); and (e) effectively subordinated to all existing and future obligations of the Non-Guarantor Subsidiaries.

Section 13.02. *Trust Indenture Act Controls*.  If this Indenture is, at any time, required to be qualified under the United States Trust Indenture Act of 1939, as amended (the "**Trust Indenture Act**") and any provision of this Indenture limits, qualifies or conflicts with another provision that is required to be included in this Indenture by the Trust Indenture Act, the required provision shall control.  The Issuer shall provide notice to the Trustee prior to qualification of this Indenture pursuant to the Trust Indenture Act as soon as practicable. The Trustee shall reserve the right to resign (subject to Section 7.10(a)(i)) upon such qualification or receipt of notice thereof. If the Trustee exercises its right to resign, it will use its reasonable best efforts to assist the Issuer in the appointment of a successor trustee.

Section 13.03. *Notices*.  (a) All notices or demands required or permitted by the terms of the Notes or this Indenture to be given to or by the Holders are required to be in writing and may be given or served by being sent by prepaid courier or by being deposited, first-class postage prepaid, in the United States mail, if intended for the Issuer or any Note Guarantor, as the case may be, mailed, delivered or faxed to Rolta Americas LLC, 5865 North Point Parkway, Alpharetta, Georgia 30022, USA, Fax: +1-678-942-5001; if intended for the Trustee, addressed to the Trustee at the corporate trust office of the Trustee at Citicorp International Limited, 39/F Citibank Tower, Citibank Plaza, 3 Garden Road, Central, Hong Kong, Facsimile No.: +852 2323 0279, Attention: Agency and Trust; if intended for the Paying and Transfer Agent addressed to the Paying and Transfer Agent at London Branch, c/o Citibank, N.A., Dublin Branch, One North Wall Quay, Dublin 1, Ireland, Facsimile Nos.: +353 1 6226210 (payment) / +353 1 5060339 (transfer), Attention: Agency and Trust; if intended for the Registrar addressed to the Registrar at Citigroup Global Markets Deutschland AG, Reuterweg 16, 60323 Frankfurt, Germany, Facsimile No.: +49 69 1366 1429, Attention: Agency and Trust; and, if intended for any Holder, addressed to such Holder at such Holder's last address as it appears in the Note register (or otherwise delivered to such Holders in accordance with applicable DTC, Euroclear or Clearstream procedures). Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee at the

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 409 of 739

same time.  Defect in mailing a notice or communication to any particular Holder shall not affect its sufficiency with respect to other Holders.

(b)     Any notice or demand shall be deemed to have been sufficiently given or served when so sent or deposited and, if to the Holders, when delivered in accordance with the applicable rules and procedures of the Depositary.  Any such notice shall be deemed to have been delivered on the day such notice is delivered to the Depositary or if by mail, when so sent or deposited.  Any notice to the Trustee shall be effective only upon receipt.

(c)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver shall be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

Section 13.04. *Certificate and Opinion as to Conditions Precedent.*  (a) Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Issuer shall furnish to the Trustee at the Trustee's request:

(i)     an Officers' Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with;

(ii)     an Opinion of Counsel stating that all such conditions precedent have been complied with; and

(iii)     an incumbency certificate giving the names and specimen signatures of Authorized Officers for any such Authorized Officers who have not previously provided specimen signatures to the Trustee.

(b)     In any case where several matters are required to be certified by, or covered by an Opinion of Counsel of, any specified Person, it is not necessary that all such matters be certified by, or covered by the Opinion of Counsel of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an Opinion of Counsel with respect to some matters and one or more such Persons as to other matters, and any such Person may certify or give an Opinion of Counsel as to such matters in one or several documents.

(c)     Any certificate of an Officer of the Issuer or any Note Guarantor may be based, insofar as it relates to legal matters, upon an Opinion of Counsel, unless such Officer knows, or in the exercise of reasonable care should know, that such Opinion of Counsel with respect to the matters upon which his certificate is based are erroneous.  Any Opinion of Counsel may be based, and may state that it is so based, insofar as it relates to factual matters, upon a certificate of, or representations by, an officer or officers of the Issuer or a Note Guarantor stating that the information with respect to such factual matters is in the possession of the Issuer or such Note Guarantor, as the case may be,

112

unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or representations with respect to such matters are erroneous.

(d)     Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 13.05. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(a)     a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(c)     a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)     a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials with respect to matters of fact.

Section 13.06. *Payment Date Other Than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption or purchase of any Note) is due on a day which is not a Business Day in the relevant place of payment or in the place of business of the Trustee, then the payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest shall accrue for the intervening period.

Section 13.07. *Governing Law, Consent to Jurisdiction; Waiver of Jury Trial, Waiver of Immunities*.  (a) Each of the Notes, the Note Guarantees and this Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)     The Issuer and each of the Note Guarantors hereby irrevocably and unconditionally submits to the non-exclusive, personal jurisdiction of any New York state or United States federal court located in the Borough of Manhattan, The City of New York in connection with any suit, action or proceeding arising out of or relating to this Indenture, any Note or any Note Guarantee or any transaction contemplated hereby or thereby.  The Issuer and each of the Note Guarantors irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection which it may now

113

or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each of the parties hereto irrevocably and unconditionally waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Indenture or the transactions contemplated hereby. To the extent that the Issuer or any Note Guarantor, as the case may be, has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect to itself or its property, the Issuer or such Note Guarantor, as the case may be, irrevocably waives such immunity in respect of its obligations hereunder or under any Note or any Note Guarantee, as applicable. The Issuer and each of the Note Guarantors agree that final judgment in any such suit, action or proceeding, brought in such a court shall be conclusive and binding upon the Issuer or the Note Guarantor, as the case may be, and, to the extent permitted by applicable law, may be enforced in any court to the jurisdiction of which the Issuer or any of the Note Guarantors, as the case may be, is subject by a suit upon such judgment or in any manner provided by law, *provided* that service of process is effected upon the Issuer or any of the Note Guarantors, as the case may be, in the manner specified in the following subsection or as otherwise permitted by applicable law.

(c)     As long as any of the Notes remain outstanding, the Issuer and each of the Note Guarantors shall at all times have an authorized agent in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture, any Note or any Note Guarantee. Service of process upon such agent and written notice of such service mailed or delivered to the Issuer or any Note Guarantor, as the case may be, shall to the fullest extent permitted by applicable law be deemed in every respect effective service of process upon the Issuer or such Note Guarantor, as the case may be, in any such legal action or proceeding. The Issuer and each of the Note Guarantors hereby appoint CT Corporation System as its agent for such purpose, and covenants and agrees that service of process in any suit, action or proceeding may be made upon it at the office of such agent at 111 Eighth Avenue, New York, New York 10011. Notwithstanding the foregoing, the Issuer or any Note Guarantor may, with prior written notice to the Trustee, terminate the appointment of CT Corporation System and appoint another agent for the above purposes so that the Issuer and the Note Guarantors shall at all times have an agent for the above purposes in the City of New York. The Issuer and each of the Note Guarantors hereby agree to take any and all action as may be necessary to maintain the designation and appointment of an agent in full force and effect until the Final Maturity Date (or earlier, if the Notes are prepaid in full).

(d)     The Issuer and each of the Note Guarantors hereby irrevocably waive, to the fullest extent permitted by applicable law, any requirement or other provision of law, rule, regulation or practice which requires or otherwise establishes as a condition to the institution, prosecution or completion of any suit, action or proceeding (including appeals) arising out of or relating to this Indenture or any Note or any Note Guarantee, the posting of any bond or the furnishing, directly or indirectly, of any other security.

Section 13.08. *No Adverse Interpretation of Other Agreements*. This Indenture may not be used to interpret another indenture or loan or debt agreement of the Parent Guarantor or any Subsidiary of the Parent Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture. In addition, no other agreement or document may be used to interpret this Indenture with regard to any rights, duties or obligations of the Trustee created hereunder.

Section 13.09. *Successors*. All agreements of the Issuer and any Note Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successor.

Section 13.10. *Duplicate Originals*. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.11. *Separability*. In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.12. *Table of Contents and Headings*. The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 13.13. *No Personal Liability of Incorporators, Stockholders, Officers, Directors or Employees*. No recourse for the payment of the principal of, premium, if any, or interest on any of the Notes or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Issuer or any Note Guarantor in this Indenture, or in any of the Notes or the Note Guarantees or because of the creation of any Indebtedness represented thereby, shall be had against any incorporator, stockholder, officer, director, employee or controlling person of the Issuer or any Note Guarantor or of any successor Person thereof. Each Holder, by accepting the Notes, waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes and the Note Guarantees.

Section 13.14. *Force Majeure*. The Agents shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Agents (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 13.15. *USA Patriot Act*. The parties hereto acknowledge that in order to help the United States government fight the funding of terrorism and money laundering activities, pursuant to Federal regulations that became effective on October 1, 2003

(Section 326 of the USA PATRIOT Act), all financial institutions are required to obtain, verify, record and update information that identifies each person establishing a relationship or opening an account. The parties to this Indenture agree that they will provide to the Agents such information as it may request, from time to time, in order for the Agents to satisfy the requirements of the USA PATRIOT Act, including but not limited to the name, address, tax identification number and other information that will allow it to identify the individual or entity who is establishing the relationship or opening the account and may also ask for formation documents such as articles of incorporation or other identifying documents to be provided.

Section 13.16. *Anti-Money Laundering and Terrorism*.  Each of the Trustee and the Paying and Transfer Agent may take and instruct any delegate to take any action which they in their discretion (acting properly in accordance with applicable laws and the Trustee's and the Paying and Transfer Agent's internal policies and guidelines) consider necessary so as to comply with any applicable law, regulation, request of a public or regulatory authority which relates to the prevention of fraud, money laundering, terrorism or other criminal activities or the provision of financial and other services to sanctioned persons or entities. Such action may include but is not limited to the interception and investigation of transactions on the Issuer's accounts (particularly those involving the international transfer of funds) including the source of the intended recipient of funds paid into or out of the Issuer's accounts. To the extent permitted by law and regulation and if reasonably practicable, the Trustee or the Paying and Transfer Agent, as the case may be, shall notify the Issuer as early as possible of the existence of any such circumstance prior to taking any action, *provided* that if such notification is not possible or reasonably practicable to be made prior to the taking of such action, as soon as possible or reasonably practicable thereafter if permitted by law and regulation.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 414 of 739

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

Very Truly Yours,

**ROLTA AMERICAS LLC,** as Issuer

By: _____
    Name: Hiranya Ashar
    Title:  Director

**ROLTA INDIA LIMITED,** as Parent Guarantor

By: _____
    Name: Hiranya Ashar
    Title:   Director

**Signed for on behalf of each of the Subsidiary Guarantors named in Schedule 1 hereto**

By: _____
    Name: Hiranya Ashar
    Title:  Director

[Indenture]

Very Truly Yours,

**CITICORP INTERNATIONAL
LIMITED,** as Trustee and Security Agent

By: _____

Name:
Title:

Terence Young
Vice President

**CITIBANK, N.A., LONDON BRANCH,**
as Paying and Transfer Agent

By: _____

Name:
Title:

**CITIGROUP GLOBAL MARKETS
DEUTSCHLAND AG,** as Registrar

By: _____

Name:
Title:

[Indenture]

Very Truly Yours,

**CITICORP INTERNATIONAL
LIMITED**, as Trustee and Security Agent

By: _____
     Name:
     Title:

**CITIBANK, N.A., LONDON BRANCH,**
as Paying and Transfer Agent

By: _____
     Name:
     Title:

**CITIGROUP GLOBAL MARKETS
DEUTSCHLAND AG,** as Registrar

By: _____
     Name:
     Title:

[Indenture]

Very Truly Yours,

**CITICORP INTERNATIONAL LIMITED**, as Trustee and Security Agent

By: _____
     Name:
     Title:

**CITIBANK, N.A., LONDON BRANCH,**
as Paying and Transfer Agent

By: _____
     Name:
     Title:

**CITIGROUP GLOBAL MARKETS DEUTSCHLAND AG,** as Registrar

By: _____
     Name:
     Title:    Gabriele Fisch    Brigitte Deumlich

[Indenture]

**SCHEDULE I**

List of Initial Subsidiary Guarantors

| Name of Subsidiary Guarantor | Jurisdiction of Incorporation |
|---|---|
| Rolta Global B.V. | Netherlands |
| Rolta International, Inc. | Delaware |
| Rolta U.K. Limited | United Kingdom |
| Rolta Middle East FZ-LLC | United Arab Emirates |

**EXHIBIT A**

FORM OF FACE OF CERTIFICATED NOTE

**ROLTA AMERICAS LLC**

[*INSERT IF ISSUED IN EXCHANGE FOR A BENEFICIAL INTEREST IN RESTRICTED GLOBAL NOTE:* THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX

A-1

SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS.]

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 421 of 739

**No.**

US$

**ROLTA AMERICAS LLC**

**8.875% SENIOR NOTES DUE 2019**

Certificated Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantees hereto

Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to _____ or registered assigns, upon surrender hereof the principal sum of _____ (US$_____) as set forth on the books and records of the Trustee, on July 24, 2019 or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate: 8.875% per annum.

Interest Payment Dates: January 24 and July 24 of each year, commencing January 24, 2015.

Interest Record Dates: January 9 and July 9.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee acting under the Indenture.

A-3

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date:

ROLTA AMERICAS LLC

By: _____
     Name:
     Title:

A-4

CERTIFICATE OF AUTHENTICATION

This is one of the 8.875% Senior Notes Due 2019 described in the Indenture referred to in this Note.

CITICORP INTERNATIONAL LIMITED,
as Trustee and Security Agent

By: _____
Name:
Title:

A-5

FORM OF REVERSE OF CERTIFICATED NOTE

## ROLTA AMERICAS LLC
8.875% Senior Notes Due 2019

1.      Principal and Interest.

The Issuer promises to pay the principal of this Note on July 24, 2019.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 8.875% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on January 9 or July 9 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing January 24, 2015.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day. Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.      Indenture; Note Guarantees.

This is one of the Notes issued under an Indenture, dated as of July 24, 2014 (as amended from time to time, the "**Indenture**"), among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I thereto (and together with the Parent Guarantor, the "**Note Guarantors**"), Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar. Capitalized terms used herein are used as defined in the

A-6

Indenture unless otherwise indicated. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer. The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to Incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create any Liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3.     Optional Redemption.

On or after July 24, 2017, the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on July 24 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
|------|------------------|
| 2017.................................................................................... | 104.438% |
| 2018.................................................................................... | 102.219% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to July 24, 2017, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to July 24, 2017, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 108.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

A-7

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)      if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)      if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate unless otherwise required by law or by applicable stock exchange or clearing system requirements.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.      Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

6.    Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes.  Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.    Authentication.

This Note is not valid until the Trustee signs the certificate of authentication on the other side of this Note.

8.    Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.    Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

A-9

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

<u>Insert Taxpayer Identification No.</u>

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[Check One]

❑   (a)   this Note is being transferred to the Issuer;

❑   (b)   this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑   (c)   this Note is being transferred pursuant to and in accordance with Regulation S and:

    (A)   the offer of this Note was not made to a Person in the United States; and

    (B)   either:

        (i)   at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

A-10

(ii)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C)     no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

☐  (d)     this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

☐  (e)     the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____          _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document     Page 430 of 739

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____          _____

NOTICE:  To be executed by an executive officer

A-12

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❏

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                              ]

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

A-13

TRUSTEE, SECURITY AGENT PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

Citicorp International Limited
39/F Citibank Tower
Citibank Plaza
3 Garden Road
Central
Hong Kong

<u>Paying and Transfer Agent</u>

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1, Ireland

<u>Registrar</u>

Citigroup Global Markets Deutschland AG
Reuterweg 16
60323 Frankfurt
Germany

A-14

**EXHIBIT B**

## FORM OF TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

<u>Insert Taxpayer Identification No.</u>

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

<u>[Check One]</u>

❏    (a)    this Note is being transferred to the Issuer;

❏    (b)    this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❏    (c)    this Note is being transferred pursuant to and in accordance with Regulation S and:

    (A)    the offer of this Note was not made to a Person in the United States; and

    (B)    either:

        (i)    at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

       (ii)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

    (C)     no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

    (D)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

❑    (d)    this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

❑    (e)    the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____         _____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

      The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a **"qualified institutional buyer"** within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding

the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____        _____

NOTICE:  To be executed by an executive officer

B-3

**EXHIBIT C**

FORM OF RESTRICTED GLOBAL NOTE

ROLTA AMERICAS LLC

THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATED TO THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ACCORDINGLY, THIS NOTE, THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN THE TIME PERIOD REFERRED TO IN RULE 144(D) UNDER THE SECURITIES ACT AS IN EFFECT WITH RESPECT TO SUCH TRANSFER, RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) IF SUCH PURCHASER IS AN INITIAL INVESTOR, (I) TO ROLTA INDIA LIMITED (THE "COMPANY") OR ANY SUBSIDIARY THEREOF; (II) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT; (III) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT (IF AVAILABLE); OR (IV) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE); (B) IF SUCH PURCHASER IS A SUBSEQUENT INVESTOR OF AN INTEREST IN THE RESTRICTED GLOBAL NOTE, AS SET FORTH IN (A) ABOVE AND, IN ADDITION, PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY OF THE NOTES, THE PARENT GUARANTEE OR THE SUBSIDIARY GUARANTEES OTHERWISE THAN AS DESCRIBED IN (A)(I), (A)(II) OR (A)(III) ABOVE OR (C) BELOW, THE ISSUER, THE PARENT GUARANTOR, THE SUBSIDIARY GUARANTORS, THE TRUSTEE, THE PAYING AGENT, THE TRANSFER AGENT, OR THE REGISTRAR MAY, IN CIRCUMSTANCES THAT ANY OF THEM DEEMS APPROPRIATE, REQUIRE EVIDENCE AS TO COMPLIANCE WITH ANY SUCH EXEMPTION); OR (C) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS NOTE, INCLUDING THE PARENT GUARANTEE AND THE SUBSIDIARY GUARANTEES RELATING TO THIS NOTE, WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF

C-1

SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE, THE PAYING AGENT AND THE TRANSFER AGENT TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING RESTRICTIONS.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF.  THIS SECURITY MAY NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

No. R-1

CUSIP: 775788 AA0
Common Code: 109064971
ISIN Number: US775788AA03

## ROLTA AMERICAS LLC

### RESTRICTED GLOBAL NOTE

Principal amount US$49,875,000.00, as revised by the
Schedule of Exchanges of Notes attached hereto

ROLTA AMERICAS LLC

8.875% SENIOR NOTES DUE 2019

Restricted Global Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantee hereto

Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon surrender hereof the principal sum of FORTY-NINE MILLION EIGHT HUNDRED AND SEVENTY-FIVE THOUSAND UNITED STATES DOLLARS (US$49,875,000.00), as revised by the Schedule of Exchanges of Notes attached hereto, on July 24, 2019, or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate:  8.875% per annum.

Interest Payment Dates:  January 24 and July 24 of each year, commencing January 24, 2015.

Interest Record Dates:  January 9 and July 9.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee acting under the Indenture.

C-3

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date: July 24, 2014

ROLTA AMERICAS LLC

By: _____
      Name:
      Title:

CERTIFICATE OF AUTHENTICATION

This is one of the 8.875% Senior Notes Due 2019 described in the Indenture referred to in this Note.

CITICORP INTERNATIONAL LIMITED,
as Trustee and Security Agent

By: _____
Name:
Title:

C-5

FORM OF REVERSE OF RESTRICTED GLOBAL NOTE

## ROLTA AMERICAS LLC
8.875% Senior Notes Due 2019

1.      Principal and Interest.

The Issuer promises to pay the principal of this Note on July 24, 2019.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 8.875% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on January 9 or July 9 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing January 24, 2015.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day.  Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.      Indenture; Note Guarantee.

This is one of the Notes issued under an Indenture, dated as of July 24, 2014 (as amended from time to time, the "**Indenture**"), among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I thereto (and together with the Parent Guarantor the "**Note Guarantors**"), Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar.  Capitalized terms used herein are used as defined in the

C-6

Indenture unless otherwise indicated. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer. The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to Incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create any Liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3.      Optional Redemption.

On or after July 24, 2017, the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on July 24 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
|---|---|
| 2017.......................................................................... | 104.438% |
| 2018.......................................................................... | 102.219% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to July 24, 2017 at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to July 24, 2017, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 108.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

C-7

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)     if the Notes are not listed on any national securities exchange, on a *pro rata* basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.     Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.     Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

C-8

6.     Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes. Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.     Authentication.

This Note is not valid until the Trustee signs the certificate of authentication on the other side of this Note.

8.     Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.     Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

C-9

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[Check One]

❑     (a)     this Note is being transferred to the Issuer;

❑     (b)     this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑     (c)     this Note is being transferred pursuant to and in accordance with Regulation S and:

(A)     the offer of this Note was not made to a Person in the United States; and

(B)     either:

(i)     at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

C-10


   (ii) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

 (C) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

 (D) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

☐ (d) this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

☐ (e) the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____  _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a **"qualified institutional buyer"** within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding

Case 20-82282-CRJ11 Doc 126 Filed 12/07/20 Entered 12/07/20 23:29:08 Desc
Main Document Page 447 of 739

the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____          _____

NOTICE:  To be executed by an executive officer

C-12

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❑

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                                    ]

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[2]:_____

---

[2] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

SCHEDULE OF EXCHANGES OF NOTES

The following changes in the aggregate principal amount of Notes represented by this Global Note have been made:

| Date of Decrease/ Increase | Amount of decrease in aggregate principal amount of Notes | Amount of increase in aggregate principal amount of Notes | Outstanding Balance | Signature |
|---|---|---|---|---|
| | | | | |

C-14

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

Trustee and Security Agent

Citicorp International Limited
39/F Citibank Tower
Citibank Plaza
3 Garden Road
Central
Hong Kong

Paying and Transfer Agent

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1, Ireland

Registrar

Citigroup Global Markets Deutschland AG
Reuterweg 16
60323 Frankfurt
Germany

C-15

**EXHIBIT D**

FORM OF REGULATION S GLOBAL NOTE

**ROLTA AMERICAS LLC**

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS SECURITY IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE THEREOF. THIS SECURITY MAY NOT BE EXCHANGEABLE IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

D-1

No. S-1

CUSIP: U77583 AA7
Common Code: 109059323
ISIN Number: USU77583AA79

## ROLTA AMERICAS LLC

### REGULATION S GLOBAL NOTE

Principal amount US$250,125,000.00, as revised by the
Schedule of Exchanges of Notes attached hereto

ROLTA AMERICAS LLC

8.875% SENIOR NOTES DUE 2019

Regulation S Global Note

Unconditionally Guaranteed by

the Signatories listed on the Note Guarantee hereto

Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon surrender hereof the principal sum of TWO HUNDRED AND FIFTY MILLION ONE HUNDRED AND TWENTY-FIVE THOUSAND UNITED STATES DOLLARS (US$250,125,000.00), as revised by the Schedule of Exchanges of Notes attached hereto, on July 24, 2019, or on such earlier date as the principal hereof may become due in accordance with the provisions hereof.

Interest Rate: 8.875% per annum.

Interest Payment Dates: January 24 and July 24 of each year, commencing January 24, 2015.

Interest Record Dates: January 9 and July 9.

Reference is hereby made to the further provisions set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee acting under the Indenture.

D-2

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed.

Date: July 24, 2014

ROLTA AMERICAS LLC

By: _____
     Name:
     Title:

[Regulation S Global Security]

D-3

CERTIFICATE OF AUTHENTICATION

This is one of the 8.875% Senior Notes Due 2019 described in the Indenture referred to in this Note.

CITICORP INTERNATIONAL LIMITED,
as Trustee and Security Agent

By: _____
Name:
Title:

[Regulation S Global Security – Subsidiary Guarantee]

D-4

FORM OF REVERSE OF REGULATION S GLOBAL NOTE

## ROLTA AMERICAS LLC
8.875% Senior Notes Due 2019

1.     Principal and Interest.

The Issuer promises to pay the principal of this Note on July 24, 2019.

The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note, at the rate of 8.875% per annum.

Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on January 9 or July 9 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing January 24, 2015.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing default in the payment of interest and if this Note is authenticated between a regular record date and the next interest payment date, from such interest payment date) or, if no interest has been paid, from the Original Issue Date.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 15th day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least 15 days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.  In any case in which the date of the payment of principal of, premium on or interest on the Notes is not a Business Day in the relevant place of payment or in the place of business of the Paying Agent, then payment of such principal, premium or interest need not be made on such date but may be made on the next succeeding Business Day.  Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

2.     Indenture; Note Guarantee.

This is one of the Notes issued under an Indenture, dated as of July 24, 2014 (as amended from time to time, the "**Indenture**"), among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I thereto (and together with the Parent Guarantor the "**Note Guarantors**"), Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar.  Capitalized terms used herein are used as defined in the

D-5

Indenture unless otherwise indicated. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general obligations of the Issuer. The Indenture provides for the issuance from time to time of up to such principal amount or amounts as may from time to time be authorized of the Notes, and the originally issued Notes and any Additional Notes vote together for all purposes as a single class. This Note is guaranteed as set forth in the Indenture.

The Indenture limits, among other things, the ability of the Issuer to Incur or guarantee additional Indebtedness and issue disqualified or preferred stock, declare dividends on its Capital Stock or purchase or redeem Capital Stock, make investments or other specified Restricted Payments, issue or sell Capital Stock of Restricted Subsidiaries, guarantee Indebtedness, sell assets, create any Liens, enter into certain Sale and Leaseback Transactions, enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans, enter into transactions with equity holders or affiliates or effect a consolidation or merger.

3.     Optional Redemption.

On or after July 24, 2017, the Issuer may on any one or more occasions redeem all or any part of the Notes, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest, if any, on the Notes redeemed, to the applicable date of redemption, if redeemed during the twelve-month period beginning on July 24 of the years indicated below, subject to the rights of holders of Notes on the relevant Record Date to receive interest on the relevant Interest Payment Date:

| Year | Redemption Price |
|------|------------------|
| 2017................................................................................... | 104.438% |
| 2018................................................................................... | 102.219% |

The Issuer may at its option redeem the Notes, in whole but not in part, at any time prior to July 24, 2017 at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time and from time to time prior to July 24, 2017, the Issuer may at its option redeem up to 35% of the aggregate principal amount of the Notes with the Net Cash Proceeds of one or more sales of Common Stock of the Issuer in an Equity Offering at a redemption price of 108.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest, if any, to the redemption date; *provided* that at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date

remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related Equity Offering.

The Issuer will give not less than 30 days' nor more than 60 days' notice of any redemption and the Issuer shall give the Trustee and Registrar notice of any such redemption not less than 45 days (or such shorter period as agreed by the Trustee or Registrar) prior to the date fixed for redemption. If less than all of the Notes are to be redeemed at any time, the Trustee or the Registrar will select Notes for redemption as follows:

(1)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2)     if the Notes are not listed on any national securities exchange, on a pro rata basis, by lot or by such other method as the Trustee or Registrar in its sole discretion shall deem to be fair and appropriate and in accordance with the procedures of DTC.

A Note of US$200,000 in principal amount or less shall not be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions of them called for redemption.

4.     Registered Form; Denominations; Transfer; Exchange.

The Notes are in registered form without coupons in denominations of US$200,000 and any multiple of $1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.     Defaults and Remedies.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all the Notes to be immediately due and payable. Notwithstanding the prior sentence, if a bankruptcy or insolvency default with respect to the Issuer or any Restricted Subsidiary occurs and is continuing, the Notes automatically become immediately due and payable. Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require security and indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of at least a majority in aggregate principal amount of the Notes then outstanding may direct the Trustee in its exercise of remedies.

6.     Amendment and Waiver.

Subject to certain exceptions, the Indenture and the Notes may be amended, or default may be waived, with the consent of the Holders of a majority in aggregate principal amount of the outstanding Notes. Without notice to or the consent of any Holder, the Issuer and the Trustee may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity, defect or inconsistency, or make any other change that does not adversely affect the rights of any Holder.

7.     Authentication.

This Note is not valid until the Trustee signs the certificate of authentication on the other side of this Note.

8.     Governing Law.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York.

9.     Abbreviations.

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

**The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.**

D-8

TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned registered holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing _____
attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

In connection with any transfer of this Note:

[Check One]

❑    (a)    this Note is being transferred to the Issuer;

❑    (b)    this Note is being transferred pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and, accordingly, the undersigned does hereby further certify that this Note is being transferred to a Person that the undersigned reasonably believes is purchasing this Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States;

❑    (c)    this Note is being transferred pursuant to and in accordance with Regulation S and:

(A)    the offer of this Note was not made to a Person in the United States; and

(B)    either:

(i)    at the time the buy order was originated, the transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the transferee was outside the United States, or

(ii)    the transaction was executed in, on or through the facilities of a designated offshore securities market

D-9

and neither the undersigned nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States; and

(C)    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

(D)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

❑    (d)    this Note is being transferred in a transaction permitted by Rule 144 and the undersigned has delivered to the Trustee or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption; or

❑    (e)    the undersigned did not purchase this Note as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption (other than (a) through (d) above) from the registration requirements under the Securities Act and the undersigned has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence that the Issuer, any Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

If none of the foregoing boxes is checked, the Trustee, the Paying and Transfer Agent or the Registrar shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer or registration set forth herein and in Section 2.05 of the Indenture shall have been satisfied.

Date: _____    _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within-mentioned instrument in every particular, without alteration or any change whatsoever.

TO BE COMPLETED BY PURCHASER IF (b) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 461 of 739

undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____          _____

NOTICE:  To be executed by an executive officer

D-11

OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, check the box: ❑

If you wish to have a portion of this Note purchased by the Issuer pursuant to Section 4.12 or 4.13 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Wire transfer instructions for delivery of proceeds from the purchase of the Note are as follows:

[                                    ]

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[3]: _____

_____

[3] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the United States Securities Exchange Act of 1934, as amended.

D-12

SCHEDULE OF EXCHANGES OF NOTES

The following changes in the aggregate principal amount of Notes represented by this Global Note have been made:

| Date of Decrease/ Increase | Amount of decrease in aggregate principal amount of Notes | Amount of increase in aggregate principal amount of Notes | Outstanding Balance | Signature |
| --- | --- | --- | --- | --- |

D-13

FILED: NEW YORK COUNTY CLERK 06/12/2018 02:00 PM

NYSCEF DOC. NO. 17

INDEX NO. 652798/2018

RECEIVED NYSCEF: 06/12/2018

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

Trustee and Security Agent

Citicorp International Limited
39/F Citibank Tower
Citibank Plaza
3 Garden Road
Central
Hong Kong

Paying and Transfer Agent

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1, Ireland

Registrar

Citigroup Global Markets Deutschland AG
Reuterweg 16
60323 Frankfurt
Germany

D-14

**EXHIBIT E-1**

FORM OF ISSUER AUTHORIZATION CERTIFICATE

[*Date*]

I, [*Name*], [*Title*], acting on behalf of Rolta Americas LLC, hereby certify that:

(A)     the persons listed on Schedule I hereto are (i) Authorized Officers of the Issuer (as defined below) for purposes of the Indenture dated as of July 24, 2014 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**"), Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar; and (ii) the duly authorized person who executed or will execute the Notes (as defined under the Indenture) by his manual or facsimile signature or signature in scanned format delivered through e-mail was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name;

(B)     each signature appearing on Schedule I hereto is the person's genuine signature; and

(C)     attached hereto as Schedule II is a true, correct and complete specimen of the certificates representing the Notes.

[*Signature Page Follows*]

E-1-1

IN WITNESS WHEREOF, I have hereunto signed my name as of the date first written above.

ROLTA AMERICAS LLC

By: _____

Name:

Title:

E-1-2

## Schedule I

### SPECIMENS OF SIGNATURES

| **Name** | **Title** | **Signature** |
| --- | --- | --- |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 468 of 739

## Schedule II

### SPECIMENS OF THE
### 144A GLOBAL NOTE
### AND THE REGULATION S GLOBAL NOTE

E-1-4

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 469 of 739

EXHIBIT E-2

[FORM OF NOTE GUARANTOR AUTHORIZATION CERTIFICATE]

[*Date*]

I, [*Name*], [*Title*], of [the Parent Guarantor/a Subsidiary Guarantor listed in Schedule I], acting on behalf of [the Parent Guarantor/a Subsidiary Guarantor listed in Schedule I] to the Indenture (as defined below) (the "**Parent Guarantor**"/"**Subsidiary Guarantor**"), hereby certify that:

(A)     the persons listed on Schedule I hereto are (i) Authorized Officers of the [*Parent Guarantor/Subsidiary Guarantor*] for purposes of the Indenture dated as of July 24, 2014 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**"), Citicorp International Limited, as Trustee and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar; and (ii) the duly authorized person who executed or will execute the Note Guarantee (as defined under the Indenture) endorsed on the Notes (as defined under the Indenture) by his manual or facsimile signature or signature in scanned format delivered through e-mail was at the time of such execution, duly elected or appointed, qualified and acting as the holder of the office set forth opposite his name;

(B)     each signature appearing on Schedule I hereto is the person's genuine signature; and

(C)     attached hereto as Schedule II is a true, correct and complete specimen of the certificates representing the Notes.

*[Signature Page Follows]*

IN WITNESS WHEREOF, I have hereunto signed my name as of the date first written above.

[PARENT GUARANTOR/SUBSIDIARY GUARANTOR]

By: _____
     Name:
     Title:

E-2-2

**Schedule I**

**SPECIMENS OF SIGNATURES**

| **Name** | **Company** | **Signature** | **Signature** |
|----------|-------------|---------------|---------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

E-2-3

**Schedule II**

**SPECIMENS OF THE**
**144A GLOBAL NOTE**
**AND THE REGULATION S GLOBAL NOTE**

EXHIBIT F

FORM OF PAYING AND TRANSFER AGENT APPOINTMENT LETTER

[Date]

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1
Ireland

      Re:    8.875% Senior Notes Due 2019 of Rolta Americas LLC

Reference is hereby made to the Indenture dated as of July 24, 2014 (as amended, modified or supplemented from time to time, the "**Indenture**") among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor, the "**Note Guarantors**"), Citicorp International Limited, as Trustee (the "**Trustee**") and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar.  Terms used herein are used as defined in the Indenture.

The Issuer hereby appoints Citibank, N.A., London Branch as the paying agent, registrar and transfer agent (the "**Agent**") with respect to the Notes and the Agent hereby accepts such appointment. By accepting such appointment, the Agent agrees to be bound by and to perform the services with respect to itself set forth in the terms and conditions set forth in the Indenture and the Notes, as well as the following terms and conditions to all of which the Issuer agrees and to all of which the rights of the holders from time to time of the Notes shall be subject:

    (a)    The Agent shall be entitled to the compensation to be agreed upon in writing with the Issuer and the Note Guarantors, jointly and severally, for all services rendered by it under the Indenture, and the Issuer and the Note Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse the Agent upon request for all reasonable out-of-pocket expenses, disbursements and advances (including costs of collection) incurred or made by the Agent, including the reasonable compensation, expenses and disbursements of such agents, counsels and other Persons not regularly within its employ, in connection with the services rendered by it under the Indenture.  The Issuer and the Note Guarantors jointly and severally hereby agree to indemnify the Agent and its officers, directors, agents and employees and any successors thereto for, and to hold it harmless against, any obligations, taxes, judgments, suits, loss, action, proceeding, claim, penalty, damages, cost, disbursement, liability or expense incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with its acting as Agent under the Indenture and the Notes, including (1) the costs and expenses of defending itself against any claim or liability and of complying

F-1

with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under the Indenture and the Notes and (2) the compensation, expenses and disbursements of such agents, counsels and other Persons not regularly within the its employ. The obligations of the Issuer and the Note Guarantors under this paragraph (a) shall survive the payment of the Notes, the termination or expiry of the Indenture or this letter and the resignation or removal of the Agent. Under no circumstance will the Agent be liable to any party for any special, indirect, punitive or consequential loss or damage, even if it has been advised of such loss or damage. This provision shall remain in full force and effect notwithstanding the discharge of the Notes and or the resignation or replacement or removal of the Agent.

(b) In acting under the Indenture and in connection with the Notes, the Agent is acting solely as agent of the Issuer and does not assume any obligation towards or relationship of agency or trust for or with any of the owners or holders of the Notes, except that all funds held by the Agent for the payment of principal interest or other amounts (including Additional Amounts) on, the Notes shall, subject to the provisions of the Indenture, be held in trust by the Agent and applied as set forth in the Indenture and in the Notes, but need not be segregated from other funds held by the Agent, except as required by law.

(c) Any funds held by the Agents in relation to the Notes are held as banker and shall not be subject to the relevant United Kingdom Financial Conduct Authority's client money rules.

(d) The Agent may consult with counsel satisfactory to it and any advice or written opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it under the Indenture in good faith and in accordance with such advice or opinion.

(e) The Agent shall be fully protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties.

(f) The Agent and any of its Affiliates, in its individual capacity or any other capacity, may become the owner of, or acquire any interest in, any Notes or other obligations of the Issuer with the same rights that it would have if it were not the Paying and Transfer Agent, and may engage or be interested in any financial or other transaction with the Issuer, and may act on, or as depository, Trustee or agent for, any committee or body of holders of Notes or other obligations of the Issuer, as freely as if it were not the Agent.

(g) The Agent shall give the Trustee written notice of any failure by the Issuer (or by any other obligor on the Notes or the Note Guarantees) to make any payment of the principal, or premium or interest on, the Notes and any other payments to be made on behalf of the Issuer under the Indenture, when the same shall be due and payable and at

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 475 of 739

any time during the continuance of any such failure the Agent will pay any such sums so held in trust by it to the Trustee upon the Trustee's written request.

(h)     The Agent shall not be under any liability for interest on any monies received by it pursuant to any of the provisions of the Indenture or the Notes.

(i)     The Agent shall be obligated to perform such duties and only such duties as are in the Indenture and the Notes specifically set forth, and no implied duties or obligation shall be read into the Indenture or the Notes against the Agent. The Agent shall not be under any obligation to take any action under the Indenture which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its opinion, assured to it.  The Agent shall have no obligation to expend its own funds or otherwise incur any financial liability in the performance of its obligations hereunder or under the Indenture.  Notwithstanding anything contained herein to the contrary, the obligations of the Agents under this Agent Appointment Letter are several and not, and shall under no circumstances be deemed to be, joint.

(j)     The Agent may at any time resign by giving written notice of its resignation to the Issuer and the Trustee and specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept shorter notice. Upon receiving such notice of resignation, if required by the Indenture the Issuer shall promptly appoint a successor [paying agent, registrar and transfer agent] (the "**Successor Agent**") by written instrument substantially in the form hereof in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent, one copy to the Successor Agent and one copy to the Trustee.  Upon the effectiveness of the appointment of a successor paying agent, the Agent shall have no further obligations under this letter or the Indenture.  If the Issuer fails to appoint the Successor Agent by the date on which the Agent's resignation becomes effective, the Agent shall have the right to appoint the Successor Agent.

Such resignation shall become effective upon the earlier of (i) the effective date of such resignation and (ii) the acceptance of appointment by the Successor Agent, as provided below. The Issuer may, at any time and for any reason, remove the Agent and appoint a successor paying agent, by written instrument in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed, one copy to the Successor Agent and one copy to the Trustee. Any removal of the Agent and any appointment of a Successor Agent shall become effective upon acceptance of appointment by the Successor Agent as provided below. Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation for the services rendered hereunder and to the reimbursement of all properly incurred out-of-pocket expenses in connection with the services rendered by it hereunder.

The Issuer shall remove the Agent and appoint a Successor Agent if the Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other

similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.

Any Successor Agent appointed as provided herein shall execute and deliver to its predecessor and to the Issuer and the Trustee an instrument accepting such appointment (which may be in the form of an acceptance signature to the letter of the Issuer appointing such Successor Agent) and thereupon such Successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Agent and such predecessor shall pay over to such successor agent all monies or other property at the time held by it hereunder.

(k)     Notwithstanding anything contained herein to the contrary, each of the Issuer and the Note Guarantors hereby irrevocably agrees that any and all of the rights and obligations of any Agent and, to the extent applicable, the obligations of the Issuer and the Note Guarantors toward any Agent set forth in the Indenture shall be deemed to have been included in this letter.

(l)     Each Agent shall at all times be a responsible financial institution which is authorized by law to exercise its respective powers and duties hereunder and under the Indenture and the Notes.

(m)     If an Event of Default occurs and is continuing, the Trustee shall be entitled to require all Agents to, and each Agent shall be required to, act solely in accordance with the Trustee's directions.

(n)     Any notice or communication to the Agent will be deemed given when sent by facsimile transmission, with transmission confirmed.  Any notice to the Agent will be effective only upon receipt.  The notice or communication should be addressed to the Agent at:

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1
Ireland
Fax (Payment): +35316226210
Fax (Transfer): +35315060334
Attn: Agency and Trust

Any notice to the Issuer or the Trustee shall be given as set forth in the Indenture.

(o)     Any corporation into which the Agent may be merged or converted or any corporation with which the Agent may be consolidated or any corporation resulting from

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 477 of 739

any merger, conversion or consolidation to which the Agent shall be a party or any corporation succeeding to the business of the Agent shall be the successor to such Agent hereunder (*provided* that such corporation shall be qualified as aforesaid) without the execution or filing of any document or any further act on the part of any of the parties hereto.

(p)     Any amendment, supplement or waiver under Sections 9.01 and 9.02 of the Indenture that adversely affects the Agent shall not affect the Agent's rights, powers, obligations, duties or immunities, unless the Agent has consented thereto.

(q)     The Issuer and the Note Guarantors agree that the provisions of Section 7.01(e), Section 7.02(d), Section 7.02(e), Section 7.05 and Section 13.07 of the Indenture shall apply hereto, *mutatis mutandis*.

[*Signature Page Follows*]

F-5

The agreement set forth in this letter shall be construed in accordance with and governed by the laws of the State of New York.

ROLTA AMERICAS LLC

By: _____
    Name:
    Title:

ROLTA INDIA LIMITED
As Parent Guarantor

By: _____
    Name:
    Title:

[SUBSIDIARY GUARANTOR]
As Subsidiary Guarantor

By: _____
    Name:
    Title:

F-6

Agreed and accepted:

CITIBANK, N.A., LONDON BRANCH, as
Paying and Transfer Agent

By: _____
      Name:
      Title:

CITIGROUP GLOBAL MARKETS
DEUTSCHLAND AG, as Registrar

By: _____
      Name:
      Title:

Acknowledged:

CITICORP INTERNATIONAL LIMITED,
as Trustee and Security Agent

By: _____
      Name:
      Title:

F-7

**EXHIBIT G**

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS
PURSUANT TO REGULATION S

[*Date*]

Citibank, N.A., London Branch,
  as Paying and Transfer Agent

Citigroup Global Markets Deutschland AG,
  as Registrar

Rolta Americas LLC,
  as Issuer

and

The Note Guarantors (as defined below)

Re:     Rolta Americas LLC
        8.875% Senior Notes Due 2019 (the "**Notes**")

Dear Sirs:

Reference is hereby made to the Indenture, dated as of July 24, 2014 (the "**Indenture**"), among , Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed in Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**"), Citicorp International Limited, as Trustee (the "**Trustee**") and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to US$                    principal amount of Notes which are evidenced by one or more Restricted Global Notes (CUSIP No. 775788 AA0 ; ISIN No. US775788AA03; Common Code 109064971) and held with the Depositary in the name of [insert name of transferor] (the "**Transferor**"). The Transferor has requested a transfer of such beneficial interest in the Notes to a Person who will take delivery thereof in the form of an equal principal amount of Notes evidenced by one or more Regulation S Global Notes (CUSIP No. U77583 AA7; ISIN No. USU77583AA79 ; Common Code 109059323).

In connection with such request and in respect of such Notes, we hereby certify that such sale has been effected pursuant to and in accordance with either  Rule 903 or

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 481 of 739

Rule 904 of Regulation S or Rule 144 under the United States Securities Act of 1933, as amended (the "**Securities Act**"), and accordingly we hereby further certify that:

(1)    if the transfer has been effected pursuant to Rule 903 or Rule 904:

    (A)    the offer of the Notes was not made to a Person in the United States;

    (B)    either:

        (i)    at the time the buy order was originated, the transferee was outside the United States or we and any Person acting on our behalf reasonably believed that the transferee was outside the United States, or

        (ii)    the transaction was executed in, on or through the facilities of a designated offshore securities market and neither we nor any Person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

    (C)    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable; and

    (D)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; or

(2)    if the transfer has been effected pursuant to Rule 144, the Securities have been transferred in a transaction permitted by Rule 144.

*[Signature Page Follows]*

G-2

You, the Issuer and the Note Guarantors are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby. Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,
[Name of Transferor]

By: _____

Authorized Signature

G-3

**EXHIBIT H**

FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH TRANSFERS TO QIBs

[*Date*]

Citibank, N.A., London Branch,
 as Paying and Transfer Agent

Citigroup Global Markets Deutschland AG,
 as Registrar

Rolta Americas LLC,
 as Issuer

and

The Note Guarantors (as defined below)

Re:    Rolta Americas LLC (the "**Issuer**")
       8.875% Senior Notes Due 2019 (the "**Notes**")

Dear Sirs:

Reference is hereby made to the Indenture (as amended, modified or supplemented from time to time, the "**Indenture**") dated as of July 24, 2014 among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**"), Citicorp International Limited, as Trustee (the "**Trustee**") and Security Agent, Citibank, N.A., London Branch, as Paying and Transfer Agent and Citigroup Global Markets Deutschland AG, as Registrar.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to US$_____ million principal amount of Notes which are evidenced by one or more Regulation S Global Notes (CUSIP No. U77583 AA7; ISIN No. USU77583AA79; Common Code 109059323) and held with the Depositary through [Euroclear] [Clearstream] in the name of [insert name of transferor] (the "**Transferor**").  The Transferor has requested that a transfer of such beneficial interest in the Notes to a Person who will take delivery thereof (the "**Transferee**") in the form of an equal principal amount of Notes evidenced by one or more Restricted Global Notes (CUSIP No. 775788 AA0; ISIN No. US775788AA03; Common Code 109064971).

[Check One]

❑    In connection with such request and in respect of such Notes, the Transferee does hereby certify that (i) it is a "**qualified institutional**

H-1

buyer" ("**QIB**") as defined in and pursuant to Rule 144A ("**Rule 144A**") under the Securities Act, purchasing the Notes for its own account (or for the account of one or more QIBs over which account it exercises sole investment discretion) and (ii) the transfer was made in a transaction meeting the requirements of Rule 144A.

☐    The Transferor did not purchase such Notes as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption from the registration requirements of the Securities Act and the Transferor has delivered to the Trustee, the Paying and Transfer Agent or the Registrar such additional evidence the Issuer, the Note Guarantor, the Trustee, the Paying and Transfer Agent or the Registrar may require as to compliance with such available exemption.

You, the Issuer and the Note Guarantors are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,
[Name of Transferee or Transferor]

[Name of DTC participant holding such position on behalf of beneficial owner]

By: _____
     Authorized Signature

H-2

EXHIBIT I

**SUPPLEMENTAL INDENTURE**

**dated as of _____, _____**

**among**

**ROLTA AMERICAS LLC**
**as the Issuer**

**and**

**ROLTA INDIA LIMITED**
**as the Parent Guarantor**

**and**

**The entities listed on Schedule I hereto**
**as the Subsidiary Guarantors**

**and**

**CITICORP INTERNATIONAL LIMITED**
**as Trustee and Security Agent**

**and**

**CITIBANK, N.A., LONDON BRANCH**
**as Paying and Transfer Agent**

**8.875% Senior Notes Due 2019**

I-1

THIS SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**"), entered into as of _____, ____, among, Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the Subsidiary Guarantors listed on Schedule I hereto (the "**Subsidiary Guarantors**" and together with the Parent Guarantor the "**Note Guarantors**") and [*insert each new Guarantor executing this Supplemental Indenture and its jurisdiction of incorporation*] (each an "**Undersigned**") and Citicorp International Limited, as Trustee (the "**Trustee**"), and security agent and Citibank, N.A., London Branch, as paying and transfer agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture (as defined below).

## RECITALS

WHEREAS, the Issuer, the Note Guarantors party thereto, the Trustee and certain other parties thereto entered into the Indenture, dated as of July 24, 2014 (as amended or supplemented to the date hereof, the "**Indenture**"), relating to the Issuer's 8.875% Senior Notes Due 2019 (the "**Notes**").

WHEREAS, pursuant to Sections 11.09 and 11.10 of the Indenture each new Subsidiary Guarantor (other than Persons designated as a Non-Guarantor Subsidiary) is required to enter into a supplemental indenture which supplemental indenture may be entered into without the consent of the Holders pursuant to Section 9.01(a)(viii).

WHEREAS, as a condition to the Trustee entering into the Indenture and the purchase of the Notes by the Holders, the Parent Guarantor agreed pursuant to the Indenture to cause any future Restricted Subsidiaries (other than Persons designated as a Non-Guarantor Subsidiary) to provide Subsidiary Guarantees.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and intending to be legally bound, the parties to this Supplemental Indenture hereby agree as follows:

Section 1. Capitalized terms used herein and not otherwise defined herein are used as defined in the Indenture.

Section 2. Each Undersigned, by its execution of this Supplemental Indenture, agrees to be a Subsidiary Guarantor under the Indenture and to be bound by all the terms of the Indenture applicable to Subsidiary Guarantors, including, but not limited to, Article 11 thereof. To evidence its Guarantee set forth in this Indenture, the Subsidiary Guarantor hereby agrees that a notation of such Guarantee, substantially in the form of Exhibit M, shall be endorsed by an authorized officer of such Subsidiary Guarantor on each Note authenticated and delivered by the Trustee prior to (and continuing to be outstanding), on or after the date thereof.

I-2

Section 3.  This Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

Section 4.  This Supplemental Indenture may be signed in various counterparts which together will constitute one and the same instrument.

Section 5.  This Supplemental Indenture is an amendment supplemental to the Indenture and the Indenture and this Supplemental Indenture will henceforth be read together.

Section 6.  The recitals contained herein shall be taken as the statements of the Issuer, the Note Guarantors and the Undersigned, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity or sufficiency of this Supplemental Indenture.

Section 7.  Notwithstanding anything contained herein, nothing in this Supplemental Indenture shall relieve the Issuer, the Note Guarantors or the Trustee of any of their obligations under the Indenture, as amended and supplemented by this Supplemental Indenture, and the Notes.  The Trustee shall not be responsible and shall have no liability for the validity or efficiency of this Supplemental Indenture.  The Issuer and the Note Guarantors acknowledge and agree that the indemnification and other provisions of Section 7.06 of the Indenture shall apply to this Supplemental Indenture and the transactions contemplated therein as if set forth herein.

Section 8.  All of the provisions of the Indenture shall remain in full force and effect as set forth therein.

[*Signature Page Follows*]

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 488 of 739

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

ROLTA AMERICAS LLC

By: _____
    Name:
    Title:

ROLTA INDIA LIMITED
As Parent Guarantor

By: _____
    Name:
    Title:

[SUBSIDIARY GUARANTOR]
As Subsidiary Guarantor

By: _____
    Name:
    Title:

[NEW GUARANTOR]
As Subsidiary Guarantor

By: _____
    Name:
    Title:

I-4

Very Truly Yours,

CITICORP INTERNATIONAL LIMITED,
as Trustee and Security Agent


By: _____
    Name:
    Title:


CITIBANK, N.A., LONDON BRANCH, as
Paying and Transfer Agent


By: _____
    Name:
    Title:


CITIGROUP GLOBAL MARKETS
DEUTSCHLAND AG, as Registrar


By: _____
    Name:
    Title:

I-5

**SCHEDULE I
TO EXHIBIT I**

LIST OF SUBSIDIARY GUARANTORS[4]

1.  Rolta Global, B.V.

2.  Rolta International, Inc.

3.  Rolta U.K. Limited

4.  Rolta Middle East FZ-LLC

---

[4] To be updated as of the date of any Supplemental Indenture.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document        Page 491 of 739

**EXHIBIT J**

FORM OF COMPLIANCE CERTIFICATE

[*Date*]

This Compliance Certificate is delivered pursuant to Section 6.08 of the Indenture, dated as of July 24, 2014, as amended, supplemented or modified from time to time (the "**Indenture**"), among Rolta Americas LLC, a Delaware limited liability company (the "**Issuer**"), Rolta India Limited, a company organized under the laws of the Republic of India (the "**Parent Guarantor**"), the entities listed on Schedule I thereto (the "**Subsidiary Guarantors**" and, together with the Parent Guarantor, the "**Note Guarantors**") and Citicorp International Limited, as Trustee (the "**Trustee**"), and Security Agent and Citibank, N.A., London Branch, as paying and transfer agent. Terms defined in the Indenture are used herein as therein defined.

Each of the undersigned hereby certifies to the Trustee as follows:

1. I am the duly elected, qualified and acting [title] or [title], as the case may be, of the Issuer.

2. I have reviewed and am familiar with the contents of this Compliance Certificate.

3. I have reviewed the terms of the Indenture and the Security Documents and have made or caused to be made under my supervision, a review in reasonable detail of the Collateral and the condition of the Collateral. Such review did not disclose the existence during or at the end of the annual period covered by this Compliance Certificate, and I have no knowledge of the existence as of the date of this Compliance Certificate, of any condition or event which would impair the perfected security interest created by the Indenture and the Security Documents with at least the priority of such security interest on the Original Issue Date[, except as set forth below].

4. Based upon the advice of counsel, all action has been taken with respect to the recording, registering, filing, re-recording, registering and refiling of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as may be necessary to maintain the Liens granted pursuant to the Security Documents to the extent required by the Security Documents, if any [and, if necessary, reciting the details of such action].

5. Since the Original Issue Date:

(a) none of the Issuer nor any Note Guarantor has changed its jurisdiction of organization, name, identity or corporate structure to such an extent that any financing statement or other Security Document filed by or on behalf of the Security Agent would become misleading;

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 492 of 739

(b)      the Issuer has performed any re-filing, re-recording or continuation of documentation with respect to the Collateral as necessary to maintain such security interest in the Collateral in favor of the Security Agent on behalf of the Holders of Notes,

except, in each case, (i) any of the foregoing that has been previously disclosed to the Security Agent in accordance with the Indenture and any relevant Security Document and in respect of which the Issuer and each Note Guarantor have delivered to the Security Agent all required documents and other filings required to maintain the perfection and priority of the Security Agent's security interest in the Collateral after giving effect to such event, in each case as required by the Indenture and the relevant Security Documents and (ii) any of the foregoing described in Attachment 1 hereto in respect of which the Issuer or the Note Guarantor is delivering to the Security Agent herewith all required statements and other filings required to maintain the perfection and priority of the Security Agent's security interest in the Collateral after giving effect to such event, in each case, as required by the Indenture and the relevant Security Documents.

6.      That a review has been conducted of the activities of the Parent Guarantor and the Restricted Subsidiaries and the Parent Guarantor's and the Restricted Subsidiaries' performance under the Indenture, in each case since the Original Issue Date, [and that the Issuer and each Restricted Subsidiary have been since the Original Issue Date and are in compliance with of their respective all obligations under the Indenture]/[if there has been a default in the fulfillment of any obligation under the Indenture, specifying each such default and the nature and status thereof.]

*[Signature Page Follows]*

J-2

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date first written above.

ROLTA INDIA LIMITED

By: _____

Name:

Title:

J-3

**EXHIBIT K**

TRUSTEE, SECURITY AGENT, PAYING AND TRANSFER AGENT AND
REGISTRAR

<u>Trustee and Security Agent</u>

Citicorp International Limited
39/F Citibank Tower
Citibank Plaza
3 Garden Road
Central
Hong Kong

<u>Paying and Transfer Agent</u>

Citibank, N.A., London Branch
c/o Citibank, N.A., Dublin Branch
One North Wall Quay
Dublin 1, Ireland

<u>Registrar</u>

Citigroup Global Markets Deutschland AG
Reuterweg 16
60323 Frankfurt
Germany

K-1

**EXHIBIT L**

FORM OF NOTATION OF PARENT GUARANTEE

For value received, the undersigned (the "**Parent Guarantor**") hereby, jointly and severally, Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and the Indenture.  The Parent Guarantor further Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of all amounts due under the Subsidiary Guarantee of the Notes by Rolta International, Inc.

The obligations of the Parent Guarantor are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by: (1) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under the Indenture or any Note, by operation of law or otherwise; (2) any modification or amendment of or supplement to the Indenture or any Note; (3) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in the Indenture or any Note; (4) the existence of any claim, set off or other rights which the Parent Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with the Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim; (5) any invalidity, irregularity, or unenforceability relating to or against the Issuer for any reason of the Indenture or any Note; or (6) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Parent Guarantor's obligations hereunder.

This Parent Guarantee will not be discharged with respect to any Note except by payment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable, in respect of the Parent Guarantor, as otherwise contemplated in the Indenture.  In case of the failure of the Issuer punctually to pay any such principal of, premium, if any, and interest on the Notes and all other amounts payable, the Parent Guarantor hereby agrees to cause any such payment to be made punctually when and as the same shall become due and payable, whether at the stated maturity, by acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

Subject to certain exceptions as set forth in the Indenture, the Parent Guarantor hereby further agrees that all payments of, or in respect of, principal of, and premium (if any) and interest on the Notes or under a Note Guarantee will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Surviving Person (as defined in the Indenture) or

L-1

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 496 of 739

any Note Guarantor is organized or resident for tax purposes (or any political subdivision or taxing authority thereof or therein) or any jurisdiction through which payment is made by or behalf of the Issuer, a Surviving Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein, unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Surviving Person, the Parent Guarantor or the Subsidiary Guarantors, as the case may be, will pay such Additional Amounts as will result in receipt by the holder of this Parent Guarantee of such amounts as would have been received by such holder had no such withholding or deduction been required.

Notwithstanding the foregoing, as at the Original Issue Date, the Parent Guarantor's potential liability under the Parent Guarantee is capped at an amount equal to 150 percent of the total initial aggregate principal amount of the Notes being US$450,000,000 (the "**Parent Guaranteed Amount**"). The Parent Guaranteed Amount will be reduced by any amounts paid by the Parent Guarantor under the Parent Guarantee from time to time up to a maximum of 150 percent of the then outstanding total aggregate Principal Amount of the Notes (the "**Maximum Guaranteed Amount**").

The obligations of the Parent Guarantor to the holder of this Note and to the Trustee pursuant to this Parent Guarantee and the Indenture are expressly set forth in Article 10 of the Indenture, and reference is hereby made to such Article and Indenture for the precise terms of the Parent Guarantee.

This Parent Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Parent Guarantee is endorsed shall have been executed by the Trustee under the Indenture by manual signature of one of its authorized officers.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

Date: _____

ROLTA INDIA LIMITED

By: _____
     Name:
     Title:

**EXHIBIT M**

FORM OF NOTATION OF SUBSIDIARY GUARANTEE

For value received, each of the undersigned (the "**Subsidiary Guarantors**") hereby, jointly and severally, Guarantees as principal obligor to each Holder of a Note authenticated by the Trustee and to the Trustee and its successors and assigns the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes and the Indenture. The obligations of each Subsidiary Guarantor are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by: (1) any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under the Indenture or any Note, by operation of law or otherwise; (2) any modification or amendment of or supplement to the Indenture or any Note; (3) any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in the Indenture or any Note; (4) the existence of any claim, set off or other rights which the Subsidiary Guarantor may have at any time against the Issuer, the Trustee or any other Person, whether in connection with the Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim; (5) any invalidity, irregularity, or unenforceability relating to or against the Issuer for any reason of the Indenture or any Note; or (6) any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to such Subsidiary Guarantor's obligations hereunder.

This Subsidiary Guarantee will not be discharged with respect to any Note except by payment in full of the principal of, premium, if any, and interest on the Notes and all other amounts payable, in respect of any Subsidiary Guarantor, or as otherwise contemplated in the Indenture. In case of the failure of the Issuer punctually to pay any such principal of, premium, if any, and interest on the Notes and all other amounts payable, each of the Subsidiary Guarantors hereby agrees to cause any such payment to be made punctually when and as the same shall become due and payable, whether at the stated maturity, by acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

Subject to certain exceptions as set forth in the Indenture, each of the Subsidiary Guarantors hereby further agrees that all payments of, or in respect of, principal of, and premium (if any) and interest in respect of this Subsidiary Guarantee will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Surviving Person (as defined in the Indenture) or the applicable Subsidiary Guarantor is organized or resident for tax purposes (or any political subdivision or taxing authority thereof or therein) or any jurisdiction through which payment is made by or behalf of the Issuer, a Surviving

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document      Page 498 of 739

Person or a Note Guarantor, or any political subdivision or taxing authority thereof or therein, unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, each Subsidiary Guarantor severally agrees to pay such Additional Amounts as will result in receipt by the holder of this Subsidiary Guarantee of such amounts as would have been received by such holder had no such withholding or deduction been required.

The obligations of the Subsidiary Guarantors to the holder of this Note and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article 11 of the Indenture, and reference is hereby made to such Article and Indenture for the precise terms of the Subsidiary Guarantee.

This Subsidiary Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Subsidiary Guarantee is endorsed shall have been executed by the Trustee under the Indenture by manual signature of one of its authorized officers.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

Date: _____

ROLTA GLOBAL, B.V.

By: _____
    Name:
    Title:

ROLTA INTERNATIONAL, INC.

By: _____
    Name:
    Title:

ROLTA U.K. LIMITED

By: _____
    Name:

M-2

Title:


ROLTA MIDDLE EAST FZ-LLC


By: _____

Name:
Title:


M-3

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART IAS MOTION 48EFM

-----------------------------------------------------------------------X

PALA ASSETS HOLDINGS LTD, PINPOINT MULTI-
STRATEGY FUND, VALUE PARTNERS FIXED INCOME
SPC - VALUED PARTNERS CREDIT OPPORTUNITIES
FUND, VALUED PARTNERS GREATER CHINA HIGH
YIELD INCOME FUND,

| | |
|---|---|
| **INDEX NO.** | 652798/2018 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 009 |

                                        Plaintiffs,

                        - v -

ROLTA, LLC,ROLTA INDIA LTD, ROLTA
INTERNATIONAL INC., ROLTA UK LTD, ROLTA MIDDLE
EAST FZ-LLC, ROLTA AMERICAS LLC, ROLTA GOLBAL
B.V.

                                        Defendants.

**DECISION + ORDER ON
MOTION**

-----------------------------------------------------------------------X

**AMENDED[1]**

HON. ANDREA MASLEY

HON. ANDREA MASLEY:

The following e-filed documents, listed by NYSCEF document number (Motion 009) 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 333, 338, 339, 340, 341, 343, 346

were read on this motion to/for                     JUDGMENT - SUMMARY

Upon the foregoing documents, it is

        Plaintiffs Pala Assets Holdings LTD (Pala), Pinpoint MultiStrategy Fund

(Pinpoint), Value Partners Fixed Income SPC – Value Partners Credit Opportunities

Fund (VP Credit), and Value Partners Greater China High Yield Income Fund (VP

China) moved pursuant to CPLR 3212 for summary judgment.

---

[1] By October 6, 2020 email, plaintiffs informed the court of an error in this decision. (NYSCEF 370, September 10, 2020 letter filed in NYSCEF but not provided to the court until October 6, 2020).  Defendants informed the court by October 8, 2020 email that they took no position on plaintiffs' requested correction.

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No.  009

Page 1 of 7

In this breach contract action, initiated with a Summons, summary judgment motion in lieu of complaint, and ex parte application for attachment, plaintiffs seek to recover $147,692,000[2] plus interest against defendants for defaulting on the 2018 and 2019 Notes totaling $500 million. (NYSCEF 1, Summons; NYSCEF 243 Supplemental Summons, NYSCEF 19, Ex Parte Order of Attachment; NYSCEF 36, Notice of Motion for Summary Judgment in Lieu of Complaint; NYSCEF 117, Amended Notice of Motion for Summary Judgment in Lieu of Complaint.) The facts are set forth in the court's decision denying plaintiffs' CPLR 3213 motion which also converted the papers into pleadings. (NYSCEF 230, Decision & Order.) The court subsequently granted partial summary judgment. (NYSCEF 346, Decision and So Ordered Transcript.) A judgment was entered for $31,794,000 plus interest under the 2018 Notes and $90,135,000 plus interest under the 2019 Notes. (NYSCEF 348, Judgment.) The remaining issues are Pala's transfer of notes to Pinpoint and VP China and acceleration of the 2019 Notes.[3]

On November 2, 2018, Pinpoint purchased 2019 Notes in the amount of $13,313,000 from Pala. At argument, the court reserved decision as to summary judgment on these notes since Pala, not Pinpoint, had authority to initiate this action as to those notes. (NYSCEF 339, tr at 48:20-49:20). Pinpoint has since supplemented the record with a new authorization letter from Cede & Co recognizing Pinpoint as the holder of $99,268,000 in 2019 Notes which addresses defendants' objection. (NYSCEF

---

[2] For the 2018 Notes: Pinpoint $12,444,000 (NYSCEF 272, Wu Aff ¶ 8) + VPChina $20,800,000 (NYSCEF 289, Kam Aff ¶12). For the 2019 Notes: Pinpoint $54,200,000 + Pinpoint purchased from Pala $13,313,000 (NYSCEF 272, Wu Aff ¶¶ 24-27) + VPChina $29,085,000 + VPChina purchased from Pala $11,000,000 (NYSCEF 289, Kam Aff ¶ 35) + VP Credit $6,850,000 (*Id.* ¶ 30.)

[3] Since this decision was originally issued, the parties have discontinued the action as to the accelerated note issue.

**652798/2018 PALA ASSETS HOLDINGS vs. ROLTA, LLC**
**Motion No. 009**

**Page 2 of 7**

___, Affidavit of Kevin Wu, Pinpoint Portfolio Manager, Exhibit A, authorization letter; NYSCEF ___, Jeanne Mauro affidavit of authenticity.)[4] Cede & Co had previously authorized Pinpoint on its initial investment of $54,200,000. (NYSCEF 284, DTC 10/10/2018 Authorization Letter.) Therefore, the motion is granted, and Pinpoint shall have judgment for $67,513,000 ($54,200,000 + $13,313,000) plus interest.[5] Having signed an order directing entry of judgment in favor of Pinpoint for $54,200,000, Pinpoint shall have judgment for $13,313,000 plus interest. (NYSCEF 348, Judgment Signed by County Clerk).

As to VPChina which purchased $1,450,000 in 2018 Notes and $11,000,000 in 2019 Notes from Pala, the facts are the same except that Cede &Co. has not issued a new authorization letter. (NYSCEF 234, Kam Aff. ¶ 5.) However, Cede & Co. did authorize Pala and Pala assigned all of its rights to VPChina. (NYSCEF 56, Authorization letters from The Depository Trust Company (DTC)[6] and Cede & Co. as to 2018 Notes for $1,200,000; NYSCEF 330, Authorization letters from The Depository Trust Company and Cede & Co. as to 2019 Notes for $24,313,000.) Defendants challenge whether Pala can assign DTC's and Cede & Co.'s authorization to VPChina to continue this action.

Section 2.06(f) of the Indentures provides that "[t]he registered holder of a Global Note may grant proxies and otherwise authorize any Person . .. to take any action which a Holder is entitled to take under this Indenture or the Notes." (NYSCEF 273, 2018

---

[4] Due to COVID, these documents were emailed to the court, but not e-filed. Plaintiffs are directed to file all documents in NYSCEF.

[5] Pinpoint does not seek summary judgment as to $31,755,000 that it subsequently purchased. (NYSCEF 343, Wu 4/27/20 Aff. ¶ 7.)

[6] DTC is by definition the depository of the Notes. (NYSCEF 11, 2018 Indenture at 11, NYSCEF 17, 2019 Indenture at 11.)

Indenture; NYSCEF 279, 2019 Indenture.) Cede & Co is a "Holder," while Pala is

referenced in Cede & Co.'s authorization letter as the "beneficial owner." (*Id.* at 12

[Definition of "Holder"].) Since Cede &Co. is the defined Holder, then the beneficial

holder is the "registered holder," an undefined term. Likewise, "beneficial holder" is not

defined, but this is an arrangement pursuant to which individuals and funds hold

securities through banks and brokerage firms in the name of DTC. (*Royal Park*

*Investments SA/NV v Deutsche Bank Natl. Tr. Co.,* 2017 WL 1331288 *6 [SDNY 2017].)

Based on Section 2.06(f), the court rejects defendants' argument that VPChina

lacks authority to recover on the 2019 Notes for $11,000,000 it purchased from Pala.

VPChina has been authorized by Pala to prosecute this action. Pala's assignment to

VP China of its authority to bring this action is consistent with New York law.

"[C]ontracts are freely assignable absent language which expressly prohibits

assignments." (*In re Stralem*, 303 AD2d 120, 122 [2d Dept 2003] [citations omitted].)

No express prohibition is present here. Defendants' reliance on *Cortlandt St. Recovery*

*Corp. v Hellas Telecom, S.D.r.l.,* 142 AD3d 833 (1st Dept 2016), *affd* 31 NY3d 30

(2018) for the proposition otherwise is misplaced. In *Cortlandt*, the plaintiff "lack[ed]

standing because the party that gave it the assignment to sue on the subordinated

notes did not have the authority to assert or assign such claims … ." (*Id.* at 835.)

Therefore, plaintiffs' motion is granted as to the 2018 and 2019 Notes VPChina

purchased from Pala.

The court has considered the parties' remaining arguments and finds them

unavailing without merits or otherwise not requiring an alternate result.

652798/2018  PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 009

Page 4 of 7

This leaves the issue of plaintiffs' acceleration of the 2019 Notes. Section 6.02 of

the 2018 and 2019 Indentures requires written notice of acceleration to the Trustee.

(NYSCEF 273, 2018 Indenture; NYSCEF 279, 2019 Indenture.) Section 13.03 of the

Indentures address notice:

> "Section 13.03. Notices. (a) All notices or demands required or permitted by the
> terms of the Notes or this Indenture to be given to or by the Holders are required
> to be in writing and may be given or served by being sent by prepaid courier or by
> being deposited, first-class postage prepaid, in the United States mail, if intended
> for the Issuer or any Note Guarantor, as the case may be, mailed, delivered or
> faxed to Rolta, LLC, 5865 North Point Parkway, Alpharetta, Georgia 30022, USA,
> Fax: +1-678-942-5001; if intended for the Trustee, addressed to the Trustee at
> the corporate trust office of the Trustee at DB Trustees (Hong Kong) Limited,
> Level 52, International Commerce Centre, 1 Austin Road West, Kowloon, Hong
> Kong, Facsimile No.: +852-2203-7320/7323, Attention: Managing Director; if
> intended for the Paying and Transfer Agent or the Registrar, addressed to
> Deutsche Bank Trust Company Americas, Trust and Agency Services, 60 Wall
> Street, 27th Floor, MS NYC60-2710, New York, New York 10005, USA, Fax: 732-
> 578-4635, Attention: Corporates Team - Rolta, LLC, with a copy to Deutsche
> Bank Trust Company Americas, c/o Deutsche Bank National Trust Company, by
> Trust and Agency Services, 100 Plaza One, Mailstop JCY03-0699, Jersey City,
> New Jersey 07311, USA, Fax: 732-578-4635, Attention: Corporates Team -
> Rolta, LLC; and, if intended for any Holder, addressed to such Holder at such
> Holder's last address as it appears in the Note register (or otherwise delivered to
> such Holders in accordance with applicable DTC, Euroclear or Clearstream
> procedures). Copies of any notice or communication to a Holder, if given by the
> Issuer, will be mailed to the Trustee at the same time. Defect in mailing a notice
> or communication to any particular Holder shall not affect its sufficiency with
> respect to other Holders
>
> (b) Any notice or demand shall be deemed to have been sufficiently given or
> served when so sent or deposited and, if to the Holders, when delivered in
> accordance with the applicable rules and procedures of the Depositary. Any such
> notice shall be deemed to have been delivered on the day such notice is
> delivered to the Depositary or if by mail, when so sent or deposited. Any notice to
> the Trustee shall be effective only upon receipt."

(*Id.*)

Defendants challenge whether plaintiffs complied with the notice requirement for

the Trustee. (NYSCEF 338, Tr at 15:15-17:8.) Plaintiffs' proof of notice to the Trustee

of acceleration is an October 26, 2018 letter from Ropes & Gray signed by "Ropes &

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 506 of 739

Gray" and sent "BY REGISTERED MAIL AND FACSIMILE." (NYSCEF 311, Letter.)

Plaintiffs insist that the fax service on the Trustee should be sufficient because a fax

number is listed next to the Trustee's address in section 13.03. The court agrees with

defendants' reading of the notice provision that service on the Trustee must be by

courier or first-class US mail. However, the Trustee is located in Hong Kong where US

mail would be unavailable. That leaves courier. Moreover, there is no authentication of

the Ropes & Gray letter from the individual who signed "Ropes & Gray" on the letter.

Further, there is no affidavit from a person with knowledge attesting to the Ropes &

Gray's mailing procedure or what is meant by "registered mail" and the procedure or

proof of such mailing such as a post office receipt. Even if the court were to accept

plaintiffs' fax argument, there is no evidence before the court to establish that the letter

was actually transmitted, such as a fax report demonstrating that it went through.

Plaintiffs also argue that the acceleration notice was effective because there is no

dispute that defendants received notice. However, to be effective notice on the Trustee,

Section 13.03(b) requires proof of the Trustee's receipt. There is no evidence of the

Trustee's receipt of the acceleration notice. Plaintiffs shall inform the court within 10

business days whether they wish to proceed to trial on acceleration.

Accordingly, it is

ORDERED that Pinpoint Multi-Strategy fund shall have judgment for $13,313,000

plus interest. Pinpoint shall submit to Part 48 a proposed judgment giving defendants 5

business days' notice. Defendants may submit a counter judgment within 5 days

thereafter; and it is further

652798/2018 PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No. 009

Page 6 of 7

ORDERED that VPChina shall have judgment for $12,450,000 plus interest.

VPChina shall submit to Part 48 a proposed judgment giving defendants 5 business

days' notice.  Defendants may submit a counter judgment within 5 days thereafter.

Motion Seq. No.   09:

10/16/2020

DATE

ANDREA MASLEY, J.S.C.

| CHECK ONE: | | | | | |
|---|---|---|---|---|---|
| | | CASE DISPOSED | | x | NON-FINAL DISPOSITION |
| | X | GRANTED | DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

652798/2018   PALA ASSETS HOLDINGS vs. ROLTA, LLC
Motion No.  009

Page 7 of 7

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document   Page 508 of 739

# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PALA ASSETS HOLDINGS LTD.,
PINPOINT MULTI-STRATEGY FUND,
VALUE PARTNERS FIXED INCOME SPC –
VALUE PARTNERS CREDIT OPPORTUNITIES
FUND, VALUE PARTNERS GREATER
CHINA HIGH YIELD INCOME FUND,

             Plaintiffs,

        -against-

ROLTA, LLC, ROLTA INDIA LTD.,
ROLTA INTERNATIONAL, INC.,
ROLTA U.K. LTD.,
ROLTA MIDDLE EAST FZ-LLC,
ROLTA AMERICAS LLC, and
ROLTA GLOBAL B.V.,

            Defendants.

Index No. 652798/2018

Hon. Andrea Masley

**▮▮▮▮▮▮ ORDER
AND JUDGMENT**

**F I L E D
Sep 02 2020
NEW YORK
COUNTY CLERK'S OFFICE**

      Plaintiffs Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund

("VP Credit"), Value Partners Greater China High Yield Income Fund ("VP China" and, together

with VP Credit, "Value Partners"), and Pinpoint Multi-Strategy Fund ("Pinpoint" and, collectively

with Value Partners, "Plaintiffs"), having moved before this Court for an order, pursuant to CPLR

3212, granting summary judgment on Plaintiffs' breach of contract claims and directing entry of

judgment in favor of Plaintiffs and against Defendants (the "Motion") in the amount of

$187,098,105.00, plus interest, for failure to make payment on notes issued pursuant to the

indenture agreements dated May 16, 2013 ("2018 Indenture") and July 24, 2014 ("2019

Indenture"),

1

UPON reviewing Plaintiffs' Notice of Motion for Summary Judgment and accompanying Memorandum of Law, dated September 24, 2019 (NYSCEF Nos. 269–270); the Joint Statement of Undisputed Facts, dated September 23, 2019 (NYSCEF No. 271); the Affirmation of Kevin Wu, dated September 23, 2019 (NYSCEF No. 272); the Affirmation of Edwin Kam, dated September 23, 2019 (NYSCEF No. 289); the Affirmation of Alain Nydegger, dated September 19, 2019 (NYSCEF No. 306); the Affirmation of Gregory M. Starner, dated September 24, 2019 (NYSCEF No. 308); the Affidavit of Vincent Gerosa, dated August 8, 2019 (NYSCEF No. 313); the Affidavit of Matthew Young, dated July 31, 2019 (NYSCEF No. 319); and the corresponding exhibits annexed thereto, and upon reviewing Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, dated October 31, 2019 (NYSCEF No. 322); Plaintiffs' Reply Memorandum of Law, dated November 14, 2019 (NYSCEF No. 323); the Affirmation of Edwin Kam, dated November 14, 2019 (NYSCEF No. 324); and the Affirmation of Gregory M. Starner, dated November 14, 2019, and Exhibit 1 annexed thereto (NYSCEF Nos. 325–326),

NOW, the parties having appeared by their respective counsel before this Court for argument on the Motion, and for the reasons set forth on the record on December 20, 2019 and February 14, 2020, it is hereby

ORDERED that summary judgment is granted to Pinpoint, VP China, and VP Credit on their claims as set forth herein, and it is

ORDERED that the claims decided herein are hereby severed from the remainder of the action to permit the entry of judgment on such claims, and it is further

ORDERED that the judgment signed May 22, 2020 is hereby vacated, and it is further

AMERICAS 103313707

ADJUDGED and ORDERED that Plaintiffs

| Plaintiff Name | Plaintiff Address |
|---|---|
| Pinpoint Multi-Strategy Fund ("Pinpoint") | Two International Finance Centre Level 33 8 Finance Street Central Hong Kong |
| Value Partners Greater China High Yield Income Fund ("VP China") | The Center 43rd Floor, 99 Queens Road Central Hong Kong |
| Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund ("VP Credit") | The Center 43rd Floor, 99 Queens Road Central Hong Kong |

are entitled to summary judgment on their claims against Defendants, identified herein as

**The 2018 Issuer & Guarantors:**

| Defendant Name | Defendant Address |
|---|---|
| Rolta, LLC | 5865 North Point Parkway, Ste #300, Alpharetta, GA 30022 |
| Rolta India Ltd. | Rolta Tower A, Rolta Technology Park, 22nd Street MIDC-Marol Andheri (East), Mumbai 400 093 India |
| Rolta International, Inc. | 5865 North Point Parkway, Ste #300, Alpharetta, GA 30022 |
| Rolta U.K. Ltd. | 100 Longwater Avenue Green Park, Reading RG2 6GP United Kingdom |
| Rolta Middle East FZ-LLC | Office No 210 Building No. 9, P.O. Box 500106 Dubai Internet City, Dubai U.A.E. |

**The 2019 Issuer & Guarantors:**

| Defendant Name | Defendant Address |
|---|---|
| Rolta Americas LLC | 5865 North Point Parkway, Ste #300, Alpharetta, GA 30022 |
| Rolta India Ltd. | Rolta Tower A Rolta Technology Park, 22nd Street MIDC-Marol Andheri (East), Mumbai 400 093 India |
| Rolta International, Inc. | 5865 North Point Parkway, Ste #300, Alpharetta, GA 30022 |

AMERICAS 103313707

3

| Rolta U.K. Ltd. | 100 Longwater Avenue Green Park, Reading RG2 6GP United Kingdom |
| Rolta Middle East FZ-LLC | Office No 210 Building No. 9, P.O. Box 500106 Dubai Internet City, Dubai U.A.E. |
| Rolta Global B.V. | Siriusdreef 17, 2132WT Hoofddorp, The Netherlands |

as follows:

It is ADJUDGED that

1. **PLAINTIFF PINPOINT** have judgment and recover from:

   a. **THE 2018 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on its 2018 Notes in the amount of $15,788,325.00 ($12,444,000.00 in principal plus $3,344,325.00 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of Pinpoint's 2018 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
| --- | --- | --- |
| $12,444,000.00 | May 16, 2018 | $2,577,442.19 |
| | Total Pre-Judgment Interest Due: | $2,577,442.19 |

**Missed Interest Payments on Pinpoint's 2018 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
| --- | --- | --- |
| $668,865.00 | May 16, 2016 | $258,933.22 |
| $668,865.00 | November 16, 2016 | $228,586.90 |
| $668,865.00 | May 16, 2017 | $198,735.37 |
| $668,865.00 | November 16, 2017 | $168,389.05 |
| $668,865.00 | May 16, 2018 | $138,537.52 |
| | Total Pre-Judgment Interest Due: | $993,182.06 |

For a total judgment in favor of Pinpoint and against the 2018 Issuer & Guarantors in the sum of $19,358,949.25          , and that plaintiff Pinpoint have execution thereon.          x

AMERICAS 103313707

b. **THE 2019 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on its 2019 Notes in the amount of $71,035,875.00 ($54,200,000.00 in principal plus $16,835,875.00 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of Pinpoint's 2019 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $54,200,000.00 | July 24, 2019 | $5,425,939.73 |
| | Total Pre-Judgment Interest Due: | $5,425,939.73 |

**Missed Interest Payments on Pinpoint's 2019 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $2,405,125.00 | July 24, 2016 | $890,159.83 |
| $2,405,125.00 | January 24, 2017 | $781,039.63 |
| $2,405,125.00 | July 24, 2017 | $673,698.58 |
| $2,405,125.00 | January 24, 2018 | $564,578.38 |
| $2,405,125.00 | July 24, 2018 | $457,237.33 |
| $2,405,125.00 | January 24, 2019 | $348,117.13 |
| $2,405,125.00 | July 24, 2019 | $240,776.08 |
| | Total Pre-Judgment Interest Due: | $3,955,606.96 |

For a total judgment in favor of Pinpoint and against the 2019 Issuer & Guarantors in the sum of $80,417,421.69 _____, and that plaintiff Pinpoint have execution thereon. x

2. **PLAINTIFF VP CHINA** have judgment and recover from:

a. **THE 2018 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on its 2018 Notes in the amount of $24,550,312.50 ($19,350,000.00 in principal plus $5,200,312.50 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of VP China's 2018 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $19,350,000.00 | May 16, 2018 | $4,007,835.62 |
| | Total Pre-Judgment Interest Due: | $4,007,835.62 |

**Missed Interest Payments on VP China's 2018 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $1,040,062.50 | May 16, 2016 | $402,632.41 |
| $1,040,062.50 | November 16, 2016 | $355,444.92 |
| $1,040,062.50 | May 16, 2017 | $309,026.79 |
| $1,040,062.50 | November 16, 2017 | $261,839.30 |
| $1,040,062.50 | May 16, 2018 | $215,421.16 |
| | Total Pre-Judgment Interest Due: | $1,544,364.58 |

For a total judgment in favor of VP China and against the 2018 Issuer & Guarantors in the sum of $30,102,512.70 ⎯⎯⎯⎯⎯⎯, and that plaintiff VP China have execution thereon.  x

b.  **THE 2019 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on its 2019 Notes in the amount of $38,119,528.13 ($29,085,000.00 in principal plus $9,034,528.13 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of VP China's 2019 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $29,085,000.00 | July 24, 2019 | $2,911,687.40 |
| | Total Pre-Judgment Interest Due: | $2,911,687.40 |

AMERICAS 103313707

**Missed Interest Payments on VP China's 2019 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $1,290,646.88 | July 24, 2016 | $477,680.79 |
| $1,290,646.88 | January 24, 2017 | $419,124.31 |
| $1,290,646.88 | July 24, 2017 | $361,522.57 |
| $1,290,646.88 | January 24, 2018 | $302,966.10 |
| $1,290,646.87 | July 24, 2018 | $245,364.35 |
| $1,290,646.87 | January 24, 2019 | $186,807.88 |
| $1,290,646.87 | July 24, 2019 | $129,206.13 |
| | Total Pre-Judgment Interest Due: | $2,122,672.13 |

For a total judgment in favor of VP China and against the 2019 Issuer & Guarantors in the sum of $43,153,887.66       , and that plaintiff VP China have execution thereon.   X

3. **PLAINTIFF VP CREDIT** have judgment and recover from:

a. **THE 2019 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on its 2019 Notes in the amount of $8,977,781.25 ($6,850,000.00 in principal plus $2,127,781.25 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of VP Credit's 2019 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $6,850,000.00 | July 24, 2019 | $685,750.68 |
| | Total Pre-Judgment Interest Due: | $685,750.68 |

**Missed Interest Payments on VP Credit's 2019 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $303,968.75 | July 24, 2016 | $112,501.75 |
| $303,968.75 | January 24, 2017 | $98,710.73 |
| $303,968.75 | July 24, 2017 | $85,144.56 |
| $303,968.75 | January 24, 2018 | $71,353.53 |

| $303,968.75 | July 24, 2018 | $57,787.37 |
| $303,968.75 | January 24, 2019 | $43,996.35 |
| $303,968.75 | July 24, 2019 | $30,430.19 |
| | Total Pre-Judgment Interest Due: | $499,924.48 |

For a total judgment in favor of VP Credit and against the 2019 Issuer & Guarantors in the sum of $10,163,456.41 _____, and that plaintiff VP Credit have execution thereon. X

Judgment signed and entered this 24 day of _____August_____, 2020.

ENTER:

J.S.C.

**FILED**
**Sep 02 2020**
NEW YORK
COUNTY CLERK'S OFFICE

Clerk

AMERICAS 103313707

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INDEX # 652798/2018

*Pala Assets Holdings Ltd, Pinpoint Multi-Strategy Fund,
Value Partners Fixed Income SPC - Valued Partners
Credit Opportunities Fund, Valued Partners Greater
China High Yield Income Fund*

Plaintiff(s)/Petitioner(s)

Against

*Rolta, Llc, Rolta India Ltd, Rolta International Inc.,
Rolta Uk Ltd, Rolta Middle East Fz-Llc, Rolta Americas
Llc, Rolta Golbal B.V.*

Defendant(s)/Respondent(s)

3–6
**FILED AND
DOCKETED
Sep 02 2020**
AT      02:53 P      M
N.Y. CO. CLK'S OFFICE

## JUDGMENT

*Attorney for the Prevailing Party*

White & Case LLP
1221 Avenue Of The Americas
New York, NY 10020
(212) 819-8517

# EXHIBIT G

1   SUPREME COURT OF THE STATE OF NEW YORK
    NEW YORK COUNTY : CIVIL TERM : PART 48
2   -------------------------------------x
    PALA ASSETS HOLDINGS LTD., PINPOINT
3   MULTI-STRATEGY FUND VALUE PARTNERS
    FIXED INCOME SPC - VALUE PARTNERS
4   CREDIT OPPORTUNITIES FUND, VALUE
    PARTNERS GREATER CHINA HIGH YIELD
5   INCOME FUND,

6                       Plaintiffs,          INDEX NO.
                                             652798/2018
7             -against-

8   ROLTA, LLC, ROLTA INDIA LTD., ROLTA
    INTERNATIONAL, INC., ROLTA U.K. LTD.,
9   ROLTA MIDDLE EAST FZ-LLC, ROLTA
    AMERICAS LLC, and ROLTA GLOBAL B.V.,

10

                        Defendants.
11  -------------------------------------x
                        December 20, 2019
12
                        60 Centre Street
13                      New York, New York

14  B E F O R E :

15              HON. ANDREA MASLEY,

16                    Supreme Court Justice.

17  A P P E A R A N C E S :
    WHITE & CASE, LLP
18      1221 Avenue of the Americas
        New York, New York 10020-1095
19  BY: GREGORY M. STARNER ESQ.
        CHRISTOPHER VOLPE, ESQ.
20      Attorneys for the Plaintiffs

21  SIRI & GLIMSTAD, LLP
        200 Park Avenue, 17th Floor
22      New York, New York 10166
    BY: MASON BARNEY, ESQ.
23      Attorneys for the Defendants

24
                        KAREN MENNELLA
25                      Senior Court Reporter

        KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1          THE COURT:  In the matter of Pala Assets Holdings

2     against Rolta, LLC.

3          For Plaintiffs I see Mr. Starner is here and

4     Mr. Volpe.  Okay.  And for Rolta I see Mr. Barney.

5          MR. BARNEY:  Yes, Your Honor.

6          THE COURT:  Wonderful.  We had a summary judgement

7     motion from the Plaintiffs, which, for the purposes of

8     argument, we'll call Pala.  And the issue of fact that the

9     Defendants raised comes down, it seems to me, to two things.

10    Whether Pala and others are actually the registered holder

11    of the global note, which of course the name on the note is

12    Seed; but pursuant to Section 2.06, whether the registered

13    holders of the notes have proxies from Seed to take action

14    or to take this action.

15          So, two issues.  One, are they the right person.

16    Are they the registered holders and do they have the

17    authority to proceed, right.  Two issues.  So let me just

18    say, based on Mr. Starner's affirmation with the charts

19    attached, initially I looked at it and said, well, doesn't

20    that raise -- isn't that proving an issue of fact, right?

21    Because there are all these different options.  But as I dug

22    in, it seemed to me that as to that the three entities are

23    in different positions or might be in different positions

24    and the Defendant is raising different issues with regard to

25    those two issues as to each one.

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

```
 1              So for the purposes of argument, let's start with

 2    Pinpoint and walk through, one, what evidence is before the

 3    court based upon which I can determine that they are the

 4    registered holder with the authority to proceed with the

 5    action and for which I could grant summary judgement today.

 6              MR. STARNER:  Surely, Your Honor.  So Pinpoint --

 7    and I think maybe just to clarify whether or not the

 8    Plaintiffs were registered holders, that's not in dispute.

 9    They're not the registered holders.  Seed Co. is the

10    registered holder.  So the Plaintiffs here are all

11    beneficial owners.

12              So the issue in dispute, as I understand, is that

13    the Defendants are challenging whether or not certain of the

14    Plaintiffs are owners and whether they have authority to

15    proceed.

16              THE COURT:  Right.

17              MR. STARNER:  So Pinpoint, they are not challenging

18    their ownership.  They're not challenging their authority.

19    So there's no dispute that Pinpoint is the beneficial owner

20    of the notes.

21              THE COURT:  It's the acceleration as to Pinpoint.

22              MR. STARNER:  Correct.

23              THE COURT:  Okay.  So let's just talk about

24    acceleration then.

25              MR. STARNER:  Okay.
```

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1          THE COURT:  Hold on one second.  Agreed?

2          MR. BARNEY:  No, Your Honor.  We have -- I'm sorry.

3     We have a couple of arguments on Pinpoint.  One being this

4     issue of the book entries that are required by the

5     indentures.

6          THE COURT:  With the brokers?

7          MR. BARNEY:  Well, the indentures themselves in

8     Section 2.05 require that the beneficial interest in the

9     note shall be required to be reflected in a book entry.  And

10    the book entry that they're referring to there is from

11    either DTC, Euroclear or Clear Stream.  And our contention

12    is that they have not provided that book entry from either

13    DTC, Euroclear or Clear Stream for Pinpoint or for VP.  And

14    because they haven't provided that, they haven't satisfied

15    2.05 and established that they are, in fact, the beneficial

16    owner.

17         THE COURT:  Okay.  So have a seat.

18         And for that you have the broker letters, correct?

19    Because it's actually the brokers that have the accounts,

20    not the Plaintiff?

21         MR. STARNER:  Let me step back.  I'll address that

22    argument in a moment.  But take it a step back in terms of

23    how this is structured.

24         The Plaintiffs are beneficial owners of the notes.

25    They hold the notes through -- you know, they have a broker

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    and then the broker ultimately has an account with DTC, Seed

2    Co. and so they are beneficial owners.  And that's a fairly

3    standard structure of the notes.  And so it's not

4    necessarily an issue with how it's structured.  Well, what

5    evidence do you have to show that they actually are owners

6    of the notes?  That's kind of where we are.

7              THE COURT:  Pinpoint.

8              MR. STARNER:  Notice we have sworn affidavits from

9    the brokers.  We've got bank account statements.  The court

10   may recall in February we were here before you last, one of

11   the questions was I want to see evidence maybe of when they

12   purchased the notes.  We actually have the trading activity,

13   the trade history of the note.  So that's all evidence that

14   we've submitted.  No dispute that evidence is admissible.

15   This is on Pinpoint now.

16            The only argument that I understand that they're

17   raising on Pinpoint is this book entry argument.  It's a

18   very kind of technical argument under the indenture.  And

19   their argument is there's a provision that refers to this

20   book entry stuff.  It's Section 2.05, but it has nothing to

21   do with enforcement of the notes.  It has nothing to do with

22   beneficial note holders enforcing their rights.  What it has

23   to do with is registration and transfer of interest.  So it

24   has nothing to do with note holders.

25            So it's all about whether Seed registers transfers

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    of interest of notes, but there's no transfer of interest of

2    notes.  We're not talking about that.  So Section 2.05 we

3    submit to the court is totally irrelevant here.  It has no

4    application.  It's not implicated in this enforcement

5    proceeding.

6            THE COURT:  Alright.  Section -- hold on.  Let's

7    just talk about Section 2 --

8            MR. STARNER:  2.05.

9            THE COURT:  No, I understand that.  But the title

10   of Article 2 is execution -- issue execution form and

11   registration of notes.

12           MR. STARNER:  Correct.

13           THE COURT:  2.05 provides registration transfer and

14   exchange.

15           MR. STARNER:  So this is somewhat technical, but

16   this deals with how the holder is set up as the registered

17   holder of the notes.

18           THE COURT:  Which is here Deutsche Bank.

19           MR. STARNER:  Seed & Co. is the registered holder

20   for the notes.

21           THE COURT:  Well, Deutsche Bank is the registrar.

22           MR. STARNER:  Yes.  That's a slightly different

23   role, right.

24           THE COURT:  Okay.  And in this the issuer is Rolta.

25           MR. STARNER:  Right.  There's two sets of notes,

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1     two different issues, yes, but same provision.

2            THE COURT:  And the registered holder in this

3     paragraph is Seed & Co.

4            MR. STARNER:  Right.

5            THE COURT:  Okay.

6            MR. STARNER:  So you'll see, Your Honor --

7            THE COURT:  So this is about Seed & Co.

8            MR. STARNER:  Right.  But this is all about Seed &

9     Co. kind of maintaining records of its ownership in the

10    notes, recording registered transfers of notes.  So there's

11    no transfer of interest in the notes.  Seed & Co. is the

12    registered holder.  Their name is on the notes.  No dispute.

13    All the notes.

14            What they've done is they've authorized the

15    beneficial holders.

16            THE COURT:  The seven letters.

17            MR. STARNER:  That's it.  So this has nothing to do

18    with that.  So I think in the Defendant's interpretation of

19    this provision what they're saying is you can't sue unless

20    you abide by these kind of the registered holder registering

21    the notes.  One, totally not applicable.  Two, if you read

22    it the way they read it, no beneficial holder could ever

23    sue, ever.

24            THE COURT:  Right.

25            MR. STARNER:  Because no beneficial holder, none of

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    them are registered with DTC.  Why?  Because that's not how

2    it's structured.  You got Seed & Co. a holder --

3              THE COURT:  Right.  I understand that.  Okay.  Just

4    have a seat.

5              Do you have anything to say about this Section

6    2.05?

7              MR. BARNEY:  Yes, Your Honor, I do.

8              THE COURT:  Okay.

9              MR. BARNEY:  So first to address this question of

10   whether it's just Seed & Co., this whole section refers to

11   the holder.  Right now because they're suing under 6.05,

12   they are sitting in the shoes of a holder.

13             THE COURT:  Pursuant to those letters from Seed &

14   Co.?

15             MR. BARNEY:  Correct.  But if they're sitting in

16   the shoes of the holder, you'll pardon the quote from

17   Spiderman, "with great power becomes great responsibility,"

18   here Seed & Co. is giving them all their authority, but that

19   means they're also required to abide by the same rules that

20   Seed & Co. is as a holder.  They would required to under any

21   other section here.  And as a result, this section, because

22   it refers to holders, applies to them.  If they're going to

23   come in under 6.05 or -- yes, 6.07 and say we have the right

24   to sue because we are a holder and now we're sitting in the

25   holder's shoes, then they also have to abide by this

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    section.

2           Now, this section has multiple sentences and

3    several clauses.  Most of the rest of this does deal with

4    registering transferring of notes.  However, there is this

5    one sentence in the middle on Page 36 of document number 279

6    that's the indenture 2019 --

7           THE COURT:  I got in.

8           MR. BARNEY:  -- that says, "Furthermore, any holder

9    of a global note shall by accepting such global note agree

10   that transfers of beneficial interest in the global note may

11   be effective only through a book entry system maintained by

12   depository -- by the depository;" that's DTC, Euroclear and

13   Clear Stream, "and that ownership of beneficial interest in

14   the note shall be required to be reflected in a book entry."

15          So that sentence does apply to beneficial interest,

16   which is what Plaintiffs are claiming they have here.  And

17   so they're a holder.  And if they're standing in the shoes

18   of the holder and they say we have a beneficial interest,

19   well to prove that you need a book entry from DTC, Euroclear

20   or Clear Stream.

21          Now to address the second argument Mr. Starner

22   raised regarding the fact that, well, it would be impossible

23   for anyone to do this.  That's not true.  As they explained

24   in other areas and as we agree, the way that these notes are

25   held is DTC or Seed holds them.  They have a participating

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    bank and the participating bank has the interest and then

2    participating bank sells that interest to Plaintiffs.  Well,

3    the way that they could satisfy this is to show the book

4    entry showing that the participating bank holds this portion

5    of the note and then show that this participating bank holds

6    it in the name of the Plaintiffs.  It's just -- it's a

7    chain.  It's not an impossibility.  It's simply a method of

8    doing this.

9           What they don't have is that first piece, the book

10    entry that shows -- from DTC, Euroclear or Clear Stream that

11    shows the participating bank is the holder or owner of this

12    beneficial interest --

13           THE COURT:  Got it.

14           MR. BARNEY:  -- in these notes.

15           THE COURT:  I understand.

16           MR. BARNEY:  So that is a requirement, because

17    they're standing in the shoes.  They are required to satisfy

18    that.

19           THE COURT:  Such a weird sentence, because it may

20    be effective only through a book entry system maintained by

21    DTC, Euroclear -- so what do you have?  You're saying you

22    don't have to satisfy this at all?

23           MR. STARNER:  No, that argument doesn't apply.

24    One, no law was cited in reference to anywhere in the world

25    where there was ever interpreted the way they're

KAREN MENNELLA - OFFICIAL COURT REPORTER

11

Proceedings

1    interpreting it, one.  Number two, they didn't raise this

2    any time before summary judgement.  I just note that,

3    because there's some novel, brand-new argument they've now

4    carved out.  But the way you read this, I think it's clear

5    from the language from the provision, it talks about

6    registration, transfer and exchange.  And that whole

7    paragraph is about the holder registering, transferring --

8              THE COURT:  Holder being Seed & Co.?

9              MR. STARNER:  Right.  No dispute.  We're not Seed &

10   Co.  And Seed & Co. is defined as the holder.  This is

11   structuring the way the note's going to be issued and

12   maintained.  And this paragraph deals with transferring the

13   notes.  And, again, yes, we're beneficial holders, but our

14   ownership interest is not registered with Seed & Co.,

15   because that's not the way it's structured.  Seed & Co. is

16   the holder and the ownership interest is held through the

17   brokerage firm through, ultimately --

18             THE COURT:  And that's the reason that I have the

19   letter from the broker?

20             MR. STARNER:  Correct.

21             THE COURT:  Because it's the broker that's

22   registered here?

23             MR. STARNER:  Well, they are participants.  They're

24   participating.  They have an account with, in fact --

25             THE COURT:  J.P. Morgan or HSBC?

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1           MR. STARNER:  J.P. Morgan on the one hand with VP

2      and Citibank with Pinpoint.

3           THE COURT:  Okay.  So is there a document -- the

4      document I have to satisfy this is the letter from the

5      broker saying I have an account with the bank and the bank

6      is registered with Seed & Co.?

7           MR. STARNER:  You've got kind of three or

8      four pieces of evidence.  You've got an affidavit from the

9      fact witnesses saying this is how this is set up, this is

10     our ownership structure.  You've got the letter from Seed &

11     Co. authorizing they're the bank, the brokerage, basically

12     acknowledging that the brokerage firm has an account request

13     with them and that they're now authorizing the ultimate

14     beneficial holder, the Plaintiff's, authority.

15          Then you also have evidence from the bank the

16     brokerage firm saying this is how it's set up.  So, yes, you

17     have a few pieces of evidence on this.

18          THE COURT:  And then I have the bank.  So I have

19     Seed & Co. to the bank, bank to the broker, broker to the

20     Plaintiffs?

21          MR. STARNER:  Correct.

22          THE COURT:  Okay.

23          MR. STARNER:  The bank and brokerage are the same.

24     VP is a little bit different.  They're layered.  There's a

25     few layers there.  Pinpoint is a little bit simpler, because

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1      it goes Seed & Co., bank, Pinpoint.

2              THE COURT:  Okay.

3              MR. STARNER:  And we've got evidence from each of

4      those pieces to establish that chain.

5              THE COURT:  Okay.  Alright.  What's wrong with that

6      in Pinpoint's case?

7              MR. BARNEY:  In Pinpoint's case, the issue is this

8      section is very clear that the note shall be required to be

9      reflected in a book entry.  They don't have evidence of the

10     book entry.  They haven't submitted the book entry itself.

11     They haven't submitted a line in a ledger or in a computer

12     program from DTC, Euroclear or Clear Stream saying here's

13     the book entry; yes, this is reflected in our book entry; we

14     have now satisfied 2.05.

15             THE COURT:  So you have the transactions, but Seed

16     & Co. and the bank are the two ends of the book entry.

17             MR. BARNEY:  Yes, Your Honor.

18             THE COURT:  At the end of the day, the problem is

19     if there's some nefarious other party out there who is

20     actually the owner, right.  And your client is saying, oh, I

21     don't know who to pay.  I owe someone, but I don't know who

22     to pay.

23             So from my perspective I have to be satisfied that

24     the entities before me are the entities you're supposed to

25     be paying.  And I understand what you're saying.  I mean, I

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    don't know why you couldn't get a book entry.  But if I have

2    this end of the book entry and that end of the book entry,

3    the two entities on the book entry, I don't -- I am

4    satisfied with what I have with regard to Pinpoint.  I don't

5    see that another party could come in and say these two

6    entities on this side, these two sides of the transaction,

7    are either lying or they are wrong.  I'm going to find with

8    regard to Pinpoint I have the documentation I need to find

9    that Pinpoint is the right entity.

10        Moving on, do you have any other issues with

11   Pinpoint?

12        MR. BARNEY:  The other issue with Pinpoint would be

13   the Pala notes.  But I don't know if you want to move on to

14   that.

15        THE COURT:  I want to do that separately.  So with

16   regard to Pinpoint, do you have any other issues?

17        MR. BARNEY:  The only other one would be

18   acceleration.

19        THE COURT:  Let's talk about acceleration.

20        MR. BARNEY:  Would you like me --

21        THE COURT:  What's the problem?  I want to hear

22   what your problem with acceleration is.

23        MR. BARNEY:  Sure.  The problem with acceleration

24   is that the indenture is quite clear as to how notice and

25   notice of acceleration are supposed to go.  To accelerate

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1       the notes you need three things; an event of default.  Yes,

2       we agree that happened.  Two, the holders of 25 percent in

3       aggregate of the principal outstanding notes must agree to

4       accelerate.  And three, they must jointly send notice to

5       both the issuer and the trustee.

6               Here there are a few problems.  One, as I think

7       we'll discuss in a little bit, there is this issue with VP

8       and whether VP satisfies the ownership requirement.  So we

9       have this question the Seed letters point to J.P. Morgan

10      Chase -- J.P. Morgan, excuse me, but they're claiming under

11      HSBC.  We'll get to that in a minute, but that's one issue.

12      So if they do bot own those amounts, then the Plaintiffs did

13      not have the 25 percent.

14              THE COURT:  When they issued the letters.

15              MR. BARNEY:  When they issued the letters, correct.

16      So that's just an issue of fact that's been raised.  But

17      setting that aside, I believe we'll get to that in a little

18      bit.  The other issue is the notice itself.  So the notice

19      is supposed to be sent to the issuer and to the trustee.

20              Section 13.03(a) deals with notes.  And it says,

21      that all notices and demands -- fast forwarding a little

22      bit -- may be given or served by being sent or prepaid by

23      prepaid currier or by being deposited first class postage

24      paid in the United States mail, if intended for the issuer

25      or any note guarantor, as the case may be, mail, delivered

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    or faxed to -- and then it provides the address for Rolta

2    LLC -- then semicolon, if intended for the trustee,

3    addressed to the trustee -- and then they give the address

4    for the corporate trust office -- and then semicolon and

5    then they move on to the next.

6         The way the sentence is structured is three

7    clauses.  The first clause says that notice may be given or

8    served by currier or first class U.S. mail.  The second

9    clause says if it's being sent to the issuer or the note

10   guarantor, the people who are asking for your money, you can

11   do it by mail, by delivery, by fax.  They'll accept

12   anything.  The third clause, if you're sending it to the

13   trustee, well, no, they don't say anything in there about a

14   fax.

15        So you go back to the first clause, the general

16   application clause, and that only allows currier or U.S.

17   first class mail.  So once you read those three clauses,

18   it's clear that fax transmission does not apply to the

19   trustee.  The only evidence Plaintiffs provide was that this

20   was faxed to the trustee.  And as a result, it didn't

21   actually satisfy 13.03(a).  Plaintiffs argument that, well,

22   wait a minute, they have a fax number here so it must have

23   been able to be faxed, but that's not the way the sentence

24   is structured.

25        In addition, it's also very important, because the

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1     next portion of 13.03, which is 13.03(b), says that any

2     notice to the trustee shall be effective only upon receipt.

3     And because it was sent by fax, we don't have a fax cover

4     sheet.  We don't have a fax confirmation.  We haven't been

5     given -- the court hasn't been presented with a confirmation

6     from the trustee saying, yep, we received it on this date.

7     Therefore, they haven't satisfied the second part of the

8     notice, which is establishing when it was received.

9              THE COURT:  Have a seat.  Thank you.

10              MR. STARNER:  I guess two pieces there.  The fax

11     argument, I think we'll just refer the court to the

12     language.  There is a reference to a fax number and the

13     trustee.  And it's our argument, certainly, that the reason

14     that's included is to allow the parties to send notice by

15     facsimile.  It's our contention we put in evidence of our

16     fact witness that notice was sent to the trustee.  So we

17     think that satisfies the requirements.  There's no dispute

18     that corporate notice was provided to the issuer.  No issue

19     on that front.  And this is, I think, not a basis to suggest

20     acceleration was not effective.

21              But, you know, Your Honor, I think the fallback

22     here is this is something where the court can't get

23     comfortable with the acceleration notice, you know.  That's

24     something what we can deal with down the road.  And, you

25     know, we acknowledge that this, frankly, is a little bit of

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1      a smaller issue in terms of the total amount of claims.

2      That's all I'll say on that.

3                THE COURT:  Well, doesn't it affect all three of

4      the entities?

5                MR. STARNER:  Only as to the 2019 notes.  So the

6      2018 notes -- the 2000 notes.

7                THE COURT:  2018, 2019.

8                MR. STARNER:  Only is relevant for the 2019 notes.

9                THE COURT:  Because the 2018 were due already?

10               MR. STARNER:  Both have matured.  We, in fact,

11     accelerated both.  We are not seeking summary judgement with

12     respect to acceleration of '18s.  It's not before the court

13     today.  We did move for summary judgement on the

14     acceleration of '19s.  We do believe that we've satisfied

15     the notice provisions.

16               But my point to the court is ultimately if we can't

17     get there on summary judgement, okay, we still would be

18     entitled to partial summary judgement for the rest of the

19     claims.  So it's the math exercise.

20               THE COURT:  For which there was no acceleration?

21               MR. STARNER:  No acceleration.  The acceleration is

22     only relevant so that both notes are matured.  The '19 notes

23     matured in July of this year.  So fully due -- all of the

24     interest payments are due.  The acceleration was only

25     relevant if we had properly, as we contend, we accelerated

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    in October of '18.  So what would that do?  That means as of

2    October of last year everything was due and interest started

3    to accrue there.  So if to the extent we and the court was

4    uncomfortable with this question --

5          THE COURT:  I am uncomfortable.

6          MR. STARNER:  -- that period of a year of interest

7    we would not be seeking partial summary judgement on that

8    today is my point.

9          THE COURT:  Right.  But you would get it with

10   regard to it maturing when it actually matured.

11         MR. STARNER:  So maturity as of July of this year.

12   We get all principal that's due and then those prior

13   interest payments.  Acceleration was really only relevant

14   for interest accruing on the total amount.  Think of it as

15   post judgment interest, in effect.  So it would be

16   accelerated, everything was due.  And so between October and

17   today that's, you know, the period of time that we were

18   entitled -- we would accrue for interest on all of our '19

19   notes.

20         But if the court's not comfortable with that

21   standard, then I think we've basically set that aside for

22   summary judgement purposes.

23         THE COURT:  Okay.  But I could still grant summary

24   judgement.  And you are asking for summary judgement with

25   regard to those notes as to the maturity date, not including

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    acceleration interest?

2         MR. STARNER:  Correct.  All those numbers, none of

3    those numbers include interest associated with the

4    acceleration.  We had not really done that math yet, because

5    it would all depend on when we ultimately got the ruling.

6    So those numbers are separate from the acceleration.

7         THE COURT:  Okay.  So anything else with regard to

8    Pinpoint?

9         MR. BARNEY:  I would -- I mean, I have just two

10   quick points on the acceleration.  One, the note that the

11   witness --

12        THE COURT:  Hold on.  Because, to be clear, I am

13   denying their motion for summary judgement as to the

14   acceleration.  So what else do want to tell me about

15   acceleration?

16        MR. BARNEY:  I will stop there.

17        THE COURT:  I agree with you and your reading of

18   this provision as to the notice, reading it as you're

19   reading it.

20        MR. BARNEY:  The only point then that I would raise

21   is, and this is a minor point, I will admit, the notice of

22   motion in this case was very clear --

23        THE COURT:  Actually, hold on one second, because

24   it doesn't really matter because you're not going to seek it

25   if you're just going to seek the judgment based on the

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    maturity date.  So it's not an open issue.

2              MR. STARNER:  Well, I would have to think through

3    that.

4              THE COURT:  I suppose that I could say that it's

5    ambiguous as to whether the notice is one way or the other.

6    And you could have a trial on the issue of that interest, if

7    you want.

8              MR. STARNER:  The trustee's notice I could.  So

9    that claim would still have that interest claim on the

10   acceleration.

11             THE COURT:  I can see your reading of it.  I can

12   see -- you're not seeking summary judgement as to your

13   reading, you're just reading it as an issue of fact.

14             MR. BARNEY:  Correct.

15             THE COURT:  So as to your motion for summary

16   judgement on the reading of the acceleration provision, the

17   way you're saying, I am denying your motion for summary

18   judgement as to that reading and finding an issue of fact on

19   acceleration.

20             MR. STARNER:  Understood.

21             THE COURT:  To be clear.  What else do you have to

22   say as to Pinpoint only?

23             MR. BARNEY:  As to Pinpoint only, the only other

24   issue I'd raise is in their notice of motion.  They were

25   very clear that it was Plaintiffs together, as a unit, were

KAREN MENNELLA - OFFICIAL COURT REPORTER

22

Proceedings

1      asking for summary judgement for the full amount.  They

2      weren't -- this idea of the partial summary judgement and

3      six different scenarios that could possibly come out, it

4      only came up in their reply brief.  And as a result, we

5      believe that partial summary judgement wouldn't be

6      appropriate here.

7              In addition, partial summary judgement here, giving

8      partial summary judgement, for instance, just to Pinpoint,

9      is going to prejudice the Defendants, because we're going to

10     then be fighting a battle on two fronts.  We're going to be

11     working regarding the judgment on the one hand and trying to

12     figure out how we can satisfy that; and working on whatever

13     claims remain over here on the other hand.  And as a

14     result --

15             THE COURT:  I'm just going to interrupt you,

16     because the court can always grant pieces of summary

17     judgement.  I mean --

18             MR. BARNEY:  Understood, Your Honor.

19             THE COURT:  I completely reject that argument.

20     Sorry.

21             MR. BARNEY:  Understood.

22             THE COURT:  It's creative but, you know, based on

23     all the summary judgement motions that are before this court

24     and everywhere, the court can grant partial --

25             MR. BARNEY:  Understood, Your Honor.

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1           THE COURT:  -- regardless of whether it's requested

2    or not.  I can even do -- the power of my position, I can

3    grant reverse summary judgement, even if you don't ask for

4    it, right?

5           MR. BARNEY:  This is true.

6           THE COURT:  So I think I can also do partial

7    summary judgement when I have multiple parties.

8           MR. BARNEY:  Understood.

9           THE COURT:  Alright.  So, to be clear, with regard

10   to Pinpoint, Plaintiffs are asking for -- looking at your

11   charts, Mr. Starner --

12          MR. STARNER:  Yes, this is Exhibit 1 to my

13   affidavit.  Document number 326, Your Honor.

14          THE COURT:  Yes.  So which as to Pinpoint?

15          MR. STARNER:  Scenario six, which is the last page

16   of the exhibit.

17          THE COURT:  Scenario six.  Okay.  You are asking

18   for, with regard to the 2018 notes, the interest payment --

19   the interest calculation that you have here in scenario six

20   is up until today or --

21          MR. STARNER:  No, those are interest payments that

22   were due previously.  So they're not accruing.  Those are

23   all payments that were due before maturity.  So there's no

24   dispute about those numbers, as far as I'm aware.

25          THE COURT:  Alright.  So with regard to Pinpoint,

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    for the reasons stated on the record so far, the court is

2    granting summary judgement in favor of Pinpoint and against

3    the Defendants in the amount of $86,824,200.

4         Moving on to VP China, we're going to go through

5    the same thing again.  Okay.  So step by step, VP China,

6    looking at that agreement.

7         MR. STARNER:  Thank you, Your Honor.  So now VP

8    China, the same overarching kind of structure we talked

9    about applies.  The only difference now is the way VP held

10   their notes.  It was layered, so they didn't just have one

11   bank involved.  They had three.  So it kind of -- the direct

12   bank, the direct kind of brokerage bank, was HSBC.  And then

13   there's an intermediary bank they used, Euroclear.  And then

14   it was J.P. Morgan at the top, who then had the account with

15   Seed & Co.

16        So what do we have in terms of evidence, we've got

17   the authorization letter from Seed & Co. that J.P.M. also

18   coordinated.  Now I want to pause there for a moment, Your

19   Honor.  The authorization letter on its face doesn't

20   authorize J.P.M. to do anything, right?  It authorizes VP,

21   Value Partners, Plaintiff here to sue.  So I want to circle

22   back on that, because standing alone that authorization

23   letter, no dispute, that's admissible evidence, gives Value

24   Partners the authority to sue on the notes.  So the

25   authority, I think, question is definitively determined by

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1     that evidence.  In addition to, of course, we have the fact

2     witness evidence.

3              So where we kind of run into I think the

4     Defendant's challenge is, well, you know, we don't have, you

5     know, evidence from the intermediary bank.  And it's a

6     little confusing, because you have some stuff from HSBC and

7     you have these bank accounts from HSBC, but that's not

8     J.P.M.  Hey, wait a minute here, there's something fishy

9     here.  There's inconsistencies with the evidentiary record.

10             And we submit to the court there are no

11    inconsistencies at all with what we've put in to the court.

12    We've articulated very clearly, both in our papers and

13    through our fact witness, how this was structured.  There's

14    to dispute, no evidence --

15             THE COURT:  And I also have no witness on the other

16    side disputing that.

17             MR. STARNER:  Right.  There's no admissible

18    evidence.  It kind of goes back to what we talked about with

19    Pinpoint.  It's like what if someone came forward and said

20    those are my notes.  What if someone said no, no, all that

21    stuff that was in put in that's wrong, they're lying.

22    That's not the standard for summary judgement.

23             THE COURT:  Well, the standard is I need someone on

24    the other side explaining the alternative.

25             MR. STARNER:  Right.

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1          THE COURT:  And I don't have it.

2          MR. STARNER:  With admissible evidence, right.  Not

3     just speculation.  So, going back --

4          THE COURT:  Nonetheless, before I issue another

5     judgment like the one I just did, I need to be certain --

6          MR. STARNER:  Absolutely.  Understood.

7          THE COURT:  -- that the factual record is there

8     demonstrating your right to this judgment.

9          MR. STARNER:  Right.  So in terms of the evidence

10     and how it fits together, what we've got is the

11     authorization letter from Seed & Co. that says Value

12     Partners you can sue.  And it refers to the amount of the

13     notes they can sue on.  There's an amount, okay.

14          THE COURT:  So can you just hold on for one second

15     and have a seat.  Why isn't that enough?

16          MR. BARNEY:  Why isn't that enough, Your Honor?

17          THE COURT:  Yes.

18          MR. BARNEY:  For a couple of reasons.  The way that

19     the Seed & Co. letters are structured is the notes that they

20     are giving provision on are identified by two things; the

21     bank and the amount.  So here Seed & Co. gave permission

22     based on notes held by J.P.M.C. for this amount.  However,

23     they're suing on notes held by -- that they say are held

24     through HSBC.  Now, it's the same amount, but that means

25     that the notes that Seed & Co. gave permission on are not

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1     directly tied to the notes that they are suing on, unlike in

2     the Pinpoint situation.

3             THE COURT:  Okay.  Alright.

4             MR. BARNEY:  And now Mr. Starner gave you that

5     connection, but I will note we didn't hear anything about

6     J.P.M.C. until the reply brief.  That's the first time they

7     raised any question regarding J.P. Morgan.

8             THE COURT:  So, hold on.  So are you saying then,

9     you know, do you want me to adjourn today's summary

10    judgement as to VP China to give you an opportunity for a

11    sur-reply?

12            MR. BARNEY:  No.  What I'm saying, Your Honor, is

13    that the only evidence we have for this chain, this HSBC to

14    I believe it's Euroclear to J.P. Morgan to DTC, is the

15    affidavit of Mr. Cam.  That's the only evidence we have of

16    that chain.

17            THE COURT:  And what do you have?

18            MR. BARNEY:  Well, but here's the issue, Your

19    Honor.  Mr. Cam doesn't say how he knows that.  He doesn't

20    say he has firsthand evidence of it.  He just says that

21    that's the chain.  And as a result, he is not a competent

22    witness to testify to that.

23            As Your Honor said in the previous ruling, you

24    know, he has to have firsthand knowledge of this.  And his

25    affidavit doesn't tell us he has first-hand knowledge.  He

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    doesn't work for any of those banks.  So he's just saying

2    here's my understanding, but at best that's hearsay.  It's

3    like saying oh, yes, I fell down, I broke my clavicle and

4    these three ribs.  Well, no, you fell down and, you know, it

5    hurts.  Your doctor told you you broke your clavicle and

6    three ribs.  But that the courts have said is hearsay.  And

7    I'm actually happy to provide a case cite on that.

8           THE COURT:  Hold on one second.  Go ahead.

9           MR. BARNEY:  So the case cite is Bhowmik v.

10   Santana, that's 140 AD3d 460, and it's at Page 461.  That's

11   a First Department 2016 case.  That's actually where I got

12   the clavicle and ribs examples.  So this chain, we don't

13   have that connection.  They haven't put in evidence that is

14   firsthand knowledge on that.

15          Second, they assert, well, it's consistent with all

16   the other evidence.  However, all the other evidence, other

17   than Mr. Cam's original affidavit, is inadmissible because

18   it is not appropriately before the court.  And I can get

19   into that, if you like, or I can hold that argument, if you

20   prefer.

21          THE COURT:  Let's hear from Mr. Starner on that

22   one.

23          MR. STARNER:  Thank you, Your Honor.

24          Let me just start with the, I think, novel argument

25   that our fact witness doesn't have personal knowledge.

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1          THE COURT:  Well, if he has personal knowledge as

2     to the books and records of his company.

3          MR. STARNER:  He says, "I have personal knowledge

4     of the facts stated herein."  This is the, just to be clear,

5     he's the fund manager.  He's the one.  He's not a custodian.

6     He's the fact witness who's involved with these funds.  He

7     said that he attests to all of the facts in his affirmation.

8     So there's no basis to say he doesn't have firsthand

9     knowledge.

10          THE COURT:  No.  The problem is he's not an

11     appropriate witness with regard to Chase, HSBC or Euroclear.

12     That's the problem.

13          MR. STARNER:  Okay.  He doesn't work for those

14     banks.  I get that.  But just to be clear, his attesting to

15     the way that VP's holdings are structured, he absolutely has

16     firsthand knowledge of that.  I want to be clear about that.

17     So he knows, certainly has a basis to know, that it's held

18     through HSBC, Euroclear, J.P.M.  He knows that, okay.  And I

19     would also note --

20          THE COURT:  How does he know that?  He knows that

21     from his -- is that where we get the bank statements?

22          MR. STARNER:  Yes.  So bank statements, let's go

23     there.  Those are HSBC bank statements that show when the

24     notes were bought by Value Partners over the course of the

25     last six years.  They started buying though notes back in

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1        2001.  So we have records to show when each of the notes

2        they own were purchased.  In that same record, it also

3        refers to Euroclear as the intermediary holder, okay.  Then

4        we have the information in evidence about J.P.M. going to

5        Seed & Co. and where is the connection between Euroclear and

6        J.P.M.  that's Mr. Cam, who says, look, that's how this is

7        structured.  So I think he certainly is a competent witness

8        to put those connections together.

9                THE COURT:  Well, the bottom line, though, is that

10       he relies on those statements to confirm his position in the

11       fund.

12               MR. STARNER:  I might characterize it as

13       corroboration, certainly.  I don't think he need those

14       statements, frankly.  He could say we own these notes; this

15       is the way they're structured; we just stop there.  I would

16       argue, Your Honor, in terms of evidence and meeting our

17       burden, but we put in bank statements and put in more than

18       that.

19               We can argue about whether or not the statements

20       from the banker are admissible, you know, because -- but the

21       bank account statements, you know, we put in, you know,

22       we've identified 10 or 12 cases.  The court has discretion

23       to consider whether those statements come in as

24       self-authenticated documents.  And again, I think it's

25       important to look at that in the context of what are the

KAREN MENNELLA - OFFICIAL COURT REPORTER

31

Proceedings

1     Defendants putting forward in terms of evidence.  And it's

2     zero.

3           In terms of not directly tied, there's a reference

4     to only raising J.P.M. in the reply.  Just to be clear,

5     that's been in this case since day one back in February.

6     The authorization letters are from Seed & Co. to J.P.M., so

7     that's certainly been front and center from day one.

8           So I'll stop there, unless you want me to

9     address --

10          THE COURT:  No.  Have a seat.

11          If I tell you that I'm going to accept the bank

12    statements both because they are records, even though they

13    are not records of VP China, they are records that are being

14    used by the manager, number one.  And number two, you

15    haven't really given anything to me.  If I accept it just

16    prima facie, let's say, I need something from you that says,

17    no, these records shouldn't be accepted; they're not

18    reliable.  Because at the end of the day the only thing that

19    I really care about is are they reliable or not.  And you

20    haven't given me anything to say they're not reliable.

21          MR. BARNEY:  Well, Your Honor, my statement there

22    would be to get past that prima facie evidence hurdle they

23    must submit admissible evidence.  So this admissibility --

24    first off, just to go back to what Mr. Starner said a moment

25    ago, he said, well, the connection between J.P. Morgan Chase

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    and Euroclear, that's Mr. Cam.  As Your Honor pointed out,

2    he only knows that through -- because he was told that.

3    Because he found that out through a document, from whatever

4    else.  The person who should have testified to that is

5    someone from Euroclear or J.P. Morgan.

6         Second, as to --

7         THE COURT:  What would that person testify to?  You

8    know what that person would testify to?  It would be a

9    records custodian that would come in and say, yep, this is

10   my record -- this is my statement that shows their position

11   that I'm holding.

12        MR. BARNEY:  Well, Your Honor, they actually don't

13   have any statement in -- any bank statement in there from

14   Euroclear.  They have a reference to Euroclear on some of

15   the HSBC bank statements, and they have the Seed & Co.

16   letters that reference J.P. Morgan, but there is no document

17   connecting Euroclear to J.P. Morgan.  That's the leap that

18   they're make with Mr. Cam.  And that's the -- that's why the

19   fact that his testimony is based on third-party knowledge is

20   an issue.

21        Next, if I can go on the record --

22        THE COURT:  Wait.  Let's just look at the document

23   that -- oh, here it is.  Okay.  Exhibit 3 to Cam.  So the

24   Citibank document has the Rolta LLC 10.75 percent, May 16,

25   2018, right?  It identifies it.  And then the face amount is

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1        $1,450,000, right?  And settlement at the bottom of this is

2        Euroclear, right?  That's Exhibit 1 to Cam.

3                MR. BARNEY:  Yes.

4                THE COURT:  Okay.  Exhibit 2 to Cam, where do I

5        find the $1,450,000?

6                MR. BARNEY:  I believe it's at the bottom.  The

7        line starts 19-11/18.

8                THE COURT:  Oh, 1,400,000.  Okay.  Thank you.  Got

9        it.  Alright.  And that is HSBC, Rolta -- same note, okay.

10       How do I get from Citibank, Euroclear to Exhibit 2?

11       Mr. Starner, can you just walk me through this, please?

12               MR. STARNER:  Certainly.

13               THE COURT:  How do I get from Exhibit 1 to Exhibit

14       2.

15               MR. STARNER:  So --

16               THE COURT:  Oh, because it's Citi Group.  Never

17       mind, I see it.  I see it.  And then I go to Exhibit 3,

18       HSBC.  Now --

19               MR. STARNER:  Your Honor, it just shows current

20       holdings as of June of '19, static number.

21               THE COURT:  So the holding now is 20,800,000,

22       right?

23               MR. STARNER:  Correct.

24               THE COURT:  Alright.  And the reason --

25               MR. STARNER:  That includes the Pala notes.  That

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1      math is straightforward.  We know what that number is.

2              THE COURT:  Alright.  So as to the $1,450,000, if I

3      tell you that I'm going to accept these statements that I've

4      just walked through on the record as admissible evidence

5      that supports their position, do you have anything -- any

6      admissible evidence to challenge that?

7              MR. BARNEY:  My only response is, as I said before,

8      our position is that these are not admissible in and of

9      themselves.  That a bulk of inadmissible evidence does not

10     create admissible evidence that each one of them don't have

11     a consortium of records for those documents.  And these are

12     not -- all of the cases that they cited to, the documents

13     that were considered to be self-authenticating were

14     essentially consumer-level bank records.  Stuff that even a

15     financially illiterate lawyer, like myself, would look at it

16     and say, oh, yeah, I've gotten this credit card statement

17     every month.  They weren't these type of complicated

18     documents.

19             THE COURT:  There's another provision in the CPLR,

20     though, for electronic records.  So even if I agree on -- if

21     I were to accept this argument that you're making now that

22     commercial bank statements are not the same as consumer bank

23     statements, which I actually don't agree with, there's also

24     the alternate provision about electronic records, which also

25     gets these documents in.

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1        So on those two grounds, I'm accepting these

2    documents.  Do you have any other argument with regard to VP

3    China?

4        MR. BARNEY:  With VP China the other argument would

5    be the fact that it would refer to the Seed letters where we

6    have this connection between J.P. Morgan and the disconnect

7    with HSBC.  We still haven't seen any documents that connect

8    Euro -- HSBC to Euroclear, but not Euroclear to J.P. Morgan.

9        And just to clarify, Mr. Starner said this has been

10   in since the beginning.  Well, Mr. Cam has never mentioned

11   J.P. Morgan until his very last affidavit after we made our

12   opposition.  So, yes, the document has been in there; and,

13   yes, the reference to J.P. Morgan has been in there, but

14   this is the first time we're hearing an explanation of this

15   whole chain.  And it's that connection between that they

16   haven't shown between Euroclear and J.P. Morgan that's the

17   issue.

18       THE COURT:  What I have, though, is corroborating

19   the letter from Seed & Co. to VP China, right?  So that

20   connection between Seed & Co. authorizing VP China and the

21   chain up to J.P. Morgan, I would say, are corroborating to

22   authorize VP China be here today asking for this judgment.

23       So I am satisfied, as I sit here today, that A, I

24   am not going -- that the Plaintiff has presented evidence

25   that it is the proper Plaintiff as with regard to the

36

Proceedings

1      $1,450,000 that we're talking about.  So do you have

2      anything else with regard to these particular $1,450,000?

3           MR. BARNEY:  Yes.  The last piece would be this

4      question about Pala notes, because the $1,450,000, I

5      believe, is the Pala.

6           THE COURT:  Separate issue.  We're going to move on

7      to that, but as to --

8           MR. BARNEY:  I believe there are -- I believe the

9      VP clients are asking for more than the 1.45 million.

10     They're asking for many times that.  And so --

11          THE COURT:  I understand that.  But in my --

12          MR. BARNEY:  Understood.

13          THE COURT:  I can't do so many things at a time.

14     So that's my first chain.  So with regard to VP China, so

15     far we have a sufficient record with regard to 1.4 million.

16          MR. STARNER:  Sorry.  If I may, Your Honor, sorry

17     to interrupt.  That number, the 1.45, that was the purchase

18     VP made from Pala in November of '18.  Sorry if there was

19     any confusion there.  So I don't know whether we'd look at

20     the underlying documents.  The chart we put together shows

21     the total amounts of VP's holding.  And again, when I say

22     VP, VP have different holdings.

23          THE COURT:  VP China is the one I'm working with

24     right now.

25          MR. STARNER:  Excellent.

KAREN MENNELLA - OFFICIAL COURT REPORTER

37

Proceedings

1          THE COURT:  So how do I get -- so I'm satisfied,

2     you're asking for?

3          MR. STARNER:  A total amount is 26.390.  And that

4     is reflected in a document I'm going to point the court to

5     in a moment.  Your Honor can get there.  This is Cam

6     Exhibit 2 that shows the trading activity.  That is all of

7     the notes up until that last purchase of 1.45 in November of

8     '18.  So this is document number 291, Cam Exhibit 2, which

9     shows the total trading activities of VP on the 18 notes.

10    And if you added up all those numbers, except for that

11    transaction at the end, that's where you get to the

12    26,390,000 number, if I'm not mistaken.

13         THE COURT:  If I add up, looking at the bottom is

14    Ben Holder's 9, the HSBC statement.

15         MR. STARNER:  Sorry, what exhibit are you looking

16    at, Your Honor?

17         THE COURT:  Exhibit 2.

18         MR. STARNER:  Yes.

19         THE COURT:  Page number 009.

20         MR. STARNER:  Yes.

21         THE COURT:  Bates number.  Okay.  Now, where are

22    you seeing the 26,390,000?

23         MR. STARNER:  I apologize, Your Honor.

24         THE COURT:  Because I only see 16,772,000.  Let me

25    just -- it's 10:54, and I need to be able to walk through

KAREN MENNELLA - OFFICIAL COURT REPORTER

Proceedings

1    each transaction the way we are doing it right now and make

2    a record of my findings as to each of your challenges.  This

3    is going to take -- I can't rush this.  I have a meeting

4    with the administrative judge in six minutes.  And I'm

5    meeting with my mom's doctor that I have to get to at 2:00.

6    So I can't finish this up in the next six minutes.  And it

7    deserves, you know, as much time as it takes.

8          So let me ask you if we could -- you see how I'm --

9    you see where I'm going, right?  You see I'm trying to make

10   this record.

11          MR. STARNER:  Sure.

12          MR. BARNEY:  If I may, Your Honor, my calendar is

13   in my jacket pocket.

14          THE COURT:  Okay.  But to be quite honest with you,

15   I want to finish this on Monday.

16          MR. STARNER:  On Monday?

17          THE COURT:  I do.  Can we do this on Monday?

18          MR. BARNEY:  I'm supposed to be leaving for the

19   holidays tomorrow.

20          MR. STARNER:  We can do it first thing -- we're

21   available, Your Honor.  We have an interest to get this

22   done, respecting counsel's schedule.

23          THE COURT:  When are you back?

24          MR. BARNEY:  I should be back on Thursday next

25   week.

KAREN MENNELLA - OFFICIAL COURT REPORTER

1          MR. BARNEY:  And I'm around the following week.

2          THE COURT:  I'm here everyday.  So you two, you

3     talk about this, and I'm here everyday.  I'm not going

4     anywhere.  And I'm sorry to do this to you, but I just --

5     I'm not seeing, you know, even if I have this meeting --

6     hold on one second.  I might be able to get another half

7     hour or 45 minutes.  I don't know if that would be enough

8     after that meeting.  I only meet with her once a year, so.

9          Off the record.

10          (Whereupon, there was an off-the-record

11     discussion.)

12          THE COURT:  Hold off on your judgment on Pinpoint.

13     We're going to try to wrap up the whole thing either the

14     30th or the 8th.

15          Have a good holiday.  Have a nice time.  Sorry that

16     we're not able to --

17          MR. STARNER:  We appreciate the court's time.  We

18     appreciate the rescheduling the hearing today, and we

19     appreciate the court's assistance.

20          THE COURT:  We'll get through it.  We'll do it

21     right.  And we'll get it done right.

22          MR. STARNER:  Hopefully, you'll get some time.

23

24

25

```
 1                    * * * * * * * * * * * *

 2                    C E R T I F I C A T E

 3

 4   I, Karen M. Mennella, a Senior Court Reporter for the State of

 5   New York do hereby certify that the foregoing is a true and

 6   accurate transcription of my original stenographic notes.

 7

 8                                  _____

 9                                  Karen M. Mennella,

10                                  Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KAREN MENNELLA - OFFICIAL COURT REPORTER

**$**

**$1,450,000** [6] - 33:1, 33:5, 34:2, 36:1, 36:2, 36:4
**$86,824,200** [1] - 24:3

**'**

**'18** [3] - 19:1, 36:18, 37:8
**'18s** [1] - 18:12
**'19** [3] - 18:22, 19:18, 33:20
**'19s** [1] - 18:14

**0**

**009** [1] - 37:19

**1**

**1** [3] - 23:12, 33:2, 33:13
**1,400,000** [1] - 33:8
**1.4** [1] - 36:15
**1.45** [3] - 36:9, 36:17, 37:7
**10** [1] - 30:22
**10.75** [1] - 32:24
**10020-1095** [1] - 1:18
**10166** [1] - 1:22
**10:54** [1] - 37:25
**12** [1] - 30:22
**1221** [1] - 1:18
**13.03** [1] - 17:1
**13.03(a** [1] - 15:20
**13.03(a)** [1] - 16:21
**13.03(b** [1] - 17:1
**140** [1] - 28:10
**16** [1] - 32:24
**16,772,000** [1] - 37:24
**17th** [1] - 1:21
**18** [1] - 37:9
**19-11/18** [1] - 33:7

**2**

**2** [8] - 6:7, 6:10, 33:4, 33:10, 33:14, 37:6, 37:8, 37:17
**2.05** [8] - 4:8, 4:15, 5:20, 6:2, 6:8, 6:13, 8:6, 13:14
**2.06** [1] - 2:12
**20** [1] - 1:11
**20,800,000** [1] - 33:21
**200** [1] - 1:21
**2000** [1] - 18:6
**2001** [1] - 30:1

**2016** [1] - 28:11
**2018** [5] - 18:6, 18:7, 18:9, 23:18, 32:25
**2019** [5] - 1:11, 9:6, 18:5, 18:7, 18:8
**25** [2] - 15:2, 15:13
**26,390,000** [2] - 37:12, 37:22
**26.390** [1] - 37:3
**279** [1] - 9:5
**291** [1] - 37:8
**2:00** [1] - 38:5

**3**

**3** [2] - 32:23, 33:17
**30th** [1] - 39:14
**326** [1] - 23:13
**36** [1] - 9:5

**4**

**45** [1] - 39:7
**460** [1] - 28:10
**461** [1] - 28:10
**48** [1] - 1:1

**6**

**6.05** [2] - 8:11, 8:23
**6.07** [1] - 8:23
**60** [1] - 1:12
**652798/2018** [1] - 1:6

**8**

**8th** [1] - 39:14

**9**

**9** [1] - 37:14

**A**

**abide** [3] - 7:20, 8:19, 8:25
**able** [4] - 16:23, 37:25, 39:6, 39:16
**absolutely** [2] - 26:6, 29:15
**accelerate** [2] - 14:25, 15:4
**accelerated** [3] - 18:11, 18:25, 19:16
**acceleration** [25] - 3:21, 3:24, 14:18, 14:19, 14:22, 14:23, 14:25, 17:20, 17:23, 18:12, 18:14, 18:20, 18:21, 18:24, 19:13,

20:1, 20:4, 20:6, 20:10, 20:14, 20:15, 21:10, 21:16, 21:19
**accept** [5] - 16:11, 31:11, 31:15, 34:3, 34:21
**accepted** [1] - 31:17
**accepting** [2] - 9:9, 35:1
**account** [7] - 5:1, 5:9, 11:24, 12:5, 12:12, 24:14, 30:21
**accounts** [2] - 4:19, 25:7
**accrue** [2] - 19:3, 19:18
**accruing** [2] - 19:14, 23:22
**accurate** [1] - 40:6
**acknowledge** [1] - 17:25
**acknowledging** [1] - 12:12
**action** [3] - 2:13, 2:14, 3:5
**activities** [1] - 37:9
**activity** [2] - 5:12, 37:6
**AD3d** [1] - 28:10
**add** [1] - 37:13
**added** [1] - 37:10
**addition** [3] - 16:25, 22:7, 25:1
**address** [6] - 4:21, 8:9, 9:21, 16:1, 16:3, 31:9
**addressed** [1] - 16:3
**adjourn** [1] - 27:9
**administrative** [1] - 38:4
**admissibility** [1] - 31:23
**admissible** [10] - 5:14, 24:23, 25:17, 26:2, 30:20, 31:23, 34:4, 34:6, 34:8, 34:10
**admit** [1] - 20:21
**affect** [1] - 18:3
**affidavit** [6] - 12:8, 23:13, 27:15, 27:25, 28:17, 35:11
**affidavits** [1] - 5:8
**affirmation** [2] - 2:18, 29:7
**aggregate** [1] - 15:3
**ago** [1] - 31:25
**agree** [7] - 9:9, 9:24, 15:2, 15:3, 20:17, 34:20, 34:23
**agreed** [1] - 4:1
**agreement** [1] - 24:6

**ahead** [1] - 28:8
**allow** [1] - 17:14
**allows** [1] - 16:16
**alone** [1] - 24:22
**alright** [8] - 6:6, 13:5, 23:9, 23:25, 27:3, 33:9, 33:24, 34:2
**alternate** [1] - 34:24
**alternative** [1] - 25:24
**ambiguous** [1] - 21:5
**AMERICAS** [1] - 1:9
**Americas** [1] - 1:18
**amount** [11] - 18:1, 19:14, 22:1, 24:3, 26:12, 26:13, 26:21, 26:22, 26:24, 32:25, 37:3
**amounts** [2] - 15:12, 36:21
**ANDREA** [1] - 1:15
**apologize** [1] - 37:23
**applicable** [1] - 7:21
**application** [2] - 6:4, 16:16
**applies** [2] - 8:22, 24:9
**apply** [3] - 9:15, 10:23, 16:18
**appreciate** [3] - 39:17, 39:18, 39:19
**appropriate** [2] - 22:6, 29:11
**appropriately** [1] - 28:18
**areas** [1] - 9:24
**argue** [2] - 30:16, 30:19
**argument** [19] - 2:8, 3:1, 4:22, 5:16, 5:17, 5:18, 5:19, 9:21, 10:23, 11:3, 16:21, 17:11, 17:13, 22:19, 28:19, 28:24, 34:21, 35:2, 35:4
**arguments** [1] - 4:3
**Article** [1] - 6:10
**articulated** [1] - 25:12
**aside** [2] - 15:17, 19:21
**assert** [1] - 28:15
**ASSETS** [1] - 1:2
**Assets** [2] - 2:1
**assistance** [1] - 39:19
**associated** [1] - 20:3
**attached** [1] - 2:19
**attesting** [1] - 29:14
**attests** [1] - 29:7
**Attorneys** [1] - 1:20, 1:23
**authenticated** [1] - 30:24

**authenticating** [1] - 34:13
**authority** [8] - 2:17, 3:4, 3:14, 3:18, 8:18, 12:14, 24:24, 24:25
**authorization** [5] - 24:17, 24:19, 24:22, 26:11, 31:6
**authorize** [1] - 24:20, 35:22
**authorized** [1] - 7:14
**authorizes** [1] - 24:20
**authorizing** [3] - 12:11, 12:13, 35:20
**available** [1] - 38:21
**Avenue** [2] - 1:18, 1:21
**aware** [1] - 23:24

**B**

**B.V** [1] - 1:9
**Bank** [2] - 6:18, 6:21
**bank** [35] - 5:9, 10:1, 10:2, 10:4, 10:5, 10:11, 12:5, 12:11, 12:15, 12:18, 12:19, 12:23, 13:1, 13:16, 24:11, 24:12, 24:13, 25:5, 25:7, 26:21, 29:21, 29:22, 29:23, 30:17, 30:21, 31:11, 32:13, 32:15, 34:14, 34:22
**banker** [1] - 30:20
**banks** [2] - 28:1, 29:14
**BARNEY** [46] - 1:22, 2:5, 4:2, 4:7, 8:7, 8:9, 8:15, 9:8, 10:14, 10:16, 13:7, 13:17, 14:12, 14:17, 14:20, 14:23, 15:15, 20:9, 20:16, 20:20, 21:14, 21:23, 22:18, 22:21, 22:25, 23:5, 23:8, 26:16, 26:18, 27:4, 27:12, 27:18, 28:9, 31:21, 32:12, 33:3, 33:6, 34:7, 35:4, 36:3, 36:8, 36:12, 38:12, 38:18, 38:24, 39:1
**Barney** [1] - 2:4
**based** [6] - 2:18, 3:3, 20:25, 22:22, 26:22, 32:19
**basis** [3] - 17:19, 29:8, 29:17
**Bates** [1] - 37:21
**battle** [1] - 22:10

KAREN MENNELLA - OFFICIAL COURT REPORTER

becomes [1] - 8:17
beginning [1] - 35:10
Ben [1] - 37:14
beneficial [17] - 3:11, 3:19, 4:8, 4:15, 4:24, 5:2, 5:22, 7:15, 7:22, 7:25, 9:10, 9:13, 9:15, 9:18, 10:12, 11:13, 12:14
best [1] - 28:2
between [7] - 19:16, 30:5, 31:25, 35:6, 35:15, 35:16, 35:20
Bhowmik [1] - 28:9
bit [6] - 12:24, 12:25, 15:7, 15:18, 15:22, 17:25
book [22] - 4:4, 4:9, 4:10, 4:12, 5:17, 5:20, 9:11, 9:14, 9:19, 10:3, 10:9, 10:20, 13:9, 13:10, 13:13, 13:16, 14:1, 14:2, 14:3
books [1] - 29:2
bot [1] - 15:12
bottom [4] - 30:9, 33:1, 33:6, 37:13
bought [1] - 29:24
brand [1] - 11:3
brand-new [1] - 11:3
brief [2] - 22:4, 27:6
broke [2] - 28:3, 28:5
broker [8] - 4:18, 4:25, 5:1, 11:19, 11:21, 12:5, 12:19
brokerage [6] - 11:17, 12:11, 12:12, 12:16, 12:23, 24:12
brokers [3] - 4:6, 4:19, 5:9
bulk [1] - 34:9
burden [1] - 30:17
buying [1] - 29:25
BY [2] - 1:19, 1:22

**C**

calculation [1] - 23:19
calendar [1] - 38:12
Cam [6] - 27:15, 32:23, 33:2, 33:4, 37:5, 37:8
cam [5] - 27:19, 30:6, 32:1, 32:18, 35:10
cam's [1] - 28:17
card [1] - 34:16
care [1] - 31:19
carved [1] - 11:4
case [8] - 13:6, 13:7,

15:25, 20:22, 28:7, 28:9, 28:11, 31:5
CASE [1] - 1:17
cases [2] - 30:22, 34:12
center [1] - 31:7
Centre [1] - 1:12
certain [2] - 3:13, 26:5
certainly [6] - 17:13, 29:17, 30:7, 30:13, 31:7, 33:12
certify [1] - 40:5
chain [9] - 10:7, 13:4, 27:13, 27:16, 27:21, 28:12, 35:15, 35:21, 36:14
challenge [2] - 25:4, 34:6
challenges [1] - 38:2
challenging [3] - 3:13, 3:17, 3:18
characterize [1] - 30:12
chart [1] - 36:20
charts [2] - 2:18, 23:11
Chase [3] - 15:10, 29:11, 31:25
CHINA [1] - 1:4
China [12] - 24:4, 24:5, 24:8, 27:10, 31:13, 35:3, 35:4, 35:19, 35:20, 35:22, 36:14, 36:23
CHRISTOPHER [1] - 1:19
circle [1] - 24:21
cite [2] - 28:7, 28:9
cited [2] - 10:24, 34:12
Citi [1] - 33:16
Citibank [2] - 12:2, 32:24, 33:10
CIVIL [1] - 1:1
claim [1] - 21:9
claiming [2] - 9:16, 15:10
claims [3] - 18:1, 18:19, 22:13
clarify [2] - 3:7, 35:9
class [3] - 15:23, 16:8, 16:17
clause [5] - 16:7, 16:9, 16:12, 16:15, 16:16
clauses [3] - 9:3, 16:7, 16:17
clavicle [3] - 28:3, 28:5, 28:12
clear [13] - 11:4, 13:8, 14:24, 16:18, 20:12, 20:22, 21:21, 21:25,

23:9, 29:4, 29:14, 29:16, 31:4
Clear [6] - 4:11, 4:13, 9:13, 9:20, 10:10, 13:12
clearly [1] - 25:12
client [1] - 13:20
clients [1] - 36:9
Co [33] - 3:9, 5:2, 6:19, 7:3, 7:7, 7:9, 7:11, 8:2, 8:10, 8:14, 8:18, 8:20, 11:8, 11:10, 11:14, 11:15, 12:6, 12:11, 12:19, 13:1, 13:16, 24:15, 24:17, 26:11, 26:19, 26:21, 26:25, 30:5, 31:6, 32:15, 35:19, 35:20
comfortable [2] - 17:23, 19:20
commercial [1] - 34:22
company [1] - 29:2
competent [2] - 27:21, 30:7
completely [1] - 22:19
complicated [1] - 34:17
computer [1] - 13:11
confirm [1] - 30:10
confirmation [2] - 17:4, 17:5
confusing [1] - 25:6
confusion [1] - 36:19
connect [1] - 35:7
connecting [1] - 32:17
connection [7] - 27:5, 28:13, 30:5, 31:25, 35:6, 35:15, 35:20
connections [1] - 30:8
consider [1] - 30:23
considered [1] - 34:13
consistent [1] - 28:15
consortium [1] - 34:11
consumer [2] - 34:14, 34:22
consumer-level [1] - 34:14
contend [1] - 18:25
contention [2] - 4:11, 17:15
context [1] - 30:25
coordinated [1] - 24:18
corporate [2] - 16:4, 17:18
correct [10] - 3:22, 4:18, 6:12, 8:15, 11:20, 12:21, 15:15,

20:2, 21:14, 33:23
corroborating [2] - 35:18, 35:21
corroboration [1] - 30:13
counsel's [1] - 38:22
COUNTY [1] - 1:1
couple [2] - 4:3, 26:18
course [3] - 2:11, 25:1, 29:24
court [18] - 3:3, 5:9, 6:3, 17:5, 17:11, 17:22, 18:12, 18:16, 19:3, 22:16, 22:23, 22:24, 24:1, 25:10, 25:11, 28:18, 30:22, 37:4
COURT [112] - 1:1, 2:1, 2:6, 3:16, 3:21, 3:23, 4:1, 4:6, 4:17, 5:7, 6:6, 6:9, 6:13, 6:18, 6:21, 6:24, 7:2, 7:5, 7:7, 7:16, 7:24, 8:3, 8:8, 8:13, 9:7, 10:13, 10:15, 10:19, 11:8, 11:18, 11:21, 11:25, 12:3, 12:18, 12:22, 13:2, 13:5, 13:15, 13:18, 14:15, 14:19, 14:21, 15:14, 17:9, 18:3, 18:7, 18:9, 18:20, 19:5, 19:9, 19:23, 20:7, 20:12, 20:17, 20:23, 21:4, 21:11, 21:15, 21:21, 22:15, 22:19, 22:22, 23:1, 23:6, 23:9, 23:14, 23:17, 23:25, 25:15, 25:23, 26:1, 26:4, 26:7, 26:14, 26:17, 27:3, 27:8, 27:17, 28:8, 28:21, 29:1, 29:10, 29:20, 30:9, 31:10, 32:7, 32:22, 33:4, 33:8, 33:13, 33:16, 33:21, 33:24, 34:2, 34:19, 35:18, 36:6, 36:11, 36:13, 36:23, 37:1, 37:13, 37:17, 37:19, 37:21, 37:24, 38:14, 38:17, 38:23, 39:2, 39:12, 39:20
Court [4] - 1:16, 1:25, 40:4, 40:10
court's [3] - 19:20, 39:17, 39:19
courts [1] - 28:6
cover [1] - 17:3
CPLR [1] - 34:19

create [1] - 34:10
creative [1] - 22:22
credit [1] - 34:16
CREDIT [1] - 1:4
current [1] - 33:19
currier [3] - 15:23, 16:8, 16:16
custodian [2] - 29:5, 32:9

**D**

date [3] - 17:6, 19:25, 21:1
deal [2] - 9:3, 17:24
deals [3] - 6:16, 11:12, 15:20
December [1] - 1:11
default [1] - 15:1
Defendant [1] - 2:24
Defendant's [2] - 7:18, 25:4
Defendants [7] - 1:10, 1:23, 2:9, 3:13, 22:9, 24:3, 31:1
defined [1] - 11:10
definitively [1] - 24:25
delivered [1] - 15:25
delivery [1] - 16:11
demands [1] - 15:21
demonstrating [1] - 26:8
denying [2] - 20:13, 21:17
Department [1] - 28:11
deposited [1] - 15:23
depository [2] - 9:12
deserves [1] - 38:7
determine [1] - 3:3
determined [1] - 24:25
Deutsche [2] - 6:18, 6:21
difference [1] - 24:9
different [9] - 2:21, 2:23, 2:24, 6:22, 7:1, 12:24, 22:3, 36:22
direct [2] - 24:11, 24:12
directly [2] - 27:1, 31:3
disconnect [1] - 35:6
discretion [1] - 30:22
discuss [1] - 15:7
discussion [1] - 39:11
dispute [10] - 3:8, 3:12, 3:19, 5:14, 7:12, 11:9, 17:17, 23:24, 24:23, 25:14
disputing [1] - 25:16

doctor [2] - 28:5, 38:5
document [11] - 9:5, 12:3, 12:4, 23:13, 32:3, 32:16, 32:22, 32:24, 35:12, 37:4, 37:8
documentation [1] - 14:8
documents [8] - 30:24, 34:11, 34:12, 34:18, 34:25, 35:2, 35:7, 36:20
done [4] - 7:14, 20:4, 38:22, 39:21
down [4] - 2:9, 17:24, 28:3, 28:4
DTC [11] - 4:11, 4:13, 5:1, 8:1, 9:12, 9:19, 9:25, 10:10, 10:21, 13:12, 27:14
due [8] - 18:9, 18:23, 18:24, 19:2, 19:12, 19:16, 23:22, 23:23
dug [1] - 2:21

**E**

EAST [1] - 1:9
effect [1] - 19:15
effective [4] - 9:11, 10:20, 17:2, 17:20
either [4] - 4:11, 4:12, 14:7, 39:13
electronic [2] - 34:20, 34:24
end [5] - 13:18, 14:2, 31:18, 37:11
ends [1] - 13:16
enforcement [2] - 5:21, 6:4
enforcing [1] - 5:22
entities [6] - 2:22, 13:24, 14:3, 14:6, 18:4
entitled [2] - 18:18, 19:18
entity [1] - 14:9
entries [1] - 4:4
entry [21] - 4:9, 4:10, 4:12, 5:17, 5:20, 9:11, 9:14, 9:19, 10:4, 10:10, 10:20, 13:9, 13:10, 13:13, 13:16, 14:1, 14:2, 14:3
ESQ [3] - 1:19, 1:19, 1:22
essentially [1] - 34:14
establish [1] - 13:4
established [1] - 4:15

establishing [1] - 17:8
Euro [1] - 35:8
Euroclear [23] - 4:11, 4:13, 9:12, 9:19, 10:10, 10:21, 13:12, 24:13, 27:14, 29:11, 29:18, 30:3, 30:5, 32:1, 32:5, 32:14, 32:17, 33:2, 33:10, 35:8, 35:16
event [1] - 15:1
everyday [2] - 39:2, 39:3
everywhere [1] - 22:24
evidence [37] - 3:2, 5:5, 5:11, 5:13, 5:14, 12:8, 12:15, 12:17, 13:3, 13:9, 16:19, 17:15, 24:16, 24:23, 25:1, 25:2, 25:5, 25:14, 25:18, 26:2, 26:9, 27:13, 27:15, 27:20, 28:13, 28:16, 30:4, 30:16, 31:1, 31:22, 31:23, 34:4, 34:6, 34:9, 34:10, 35:24
evidentiary [1] - 25:9
examples [1] - 28:12
excellent [1] - 36:25
except [1] - 37:10
exchange [2] - 6:14, 11:6
excuse [1] - 15:10
execution [1] - 6:10
exercise [1] - 18:19
Exhibit [11] - 23:12, 32:23, 33:2, 33:4, 33:10, 33:13, 33:17, 37:6, 37:8, 37:17
exhibit [2] - 23:16, 37:15
explained [1] - 9:23
explaining [1] - 25:24
explanation [1] - 35:14
extent [1] - 19:3

**F**

face [2] - 24:19, 32:25
facie [2] - 31:16, 31:22
facsimile [1] - 17:15
fact [17] - 2:8, 2:20, 4:15, 9:22, 11:24, 12:9, 15:16, 17:16, 18:10, 21:13, 21:18, 25:1, 25:13, 28:25, 29:6, 32:19, 35:5

facts [2] - 29:4, 29:7
factual [1] - 26:7
fairly [1] - 5:2
fallback [1] - 17:21
far [3] - 23:24, 24:1, 36:15
fast [1] - 15:21
favor [1] - 24:2
fax [9] - 16:11, 16:14, 16:18, 16:22, 17:3, 17:4, 17:10, 17:12
faxed [3] - 16:1, 16:20, 16:23
February [2] - 5:10, 31:5
fell [2] - 28:3, 28:4
few [3] - 12:17, 12:25, 15:6
fighting [1] - 22:10
figure [1] - 22:12
financially [1] - 34:15
findings [1] - 38:2
finish [2] - 38:6, 38:15
firm [3] - 11:17, 12:12, 12:16
First [1] - 28:11
first [13] - 8:9, 10:9, 15:23, 16:7, 16:8, 16:15, 16:17, 27:6, 27:25, 31:24, 35:14, 36:14, 38:20
first-hand [1] - 27:25
firsthand [5] - 27:20, 27:24, 28:14, 29:8, 29:16
fishy [1] - 25:8
fits [1] - 26:10
FIXED [1] - 1:3
Floor [1] - 1:21
following [1] - 39:1
foregoing [1] - 40:5
form [1] - 6:10
forward [2] - 25:19, 31:1
forwarding [1] - 15:21
four [1] - 12:8
frankly [2] - 17:25, 30:14
front [2] - 17:19, 31:7
fronts [1] - 22:10
full [1] - 22:1
fully [1] - 18:23
fund [2] - 29:5, 30:11
FUND [3] - 1:3, 1:4, 1:5
funds [1] - 29:6
Furthermore [1] - 9:8
FZ [1] - 1:9
FZ-LLC [1] - 1:9

**G**

general [1] - 16:15
given [5] - 15:22, 16:7, 17:5, 31:15, 31:20
GLIMSTAD [1] - 1:21
GLOBAL [1] - 1:9
global [4] - 2:11, 9:9, 9:10
grant [5] - 3:5, 19:23, 22:16, 22:24, 23:3
granting [1] - 24:2
great [2] - 8:17
GREATER [1] - 1:4
GREGORY [1] - 1:19
grounds [1] - 35:1
Group [1] - 33:16
guarantor [2] - 15:25, 16:10
guess [1] - 17:10

**H**

half [1] - 39:6
hand [4] - 12:1, 22:11, 22:13, 27:25
happy [1] - 28:7
hear [3] - 14:21, 27:5, 28:21
hearing [2] - 35:14, 39:18
hearsay [2] - 28:2, 28:6
held [7] - 9:25, 11:16, 24:9, 26:22, 26:23, 29:17
hereby [1] - 40:5
herein [1] - 29:4
HIGH [1] - 1:4
history [1] - 5:13
hold [11] - 4:1, 4:25, 6:6, 20:12, 20:23, 26:14, 27:8, 28:8, 28:19, 39:6, 39:12
holder [27] - 2:10, 3:4, 3:10, 6:16, 6:17, 6:19, 7:2, 7:12, 7:20, 7:22, 7:25, 8:2, 8:11, 8:12, 8:16, 8:20, 8:24, 9:8, 9:17, 9:18, 10:11, 11:7, 11:8, 11:10, 11:16, 12:14, 30:3
holder's [1] - 8:25
Holder's [1] - 37:14
holders [10] - 2:13, 2:16, 3:8, 3:9, 5:22, 5:24, 7:15, 8:22, 11:13, 15:2
holding [3] - 32:11,

33:21, 36:21
HOLDINGS [1] - 1:2
holdings [2] - 29:15, 33:20, 36:22
Holdings [2] - 2:1
holds [3] - 9:25, 10:4, 10:5
holiday [1] - 39:15
holidays [1] - 38:19
HON [1] - 1:15
honest [1] - 38:14
Honor [28] - 2:5, 3:6, 4:2, 7:6, 8:7, 13:17, 17:21, 22:18, 22:25, 23:13, 24:7, 24:19, 26:16, 27:12, 27:19, 27:23, 28:23, 30:16, 31:21, 32:1, 32:12, 33:19, 36:16, 37:5, 37:16, 37:23, 38:12, 38:21
hopefully [1] - 39:22
hour [1] - 39:7
HSBC [16] - 11:25, 15:11, 24:12, 25:6, 25:7, 26:24, 27:13, 29:11, 29:18, 29:23, 32:15, 33:9, 33:18, 35:7, 35:8, 37:14
hurdle [1] - 31:22
hurts [1] - 28:5

**I**

idea [1] - 22:2
identified [2] - 26:20, 30:22
identifies [1] - 32:25
illiterate [1] - 34:15
implicated [1] - 6:4
important [2] - 16:25, 30:25
impossibility [1] - 10:7
impossible [1] - 9:22
inadmissible [2] - 28:17, 34:9
INC [1] - 1:8
include [1] - 20:3
included [1] - 17:14
includes [1] - 33:25
including [1] - 19:25
INCOME [2] - 1:3, 1:5
inconsistencies [2] - 25:9, 25:11
indenture [3] - 5:18, 9:6, 14:24
indentures [2] - 4:5, 4:7
INDEX [1] - 1:6

KAREN MENNELLA - OFFICIAL COURT REPORTER

**INDIA** [1] - 1:8
**information** [1] - 30:4
**instance** [1] - 22:8
**intended** [2] - 15:24, 16:2
**interest** [29] - 4:8, 5:23, 6:1, 7:11, 9:10, 9:13, 9:15, 9:18, 10:1, 10:2, 10:12, 11:14, 11:16, 18:24, 19:2, 19:6, 19:13, 19:14, 19:15, 19:18, 20:1, 20:3, 21:6, 21:9, 23:18, 23:19, 23:21, 38:21
**intermediary** [3] - 24:13, 25:5, 30:3
**INTERNATIONAL** [1] - 1:8
**interpretation** [1] - 7:18
**interpreted** [1] - 10:25
**interpreting** [1] - 11:1
**interrupt** [2] - 22:15, 36:17
**involved** [2] - 24:11, 29:6
**irrelevant** [1] - 6:3
**issue** [24] - 2:8, 2:20, 3:12, 4:4, 5:4, 6:10, 13:7, 14:12, 15:7, 15:11, 15:16, 15:18, 17:18, 18:1, 21:1, 21:6, 21:13, 21:18, 21:24, 26:4, 27:18, 32:20, 35:17, 36:6
**issued** [3] - 11:11, 15:14, 15:15
**issuer** [6] - 6:24, 15:5, 15:19, 15:24, 16:9, 17:18
**issues** [7] - 2:15, 2:17, 2:24, 2:25, 7:1, 14:10, 14:16
**itself** [2] - 13:10, 15:18

**J**

**J.P** [17] - 11:25, 12:1, 15:9, 15:10, 24:14, 27:7, 27:14, 31:25, 32:5, 32:16, 32:17, 35:6, 35:8, 35:11, 35:13, 35:16, 35:21
**J.P.M** [8] - 24:17, 24:20, 25:8, 29:18, 30:4, 30:6, 31:4, 31:6
**J.P.M.C** [2] - 26:22, 27:6

**jacket** [1] - 38:13
**jointly** [1] - 15:4
**judge** [1] - 38:4
**judgement** [27] - 2:6, 3:5, 11:2, 18:11, 18:13, 18:17, 18:18, 19:7, 19:22, 19:24, 20:13, 21:12, 21:16, 21:18, 22:1, 22:2, 22:5, 22:7, 22:8, 22:17, 22:23, 23:3, 23:7, 24:2, 25:22, 27:10
**judgment** [7] - 19:15, 20:25, 22:11, 26:5, 26:8, 35:22, 39:12
**July** [2] - 18:23, 19:11
**June** [1] - 33:20
**Justice** [1] - 1:16

**K**

**KAREN** [1] - 1:24
**Karen** [2] - 40:4, 40:9
**kind** [10] - 5:6, 5:18, 7:9, 7:20, 12:7, 24:8, 24:11, 24:12, 25:3, 25:18
**knowledge** [9] - 27:24, 27:25, 28:14, 28:25, 29:1, 29:3, 29:9, 29:16, 32:19
**knows** [5] - 27:19, 29:17, 29:18, 29:20, 32:2

**L**

**language** [2] - 11:5, 17:12
**last** [7] - 5:10, 19:2, 23:15, 29:25, 35:11, 36:3, 37:7
**law** [1] - 10:24
**lawyer** [1] - 34:15
**layered** [2] - 12:24, 24:10
**layers** [1] - 12:25
**leap** [1] - 32:17
**leaving** [1] - 38:18
**ledger** [1] - 13:11
**letter** [8] - 11:19, 12:4, 12:10, 24:17, 24:19, 24:23, 26:11, 35:19
**letters** [10] - 4:18, 7:16, 8:13, 15:9, 15:14, 15:15, 26:19, 31:6, 32:16, 35:5
**level** [1] - 34:14
**line** [3] - 13:11, 30:9,

33:7
**LLC** [6] - 1:8, 1:9, 1:9, 2:2, 16:2, 32:24
**LLP** [2] - 1:17, 1:21
**look** [3] - 30:6, 30:25, 32:22, 34:15, 36:19
**looked** [1] - 2:19
**looking** [4] - 23:10, 24:6, 37:13, 37:15
**LTD** [3] - 1:2, 1:8, 1:8
**lying** [2] - 14:7, 25:21

**M**

**mail** [5] - 15:24, 15:25, 16:8, 16:11, 16:17
**maintained** [3] - 9:11, 10:20, 11:12
**maintaining** [1] - 7:9
**manager** [2] - 29:5, 31:14
**MASLEY** [1] - 1:15
**MASON** [1] - 1:22
**math** [3] - 18:19, 20:4, 34:1
**matter** [2] - 2:1, 20:24
**matured** [4] - 18:10, 18:22, 18:23, 19:10
**maturing** [1] - 19:10
**maturity** [4] - 19:11, 19:25, 21:1, 23:23
**mean** [3] - 13:25, 20:9, 22:17
**means** [8] - 8:19, 19:1, 26:24
**meet** [1] - 39:8
**meeting** [5] - 30:16, 38:3, 38:5, 39:5, 39:8
**MENNELLA** [1] - 1:24
**Mennella** [2] - 40:4, 40:9
**mentioned** [1] - 35:10
**method** [1] - 10:7
**middle** [1] - 9:5
**MIDDLE** [1] - 1:9
**might** [3] - 2:23, 30:12, 39:6
**million** [2] - 36:9, 36:15
**mind** [1] - 33:17
**minor** [1] - 20:21
**minute** [3] - 15:11, 16:22, 25:8
**minutes** [3] - 38:4, 38:6, 39:7
**mistaken** [1] - 37:12
**mom's** [1] - 38:5
**moment** [4] - 4:22, 24:18, 31:24, 37:5

**Monday** [3] - 38:15, 38:16, 38:17
**money** [1] - 16:10
**month** [1] - 34:17
**Morgan** [17] - 11:25, 12:1, 15:9, 15:10, 24:14, 27:7, 27:14, 31:25, 32:5, 32:16, 32:17, 35:6, 35:8, 35:11, 35:13, 35:16, 35:21
**most** [1] - 9:3
**motion** [6] - 2:7, 20:13, 20:22, 21:15, 21:17, 21:24
**motions** [1] - 22:23
**move** [4] - 14:13, 16:5, 18:13, 36:6
**moving** [2] - 14:10, 24:4
**MR** [113] - 2:5, 3:6, 3:17, 3:22, 3:25, 4:2, 4:7, 4:21, 5:8, 6:8, 6:12, 6:15, 6:19, 6:22, 6:25, 7:4, 7:6, 7:8, 7:17, 7:25, 8:7, 8:9, 8:15, 9:8, 10:14, 10:16, 10:23, 11:9, 11:20, 11:23, 12:1, 12:7, 12:21, 12:23, 13:3, 13:7, 13:17, 14:12, 14:17, 14:20, 14:23, 15:15, 17:10, 18:5, 18:8, 18:10, 18:21, 19:6, 19:11, 20:2, 20:9, 20:16, 20:20, 21:2, 21:8, 21:14, 21:20, 21:23, 22:18, 22:21, 22:25, 23:5, 23:8, 23:12, 23:15, 23:21, 24:7, 25:17, 25:25, 26:2, 26:6, 26:9, 26:16, 26:18, 27:4, 27:12, 27:18, 28:9, 28:23, 29:3, 29:13, 29:22, 30:12, 31:21, 32:12, 33:3, 33:6, 33:12, 33:15, 33:19, 33:23, 33:25, 34:7, 35:4, 36:3, 36:8, 36:12, 36:16, 36:25, 37:3, 37:15, 37:18, 37:20, 37:23, 38:11, 38:12, 38:16, 38:18, 38:20, 38:24, 39:1, 39:17, 39:22
**MULTI** [1] - 1:3
**MULTI-STRATEGY** [1] - 1:3

**multiple** [2] - 9:2, 23:7
**must** [4] - 15:3, 15:4, 16:22, 31:23

**N**

**name** [3] - 2:11, 7:12, 10:6
**necessarily** [1] - 5:4
**need** [8] - 9:19, 14:8, 15:1, 25:23, 26:5, 30:13, 31:16, 37:25
**nefarious** [1] - 13:19
**never** [2] - 33:16, 35:10
**NEW** [2] - 1:1, 1:1
**new** [1] - 11:3
**New** [7] - 1:13, 1:18, 1:22, 40:5
**next** [5] - 16:5, 17:1, 32:21, 38:6, 38:24
**nice** [1] - 39:15
**NO** [1] - 1:6
**none** [2] - 7:25, 20:2
**nonetheless** [1] - 26:4
**note** [19] - 2:11, 4:9, 5:13, 5:22, 5:24, 9:9, 9:10, 9:14, 10:5, 11:2, 13:8, 15:25, 16:9, 20:10, 27:5, 29:19, 33:9
**note's** [1] - 11:11
**notes** [55] - 2:13, 3:20, 4:24, 4:25, 5:3, 5:6, 5:12, 5:21, 6:1, 6:2, 6:11, 6:17, 6:20, 6:25, 7:10, 7:11, 7:12, 7:13, 7:21, 9:4, 9:24, 10:14, 11:13, 14:13, 15:1, 15:3, 15:20, 18:5, 18:6, 18:8, 18:22, 19:19, 19:25, 23:18, 24:10, 24:24, 25:20, 26:13, 26:19, 26:22, 26:23, 26:25, 27:1, 29:24, 29:25, 30:1, 30:14, 33:25, 36:4, 37:7, 37:9, 40:6
**nothing** [4] - 5:20, 5:21, 5:24, 7:17
**notice** [19] - 5:8, 14:24, 14:25, 15:4, 15:18, 16:7, 17:2, 17:8, 17:14, 17:16, 17:18, 17:23, 18:15, 20:18, 20:21, 21:5, 21:8, 21:24
**notices** [1] - 15:21
**novel** [2] - 11:3, 28:24

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 563 of 739

**November** [2] - 36:18, 37:7
**number** [14] - 9:5, 11:1, 16:22, 17:12, 23:13, 31:14, 33:20, 34:1, 36:17, 37:8, 37:12, 37:19, 37:21
**numbers** [5] - 20:2, 20:3, 20:6, 23:24, 37:10

## O

**October** [3] - 19:1, 19:2, 19:16
**OF** [2] - 1:1
**off-the-record** [1] - 39:10
**office** [1] - 16:4
**once** [2] - 16:17, 39:8
**one** [30] - 2:15, 2:25, 3:2, 4:1, 4:3, 5:10, 7:21, 9:5, 10:24, 11:1, 12:1, 14:17, 15:6, 15:11, 20:10, 20:23, 21:5, 22:11, 24:10, 26:5, 26:14, 28:8, 28:22, 29:5, 31:5, 31:7, 31:14, 34:10, 36:23, 39:6
**open** [1] - 21:1
**OPPORTUNITIES** [1] - 1:4
**opportunity** [1] - 27:10
**opposition** [1] - 35:12
**options** [1] - 2:21
**original** [2] - 28:17, 40:6
**outstanding** [1] - 15:3
**overarching** [1] - 24:8
**owe** [1] - 13:21
**own** [3] - 15:12, 30:2, 30:14
**owner** [4] - 3:19, 4:16, 10:11, 13:20
**owners** [5] - 3:11, 3:14, 4:24, 5:2, 5:5
**ownership** [7] - 3:18, 7:9, 9:13, 11:14, 11:16, 12:10, 15:8

## P

**page** [1] - 23:15
**Page** [3] - 9:5, 28:10, 37:19
**paid** [1] - 15:24
**PALA** [1] - 1:2
**Pala** [8] - 2:1, 2:8,

2:10, 14:13, 33:25, 36:4, 36:5, 36:18
**papers** [1] - 25:12
**paragraph** [3] - 7:3, 11:7, 11:12
**pardon** [1] - 8:16
**Park** [1] - 1:21
**part** [1] - 17:7
**PART** [1] - 1:1
**partial** [8] - 18:18, 19:7, 22:2, 22:5, 22:7, 22:8, 22:24, 23:6
**participants** [1] - 11:23
**participating** [7] - 9:25, 10:1, 10:2, 10:4, 10:5, 10:11, 11:24
**particular** [1] - 36:2
**parties** [2] - 17:14, 23:7
**Partners** [4] - 24:21, 24:24, 26:12, 29:24
**PARTNERS** [3] - 1:3, 1:3, 1:4
**party** [3] - 13:19, 14:5, 32:19
**past** [1] - 31:22
**pause** [1] - 24:18
**pay** [2] - 13:21, 13:22
**paying** [1] - 13:25
**payment** [1] - 23:18
**payments** [4] - 18:24, 19:13, 23:21, 23:23
**people** [1] - 16:10
**percent** [3] - 15:2, 15:13, 32:24
**period** [2] - 19:6, 19:17
**permission** [2] - 26:21, 26:25
**person** [4] - 2:15, 32:4, 32:7, 32:8
**personal** [3] - 28:25, 29:1, 29:3
**perspective** [1] - 13:23
**piece** [2] - 10:9, 36:3
**pieces** [5] - 12:8, 12:17, 13:4, 17:10, 22:16
**PINPOINT** [1] - 1:2
**Pinpoint** [30] - 3:2, 3:6, 3:17, 3:19, 3:21, 4:3, 4:13, 5:7, 5:15, 5:17, 12:2, 12:25, 13:1, 14:4, 14:8, 14:9, 14:11, 14:12, 14:16, 20:8, 21:22,

21:23, 22:8, 23:10, 23:14, 23:25, 24:2, 25:19, 27:2, 39:12
**Pinpoint's** [2] - 13:6, 13:7
**Plaintiff** [4] - 4:20, 24:21, 35:24, 35:25
**Plaintiff's** [1] - 12:14
**Plaintiffs** [17] - 1:6, 1:20, 2:3, 2:7, 3:8, 3:10, 3:14, 4:24, 9:16, 10:2, 10:6, 12:20, 15:12, 16:19, 16:21, 21:25, 23:10
**pocket** [1] - 38:13
**point** [6] - 15:9, 18:16, 19:8, 20:20, 20:21, 37:4
**pointed** [1] - 32:1
**points** [1] - 20:10
**portion** [2] - 10:4, 17:1
**position** [5] - 23:2, 30:10, 32:10, 34:5, 34:8
**positions** [2] - 2:23
**possibly** [1] - 22:3
**post** [1] - 19:15
**postage** [1] - 15:23
**power** [2] - 8:17, 23:2
**prefer** [1] - 28:20
**prejudice** [1] - 22:9
**prepaid** [2] - 15:22, 15:23
**presented** [2] - 17:5, 35:24
**previous** [1] - 27:23
**previously** [1] - 23:22
**prima** [2] - 31:16, 31:22
**principal** [2] - 15:3, 19:12
**problem** [6] - 13:18, 14:21, 14:22, 14:23, 29:10, 29:12
**problems** [1] - 15:6
**proceed** [3] - 2:17, 3:4, 3:15
**proceeding** [1] - 6:5
**program** [1] - 13:12
**proper** [1] - 35:25
**properly** [1] - 18:25
**prove** [1] - 9:19
**provide** [2] - 16:19, 28:7
**provided** [3] - 4:12, 4:14, 17:18
**provides** [2] - 6:13, 16:1
**proving** [1] - 2:20
**provision** [9] - 5:19,

7:1, 7:19, 11:5, 20:18, 21:16, 26:20, 34:19, 34:24
**provisions** [1] - 18:15
**proxies** [1] - 2:13
**purchase** [2] - 36:17, 37:7
**purchased** [2] - 5:12, 30:2
**purposes** [3] - 2:7, 3:1, 19:22
**pursuant** [2] - 2:12, 8:13
**put** [9] - 17:15, 25:11, 25:21, 28:13, 30:8, 30:17, 30:21, 36:20
**putting** [1] - 31:1

## Q

**questions** [1] - 5:11
**quick** [1] - 20:10
**quite** [2] - 14:24, 38:14
**quote** [1] - 8:16

## R

**raise** [4] - 2:20, 11:1, 20:20, 21:24
**raised** [4] - 2:9, 9:22, 15:16, 27:7
**raising** [3] - 2:24, 5:17, 31:4
**read** [4] - 7:21, 7:22, 11:4, 16:17
**reading** [8] - 20:17, 20:18, 20:19, 21:11, 21:13, 21:16, 21:18
**really** [5] - 19:13, 20:4, 20:24, 31:15, 31:19
**reason** [3] - 11:18, 17:13, 33:24
**reasons** [2] - 24:1, 26:18
**receipt** [1] - 17:2
**received** [2] - 17:6, 17:8
**record** [12] - 24:1, 25:9, 26:7, 30:2, 32:10, 32:21, 34:4, 36:15, 38:2, 38:10, 39:9, 39:10
**recording** [1] - 7:10
**records** [12] - 7:9, 29:2, 30:1, 31:12, 31:13, 31:17, 32:9, 34:11, 34:14, 34:20, 34:24
**refer** [2] - 17:11, 35:5

**reference** [6] - 10:24, 17:12, 31:3, 32:14, 32:16, 35:13
**referring** [1] - 4:10
**refers** [5] - 5:19, 8:10, 8:22, 26:12, 30:3
**reflected** [5] - 4:9, 9:14, 13:9, 13:13, 37:4
**regard** [16] - 2:24, 14:4, 14:8, 14:16, 19:10, 19:25, 20:7, 23:9, 23:18, 23:25, 29:11, 35:2, 35:25, 36:2, 36:14, 36:15
**regarding** [3] - 9:22, 22:11, 27:7
**regardless** [1] - 23:1
**registered** [17] - 2:10, 2:12, 2:16, 3:4, 3:8, 3:9, 3:10, 6:16, 6:19, 7:2, 7:10, 7:12, 7:20, 8:1, 11:14, 11:22, 12:6
**registering** [3] - 7:20, 9:4, 11:7
**registers** [1] - 5:25
**registrar** [1] - 6:21
**registration** [4] - 5:23, 6:11, 6:13, 11:6
**reject** [1] - 22:19
**relevant** [4] - 18:8, 18:22, 18:25, 19:13
**reliable** [3] - 31:18, 31:19, 31:20
**relies** [1] - 30:10
**remain** [1] - 22:13
**reply** [4] - 22:4, 27:6, 27:11, 31:4
**Reporter** [3] - 1:25, 40:4, 40:10
**request** [1] - 12:12
**requested** [1] - 23:1
**require** [1] - 4:8
**required** [7] - 4:4, 4:9, 8:19, 8:20, 9:14, 10:17, 13:8
**requirement** [2] - 10:16, 15:8
**requirements** [1] - 17:17
**rescheduling** [1] - 39:18
**respect** [1] - 18:12
**respecting** [1] - 38:22
**response** [1] - 34:7
**responsibility** [1] - 8:17
**rest** [2] - 9:3, 18:18
**result** [5] - 8:21,

16:20, 22:4, 22:14, 27:21

**reverse** [1] - 23:3

**ribs** [3] - 28:4, 28:6, 28:12

**rights** [1] - 5:22

**road** [1] - 17:24

**role** [1] - 6:23

**Rolta** [6] - 2:2, 2:4, 6:24, 16:1, 32:24, 33:9

**ROLTA** [7] - 1:8, 1:8, 1:9, 1:9

**rules** [1] - 8:19

**ruling** [2] - 20:5, 27:23

**run** [1] - 25:3

**rush** [1] - 38:3

**S**

**Santana** [1] - 28:10

**satisfied** [8] - 4:14, 13:14, 13:23, 14:4, 17:7, 18:14, 35:23, 37:1

**satisfies** [2] - 15:8, 17:17

**satisfy** [6] - 10:3, 10:17, 10:22, 12:4, 16:21, 22:12

**scenario** [3] - 23:15, 23:17, 23:19

**scenarios** [1] - 22:3

**schedule** [1] - 38:22

**seat** [5] - 4:17, 8:4, 17:9, 26:15, 31:10

**second** [10] - 4:1, 9:21, 16:8, 17:7, 20:23, 26:14, 28:8, 28:15, 32:6, 39:6

**section** [7] - 6:6, 8:10, 8:21, 9:1, 9:2, 13:8

**Section** [7] - 2:12, 4:8, 5:20, 6:2, 6:7, 8:5, 15:20

**see** [13] - 2:3, 2:4, 5:11, 7:6, 14:5, 21:11, 21:12, 33:17, 37:24, 38:8, 38:9

**Seed** [39] - 2:12, 2:13, 3:9, 5:1, 5:25, 6:19, 7:3, 7:7, 7:8, 7:11, 8:2, 8:10, 8:13, 8:18, 8:20, 9:25, 11:8, 11:9, 11:10, 11:14, 11:15, 12:6, 12:10, 12:19, 13:1, 13:15, 15:9, 24:15, 24:17, 26:11, 26:19, 26:21, 26:25, 30:5, 31:6,

32:15, 35:5, 35:19, 35:20

**seeing** [2] - 37:22, 39:5

**seek** [2] - 20:24, 20:25

**seeking** [3] - 18:11, 19:7, 21:12

**self** [2] - 30:24, 34:13

**self-authenticated** [1] - 30:24

**self-authenticating** [1] - 34:13

**sells** [1] - 10:2

**semicolon** [2] - 16:2, 16:4

**send** [2] - 15:4, 17:14

**sending** [1] - 16:12

**Senior** [3] - 1:25, 40:4, 40:10

**sent** [5] - 15:19, 15:22, 16:9, 17:3, 17:16

**sentence** [5] - 9:5, 9:15, 10:19, 16:6, 16:23

**sentences** [1] - 9:2

**separate** [2] - 20:6, 36:6

**separately** [1] - 14:15

**served** [2] - 15:22, 16:8

**set** [4] - 6:16, 12:9, 12:16, 19:21

**sets** [1] - 6:25

**setting** [1] - 15:17

**settlement** [1] - 33:1

**seven** [1] - 7:16

**several** [1] - 9:3

**shall** [5] - 4:9, 9:9, 9:14, 13:8, 17:2

**sheet** [1] - 17:4

**shoes** [5] - 8:12, 8:16, 8:25, 9:17, 10:17

**show** [5] - 5:15, 10:3, 10:5, 29:23, 30:1

**showing** [1] - 10:4

**shown** [1] - 35:16

**shows** [7] - 10:10, 10:11, 32:10, 33:19, 36:20, 37:6, 37:9

**side** [3] - 14:6, 25:16, 25:24

**sides** [1] - 14:6

**simpler** [1] - 12:25

**simply** [1] - 10:7

**SIRI** [1] - 1:21

**sit** [1] - 35:23

**sitting** [3] - 8:12, 8:15, 8:24

**situation** [1] - 27:2

**six** [7] - 22:3, 23:15,

23:17, 23:19, 29:25, 38:4, 38:6

**slightly** [1] - 6:22

**smaller** [1] - 18:1

**someone** [5] - 13:21, 25:19, 25:20, 25:23, 32:5

**somewhat** [1] - 6:15

**sorry** [8] - 4:2, 22:20, 36:16, 36:18, 37:15, 39:4, 39:15

**SPC** [1] - 1:3

**speculation** [1] - 26:3

**Spiderman** [1] - 8:17

**standard** [4] - 5:3, 19:21, 25:22, 25:23

**standing** [3] - 9:17, 10:17, 24:22

**STARNER** [69] - 1:19, 3:6, 3:17, 3:22, 3:25, 4:21, 5:8, 6:8, 6:12, 6:15, 6:19, 6:22, 6:25, 7:4, 7:6, 7:8, 7:17, 7:25, 10:23, 11:9, 11:20, 11:23, 12:1, 12:7, 12:21, 12:23, 13:3, 17:10, 18:5, 18:8, 18:10, 18:21, 19:6, 19:11, 20:2, 21:2, 21:8, 21:20, 23:12, 23:15, 23:21, 24:7, 25:17, 25:25, 26:2, 26:6, 26:9, 28:23, 29:3, 29:13, 29:22, 30:12, 33:12, 33:15, 33:19, 33:23, 33:25, 36:16, 36:25, 37:3, 37:15, 37:18, 37:20, 37:23, 38:11, 38:16, 38:20, 39:17, 39:22

**Starner** [8] - 2:3, 9:21, 23:11, 27:4, 28:21, 31:24, 33:11, 35:9

**Starner's** [1] - 2:18

**start** [2] - 3:1, 28:24

**started** [2] - 19:2, 29:25

**starts** [1] - 33:7

**State** [1] - 40:4

**STATE** [1] - 1:1

**statement** [6] - 31:21, 32:10, 32:13, 34:16, 37:14

**statements** [15] - 5:9, 29:21, 29:22, 29:23, 30:10, 30:14, 30:17, 30:19, 30:21, 30:23, 31:12, 32:15, 34:3, 34:22, 34:23

**States** [1] - 15:24

**static** [1] - 33:20

**stenographic** [1] - 40:6

**step** [4] - 4:21, 4:22, 24:5

**still** [4] - 18:17, 19:23, 21:9, 35:7

**stop** [3] - 20:16, 30:15, 31:8

**straightforward** [1] - 34:1

**STRATEGY** [1] - 1:3

**Stream** [6] - 4:11, 4:13, 9:13, 9:20, 10:10, 13:12

**Street** [1] - 1:12

**structure** [3] - 5:3, 12:10, 24:8

**structured** [11] - 4:23, 5:4, 8:2, 11:15, 16:6, 16:24, 25:13, 26:19, 29:15, 30:7, 30:15

**structuring** [1] - 11:11

**stuff** [4] - 5:20, 25:6, 25:21, 34:14

**submit** [3] - 6:3, 25:10, 31:23

**submitted** [3] - 5:14, 13:10, 13:11

**sue** [7] - 7:19, 7:23, 8:24, 24:21, 24:24, 26:12, 26:13

**sufficient** [1] - 36:15

**suggest** [1] - 17:19

**suing** [3] - 8:11, 26:23, 27:1

**summary** [27] - 2:6, 3:5, 11:2, 18:11, 18:13, 18:17, 18:18, 19:7, 19:22, 19:23, 19:24, 20:13, 21:12, 21:15, 21:17, 22:1, 22:2, 22:5, 22:7, 22:8, 22:16, 22:23, 23:3, 23:7, 24:2, 25:22, 27:9

**supports** [1] - 34:5

**suppose** [1] - 21:4

**supposed** [4] - 13:24, 14:25, 15:19, 38:18

**SUPREME** [1] - 1:1

**Supreme** [1] - 1:16

**sur** [1] - 27:11

**sur-reply** [1] - 27:11

**surely** [1] - 3:6

**sworn** [1] - 5:8

**system** [2] - 9:11, 10:20

**T**

**talks** [1] - 11:5

**technical** [2] - 5:18, 6:15

**TERM** [1] - 1:1

**terms** [7] - 4:22, 18:1, 24:16, 26:9, 30:16, 31:1, 31:3

**testified** [1] - 32:4

**testify** [3] - 27:22, 32:7, 32:8

**testimony** [1] - 32:19

**THE** [112] - 1:1, 2:1, 2:6, 3:16, 3:21, 3:23, 4:1, 4:6, 4:17, 5:7, 6:6, 6:9, 6:13, 6:18, 6:21, 6:24, 7:2, 7:5, 7:7, 7:16, 7:24, 8:3, 8:8, 8:13, 9:7, 10:13, 10:15, 10:19, 11:8, 11:18, 11:21, 11:25, 12:2, 12:18, 12:22, 13:2, 13:5, 13:15, 13:18, 14:15, 14:19, 14:21, 15:14, 17:9, 18:3, 18:7, 18:9, 18:20, 19:5, 19:9, 19:23, 20:7, 20:12, 20:17, 20:23, 21:4, 21:11, 21:15, 21:21, 22:15, 22:19, 22:22, 23:1, 23:6, 23:9, 23:14, 23:17, 23:25, 25:15, 25:23, 26:1, 26:4, 26:7, 26:14, 26:17, 27:3, 27:8, 27:17, 28:8, 28:21, 29:1, 29:10, 29:20, 30:9, 31:10, 32:7, 32:22, 33:4, 33:8, 33:13, 33:16, 33:21, 33:24, 34:2, 34:19, 35:18, 36:6, 36:11, 36:13, 36:23, 37:1, 37:13, 37:17, 37:19, 37:21, 37:24, 38:14, 38:17, 38:23, 39:2, 39:12, 39:20

**themselves** [2] - 4:7, 34:9

**therefore** [1] - 17:7

**they've** [3] - 7:14, 11:3

**third** [2] - 16:12, 32:19

**third-party** [1] - 32:19

**three** [10] - 2:22, 12:7, 15:1, 15:4, 16:6, 16:17, 18:3, 24:11, 28:4, 28:6

**Thursday** [1] - 38:24

KAREN MENNELLA - OFFICIAL COURT REPORTER

**tied** [2] - 27:1, 31:3
**title** [1] - 6:9
**today** [8] - 3:5, 18:13, 19:8, 19:17, 23:20, 35:22, 35:23, 39:18
**today's** [1] - 27:9
**together** [4] - 21:25, 26:10, 30:8, 36:20
**tomorrow** [1] - 38:19
**top** [1] - 24:14
**total** [5] - 18:1, 19:14, 36:21, 37:3, 37:9
**totally** [2] - 6:3, 7:21
**trade** [1] - 5:13
**trading** [3] - 5:12, 37:6, 37:9
**transaction** [3] - 14:6, 37:11, 38:1
**transactions** [1] - 13:15
**transcription** [1] - 40:6
**transfer** [5] - 5:23, 6:1, 6:13, 7:11, 11:6
**transferring** [3] - 9:4, 11:7, 11:12
**transfers** [3] - 5:25, 7:10, 9:10
**transmission** [1] - 16:18
**trial** [1] - 21:6
**true** [3] - 9:23, 23:5, 40:5
**trust** [1] - 16:4
**trustee** [11] - 15:5, 15:19, 16:2, 16:3, 16:13, 16:19, 16:20, 17:2, 17:6, 17:13, 17:16
**trustee's** [1] - 21:8
**try** [1] - 39:13
**trying** [2] - 22:11, 38:9
**two** [20] - 2:9, 2:15, 2:17, 2:25, 6:25, 7:1, 7:21, 11:1, 13:16, 14:3, 14:5, 14:6, 15:2, 17:10, 20:9, 22:10, 26:20, 31:14, 35:1, 39:2
**type** [1] - 34:17

**U**

**U.K** [1] - 1:8
**U.S** [2] - 16:8, 16:16
**ultimate** [1] - 12:13
**ultimately** [4] - 5:1, 11:17, 18:16, 20:5
**uncomfortable** [2] - 19:4, 19:5

**under** [5] - 5:18, 8:11, 8:20, 8:23, 15:10
**underlying** [1] - 36:20
**understood** [7] - 21:20, 22:18, 22:21, 22:25, 23:8, 26:6, 36:12
**unit** [1] - 21:25
**United** [1] - 15:24
**unless** [2] - 7:19, 31:8
**unlike** [1] - 27:1
**up** [11] - 6:16, 12:9, 12:16, 22:4, 23:20, 35:21, 37:7, 37:10, 37:13, 38:6, 39:13

**V**

**VALUE** [3] - 1:3, 1:3, 1:4
**Value** [4] - 24:21, 24:23, 26:11, 29:24
**VOLPE** [1] - 1:19
**Volpe** [1] - 2:4
**VP** [24] - 4:13, 12:1, 12:24, 15:7, 15:8, 24:4, 24:5, 24:7, 24:9, 24:20, 27:10, 31:13, 35:2, 35:4, 35:19, 35:20, 35:22, 36:9, 36:14, 36:18, 36:22, 36:23, 37:9
**VP's** [2] - 29:15, 36:21

**W**

**wait** [3] - 16:22, 25:8, 32:22
**walk** [3] - 3:2, 33:11, 37:25
**walked** [1] - 34:4
**week** [2] - 38:25, 39:1
**weird** [1] - 10:19
**WHITE** [1] - 1:17
**whole** [4] - 8:10, 11:6, 35:15, 39:13
**witness** [10] - 17:16, 20:11, 25:2, 25:13, 25:15, 27:22, 28:25, 29:6, 29:11, 30:7
**witnesses** [1] - 12:9
**wonderful** [1] - 2:6
**world** [1] - 10:24
**wrap** [1] - 39:13

**Y**

**year** [5] - 18:23, 19:2, 19:6, 19:11, 39:8
**years** [1] - 29:25

**YIELD** [1] - 1:4
**YORK** [2] - 1:1, 1:1
**York** [7] - 1:13, 1:18, 1:22, 40:5

**Z**

**zero** [1] - 31:2

KAREN MENNELLA - OFFICIAL COURT REPORTER

# EXHIBIT H

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : CIVIL TERM :  PT. 48
---------------------------------------------x
PALA ASSETS HOLDINGS LTD., PINPOINT
MULTI-STRATEGY FUND, VALUE PARTNERS FIXED
INCOME SPC-VALUE PARTNERS CREDIT OPPORTUNITIES
FUND, VALUE PARTNERS GREATER CHINA HIGH YIELD
INCOME FUND,

                              Index: 652798/2018

                    Plaintiffs.
          -against-

ROLTA, LLC, ROLTA INDIA LTD., ROLTA
INTERNATIONAL, INC., ROLTA U.K. LTD., ROLTA
MIDDLE EAST FZ-LLC, ROLTA AMERICAS LLC, and
ROLTA GLOBAL B.V.,

                    Defendants.
---------------------------------------------x
                    February 14, 2020
                    60 Centre Street
                    New York, New York 10007

B E F O R E:

        HONORABLE ANDREA MASLEY
        Justice of the Supreme Court

A P P E A R A N C E S:

        WHITE & CASE
        Attorneys for the Plaintiffs
        1155 Avenue of the Americas
        New York, NY 10036
        BY: GREGORY M. STARNER, ESQ.
            SEQUOIA KAUL BARRY, ESQ.

        SIRI & GLIMSTAD LLP.
        Attorneys for the Defendants
        200 Park Avenue, 17th Floor
        New York, NY 10166
        BY: MASON BARNEY, ESQ.


                    Monica A. Martinez
                    Senior Court Reporter

2

Proceedings

1          (Time noted 2:34 p.m.)

2          THE COURT:  In the matter of Pala Assets

3     against Rolta.  I see Mr. Starner is here, and with you

4     is Ms. Barry.

5          MR. STARNER:  Ms. Sequoia Kaul Barry.

6          THE COURT:  And Mr. Barney again.

7          MR. BARNEY:  Yes.  Good afternoon, your Honor.

8          THE COURT:  So picking up where we left off.

9          Again, I'm so sorry I wasn't able to finish

10    this on, I think it was December 23rd, December 20th.

11    So picking up where we left off, is there anything new

12    to report since we were here on December 20th regarding

13    this case?

14         MR. STARNER:  I don't think so.

15         THE COURT:  Okay.  And so we left it on that

16    day.  We were talking about the $26,390,000 and looking

17    at Mr. Starner's chart, we are on.

18         MR. STARNER:  If you would like, I think where

19    we were, your Honor, if you recall --

20         THE COURT:  There it is.  Line 2, VP China.

21    I don't think that we.  Concluded the two issues that

22    we're discussing again are whether the plaintiffs are

23    the registered holders of the note, and whether they

24    have the documentation needed to take this action from

25    Cede & Co., and are you going to be correcting the

3

Proceedings

1    transcript?  You know that has Cede, S E E D.

2              MR. STARNER:  We certainly can and will.

3              THE COURT:  I'm -- just for today, it is,

4    C E D E.

5              MR. STARNER:  As opposed to.

6              THE COURT:  We'll get it right.

7              MR. STARNER:  We'll fix that.

8              I defer to, your Honor, but I guess what I was

9    prepared to do, we can talk about so much of the legal

10   points, if you want to rehash what we already did.  I

11   think where we were, I kind of committed to come back to

12   you and we would walk through the documents specifically

13   as to --

14             THE COURT:  As to the 26 million?

15             MR. STARNER:  The reason 26 million, what you

16   are referring to --

17             THE COURT:  VP China $26,390,000.

18             MR. STARNER:  So if I'm looking on the chart.

19             THE COURT:  It is the --

20             MR. STARNER:  This is docket 326.

21             THE COURT:  Right.

22             MR. STARNER:  With the different scenarios.

23   I was looking at scenario three, and the reason I'm

24   looking at scenario three.  I'm happy to look at two.

25   If you recall there was outstanding issue of Pala notes

4

Proceedings

1    and whether or not they will be included as part of the

2    summary judgment or not.  Happy to take that up or put

3    that aside for the moment, because that obviously

4    changes the numbers a little bit.

5            THE COURT:  I think the one issue that I was

6    denying the motion for summary judgment was just as to

7    acceleration.

8            MR. STARNER:  Correct.

9            MR. BARNEY:  Correct.

10           THE COURT:  So moving -- my plan was to go in

11   an ordered fashion through --

12           MR. STARNER:  So, if you look at my chart,

13   the chart we prepared scenario three, those numbers are

14   the actual -- scenario four is the one we're in.  That

15   is summary judgment on all notes, except for the Pala

16   notes, acceleration can't be resolved on summary

17   judgment.

18           It is the same as the chart scenario three.  It

19   is just the -- and keep in mind, the acceleration date

20   really is only relevant for the interest accrual, which

21   is not in these charts.  So I think we can use scenario,

22   that chart scenario three, and I can walk the court

23   through the numbers here.

24           THE COURT:  Right.

25           MR. STARNER:  Because these numbers, just

5

Proceedings

1  looking now at the VP entities, those reflect the VP

2  entities holdings of the 18 and 19 notes.

3          THE COURT:  Right.

4          MR. STARNER:  So mainly for easy reference,

5  maybe I can start with VP credit.  There are only 19

6  notes for that entity.

7          THE COURT:  Okay.

8          MR. STARNER:  Let's start with VP credit.

9          So you will see listed there, we've got 6.85,

10  so $6,850,000 in principle of 2019 notes.  So let's --

11  now I would like to direct the court to various

12  documents in the record that reflect those notes.

13          First, I would refer the court as to what is --

14  I'm sorry.  Bear with me.  This is Docket No. 312, and

15  so this is Exhibit 4 to the Starner declaration.  And

16  what this is, is the affidavit from Cede & Co., C E D E,

17  & Co.

18          THE COURT:  I think we have lost part of the

19  file.  All I have is the Woo volumes.

20          MR. STARNER:  Okay.  Then I guess -- do you

21  have the Kam declaration by chance?  Woo is the pinpoint

22  witness.  Kam is the relevant VP witness.

23          THE COURT:  Let me just use the ECF because --

24  oh, I have Kam.  I have an affirmation by Kam, K A M.

25          MR. STARNER:  Do you by chance have the Starner

6

Proceedings

1    declaration?

2           THE COURT:  I don't, and I don't know why

3    something got lost since we were last here.

4           MR. STARNER:  Perhaps we can give you a copy.

5           Do you have a copy?

6           MR. BARNEY:  I don't have an extra.

7           THE COURT:  I'll use the electronic.

8           MR. STARNER:  I appreciate there are a lot of

9    documents.

10          THE COURT:  Okay.  So 312.  Cede & Co.

11   affidavit and exhibits.

12          MR. STARNER:  Correct.

13          THE COURT:  Okay.

14          MR. STARNER:  So this is the affidavit from the

15   Cede & Co. custodian of records and --

16          THE COURT:  Whose name is John Faith,

17   F A I T H.

18          MR. STARNER:  Yes.

19          THE COURT:  Okay.

20          MR. STARNER:  If I could direct the court's

21   attention to what is Exhibit C to his affidavit, still

22   in Docket No. 312, and you will see there is an

23   authorization letter dated October 18, 2018, and you

24   will see in the second paragraph there, a reference to,

25   well, you know, the re line is a reference to the 8.875

7

Proceedings

1    notes due 2019.  So these are the '19 notes.

2              THE COURT:  Okay.

3              MR. STARNER:  Second paragraph there refers to

4    a participant, JP Morgan Holding and an, and beneficial

5    owner, Valued Partners Fixed Income SPC Value Partners

6    Credit Opportunities Fund.  So a very long name, but

7    that is Value Partner, that is VP credit in our chart.

8              THE COURT:  Okay.

9              MR. STARNER:  See the reference to 6.850.

10   So $6,850,000 in face amount of notes.

11             THE COURT:  Okay.

12             MR. STARNER:  So this reflects the

13   authorization letter from Cede & Co. for VP credit for

14   2019 notes and a face amount of 6.85 million.

15             THE COURT:  Okay.  So with regard to

16   authorization -- have a seat.

17             MR. STARNER:  Yes, okay.

18             THE COURT:  What is your objection to this

19   authorization for VP credit to go forward with regard to

20   the 2019 notes face value 6.85 million?

21             MR. BARNEY:  The objection that we had raised

22   previously, I raise again, as to the reference here to

23   JP Morgan throughout most of this litigation, the VP

24   entities have been very clear that their notes were held

25   through HSBC, and here the only way to identify a note

8

Proceedings

1      is by the bank, and the only reference here is not to

2      HSBC, but rather to JP Morgan.

3              THE COURT:  Okay.  So show me one of those

4      references, please.

5              MR. BARNEY:  In the second paragraph, first

6      line, DTC is informed by it's participant JP Morgan

7      Chase that on the date hereof --

8              THE COURT:  No, understand that.  Talking

9      about the HSBC.  You are saying that the history is that

10     they've been talking about HSBC holding.

11             MR. BARNEY:  Yes.  And so if you were to go to,

12     for example, I hate to ask, the Kam affidavit.

13             THE COURT:  Okay.

14             MR. BARNEY:  Let me get there, your Honor.  One

15     second.

16             MR. STARNER:  That is Docket No. 289.

17             THE COURT:  Okay.  And this is the Kam

18     affidavit of September 23, 2019?

19             MR. BARNEY:  Yes.

20             THE COURT:  Okay.  What exhibit?

21             MR. BARNEY:  It would be -- well, there are a

22     number of the exhibits, but for example, the primary one

23     is Kam Exhibit 4 which is the only letter or affidavit

24     or anything they have from a bank, and it is from HSBC,

25     and it does list -- that would be Page 7 of that

9

Proceedings

1  affidavit.  Yes.  See it says 2019 on the security name
2  line, then the holding 6.8 million.
3          THE COURT:  Uh-huh.
4          MR. BARNEY:  And this is -- it is from HSBC.
5          THE COURT:  So they are holding the position
6  they say of Value Partners.  Okay.  And this certificate
7  of holding is for the 6.850 million of -- it is the same
8  as the 6.850 million in the chart.
9          So how do you explain the change?
10          Thanks.  Mr. Barney, have a seat.
11          MR. STARNER:  If the court may recall, how this
12  beneficial ownership was setup, you recall pinpoint, it
13  was just, it was Cede & Co. registered note holder, that
14  participant bank and then the bank that was the broker
15  for pinpoint.  With Value Partners, there is one more
16  piece of the chain.  So it goes Cede & Co., JP Morgan,
17  Euroclear, HSBC, Value Partners.  So if you look at this
18  document --
19          THE COURT:  I see the Euroclear.
20          MR. STARNER:  Right.  What this reflects is
21  HSBC which is Value Partner Credit's direct bank/broker.
22  They have an account with Euroclear Bank and so
23  basically how it worked is you have Cede & Co., of
24  course is the registered note holder for all of the
25  notes.

10

Proceedings

1      THE COURT: Right.

2      MR. STARNER: It has participants, and that

3  will be the JP Morgan bank in this particular instance.

4      THE COURT: How do I know that?

5      MR. STARNER: That is from the authorization

6  letter we just looked at where it said that JP Morgan is

7  a participant which is document Docket No. 312.

8      THE COURT: So Cede & Co. points to JP Morgan.

9  Then what do I have that connects JP Morgan to HSBC?

10      MR. STARNER: Sure. If I -- one, point of

11  clarification. The authorization letter I think is

12  important to note, authorizes Valued Partners, okay.

13  So it does recognize JP Morgan is the participant and

14  relies certainly upon the representations made, but to

15  be clear, the authorization letter does not authorize

16  JP Morgan to do anything it specifically authorizes

17  Value Partners. Okay.

18      So the way the whole system is structured, it

19  allows the participants and the parties, ultimate

20  beneficial owners to get that authorization from the

21  ultimate registered holder. Notwithstanding the fact

22  there may be some intermediary bank in there.

23      THE COURT: Okay.

24      MR. STARNER: I think I made the point there.

25      With respect to the different pieces of the

11

Proceedings

1    chain, so you have the HSBC pieces, and there are a

2    number of them.  It is not just this document.  There

3    are a number other bank records I'm happy to walk the

4    court through.

5         If you recall at our last hearing, there was an

6    argument about how some of the material was

7    inadmissible.  We argue that had, one, they were self

8    authenticating as business/bank records.  There were

9    some back and forth on that point.  I think ultimately,

10   based on my reading of the record, my recollection, the

11   court indicated it was inclined to allow those to come

12   in, whether it is self-authenticating or under the

13   electronic record exception to hearsay.

14        But frankly, my argument would be, yes, it

15   should come in.  They are all corroborating, but I have

16   missile evidence.  I think also by itself establishes,

17   again -- keep in mind, this comes into the top and the

18   bottom.  I establish that we got a registered holder

19   Cede & Co. authorizing a beneficial owner, and there is

20   no evidence to suggest anything, there is no issue,

21   there is no -- no admissible evidence committed by the

22   defendant to call and question anything put forward in

23   terms of that ownership structure.  I just wanted to say

24   that from the outset.  I would like to, I guess walk

25   through a few additional documents that have then show

12
Proceedings

1     you the, HSBC's position, and the kind of structure that

2     is set up.

3              THE COURT:  Right.

4              MR. STARNER:  The first point I point the court

5     would be the affidavit itself from the fact witness.

6     That is Document No. 289, that is Mr. Kam's affidavit

7     where he describes the way that this is structured in

8     terms of, you know, direct, you know, direct brokerage

9     account with HSBC.

10              THE COURT:  Okay.  What paragraph?

11              MR. STARNER:  This is --

12              THE COURT:  And for the record, Kam Edman

13     Kam is the fund manager for Value Partners Hong Kong,

14     which we are calling VP credit.  Okay.  It is on

15     Page 11.  No.  Here it is, 11.  Paragraph 49.

16     Exhibit 15.  I need something that gets from Euroclear

17     to connect up Euroclear and JP Morgan on the 6.85.

18              MR. STARNER:  Yes.  Let me find that.

19              While I'm looking for that, your Honor, I'll

20     keep walking through some of the bank documents.  If I

21     can direct the court's attention to what is Docket No.

22     297 which is exhibit --

23              THE COURT:  297.

24              MR. STARNER:  297.  Exhibit 8 to the Kam

25     declaration.  And you will see what this is, is a bank

13

Proceedings

1    statement as presented out by Mr. Kam from their HSBC

2    account, and you will see reflected there the 6.85

3    million face value of the 19 notes actually reference

4    to Euroclear, ECLR the bottom left corner there.

5            THE COURT:  Right.  You have demonstrated,

6    have several documents that show the connection between

7    HSBC and Euroclear.  I still don't see anything

8    connecting JP Morgan and either Euroclear or HSBC with

9    regard to the 6.85.

10           MR. STARNER:  Yeah, well, we do have the

11   authorization letter that identified.

12           THE COURT:  We do but, you know, I would feel a

13   lot more comfortable if I had proof of the chain.

14           MR. STARNER:  If I could direct your attention

15   to -- this is Docket No. 286.  This is Exhibit 14 to

16   the Woo declaration now, and what this is, is a HSBC --

17   what this is, is an acceleration notice.  The reason I

18   direct your attention to this, principally it does refer

19   to JPM and Cede and VP again, and the reference I point

20   you to.

21           THE COURT:  I see Citicorp.

22           MR. STARNER:  This is probably Docket No. 286.

23           THE COURT:  Right.

24           MR. STARNER:  I think it is Page 10 of 23, if

25   you kind of look at the facts.

14

Proceedings

1           MR. BARNEY:  What Bates number?

2           MR. STARNER:  Twenty-three.  What this is, is

3      a demand accelerating notes.  Look at the next page,

4      Bates 24, you will see the reference there to kind of

5      A, B and C-sections.

6           THE COURT:  Wait a second.

7           MR. STARNER:  Yep.

8           THE COURT:  The Woo Exhibit 16.

9           MR. STARNER:  Yes.

10           THE COURT:  Is a registered letter --

11           MR. BARNEY:  Fourteen.

12           MR. STARNER:  Exhibit 14, sorry.

13           THE COURT:  Oh, JP Morgan.  Okay.  Where is the

14      connection?

15           MR. STARNER:  Second page there you see

16      references to, in the principal amount owned, if you

17      look at the bottom kind of row, each one of those

18      sections you will see a reference to 6.850.

19           THE COURT:  What is the Rolta Bates number?

20           MR. STARNER:  Rolta Bates No. 24.

21           THE COURT:  Thank you.

22           MR. STARNER:  Document produced by the

23      defendants, and you will see you have Section A says,

24      execution by beneficial owner, you see that?

25           THE COURT:  Yes.

15

Proceedings

1           MR. STARNER:  That is executed by Value

2    Partners, VP credit.  You will see the reference 6.850

3    there.

4           THE COURT:  Right.

5           MR. STARNER:  Next box, JP Morgan Chase.

6           THE COURT:  Right.

7           MR. STARNER:  Thus, the participant.

8           THE COURT:  And then Cede & Co.

9           MR. STARNER:  And then the next section is

10   executed by Cede & Co.

11          THE COURT:  Okay.

12          MR. STARNER:  This is just more evidence of the

13   --

14          THE COURT:  No, actually is this is the first

15   evidence connection to JP Morgan?

16          MR. STARNER:  There is also the authorization

17   letter.  There is a reference to JP Morgan.

18          THE COURT:  There is a reference, but there is

19   no this connects up all of them.

20          So have a seat.

21          Mr. Barney, why isn't this enough to connect

22   that?

23          MR. BARNEY:  The only way to identify which

24   notes we're talking about in both of these documents is

25   by the bank and the amount.  There is no, you know,

16

Proceedings

1    separate identifier saying this batch of notes is batch

2    No. 27.  The only way is by the amount and the bank.

3    Here we have them saying that they have authorization to

4    act on behalf of note $8.65 million in notes held by

5    JPMC, but the only documents we have are them saying

6    they own 8.65 owned by HSBC, thus, you know, the --

7    while we have those two separate documents as your Honor

8    was saying, the connection between HSBC and JPMC, we

9    don't have a document showing that yet.

10                 In fact, if you look at Mr. Kam's affidavit --

11                 THE COURT:  This is basically, Rolta 24 is

12    actually the same chain as the letter.

13                 MR. BARNEY:  Correct, your Honor.

14                 THE COURT:  Okay.  So we still don't -- okay.

15                 MR. BARNEY:  And, in fact, if you were to look

16    in the Kam affidavit, your Honor pointed out, I think it

17    was on Page 11 at Paragraph 49, Mr. Kam repeatedly

18    references HSBC, but in this document, as far as, I

19    could find, there are no references to JPMC.  And so it

20    is, you know, we're trying to connect the dots, and that

21    is what we're trying to do.

22                 MR. STARNER:  Sorry, your Honor.  I finally

23    found what I was looking for.  There is a supplemental

24    affidavit put in with our reply.

25                 THE COURT:  Okay.

17

Proceedings

1           MR. STARNER:  That spells this out.  Mr. Kam

2      talked about the structure of the holdings.  I

3      apologize.  Took me a while to find it.

4           THE COURT:  What document number is that?

5           MR. STARNER:  That is a very good question.

6      So it was filed on November 14th.

7           MR. BARNEY:  324.

8           MR. STARNER:  324, thank you.

9           THE COURT:  The document number is 324?

10          MR. STARNER:  324.

11          THE COURT:  Okay.

12          MR. STARNER:  So this is Paragraph 7 of

13     Document No. 324, which is the, the fact witness

14     articulating how the holdings were structured.

15          THE COURT:  Okay.

16          MR. BARNEY:  And the issue there, your Honor --

17     sorry.

18          THE COURT:  Go ahead.

19          MR. BARNEY:  The issue there, your Honor, is

20     Mr. Kam is he's an employee of VP.

21          THE COURT:  Right.

22          MR. BARNEY:  But he's talking about a structure

23     between four different banks, and none of which are we

24     have documents connecting them, and on top of that, you

25     know, his knowledge of this is hearsay.  I mean, he

18

Proceedings

1    doesn't attest here, yes, I have walked into JPMC and

2    looked at the documents and this, that, the other thing

3    and, therefore, I know on firsthand that this is the

4    structure.  He's merely -- he states what the structure

5    is, but it is no different than Mr. Starner stating it

6    because neither of them had firsthand knowledge.  It is

7    all secondhand.  And as such it is hearsay.

8            Since we have no documents connecting them, it

9    is inadmissible.

10           MR. STARNER:  I'm happy to address the hearsay

11   point if you would like me to.  I don't think it holds

12   up.

13           THE COURT:  All right.  Well, I think that

14   Mr. Kam can say and has -- he can say himself, um, that

15   Value Partners holds it's beneficial interest in the

16   notes through HSBC.  And then the documents show that,

17   well, that Euroclear holds it with Chase, JP Morgan, and

18   that JP Morgan -- so how do I make the link -- how is he

19   in position to say that HSBC holds at Euroclear?  He's

20   at VP, right?

21           MR. STARNER:  Yes, it is.  I mean, that is a

22   number of documents that we just looked at.  Some of the

23   HSBC documents, if you recall the first we looked at is

24   a reference to Euroclear.  The reference to Euroclear

25   and number of HSBC documents we can point to.

19

Proceedings

1          THE COURT:  Okay.  So back to Exhibit 4 of

2     Kam's, yeah, Kam's affidavit where it says that --

3          MR. STARNER:  You can look there, it says

4     depository bank.

5          THE COURT:  HSBC certificate of holding for

6     Value Partners, and it is held at Euroclear and then

7     Euroclear holds at Chase, JP Morgan.  I think I have --

8          MR. BARNEY:  The issue is just the connection

9     between Euroclear and JPMC.  That is the piece that we

10     don't have any documents on.  And as far as I know, the

11     only place where we see that is Mr. Kam's second

12     affidavit.

13          THE COURT:  We have the first document.

14     Okay.  And the connection between Euroclear and

15     JP Morgan?

16          MR. STARNER:  I mean, your Honor, the way it

17     is set up, they are an intermediary bank.  Basically

18     saying, you go to HSBC, I want to buy this bond.  HSBC

19     turns around and says, I want to buy the bond.  They buy

20     through Euroclear.  Euroclear happens to be the entity

21     they go to.  Euroclear turns around and says, I'll buy

22     from you JP Morgan.  Why?  Because you are a participant

23     with Cede & Co. is the registered holder.

24          So the idea that Mr. Kam certainly is a fact

25     witness would know how they are to buy this note.  And

20

Proceedings

1    I also would argue, your Honor, that by itself makes the

2    connection.  I would also argue that you've established

3    both sides of where the start to where this ends.  And

4    what the defendants haven't done is actually put forward

5    admissible evidence to say that is not the case.  In

6    fact, you don't own these notes.  They don't have any

7    evidence to actually say that that is not true.  They

8    don't have anything to say that is false.  What they

9    are saying is, well, you need to bring somebody else in,

10   custodian of records from --

11            THE COURT:  Euroclear.

12            MR. STARNER:  Euroclear, which I would just

13   argue is not, not the appropriate standard on summary

14   judgment in this circumstances where they have not

15   presented any evidence to say that what -- all our

16   pieces, all taken together certainly tell a sufficient

17   story to establish our standing to sue and recover on

18   our notes.

19            Again, I would argue just with the

20   authorization letter by itself saying you VP authorized

21   to do this should be sufficient.  We've added a lot more

22   to that chain.  And that is why it is set up that way to

23   allow us to do this.  I think that is where I would

24   suggest to the court where we end up, because we put

25   forward affirmative evidence to establish the ownership,

21

Proceedings

1    the chain, the top and the bottom, and I don't think the

2    defendants have come forward with any admissible

3    evidence to say that what we're saying is, in fact,

4    wrong or false.

5              MR. BARNEY:  My response, your Honor,

6    respectfully, it is their burden to establish this

7    portion of it.  And when it came to all of the other

8    banks, they did put in custodian of records statements.

9              So for pinpoint, they put in the statement of

10   Vincent Gerosa.  That is Document 313.  He's from

11   Morgan Stanley, and I believe it was for Pala.  That

12   would be Document 319 which is the affidavit of Matthew

13   Young, and he's from UBS.  So at some point they

14   thought, yeah, probably we do need this custodian of

15   records to be able to enter the information.  They just

16   didn't do it for JP Morgan or --

17             THE COURT:  Why shouldn't I just rely on the

18   Cede & Co., the original document that says, you know,

19   our beneficial folder at JP Morgan tells us --

20             MR. BARNEY:  Well, your Honor, that is hearsay.

21   The fact that Cede provide --

22             THE COURT:  Well, it is hearsay that they are

23   willing to rely on.

24             MR. BARNEY:  They are willing to rely on.  It

25   is still hearsay, your Honor.  It is still third-party

22
Proceedings

1      evidence that is not admissible in court that -- the

2      fact that Cede is relying on it, that is their business

3      practice.  They are willing to take that risk, that is

4      fine.  They have, I'm sure, a contract with JP Morgan.

5      I'm sure that contract says something that JP Morgan

6      would not want to rely on.  We don't have that contract,

7      we don't have that evidence.  We just have, this is what

8      JP Morgan told us.  Then we have this --

9               THE COURT:  Right, but what I have is an

10     admissible document from the undisputed holder, I can't

11     remember the different titles, but Cede & Co., right,

12     they had them.  They are holding them.

13              MR. BARNEY:  But, again, the only way to

14     identify which notes they are getting permission on is

15     by the bank and the amount.  And the bank and the amount

16     they are getting permission on don't match up to the

17     bank and amount that they say they own other than

18     through this chain, and we don't have the full chain.

19     And that is the issue that we're raising.

20              THE COURT:  All right.  Well, based on the

21     original Cede & Co. letter and, the Cede & Co. letter

22     and the documents that link up Kam Exhibit 4, Kam

23     Exhibit 8, um, which links up the HSBC and the Euroclear

24     and then VP, JP Morgan Chase, and Euroclear -- sorry,

25     Cede, um, I'm going to find that the plaintiff

23

Proceedings

1    established it's ownership -- it's authority to bring

2    the action.  Yes.

3            And, anyway, so the summary judgment is

4    granted with regard to the 6.85 million notes, 2019.

5    Okay.

6            So are you seeking acceleration on this?

7            MR. STARNER:  No, your Honor.  The only

8    additional point on this, these are the 2019 notes held

9    by VP credit.  There are also interest payments.

10           THE COURT:  Right.

11           MR. STARNER:  That were missed, in the amount

12   of $2,127,781.25.

13           THE COURT:  Right.

14           MR. STARNER:  I don't think there is any

15   dispute about the interest payments.

16           So total principal and missed interest payments

17   due on the 19 notes for VP credit is this number

18   $8,977,781.25.

19           THE COURT:  Are you challenging the account,

20   the calculation of the interest?

21           MR. BARNEY:  No, your Honor.

22           THE COURT:  Okay.

23           So the summary judgment is granted as to

24   damages too.

25           Moving on.

24
Proceedings

1          MR. STARNER:  So let's do the same, I guess

2     with VP China.  I would propose to start with the 18

3     notes, your Honor.

4          So there we've got notes under the principal

5     amount of $19 million --

6          THE COURT:  Right.

7          MR. STARNER:  -- 350,000.  Let's start with,

8     again, the same -- this is now Docket 312, which is that

9     same --

10          THE COURT:  You know what, I'm sorry.  Before

11     you start this chain, I'm going to ask Elaine to come

12     up.  I have to sign some emergency orders.  I'm ex

13     parte.

14          MR. STARNER:  Understandable, your Honor.

15          THE COURT:  We're going to get through this, I

16     promise you.  This will be quick.

17          (A brief pause.)

18          (Case recalled.)

19          THE COURT:  Sorry.

20          Valentine's Day is today, and there are so many

21     weddings they have to be done today.  It is a really

22     business day.

23          Back on the record at 3:20.  Thank you for your

24     patience.  Moving onto?

25          MR. STARNER:  VP China, starting with 2019

25

Proceedings

1    notes.

2              THE COURT:  $19,350,000.

3              MR. STARNER:  Yes.

4              THE COURT:  Okay.

5              MR. STARNER:  If I can direct the court's

6    attention, this is now Docket 312.

7              THE COURT:  Hold on.

8              MR. STARNER:  Exhibit D to the Starner

9    affidavit.  This is the last page of this, that exhibit,

10   sorry.  Not the last page.  It is Exhibit D to that

11   Docket No. 312.

12             THE COURT:  Got it.

13             MR. STARNER:  So that is the authorization

14   letter from Cede & Co.

15             THE COURT:  Okay.

16             MR. STARNER:  To VP China on the 18 notes in

17   the amount of 19.350.

18             THE COURT:  Okay.

19             MR. STARNER:  Then if I can direct your

20   attention to Docket 293.

21             THE COURT:  293.

22             MR. STARNER:  Which are bank records from HSBC,

23   and the last page of that exhibit or that document, this

24   is Document 293.  Kam is Exhibit 4 to the Kam affidavit.

25             THE COURT:  Kam, got it.

26

Proceedings

1          MR. STARNER:  Last page of that exhibit.

2          THE COURT:  Yes, sir.

3          MR. STARNER:  And you will see that that is a

4    record for 19.35 face.

5          THE COURT:  Yes, and it says that it is account

6    VP, depository bank, Euroclear.

7          MR. STARNER:  Right.  And there is another

8    reference, if I could direct your attention to Docket

9    292, which is Kam Exhibit 3.  So one exhibit up on that

10   same affidavit.

11         THE COURT:  Okay.  Exhibit 3.

12         MR. STARNER:  Not Exhibit 3.  I'm sorry.

13         THE COURT:  Exhibit 3.

14         MR. STARNER:  Not Exhibit 3.  Well, what

15   Exhibit 3 is, just for reference, that number 20.8.

16         THE COURT:  Yeah.

17         MR. STARNER:  That reflects the 19.350 plus an

18   amount they purchased from Pala.

19         So not to confuse the court too much, but if

20   you look at Kam Exhibit 2, which is Docket 291.

21         THE COURT:  Right.

22         MR. STARNER:  This spells it out a little more

23   clearly.

24         What you will see here, your Honor, is

25   basically their purchase record for all of the 19 notes,

27

Proceedings

1    and if I could direct your attention to, it is November

2    18, 2016 is the date on the bottom left.

3              THE COURT:  Yes.

4              MR. STARNER:  So that is kind of the second to

5    last purchase in 2016.

6              At that point in time, their total holdings

7    face of the 19 notes was 19.350.  You see that?

8              THE COURT:  Right, but then we bring in BNP

9    Paribas.

10             MR. STARNER:  Well, that is now.  I guess that

11   is says broker short name.

12             THE COURT:  But, you know, I follow your, you

13   know, whoever negotiates or makes the transaction

14   happen, the broker.  At the end of the day, it is who

15   owns the notes.

16             MR. STARNER:  Well, keep in mind the broker

17   may just -- broker, frankly, can be a guy you call, he

18   calls somebody else, doesn't actually touch the bond.

19             THE COURT:  No, I understand that.

20             MR. STARNER:  I'm not sure if that is the

21   broker.  As far as I know, none of the entities there

22   ever held any of the notes at any point in time.

23             THE COURT:  Right.

24             MR. STARNER:  As set out in the affidavit of

25   Mr. Kam, it was always Cede & Co., JPM., Euroclear,

28

Proceedings

1    HSBC.

2              THE COURT:  Right, right.  Okay.

3              So sticking with the 16 -- all right.  And you

4    are saying that the 16.

5              MR. STARNER:  I think the other reason frankly

6    I pointed you here, we can go back to this later, is to

7    reflect --

8              THE COURT:  The 19.350 is here.

9              MR. STARNER:  Right, correct.  And then there

10   is additional purchase from Pala, purchased Pala's notes

11   in November of 2018 which I understand we'll get to

12   separately.  So that is why the 20.8 -- the $20,800,000

13   was the face amount of the more recent bank account

14   statement we looked at, which was Docket 292.  Not to

15   throw too many numbers to the court.  I guess for our

16   purposes, I maybe just direct you back to that Kam

17   Exhibit 4, Docket 293 which shows the bank account

18   statements as of the earlier date, shows the holdings of

19   19.350.

20             THE COURT:  Okay.  And you are still missing

21   the link, same argument?

22             MR. BARNEY:  Same argument, yes, your Honor.

23             THE COURT:  And for the same reasons, I would

24   be much happier with that affidavit linking the

25   Euroclear, but at the end of the day, I think that the

29

Proceedings

1     plaintiffs have established their standing and

2     ownership.

3               So moving on.

4               MR. STARNER:  So just to wrap that up, your

5     Honor, the total notes, 2018 notes held by VP China is

6     the principal amount of $19,350,000 with missed interest

7     payments of $5,200,312.50.

8               THE COURT:  Are you challenging the

9     calculation?

10              MR. BARNEY:  No, your Honor.

11              THE COURT:  Okay.  Thank you.

12              MR. BARNEY:  I'm assuming, just to be clear,

13    that does not include any acceleration?

14              MR. STARNER:  Correct.

15              MR. BARNEY:  So in that case, no, you are not.

16              THE COURT:  To be clear, the acceleration issue

17    I ruled on the last time and denied summary judgment as

18    to acceleration.

19              MR. STARNER:  Understood.  None of these

20    numbers include any acceleration.

21              So the total then for VP China on the 2018

22    notes is a total amount of principal, plus missed

23    interest payments of this number $24,550,312.50.

24              THE COURT:  Right.  So you will have judgment

25    for that amount.

30
Proceedings

1        Moving on.

2              MR. STARNER:  Moving onto the 2019 notes for

3    VP China.

4              THE COURT:  $29,085,000.

5              MR. STARNER:  $29,085,000 in face amount.

6              So I would first direct the court's attention

7    back to the Cede & Co. affidavit which is Docket No.

8    312.

9              THE COURT:  Okay.

10             MR. STARNER:  And it is Exhibit E to the

11   Starner Exhibit 4 which reflects --

12             THE COURT:  Okay.  Okay.  312 Exhibit.

13             MR. STARNER:  At Exhibit E as in elephant or

14   echo.

15             THE COURT:  Okay.

16             MR. STARNER:  And that reflects the October 18,

17   2018 authorization letter from Cede & Co. with respect

18   to the $29,085,000 in face amount of the 19 notes held

19   by VP China.

20             THE COURT:  Okay.  And JP Morgan.

21             MR. STARNER:  I would direct the court to

22   Docket 393 which is HSBC records and it looks like --

23             MR. BARNEY:  You said.

24             MR. STARNER:  293.  Sorry.  Thank you,

25   Exhibit 4 to the Kam affidavit.

31
Proceedings

1           THE COURT:  Okay.

2           MR. STARNER:  And it looks about six or seven

3   pages in.  There is a reference to the $29,085,000 face

4   amount in holdings for the 19 notes held by VP China and

5   the same reference to Euroclear as the depository bank.

6           THE COURT:  Okay.  Same objection.

7           MR. BARNEY:  Same objection.

8           THE COURT:  Same ruling.  And for the same

9   reasons as with the prior notes, the 2018 notes as to

10  VP China, the court finds that the plaintiff has

11  established it's ownership of the $29,085,000 in

12  principle.  As to the calculation of the interest,

13  $9,034,528.13.

14          MR. BARNEY:  Same.  No objection, your Honor.

15          THE COURT:  No objection.

16          MR. STARNER:  To be clear, that is not

17  calculation.  Those are the missed interest payments.

18          THE COURT:  Sorry.

19          MR. STARNER:  So the total of the VP China's

20  claim on 19 notes, principal plus missed interest

21  payments is the $39,119,528.13.

22          THE COURT:  Okay.  $38,119,528.13.

23          MR. STARNER:  Yes.

24          THE COURT:  Okay.  So you will have judgment in

25  that amount.

32
                    Proceedings

1           MR. BARNEY:  Just to be clear, it is summary

2       judgment, and they still need to put in a -- for a

3       judgment, correct.  Just want to make sure I'm clear on

4       that.

5           THE COURT:  So their motion for summary

6       judgment is granted.  In that amount.  I mean, they have

7       to submit a judgment for the clerk to sign --

8           MR. BARNEY:  Just want to be clear.

9           THE COURT:  But they shall have judgment for

10      that amount.

11          MR. BARNEY:  Thank you, Judge.  I just wanted

12      to be clear.

13          MR. STARNER:  I wanted to cover at the end of

14      the hearing, if I may.

15          THE COURT:  Sure.

16          MR. STARNER:  That leaves us with one last

17      issue, with respect to the Pala notes.

18          THE COURT:  We did pinpoint last time, yes.

19          MR. STARNER:  I think where that leaves us is,

20      I believe, if you may recall there used to be three sets

21      of plaintiffs here, Pala being the kind of named

22      plaintiff that initially brought this action.

23          THE COURT:  Right.

24          MR. STARNER:  During the course of the action

25      they sold their, sold and transferred their interests

33

Proceedings

1          and their notes to the other two plaintiffs.

2                    THE COURT:  Right.

3                    MR. STARNER:  And as I understand it, the

4          defendants are challenging whether or not that transfer

5          was legally effective, and on this point, your Honor, I

6          think, I want to start by saying this is -- I think is

7          a pure legal issue for the court to determine whether or

8          not it was an appropriate transfer.  And on this point,

9          if I may -- I'm sorry.

10                   So we basically had Pala, who had, I don't

11         think it is a dispute, they had authorization from Cede

12         & Co. to bring the action.  And we've also submitted

13         authenticated bank records from their bank as to their

14         holdings.  So I think if Pala was here today, I don't

15         think there would be any issue with them getting

16         judgment, summary judgment on their claims.  So what

17         they did is they basically sold their interest and

18         transferred them to the other two plaintiffs.  And

19         there is an assignment agreement, and what they did is

20         basically said we're authorized to bring this action,

21         we have this claim, we're giving this and assigning it

22         to the other plaintiffs.

23                   This is something that happens fairly commonly

24         in court.  The only case that has been cited by the

25         defendant was a Cortlandt case where the court

34
Proceedings

1    determined that the party that purported to have been

2    assigned the claim had no standing.  Why?  Because the

3    original party didn't have standing.  So that case is

4    not applicable here because here Pala, I think no

5    dispute had standing initially.  So I think the only

6    other argument they've asserted is an argument based on

7    the language of the indenture.  We may need to go back

8    to the indenture, your Honor.

9             THE COURT:  All right.

10            MR. STARNER:  What they've done is referred to

11   Section 2.06F of the indenture.  I think it is at Page

12   38.

13            THE COURT:  Thirty-two.

14            MR. STARNER:  Thirty-eight.  There are two

15   different indentures.  It is the same language in both

16   indentures.

17            THE COURT:  Okay.

18            MR. STARNER:  Are you there, 2.06F?

19            THE COURT:  Right.

20            MR. STARNER:  States the registered holder of

21   the global note.

22            So as I understand, the issue here is, the

23   position they are taking is while Cede & Co. who is the

24   registered holder of the note here can grant proxies and

25   authorize people to bring action, the distinction they

35

Proceedings

1    are making is between the lower case, undefined

2    registered holder, and the upper case holder.  So I

3    think my first -- I think our first response to this,

4    your Honor, is number one, we don't think 2.06F applies,

5    because Pala was not granting a proxy, or authorizing

6    anybody per this section.

7         What they were doing is, they were authorized

8    to bring the action, and they just assigned it.  So I

9    don't think we would argue 2.06 does not apply.  They

10   are not exercising any rights under 2.06.  But even if

11   they were, our argument is that we think that basically

12   registered holder of the global note is a capitalized

13   H holder.  It is the same thing.  Effectively, the same.

14   Whether it is Cede & Co. or another registered holder,

15   either way, when Cede & Co. effectively authorized the

16   beneficial owner, in this case Pala to do something,

17   Pala then had the ability to take whatever action that

18   Cede & Co. initially had.  Why?  Because Cede & Co. was

19   effectively giving Pala whatever rights Cede & Co. had

20   to enforce, they gave it to Pala.

21        THE COURT:  Isn't the -- instead of going

22   through the, all of this.

23        MR. STARNER:  Yeah.

24        THE COURT:  Just get another letter from Cede &

25   Co. as to the new owners.

36

Proceedings

1              MR. STARNER: Could we do that? Yes. Will

2      that take time? Yes. And I think here we thought the

3      cleanest, and frankly legally appropriate and allowable

4      way to do it was an assignment.

5              THE COURT: Okay.

6              MR. STARNER: We thought that was the simplest

7      way to do it, frankly.

8              THE COURT: Mr. --

9              MR. BARNEY: Quite frankly, that was my thought

10     in the year plus this has been going on, why didn't they

11     just say to Cede, hey, can we get a new letter. That

12     would have solved this problem.

13             THE COURT: Right.

14             MR. BARNEY: I disagree with the use of the

15     lower case versus the upper case. Doesn't matter.

16     This is a very carefully drawn up indenture. It is very

17     complicated, and as far as I can tell only three places

18     where they used the term registered holder. It is here

19     in 2.6F. It is in 2.05, which is the section where they

20     want the name and address of the registered holder to be

21     recorded in the records, and 2.08B where they request

22     that, who can request a replacement for mutilated

23     originals of the notes. Nowhere else do they use

24     registered holder. I would submit all three of those

25     are places where logically there is only one party that

37

Proceedings

1    can really, they really want doing this, which is the

2    actual holder registered in the register book, as

3    opposed to holder with the capital H, where they use

4    everywhere else.

5         In fact, 2.06F uses registered holder in the

6    beginning, and then if you look at the end of that

7    section, it uses capital H holder.  So what our position

8    is that while the drafters of this indenture, their

9    intent was we don't want everyone giving out proxies

10   everywhere.  We want the registered holder, Cede & Co.,

11   to be the one's who is controlling who has these

12   proxies.  Otherwise, why wouldn't, when Cede & Co.

13   first sells these notes, why not sell them with a proxy,

14   and that proxy can get transferred down, and we never

15   have to deal with these problems ever again.  It is

16   because of this section.  It is because of the use of

17   registered holder, and we want Cede & Co. to know who

18   has the proxy, so at the end of the day we can go back

19   to Cede & Co., and say Cede & Co., are -- is this the

20   authorized entity?  Yes.  Okay.  We know they have

21   authority to proceed.

22        Let's say Pala were -- let's say VP were to

23   turn around and sell these onto someone else, and do the

24   same thing.  Well, suddenly we've got three levels

25   removed from Cede & Co. and we're still relying on that

38

Proceedings

1    same Pala, and then a chain of transfers.  It gets very

2    messy.  And so the logical reading here is the only

3    entity that can give a proxy is Cede & Co.  So when Cede

4    & Co. gave that proxy to Pala, it gave it to Pala and

5    Pala didn't have the right then to transfer that proxy

6    to someone else.  Because if you notice here in 2.06F

7    they are only allowed to give those rights that are to

8    which a holder is entitled to take under this indenture.

9              So that is the distinction.

10             Cede as the registered holder is able to give

11    all rights that a holder may have.  It is not able to --

12             THE COURT:  Are you making a distinction

13    between the registered holder in the first line and

14    holder cap H in the last line?

15             MR. BARNEY:  Yes, your Honor, I am.

16             THE COURT:  And you are saying the registered

17    holder in Line 1 is Cede & Co. and the holder capital H

18    in the third line is Pala.

19             MR. BARNEY:  No.  The holder in the last line,

20    they are both referring in this instance to the same

21    entity.

22             However, what it is saying is, it can, during a

23    proxy quote, "to take any actions which a holder is

24    allowed -- is entitled to take under this indenture."

25             There are a whole lot of actions that a cap H

39
Proceedings

1     holder is allowed to take including initiating a

2     lawsuit.

3          THE COURT:  Holder, on Page 12 in the

4     definitions, means the person in whose name a note is

5     registered in the note register.  Capital H.  In the

6     holder register.  So that would be Pala.

7          MR. STARNER:  No.

8          MR. BARNEY:  No.  That would be Cede & Co.

9     here.

10          MR. STARNER:  So that is the whole point.

11     We're not the holder, capital H, nor are we the

12     registered holder, lower H.  It is Cede.

13          THE COURT:  Registered holder is the holder --

14          MR. STARNER:  Beneficial holders can never be

15     holders, capital H.

16          THE COURT:  Nor are they registered holders.

17          MR. STARNER:  Correct.

18          MR. BARNEY:  Correct.

19          What 2.06F is saying is that the registered

20     holder, Cede, is allowed to give proxies to a beneficial

21     owner, in this case Pala, to do whatever a holder can

22     do.  Nine times out of ten, for all of our other

23     instances here, that is enough because a capital H

24     holder is allowed to initiate a lawsuit here.

25          However, a capital H holder is not -- you are

40

Proceedings

1      not giving that right to then transfer that proxy

2      because the only entity that can give out a proxy is

3      Cede & Co.  And so when Cede & Co. granted that -- and

4      the letters by the way from Cede & Co. don't say

5      anything about this being transferable.

6               THE COURT:  Yeah, that is what I wanted to look

7      at.

8               MR. BARNEY:  Or anything else.

9               THE COURT:  What is the Docket number for the

10     Pala proxy?

11              MR. STARNER:  Sure.  I think they are all in

12     the same exhibit.  I think it is docket --

13              THE COURT:  319.

14              MR. STARNER:  312, I think.  Let me confirm.

15              MR. BARNEY:  I believe so.

16              THE COURT:  Yep.

17              MR. BARNEY:  One-third page to that document.

18     Actually, that brings up a very good point.

19              THE COURT:  Pinpoint is the first one.

20              MR. BARNEY:  Exhibit G, I believe.

21              THE COURT:  Oh, okay.  Thanks.

22              MR. BARNEY:  To the -- to Exhibit 4 of the

23     Starner affidavit.  If I may, your Honor?

24              THE COURT:  Okay.  So Cede & Co. is

25     authorizing Pala to bring suit for the enforcement of

41

Proceedings

1    payment, institute any proceeding, commence, institute,

2    file, carry out, continue, prosecute, defend, and serve,

3    participate in, lodge any proof.

4            You know, I don't see that you can transfer

5    this.

6            MR. STARNER:  Well, your Honor, there are two

7    points there.

8            One, if you look at the beginning it says, to

9    take any action with -- to notice, Cede & Co, the holder

10   of record of the notes, holder of record being not

11   capitalized, is entitled to take under any applicable

12   law in equity or under controlling documents.  Sorry, or

13   under the controlling documents, including the indenture

14   and the notes.  Including, but not limited to.  Then it

15   goes on.  So I think that is very broad language they

16   include in terms of what a beneficial owner is being

17   authorized by Cede & Co. can do, number one.  Number

18   two, again, I don't think this is -- this is not Pala

19   giving a proxy to someone.  They are assigning a right

20   they have to someone else to effectively step into their

21   shoes and say I'm acting from Pala here.  And it is no

22   different than if Pala had, what if Pala had

23   restructured, they have a sub now and the same kind of

24   thing to assigning this to an affiliate.  Same idea.

25   Effectively, the plaintiffs are asserting the rights to

42

Proceedings

1    Pala has under the authorization letter, and they are

2    not -- Pala was not purporting to, you know, transfer or

3    give any kind of proxy, number one. And number two, it

4    is not like this chain is so hard to follow. We have,

5    you know, admissible, undisputed evidence that Pala

6    assigned this right to these plaintiffs.

7         MR. BARNEY: But, your Honor, if I may, just

8    looking at this letter, as I raised before, the only way

9    to tell which notes are being, which notes Pala is being

10   given authority over is by the bank and the amount. So

11   you have UBS securities here and 20 million --

12        THE COURT: To be quite honest with you, you've

13   a CUSIP number.

14        MR. BARNEY: The CUSIP number is only for the,

15   the note and the bond itself. Believe me, I spent quite

16   a bit of time figuring out the three numbers and none of

17   them is as to this batch 20 million 313. It is only as

18   to the note itself.

19        THE COURT: It is so --

20        MR. BARNEY: Here is the thing, your Honor. If

21   they were to, let's say transfer this again --

22        THE COURT: Who has shares anymore? Who has

23   paper shares?

24        MR. BARNEY: I agree, but this is the system

25   that has been set up for these notes.

43

Proceedings

1    THE COURT:  Well, the system that is set up is

2    that Cede & Co. gets to say who is the owner.  And, you

3    know, I need to dig in a little bit more.  It is 3:47.

4    I will take a look at the legal argument of whether it

5    can be assigned or not.  I'm not prepared to make a

6    decision as to this today.

7    MR. STARNER:  Just on that last point, your

8    Honor, if I may, we can trace these bonds, okay.  So the

9    record goes, Pala buys them, gets -- so we have bank

10   account statement.  I can point the court to these.

11   THE COURT:  Right.

12   MR. STARNER:  That is not in dispute.  Pala

13   buys them, bank account, authorization from Cede & Co.,

14   then we have a sale.  So that is an agreement of sale

15   and we have bank records from the plaintiffs saying I

16   bought this much from Pala, and we have a fact witness

17   from Pala saying I sold this much in face to this

18   plaintiff.

19   THE COURT:  You know what I don't have is

20   whether they, the entity to which Pala sent, sold it to.

21   MR. STARNER:  You do, actually.

22   THE COURT:  Huh?

23   MR. STARNER:  Which entity, which plaintiff?

24   THE COURT:  Whoever it sold.

25   MR. STARNER:  You do.  That is the fact witness

44

Proceedings

1    statement in the affidavit from the Pala fact witness.

2              THE COURT:  No, but what I'm saying is I --

3    okay.  So you sold it, right, to Mr. Barney.  How do I

4    know he didn't sell it to somebody else?  That is my

5    problem.

6              MR. STARNER:  Well, we have a bank record that

7    shows that pinpoint and VP hold these notes.  So it is

8    the same bank records we relied upon earlier for the

9    other holdings.  We have the same bank records now for

10   these Pala notes, and we have fact witnesses, admissible

11   evidence from fact witnesses, uncontested, undisputed,

12   no evidence to dispute them saying we bought these notes

13   and we hold these notes.

14             THE COURT:  That is Kam saying we hold?

15             MR. STARNER:  That is Kam and Woo.  Woo for the

16   pinpoint notes, and Kam for the VP notes.

17             THE COURT:  Okay.  Kam in what paragraph says,

18   and we continue to hold.

19             MR. STARNER:  Certainly.  Do you want to look

20   at pinpoint or VP?

21             THE COURT:  I have Kam open.

22             MR. STARNER:  That is Docket 289 you have.

23             THE COURT:  Uh-huh.

24             MR. STARNER:  Okay.  If you look at Paragraph 9

25   it says on November -- this is when purchased the notes

45

Proceedings

1    and then Paragraph 10 refers to a proof of purchase for

2    the notes.  And we have bank statements as of, you know,

3    when we filed the summary judgment papers.  This is

4    October of '19 showing the holdings as of that date.

5    We certainly supplement that if the court would like us

6    to, but we have the banks records as of the filing of

7    summary judgment.

8              MR. BARNEY:  Well, Pala is --

9              MR. STARNER:  We're talking about VP right

10   now.

11             MR. BARNEY:  Right, but when I filed in October

12   of 2018 or, you know, yeah, 2018, you had not

13   transferred them yet.  The transfer didn't happen until

14   November of 2018.

15             MR. STARNER:  I was talking about the summary

16   judgment papers we filed in October of 2019.

17             MR. BARNEY:  Oh.

18             MR. STARNER:  And we have bank accounts

19   statements from that period of time showing the bonds

20   as held by VP on that date.  So showing the purchase

21   from Pala -- the concern I thought the court raised was

22   what if VP sold and when we filed for summary judgment,

23   we submitted evidence to show they held them as of that

24   date.

25             THE COURT:  You know, with regard to Pala and

46

Proceedings

1      the other, everything else we did today, and on the

2      20th, I had the Cede & Co. saying, and on our books and

3      records it shows that they pulled them, they are the

4      beneficial owners.

5               MR. STARNER:  Right.

6               THE COURT:  I don't have that here with these

7      transfers from Pala.

8               MR. STARNER:  Well, you have the evidence from

9      Pala to the VP and pinpoint, right, showing that they

10     sold their ownership to them.  You do have that.

11              THE COURT:  Right, but I don't actually have

12     anything here that says that, and we continue to hold,

13     and it is in the books and records of Cede & Co.

14              MR. STARNER:  We can, you know, we can

15     certainly supplement the record if the court would like

16     us to, if the court wants to put that in.

17              MR. BARNEY:  To be clear, that is what exactly

18     didn't happen in November of 2018.  They filed for

19     summary judgment, Pala saying, yes, we owned these and

20     two weeks later they sold them and we didn't find out

21     about that until much later.

22              MR. STARNER:  One, it is not true.  Number two,

23     parties sell their holdings all of the time, and how

24     that works is you basically supplement your papers and

25     say this is now what our current holdings are.

47

Proceedings

1        Keep in mind, you can sell your holdings and

2    still proceed as a plaintiff if you have an arrangement

3    that kind of covers that economic interest.  So there

4    are a few issues.  But, I mean, if the court is

5    indicating, if you know -- I do think that we've put in

6    enough evidence to establish the chain.  But if the

7    court is now indicating, suggesting that you would be

8    more comfortable if we put in an affidavit from Cede &

9    Co., you know, we can certainly go back and do that,

10    your Honor, if that is kind of where we are.

11        THE COURT:  Either an affidavit or the letter

12    saying on our books and records, the owners of these

13    Pala amounts are VP China, you know, has this amount,

14    like these letters, the authorization letters.

15        MR. STARNER:  So if I'm hearing the court

16    correctly, think we're talking about the Cede & Co.

17    authorization, an updated one for these this holdings

18    for these plaintiffs as opposed to, just so I'm clear, I

19    guess I could bring in my guys from VP and pinpoint to

20    say we still hold them, but I think what you would like

21    to see is the Cede & Co. piece.

22        THE COURT:  Look, if are you going to go, if

23    you wish to proceed with them, with the new owners

24    putting in affidavits and saying and we continue to own

25    it, then I need to go back and research and write about

48

Proceedings

1    whether you can assign that interest, right.  So that is

2    where we are if that is the option.  If the option is

3    you come in with an authorization letter for these

4    amounts, the Pala amounts, um, then that is all I would

5    need.

6              MR. STARNER:  Okay.

7              THE COURT:  As I have with each and everyone of

8    the other.

9              MR. STARNER:  Understood.  One of the

10   challenges, Cede & Co. is not in the US.  We don't have

11   control over them.  It is a situation where you are

12   trying to figure out the most efficient way to approach

13   this.

14             THE COURT:  Right.

15             MR. STARNER:  But just based on the court's I

16   think feedback, I can go back to my clients, talk to

17   them, see how they want to approach this.  Maybe come

18   back to you and say we would like you to rule, we feel

19   very strongly, the way we structured it, maybe --

20             THE COURT:  I mean, as of now I'm not denying

21   it.  I'm saying I'll go back and look at your cases and

22   your briefs on the issue of whether you can assign the

23   authorization letter, and maybe you can.  I don't know.

24   I'm not comfortable making a ruling right now on that

25   issue.  And you know how backed up I am, so it will take

49

Proceedings

1       a while to get that.  It maybe quicker to get the

2       authorization letter.  If are you going to go that

3       route, I would appreciate it if you let me know and

4       then, you know, we won't put that on the pile of things

5       we have to do.

6              MR. STARNER:  Fair enough.

7              THE COURT:  For now, I'll grant your motion

8       for summary judgment for the reasons that I stated

9       earlier as to all the other notes.

10             As to the Pala transfer, the issue is whether

11      they could assign the authorization letter to the new

12      owners.  Maybe they can.  Maybe they can't.  I'm going

13      to mark it submitted.

14             We're going to wait for you to get the

15      transcript before we mark this motion submitted on this

16      one remaining issue.  And between now and the time you

17      get me the transcript, you will talk to your client and

18      let me know how you are going to proceed.

19             MR. STARNER:  Very good.  Happy to do that,

20      your Honor.

21             Just notice of process, would you like me to

22      put an e-mail in, a letter in, how would you like me to

23      do that?

24             THE COURT:  You can send an e-mail to the

25      Part 48 e-mail and let us know when you submit it.  It

50

Proceedings

1    is your motion, so you will submit the transcript.

2    So, you know, you can do a cover letter with the

3    transcript or whatever.

4              MR. STARNER:  Very good.

5              THE COURT:  Or I can assure you we are not

6    going to work on it any time soon.  We're so backed up

7    it is ridiculous.

8              So with regard to the judgments, so I'm going

9    to do an order today on a gray sheet saying it is

10   granted, that this is an interim order, that it is

11   granted for the reasons, and as to the notes that are

12   stated on the record, and that you are directed to

13   submit a judgment on notice to counsel with an

14   opportunity, ten days, you know, to propose a

15   counter-judgment, if you are so inclined, and I would

16   like to get this off and get it done.

17             MR. STARNER:  Appreciate that.

18             THE COURT:  The question is whether the county

19   clerk is going to take -- I have to look into whether

20   they will take this judgment.  We may have to sever.

21             MR. STARNER:  I was going to bring it up,

22   request to sever.  So there is one or two open issues,

23   the acceleration piece, and now the Pala notes.  I ask

24   the court to sever those claims from the claims you've

25   granted summary judgment on.

51

Proceedings

1      THE COURT:  Uh-huh.  Um, I will look into how

2   we need to do that.

3      In the mean time, you could submit the

4   judgments on, for the amounts that were decided on the

5   record.

6      MR. STARNER:  Just on that point, certainly we

7   will work to settle an order and work, give them notice

8   on that front.  You will -- I think on the interest, the

9   I don't think there is any dispute about when the

10   interest will be, will have accrued from when the

11   interest payments either had to be paid or the maturity

12   dates.  I'm hopeful there will be no issue with those

13   kind of interest accrual dates.

14      THE COURT:  So it would be best if you submit

15   the excel chart with the interest as to each thing.

16      Normally, the county clerk would do that.  I

17   think this is asking too much if we --

18      MR. STARNER:  Normally, we put in the dates,

19   they do the math.

20      Would you like us to do the actual excel and do

21   both?

22      THE COURT:  I think it is a lot more

23   complicated than just an interest amount and the days

24   because you have it on different days when something was

25   due as to this amount and when it was due it will be a

52

Proceedings

1     little more complicated.

2               MR. STARNER:  We've done that work so we can

3     certainly get that with the other side.

4               THE COURT:  Okay.

5               MR. BARNEY:  Absolutely.  I was going to say

6     we've done that work too, and I can attest it is

7     complicated.

8               THE COURT:  Yeah.  I think an excel sheet would

9     be the best way to do it.

10              MR. BARNEY:  I'll have to get my partner the

11    CPA to do it actually for me.

12              MR. STARNER:  One final thing.

13              THE COURT:  To be clear, you will submit it

14    here, and you will submit the counter order here.  Don't

15    submit it to the clerks office.

16              MR. STARNER:  Okay.  We'll aim to do that in

17    short order by the end of, you know, I guess by the end

18    of next week.

19              THE COURT:  I'm here.  Not going anywhere.

20              MR. STARNER:  Finally, I think there is a

21    status conference on the calendar for next week.  I

22    think I propose to adjourn or.

23              THE COURT:  We'll adjourn the whole matter for

24    30 days from today, including the conference next week.

25              Let's just hypothetically, if you are correct

53
Proceedings

1    on the assignment, and you can assign it, and you get a

2    judgment as to the Pala notes, the only issue left is

3    the acceleration.

4            MR. STARNER:  Correct.

5            MR. BARNEY:  That's correct.

6            THE COURT:  So then the question is whether you

7    will be proceeding to trial on the acceleration issue.

8            MR. STARNER:  Yes.

9            THE COURT:  And you would be able to file a

10   note of issue and we could go to trial on it.

11           MR. STARNER:  And I think with that, your

12   Honor, depending how things checkout, Pala, I'll have a

13   conversation with the client and determine how they want

14   to proceed with that.

15           Are you asking for timing?

16           THE COURT:  No.  I just want to figure out

17   what to do next.  And I might just to expedite things

18   if that does go to a hearing, unless you are asking for

19   a jury trial on it, I would send it to a referee,

20   probably.  Although they are backed up too, but I still

21   think you get an earlier date.  I'm on trial, and jury

22   trials through me.

23           MR. STARNER:  Okay.  We appreciate that.

24           THE COURT:  Okay.

25           So thank you very much, and Happy Valentine's

54

Proceedings

1    Day.   Have some chocolate.

2                (Time noted 4:02 p.m.)

3            I, Monica A. Martinez, do hereby certify the

4    foregoing to be a true and accurate verbatim

5    transcription of the original stenographic record.

6            _____

7                  Monica A. Martinez

8                  Senior Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$19** [1] - 24:5
**$19,350,000** [2] - 25:2, 29:6
**$2,127,781.25** [1] - 23:12
**$20,800,000** [1] - 28:12
**$24,550,312.50** [1] - 29:23
**$26,390,000** [2] - 2:16, 3:17
**$29,085,000** [5] - 30:4, 30:5, 30:18, 31:3, 31:11
**$38,119,528.13** [1] - 31:22
**$39,119,528.13** [1] - 31:21
**$5,200,312.50** [1] - 29:7
**$6,850,000** [2] - 5:10, 7:10
**$8,977,781.25** [1] - 23:18
**$8.65** [1] - 16:4
**$9,034,528.13** [1] - 31:13

## '

**'19** [2] - 7:1, 45:4

## 1

**1** [1] - 38:17
**10** [2] - 13:24, 45:1
**10007** [1] - 1:12
**10036** [1] - 1:18
**10166** [1] - 1:21
**11** [3] - 12:15, 16:17
**1155** [1] - 1:17
**12** [1] - 39:3
**14** [3] - 1:11, 13:15, 14:12
**14th** [1] - 17:6
**15** [1] - 12:16
**16** [3] - 14:8, 28:3, 28:4
**17th** [1] - 1:21
**18** [6] - 5:2, 6:23, 24:2, 25:16, 27:2, 30:16
**19** [9] - 5:2, 5:5, 13:3, 23:17, 26:25, 27:7, 30:18, 31:4, 31:20
**19.35** [1] - 26:4
**19.350** [5] - 25:17, 26:17, 27:7, 28:8, 28:19

## 2

**2** [2] - 2:20, 26:20
**2.05** [1] - 36:19
**2.06** [2] - 35:9, 35:10
**2.06F** [6] - 34:11, 34:18, 35:4, 37:5, 38:6, 39:19
**2.08B** [1] - 36:21
**2.6F** [1] - 36:19
**20** [2] - 42:11, 42:17
**20.8** [2] - 26:15, 28:12
**200** [1] - 1:21
**2016** [2] - 27:2, 27:5
**2018** [10] - 6:23, 28:11, 29:5, 29:21, 30:17, 31:9, 45:12, 45:14, 46:18
**2019** [11] - 5:10, 7:1, 7:14, 7:20, 8:18, 9:1, 23:4, 23:8, 24:25, 30:2, 45:16
**2020** [1] - 1:11
**20th** [3] - 2:10, 2:12, 46:2
**23** [2] - 8:18, 13:24
**23rd** [1] - 2:10
**24** [3] - 14:4, 14:20, 16:11
**26** [2] - 3:14, 3:15
**27** [1] - 16:2
**286** [2] - 13:15, 13:22
**289** [3] - 8:16, 12:6, 44:22
**291** [1] - 26:20
**292** [2] - 26:9, 28:14
**293** [5] - 25:20, 25:21, 25:24, 28:17, 30:24
**297** [3] - 12:22, 12:23, 12:24
**2:34** [1] - 2:1

## 3

**3** [6] - 26:9, 26:11, 26:12, 26:13, 26:14, 26:15
**30** [1] - 52:24
**312** [10] - 5:14, 6:10, 6:22, 10:7, 24:8, 25:6, 25:11, 30:8, 30:12, 40:14
**313** [2] - 21:10, 42:17
**319** [2] - 21:12, 40:13
**324** [5] - 17:7, 17:8, 17:9, 17:10, 17:13
**326** [1] - 3:20
**350,000** [1] - 24:7
**38** [1] - 34:12
**393** [1] - 30:22

**3:20** [1] - 24:23
**3:47** [1] - 43:3

## 4

**4** [9] - 5:15, 8:23, 19:1, 22:22, 25:24, 28:17, 30:11, 30:25, 40:22
**48** [2] - 1:1, 49:25
**49** [2] - 12:15, 16:17
**4:02** [1] - 54:2

## 6

**6.8** [1] - 9:2
**6.85** [7] - 5:9, 7:14, 7:20, 12:17, 13:2, 13:9, 23:4
**6.850** [5] - 7:9, 9:7, 9:8, 14:18, 15:2
**60** [1] - 1:11
**652798/2018** [1] - 1:5

## 7

**7** [2] - 8:25, 17:12

## 8

**8** [2] - 12:24, 22:23
**8.65** [1] - 16:6
**8.875** [1] - 6:25

## 9

**9** [1] - 44:24

## A

**ability** [1] - 35:17
**able** [5] - 2:9, 21:15, 38:10, 38:11, 53:9
**absolutely** [1] - 52:5
**accelerating** [1] - 14:3
**acceleration** [12] - 4:7, 4:16, 4:19, 13:17, 23:6, 29:13, 29:16, 29:18, 29:20, 50:23, 53:3, 53:7
**account** [9] - 9:22, 12:9, 13:2, 23:19, 26:5, 28:13, 28:17, 43:10, 43:13
**accounts** [1] - 45:18
**accrual** [2] - 4:20, 51:13
**accrued** [1] - 51:10
**accurate** [1] - 54:4
**act** [1] - 16:4
**acting** [1] - 41:21

**action** [10] - 2:24, 23:2, 32:22, 32:24, 33:12, 33:20, 34:25, 35:8, 35:17, 41:9
**actions** [2] - 38:23, 38:25
**actual** [3] - 4:14, 37:2, 51:20
**added** [1] - 20:21
**additional** [3] - 11:25, 23:8, 28:10
**address** [2] - 18:10, 36:20
**adjourn** [2] - 52:22, 52:23
**admissible** [7] - 11:21, 20:5, 21:2, 22:1, 22:10, 42:5, 44:10
**affidavit** [27] - 5:16, 6:11, 6:14, 6:21, 8:12, 8:18, 8:23, 9:1, 12:5, 12:6, 16:10, 16:16, 16:24, 19:2, 19:12, 21:12, 25:9, 25:24, 26:10, 27:24, 28:24, 30:7, 30:25, 40:23, 44:1, 47:8, 47:11
**affidavits** [1] - 47:24
**affiliate** [1] - 41:24
**affirmation** [1] - 5:24
**afternoon** [1] - 2:7
**agree** [1] - 42:24
**agreement** [2] - 33:19, 43:14
**ahead** [1] - 17:18
**aim** [1] - 52:16
**allow** [2] - 11:11, 20:23
**allowable** [1] - 36:3
**allowed** [5] - 38:7, 38:24, 39:1, 39:20, 39:24
**allows** [1] - 10:19
**Americas** [1] - 1:17
**AMERICAS** [1] - 1:8
**amount** [26] - 7:10, 7:14, 14:16, 15:25, 16:2, 22:15, 22:17, 23:11, 24:5, 25:17, 26:18, 28:13, 29:6, 29:22, 29:25, 30:5, 30:18, 31:4, 31:25, 32:6, 32:10, 42:10, 47:13, 51:23, 51:25
**amounts** [4] - 47:13, 48:4, 51:4
**ANDREA** [1] - 1:14
**anyway** [1] - 23:3

**apologize** [1] - 17:3
**applicable** [2] - 34:4, 41:11
**applies** [1] - 35:4
**apply** [1] - 35:9
**appreciate** [4] - 6:8, 49:3, 50:17, 53:23
**approach** [2] - 48:12, 48:17
**appropriate** [3] - 20:13, 33:8, 36:3
**argue** [6] - 11:7, 20:1, 20:2, 20:13, 20:19, 35:9
**argument** [8] - 11:6, 11:14, 28:21, 28:22, 34:6, 35:11, 43:4
**arrangement** [1] - 47:2
**articulating** [1] - 17:14
**aside** [1] - 4:3
**asserted** [1] - 34:6
**asserting** [1] - 41:25
**Assets** [1] - 2:2
**ASSETS** [1] - 1:2
**assign** [4] - 48:1, 48:22, 49:11, 53:1
**assigned** [4] - 34:2, 35:8, 42:6, 43:5
**assigning** [3] - 33:21, 41:19, 41:24
**assignment** [3] - 33:19, 36:4, 53:1
**assuming** [1] - 29:12
**assure** [1] - 50:5
**attention** [9] - 6:21, 12:21, 13:14, 13:18, 25:6, 25:20, 26:8, 27:1, 30:6
**attest** [2] - 18:1, 52:6
**Attorneys** [2] - 1:17, 1:20
**authenticated** [1] - 33:13
**authenticating** [2] - 11:8, 11:12
**authority** [3] - 23:1, 37:21, 42:10
**authorization** [23] - 6:23, 7:13, 7:16, 7:19, 10:5, 10:11, 10:15, 10:20, 13:11, 15:16, 16:3, 20:20, 25:13, 30:17, 33:11, 42:1, 43:13, 47:14, 47:17, 48:3, 48:23, 49:2, 49:11
**authorize** [2] - 10:15, 34:25
**authorized** [6] - 20:20,

2

33:20, 35:7, 35:15, 37:20, 41:17
**authorizes** [2] - 10:12, 10:16
**authorizing** [3] - 11:19, 35:5, 40:25
**Avenue** [2] - 1:17, 1:21

## B

**B.V** [1] - 1:9
**backed** [3] - 48:25, 50:6, 53:20
**Bank** [1] - 9:22
**bank** [32] - 8:1, 8:24, 9:14, 10:3, 10:22, 11:3, 12:20, 12:25, 15:25, 16:2, 19:4, 19:17, 22:15, 22:17, 25:22, 26:6, 28:13, 28:17, 31:5, 33:13, 42:10, 43:9, 43:13, 43:15, 44:6, 44:8, 44:9, 45:2, 45:18
**bank/broker** [1] - 9:21
**banks** [3] - 17:23, 21:8, 45:6
**BARNEY** [58] - 1:22, 2:7, 4:9, 6:6, 7:21, 8:5, 8:11, 8:14, 8:19, 8:21, 9:4, 14:1, 14:11, 15:23, 16:13, 16:15, 17:7, 17:16, 17:19, 17:22, 19:8, 21:5, 21:20, 21:24, 22:13, 23:21, 28:22, 29:10, 29:12, 29:15, 30:23, 31:7, 31:14, 32:1, 32:8, 32:11, 36:9, 36:14, 38:15, 38:19, 39:8, 39:18, 40:8, 40:15, 40:17, 40:20, 40:22, 42:7, 42:14, 42:20, 42:24, 45:8, 45:11, 45:17, 46:17, 52:5, 52:10, 53:5
**Barney** [4] - 2:6, 9:10, 15:21, 44:3
**BARRY** [1] - 1:19
**Barry** [2] - 2:4, 2:5
**based** [4] - 11:10, 22:20, 34:6, 48:15
**batch** [3] - 16:1, 42:17
**Bates** [4] - 14:1, 14:4, 14:19, 14:20
**bear** [1] - 5:14
**beginning** [2] - 37:6, 41:8

**behalf** [1] - 16:4
**beneficial** [12] - 7:4, 9:12, 10:20, 11:19, 14:24, 18:15, 21:19, 35:16, 39:14, 39:20, 41:16, 46:4
**best** [2] - 51:14, 52:9
**between** [8] - 13:6, 16:8, 17:23, 19:9, 19:14, 35:1, 38:13, 49:16
**bit** [3] - 4:4, 42:16, 43:3
**BNP** [1] - 27:8
**bond** [4] - 19:18, 19:19, 27:18, 42:15
**bonds** [2] - 43:8, 45:19
**book** [1] - 37:2
**books** [3] - 46:2, 46:13, 47:12
**bottom** [5] - 11:18, 13:4, 14:17, 21:1, 27:2
**bought** [2] - 43:16, 44:12
**box** [1] - 15:5
**brief** [1] - 24:17
**briefs** [1] - 48:22
**bring** [10] - 20:9, 23:1, 27:8, 33:12, 33:20, 34:25, 35:8, 40:25, 47:19, 50:21
**brings** [1] - 40:18
**broad** [1] - 41:15
**broker** [6] - 9:14, 27:11, 27:14, 27:16, 27:17, 27:21
**brokerage** [1] - 12:8
**brought** [1] - 32:22
**burden** [1] - 21:6
**business** [2] - 22:2, 24:22
**business/bank** [1] - 11:8
**buy** [5] - 19:18, 19:19, 19:21, 19:25
**buys** [2] - 43:9, 43:13
**BY** [2] - 1:18, 1:22

## C

**C-sections** [1] - 14:5
**calculation** [4] - 23:20, 29:9, 31:12, 31:17
**calendar** [1] - 52:21
**cap** [2] - 38:14, 38:25
**capital** [8] - 37:3, 37:7, 38:17, 39:5, 39:11,

39:15, 39:23, 39:25
**capitalized** [2] - 35:12, 41:11
**carefully** [1] - 36:16
**carry** [1] - 41:2
**CASE** [1] - 1:16
**case** [13] - 2:13, 20:5, 24:18, 29:15, 33:24, 33:25, 34:3, 35:1, 35:2, 35:16, 36:15, 39:21
**cases** [1] - 48:21
**Cede** [62] - 2:25, 3:1, 5:16, 6:10, 6:15, 7:13, 9:13, 9:16, 9:23, 10:8, 11:19, 13:19, 15:8, 15:10, 19:23, 21:18, 21:21, 22:2, 22:11, 22:21, 22:25, 25:14, 27:25, 30:7, 30:17, 33:11, 34:23, 35:14, 35:15, 35:18, 35:19, 35:24, 36:11, 37:10, 37:12, 37:17, 37:19, 37:25, 38:3, 38:10, 38:17, 39:8, 39:12, 39:20, 40:3, 40:4, 40:24, 41:9, 41:17, 43:2, 43:13, 46:2, 46:13, 47:8, 47:16, 47:21, 48:10
**Centre** [1] - 1:11
**certainly** [10] - 3:2, 10:14, 19:24, 20:16, 44:19, 45:5, 46:15, 47:9, 51:6, 52:3
**certificate** [2] - 9:6, 19:5
**certify** [1] - 54:3
**chain** [12] - 9:16, 11:1, 13:13, 16:12, 20:22, 21:1, 22:18, 24:11, 38:1, 42:4, 47:6
**challenges** [1] - 48:10
**challenging** [3] - 23:19, 29:8, 33:4
**chance** [2] - 5:21, 5:25
**change** [1] - 9:9
**changes** [1] - 4:4
**chart** [9] - 2:17, 3:18, 4:12, 4:13, 4:18, 4:22, 7:7, 9:8, 51:15
**charts** [1] - 4:21
**Chase** [5] - 8:7, 15:5, 18:17, 19:7, 22:24
**checkout** [1] - 53:12
**CHINA** [1] - 1:4
**China** [12] - 2:20, 3:17, 24:2, 24:25, 25:16,

29:5, 29:21, 30:3, 30:19, 31:4, 31:10, 47:13
**China's** [1] - 31:19
**chocolate** [1] - 54:1
**circumstances** [1] - 20:14
**cited** [1] - 33:24
**Citicorp** [1] - 13:21
**CIVIL** [1] - 1:1
**claim** [3] - 31:20, 33:21, 34:2
**claims** [3] - 33:16, 50:24
**clarification** [1] - 10:11
**cleanest** [1] - 36:3
**clear** [12] - 7:24, 10:15, 29:12, 29:16, 31:16, 32:1, 32:3, 32:8, 32:12, 46:17, 47:18, 52:13
**clearly** [1] - 26:23
**clerk** [3] - 32:7, 50:19, 51:16
**clerks** [1] - 52:15
**client** [2] - 49:17, 53:13
**clients** [1] - 48:16
**Co** [54] - 2:25, 5:16, 5:17, 6:10, 6:15, 7:13, 9:13, 9:16, 9:23, 10:8, 11:19, 15:8, 15:10, 19:23, 21:18, 22:11, 22:21, 25:14, 27:25, 30:7, 30:17, 33:12, 34:23, 35:14, 35:15, 35:18, 35:19, 35:25, 37:10, 37:12, 37:17, 37:19, 37:25, 38:3, 38:4, 38:17, 39:8, 40:3, 40:4, 40:24, 41:9, 41:17, 43:2, 43:13, 46:2, 46:13, 47:9, 47:16, 47:21, 48:10
**comfortable** [3] - 13:13, 47:8, 48:24
**commence** [1] - 41:1
**committed** [2] - 3:11, 11:21
**commonly** [1] - 33:23
**complicated** [4] - 36:17, 51:23, 52:1, 52:7
**concern** [1] - 45:21
**concluded** [1] - 2:21
**conference** [2] - 52:21, 52:24
**confirm** [1] - 40:14

**confuse** [1] - 26:19
**connect** [3] - 12:17, 15:21, 16:20
**connecting** [3] - 13:8, 17:24, 18:8
**connection** [7] - 13:6, 14:14, 15:15, 16:8, 19:8, 19:14, 20:2
**connects** [2] - 10:9, 15:19
**continue** [4] - 41:2, 44:18, 46:12, 47:24
**contract** [3] - 22:4, 22:5, 22:6
**control** [1] - 48:11
**controlling** [3] - 37:11, 41:12, 41:13
**conversation** [1] - 53:13
**copy** [2] - 6:4, 6:5
**corner** [1] - 13:4
**correct** [12] - 4:8, 4:9, 6:12, 16:13, 28:9, 29:14, 32:3, 39:17, 39:18, 52:25, 53:4, 53:5
**correcting** [1] - 2:25
**correctly** [1] - 47:16
**corroborating** [1] - 11:15
**Cortlandt** [1] - 33:25
**counsel** [1] - 50:13
**counter** [2] - 50:15, 52:14
**counter-judgment** [1] - 50:15
**COUNTY** [1] - 1:1
**county** [2] - 50:18, 51:16
**course** [2] - 9:24, 32:24
**court** [25] - 4:22, 5:11, 5:13, 9:11, 11:4, 11:11, 12:4, 20:24, 22:1, 26:19, 28:15, 30:21, 31:10, 33:7, 33:24, 33:25, 43:10, 45:5, 45:21, 46:15, 46:16, 47:4, 47:7, 47:15, 50:24
**COURT** [192] - 1:1, 2:2, 2:6, 2:8, 2:15, 2:20, 3:3, 3:6, 3:14, 3:17, 3:19, 3:21, 4:5, 4:10, 4:24, 5:3, 5:7, 5:18, 5:23, 6:2, 6:7, 6:10, 6:13, 6:16, 6:19, 7:2, 7:8, 7:11, 7:15, 7:18, 8:3, 8:8, 8:13, 8:17, 8:20, 9:3,

3

9:5, 9:19, 10:1, 10:4, 10:8, 10:23, 12:3, 12:10, 12:12, 12:23, 13:5, 13:12, 13:21, 13:23, 14:6, 14:8, 14:10, 14:13, 14:19, 14:21, 14:25, 15:4, 15:6, 15:8, 15:11, 15:14, 15:18, 16:11, 16:14, 16:25, 17:4, 17:9, 17:11, 17:15, 17:18, 17:21, 18:13, 19:1, 19:5, 19:13, 20:11, 21:17, 21:22, 22:9, 22:20, 23:10, 23:13, 23:19, 23:22, 24:6, 24:10, 24:15, 24:19, 25:2, 25:4, 25:7, 25:12, 25:15, 25:18, 25:21, 25:25, 26:2, 26:5, 26:11, 26:13, 26:16, 26:21, 27:3, 27:8, 27:12, 27:19, 27:23, 28:2, 28:8, 28:20, 28:23, 29:8, 29:11, 29:16, 29:24, 30:4, 30:9, 30:12, 30:15, 30:20, 31:1, 31:6, 31:8, 31:15, 31:18, 31:22, 31:24, 32:5, 32:9, 32:15, 32:18, 32:23, 33:2, 34:9, 34:13, 34:17, 34:19, 35:21, 35:24, 36:5, 36:8, 36:13, 38:12, 38:16, 39:3, 39:13, 39:16, 40:6, 40:9, 40:13, 40:16, 40:19, 40:21, 40:24, 42:12, 42:19, 42:22, 43:1, 43:11, 43:19, 43:22, 43:24, 44:2, 44:14, 44:17, 44:21, 44:23, 45:25, 46:6, 46:11, 47:11, 47:22, 48:7, 48:14, 48:20, 49:7, 49:24, 50:5, 50:18, 51:1, 51:14, 51:22, 52:4, 52:8, 52:13, 52:19, 52:23, 53:6, 53:9, 53:16, 53:24

**Court** [3] - 1:14, 1:24, 54:8

**court's** [5] - 6:20, 12:21, 25:5, 30:6, 48:15

**cover** [2] - 32:13, 50:2

**covers** [1] - 47:3

**CPA** [1] - 52:11

Credit [1] - 7:6

**credit** [9] - 5:5, 5:8, 7:7, 7:13, 7:19, 12:14, 15:2, 23:9, 23:17

**CREDIT** [1] - 1:3

**Credit's** [1] - 9:21

**current** [1] - 46:25

**CUSIP** [2] - 42:13, 42:14

**custodian** [4] - 6:15, 20:10, 21:8, 21:14

## D

**damages** [1] - 23:24

**date** [8] - 4:19, 8:7, 27:2, 28:18, 45:4, 45:20, 45:24, 53:21

**dated** [1] - 6:23

**dates** [3] - 51:12, 51:13, 51:18

**days** [4] - 50:14, 51:23, 51:24, 52:24

**deal** [1] - 37:15

**December** [3] - 2:10, 2:12

**decided** [1] - 51:4

**decision** [1] - 43:6

**declaration** [5] - 5:15, 5:21, 6:1, 12:25, 13:16

**defend** [1] - 41:2

**defendant** [2] - 11:22, 33:25

**Defendants** [2] - 1:10, 1:20

**defendants** [4] - 14:23, 20:4, 21:2, 33:4

**defer** [1] - 3:8

**definitions** [1] - 39:4

**demand** [1] - 14:3

**demonstrated** [1] - 13:5

**denied** [1] - 29:17

**denying** [2] - 4:6, 48:20

**depository** [3] - 19:4, 26:6, 31:5

**describes** [1] - 12:7

**determine** [2] - 33:7, 53:13

**determined** [1] - 34:1

**different** [8] - 3:22, 10:25, 17:23, 18:5, 22:11, 34:15, 41:22, 51:24

**dig** [1] - 43:3

**direct** [15] - 5:11, 6:20,

9:21, 12:8, 12:21, 13:14, 13:18, 25:5, 25:19, 26:8, 27:1, 28:16, 30:6, 30:21

**directed** [1] - 50:12

**disagree** [1] - 36:14

**discussing** [1] - 2:22

**dispute** [6] - 23:15, 33:11, 34:5, 43:12, 44:12, 51:9

**distinction** [3] - 34:25, 38:9, 38:12

**docket** [2] - 3:20, 40:12

**Docket** [19] - 5:14, 6:22, 8:16, 10:7, 12:21, 13:15, 13:22, 24:8, 25:6, 25:11, 25:20, 26:8, 26:20, 28:14, 28:17, 30:7, 30:22, 40:9, 44:22

**document** [13] - 9:18, 10:7, 11:2, 14:22, 16:9, 16:18, 17:4, 17:9, 19:13, 21:18, 22:10, 25:23, 40:17

**Document** [5] - 12:6, 17:13, 21:10, 21:12, 25:24

**documentation** [1] - 2:24

**documents** [20] - 3:12, 5:12, 6:9, 11:25, 12:20, 13:6, 15:24, 16:5, 16:7, 17:24, 18:2, 18:8, 18:16, 18:22, 18:23, 18:25, 19:10, 22:22, 41:12, 41:13

**done** [6] - 20:4, 24:21, 34:10, 50:16, 52:2, 52:6

**dots** [1] - 16:20

**down** [1] - 37:14

**drafters** [1] - 37:8

**drawn** [1] - 36:16

**DTC** [1] - 8:6

**due** [4] - 7:1, 23:17, 51:25

**during** [2] - 32:24, 38:22

## E

**e-mail** [3] - 49:22, 49:24, 49:25

**EAST** [1] - 1:8

**easy** [1] - 5:4

**ECF** [1] - 5:23

**echo** [1] - 30:14

**ECLR** [1] - 13:4

**economic** [1] - 47:3

**Edman** [1] - 12:12

**effective** [1] - 33:5

**effectively** [5] - 35:13, 35:15, 35:19, 41:20, 41:25

**efficient** [1] - 48:12

**eight** [1] - 34:14

**either** [4] - 13:8, 35:15, 47:11, 51:11

**Elaine** [1] - 24:11

**electronic** [2] - 6:7, 11:13

**elephant** [1] - 30:13

**emergency** [1] - 24:12

**employee** [1] - 17:20

**end** [8] - 20:24, 27:14, 28:25, 32:13, 37:6, 37:18, 52:17

**ends** [1] - 20:3

**enforce** [1] - 35:20

**enforcement** [1] - 40:25

**enter** [1] - 21:15

**entities** [4] - 5:1, 5:2, 7:24, 27:21

**entitled** [3] - 38:8, 38:24, 41:11

**entity** [8] - 5:6, 19:20, 37:20, 38:3, 38:21, 40:2, 43:20, 43:23

**equity** [1] - 41:12

**ESQ** [3] - 1:18, 1:19, 1:22

**establish** [5] - 11:18, 20:17, 20:25, 21:6, 47:6

**established** [4] - 20:2, 23:1, 29:1, 31:11

**establishes** [1] - 11:16

**Euroclear** [27] - 9:17, 9:19, 9:22, 12:16, 12:17, 13:4, 13:7, 13:8, 18:17, 18:19, 18:24, 19:6, 19:7, 19:9, 19:14, 19:20, 19:21, 20:11, 20:12, 22:23, 22:24, 26:6, 27:25, 28:25, 31:5

**everywhere** [2] - 37:4, 37:10

**evidence** [18] - 11:16, 11:20, 11:21, 15:12, 15:15, 20:5, 20:7, 20:15, 20:25, 21:3, 22:1, 22:7, 42:5, 44:11, 44:12, 45:23, 46:8, 47:6

**ex** [1] - 24:12

**exactly** [1] - 46:17

**example** [2] - 8:12, 8:22

**excel** [3] - 51:15, 51:20, 52:8

**except** [1] - 4:15

**exception** [1] - 11:13

**executed** [2] - 15:1, 15:10

**execution** [1] - 14:24

**exercising** [1] - 35:10

**exhibit** [8] - 8:20, 12:22, 12:24, 25:9, 25:23, 26:1, 26:9, 40:12

**Exhibit** [28] - 5:15, 6:21, 8:23, 12:16, 13:15, 14:8, 14:12, 19:1, 22:22, 22:23, 25:8, 25:10, 25:24, 26:9, 26:11, 26:12, 26:13, 26:14, 26:15, 26:20, 28:17, 30:10, 30:11, 30:12, 30:13, 30:25, 40:20, 40:22

**exhibits** [2] - 6:11, 8:22

**expedite** [1] - 53:17

**explain** [1] - 9:9

**extra** [1] - 6:6

## F

**face** [11] - 7:10, 7:14, 7:20, 13:3, 26:4, 27:7, 28:13, 30:5, 30:18, 31:3, 43:17

**fact** [16] - 10:21, 12:5, 16:10, 16:15, 17:13, 19:24, 20:6, 21:3, 21:21, 22:2, 37:5, 43:16, 43:25, 44:1, 44:10, 44:11

**facts** [1] - 13:25

**fair** [1] - 49:6

**fairly** [1] - 33:23

**Faith** [1] - 6:16

**false** [2] - 20:8, 21:4

**far** [4] - 16:18, 19:10, 27:21, 36:17

**fashion** [1] - 4:11

**February** [1] - 1:11

**feedback** [1] - 48:16

**few** [2] - 11:25, 47:4

**figure** [2] - 48:12, 53:16

**figuring** [1] - 42:16

**file** [3] - 5:19, 41:2, 53:9

4

**filed** [6] - 17:6, 45:3, 45:11, 45:16, 45:22, 46:18
**filing** [1] - 45:6
**final** [1] - 52:12
**finally** [2] - 16:22, 52:20
**fine** [1] - 22:4
**finish** [1] - 2:9
**first** [12] - 5:13, 8:5, 12:4, 15:14, 18:23, 19:13, 30:6, 35:3, 37:13, 38:13, 40:19
**firsthand** [2] - 18:3, 18:6
**fix** [1] - 3:7
**FIXED** [1] - 1:3
**Fixed** [1] - 7:5
**Floor** [1] - 1:21
**folder** [1] - 21:19
**follow** [2] - 27:12, 42:4
**foregoing** [1] - 54:4
**forth** [1] - 11:9
**forward** [5] - 7:19, 11:22, 20:4, 20:25, 21:2
**four** [2] - 4:14, 17:23
**fourteen** [1] - 14:11
**frankly** [6] - 11:14, 27:17, 28:5, 36:3, 36:7, 36:9
**front** [1] - 51:8
**full** [1] - 22:18
**FUND** [3] - 1:3, 1:4, 1:4
**fund** [1] - 12:13
**Fund** [1] - 7:6
**FZ** [1] - 1:8
**FZ-LLC** [1] - 1:8

**G**

**Gerosa** [1] - 21:10
**given** [1] - 42:10
**GLIMSTAD** [1] - 1:20
**global** [2] - 34:21, 35:12
**GLOBAL** [1] - 1:9
**grant** [2] - 34:24, 49:7
**granted** [7] - 23:4, 23:23, 32:6, 40:3, 50:10, 50:11, 50:25
**granting** [1] - 35:5
**gray** [1] - 50:9
**GREATER** [1] - 1:4
**GREGORY** [1] - 1:18
**guess** [8] - 3:8, 5:20, 11:24, 24:1, 27:10, 28:15, 47:19, 52:17
**guy** [1] - 27:17

**guys** [1] - 47:19

**H**

**happier** [1] - 28:24
**happy** [5] - 3:24, 4:2, 11:3, 18:10, 49:19
**Happy** [1] - 53:25
**hard** [1] - 42:4
**hate** [1] - 8:12
**hearing** [4] - 11:5, 32:14, 47:15, 53:18
**hearsay** [7] - 11:13, 17:25, 18:7, 18:10, 21:20, 21:22, 21:25
**held** [10] - 7:24, 16:4, 19:6, 23:8, 27:22, 29:5, 30:18, 31:4, 45:20, 45:23
**hereby** [1] - 54:3
**hereof** [1] - 8:7
**HIGH** [1] - 1:4
**himself** [1] - 18:14
**history** [1] - 8:9
**hold** [7] - 25:7, 44:7, 44:13, 44:14, 44:18, 46:12, 47:20
**holder** [44] - 9:19, 9:24, 10:21, 11:18, 19:23, 22:10, 34:20, 34:24, 35:2, 35:12, 35:13, 35:14, 36:18, 36:20, 36:24, 37:2, 37:3, 37:5, 37:7, 37:10, 37:17, 38:8, 38:10, 38:11, 38:13, 38:14, 38:17, 38:19, 38:23, 39:1, 39:3, 39:6, 39:11, 39:12, 39:13, 39:20, 39:21, 39:24, 39:25, 41:9, 41:10
**holders** [4] - 2:23, 39:14, 39:15, 39:16
**Holding** [1] - 7:4
**holding** [6] - 8:10, 9:2, 9:5, 9:7, 19:5, 22:12
**HOLDINGS** [1] - 1:2
**holdings** [13] - 5:2, 17:2, 17:14, 27:6, 28:18, 31:4, 33:14, 44:9, 45:4, 46:23, 46:25, 47:1, 47:17
**holds** [3] - 18:11, 18:15, 18:17, 18:19, 19:7
**honest** [1] - 42:12
**Hong** [1] - 12:13
**Honor** [37] - 2:7, 2:19, 3:8, 8:14, 12:19,

16:7, 16:13, 16:16, 16:22, 17:16, 17:19, 19:16, 20:1, 21:5, 21:20, 21:25, 23:7, 23:21, 24:3, 24:14, 26:24, 28:22, 29:5, 29:10, 31:14, 33:5, 34:8, 35:4, 38:15, 40:23, 41:6, 42:7, 42:20, 43:8, 47:10, 49:20, 53:12
**HONORABLE** [1] - 1:14
**hopeful** [1] - 51:12
**HSBC** [29] - 7:25, 8:2, 8:9, 8:10, 8:24, 9:4, 9:17, 9:21, 10:9, 11:1, 12:9, 13:1, 13:7, 13:8, 13:16, 16:6, 16:8, 16:18, 18:16, 18:19, 18:23, 18:25, 19:5, 19:18, 22:23, 25:22, 28:1, 30:22
**HSBC's** [1] - 12:1
**hypothetically** [1] - 52:25

**I**

**idea** [2] - 19:24, 41:24
**identified** [1] - 13:11
**identifier** [1] - 16:1
**identify** [3] - 7:25, 15:23, 22:14
**important** [1] - 10:12
**inadmissible** [2] - 11:7, 18:9
**INC** [1] - 1:8
**inclined** [2] - 11:11, 50:15
**include** [3] - 29:13, 29:20, 41:16
**included** [1] - 4:1
**including** [4] - 39:1, 41:13, 41:14, 52:24
**INCOME** [2] - 1:3, 1:4
**Income** [1] - 7:5
**indenture** [8] - 34:7, 34:8, 34:11, 36:16, 37:8, 38:8, 38:24, 41:13
**indentures** [2] - 34:15, 34:16
**Index** [1] - 1:5
**INDIA** [1] - 1:7
**indicated** [1] - 11:11
**indicating** [2] - 47:5, 47:7
**information** [1] -

21:15
**informed** [1] - 8:6
**initiate** [1] - 39:24
**initiating** [1] - 39:1
**instance** [2] - 10:3, 38:20
**instances** [1] - 39:23
**instead** [1] - 35:21
**institute** [2] - 41:1
**intent** [1] - 37:9
**interest** [20] - 4:20, 18:15, 23:9, 23:15, 23:16, 23:20, 29:6, 29:23, 31:12, 31:17, 31:20, 33:17, 47:3, 48:1, 51:8, 51:10, 51:11, 51:13, 51:15, 51:23
**interests** [1] - 32:25
**interim** [1] - 50:10
**intermediary** [2] - 10:22, 19:17
**INTERNATIONAL** [1] - 1:8
**issue** [20] - 3:25, 4:5, 11:20, 17:16, 17:19, 19:8, 22:19, 29:16, 32:17, 33:7, 33:15, 34:22, 48:22, 48:25, 49:10, 49:16, 51:12, 53:2, 53:7, 53:10
**issues** [3] - 2:21, 47:4, 50:22
**itself** [6] - 11:16, 12:5, 20:1, 20:20, 42:15, 42:18

**J**

**John** [1] - 6:16
**JP** [29] - 7:4, 7:23, 8:2, 8:6, 9:16, 10:3, 10:6, 10:8, 10:9, 10:13, 10:16, 12:17, 13:8, 14:13, 15:5, 15:15, 15:17, 18:17, 18:18, 19:7, 19:15, 19:22, 21:16, 21:19, 22:4, 22:5, 22:8, 22:24, 30:20
**JPM** [2] - 13:19, 27:25
**JPMC** [5] - 16:5, 16:8, 16:19, 18:1, 19:9
**Judge** [1] - 32:11
**judgment** [28] - 4:2, 4:6, 4:15, 4:17, 20:14, 23:3, 23:23, 29:17, 29:24, 31:24, 32:2, 32:3, 32:6, 32:7, 32:9, 33:16,

45:3, 45:7, 45:16, 45:22, 46:19, 49:8, 50:13, 50:15, 50:20, 50:25, 53:2
**judgments** [2] - 50:8, 51:4
**jury** [2] - 53:19, 53:21
**Justice** [1] - 1:14

**K**

**Kam** [32] - 5:21, 5:22, 5:24, 8:12, 8:17, 8:23, 12:12, 12:13, 12:24, 13:1, 16:16, 16:17, 17:1, 17:20, 18:14, 19:24, 22:22, 25:24, 25:25, 26:9, 26:20, 27:25, 28:16, 30:25, 44:14, 44:15, 44:16, 44:17, 44:21
**Kam's** [5] - 12:6, 16:10, 19:2, 19:11
**KAUL** [1] - 1:19
**Kaul** [2] - 2:5
**keep** [5] - 4:19, 11:17, 12:20, 27:16, 47:1
**kind** [12] - 3:11, 12:1, 13:25, 14:4, 14:17, 27:4, 32:21, 41:23, 42:3, 47:3, 47:10, 51:13
**knowledge** [2] - 17:25, 18:6
**Kong** [1] - 12:13

**L**

**language** [3] - 34:7, 34:15, 41:15
**last** [13] - 6:3, 11:5, 25:9, 25:10, 25:23, 26:1, 27:5, 29:17, 32:16, 32:18, 38:14, 38:19, 43:7
**law** [1] - 41:12
**lawsuit** [2] - 39:2, 39:24
**leaves** [2] - 32:16, 32:19
**left** [6] - 2:8, 2:11, 2:15, 13:4, 27:2, 53:2
**legal** [3] - 3:9, 33:7, 43:4
**legally** [2] - 33:5, 36:3
**letter** [26] - 6:23, 7:13, 8:23, 10:6, 10:11, 10:15, 13:11, 14:10, 15:17, 16:12, 20:20,

maturity [1] - 51:11
mean [7] - 17:25, 18:21, 19:16, 32:6, 47:4, 48:20, 51:3
means [1] - 39:4
merely [1] - 18:4
messy [1] - 38:2
MIDDLE [1] - 1:8
might [1] - 53:17
million [13] - 3:14, 3:15, 7:14, 7:20, 9:2, 9:7, 9:8, 13:3, 16:4, 23:4, 24:5, 42:11, 42:17
mind [4] - 4:19, 11:17, 27:16, 47:1
missed [2] - 23:11, 23:16, 29:6, 29:22, 31:17, 31:20
missile [1] - 11:16
missing [1] - 28:20
moment [1] - 4:3
Monica [3] - 1:24, 54:3, 54:7
Morgan [30] - 7:4, 7:23, 8:2, 8:6, 9:16, 10:3, 10:6, 10:8, 10:9, 10:13, 10:16, 12:17, 13:8, 14:13, 15:5, 15:15, 15:17, 18:17, 18:18, 19:7, 19:15, 19:22, 21:11, 21:16, 21:19, 22:4, 22:5, 22:8, 22:24, 30:20
most [2] - 7:23, 48:12
motion [5] - 4:6, 32:5, 49:7, 49:15, 50:1
moving [6] - 4:10, 23:25, 24:24, 29:3, 30:1, 30:2
MR [220] - 2:5, 2:7, 2:14, 2:18, 3:2, 3:5, 3:7, 3:15, 3:18, 3:20, 3:22, 4:8, 4:9, 4:12, 4:25, 5:4, 5:8, 5:20, 5:25, 6:4, 6:6, 6:8, 6:12, 6:14, 6:18, 6:20, 7:3, 7:9, 7:12, 7:17, 7:21, 8:5, 8:11, 8:14, 8:16, 8:19, 8:21, 9:4, 9:11, 9:20, 10:2, 10:5, 10:10, 10:24, 12:4, 12:11, 12:18, 12:24, 13:10, 13:14, 13:22, 13:24, 14:1, 14:2, 14:7, 14:9, 14:11, 14:12, 14:15, 14:20, 14:22, 15:1, 15:5, 15:7,

letters [3] - 40:4, 47:14
levels [1] - 37:24
limited [1] - 41:14
line [7] - 6:25, 8:6, 9:2, 38:13, 38:14, 38:18, 38:19
Line [2] - 2:20, 38:17
link [3] - 18:18, 22:22, 28:21
linking [1] - 28:24
links [1] - 22:23
list [1] - 8:25
listed [1] - 5:9
litigation [1] - 7:23
LLC [3] - 1:7, 1:8
LLP [1] - 1:20
lodge [1] - 41:3
logical [1] - 38:2
logically [1] - 36:25
look [20] - 3:24, 4:12, 9:17, 13:25, 14:3, 14:17, 16:10, 16:15, 19:3, 26:20, 37:6, 40:6, 41:8, 43:4, 44:19, 44:24, 47:22, 48:21, 50:19, 51:1
looked [5] - 10:6, 18:2, 18:22, 18:23, 28:14
looking [8] - 2:16, 3:18, 3:23, 3:24, 5:1, 12:19, 16:23, 42:8
looks [2] - 30:22, 31:2
lost [2] - 5:18, 6:3
lower [3] - 35:1, 36:15, 39:12
LTD [3] - 1:2, 1:7, 1:8

22:21, 25:14, 30:17, 35:24, 36:11, 42:1, 42:8, 47:11, 48:3, 48:23, 49:2, 49:11, 49:22, 50:2

M

mail [3] - 49:22, 49:24, 49:25
manager [1] - 12:13
mark [2] - 49:13, 49:15
Martinez [3] - 1:24, 54:3, 54:7
MASLEY [1] - 1:14
MASON [1] - 1:22
match [1] - 22:16
material [1] - 11:6
math [1] - 51:19
matter [2] - 2:2, 36:15, 52:23
Matthew [1] - 21:12

15:9, 15:12, 15:16, 15:23, 16:13, 16:15, 16:22, 17:1, 17:5, 17:7, 17:8, 17:10, 17:12, 17:16, 17:19, 17:22, 18:10, 18:21, 19:3, 19:8, 19:16, 20:12, 21:5, 21:20, 21:24, 22:13, 23:7, 23:11, 23:14, 23:21, 24:1, 24:7, 24:14, 24:25, 25:3, 25:5, 25:8, 25:13, 25:16, 25:19, 25:22, 26:1, 26:3, 26:7, 26:12, 26:14, 26:17, 26:22, 27:4, 27:10, 27:16, 27:20, 27:24, 28:5, 28:9, 28:22, 29:4, 29:10, 29:12, 29:14, 29:15, 29:19, 30:2, 30:5, 30:10, 30:13, 30:16, 30:21, 30:23, 30:24, 31:2, 31:7, 31:14, 31:16, 31:19, 31:23, 32:1, 32:8, 32:11, 32:13, 32:16, 32:19, 32:24, 33:3, 34:10, 34:14, 34:18, 34:20, 35:23, 36:1, 36:6, 36:9, 36:14, 38:15, 38:19, 39:7, 39:8, 39:10, 39:14, 39:17, 39:18, 40:8, 40:11, 40:14, 40:15, 40:17, 40:20, 40:22, 41:6, 42:7, 42:14, 42:20, 42:24, 43:7, 43:12, 43:21, 43:23, 43:25, 44:6, 44:15, 44:19, 44:22, 44:24, 45:8, 45:9, 45:11, 45:15, 45:17, 45:18, 46:5, 46:8, 46:14, 46:17, 46:22, 47:15, 48:6, 48:9, 48:15, 49:6, 49:19, 50:4, 50:17, 50:21, 51:6, 51:18, 52:2, 52:5, 52:10, 52:12, 52:16, 52:20, 53:4, 53:5, 53:8, 53:11, 53:23
MULTI [1] - 1:3
MULTI-STRATEGY [1] - 1:3
mutilated [1] - 36:22

N

name [6] - 6:16, 7:6, 9:1, 27:11, 36:20,

39:4

named [1] - 32:21
need [9] - 12:16, 20:9, 21:14, 32:2, 34:7, 43:3, 47:25, 48:5, 51:2
needed [1] - 2:24
negotiates [1] - 27:13
never [2] - 37:14, 39:14
new [5] - 2:11, 35:25, 36:11, 47:23, 49:11
NEW [2] - 1:1, 1:1
New [4] - 1:12, 1:18, 1:21
next [7] - 14:3, 15:5, 15:9, 52:18, 52:21, 52:24, 53:17
nine [1] - 39:22
none [4] - 17:23, 27:21, 29:19, 42:16
normally [2] - 51:16, 51:18
note [15] - 2:23, 7:25, 9:13, 9:24, 10:12, 16:4, 19:25, 34:21, 34:24, 35:12, 39:4, 39:5, 42:15, 42:18, 53:10
noted [2] - 2:1, 54:2
notes [65] - 3:25, 4:15, 4:16, 5:2, 5:6, 5:10, 5:12, 7:1, 7:10, 7:14, 7:20, 7:24, 9:25, 13:3, 14:3, 15:24, 16:1, 16:4, 18:16, 20:6, 20:18, 22:14, 23:4, 23:8, 23:17, 24:3, 24:4, 25:1, 25:16, 26:25, 27:7, 27:15, 27:22, 28:10, 29:5, 29:22, 30:2, 30:18, 31:4, 31:9, 31:20, 32:17, 33:1, 36:23, 37:13, 41:10, 41:14, 42:9, 42:25, 44:7, 44:10, 44:12, 44:13, 44:16, 44:25, 45:2, 49:9, 50:11, 50:23, 53:2
notice [6] - 13:17, 38:6, 41:9, 49:21, 50:13, 51:7
notwithstanding [1] - 10:21
November [6] - 17:6, 27:1, 28:11, 44:25, 45:14, 46:18
nowhere [1] - 36:23
number [21] - 8:22,

11:2, 11:3, 14:1, 14:19, 17:4, 17:9, 18:22, 18:25, 23:17, 26:15, 29:23, 35:4, 40:9, 41:17, 42:3, 42:13, 42:14, 46:22
numbers [7] - 4:4, 4:13, 4:23, 4:25, 28:15, 29:20, 42:16
NY [2] - 1:18, 1:21

O

objection [6] - 7:18, 7:21, 31:6, 31:7, 31:14, 31:15
obviously [1] - 4:3
October [5] - 6:23, 30:16, 45:4, 45:11, 45:16
OF [3] - 1:1, 1:1
office [1] - 52:15
one [24] - 4:5, 4:14, 8:3, 8:14, 8:22, 9:15, 10:10, 11:7, 14:17, 26:9, 32:16, 35:4, 36:25, 40:17, 40:19, 41:8, 41:17, 42:3, 46:22, 47:17, 48:9, 49:16, 50:22, 52:12
one's [1] - 37:11
one-third [1] - 40:17
open [2] - 44:21, 50:22
Opportunities [1] - 7:6
OPPORTUNITIES [1] - 1:3
opportunity [1] - 50:14
opposed [3] - 3:5, 37:3, 47:18
option [2] - 48:2
order [5] - 50:9, 50:10, 51:7, 52:14, 52:17
ordered [1] - 4:11
orders [1] - 24:12
original [4] - 21:18, 22:21, 34:3, 54:5
originals [1] - 36:23
otherwise [1] - 37:12
outset [1] - 11:24
outstanding [1] - 3:25
own [4] - 16:6, 20:6, 22:17, 47:24
owned [3] - 14:16, 16:6, 46:19
owner [7] - 7:5, 11:19, 14:24, 35:16, 39:21, 41:16, 43:2

6

owners [6] - 10:20, 35:25, 46:4, 47:12, 47:23, 49:12
ownership [7] - 9:12, 11:23, 20:25, 23:1, 29:2, 31:11, 46:10
owns [1] - 27:15

**P**

p.m [2] - 2:1, 54:2
Page [6] - 8:25, 12:15, 13:24, 16:17, 34:11, 39:3
page [7] - 14:3, 14:15, 25:9, 25:10, 25:23, 26:1, 40:17
pages [1] - 31:3
paid [1] - 51:11
Pala [53] - 2:2, 3:25, 4:15, 21:11, 26:18, 28:10, 32:17, 32:21, 33:10, 33:14, 34:4, 35:5, 35:16, 35:17, 35:19, 35:20, 37:22, 38:1, 38:4, 38:5, 38:18, 39:6, 39:21, 40:10, 40:25, 41:18, 41:21, 41:22, 42:1, 42:2, 42:5, 42:9, 43:9, 43:12, 43:16, 43:17, 43:20, 44:1, 44:10, 45:8, 45:21, 45:25, 46:7, 46:9, 46:19, 47:13, 48:4, 49:10, 50:23, 53:2, 53:12
PALA [1] - 1:2
Pala's [1] - 28:10
paper [1] - 42:23
papers [3] - 45:3, 45:16, 46:24
paragraph [6] - 6:24, 7:3, 8:5, 12:10, 12:15, 44:17
Paragraph [4] - 16:17, 17:12, 44:24, 45:1
Paribas [1] - 27:9
Park [1] - 1:21
Part [1] - 49:25
part [2] - 4:1, 5:18
parte [1] - 24:13
participant [7] - 7:4, 8:6, 9:14, 10:7, 10:13, 15:7, 19:22
participants [2] - 10:2, 10:19
participate [1] - 41:3
particular [1] - 10:3
parties [2] - 10:19,

46:23
partner [1] - 52:10
Partner [2] - 7:7, 9:21
PARTNERS [3] - 1:3, 1:3, 1:4
Partners [11] - 7:5, 9:6, 9:15, 9:17, 10:12, 10:17, 12:13, 15:2, 18:15, 19:6
party [4] - 21:25, 34:1, 34:3, 36:25
patience [1] - 24:24
pause [1] - 24:17
payment [1] - 41:1
payments [8] - 23:9, 23:15, 23:16, 29:7, 29:23, 31:17, 31:21, 51:11
people [1] - 34:25
per [1] - 35:6
perhaps [1] - 6:4
period [1] - 45:19
permission [2] - 22:14, 22:16
person [1] - 39:4
picking [2] - 2:8, 2:11
piece [4] - 9:16, 19:9, 47:21, 50:23
pieces [3] - 10:25, 11:1, 20:16
pile [1] - 49:4
PINPOINT [1] - 1:2
pinpoint [11] - 5:21, 9:12, 9:15, 21:9, 32:18, 40:19, 44:7, 44:16, 44:20, 46:9, 47:19
place [1] - 19:11
places [2] - 36:17, 36:25
plaintiff [6] - 22:25, 31:10, 32:22, 43:18, 43:23, 47:2
Plaintiffs [2] - 1:6, 1:17
plaintiffs [10] - 2:22, 29:1, 32:21, 33:1, 33:18, 33:22, 41:25, 42:6, 43:15, 47:18
plan [1] - 4:10
plus [4] - 26:17, 29:22, 31:20, 36:10
point [19] - 10:10, 10:24, 11:9, 12:4, 13:19, 18:11, 18:25, 21:13, 23:8, 27:6, 27:22, 33:5, 33:8, 39:10, 40:18, 43:7, 43:10, 51:6
pointed [2] - 16:16,

28:6
points [3] - 3:10, 10:8, 41:7
portion [1] - 21:7
position [5] - 9:5, 12:1, 18:19, 34:23, 37:7
practice [1] - 22:3
prepared [3] - 3:9, 4:13, 43:5
presented [2] - 13:1, 20:15
previously [1] - 7:22
primary [1] - 8:22
principal [6] - 14:16, 23:16, 24:4, 29:6, 29:22, 31:20
principally [1] - 13:18
principle [2] - 5:10, 31:12
problem [2] - 36:12, 44:5
problems [1] - 37:15
proceed [5] - 37:21, 47:2, 47:23, 49:18, 53:14
proceeding [2] - 41:1, 53:7
process [1] - 49:21
produced [1] - 14:22
promise [1] - 24:16
proof [3] - 13:13, 41:3, 45:1
propose [3] - 24:2, 50:14, 52:22
prosecute [1] - 41:2
provide [1] - 21:21
proxies [4] - 34:24, 37:9, 37:12, 39:20
proxy [13] - 35:5, 37:13, 37:14, 37:18, 38:3, 38:4, 38:5, 38:23, 40:1, 40:2, 40:10, 41:19, 42:3
PT [1] - 1:1
pulled [1] - 46:3
purchase [5] - 26:25, 27:5, 28:10, 45:1, 45:20
purchased [3] - 26:18, 28:10, 44:25
pure [1] - 33:7
purported [1] - 34:1
purporting [1] - 42:2
purposes [1] - 28:16
put [14] - 4:2, 11:22, 16:24, 20:4, 20:24, 21:8, 21:9, 32:2, 46:16, 47:5, 47:8, 49:4, 49:22, 51:18

putting [1] - 47:24

**Q**

quick [1] - 24:16
quicker [1] - 49:1
quite [3] - 36:9, 42:12, 42:15
quote [1] - 38:23

**R**

raise [1] - 7:22
raised [3] - 7:21, 42:8, 45:21
raising [1] - 22:19
rather [1] - 8:2
re [1] - 6:25
reading [2] - 11:10, 38:2
really [4] - 4:20, 24:21, 37:1
reason [4] - 3:15, 3:23, 13:17, 28:5
reasons [4] - 28:23, 31:9, 49:8, 50:11
recalled [1] - 24:18
recent [1] - 28:13
recognize [1] - 10:13
recollection [1] - 11:10
record [15] - 5:12, 11:10, 11:13, 12:12, 24:23, 26:4, 26:25, 41:10, 43:9, 44:6, 46:15, 50:12, 51:5, 54:5
recorded [1] - 36:21
records [17] - 6:15, 11:3, 11:8, 20:10, 21:8, 21:15, 25:22, 30:22, 33:13, 36:21, 43:15, 44:8, 44:9, 45:6, 46:3, 46:13, 47:12
recover [1] - 20:17
refer [2] - 5:13, 13:18
referee [1] - 53:19
reference [19] - 5:4, 6:24, 6:25, 7:9, 7:22, 8:1, 13:3, 13:19, 14:4, 14:18, 15:2, 15:17, 15:18, 18:24, 26:8, 26:15, 31:3, 31:5
references [4] - 8:4, 14:16, 16:18, 16:19
referred [1] - 34:10
referring [2] - 3:16, 38:20

refers [2] - 7:3, 45:1
reflect [3] - 5:1, 5:12, 28:7
reflected [1] - 13:2
reflects [5] - 7:12, 9:20, 26:17, 30:11, 30:16
regard [6] - 7:15, 7:19, 13:9, 23:4, 45:25, 50:8
regarding [1] - 2:12
register [3] - 37:2, 39:5, 39:6
registered [27] - 2:23, 9:13, 9:24, 10:21, 11:18, 14:10, 19:23, 34:20, 34:24, 35:2, 35:12, 35:14, 36:18, 36:20, 36:24, 37:2, 37:5, 37:10, 37:17, 38:10, 38:13, 38:16, 39:5, 39:12, 39:13, 39:16, 39:19
rehash [1] - 3:10
relevant [2] - 4:20, 5:22
relied [1] - 44:8
relies [1] - 10:14
rely [4] - 21:17, 21:23, 21:24, 22:6
relying [2] - 22:2, 37:25
remaining [1] - 49:16
remember [1] - 22:11
removed [1] - 37:25
repeatedly [1] - 16:17
replacement [1] - 36:22
reply [1] - 16:24
report [1] - 2:12
Reporter [2] - 1:24, 54:8
representations [1] - 10:14
request [3] - 36:21, 36:22, 50:22
research [1] - 47:25
resolved [1] - 4:16
respect [3] - 10:25, 30:17, 32:17
respectfully [1] - 21:6
response [2] - 21:5, 35:3
restructured [1] - 41:23
ridiculous [1] - 50:7
rights [5] - 35:10, 35:19, 38:7, 38:11, 41:25
risk [1] - 22:3

7

**Rolta** [4] - 2:3, 14:19, 14:20, 16:11
**ROLTA** [7] - 1:7, 1:8, 1:8, 1:9
**route** [1] - 49:3
**row** [1] - 14:17
**rule** [1] - 48:18
**ruled** [1] - 29:17
**ruling** [2] - 31:8, 48:24

**S**

**sale** [2] - 43:14
**scenario** [7] - 3:23, 3:24, 4:13, 4:14, 4:18, 4:21, 4:22
**scenarios** [1] - 3:22
**seat** [3] - 7:16, 9:10, 15:20
**second** [8] - 6:24, 7:3, 8:5, 8:15, 14:6, 14:15, 19:11, 27:4
**secondhand** [1] - 18:7
**Section** [2] - 14:23, 34:11
**section** [5] - 15:9, 35:6, 36:19, 37:7, 37:16
**sections** [2] - 14:5, 14:18
**securities** [1] - 42:11
**security** [1] - 9:1
**see** [24] - 2:3, 5:9, 6:22, 6:24, 7:9, 9:1, 9:19, 12:25, 13:2, 13:7, 13:21, 14:4, 14:15, 14:18, 14:23, 14:24, 15:2, 19:11, 26:3, 26:24, 27:7, 41:4, 47:21, 48:17
**seeking** [1] - 23:6
**self** [2] - 11:7, 11:12
**self-authenticating** [1] - 11:12
**sell** [5] - 37:13, 37:23, 44:4, 46:23, 47:1
**sells** [1] - 37:13
**send** [2] - 49:24, 53:19
**Senior** [2] - 1:24, 54:8
**sent** [1] - 43:20
**separate** [2] - 16:1, 16:7
**separately** [1] - 28:12
**September** [1] - 8:18
**SEQUOIA** [1] - 1:19
**Sequoia** [1] - 2:5
**serve** [1] - 41:2
**set** [6] - 12:2, 19:17, 20:22, 27:24, 42:25, 43:1

**sets** [1] - 32:20
**settle** [1] - 51:7
**setup** [1] - 9:12
**seven** [1] - 31:2
**sever** [3] - 50:20, 50:22, 50:24
**several** [1] - 13:6
**shall** [1] - 32:9
**shares** [2] - 42:22, 42:23
**sheet** [2] - 50:9, 52:8
**shoes** [1] - 41:21
**short** [2] - 27:11, 52:17
**show** [5] - 8:3, 11:25, 13:6, 18:16, 45:23
**showing** [5] - 16:9, 45:4, 45:19, 45:20, 46:9
**shows** [4] - 28:17, 28:18, 44:7, 46:3
**side** [1] - 52:3
**sides** [1] - 20:3
**sign** [2] - 24:12, 32:7
**simplest** [1] - 36:6
**SIRI** [1] - 1:20
**situation** [1] - 48:11
**six** [1] - 31:2
**sold** [10] - 32:25, 33:17, 43:17, 43:20, 43:24, 44:3, 45:22, 46:10, 46:20
**solved** [1] - 36:12
**someone** [4] - 37:23, 38:6, 41:19, 41:20
**soon** [1] - 50:6
**sorry** [14] - 2:9, 5:14, 14:12, 16:22, 17:17, 22:24, 24:10, 24:19, 25:10, 26:12, 30:24, 31:18, 33:9, 41:12
**SPC** [2] - 1:3, 7:5
**SPC-VALUE** [1] - 1:3
**specifically** [2] - 3:12, 10:16
**spells** [2] - 17:1, 26:22
**spent** [1] - 42:15
**standard** [1] - 20:13
**standing** [5] - 20:17, 29:1, 34:2, 34:3, 34:5
**Stanley** [1] - 21:11
**STARNER** [164] - 1:18, 2:5, 2:14, 2:18, 3:2, 3:5, 3:7, 3:15, 3:18, 3:20, 3:22, 4:8, 4:12, 4:25, 5:4, 5:8, 5:20, 5:25, 6:4, 6:8, 6:12, 6:14, 6:18, 6:20, 7:3, 7:9, 7:12, 7:17, 8:16,

9:11, 9:20, 10:2, 10:5, 10:10, 10:24, 12:4, 12:11, 12:18, 12:24, 13:10, 13:14, 13:22, 13:24, 14:2, 14:7, 14:9, 14:12, 14:15, 14:20, 14:22, 15:1, 15:5, 15:7, 15:9, 15:12, 15:16, 16:22, 17:1, 17:5, 17:8, 17:10, 17:12, 18:10, 18:21, 19:3, 19:16, 20:12, 23:7, 23:11, 23:14, 24:1, 24:7, 24:14, 24:25, 25:3, 25:5, 25:8, 25:13, 25:16, 25:19, 25:22, 26:1, 26:3, 26:7, 26:12, 26:14, 26:17, 26:22, 27:4, 27:10, 27:16, 27:20, 27:24, 28:5, 28:9, 29:4, 29:14, 29:19, 30:2, 30:5, 30:10, 30:13, 30:16, 30:21, 30:24, 31:2, 31:16, 31:19, 31:23, 32:13, 32:16, 32:19, 32:24, 33:3, 34:10, 34:14, 34:18, 34:20, 35:23, 36:1, 36:6, 39:7, 39:10, 39:14, 39:17, 40:11, 40:14, 41:6, 43:7, 43:12, 43:21, 43:23, 43:25, 44:6, 44:15, 44:19, 44:22, 44:24, 45:9, 45:15, 45:18, 46:5, 46:8, 46:14, 46:22, 47:15, 48:6, 48:9, 48:15, 49:6, 49:19, 50:4, 50:17, 50:21, 51:6, 51:18, 52:2, 52:12, 52:16, 52:20, 53:4, 53:8, 53:11, 53:23
**Starner** [7] - 2:3, 5:15, 5:25, 18:5, 25:8, 30:11, 40:23
**Starner's** [1] - 2:17
**start** [7] - 5:5, 5:8, 20:3, 24:2, 24:7, 24:11, 33:6
**starting** [1] - 24:25
**STATE** [1] - 1:1
**statement** [5] - 13:1, 21:9, 28:14, 43:10, 44:1
**statements** [4] - 21:8, 28:18, 45:2, 45:19
**states** [2] - 18:4, 34:20

**stating** [1] - 18:5
**status** [1] - 52:21
**stenographic** [1] - 54:5
**step** [1] - 41:20
**sticking** [1] - 28:3
**still** [11] - 6:21, 13:7, 16:14, 21:25, 28:20, 32:2, 37:25, 47:2, 47:20, 53:20
**story** [1] - 20:17
**STRATEGY** [1] - 1:3
**Street** [1] - 1:11
**strongly** [1] - 48:19
**structure** [6] - 11:23, 12:1, 17:2, 17:22, 18:4
**structured** [4] - 10:18, 12:7, 17:14, 48:19
**sub** [1] - 41:23
**submit** [10] - 32:7, 36:24, 49:25, 50:1, 50:13, 51:3, 51:14, 52:13, 52:14, 52:15
**submitted** [4] - 33:12, 45:23, 49:13, 49:15
**suddenly** [1] - 37:24
**sue** [1] - 20:17
**sufficient** [2] - 20:16, 20:21
**suggest** [1] - 11:20, 20:24
**suggesting** [1] - 47:7
**suit** [1] - 40:25
**summary** [18] - 4:2, 4:6, 4:15, 4:16, 20:13, 23:3, 23:23, 29:17, 32:1, 32:5, 33:16, 45:3, 45:7, 45:15, 45:22, 46:19, 49:8, 50:25
**supplement** [3] - 45:5, 46:15, 46:24
**supplemental** [1] - 16:23
**SUPREME** [1] - 1:1
**Supreme** [1] - 1:14
**system** [3] - 10:18, 42:24, 43:1

**T**

**ten** [2] - 39:22, 50:14
**term** [1] - 36:18
**TERM** [1] - 1:1
**terms** [3] - 11:23, 12:8, 41:16
**THE** [192] - 1:1, 2:2, 2:6, 2:8, 2:15, 2:20, 3:3, 3:6, 3:14, 3:17,

3:19, 3:21, 4:5, 4:10, 4:24, 5:3, 5:7, 5:18, 5:23, 6:2, 6:7, 6:10, 6:13, 6:16, 6:19, 7:2, 7:8, 7:11, 7:15, 7:18, 8:3, 8:8, 8:13, 8:17, 8:20, 9:3, 9:5, 9:19, 10:1, 10:4, 10:8, 10:23, 12:3, 12:10, 12:12, 12:23, 13:5, 13:12, 13:21, 13:23, 14:6, 14:8, 14:10, 14:13, 14:19, 14:21, 14:25, 15:4, 15:6, 15:8, 15:11, 15:14, 15:18, 16:11, 16:14, 16:25, 17:4, 17:9, 17:11, 17:15, 17:18, 17:21, 18:13, 19:1, 19:5, 19:13, 20:11, 21:17, 21:22, 22:9, 22:20, 23:10, 23:13, 23:19, 23:22, 24:6, 24:10, 24:15, 24:19, 25:2, 25:4, 25:7, 25:12, 25:15, 25:18, 25:21, 25:25, 26:2, 26:5, 26:11, 26:13, 26:16, 26:21, 27:3, 27:8, 27:12, 27:19, 27:23, 28:2, 28:8, 28:20, 28:23, 29:8, 29:11, 29:16, 29:24, 30:4, 30:9, 30:12, 30:15, 30:20, 31:1, 31:6, 31:8, 31:15, 31:18, 31:22, 31:24, 32:5, 32:9, 32:15, 32:18, 32:23, 33:2, 34:9, 34:13, 34:17, 34:19, 35:21, 35:24, 36:5, 36:8, 36:13, 38:12, 38:16, 39:3, 39:13, 39:16, 40:6, 40:9, 40:13, 40:16, 40:19, 40:21, 40:24, 42:12, 42:19, 42:22, 43:1, 43:11, 43:19, 43:22, 43:24, 44:2, 44:14, 44:17, 44:21, 44:23, 45:25, 46:6, 46:11, 47:11, 47:22, 48:7, 48:14, 48:20, 49:7, 49:24, 50:5, 50:18, 51:1, 51:14, 51:22, 52:4, 52:8, 52:13, 52:19, 52:23, 53:6, 53:9, 53:16, 53:24
**therefore** [1] - 18:3
**they've** [3] - 8:10,

34:6, 34:10

**third** [3] - 21:25, 38:18, 40:17

**third-party** [1] - 21:25

**thirty** [2] - 34:13, 34:14

**thirty-eight** [1] - 34:14

**thirty-two** [1] - 34:13

**three** [11] - 3:23, 3:24, 4:13, 4:18, 4:22, 14:2, 32:20, 36:17, 36:24, 37:24, 42:16

**throughout** [1] - 7:23

**throw** [1] - 28:15

**timing** [1] - 53:15

**titles** [1] - 22:11

**today** [8] - 3:3, 24:20, 24:21, 33:14, 43:6, 46:1, 50:9, 52:24

**together** [1] - 20:16

**took** [1] - 17:3

**top** [3] - 11:17, 17:24, 21:1

**total** [6] - 23:16, 27:6, 29:5, 29:21, 29:22, 31:19

**touch** [1] - 27:18

**trace** [1] - 43:8

**transaction** [1] - 27:13

**transcript** [5] - 3:1, 49:15, 49:17, 50:1, 50:3

**transcription** [1] - 54:5

**transfer** [9] - 33:4, 33:8, 38:5, 40:1, 41:4, 42:2, 42:21, 45:13, 49:10

**transferable** [1] - 40:5

**transferred** [4] - 32:25, 33:18, 37:14, 45:13

**transfers** [2] - 38:1, 46:7

**trial** [4] - 53:7, 53:10, 53:19, 53:21

**trials** [1] - 53:22

**true** [3] - 20:7, 46:22, 54:4

**trying** [3] - 16:20, 16:21, 48:12

**turn** [1] - 37:23

**turns** [2] - 19:19, 19:21

**twenty** [1] - 14:2

**twenty-three** [1] - 14:2

**two** [13] - 2:21, 3:24, 16:7, 33:1, 33:18, 34:13, 34:14, 41:6, 41:18, 42:3, 46:20,

46:22, 50:22

## U

**U.K** [1] - 1:8

**UBS** [2] - 21:13, 42:11

**ultimate** [2] - 10:19, 10:21

**ultimately** [1] - 11:9

**uncontested** [1] - 44:11

**undefined** [1] - 35:1

**under** [9] - 11:12, 24:4, 35:10, 38:8, 38:24, 41:11, 41:12, 41:13, 42:1

**understandable** [1] - 24:14

**understood** [2] - 29:19, 48:9

**undisputed** [3] - 22:10, 42:5, 44:11

**unless** [1] - 53:18

**up** [24] - 2:8, 2:11, 4:2, 12:2, 12:17, 15:19, 18:12, 19:17, 20:22, 20:24, 22:16, 22:22, 22:23, 24:12, 26:9, 29:4, 36:16, 40:18, 42:25, 43:1, 48:25, 50:6, 50:21, 53:20

**updated** [1] - 47:17

**upper** [2] - 35:2, 36:15

**US** [1] - 48:10

**uses** [2] - 37:5, 37:7

## V

**Valentine's** [2] - 24:20, 53:25

**VALUE** [3] - 1:3, 1:3, 1:4

**Value** [11] - 7:5, 7:7, 9:6, 9:15, 9:17, 9:21, 10:17, 12:13, 15:1, 18:15, 19:6

**value** [2] - 7:20, 13:3

**Valued** [2] - 7:5, 10:12

**various** [1] - 5:11

**verbatim** [1] - 54:4

**versus** [1] - 36:15

**Vincent** [1] - 21:10

**volumes** [1] - 5:19

**VP** [41] - 2:20, 3:17, 5:1, 5:5, 5:8, 5:22, 7:7, 7:13, 7:19, 7:23, 12:14, 13:19, 15:2, 17:20, 18:20, 20:20, 22:24, 23:9, 23:17, 24:2, 24:25, 25:16,

26:6, 29:5, 29:21, 30:3, 30:19, 31:4, 31:10, 31:19, 37:22, 44:7, 44:16, 44:20, 45:9, 45:20, 45:22, 46:9, 47:13, 47:19

## W

**wait** [2] - 14:6, 49:14

**walk** [4] - 3:12, 4:22, 11:3, 11:24

**walked** [1] - 18:1

**walking** [1] - 12:20

**wants** [1] - 46:16

**weddings** [1] - 24:21

**week** [3] - 52:18, 52:21, 52:24

**weeks** [1] - 46:20

**WHITE** [1] - 1:16

**whole** [4] - 10:18, 38:25, 39:10, 52:23

**willing** [3] - 21:23, 21:24, 22:3

**wish** [1] - 47:23

**witness** [8] - 5:22, 12:5, 17:13, 19:25, 43:16, 43:25, 44:1

**witnesses** [2] - 44:10, 44:11

**Woo** [6] - 5:19, 5:21, 13:16, 14:8, 44:15

**works** [1] - 46:24

**wrap** [1] - 29:4

**write** [1] - 47:25

## Y

**year** [1] - 36:10

**YIELD** [1] - 1:4

**YORK** [2] - 1:1, 1:1

**York** [4] - 1:12, 1:18, 1:21

**Young** [1] - 21:13

# EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PALA ASSETS HOLDINGS LTD.,                  :
PINPOINT MULTI-STRATEGY FUND,               :
VALUE PARTNERS FIXED INCOME SPC –           :
VALUE PARTNERS CREDIT OPPORTUNITIES         :     Index No. 652798/2018
FUND, VALUE PARTNERS GREATER               :
CHINA HIGH YIELD INCOME FUND,               :     Hon. Andrea Masley
                                            :
                                            :        **F I L E D**
                            Plaintiffs,     :
                                            :      **Dec 01 2020**
                                            :        NEW YORK
                     -against-              :    COUNTY CLERK'S OFFICE
                                            :
ROLTA, LLC, ROLTA INDIA LTD.,               :     [PROPOSED] SUPPLEMENTAL
ROLTA INTERNATIONAL, INC.,                  :     **ORDER AND JUDGMENT**
ROLTA U.K. LTD.,                            :
ROLTA MIDDLE EAST FZ-LLC,                   :
ROLTA AMERICAS LLC, and                     :
ROLTA GLOBAL B.V.,                          :
                                            :
                            Defendants.     :
                                            :        11/9/2020

---

Plaintiffs Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund

("VP Credit"), Value Partners Greater China High Yield Income Fund ("VP China" and, together

with VP Credit, "Value Partners"), and Pinpoint Multi-Strategy Fund ("Pinpoint" and, collectively

with Value Partners, "Plaintiffs"), having moved before this Court for an order, pursuant to CPLR

3212, granting summary judgment on Plaintiffs' breach of contract claims and directing entry of

judgment in favor of Plaintiffs and against Defendants (the "Motion") in the amount of

$187,098,105.00, plus interest, for failure to make payment on notes issued pursuant to the

indenture agreements dated May 16, 2013 (the "2018 Indenture") and July 24, 2014 (the "2019

Indenture"),

1

UPON reviewing Plaintiffs' Notice of Motion for Summary Judgment and accompanying Memorandum of Law, dated September 24, 2019 (NYSCEF Nos. 269, 270); the Joint Statement of Undisputed Facts, dated September 23, 2019 (NYSCEF No. 271); the Affirmation of Kevin Wu, dated September 23, 2019 (NYSCEF No. 272); the Affirmation of Edwin Kam, dated September 23, 2019 (NYSCEF No. 289); the Affirmation of Alain Nydegger, dated September 19, 2019 (NYSCEF No. 306); the Affirmation of Gregory M. Starner, dated September 24, 2019 (NYSCEF No. 308); the Affidavit of Vincent Gerosa, dated August 8, 2019 (NYSCEF No. 313); the Affidavit of Matthew Young, dated July 31, 2019 (NYSCEF No. 319); and the corresponding exhibits annexed thereto, and upon reviewing Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, dated October 31, 2019 (NYSCEF No. 322); Plaintiffs' Reply Memorandum of Law, dated November 14, 2019 (NYSCEF No. 323); the Affirmation of Edwin Kam, dated November 14, 2019 (NYSCEF No. 324); the Affirmation of Gregory M. Starner, dated November 14, 2019, and Exhibit 1 thereto (NYSCEF Nos. 325, 326); the Affirmation of Kevin Wu, dated April 27, 2020 (NYSCEF No. 364), and the Affidavit of Jeanne Mauro, dated April 23, 2020 (NYSCEF No. 366), as well as the corresponding exhibits annexed thereto,

NOW, the parties having appeared by their respective counsel before this Court for argument on the Motion, and for the reasons set forth in the Amended Decision and Order, dated October 16, 2020 (NYSCEF No. 387), it is hereby

ORDERED that summary judgment is granted to Pinpoint and VP China on their claims relating to the notes purchased from Pala Assets Holdings Ltd.—in addition to those claims previously disposed of by the Order and Judgment entered on September 2, 2020 (NYSCEF No. 350)—as set forth herein, and it is

ORDERED that the claims decided herein are hereby severed from the remainder of the

action to permit the entry of judgment on such claims, and it is further

ADJUDGED and ORDERED that Plaintiffs

| Plaintiff Name | Plaintiff Address |
|---|---|
| Pinpoint Multi-Strategy Fund ("Pinpoint") | Two International Finance Centre Level 33 8 Finance Street, Central Hong Kong |
| Value Partners Greater China High Yield Income Fund ("VP China") | The Center 43rd Floor, 99 Queens Road, Central Hong Kong |

are entitled to summary judgment on their claims against Defendants, identified herein as

**The 2018 Issuer & Guarantors:**

| Defendant Name | Defendant Address |
|---|---|
| Rolta, LLC | 5865 North Point Parkway, Ste. #300, Alpharetta, GA 30022 |
| Rolta India Ltd. | Rolta Tower A, Rolta Technology Park, 22nd Street MIDC-Marol Andheri (East), Mumbai 400 093 India |
| Rolta International, Inc. | 5865 North Point Parkway, Ste. #300, Alpharetta, GA 30022 |
| Rolta U.K. Ltd. | 100 Longwater Avenue Green Park, Reading RG2 6GP United Kingdom |
| Rolta Middle East FZ-LLC | Office No. 210 Building No. 9, P.O. Box 500106 Dubai Internet City, Dubai U.A.E. |

**The 2019 Issuer & Guarantors:**

| Defendant Name | Defendant Address |
|---|---|
| Rolta Americas LLC | 5865 North Point Parkway, Ste. #300, Alpharetta, GA 30022 |
| Rolta India Ltd. | Rolta Tower A, Rolta Technology Park, 22nd Street MIDC-Marol Andheri (East), Mumbai 400 093 India |
| Rolta International, Inc. | 5865 North Point Parkway, Ste. #300, Alpharetta, GA 30022 |

| Rolta U.K. Ltd. | 100 Longwater Avenue Green Park, Reading RG2 6GP United Kingdom |
| Rolta Middle East FZ-LLC | Office No. 210 Building No. 9, P.O. Box 500106 Dubai Internet City, Dubai U.A.E. |
| Rolta Global B.V. | Siriusdreef 17, 2132WT Hoofddorp, The Netherlands |

as follows:

It is ADJUDGED that

1. **PLAINTIFF PINPOINT** have judgment and recover from:

   a. **THE 2019 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on those 2019 Notes purchased from Pala Assets Holdings Ltd. in the amount of $17,448,350.66 ($13,313,000.00 in principal plus $4,135,350.66 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of Pinpoint's 2019 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
| --- | --- | --- |
| $13,313,000.00 | July 24, 2019 | $1,628,198.14 |
| | Total Pre-Judgment Interest Due: | $1,628,198.14 |

**Missed Interest Payments on Pinpoint's 2019 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
| --- | --- | --- |
| $590,764.38 | July 24, 2016 | $231,757.68 |
| $590,764.38 | January 24, 2017 | $204,954.78 |
| $590,764.38 | July 24, 2017 | $178,588.88 |
| $590,764.38 | January 24, 2018 | $151,785.98 |
| $590,764.38 | July 24, 2018 | $125,420.09 |
| $590,764.38 | January 24, 2019 | $98,617.19 |
| $590,764.38 | July 24, 2019 | $72,251.29 |
| | Total Pre-Judgment Interest Due: | $1,063,375.89 |

For a total judgment in favor of Pinpoint and against the 2019 Issuer & Guarantors in the sum of $20,139,924.69 X , and that plaintiff Pinpoint have execution thereon.

2. **PLAINTIFF VP CHINA** have judgment and recover from:

a. **THE 2018 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on those 2018 Notes purchased from Pala Assets Holdings Ltd. in the amount of $1,839,687.50 ($1,450,000.00 in principal plus $389,687.50 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of VP China's 2018 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $1,450,000.00 | May 16, 2018 | $332,506.85 |
| | Total Pre-Judgment Interest Due: | $332,506.85 |

**Missed Interest Payments on VP China's 2018 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $77,937.50 | May 16, 2016 | $31,900.99 |
| $77,937.50 | November 16, 2016 | $28,364.98 |
| $77,937.50 | May 16, 2017 | $24,886.62 |
| $77,937.50 | November 16, 2017 | $21,350.60 |
| $77,937.50 | May 16, 2018 | $17,872.24 |
| | Total Pre-Judgment Interest Due: | $124,375.43 |

For a total judgment in favor of VP China and against the 2018 Issuer & Guarantors in the sum of $2,296,569.78 X , and that plaintiff VP China have execution thereon.

b. **THE 2019 ISSUER & GUARANTORS**, jointly and severally, on its claims for past due principal and interest on those 2019 Notes purchased from Pala Assets Holdings Ltd. in the amount of $14,416,875.00 ($11,000,000.00 in principal plus $3,416,875.00 in missed interest payments) plus interest at the rate of 9% per annum through the entry of judgment calculated as follows:

**Principal of VP China's 2019 Notes**

| Principal Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $11,000,000.00 | July 24, 2019 | $1,345,315.07 |
| | Total Pre-Judgment Interest Due: | $1,345,315.07 |

**Missed Interest Payments on VP China's 2019 Notes**

| Missed Interest Payment Amount | Date Interest Began Accruing | Pre-Judgment Interest Due: |
|---|---|---|
| $488,125.00 | July 24, 2016 | $191,492.11 |
| $488,125.00 | January 24, 2017 | $169,345.94 |
| $488,125.00 | July 24, 2017 | $147,560.86 |
| $488,125.00 | January 24, 2018 | $125,414.69 |
| $488,125.00 | July 24, 2018 | $103,629.61 |
| $488,125.00 | January 24, 2019 | $81,483.44 |
| $488,125.00 | July 24, 2019 | $59,698.36 |
| | Total Pre-Judgment Interest Due: | $878,625.01 |

For a total judgment in favor of VP China and against the 2019 Issuer & Guarantors in the sum of $16,640,815.08_____, and that plaintiff VP China have execution thereon.            X

Judgment signed and entered this 1st day of ___December_____, 2020.

ENTER:

_____
J.S.C.

11/9/2020

**FILED**
**Dec 01 2020**
NEW YORK
COUNTY CLERK'S OFFICE

Milton Adair Tingling
Clerk

AMERICAS 104524897

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                        INDEX # 652798/2018

*Pala Assets Holdings Ltd, Pinpoint Multi-Strategy Fund,*
*Value Partners Fixed Income SPC - Valued Partners*
*Credit Opportunities Fund, Valued Partners Greater*
*China High Yield Income Fund*

Plaintiff(s)/Petitioner(s)

Against

*Rolta, LLC, Rolta India Ltd, Rolta International Inc.,*
*Rolta Uk Ltd, Rolta Middle East FZ-LLC, Rolta Americas*
*LLC, Rolta Global B.V.*

Defendant(s)/Respondent(s)

2 – 7
**FILED AND DOCKETED**
**Dec 01 2020**
AT          02:07 P     M
N.Y. CO. CLK'S OFFICE

## JUDGMENT

*Attorney for the Prevailing Party*

WHITE & CASE LLP
1221 Avenue Of The Americas, New York, NY 10020
(212) 819-8200

# EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PALA ASSETS HOLDINGS LTD.,
PINPOINT MULTI-STRATEGY FUND,
VALUE PARTNERS FIXED INCOME SPC –
VALUE PARTNERS CREDIT
OPPORTUNITIES FUND,
VALUE PARTNERS GREATER CHINA HIGH
YIELD INCOME FUND,

Index No. 652798/2018

Hon. Andrea Masley

Plaintiffs,

-against-

ROLTA, LLC, ROLTA INDIA LTD., ROLTA
INTERNATIONAL, INC., ROLTA U.K. LTD.,
ROLTA MIDDLE EAST FZ-LLC, ROLTA
AMERICAS LLC, and ROLTA GLOBAL B.V.,

Defendants.

**NOTICE OF SUGGESTION OF
BANKRUPTCY**

WHEREFORE, ROLTA, LLC, ROLTA INTERNATIONAL, INC., ROLTA U.K. LTD.,

ROLTA MIDDLE EAST FZ-LLC, ROLTA AMERICAS LLC, and ROLTA GLOBAL B.V.,  are

defendants in the above styled matter.

PLEASE TAKE NOTICE that, on October 29, 2020, ROLTA, LLC filed a petition for

relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy

Court, Northern District of Alabama, Northern Division in Case No. 20-82283-CRJ11.

PLEASE TAKE FURTHER NOTICE that, on October 29, 2020, ROLTA

INTERNATIONAL, INC. filed a petition for relief under Chapter 11 of the United States

Bankruptcy Code with the United States Bankruptcy Court, Northern District of Alabama,

Northern Division in Case No. 20-82282-CRJ11.

PLEASE TAKE FURTHER NOTICE that, on October 29, 2020, ROLTA U.K. LTD. filed a petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, Northern District of Alabama, Northern Division in Case No. 20-82287-CRJ11.

PLEASE TAKE FURTHER NOTICE that, on October 29, 2020, ROLTA MIDDLE EAST FZ-LLC filed a petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, Northern District of Alabama, Northern Division in Case No. 20-82285-CRJ11.

PLEASE TAKE FURTHER NOTICE that, on October 29, 2020, ROLTA AMERICAS LLC filed a petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, Northern District of Alabama, Northern Division in Case No. 20-82286-CRJ11.

PLEASE TAKE FURTHER NOTICE that, on October 29, 2020, ROLTA GLOBAL B.V. filed a petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court, Northern District of Alabama, Northern Division in Case No. 20-82284-CRJ11.

PLEASE BE ADVISED that, upon said filings, an automatic stay order was issued under the authority of said Federal Court, pursuant to 11 U.S.C. § 362, enjoining all creditors and claimants, from proceeding with any legal actions at this time.

PLEASE BE FURTHER ADVISED that, said stay order was effective as of the time of issuance and continues in effect at this time.

2

Dated: October 30, 2020

SIRI & GLIMSTAD LLP

Mason Barney
200 Park Avenue
17th Floor
New York, New York 10166
Tel: (212) 532-1091

*Attorneys for Defendants*

To:  Geoffrey Derrick, Esq. (via electronic filing, email and FedEx)
     Gregory M. Starner, Esq. (via electronic filing and email)
     John Han, Esq. (via electronic filing and email)
     Leif Simonson, Esq. (via electronic filing and email)
     Kimberly Ann Havlin, Esq. (via electronic filing and email)
     Christopher Volpe, Esq. (via electronic filing and email)
     Lawrence Moscowitz, Esq. (via electronic filing)
     Sequoia Kaul Barry, Esq. (via electronic filing and email)
     Josef Klazen, Esq. (via electronic filing and email)
     Jeremy Bressman, Esq. (via electronic filing and email)

# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

*[handwritten]* Rola Asset Holdings Ltd

PINPOINT MULTI-STRATEGY MASTER FUND (f/k/a
PINPOINT MULTI-STRATEGY FUND), VALUE
PARTNERS FIXED INCOME SPC – VALUE
PARTNERS CREDIT OPPORTUNITIES FUND SP,
VALUE PARTNERS GREATER CHINA HIGH YIELD
INCOME FUND,

    *Plaintiffs/Judgment Creditors,*

    v.

ROLTA, LLC, ROLTA INDIA LIMITED, ROLTA
INTERNATIONAL, INC., ROLTA UK LIMITED,
ROLTA MIDDLE EAST FZ-LLC, ROLTA AMERICAS,
LLC, ROLTA GLOBAL BV,

    *Defendants/Judgment Debtors.*

~~PROPOSED~~ **ORDER**

Index No.: 652798/2018

Hon. Andrea Masley

①  This matter, having come before the Court on Plaintiffs' Motion for a Turnover Order
Pursuant to CPLR 5225(a),

②  IT IS HEREBY ORDERED that Plaintiffs' Motion for a Turnover Order Pursuant to CPLR
5225(a) is GRANTED; it is

④  FURTHER ORDERED that Rolta India Limited shall turn over to Plaintiffs/Judgment
Creditors Pinpoint Multi-Strategy Master Fund (formerly known as Pinpoint Multi-Strategy
Fund), Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund SP, and
Value Partners Greater China High Yield Income Fund (collectively, "Plaintiffs") any shares or
membership interests it possesses, receives, owns, or controls in Rolta Global BV, Rolta
International, Inc., Rolta BI and Big Data Analytics Pvt. Ltd., Rolta Thales Limited, and Rolta
Defence Technology Systems Pvt Ltd.; it is *[handwritten]* sufficient to satisfy the judgment, NYSCEF doc No 350

1

⑤ FURTHER ORDERED that Rolta Global BV shall turn over to Plaintiffs any shares or membership interests it possesses, receives, owns, or controls in Rolta Middle East FZ-LLC, Rolta UK Limited, and Rolta International, Inc.; it is

⑥ FURTHER ORDERED that Rolta Middle East FZ-LLC shall turn over to Plaintiffs any *Sufficient to satisfy the judgment, NYSCEF Doc 350* shares it possesses, receives, owns, or controls in Rolta Saudi Arabia Limited and Rolta Muscat LLC; it is *sufficient to satisfy the judgment, NYSCEF 350*

⑦ FURTHER ORDERED that Rolta International, Inc. shall turn over to Plaintiffs any shares or membership interests it possesses, receives, owns, or controls in Rolta Canada Ltd, Rolta AdvizeX Technologies, LLC, Rolta, LLC, Rolta Americas, LLC, and Rolta Hungary KFT; it is *sufficient to satisfy the judgment, NYSCEF 350*

③ ~~FURTHER~~ ORDERED that Rolta, LLC, Rolta India Limited, Rolta International, Inc., Rolta UK Limited, Rolta Middle East FZ-LLC, Rolta Americas, LLC, and Rolta Global BV shall turn over all cash on hand, including but not limited to the US $2,120,807.67 identified in Rolta India Limited's 2018-19 Annual Report and it is *, sufficient to satisfy the judgment, NYSCEF Doc. No. 350*

FURTHER ORDERED that the Defendants and Judgment Debtors shall execute and deliver any document necessary to effect the foregoing. *and government initiate any proceeding necessary*

SO ORDERED this 20th day of October 2020

Hon. Andrea Masley

2

# EXHIBIT L

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK : CIVIL TERM : PART 48
 2   ------------------------------------------- X
     PALA ASSETS HOLDINGS, LTD,
 3
                        Plaintiff,
 4
                                     Index No.
 5        -against-                  652798/2018

 6   ROLTA LLC, ROLTA INDIA LTD, ROLTA INTERNATIONAL,
     INC. ROLTA U.K. LTD, ROLTA MIDDLE EAST FZ, LLC,
 7   ROLTA AMERICAS, LLC and ROLTA GOBAL B.V.,

 8                      Defendants.
     ------------------------------------------- X
 9                         (VIA SKYPE)
                        October 20, 2020
10
     B E F O R E:
11
     HONORABLE ANDREA MASLEY,
12                      Justice, Supreme Court

13
     A P P E A R A N C E S:
14
     KOBRE & KIM, LLP
15   Attorneys for Plaintiff
     800 Third Avenue
16   New York, New York  10022
     BY:  JOSEPH KLAZEN, ESQ.
17
     SIRI GLIMSTAB, LLP
18   Attorneys for Defendants
     200 Park Avenue
19   New York, New York  10166
     BY:  MASON BARNEY, ESQ.
20

21
                              NICOLE C. ROBINSON, CSR
22                            Senior Court Reporter

23

24

25
```

PROCEEDINGS

1           THE COURT:  Pinpoint -- anyway, Pinpoint or Pala

2      against Rolta.  Who do we have on Skype Teams at 11:02 for

3      plaintiffs?

4           MR. KLAZEN:  Is Joseph Klazen.

5           MR. BARNEY:  Is Mason Barney.

6           THE COURT:  John Han, who's he with?

7           MR. KLAZEN:  He is with our firm, your Honor.  He

8      is in our Hong Kong office.  So it is the middle of the

9      night over there.

10           THE COURT:  Oh, okay.

11           MR. KLAZEN:  He's not --

12           THE COURT:  He is not participating.

13           MR. KLAZEN:  In this particular motion.

14           THE COURT:  Got it.  So we have an order to show

15      cause seeking a turnover order in support of this Court's

16      judgment for about, if I remember correctly, 183 million.

17           MR. KLAZEN:  That's correct, your Honor.

18           THE COURT:  Okay.  So if I understand the

19      petition -- sorry, plaintiffs, you know you claim that you

20      have a judgment, no dispute.  Under the CPLR 5225(a), you

21      have the judgment.  It is not paid and the judgment debtor

22      is in possession of money or personal property.  Let me just

23      ask you does the money have to come first?  Do they have to

24      hand over under 5225 cash liquid assets first?

25           MR. KLAZEN:  So --

PROCEEDINGS

1        THE COURT:  Is there any priority?

2        MR. KLAZEN:  Well, the statute does indicate that

3    essentially the requirement is to pay cash up to the amount

4    of the judgment if the debtor -- the judgment debtor has

5    that amount of cash to pay.  And then if they don't have

6    that amount of cash to pay, they should essentially satisfy

7    the remainder of the judgment through personal property.

8        But there's no -- the judgment debtors, I will

9    call them defendants Rolta for convenience, they seem to be

10   arguing that somehow we would have to make two separate

11   turnover motions where you first ask for money and only go

12   for personal property.

13       There is no indication in the statute or in any of

14   the cases that I've seen that suggest that.  In fact, a

15   number of cases make it clear that the order is first of

16   all, pay cash in the amount of the judgment if they have it

17   and then to turn over personal property.  So that's how we

18   understand the statute, your Honor.  So if they do not have

19   enough cash, which I could imagine in this situation because

20   it is a very large judgment, if they do not have the amount

21   of cash available, they should hand over personal property

22   and up to the amount of the judgment.

23       THE COURT:  Right.  Thank you.

24       Mr. Barney, did I read your papers correctly they

25   get nothing, they're out of luck?

PROCEEDINGS

1    MR. BARNEY:  Well, your Honor, it is not that

2    we're saying they're out of luck.  We're simply saying that

3    we need to follow the procedures and that that's not what's

4    happening here.  We're saying that in essence, the

5    plaintiffs are trying to skip over a number of steps.

6    THE COURT:  Isn't it really your burden?  Isn't it

7    really your burden to show they've established that you

8    have -- they've' certainly established, number one.  You

9    can't possibly say that your client is not in possession of

10   money or personal property.

11   MR. BARNEY:  The issue is what money and what

12   personal property.

13   THE COURT:  All of it.  All of it.

14   MR. BARNEY:  Well, but there are --

15   THE COURT:  Up to 183 million.

16   MR. BARNEY:  But your Honor, there are a number of

17   cases that say simply saying all of it is not sufficient,

18   that what you need to do is instead identify which items are

19   being turned over because we're asking a company to turn

20   over its own property.  And if for example, the order is

21   just simply defendants must turn over all of their

22   subsidiaries.  Well, some of the defendants have

23   subsidiaries.  Some of the defendants don't.

24   For example, in the Griffin domestic case, the

25   First Department actually -- which plaintiff cited to, the

PROCEEDINGS

1    First Department actually amended the order in that case

2    because the order from the Supreme Court said defendants

3    must turn over their subsidiaries.

4         And the First Department said wait a minute, only

5    one of the defendants has subsidiaries.  So we need to amend

6    the order to say the specific defendant must turn over it

7    and there are other cases as well that also go into this.

8    For example, Bernard v. Lombard, which is 2016 WL 7377240,

9    that actually specifically held that the plaintiffs can't

10   simply say turn over all money and all assets.  It has to be

11   specific money and specific assets.

12        The other issue is simply saying turn over

13   everything up to a certain value.  Well, what is -- how do

14   we determine what that value is?  It needs to be determined

15   through a motion, so that the Court can say these are the --

16        THE COURT:  Doesn't Griffin say that they can rely

17   on your numbers that you gave in your annual report?  And I

18   understand you are saying those numbers are a year

19   and-a-half old because, of course, it takes a while to

20   prepare an annual report.

21        But, again, if I understand you correctly, it's a

22   moving target.  They're never going to be able to say

23   precisely the value today versus the value tomorrow.  It is

24   going to be a little different every day.  And so your

25   argument seems to be that they have to say the subsidiary's

PROCEEDINGS

1    worth a hundred million and -- but if it is actually worth

2    101 million at that point in time, then they're out, no, you

3    can't -- you know, it's worth more than your -- it is not

4    worth more than your judgment.  If it was worth 184 million,

5    there is that one case that said that the property was worth

6    more than the judgment.

7            MR. BARNEY:  Well, two things on that, your Honor.

8    I'm not sure that we are saying that you have to get the

9    precise amount and if tomorrow it is one penny more, then

10   we're off.  But here, we've got a big -- 2020 has been a big

11   year.  I think everyone can agree to that and it certainly

12   has been a big year for my clients.  They shed almost

13   two-thirds of their employees.

14           So the numbers that are referenced in there I

15   think are so substantially off that we need to question it.

16   But even if we assume that we can use those numbers, those

17   numbers say that my client's company has $1.1 billion in

18   assets.  Now, of course, they also had a number of

19   liabilities, but 1.1 billion is six times the judgment.

20           So even if plaintiff's just getting a fraction of

21   that and they don't get all of the liabilities because, for

22   example, they're not necessarily going to be getting the

23   $500 million in liabilities on the bonds.  Those are not

24   going to be necessarily going to them.  That wouldn't

25   necessarily make sense.

PROCEEDINGS

1          And so at that point, it is easy to conceive of a

2     situation where they are getting substantially more than the

3     value of their judgment and that is what 5225 doesn't allow.

4     It specifically says you can only turn over up to the value

5     of the judgment and so that's why I'm saying --

6          THE COURT:  What subsidiary do you think they

7     should take then?  You are the one with the information

8     about your company.  Not you personally, Mr. Barney, but

9     your client.  So do you have a subsidiary that's worth

10     $183 million?

11          MR. BARNEY:  That's the question.  We need to go

12     through discovery to understand that.

13          THE COURT:  No.  Your client knows.  Your client

14     knows what its worth and what its subsidiary are worth.

15     Maybe not to the penny.

16          MR. BARNEY:  Well, money -- your Honor, you're

17     right.  I don't know how much it is worth.  Sitting here

18     today I'm not sure.  We would need to determine that and we

19     need time to be able to do that.  And typically the way you

20     do that is through discovery because I also suspect

21     plaintiffs are not going to -- if I come out and say here it

22     is, it is worth -- this one subsidiary is worth

23     $180 million, I have a sneaking suspicion we are going to

24     have a dispute over whether that is a correct number.

25          We need the discovery, get the information out

PROCEEDINGS

1    there and then the parties can either agree on numbers or if

2    we have a dispute, we can resolve that dispute before

3    yourself or before a referee.  Resolve and that way --

4            THE COURT:  Oh, referees are no longer available

5    to us.  Sorry.

6            MR. BARNEY:  Oh.

7            THE COURT:  You're stuck with me and my 421 cases.

8            MR. BARNEY:  Well, your Honor, I've always -- it

9    is nice to be before you, but the issue that I'm simply

10   saying is that we need to determine the value of these

11   assets, so that we know what's getting turned over.  At the

12   very least, how much is left of the judgement if we just

13   turn over -- let's say as you said, let's turn over all the

14   subsidiary.  Let's assume that were possible.  Well, okay,

15   does that satisfy the judgment or is there more left?

16           THE COURT:  I think that's on you, though.  I

17   think that's the point.  So they say we want all the

18   subsidiaries and based on their -- on your annual report,

19   which of course you know is certified and accountants rely

20   on it, putting aside COVID and the changes that have

21   occurred since then.

22           I mean, what better document to rely on than that

23   document at that point in time and it is up to you to show

24   us no, we are no longer worth that much, we sold this, this

25   and this.  We got rid of all these employees and this is

PROCEEDINGS

1       what we are worth.  It is on you to show them it no longer

2       has the value that you say.

3               MR. BARNEY:  Well, the value that --

4               THE COURT:  That they say.

5               MR. BARNEY:  To the extent that there is value in

6       there, in that document, it states that the value could

7       easily be well over the amount of the judgment.

8               THE COURT:  They just want one little old -- one

9       little old subsidiary.  They're not taking all of them.

10      Just one.  Why don't you start there?

11              MR. BARNEY:  If we were talking one subsidiary,

12      then that might be a different question.  They're asking for

13      basically all of the subsidiaries and in that case --

14              THE COURT:  In your annual statement, what does

15      that add up to?

16              MR. BARNEY:  I do not believe that the annual

17      statement has a subsidiary by subsidiary valuation.  At

18      least I couldn't find one in there and my client didn't

19      indicate one to me.  Hence why the numbers that they produce

20      were either one, the only number they had in their

21      preliminary opening document was $188 million in revenue,

22      that just one of the subsidiaries, Advise X, produces, which

23      that alone is over the amount of the judgment.  Or we look

24      at the assets and liabilities and the annual report doesn't

25      break that down by subsidiary, so we can't say okay, if we

PROCEEDINGS

1    transferred this subsidiary, here are the assets and

2    liabilities that will be going with it based on just that

3    document.

4            The parties could, I'm confident, figure that out

5    through discovery, but the one document that we have right

6    now doesn't say that.  And the only numbers that they have

7    presented indicate that it could easily be more than the

8    value of the judgment.  And in that case, that's why we

9    believe that at least the parties need to figure out what is

10   the proper valuation here because the only evidence in the

11   record indicates that it could be more than the value.

12           THE COURT:  Okay.

13           MR. BARNEY:  But --

14           MR. KLAZEN:  Your Honor, may I respond to that?

15           THE COURT:  Yes.

16           MR. KLAZEN:  The key point is we are seeking to

17   turn over assets sufficient to satisfy the judgement.  We

18   are obviously not seeking more than the judgment.  But to

19   the extent that any valuation needs to be done, I think as

20   your Honor correctly pointed out, the burden is on them to

21   tell us what these are worth and then we can -- if it turns

22   out they are worth more than the judgment amount, which is

23   not clear and in fact, counsel has stated that the value

24   apparently has gone down a lot this year.  So personally,

25   I'm not aware of any subsidiary that is worth the amount of

PROCEEDINGS

1    the judgment, but that is something where the burden is on

2    them to tell us they're worth more and that's something that

3    if we disagree, if necessary be adjudicated before your

4    Honor, but --

5        THE COURT:  Sorry to interrupt you, but it seems

6    to me you have to come up with a process, right.  So you've

7    submitted the annual report, which I'm looking for and not

8    finding.  They have -- you submit the annual report and you

9    say we want a piece of that and they say no, based on the

10   case law, you don't get the whole thing.  You just get up to

11   the judgment.

12       So Mr. Barney has to counter that annual report

13   with something.  So what is it?  What is it, a current

14   financials or what are we going to do for this process?

15   Because seriously, you do have to take into consideration

16   that I can't supervise this process.  And you all get along

17   anyway, so I don't think you need me anyway, but someone may

18   have to supervise this.  So you have to think about that.

19   You want Mr. Barney to submit something from the CFO saying

20   this is worth this, this is worth that?  I don't know.  You

21   have to come up with a process.

22       MR. KLAZEN:  Right, so I would say and I think

23   that this is important.  Is that the case law does not say

24   that in order for the Court to even grant a turnover order,

25   that the burden is on the creditors to establish the value.

PROCEEDINGS

1    It simply isn't.  If you look for example at the Gryphon

2    case and the second one is Ruth Kassover, in those cases,

3    the court ordered turnover of assets sufficient to satisfy

4    the judgment.  So that implies --

5              THE COURT:  In the Ruth Kassover case, it wasn't.

6    It was -- there is process in that order.  Turn over to the

7    sheriff for auction of its membership interests in the

8    following entities.  See, there's specificity in that order

9    and I think that's what Mr. Barney is talking about.  Just

10   saying -- and actually, if you can't say today what the

11   specific assets are, I believe I am required to do -- to say

12   in my order turn over up to this amount and some process.

13   What is the process?  I'm not going to tell you.  You're

14   going to tell me.

15             MR. KLAZEN:  Right.

16             THE COURT:  You're not going to have an auction.

17   The sheriff is not having an auction.  I'm not directing

18   that, right?

19             MR. KLAZEN:  Right.  The auction is not happening

20   yet if there is to be one.  So, of course, that also

21   provides protection, essentially a backstop because if the

22   sheriff auctions off assets and the actual amount is

23   realized up to the judgment --

24             THE COURT:  Back to them.

25             MR. KLAZEN:  -- then the process stops essentially

PROCEEDINGS

1    and we would be amendable if there were to be an auction or

2    if there was a receiver in place that things be sold in

3    sequence, so that we can come to the point of the judgment

4    and then obviously whatever then -- any excess can be

5    returned to the debtors and any assets not sold will be

6    returned to the debtors.  That, I think, is a

7    straightforward process.

8            The other that your Honor indicated is that

9    we -- I think we can work out a process with opposing

10   counsel where they provide financials of specific

11   subsidiaries and we can have a valuation process, but I

12   think, forgive me your Honor, it is difficult for me to say

13   right now exactly what that process should be, but I'm

14   confident that we can work something out.

15           But I think what's important for my clients is

16   that your Honor not use that as a reason to deny a turnover

17   motion because then we are embarking on a long process of

18   discovery apparently where at some -- where you could

19   imagine is going on for months and months and there is no

20   actual order, and we are sitting with a judgment that

21   remains unsatisfied.  I think that that would not be

22   appropriate under the law or fair for that matter.

23           THE COURT:  But you're asking the Court to direct

24   the turnover of the one million and change, whatever it was

25   in the annual report.

14

PROCEEDINGS

1          MR. KLAZEN:  Right.  Whatever cash on hand they

2     have, but it seems that that cash is a miniscule fraction of

3     the judgment amount.

4          THE COURT:  Right.  Even in 2018, 2019 it was one

5     point something million.

6          MR. KLAZEN:  $2,000,000 U.S. dollars is

7     $183 million judgment.  The cash alone, I would urge your

8     Honor not to simply say you get the cash and then the rest

9     is denied until some future time.

10          THE COURT:  No, I would grant the cash, but quite

11     frankly, my instinct is always how do we keep the business

12     going and certainly sucking all the cash out right now at

13     this point, that will certainly doom the prospect of any

14     continuing revenue if you just take out the cash today or

15     tomorrow or whatever.  You are definitely entitled to a

16     turnover order for that cash amount.

17          MR. KLAZEN:  Right.

18          THE COURT:  I have nothing before me other than

19     that I can take judicial notice that there's a pandemic and

20     it certainly impacts everyone's finances, but then it would

21     be up to the defendant -- the defendant to just say well, we

22     don't have a million dollars, we have five dollars.

23          MR. KLAZEN:  Right.

24          THE COURT:  Here it is.

25          MR. KLAZEN:  If that's --

PROCEEDINGS

1    THE COURT:  Then you are out of business because

2    we have no cash to run our business.

3    MR. KLAZEN:  Well, look, first of all, they are

4    always welcome to satisfy the judgment in whatever way is

5    most appropriate to them.  So if they decide that they would

6    rather satisfy the judgment by liquidating certain other

7    assets rather than giving up their cash, they can do that

8    today or we can enter into a settlement agreement to make

9    that happen.  But they haven't approached us.

10    That is not on the table, so we're seeking the

11    cash that they have.  I'm fairly confident given that this

12    is apparently a multi-billion-dollar operation with numerous

13    subsidiaries, that they can find a way to obtain some cash

14    to pay the judgment so -- or at least partial judgment and

15    then we could talk.

16    I understand what your Honor is saying, but we

17    have to go off the assets that are.  There's no evidence in

18    the record to say that that would doom the company and --

19    THE COURT:  If the company had no liquid assets,

20    no cash?

21    MR. KLAZEN:  Well, I suppose that's possible, but

22    we are not trying to doom the company I guess is what I'm

23    trying to say.  I am certainly happy to enter into

24    settlement discussion with opposing counsel to see what can

25    be worked out to preserve the company's operations, so that

PROCEEDINGS

1    we can all get what we want, is we get our judgment

2    satisfied and they can continue running their business.

3              THE COURT:  Okay.  Thank you.

4         Mr. Barney.

5         MR. BARNEY:  In terms of the cash, the issue that

6    I would raise is A, the issue that you raised your Honor,

7    that we've got hundreds of employees who need to be paid and

8    we need the cash to be able to do that.  We can't pay our

9    employees.  We can't operate the company and there's --

10             THE COURT:  Sorry to interrupt you, but that's

11   again on you.  So then you have to say to them yes, we have

12   a million dollars in cash today, but we have to do payroll

13   tomorrow and that's $800,000 or something, so we can only

14   give you 200,000 today.

15             But that's on you to say no, you can't have that

16   much and here is why.  But for me as of today, I have a

17   document from you, albeit dated, that says you have cash

18   available.

19             MR. BARNEY:  Well, A, I would note that that is

20   dated.  We do not have and we have -- I have an affidavit

21   from my client saying we don't have that amount of cash.  It

22   is just not what we have on hand, one.

23             Two, technically, it is in the bank, which

24   normally under 5225 process, that would -- they would have

25   to go through a garnishing process.

PROCEEDINGS

1          THE COURT:  They're ready, willing and able to do

2     it.  They're actually apparently waiting to make a motion

3     for a receiver sounds like.

4          MR. BARNEY:  Well -- and that's another issue.

5     Certain of the cash has been frozen with restraining

6     notices.  So we also don't have access to that money either.

7     And so I don't disagree with you that there's -- I'm sure

8     there is money that can be transferred over without

9     sacrificing the company and I certainly will talk to my

10    clients and I'm sure if that is what your Honor would

11    prefer -- would want us to do, we are happy to do that.  It

12    is just based on what we have now, the evidence before you

13    at the moment, we don't have that cash and we have an

14    affidavit to that effect.

15         THE COURT:  Yes, but your affidavit doesn't say no

16    cash.

17         MR. BARNEY:  And that's -- I'm not saying we don't

18    have any cash.  I'm just saying we would -- in order to be

19    able to preserve the company and -- we can't give

20    everything, but I'm sure my client would be happy to figure

21    out a solution with the plaintiffs to get them some cash.

22         THE COURT:  Well, they're going to have to do that

23    because I'm certainly signing the order today as to

24    available cash.  And then I think based on Griffin, I do

25    believe I can say -- see, based on these cases that -- I

PROCEEDINGS

 1    feel like for the rest of it, I have to say something more

 2    specific than -- as to the balance, which let's just use a

 3    million dollars, that you have a million dollars in cash to

 4    give them tomorrow and as to the other $182 million, I have

 5    to be more specific than that they will turn over personal

 6    property up to $182 million.  I really think I have to be

 7    more specific and, of course, I can't be more specific

 8    because they don't know.  I think you have to do a proposal

 9    to them and say as to the balance, we will do this.

10            MR. BARNEY:  And that's --

11            THE COURT:  Then you can go back and forth about

12    it.

13            MR. BARNEY:  That is a process that I certainly

14    can go back to my clients and I'm sure we can work something

15    out with the plaintiffs on.  Though, the other issue I would

16    raise is this question of the foreign jurisdictions and the

17    fact -- so, for example, we can't transfer a non-subsidiary

18    without first going through the review process for the

19    Reserve Bank of India.  That's just part of the law of

20    India.

21            THE COURT:  I think one is in Bermuda, is that

22    right, and subsidiaries in other places?  And what are your

23    assets in the United States?

24            MR. BARNEY:  Well, that is the issue, your Honor.

25    Sorry.  I didn't mean to interrupt.  The issue is it

PROCEEDINGS

1    actually covers all non-Indian subsidiaries.  So the history

2    behind the rules are the rupee is a fixed currency and as a

3    result, the Reserve Bank needs to strictly control what's

4    going out and what's coming in.

5          And as a result, they've determined that if any

6    Indian company has a non-Indian subsidiary, that non-Indian

7    subsidiary is being transferred to a non-Indian company,

8    which would be the circumstance here.  You have to go back

9    to the reserve back and say this is what we're doing, please

10   bless this transaction.

11         And that is a process, it takes time.  I'm not

12   saying we can't get that, but at this point, I can't say,

13   for example, hey, let's turn over Rolta, L.L.C.  It is just

14   a U.S. entity because if the Reserve Bank found out we did

15   that, we would be liable for three times the value of Rolta,

16   L.L.C., the Reserve Bank, which is company-ending liability

17   if we were to turn over all of them.  So what the -- so the

18   issue I would say there is just whatever process we have

19   needs to take that into account.

20         And the only two other ones that wouldn't be able

21   to be transferred would just be the Saudi Arabian and Aman

22   subsidiary because in those countries, they don't allow

23   transfers to predators is our understanding.  That being

24   said, the Middle East entity is like the Indian entity.  It

25   simply needs permission from the Dubai registrar to do the

PROCEEDINGS

1      transfer.  I wanted to raise that as one of the issues that

2      we need to address in a proposed process.

3              MR. KLAZEN:  Your Honor, what I would say is we

4      would be satisfied with your Court granting the turnover

5      order.  But, for example, providing that the actual

6      subsidiary turnover is subject to a valuation to be

7      performed by the parties within, say, 30 days, and that the

8      order is there, but that we can look at evidence that they

9      submit and if there are -- I have specific arguments about

10     the Indian regulations, et cetera, that I'm happy to get

11     into, but the point is they're contending --

12             THE COURT:  Sorry to interrupt.  Because with

13     regard to that process or any of these processes with regard

14     to the governments where these entities are located, my

15     thought is that I direct defendants now to take any and all

16     steps or initiate any and all steps that are necessary to

17     turn over or liquidate.  Really based on all of this

18     government regulations, it seems like and it sounds like

19     your argument is also you want liquidation, you want cash.

20     You don't want to get into the business of whatever it is

21     they're doing, right?  You want them to liquidate.

22             MR. KLAZEN:  Correct.  And so there is, of course,

23     a process for a sheriff to do that if necessary.  But

24     certainly, that's something that they can do and I think

25     that would be a very appropriate order for your Honor to

PROCEEDINGS

1      enter.  So I think that that is correct.

2              I mean, the government regulations as we pointed

3      out in our briefs, our view is that they have actually not

4      established that -- they certainly haven't established they

5      are barred from your Honor entering a turnover order.  That

6      is clear and they don't assert otherwise.  So whether they

7      require permission from the Reserve Bank of India I think is

8      not clear and the affirmation they submitted from an Indian

9      lawyer says somethings, but provides no support for it

10     whatsoever.

11             So I think that's -- the record is really quite

12     thin on that.  If necessary, that could obviously be

13     something on that issue of law that further briefing be

14     submitted.  But, I think it is -- based on the record, it is

15     not clear at all that most of the subsidiaries cannot

16     be -- cannot be sold and to satisfy a judgement.  To the

17     extent that there is a requirement for permission, they can

18     apply for permission and it is not a ground for your Honor

19     not to grant the turnover order.

20             THE COURT:  Okay.  In the proposed order, you have

21     that they would be directed to turn over, that Rolta

22     International would be directed to turn over shares, which

23     is something.  There might be some government process that

24     Mr. Barney is talking about, but that they turn over the

25     shares of those LLCs.

PROCEEDINGS

1          MR. KLAZEN:  Right, or they can liquidate it as

2     your Honor suggested or your Honor can order them to be

3     transferred to the sheriff under 5225(a).  So there are

4     different options to essentially realize the value and I

5     think your Honor stated correctly that it is their burden to

6     tell us if they exceed the value.  If they need to get

7     permission from a government body, they can do that.  This

8     is their burden.  These are not things that prohibit your

9     Honor from entering the turnover order.

10          MR. BARNEY:  If I may, your Honor.

11          THE COURT:  Yes.

12          MR. BARNEY:  Fundamentally, we don't disagree that

13     there can't be a turnover at some point.  The issue is the

14     order they propose thinks of an immediate turnover directly

15     to them of all of the assets.  That's the part that we are

16     opposed to and as your Honor suggested, if that means that

17     we either need to liquidate these assets, find a buyer for

18     these assets, do something along those lines, that's a

19     different situation that I think -- that I would certainly

20     want to bring to my client, but I could see them finding

21     that a more -- finding that a solution that would work

22     better.

23          As to the government process, our position has not

24     been that the turnover order can never occur because of the

25     government process.  It is simply that the turnover that's

PROCEEDINGS

1     been proposed, which is an immediate turnover, can't occur,

2     that it needs -- that turnover order needs to take into

3     account that we need to get permission, that hopefully the

4     permission will be granted, but it might not be granted.

5           So if, for instance, we are ordered to turn over

6     Rolta International, well we-- and the RBI says no -- it's

7     not -- we're not the one saying no.  It's the RBI is saying

8     no.  And we then can't transfer it.  So we don't want to be

9     sitting in a position with an order from you saying transfer

10    this and an order from the RBI saying don't and we have to

11    choose who do we follow and who do we not follow.  That's

12    the situation we want to avoid.

13          THE COURT:  Right.  So I think the two things I

14    would add to the proposed order are that in addition in that

15    last paragraph where it says that defendants and judgment

16    debtors shall execute and deliver any document necessary to

17    effect the foregoing and take any steps necessary for

18    government approval.  Because if you hand over the shares

19    like they feel if you haven't done what you need to do, just

20    add that unless someone has an objection.

21          And the other thing I would add is that it's up to

22    the amount of the judgment, which maybe I missed it.  But

23    obviously, it can't be for more than the judgment.  And I

24    see the shaking heads.  So you agree.  So I would just put

25    that limitation, that it only be up to the amount.  You

PROCEEDINGS

1    know, then I think my job is done on this motion.

2                MR. BARNEY:  Well, I'm sorry, your Honor, but the

3    other issue would be the securitization question.

4    so Rolta -- Advise X Rolta, the shares of those companies

5    are actually held by banks, two different banks.  And so as

6    a result, we wouldn't be able to turn over those shares.

7    And there is the issue of hypothecation of certain assets

8    for Rolta Defence where if we were to turn over Rolta

9    Defence, that hop indication would be nullified.

10               And I'm honestly -- I am still trying to get those

11   hypothecation agreements.  The gentleman in India who would

12   know where those are has been out with COVID.  So I have not

13   physically been able to see those agreements yet.  So I'm

14   not sure whether those have a prohibition on transfer or

15   not.  But if they do, they would be another issue we would

16   just have to deal with.

17               THE COURT:  I am trying to figure out whether this

18   terminates the -- items are actually in your possession, so

19   you don't go to paragraph B, property not in the possession

20   of the judgment debtor.

21               MR. BARNEY:  Some of it is in our possession.

22   Some of it is not.  The stock certificates for Rolta

23   International and Advise X are with the banks.  And just one

24   other gloss on this, the Rolta International security

25   agreement, the pledge agreement says that it is $19 million

PROCEEDINGS

1     worth of stock, which at the time the pledge agreement was

2     entered into was about 26,000 shares.

3          But this pledge specifically says if the value

4     dips below where it was at the beginning, additional shares

5     are deemed to be.  So we have to figure out the value and

6     then understand how many of the shares are held by Bank of

7     Baroda.

8          MR. KLAZEN:  If I just may address a few of his

9     points very briefly.  As your Honor already indicated,

10    several of these assets are in their possession, in Rolta's

11    possession.  So the hypothecation charge, that is still

12    property in which Rolta has an interest and it is in their

13    possession or custody and can be turned over under CPLR

14    3225(a).

15         With respect to the shares in Rolta International,

16    it may be that some of those shares are as Mr. Barney just

17    said are in the possession of a bank.  If that is in fact

18    the case, then 5225(b) applies, but based on our count,

19    there are about 77,000 shares issued by Rolta International

20    and at least on the evidence presented, it looked like

21    26,000 were pledged to Bank of Baroda.

22         It might be based on the statement just made by

23    opposing counsel, it might be that the security interest is

24    greater.  But in terms of the shares that are actually in

25    the possession of Rolta International, that are in the

PROCEEDINGS

1    possession of Rolta India, there's at least a surplus there

2    that is in their possession and can be turned over.

3           Again, the burden is on them to tell us what they

4    don't have and then 48 percent of Rolta International is

5    owned by a different entity, which is a Dutch entity called

6    Rolta Global B.V.  And there's no evidence in the record

7    that those are not somehow in the debtor's possession.  So

8    those would be just the clarifying comments on what had just

9    been said.

10          THE COURT:  So with the additions that I just

11   mentioned, when I sign this turnover order, what's next?

12          MR. BARNEY:  We would need to figure out these

13   securitization issues.  And just to respond quickly to what

14   plaintiff's counsel just said, it's not just a matter of are

15   these in our possession or not.  The question is can we

16   transfer them.  We have a security agreement that says we

17   are not allowed to transfer, which is what the Bank of

18   Baroda agreement says.  That's the issue.

19          Even if it is more than -- if it is more than the

20   26,000 shares, in order to equal the 19 million, we wouldn't

21   be able to transfer that.  So it is not just -- I want to

22   clarify.  It is not a question of are we in A or B.  It is

23   also if we're in A, are we allowed to transfer it legally.

24   If we are, then that's something we could work out.  If it

25   is not, that's something we would have to figure out.

PROCEEDINGS

1          And with regard to Advise X, it is -- the whole

2      thing is with Huntington Bank.  So we would need to work out

3      those issues and I would ask that the Court put that in any

4      order.  The other question and --

5          THE COURT:  Wait.  You have to tell me the

6      language.  Put what in?  You want me to put what into the

7      order?

8          MR. BARNEY:  We would want that the parties need

9      to determine whether any assets are subject to a security

10     agreement that prohibits transfer.  And if so, which assets

11     and that those not be transferred.

12         MR. KLAZEN:  Your Honor, I think we have a much

13     more straightforward proposal to be honest, is that I think

14     your Honor can simply order that the turnover happen a

15     certain period of time from today, 30 days or 60 days.

16         THE COURT:  Right.

17         MR. KLAZEN:  To give the parties time to

18     essentially determine and frankly for Rolta to provide

19     evidence as to exactly what they say happened or that they

20     say they can't turn over.  And then the turnover happens at

21     the end of that amount of time.

22         I think if your Honor were to incorporate in the

23     order all of the possible arguments that Rolta has raised

24     that might prohibit turnover, they will come back and say it

25     is much more complicated.  We haven't agreed on this

PROCEEDINGS

1          particular issue.  We haven't agreed on that particular

2          issue.

3                  I think that's a recipe for burdening both

4          ourselves and your Honor with continued arguments and this

5          is going to just stretch into Infiniti.  So I think it is

6          much simpler for your Honor to say this is the time period,

7          acknowledgment that there may be some issues about valuation

8          and otherwise need to be worked out and then the turnover

9          happens then.

10                 If for some reason it turns out that

11         there's -- that an important person has suffered from COVID

12         and can't provide evidence, we can deal with those issues

13         when the time comes.

14                 THE COURT:  Right.

15                 MR. BARNEY:  Your Honor, my comment to that would

16         be that the -- we're not in control of the approval process

17         from foreign government.

18                 THE COURT:  Right.

19                 MR. BARNEY:  My understanding is --

20                 THE COURT:  Sorry.  Which is why I'm just going to

21         add that you're required to take all steps necessary to get

22         government's approval to effectuate the turnover.  It is

23         your responsibility.

24                 MR. BARNEY:  And that's fine, but if we were to do

25         as plaintiff's counsel suggested, a date on which turnover

PROCEEDINGS

1    must happen by, then that -- if we don't have permission by

2    that point, then we can't do the turnover at that point.

3        I was simply going to say if we were going to do

4    it, 60 or 90 days would probably be -- I would actually say

5    90 days because I know from Indian counsel that the approval

6    process in India takes at least six to eight weeks because

7    of the COVID situation.  Normally, it is four to six, but

8    now it is more like six to eight.

9        So if we were to do a longer period like 90 days,

10   that would give us the time to do the valuation and still be

11   able to get the approval -- government approval.

12       MR. KLAZEN:  I would say that 30 or 60 days is

13   more appropriate because first of all, this might be

14   academic.  Mr. Barney said the total value may exceed the

15   judgment amount.  It may be that they don't even need to

16   sell subsidiaries for which approval might be required.  And

17   in fact, we don't even know that it is required to be

18   honest.

19       So that would be our proposal and then if there

20   are extenuating circumstances, that might be a basis for

21   your Honor to bury the order.  But I think from our

22   perspective, this should be done in a reasonable amount of

23   time and we think 30 is appropriate.  If your Honor wants to

24   give them more time, I would say 60.

25       THE COURT:  I'm actually inclined to -- what I am

30

PROCEEDINGS

1     struggling with is I'm not supposed to be doing the

2     enforcement proceeding.  It is supposed to be a separate or

3     new proceeding.  I'm trying to make sure that I can do this

4     within my action that is currently before me and then just

5     say that it has to be -- the party -- you would have to make

6     another motion or come back to the Court and explain why you

7     can't comply in 30 days or something like that.

8          But I don't really want to wait around for 60 or

9     90 days.  I think you should be required to get the

10    information today and then deal with the approvals that are

11    necessary.  Show me basically.

12         MR. KLAZEN:  I agree.

13         THE COURT:  What I would like to do is just say

14    that you have to comply in 30 days and just put you on the

15    calendar for the day before and then you let me know what

16    you're able to work out.  Maybe in 30 days you decide to

17    liquidate one of your subsidiaries and you can.  I don't

18    know, but I really don't want this dragging out because as

19    it is, it took -- and I apologize.  Really out of my control

20    that it took so long really just to get the judgment.

21         You saw that I corrected the last -- hope it is in

22    there.  Last week I issued an amended decision and order

23    with regard to the second set of notes.

24         MR. KLAZEN:  Yes.

25         MR. BARNEY:  Yes, I believe it came out yesterday.

31

PROCEEDINGS

1      It was entered yesterday.

2              THE COURT:  Oh, sorry.  I did it last week.  Oh,

3      well.  Anyway, everyone is getting their staff cut, so

4      everything is going to be delayed.  So I have to check into

5      that to see whether the judgment terminated that action, so

6      this is effectively a new enforcement action.  That's the

7      only thing I have to check on.  Signing off on this and then

8      saying that the proceeding is disposed from my perspective,

9      right.  You have a judgment and you have a turnover order

10     and then if you can't turn it over, then that's it.  That

11     gets you into a new proceeding of enforcement.

12             MR. BARNEY:  What if we were to adjourn this for

13     30 days with --

14             THE COURT:  Your client is going to have to get

15     some cash out.

16             MR. BARNEY:  Okay.  What if we were to do an order

17     where we include the cash portion, give 30 days for us to be

18     able to come to an agreement on the value and provide that

19     information and have a date on the calendar when we then

20     come back and you can enter an order on that date in which

21     whatever government approvals are ordered and we take all

22     steps necessary to turn over those assets that we have

23     identified and that the parties have proposed be turned over

24     in the valuation process?

25             THE COURT:  I think it needs to be clear to your

PROCEEDINGS

1      client that they have to come up with something now.

2                MR. BARNEY:  And as I said, we certainly can do

3      just that with regard to the cash.

4                MR. KLAZEN:  I think --

5                THE COURT:  I would -- if you want to do that, I

6      would say the cash in one week and then come back in 30 days

7      with a plan and -- with a plan and evidence of what steps,

8      the logistics of what have to be done to effect that plan,

9      which would become a second turnover order.

10               MR. KLAZEN:  Your Honor, respectfully, that sounds

11     quite different from what was discussed earlier.  And we

12     would respectfully disagree with that because then

13     essentially then your Honor would be denying turnover

14     effectively as --

15               THE COURT:  No.  No.  Granting cash immediately.

16               MR. KLAZEN:  Well, cash, yes.  But as -- I mean,

17     that is -- sounds like a million or maybe$2 million and then

18     the rest -- what we are concerned about is there are going

19     to be delays and there is no actual order from the Court to

20     turn over assets.  And so then we're going to get stuck in a

21     long process of well, let's talk about valuation method.  We

22     need to get approval.  We didn't get approval.  Extend,

23     extend, extend.

24               If your Honor issues a turnover order today even

25     if it requires turnover after, say, 30 or even 60 days, then

PROCEEDINGS

1      there is a clear court order that requires assets to be

2      turned over within a certain amount of time.  And that is

3      something that I think will actually provide hopefully the

4      incentive to Rolta to actually turnover assets in

5      satisfaction of the judgement.

6              Otherwise, it is essentially a meet-and-confer

7      process that gives us very little.  The judgment was -- your

8      Honor issued the order in April I believe and then the

9      judgment was ultimately entered by the clerk and here we

10     are.  They have known that this has been coming because

11     there was no dispute that they defaulted on the notes.

12             So for years they've known that this is coming and

13     to now then say we are not going to pay the judgment, but we

14     want to enter sort of a long meet-and-confer process before

15     your Honor enters an order, we think that would be unfair

16     and it is not required under the CPLR.

17             MR. BARNEY:  But that's not what we're proposing.

18     We're proposing a strict limit on 30 days.  We're simply

19     saying this is a complicated process.  This is not like here

20     is the painting off of my wall, sign a sheet of paper

21     transferring ownership.  There are government approvals.

22     There are securitization agreements.

23             THE COURT:  I get that.  I get that.  You know

24     what, for me, the only issue right now is whether I add to

25     this order in addition to the two items, I will add about up

PROCEEDINGS

1    to the amount of the judgment plus interest and requiring

2    you to take any steps necessary to get approval forthwith,

3    not waiting 30 days or anything, but to get those processes

4    underway if they are not already.

5            And the only question is whether I have you report

6    back with a document in 30 days telling me whether

7    they -- or 31 days whether they complied or not and whether

8    you're coming back.  And that, I just have to look into

9    because that's more of a procedural issue here under New

10   York law and an enforcement procedure should be a separate

11   proceeding.

12           MR. KLAZEN:  No special proceeding is needed under

13   5225.

14           THE COURT:  Which is why I can sign the turnover

15   order, but anything after that, I think I have to -- you

16   have to take whatever steps are necessary.  Mr. Barney would

17   have to take whatever steps are necessary to initiate an

18   enforcement action saying I can't comply with this in

19   30 days and here's why.  So I just need to look into that.

20           MR. KLAZEN:  All right.  You can certainly apply

21   for variation --

22           THE COURT:  Yes.

23           MR. KLAZEN:  We can take a position on that then.

24           THE COURT:  Let me see if I can put that in the

25   judgment.  It is going to be 30 days.

PROCEEDINGS

1          Your client has to come up with some plan, Mr.

2     Barney.  They have to visit -- this is how we are going to

3     do it and these are the steps we need to take to effect.

4               MR. BARNEY:  Understood, your Honor.

5               THE COURT:  So I will work on that and I'll

6     get -- we'll e-mail it to you just so you have it regardless

7     of how long it takes to get things up on NYSCEF, okay.  If

8     you don't get it by tomorrow, just drop us an e-mail and

9     remind us to e-mail it to you, okay.

10               MR. KLAZEN:  Thank you.

11               MR. BARNEY:  Thank you.

12               *************************

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
13     ORIGINAL MINUTES TAKEN OF THIS PROCEEDING.

14

15               _____
                 NICOLE C. ROBINSON,CSR
16               Senior Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT M



# ROLTA INDIA LIMITED

**Regd. Office : Rolta Tower A, Rolta Technology Park, MIDC, Andheri (East), Mumbai - 400 093 Maharashtra, India.**

**CIN : L74999MH1989PLC052384**

**Tel. Nos. 91-22-29266666 Fax No. 91-22-28365992 email id: investor@rolta.com, website: www.rolta.com**

## STATEMENT OF UNAUDITED CONSOLIDATED FINANCIAL RESULTS FOR THE QUARTER AND SIX MONTHS ENDED SEPTEMBER 30, 2020

(In ₹ Crores)

| Sr. No. | Particulars | Quarter Ended | | | Six Months Ended | | Year Ended |
|---|---|---|---|---|---|---|---|
| | | September 30, 2020 | June 30, 2020 | September 30, 2019 | September 30, 2020 | September 30, 2019 | March 31,2020 |
| | | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Audited) |
| 1 | **Income from Operations** | | | | | | |
| | a. Revenue from operations | 292.83 | 359.67 | 374.59 | 652.50 | 738.17 | 1,492.67 |
| | b. Other Income | 1.31 | 2.86 | 1.02 | 4.17 | 2.32 | 10.98 |
| | **Total Income** | **294.14** | **362.53** | **375.61** | **656.67** | **740.49** | **1,503.65** |
| 2 | **Expenses** | | | | | | |
| | a. Cost of materials & technical sub-contractors | 200.61 | 252.12 | 260.65 | 452.73 | 503.04 | 1,005.32 |
| | b. Employee benefits expense | 86.38 | 97.33 | 105.59 | 183.71 | 216.52 | 429.21 |
| | c. Finance Costs | 352.06 | 194.43 | 195.04 | 546.49 | 414.53 | 773.56 |
| | d. Depreciation and amortization expenses | 23.56 | 59.48 | 61.87 | 83.04 | 125.72 | 247.67 |
| | e. Other expenses | 16.88 | 19.89 | 30.58 | 36.77 | 66.74 | 139.38 |
| | f. Exchange Difference (Gain)/Loss | (29.18) | 15.88 | 18.31 | (13.30) | 37.76 | 44.16 |
| | **Total Expenses** | **650.31** | **639.13** | **672.04** | **1,289.44** | **1,364.31** | **2,639.30** |
| 3 | Profit/(Loss) From Operations Before Exceptional Items and Tax (1-2) | (356.17) | (276.60) | (296.43) | (632.77) | (623.82) | (1,135.65) |
| 4 | Exceptional Item (refer note no 12) | (0.00) | 2,165.28 | 5.64 | 2,165.28 | 12.26 | (44.76) |
| 5 | Profit/(Loss) from ordinary activities before tax (3 - 4) | (356.17) | (2,441.88) | (302.07) | (2,798.05) | (636.08) | (1,090.89) |
| 6 | Tax (Expense) / benefit | | | | | | |
| | a. Current Tax | (0.37) | (0.41) | (0.56) | (0.78) | (1.25) | (2.19) |
| | b. Deferred Tax | 23.39 | 312.29 | 26.77 | 335.68 | 194.19 | 178.05 |
| | c. Taxation of Earlier Year | - | - | - | - | - | 0.12 |
| 7 | Net Profit/(Loss) from continuing operations (5 + 6) | (333.15) | (2,130.00) | (275.86) | (2,463.15) | (443.14) | (914.91) |
| | **Attributable to:** | | | | | | |
| | Shareholders of the Company | (333.15) | (2,130.00) | (275.86) | (2,463.15) | (443.14) | (914.91) |
| | Non controlling Interest | - | - | - | - | - | - |
| 8 | Other Comprehensive Income (Not to be considered for EPS) | 57.49 | 9.08 | (102.12) | 66.57 | (50.35) | (413.67) |
| 9 | Total Comprehensive income for the period (7 + 8) | (275.66) | (2,120.92) | (377.98) | (2,396.58) | (493.49) | (1,328.58) |
| | **Attributable to:** | | | | | | |
| | Shareholders of the Company | (275.66) | (2,120.92) | (377.98) | (2,396.58) | (493.49) | (1,328.58) |
| | Non controlling Interest | - | - | - | - | - | - |
| 10 | Paid-up Equity Share Capital (F.V. ₹10/- each) | 165.89 | 165.89 | 165.89 | 165.89 | 165.89 | 165.89 |
| 11 | Other Equity | | | | | | |
| 12 | Earnings Per Share (EPS) (of ₹ 10/- each) | | | | | | |
| | Basic EPS (in ₹) (not annualised) | (20.1) | (128.4) | (16.6) | (148.5) | (26.7) | (55.2) |
| | Diluted EPS (in ₹) (not annualised) | (19.9) | (127.2) | (16.4) | (147.2) | (26.4) | (54.6) |

## SEGMENT-WISE REVENUE, RESULTS AND CAPITAL EMPLOYED FOR THE QUARTER AND SIX MONTHS ENDED SEPTEMBER 30, 2020

(In ₹ Crores)

| Particulars | Quarter Ended | | | Six Months Ended | | Year Ended |
|---|---|---|---|---|---|---|
| | September 30, 2020 | June 30, 2020 | September 30, 2019 | September 30, 2020 | September 30, 2019 | March 31,2020 |
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Audited) |
| **Segment Revenue** | | | | | | |
| Enterprise Geospatial & Engineering Solutions | 66.92 | 79.02 | 96.01 | 145.94 | 199.31 | 404.09 |
| System Integration & Enterprise IT Solutions | 225.91 | 280.65 | 278.58 | 506.56 | 538.86 | 1,088.58 |
| **TOTAL** | **292.83** | **359.67** | **374.59** | **652.50** | **738.17** | **1,492.67** |
| **Net sales/Income From Operations** | **292.83** | **359.67** | **374.59** | **652.50** | **738.17** | **1,492.67** |
| **Segment Results Profit/ (Loss) before tax and interest from each segment** | | | | | | |
| Enterprise Geospatial & Engineering Solutions | (14.42) | (9.93) | 2.18 | (24.35) | 3.68 | (41.11) |
| System Integration & Enterprise IT Solutions | 3.38 | 0.26 | (24.41) | 3.64 | (51.81) | (40.13) |
| **TOTAL** | **(11.04)** | **(9.67)** | **(22.23)** | **(20.71)** | **(48.13)** | **(81.24)** |
| **Unallocated** | | | | | | |
| Less: Finance costs | 352.06 | 194.43 | 195.04 | 546.49 | 414.53 | 773.56 |
| Less: Exchange Difference (Gain)/Loss | (29.18) | 15.88 | 18.31 | (13.30) | 37.76 | 44.16 |
| Less: Depreciation and amortization expense | 23.56 | 59.48 | 61.87 | 83.04 | 125.72 | 247.67 |
| Add: Un-allocable income | 1.31 | 2.86 | 1.02 | 4.17 | 2.32 | 10.98 |
| **Total Profit / (Loss) Before Tax** | **(356.17)** | **(276.60)** | **(296.43)** | **(632.77)** | **(623.82)** | **(1,135.65)** |
| Exceptional Item (refer note no 12) | (0.00) | 2,165.28 | 5.64 | 2,165.28 | 12.26 | (44.76) |
| **Profit/(Loss) after exceptional item before tax** | **(356.17)** | **(2,441.88)** | **(302.07)** | **(2,798.05)** | **(636.08)** | **(1,090.89)** |
| Tax (Expense) / benefit | 23.02 | 311.88 | 26.21 | 334.90 | 192.94 | 175.98 |
| **Net Profit / (Loss)** | **(333.15)** | **(2,130.00)** | **(275.86)** | **(2,463.15)** | **(443.14)** | **(914.91)** |

Notes on segment ... <span>Segment ...</span> Fixed ... in the ... liabilities ... year ... The Company believes that it is currently not practical to provide segment disclosure ... and liabilities.

**STATEMENT OF UNAUDITED CONSOLIDATED ASSETS AND LIABILITIES AS AT SEPTEMBER 30, 2020**

(In ₹ Crores)

| Sr.No. | | Particulars | September 30,2020 (Unaudited) | March 31,2020 (Audited) |
|---|---|---|---|---|
| 1 | | **ASSETS** | | |
| | | **Non-current assets** | | |
| | a | Property, plant and equipment | 1,794.85 | 1,823.31 |
| | b | ROU- Lease Assets | 1,055.75 | 1,070.83 |
| | c | Intangible assets | 15.82 | 2,218.27 |
| | d | Goodwill on Consolidation | 548.06 | 559.85 |
| | e | Non-current investments | 5.42 | 4.39 |
| | f | Other financial asset | 26.62 | 23.98 |
| | g | Other Non current asset | 0.55 | 1.11 |
| | h | Deferred tax assets (net) | 1,828.82 | 1,501.88 |
| | i | Income tax assets (net) | 99.04 | 100.66 |
| | | | 5,374.93 | 7,304.28 |
| 2 | | **Current assets** | | |
| | a | Financial assets | | |
| | | i) Trade receivables | 246.08 | 311.11 |
| | | ii) Cash and Cash Equivalent | 16.82 | 30.31 |
| | | iii) Other Bank Balances | 3.11 | 3.69 |
| | | iv) Other financial asset | 360.90 | 359.41 |
| | | v) Other current assets | 36.04 | 37.23 |
| | | | 662.95 | 741.75 |
| | | **TOTAL ASSETS** | 6,037.88 | 8,046.03 |
| | | | | |
| | | | | |
| | | **EQUITY AND LIABILITIES** | | |
| 1 | | **Equity** | | |
| | a | Equity Share Capital | 165.89 | 165.89 |
| | b | Other equity | (5,185.76) | (2,790.96) |
| | | **Equity attributable to shareholders of the Company** | (5,019.87) | (2,625.07) |
| | c | Non Controlling Interest | (0.04) | (0.04) |
| | | | (5,019.91) | (2,625.11) |
| 2 | | **Non-current liabilities** | | |
| | a | Financial liabilities - Long term borrowings | | |
| | | i) Lease Liabilities | 9.58 | 13.21 |
| | b | Long term provisions | 9.37 | 11.39 |
| | | | 18.95 | 24.60 |
| 3 | | **Current liabilities** | | |
| | a | Financial liabilities | | |
| | | i) Secured borrowings | 4,686.21 | 4,308.27 |
| | | ii) Inter corporate deposit | 575.77 | 560.53 |
| | | iii) Senior notes | 3,682.65 | 3,761.90 |
| | | iv) Trade payables | 236.53 | 348.80 |
| | | v) Lease Liabilities | 10.36 | 11.47 |
| | | vi) Other financial liabilities | 1,545.74 | 1,348.83 |
| | b | Other current liabilities | 298.33 | 304.39 |
| | c | Short term provisions | 3.25 | 2.35 |
| | | | 11,038.84 | 10,646.54 |
| | | **TOTAL EQUITY AND LIABILITIES** | 6,037.88 | 8,046.03 |

**UNAUDITED CONSOLIDATED STATEMENT OF CASH FLOW FOR SIX MONTHS ENDED SEPTEMBER 30, 2020**

(In ₹ Crores)

| Sr.No. | | Particulars | September 30,2020 (Unaudited) | September 30,2019 (Unaudited) |
|---|---|---|---|---|
| 1. | | **CASH FLOW FROM OPERATING ACTIVITIES:** | | |
| | | **Net Loss before tax** | (2,798.05) | (636.07) |
| | | Adjustments for : | | |
| | a | Depreciation and Amortisation Expenses | 83.04 | 125.72 |
| | b | Finance Costs | 546.49 | 414.53 |
| | c | Interest income | (0.01) | (0.22) |
| | d | License Fees | (1.88) | (1.93) |
| | e | Exceptional Item | 2,165.28 | 12.26 |
| | f | Bad debts & Provision for Doubtful Debts | 0.38 | 0.70 |
| | g | (Profit)/Loss on Sale of Asset (net) | (0.08) | (0.03) |
| | h | Employee Stock Option Scheme | 2.17 | 1.07 |
| | i | Exchange difference adjustment(net) | 77.81 | (60.11) |
| | | **OPERATING PROFIT / (LOSS) BEFORE WORKING CAPITAL CHANGES** | 75.15 | (144.08) |
| | | | | |
| | | Adjustments for : | | |
| | a | Trade Receivables, Loans & Advances and Other Assets | (2,103.02) | 71.30 |
| | b | Trade Payables, Other Liabilities and Provisions | 191.23 | 125.58 |
| | | **CASH GENERATED FROM OPERATIONS** | (1,836.64) | 52.80 |

| | | | | |
|---|---|---|---|---|
| | a | Direct taxes paid (net of refunds) | 16.63 | (9.86) |
| | | **NET CASH FROM OPERATING ACTIVITIES** | **(1,820.01)** | **42.94** |
| | | | | |
| **2.** | | **CASH FLOW FROM INVESTING ACTIVITIES** | | |
| | a | Purchase of Fixed Assets (including CWIP & Intangible) | (3.01) | (30.80) |
| | b | Sale of Fixed Assets | 2,165.57 | 0.09 |
| | c | Sale / purchase of Investment (net) | (1.04) | (0.64) |
| | d | Interest received | 0.02 | 0.05 |
| | e | License Fees | 1.88 | 1.93 |
| | f | Consideration towards Acquisition of Intangibles | 0.22 | (0.21) |
| | g | Fixed deposits with banks matured having original maturity over twelve months | 0.57 | 0.50 |
| | | **NET CASH USED IN INVESTING ACTIVITIES** | **2,164.21** | **(29.08)** |
| | | | | |
| **3.** | | **CASH FLOW FROM FINANCING ACTIVITIES** | | |
| | a | Proceeds/(Repayments) of short-term borrowings (net) | - | 294.18 |
| | b | Interest paid | (357.65) | (290.87) |
| | c | Proceeds/(Refund) from issue of Share Capital (includes security premium) | (0.05) | (0.05) |
| | | **NET CASH FROM FINANCING ACTIVITIES** | **(357.70)** | **3.26** |
| | | | | |
| | | **NET INCREASE / (DECREASE) IN CASH & CASH EQUIVALENTS** | **(13.50)** | **17.12** |
| | | | | |
| | | CASH & CASH EQUIVALENTS(OPENING BALANCE) | 30.32 | 16.30 |
| | | | | |
| | | **CASH & CASH EQUIVALENTS(CLOSING BALANCE)** | **16.82** | **33.42** |

**Notes**

1  The above results were reviewed by the Audit Committee and approved by the Board of Directors at its meeting held on November 11, 2020.

2  The Statutory Auditors of the Company have carried out a Limited Review of the financial results for the quarter and six months ended September 30, 2020.

3  An order of Supreme Court of The State of New York, County of New York, has been passed on September 02, 2020 in favour of certain Bondholders for an amount of US $ 183 million (approx) inclusive of interest at 9% upto September 02, 2020 against the Holding Company and six International Subsidiaries of the Company. Further a turnover order dated October 20, 2020 on a motion submitted by the plaintiffs, was passed by the said Hon'ble Court in New York in favour of the Plaintiffs, directing the defendants to turn over their cash on hand and their stock / membership interest owned in certain subsidiaries of the Group. The international defendants filed voluntary Chapter – 11 proceedings in the United States Bankruptcy Court for the Northern District of Alabama in the U.S. on October 29, 2020. By virtue of this filing, enforcement of the judgment against the international defendants has been stayed. Rolta India Ltd. has filed a suit no. 33962020 dated November 10, 2020 in Hon'ble Bombay High Court with the main prayer to grant interim injunction and declare that the summary judgement dated September 2, 2020 and turnover order dated October 20, 2020 cannot be executed by the Plaintiffs against the defendants in India.

4  Pursuant to the execution of a definitive Restructuring Services Agreement (RSA) entered with the Streamcast Group on August 6, 2019, under the terms of which the Streamcast Group will assist Rolta India Ltd., its group companies and its subsidiaries in repayment and restructuring of its liabilities (including providing financial assistance), and the Company is also in the process of finalizing overseas orders, which is expected to materialize in the near future. The Company expects that this along with the valuable IPs that the Company and its subsidiaries possess, would also result in getting more orders. After restructuring of the business the management of the Company is confident that it will improve further. Under the circumstances, the Management of the Company is of the view that the Company continues to be a going concern.

5  Pursuant to the Order of the Supreme Court of The State of New York, County of New York, passed on September 02, 2020 in favour of certain Bondholders for an approx. amount of US $ 183 million plus interest at 9% upto September 02, 2020 against International Subsidiaries, the international subsidiaries have filed for voluntary bankruptcy - Chapter -11 proceeding in the United States Bankruptcy Court for the Northern District of Alabama in the U.S. on October 29, 2020. By virtue of this filing enforcement of the judgment against the international defendants has been stayed. In view of the above, International subsidiaries have prepared account for the six months results on a going concern basis.

6  The Group has recognized deferred tax asset on the incremental tax losses during the period as the management is of the view that the Group will be able to generate enough taxable profits in the subsequent years for setting off the accumulated losses, in view of what is stated in note 4 above.

7  Unbilled receivable includes amount of Rs.274.83 crores receivable from a Government Department towards maintenance and support services provided by the Holding Company, at the request of the user department, pending renewal of the contract. The Holding Company is confident of recovering the amount as the process of obtaining approval is in an advanced stage.

8  In February 2020, Tower C which is situated in the same complex as the Corporate Office and having a written down value of Rs. 162.59 crores caught fire due to a short circuit, causing substantial damage to the building and the assets housed therein. However, due to the ongoing COVID 19 lockdown, apart from the police panchanama, no further work could be undertaken for ascertaining the extent of damage and for initiating the process for lodging of the insurance claim under a reinstatement policy. Under the circumstances, Holding Company has been compelled to retain the said written down value under the head Buildings.

9  The Group, at the time of its transition to Ind AS effective April 1, 2015, had opted for and adopted the revaluation model, for its land and buildings, in accordance with Ind AS 16 – Property, Plant & Equipment. In terms of Para 34 of Ind AS 16, the revaluation was required to be carried as at March 31, 2020. However, due to the ongoing COVID 19 lockdown the Group was unable to undertake the revaluation which has not been carried out till date.

10  In respect of Senior Notes 2013 of $ 127 Mn, along with the overdue interest, which matured on May 16, 2018 and Senior Notes 2014 of $ 372 Mn, along with overdue interest which matured on July 24, 2019, the Company has not made any provision for interest for the period beyond the date of maturity, as there is no specific provision in the Indenture on payment of interest beyond the date of maturity. However, the Company have provided USD$ 24.73 Mn towards interest liability in respect of some of the Bondholders, in view of the Order of the Supreme Court of New York as stated in Note No. 3 above.

11    Certain Bondholders had filed a Petition in the NCLT seeking relief under Section 7 of Insolvency and Bankruptcy Code. The NCLT admitted the case in November 2019. The said Petition was dismissed by the Hon'ble High Court on December 17, 2019. The Bondholders petition before the NCLT inview of High Court order will be heard afresh, which is yet to be heard and admitted. The Petition filed by Union Bank of India, leader of the consortium banks, in NCLT seeking relief under Section 7 of the Insolvency and Bankruptcy Code 2016, was dismissed by the NCLT (Mumbai) on May 1, 2019 (with liberty to the applicant to file fresh petition) on the ground that it was not maintainable in view of the judgment delivered by the Supreme Court in the case of Dharani Sugars Ltd vs RBI. The Bank has filed a fresh petition on Jan 27, 2020 in NCLT for recovery of its dues from the Parent Company. The said Petition is yet to be heard and admitted. The Union Bank of India has also given a notice to the Holding Company under SARFAESI Act against, which the Holding Company is seeking legal steps. Central Bank of India had also issued a notice under the SARFAESI Act. However no further development has taken place till date.

12    During the six months, the Company has reviewed the Intangible Assets in the books of its wholly owned subsidiary Company Rolta Defence Technology Systems Pvt. Ltd. (RDTSPL) which were transferred to them in the year 2015. The Company has obtained a Valuation Report from a leading valuer for reviewing of the intangible Assets (IPRs) and testing of impairment of value in books of RDTPSL. They are of the opinion that the said IPRs are now obsolete due to non-upgradation of technology and cannot be recognized at current value in the books. Accordingly they have recommended to write off the entire IPR value in the books of RDTSPL. In view of this valuation report, an amount of Rs. 2,165.28 Cr as on 30th June 2020 in the books of RDTSPL is written off. However, the said IPRs will still continue to exist without value and can be utilized in future with modifications and upgradation of technology.

13    The ongoing COVID-19 pandemic has impacted and continues to impact the operations of the Company. The Management of the Company continues to monitor the situation closely. However as there is a uncertainty regarding as to when the situation will return to normalcy, it is currently not possible to ascertain the complete impact of the pandemic on the Company.

14    Other Comprehensive Income is not to be considered for the purpose of computation of earning per share as per Ind AS.

15    Previous period figures are regrouped/rearranged wherever necessary.

**On Behalf of Board of Directors**
**For Rolta India Limited**

**Place : Mumbai**
**Date : November 11, 2020**

**Kamal K Singh**
**Chairman & Managing Director**

# EXHIBIT N

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA


IN RE:                        .    Case No. 20-82282-CRJ-11
                              .
ROLTA INTERNATIONAL,          .
INC.,                         .    United States Bankruptcy Court
                              .    400 Well Street
                              .    Decatur, AL 35601
          Debtor.            .
                              .    November 17, 2020
. . . . . . . . . . . . ..        9:55 a.m.



TRANSCRIPT OF CONTINUANCE OF
FIRST DAY MOTIONS
BEFORE HONORABLE CLIFTON R. JESSUP, JR.
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtor:            Maples Law Firm, P.C.
                           By:  STUART M. MAPLES, ESQ.
                           200 Clinton Avenue W.; Suite 1000
                           Huntsville, Al 35801

For the Bankruptcy         Office of the Bankruptcy Administrator
Administrator:             By:  RICHARD BLYTHE, ESQ.
                           400 Well Street
                           Decatur, AL 35602

For Pinpoint and           Christian & Small, LLP
Value Partners:            By:  DANIEL D. SPARKS, ESQ.
                                BILL D. BENSINGER, ESQ.
                           1800 Financial Center
                           505 North 20th Street
                           Birmingham, AL 35203


Audio Operator:            Melissa Brown


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (CONT'D):


                              Kobre & Kim, LLP
                              By:  DANIEL J. SAVAL, ESQ.
                              800 Third Avenue
                              New York, NY 10022

For Rolta Advizex            McDonald Hopkins, LLC
Technologies, LLC:           By:  SEAN D. MALLOY, ESQ.
                             600 Superior Avenue, E.; Suite 2100
                             Cleveland, OH 44114


For Huntington               Calfee Halter & Griswold, LLP
National Bank:               By:  GUS KALLERGIS, ESQ.
                             1405 East 6th Street
                             Cleveland, OH 44114



**WWW.JJCOURT.COM**

1          THE COURT:  Good morning.  We're here on the Rolta

2    International, Inc. and affiliates, continuation of first day

3    motions.  Let me have appearance of counsel for the debtor.

4          MR. MAPLES:  Stuart Maples, for the debtor.

5          THE COURT:  Good morning.

6          MR. MAPLES:  Good morning.

7          THE COURT:  Bankruptcy Administrator?

8          MR. BLYTHE:  Good morning, Your Honor, Richard Blythe

9    here for the Bankruptcy Administrator.

10         THE COURT:  Good morning.  And I'll take other

11   (indiscernible) at this time.

12         MR. SPARKS:  Your Honor, Daniel Sparks and Bill

13   Bensinger, Christian & Small, Birmingham, for the entities

14   referred to previously as the judgement creditors and

15   (indiscernible) Pinpoint Multi-Strategy and Value Partners

16   (indiscernible) clients.

17         Also on the line, Your Honor, are counsel from the

18   Kobre & Kim firm, which I think can introduce themselves.

19         THE COURT:  Okay.  Let me have those appearances.

20         MR. SAVAL:  Good morning, Your Honor.  Daniel Saval

21   from Kobre & Kim, here on behalf of the Judgment Creditors,

22   specifically Pinpoint and the VP entities.

23         THE COURT:  Good morning.

24         MR. MALLOY:  Good morning, Your Honor.  Sean Malloy

25   from McDonald Hopkins on behalf of Rolta Advizex Technologies,

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document      Page 689 of 739

1  LLC a non-debtor affiliate.

2  THE COURT:  Good morning.  Anyone else?

3  MR. KALLERGIS:  Yeah, this is Gus Kallergis.  I

4  represent Huntington National Bank, who has a security interest

5  and has been pledged the stock of Rolta International.

6  THE COURT:  Okay.  Good morning.  Anyone else?

7  (No audible response)

8  THE COURT:  Okay.  Let's start with the status

9  conference.  Mr. Maples, where are we in this case?

10  MR. MAPLES:  Your Honor, we had filed a memorandum

11  addressing certain of the issues that were addressed at the

12  previous hearing and we are moving forward.  We have modified

13  and clarified, I think, the cash collateral position and that

14  we've withdrawn certain requests for cash collaterals for

15  dormant entities that don't have operations and had clearly

16  delineated in new rolling budgets for three different --

17  rolling 13 weeks revenues and expenditures for Rolta

18  International, Rolta UK and Rolta Middle East.

19  THE COURT:  Okay.  I have reviewed your memorandum.

20  I think it provided answers to some things, but let me, sort

21  of, start -- we're in the status conference phase, but let's

22  just talk about the case.  The case has started with a lot of

23  consolidated documents and now I see them being peeled back and

24  that's probably appropriate.  I think your memorandum addressed

25  some of those issues, but there's still some that had been not

1  addressed and we'll talk about those today.

2        But let's start with the primary issue which I think

3  had to be addressed and I think you at least provided an answer

4  to that, the venue issue.  The nerve center case which you

5  cited is interesting because it's not a bankruptcy case but it

6  has been decided by a bankruptcy court, the matter of <u>Asanda</u>

7  <u>Air II</u>, and I noted that and I'm curious to see what the other

8  parties think.  Mr. Blythe, let's talk about the venue issue.

9  What is the bankruptcy administrator's position on that issue?

10        MR. BLYTHE:  Your Honor, this is the first time we've

11  had to address, or had a situation where the argument was made

12  that it was a nerve center.  I understand the argument and I

13  guess in this COVID world we all work in different places --

14  I've been working from home, so -- but I -- we still have an

15  office.

16        So, I don't know if that totally answers my question

17  as far as where this Rolta International, Inc. is located

18  because that seems to be the prime question.  If they're a

19  proper venue then the other entities, apparently, are piggy-

20  backing off of their venue.

21        I don't have any information or evidence that says

22  that they don't operate from the homes of the two parties'

23  officers that were listed.  I just have never seen that used

24  before and especially if the company maintains assets and has

25  offices in, I believe, it's Atlanta if I look at the little

1  listing of other assets.

2          THE COURT: Okay. Thank you. Mr. Sparks or Mr.
3  Saval, we have for the judgment creditors. Any position on
4  this issue?

5          MR. SAVAL: Yeah, Your Honor, this is Daniel Saval
6  again from Kobre & Kim. We had noted at the initial hearing
7  that we had some concerns about the choice of venue in Alabama.
8  At this point, you know, we still have concerns but we're not
9  formally taking a position on the venue issue. We're not
10 currently seeking to have venue transferred.

11         THE COURT: Okay. Is there any other party on the
12 phone that has an issue or concern about the venue issue?
13 Hearing none, let me tell you what the Court's position is.
14 I've looked at this closely. I've actually consulted with some
15 judges around the country who dealt with this issue, and I did
16 something that normally judges don't do, but I thought it was
17 appropriate in this circumstance, and that is I went online to
18 see what the business address is is for Rolta International and
19 D and B says it's the Huntsville address.

20         And so that coupled with the nerve center argument
21 that's given by Mr. Maples in his memorandum gave the Court
22 comfort enough that I don't need to go any further on that
23 issue especially since there's been no objection formally by
24 anyone. So, I'm going to treat that issue as resolved. It
25 does not mean it cannot be opened again if new information is

1  provided for instance schedules haven't been filed or whatever
2  but as we sit here today, I'm going to deem that issue as being
3  settled for the time being and me going to other matters.

4        Mr. Maples, the other issue that you addressed in
5  your memorandum, and I'm going to take it up now because it
6  comes up in all six of the other cases -- all six cases, is the
7  conflict of interest issue.

8        MR. MAPLES:  Yes, sir.

9        THE COURT:  Let me tell you what my position is and
10 then you can tell me how you'd like to respond.  The existence
11 of inter-company claims between several entities is
12 insufficient to warrant disqualification based on what you say
13 in your memorandum.  Here's what I found concerning.  The
14 disqualification argument you make is based on a Second Circuit
15 case from 1970.  There was no bankruptcy code in 1970.  The
16 bankruptcy code did not go into effect until October 1, 1979.
17 What that means is, there is no 327 that existed at the time
18 that case was passed.

19        So, the authority to the site doesn't give support
20 for conflict of interest issues under 327.  But more
21 importantly, your brief doesn't address the issue of
22 disinterestedness at all.  327(a) attorneys may be employed but
23 do not represent interest adverse to the estate.  That's the
24 conflict of interest and that is disinterested.  The
25 disinterested issue comes up in the context of the retainer

**WWW.JJCOURT.COM**

1 that was received by counsel for the debtors from a non-debtor

2 entity. And that leaves the question of royalty and influence

3 that go to disinterested. And you know, Mr. Maples,

4 disinterestedness is a standard higher than conflict of

5 interest.

6 MR. MAPLES: Yes.

7 THE COURT: So, even after using a conflict of

8 interest, you can still not be disinterested. So that issue

9 wasn't addressed at all in your brief. And so I'm concerned

10 because I don't have anything at all that shows me that there

11 isn't a disinterestedness, especially in the setting where the

12 retainer comes from a non-debtor party.

13 MR. MAPLES: The non-debtor party paid a recurring

14 consulting fee and it was paid on the -- that's it's due every

15 month to Rolta International, and that was just directed to my

16 firm for the retainer by Rolta International.

17 THE COURT: But you didn't receive it from the

18 debtor?

19 MR. MAPLES: I got it on instruction from the debtor

20 but not from the debtor. I do not represent, and I do not have

21 an engagement with Advizex and neither their law firm.

22 THE COURT: Okay. All right. Well, what I have now

23 is a brief that addresses the conflict of interest in a case

24 that was pre-Code and no brief at all on the issue of

25 retention. That's where we are right now.

**WWW.JJCOURT.COM**

1          Let me hear from Mr. Blythe.  Mr. Blythe, the view of

2    the bankruptcy administrator's office taking a look at this

3    issue?

4          MR. BLYTHE:  Your Honor, I've discussed it with Mr.

5    Corbett (phonetic), the bankruptcy administrator, in length of

6    the issue and I think, of course, the issue of the payment by

7    the non-debtor creates the issue, and I had questioned them and

8    don't know if they fully answered my question.  But I wanted to

9    know where that money came from and what it was for -- if it

10   was a payment or a gift.  Mr. Maples said it was a payment.

11   So, if it was something that was actually owed to Rolta

12   International, I don't know why the money just wasn't paid to

13   Rolta International and then Rolta International would make the

14   retainer payment.

15         But the concern that we had was whether

16   disinterestedness could be shown given 101-14 I believe it is

17   that talks about disinterested person, it talks a disinterested

18   person is not a creditor.  So, that was the issue we looked at

19   -- was the issue whether the multiple parties that appear to be

20   creditors of each other based on just the listing of the 20

21   largest, whether that posed a conflict in itself that Mr.

22   Maples couldn't represent all of the six entities.

23         THE COURT:  Okay.  Thank you.  Mr. Saval or Mr.

24   Sparks?

25         MR. SAVAL:  This is Daniel Saval on.  We don't take a

**WWW.JJCOURT.COM**

position on these issues as it pertains to the employment or retention of Mr. Maples and his firm. I do think that there are broader issues -- some of them that were discussed to some extent at the last hearing that do remain, in terms of the relationship between non-debtor Rolta Advizex and the debtors and the basis for payments being made from Advizex to the debtors, what the terms are, what the --

THE COURT: Which we'll probably get to later. I'm just taking the issues in order in the memorandum.

MR. SAVAL: I understand, Your Honor.

THE COURT: Okay. So, those issues -- I'm looking at my notes. At the moment I'm trying to compartmentalize the status conference to deal with the issues that are overall in all the cases and then we'll take up specific issues. Okay?

MR. SAVAL: Noted, Your Honor. Thank you.

THE COURT: Is there anyone else who has any comments about the conflict of interest/disinterest issue?

No? Hearing none, Mr. Maples, I think what I'm going to ask you to do is I need you to file a supplemental brief on these issues.

MR. MAPLES: Yes, sir.

THE COURT: I need one on the conflict of interest that gives current authority. And I also need one on the disinterestedness. I hear what you're saying. It may be okay, but right now I don't have anything affirmative that provides

1  for any of those issues.  And the issue that Mr. Blythe

2  mentioned will come up again as we talk about various other

3  motions to be brought.  How much time do you need to prepare

4  that brief?  Well, let me before you answer, Mr. Maples --

5  MR. MAPLES:  I'm sorry.

6  THE COURT:  -- let me say this.  I'm considering

7  continuing some or portions of this hearing until next week.

8  Is that going to be sufficient time?

9  MR. MAPLES:  It is.

10  THE COURT:  I guess what I'm currently thinking and

11  this is subject to anybody's concern about time or whatever, is

12  to continue the matters that need to be continued from today

13  that don't get resolved until the afternoon on the 23rd.

14  MR. MAPLES:  That's fine.

15  THE COURT:  Is that enough time?

16  MR. MAPLES:  Okay.

17  THE COURT:  And we'll have the conflict of interest

18  issue, disinterestedness issue brief, in addition, can you do

19  it by Friday so I have it before the hearing on Monday?

20  MR. MAPLES:  Yes, sir.

21  THE COURT:  Okay.

22  MR. SPARKS:  Your Honor, Dan Sparks.  I do have a

23  morning hearing.  You said afternoon, correct -- Thursday,

24  right?

25  THE COURT:  I did.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 697 of 739

1          MR. SPARKS:  That works for me.

2          THE COURT:  1 o'clock.  I have a regular docket on

3    the 23rd and that's why I tried to put it in the afternoon.

4          MR. SPARKS:  Right.

5          THE COURT:  Okay.  Let me go then to the next issue

6    that was raised.  And once again, I'm going to the issue that

7    Mr. Maples so aptly addressed in his memorandum to see what

8    else we need to do before we get to the specifics -- joint

9    administration and the issue there that I think Mr. Blythe

10   touched on.  There are consolidated pleadings that were filed

11   from the beginning of this case as though these cases were

12   substantively consolidated.  That raises some issues, but the

13   thing that sort of raised the biggest red flag for me was when

14   after the last hearing on November 4, it was stated in a motion

15   withdrawing motions for payment of taxes and employment issues

16   and also for cash collateral that there are three entities that

17   are dormant that do not have any employees -- let's see, let me

18   rephrase -- no employees, no real property, no contractor, no

19   services performed.

20         The question is two-fold.  Number (1) should those

21   dormant entities be jointly administered with operating

22   entities.   And then number (2) why are the joint -- or the

23   dormant entities, rather, not in Chapter 7 instead of Chapter

24   11.  Mr. Maples?

25         MR. MAPLES:  Sure.  The dormant entities owned are a

1 parent of some of the entities and also two of the dormant

2 entities were the original indentured bond holders. And the

3 remaining active operating entities were guarantors of the

4 bonds. It occurs to me that in order to reorganize,

5 potentially, the bonds and indebtedness, I would need those

6 entities in the case. Also, there was a turnover order issued

7 to one of the dormant entities for the stock of some of the

8 active entities. In order to preserve the active entities I

9 filed for the parent.

10 THE COURT: Okay. Where would I find information

11 about who's a parent for which one and so on? The schedule

12 that was attached in your brief didn't show which entities were

13 parents of the others other than Rolta International being a

14 parent to a number of entities some of which are in the

15 bankruptcy.

16 MR. MAPLES: And I apologize. I thought that was in

17 there but I can supplement that. Let me supplement that in a

18 pleading, Your Honor.

19 THE COURT: Mr. Blythe?

20 MR. BLYTHE: Yes, Your Honor. As far as the joint

21 administration, you know, I'd like to see what Mr. Maples

22 supplements. I did notice the three dormant entities and

23 apparently they have -- are not operating, so I don't know what

24 they serve by being in consolidated cases. Perhaps those cases

25 could be administered separately and then whatever happens for

1  their plans are necessary whether it's a liquidation or whether
2  it's something else, I don't know at this point.
3         THE COURT:  Mr. Saval?
4         MR. SAVAL:  Again, for the record, Daniel Saval from
5  Kobre & Kim, we don't take an issue on joint administration as
6  it pertains to those entities, those three dormant entities,
7  but we do reserve our right as to the impact of the status of
8  those entities on relief that we may seek in the case,
9  including whether, you know, the cases for those entities or
10 all the entities should be dismissed.
11        THE COURT:  Okay.  Thank you.  Mr. Maples, the joint
12 administration one is interesting because normally it was not a
13 problem but here, joint administration triggers a number of
14 other issues, particularly, as you have a consolidated list of
15 the 20 largest creditors that includes entities being creditors
16 of other entities.  So if we jointly administer them, I'm
17 concerned about how that works.  Maybe this is something you
18 can address further in your brief also once we see the chart
19 which you are going to attach.
20        MR. MAPLES:  Your Honor, and I have an idea about
21 this and, you know, I did this for the purposes of simply being
22 able to be more expeditious in the administration of these
23 cases.  However, I mean, there are only six cases and from a
24 docket scheduling standpoint, so long as we're docketed in each
25 of these cases at the same time, that may resolve the issue.

**WWW.JJCOURT.COM**

1  And I could withdraw the motion for joint administration.

2          THE COURT:  You can.  I'm not sure that would resolve

3  the issue we're discussing because, for instance, it comes up

4  again when you ask for consolidated courtesy -- it's the same

5  issue.

6          MR. MAPLES:  Okay.

7          THE COURT:  The issue is you have operating -- it's

8  very symmetrical.  You have three operating entities and three

9  dormant entities but you want to mix them together both in

10  administration and creditors committee and so on.  And so it

11  just raises this issue, especially when three of the entities,

12  or two of the entities, are the largest creditors of other

13  entities.

14          MR. MAPLES:  Because we're the original recipients of

15  the bonds and the money was divvied out.

16          THE COURT:  I understand.  We're trying to look at a

17  situation where conflicts, disinterestedness, and efficiency

18  all blend in a situation --

19          MR. MAPLES:  Sure.

20          THE COURT:  -- where entities owe each other money --

21  substantial amounts of money.  And like, for instance, two of

22  the affiliates that are listed on the list of largest creditors

23  two of the top five are other Rolta entities.  So, if the Court

24  were to approve your motion for a consolidating committee, are

25  we going to have Rolta entities being on the committee with

1  other Rolta entities?

2          MR. MAPLES:  I don't anticipate that.

3          THE COURT:  But that's why you're in court right now,

4  you know, because the largest --

5          MR. SPARKS:  This is Dan Sparks -- can I offer a

6  point here?

7          THE COURT:  No, just a moment.  So, Mr. Maples,

8  that's the issue and that's why you need to find some way to

9  resolve this issue because before the Court we have creditors

10 and debtors who are all related to each other and with the

11 large debts that are allegedly owed and it affects joint

12 administration and joint creditors committee.  So, that's why.

13         Now we'll hear from Mr. Sparks?  Mr. Sparks?

14         MR. SPARKS:  Thank you, Your Honor.  A couple of

15 housekeeping points on the issues you just raised.  First of

16 all -- I'm going fast forward a little bit -- but I talked to

17 Mr. Blythe this morning and I think when we get to that motion,

18 he will report that there were not enough acceptances to form a

19 committee in any of the cases which may resolve that issue.

20         Also, I think that Mr. Maples says he thought he

21 attached a chart or made reference to the ownership.  He did

22 attach a chart, but it's not related to the motion we're

23 discussing.  He attached the chart to his memorandum and that's

24 where you'll find, I think, the chart listing the ownership.

25 That's where I found it.  Your Honor may want to use that for a

1  reference.

2          THE COURT:  I did but it didn't tell me who owned

3  what.  It told me that the debtor -- I know the one you're

4  talking about.  It said the debtor is the owner of a number of

5  entities, some of which aren't in bankruptcy.

6          MR. SPARKS:  Correct.  That is correct.

7          THE COURT:  And then it doesn't tell me, other than

8  the India entity who are the owners of some of the other

9  entities.  So, it is some information, but it's not clear

10  information.

11          MR. MAPLES:  I'll clarify it, Your Honor.

12          THE COURT:  Yes, and that's what I think you said you

13  would do, Mr. Maples.

14          MR. MAPLES:  Yes.

15          THE COURT:  You would provide clarification.  Okay.

16  We talked about the joint administration and we walked over

17  into the issue about the joint committee.  Let's talk about

18  that for a moment, Mr. Maples -- I'm sorry, Mr. Blythe?

19          MR. BLYTHE:  Yes, Your Honor.  As Mr. Sparks said, I

20  can report that because the motion for a consolidated committee

21  was only filed last week,  our office had already sent

22  solicitations in all the cases.  And we only received one

23  response -- well, two responses -- one willing to serve and one

24  not willing to serve.  So we were going to file a notice that

25  we were unable to form a creditors committee in any case due to

1    the lack of parties willing to serve.

2        THE COURT: What case was the one accepting creditor

3    have his claim in?

4        MR. BLYTHE: Your Honor, we -- the accepting creditor

5    was in all six cases. It was a creditor in all of the

6    (indiscernible).

7        THE COURT: Which one was it?

8        MR. BLYTHE: It was Mr. Sparks' client. I can't

9    remember off the top of my head the name.

10       THE COURT: It's called Pierla Assets Holding. Yes,

11    it's on the list of 20 largest. It's called Pierla Assets

12    Holding, LLC, is that correct?

13       MR. SPARKS: Right. That's -- those were successors

14    in interest to them, Your Honor.

15       THE COURT: Okay. I'm just looking at the list of 20

16    largest. Okay. Then that may moot that particular matter.

17       Mr. Maples, let me go back to what you said earlier.

18    I am prepared to grant joint administration on the operating

19    entities. I'm still concerned about the dormant entities in

20    joining them in. I think you can decide how you want to do

21    that between now and --

22       MR. MAPLES: I'm fine with that.

23       THE COURT: Okay. You don't want to think about it

24    or talk to your client about it before --

25       MR. MAPLES: Let me do that. Thank you, Judge.

1        THE COURT:  We're going to have a hearing again --

2        MR. MAPLES:  I tend to be impulsive.

3        THE COURT:  As you can tell, so do I.  I mean, so

4 that's my concern.  Mr. Blythe, do you have any concern about

5 that if that's where we end up?

6        MR. BLYTHE:  Your Honor, I don't.  As far as the

7 operating entities, I don't have a concern about the joint

8 administration.  At least not at this point.  Unless something

9 comes out in the schedule that they file, I think, which are

10 due -- I think they're due Friday.

11        THE COURT:  That's right.  We do have that coming up.

12 So, yes, maybe we should reserve this issue until more

13 information comes out.

14        Mr. Saval and Mr. Sparks, any comment on this issue?

15 Any further comments?

16        MR. SAVAL:  No, Your Honor.

17        THE COURT:  Okay.

18        MR. SAVAL:  We just reserve rights in connection with

19 what we see in the schedules.

20        THE COURT:  Everybody reserves their rights, not a

21 problem.  Okay, then that takes care of the status conference

22 phase of the hearing.  Anything further there, Mr. Maples,

23 before we go into specific cases and specific motions?

24        MR. MAPLES:  No, Your Honor.

25        THE COURT:  Okay.  Then let's take up Rolta

1 International Inc., since none of these (indiscernible)

2 consolidated yet, the motion for joint administration.  We had

3 talked about that will be carried over to next -- the next

4 hearing which, tentatively, will be the 23rd at 1 o'clock.

5 Application by debtor in possession to employ Mr. Maples' law

6 firm.  That also will be carried over after Mr. Maples

7 supplements his brief.  And that will be heard on the the 23rd.

8 And the emergency motion by the debtor in possession for order

9 authorizing and directing the honoring of debtors' pre-petition

10 payroll checks et cetera.  Let's take that matter up.  Mr.

11 Maples?

12        MR. MAPLES:  Your Honor, this a motion that we had

13 deferred last time.  It is just, you know, wanting to be able

14 to honor the pre-petition payroll and payroll tax obligations

15 of -- and any payroll benefits that would have split between

16 pre-petition in this and the other two operating entities.

17        THE COURT:  Well, we're going to take them

18 separately, remember they're not jointly consolidated

19 (indiscernible) --

20        MR. MAPLES:  I know.  I just threw that in there,

21 Your Honor.

22        THE COURT:  Okay, well, I'm trying to pull them back

23 out and keep them separate.

24        MR. MAPLES:  I understand, thank you.

25        THE COURT:  In this particular one, Mr. Maples, as I

1  understand it, the wages have been paid current through the

2  date of filing but there are some other obligations like the

3  contract dues and the taxing that you're asking for -- not

4  taxing but ancillary things to wages -- employee benefits?

5          MR. MAPLES:  That's correct, Your Honor.

6          THE COURT:  And that's what your asking for here,

7  correct?

8          MR. MAPLES:  Yes, sir.

9          THE COURT:  Okay.  Mr. Blythe?

10          MR. BLYTHE:  Your Honor, based on the amended motion

11  and the amounts set forth there and the limited nature of what

12  it's asking for, I don't have any objection.

13          THE COURT:  Thank you.  Mr. Saval?

14          MR. SAVAL:  Your Honor, I know it's customary for

15  debtors to seek and obtain approval to pay essential employees

16  and we're not seeking to get in the way of that.  But one

17  concern we had is that -- well there are actually two concerns.

18  The first is that there isn't any information in the motion

19  regarding the types of employees.  The debtors, or Rolta

20  International, is purposing to pay -- are they executive

21  employees, non-executive?   You know, what is their job

22  classification?

23          And, secondly, with respect to paying contractors,

24  again, there is no information provided about those contractors

25  -- what they do, why they are essential and why it's critical

1 to pay them immediately.  What I see in the motion is a

2 statement that at times the debtor utilizes casual contractors

3 and subcontractors for discreet periods of time when the need

4 arises.

5        So, we were hoping to get more information and think

6 it would be helpful, as a matter of disclosure, to get a better

7 understanding of that.

8        THE COURT:  Okay.  Let me make sure I'm clear.  And

9 because you have three of these, I may be confusing them.  Is

10 this the amendment to your motion -- amended emergency motion

11 that says your employees were paid current as of the date of

12 signing?

13        MR. MAPLES:  Yes, sir.

14        THE COURT:  And that the contractors who you

15 mentioned, although don't give the description of, are owed

16 about $9,000?

17        MR. MAPLES:  Yes, sir.

18        THE COURT:  Okay.  But, Mr. Saval, I think your issue

19 is a relevant one but, in the context of this particular

20 motion, it may not have that much substance because there is no

21 wage issue that he's asking to be paid and the $9,000 in

22 contractors.  So, I don't think those are insiders or other

23 people -- it isn't a lot of money that's being request there.

24        MR. SAVAL:  That's noted, Your Honor.

25        THE COURT:  Okay.  And your comment may be more

**WWW.JJCOURT.COM**

1 relevant as we get to some of the others. But in this one, I

2 looked at this and it said the main case doesn't have a big ask

3 on this emergent motion. I am inclined to grant the amended

4 emergency motion with regard to the pre-petition payroll

5 because it basically is the contractors. It isn't a large

6 amount and then the employee benefits -- Mr. Maples, what was

7 the total employee benefit request in this motion?

8          MR. MAPLES: I think it was less than a thousand

9 dollars.

10          THE COURT: Do you have the number there somewhere?

11          MR. MAPLES: I'll look. Yes, sir.

12          THE COURT: I don't want to take too much time if you

13 can't locate it. Okay. Let's move along.

14          MR. MAPLES: I apologize.

15          THE COURT: I'm assuming that the number you gave me

16 was close and correct, if not told otherwise the amended

17 emergency motion for order authorizing and directing the

18 honoring of debtor's pre-petition payroll checks and

19 authorizing the debtor to pay pre-petition wages and employee

20 benefits in the Rolta International case is approved. Please

21 submit that order.

22          MR. MAPLES: I will, Your Honor.

23          THE COURT: Now let's look at the amended emergency

24 motion for authority to pay pre-petition taxes. Mr. Blythe?

25 Mr. Blythe? Did we lose Mr. Blythe?

1        MR. BLYTHE:  I'm sorry, Your Honor.  I accidentally

2  hit the mute button.  Can you hear me?

3        THE COURT:  I can hear you know.

4        MR. BLYTHE:  Yes, I'm sorry.  I was saying that as

5  far as the taxes motion, I believe they're asking to just pay

6  the amounts that were pre-petition withheld from the employer

7  wages which are most of trust fund taxes.  I don't have any

8  objection.

9        THE COURT:  Okay.  Thank you.  Mr. Saval?

10       MR. SAVAL:  Your Honor, we don't have an objection to

11  this motion.

12       THE COURT:  Thank you.  Does anyone else on the phone

13  have a comment or objection to this particular motion?  Hearing

14  none, I've reviewed it, I think the request is reasonable and

15  the amended emergency motion by the debtor in possession for

16  authority to pay pre-petition taxes and to honor checks for

17  payment of taxes is approved.  Mr. Maples, please submit that

18  order.

19       MR. MAPLES:  I will, Your Honor.

20       THE COURT:  Next is the amended motion by the debtor

21  in possession for authorization to use cash collateral.  I also

22  received and reviewed the supplement to the amended motion that

23  was filed yesterday by the debtor.  Mr. Maples, where are we on

24  this motion?

25       MR. MAPLES:  Your Honor, I think we've had --

1  demonstrated and we offer a replacement lien to the extent

2  that, yeah, there is a lien pre-petition.  We have severe

3  questions on whether there is an, in fact, yeah, not only as we

4  talked about earlier they're, I think, they're avoidable but I

5  think as to international and particularly as to UK and Middle

6  East, that there is no properly -- there's no proper attachment

7  to any of the assets that would be required to prove

8  domestication.  I don't think a New York turnover order impairs

9  a cash collateral in Dubai.

10         THE COURT:  Okay.

11         MR. MAPLES:  But I know we're only on International

12 right now.  I don't think a current order in New York attaches

13 to receivables that are received in Georgia or Alabama.

14         THE COURT:  Okay.  That's probably more relevant to

15 New York today.

16         MR. MAPLES:  Yes.

17         THE COURT:  Okay.

18         MR. MAPLES:  Yes.

19         THE COURT:  All right.  I understand the arguments.

20 It hasn't been proven -- the question is, in this emergency

21 interim phase is there adequate protection.  If there is, that

22 it's (indiscernible) creditors.

23         MR. MAPLES:  Sure.

24         THE COURT:  Let me hear from Mr. Blythe and then I

25 will hear from Mr. Saval.

**WWW.JJCOURT.COM**

1          MR. BLYTHE:  Yes, Your Honor.  As far as the motion

2    to use cash collateral, I understand the parties.  They're

3    seeking to use their cash collateral here and able to voice

4    their own objection.  I did concur with the parties' limited

5    response that they don't really say other than the fact that

6    there's going to be the rolling budget but appears to now show

7    that there's a surplus each month based on their expenditure

8    than collection, but it doesn't say what type of replacement

9    liens or what type of adequate protection that they're

10   offering.  So, other than that, I have no comment.

11         THE COURT:  Thank you.  Mr. Saval?

12         MR. SAVAL:  Good morning, again, Your Honor.  A few

13   things to point out about the amended motion.  Number (1) the

14   budget does show that the debtor, Rolta International, is

15   operating in the negative and burning through cash during the

16   13-week period.  And that's even including the $335,000 payment

17   from Advizex.  So, our lien on the cash is going to be impaired

18   under this budget and we don't have a proposal for any type of

19   meaningful adequate protection as to consequence of that

20   diminution of value.

21         In terms of the arguments that have now been raised,

22   they weren't raised in the motion, I think they were alluded to

23   in the filing of yesterday, I would just point out, Your Honor,

24   that a lien on the cash arises from the turnover order in aid

25   of the judgment in favor of our client.  And that New York law

1 is clear that a turnover order issued by a New York Court does

2 reach property physically outside the state of New York.

3         So we don't think that argument has any merit.  We

4 don't think it's, you know, been raised formally but I just

5 wanted to note that.  And I think as Your Honor alluded to,

6 whether or not there are arguments about avoidance or

7 invalidity of the lien, as of now we have a lien on that's

8 entitled to adequate protection and there's no proposal to

9 provide us with adequate protection.

10         THE COURT:  Okay.  Thank you.  Mr. Maples?

11         MR. MAPLES:  Your Honor, I think we do offer a

12 proposal, and that is they can continue to have whatever lien

13 they have, however, it might be into post-petition receivables.

14 There is a floating in the 13 week but it's not, you know, I

15 mean, it moves up and down on the net.  It is not just a

16 complete degradation of cash throughout the period.  And we're

17 asking, honestly, but, you know, we don't have an interim order

18 that stretches for the entire 13 weeks.  Let's let the proof be

19 in the pudding for a little bit.  You know, give us a month or

20 two.

21         THE COURT:  I didn't closely study the budget, but

22 I'm concerned about what Mr. Saval said about the budget

23 showing that the debtor's operating in the negative.  Is that

24 correct?

25         MR. MAPLES:  I don't think that -- I mean, I don't

**WWW.JJCOURT.COM**

1 read it that way. I think that it -- you know, the budget ebbs
2 and flows.

3       THE COURT: What happens in the next 30 days? From
4 the date of filing through 30 days is the operation in the
5 negative or in the positive?

6       MR. MAPLES: The -- well, I'm getting to that.

7       THE COURT: Mr. Maples, this raises sort of another
8 question I had, too, which is who is handling the accounting
9 for this entity. Let's just stay with the Rolta International?
10 I notice that in your statement about nerve center, the
11 officers who were in Huntsville aren't financial officers.
12 Who's the CFO?

13       MR. MAPLES: We don't really have, I don't think, in
14 title a CFO. We have a controller and, honestly --

15       THE COURT: Where is the financial headquarters of
16 this company?

17       MR. MAPLES: I would say the financial headquarters
18 of this company is in Huntsville.

19       THE COURT: Okay. Then who is handling their
20 financial records. Normally it is someone who would be handy
21 to answer questions about budgets and about other numbers and
22 you're doing it so it tells me somebody else isn't.

23       MR. MAPLES: Well, actually, you know, our CEO,
24 Preetha Pulasani, is, you know, and our executive vice-
25 president, Blane Shertz, are all intimately involved in the

**WWW.JJCOURT.COM**

1  finances of this company.  And I could certainly tender one of

2  them in a hearing or a -- you know, provide additional

3  declaration regarding that.

4       THE COURT:  Let's do this.  Yes, maybe I need a

5  declaration from them because we're not going to have an

6  evidentiary hearing on that issue.  The issue is, how will the

7  judgment creditors, assuming they have a lien, be adequately

8  protected?  And let's take it for a 30- or 60-day period

9  initially.  If the budget showed they're operating -- you're

10  operating in the negative.  (indiscernible)

11       MR. MAPLES:  No, the budget doesn't show that we're

12  operating in the negative every week.  I mean, it goes from 196

13  to 107 to 87 to 152 to 148 to 182, you know, it moves up and

14  down.  And that's not -- obviously, not unusual for an

15  operating entity.

16       THE COURT:  Well, we're not talking about operating

17  entity, we're talking about adequate protection.  If the value

18  of collateral goes up and down, you could be adequately

19  protected.  That's the issue.  That's the issue that needs to

20  be addressed.

21       MR. MAPLES:  Okay.

22       THE COURT:  And it's not a guess, because a floating

23  lien when you have a cushion is one thing.  A floating lien

24  where one week you're underwater and one week you're over

25  water, the question is, is that adequate protection.  And I

1  think --

2        MR. MAPLES:  And I think I know the answer to that,

3  too, and I think I'm going to have to supplement with --

4  because all -- the analysis that we've given you in the 13-week

5  rolling budget deals with cash and I need to give you the

6  supplement of the rolling accrual of receivables.  You wouldn't

7  usually have inventory in a case like this.  So, receivables,

8  which are also part of cash collateral, need to be factored

9  into this.

10       THE COURT:  I believe you're correct.

11       MR. MAPLES:  Yes.

12       THE COURT:  So, can you provide that also by Friday

13  at the hearing?

14       MR. MAPLES:  Yes, I can.  Yes, I can.

15       THE COURT:  Okay.  So then we need to come back to --

16  let me say it a different way -- we need to continue the

17  amended motion until the 23rd also so that we have that

18  additional information because I believe Mr. Savala's correct

19  that with the information we currently have, it does not show

20  continuous adequate protection or the lien claimed by the

21  judgment creditors.  Okay?  Thank you.

22       Mr. Saval, is there any other issue on cash

23  collateral that we need to address before we move to the next

24  debtor?

25       MR. SAVAL:  Your Honor, one other point.  We have the

1  outstanding issue, or question as I would put it, as to the

2  substantial funds that are being provided from the non-debtor

3  Avizex entity to Rolta International.  I see the line item's

4  been changed in the amended motion to refer to the payments as

5  a management fee but there's no other information or disclosure

6  provided in the motion describing the terms of that apparent

7  management fee.  Is Advizex obligated to pay the fee?  And

8  whether we can actually rely on that line item as indication

9  that the funds will, in fact, be paid, particularly because

10 it's a non-debtor party?

11          THE COURT:  Good point.  Is Advizex's counsel on the

12 phone?

13          MR. MALLOY:  I am, Your Honor, Sean Malloy.  Thank

14 you.

15          THE COURT:  Okay.  I thought you had given your

16 appearance.  And this will be -- here, we're going to do it in

17 two stages.  One is you're going to give us the short answer

18 and then, Mr. Maples, when you provide information by Friday,

19 we can put it in the context of the cash collateral adequate

20 protection.

21          MR. MAPLES:  I will.

22          THE COURT:  But since we have Advizex's counsel on

23 the phone, let's hear from him with regard to the response to

24 Mr. Saval's issue.

25          MR. MALLOY:  Thank you, Your Honor.  The answer is

**WWW.JJCOURT.COM**

1  that yes, Advizex pays a monthly management fee to its parent,

2  Rolta International.  The amount is 670,000 -- I'm sorry, not

3  670,000 -- $67,000 per month.  I believe that the September

4  management fee and part of the October management fee were

5  paid.  And I can confirm what Mr. Maples said earlier, which is

6  that Advizex paid a management fee in the amount of $97,000 to

7  its parent, Rolta International.  And for administrative

8  convenience it was sent directly to Mr. Maples' office.

9        So that portion of the management fee, obviously, can

10  be used by Rolta International however they want and they chose

11  to use it, apparently, as a retainer for their counsel.  We do

12  have a lender at the Advizex level, Huntington, who has to

13  approve any payment of the management fee.  So, Huntington has

14  a say in whether this amount of money can leave Advizex or not

15  on a go-forward basis.

16        THE COURT:  And what is your management fee for?

17        MR. MALLOY:  Shared services, management.  For

18  example, you know, there is, you know, strategic help from the

19  parent.  Rolta Advizex is part of a, you know, multinational

20  group.  We do business nationally and internationally.  And so

21  advice and such things from the parent, like you have with many

22  shared services contracts.  I don't know the specifics of the

23  shared services.  For example, sometimes, you know, parties pay

24  for each other's insurance et cetera, but I think that the core

25  of this management fee is based on strategic direction and

**WWW.JJCOURT.COM**

1  advice from the parent entities.

2          THE COURT:  Okay.  Mr. Saval, does that help a

3  little?

4          MR. SAVAL:  That provides some information.

5          THE COURT:  Okay.

6          MR. SAVAL:  And I appreciate --

7          THE COURT:  The reason I say that is the schedules

8  will be filed by the end of the week.  Mr. Maples is going to

9  put in writing additional information.  I just wanted to get an

10 indication, and I appreciate counsel giving us that, as to what

11 it was and confirming some of the information about the

12 management fee.  So, we'll have additional information about

13 that when we get to the hearing on the 23rd at 1 o'clock.  I

14 believe, then, we will continue the motion for user cash

15 collateral to the 23rd at 1 o'clock also.

16                  *  *  *  *  *

17              **C E R T I F I C A T I O N**

18          I, ALYCE H. STINE, court approved transcriber,

19 certify that the foregoing is a correct transcript from the

20 official electronic sound recording of the proceedings in the

21 above-entitled matter, and to the best of my ability.

22

23 /s/ Alyce H. Stine

24 ALYCE H. STINE

25 J&J COURT TRANSCRIBERS, INC.      DATE:  November 19, 2020

**WWW.JJCOURT.COM**

# EXHIBIT O

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA

IN RE:                      .      Case No. 20-82282-CRJ-11
                            .
ROLTA INTERNATIONAL, LLC,.
                            .
        Debtor.            .
. . . . . . . . . . . ..
IN RE:                      .      Case No. 20-82285-CRJ-11
                            .
ROLTA MIDDLE EAST           .
FZ-LLC,                     .
                            .
        Debtor.            .
. . . . . . . . . . . ..
IN RE:                      .      Case No. 20-82287-CRJ-11
                            .
ROLTA UK, LTD.              .      United States Bankruptcy Court
                            .      400 Well Street
                            .      Decatur, AL 35601
                            .
        Debtor.            .      December 1, 2020
. . . . . . . . . . . . .          10:56 a.m.

     TRANSCRIPT OF MOTION TO MODIFY THE CHAPTER 11 OPERATING
     PROCEDURES; STATUS CONFERENCE ON MOTION BY DEBTOR ROLTA
          INTERNATIONAL FOR ENTRY OF ORDER AUTHORIZING
     BUT NOT DIRECTING PAYMENTS OF PRE-PETITION CLAIMS
          OF CERTAIN CRITICAL AND FOREIGN VENDORS
          BEFORE HONORABLE CLIFTON R. JESSUP, JR.
          UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:            Maples Law Firm, P.C.
                           By:  STUART M. MAPLES, ESQ.
                           200 Clinton Avenue West, Suite 1000
                           Huntsville, AL 35801

For the Bankruptcy         Office of the Bankruptcy Administrator
Administrator:             By:  RICHARD BLYTHE, ESQ.
                           400 Well Street
                           Decatur, AL 35602

Audio Operator:            Melissa Brown

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609)587-3599**

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document      Page 721 of 739

TELEPHONIC APPEARANCES (Cont'd):

| | |
|---|---|
| For Pinpoint Multi-Strategy Master Fund, Value Partners Fixed Income SPC – Value Partners Credit Opportunities Fund SP and Value Partners Greater China High Yield Income FundPinpoint and Value Partners: | Christian & Small, LLP By:  DANIEL D. SPARKS, ESQ. 1800 Financial Center 505 North 20th Street Birmingham, AL 35203 |

For Pinpoint
Multi-Strategy Master          Christian & Small, LLP
Fund, Value Partners           By:  DANIEL D. SPARKS, ESQ.
Fixed Income SPC –             1800 Financial Center
Value Partners Credit          505 North 20th Street
Opportunities Fund SP          Birmingham, AL 35203
and Value Partners
Greater China High             Kobre & Kim, LLP
Yield Income                   By:  DANIEL J. SAVAL, ESQ.
FundPinpoint and               800 Third Avenue
Value Partners:                New York, NY 10022

                               Kobre & Kim, LLP
                               By:  GEOFFREY J. DERRICK, ESQ.
                               1919 M Street NW
                               Washington, DC 20036

For Rolta Advizex              McDonald Hopkins, LLC
Technologies, LLC:             By:  SEAN D. MALLOY, ESQ.
                               600 Superior Avenue, East, Suite 2100
                               Cleveland, OH 44114

For Huntington                 Calfee Halter & Griswold, LLP
National Bank:                 By:  GUS KALLERGIS, ESQ.
                               1405 East 6th Street
                               Cleveland, OH 44114

Attorney for                   Maynard Cooper & Gale PC
Intergraph Corporation:        By:  RYAN D. THOMPSON, ESQ.
                               1901 6th Avenue North, Suite 2400
                               Birmingham, AL 35203

_ _ _

1          THE COURT:  ..cases.  Let me have appearance of

2     counsel for the debtor.

3          MR. MAPLES:  Stuart Maples for the debtor.

4          THE COURT:  Good morning.

5          MR. MAPLES: Good morning.

6          THE COURT:  The bankruptcy administrator?  Is there

7     someone present for the bankruptcy administrator?

8                    (No audible response)

9          THE COURT:  Okay.  The judgment creditors?

10         MR. SPARKS:  Your Honor, Dan Sparks of Christian &

11    Small for the judgment creditors.

12         THE COURT:  Good morning.

13         MR. SAVAL:  Good morning, Your Honor, Daniel Saval

14    from Kobre & Kim, also here on behalf of the judgment

15    creditors.

16         THE COURT:  Good morning.  Okay.  Is there anyone

17    else who needs to enter an appearance?

18         MR. BLYTHE:  Your Honor, Richard Blythe, bankruptcy

19    administrator, I'm sorry I'm a little late.

20         THE COURT:  Okay, Mr. Blythe, and who else entered an

21    appearance?

22         MR. MALLOY:  Good morning, Your Honor, Sean Malloy of

23    McDonald Hopkins on behalf of non-debtor affiliate Rolta

24    Advizex.

25         THE COURT:  Good morning.

**WWW.JJCOURT.COM**

1      MR. KALLERGIS:  Good morning, Your Honor, Gus
2  Kallergis on behalf of Huntington National Bank, a pledge of
3  the stock of Rolta International.

4      THE COURT:  Good morning.  Okay, I think what I'm
5  going to do, no, I know what I'm going to do, is I'm going to
6  start at the end of the docket and go backwards.  Let's start
7  with the motion to modify the Chapter 11 operating proceedings
8  and because the motions are identical in the Rolta Middle East
9  case and the Rolta UK, Ltd. case, we'll take those up together.
10  Mr. Blythe?

11      MR. BLYTHE:  Yes, Your Honor, I've looked at both
12  motions.  These are at least the part of what they're asking
13  for, the waiver on opening new bank accounts and new books and
14  records, we would routinely agree to that in cases where we
15  were dealing with the United States Banks and, you know, just
16  required that the debtors provide us with additional
17  documentation from statements going back several months to show
18  the pre-petition chain of the money.  It's really a little
19  different in this case because these are, you know,
20  international banks that we don't deal with every day, so I
21  don't know that they don't do debtor-in-possession accounts.

22      Because normally what we do in the United States
23  Banks is even though we would waive the requirement perhaps to
24  open a new bank account, we would require that they designate
25  the existing accounts as debtor-in-possession and comply with

1 the requirements there; as well as, the requirements from

2 keeping money of the estates and the collateralization and

3 insured requirements under 345, which I would be very hesitant

4 to waive that because I just don't know what sort of

5 international banks we're talking about and what sort of

6 insurance coverage that would be equivalent to what the FDIC

7 limits are, so without having additional information, I don't

8 know that I could agree to that.

9          THE COURT:  Okay.  Mr. Maples?

10          MR. MAPLES:  Your Honor, I don't know the answer to

11 the insurance issue.  I understand the concern that Mr. Blythe

12 has.  I could follow-up with that.  I just have been -- it's my

13 understanding it is simply very, very difficult to open new

14 bank accounts in UAE and in UK.  It could take several months

15 and would cause some disruption.  Whether or not we may be able

16 to make some sort of designation on the existing accounts as

17 debtor-in-possession, I'm happy to pursue that, and also to

18 pursue information on any deposit insurance that are offered by

19 these two foreign institutions.

20          THE COURT:  I think, definitely, we need you to try

21 to do that.  I'm just thinking --

22          MR. MAPLES:  Sure.

23          THE COURT:  -- can't be the first time that this

24 issue has arisen in conjunction with a Chapter 11 either in the

25 Middle East or in the UK and so the question is where would you

**WWW.JJCOURT.COM**

1  find a good source of information to assist you, Mr. Maples.  I

2  would suggest and I don't know if they have the answer or not,

3  but some place like INSOL International which is the branch of

4  the American Bankruptcy Institute may be a place to look to --

5          MR. MAPLES:  That -- sure.

6          THE COURT:  But I know INSOL is the International

7  Branch of the American Bankruptcy Institute where issues like

8  this have been addressed.  I don't know if this specific issue

9  has, but I would suggest that you look there because I

10  understand what Mr. Blythe is saying and it is difficult to

11  weigh those requirements or about something comparable in place

12  to protect the estate and the creditors.  (indiscernible)

13          MR. BLYTHE:  I agree with that, Your Honor.

14          THE COURT:  Let me then continue both of these

15  matters and we'll talk about when we continue them to after we

16  discuss and consider the other matters on the docket.  Before I

17  move off these two matters I've heard from Mr. Blythe, does

18  anyone else have any comments with regard to the motions to

19  modify the Chapter 11 operating procedures?

20          (No audible response)

21          THE COURT:  Okay.  Then we'll take that up as far as

22  rescheduling in a moment.  The other item, and I'm going to do

23  them corporately because they're related, is the status

24  conferences are set on the motions by the debtors for entry of

25  an order authorizing but not directing payments of pre-petition

1  claims of certain critical and foreign vendors in the Rolta

2  International, Rolta UK, Ltd., and Rolta Middle East cases.  I

3  received this morning the objection to the motion by the

4  judgment creditors, which actually came later than I was

5  hoping, but it did come, and what I'm about to start with is my

6  notes about the motions before I receive the objections by the

7  judgment creditors, so if there's any overlap, it's just purely

8  because of the nature of the matter.

9        The term critical vendor does not appear in the

10  Bankruptcy Code.  The concept was developed by the bankruptcy

11  courts and the Chapter 11 process since the Code went into

12  effect until the first 1979.  The Courts will not generally

13  rubberstamp a debtors request, but will require proof that the

14  payment is indispensable to the success of the debtors' cases

15  and cannot be obtained elsewhere.  The critical vendor is

16  generally the sole source supplier or otherwise provides goods

17  or services that are difficult for the debtor to replace.

18        The debtor must show that the failure to pay the pre-

19  petition creditor risked probable harm that is disproportional

20  to the amount of the claim.  Critical vendor claims are

21  routinely paid via a first day motion, if at all, which is

22  filed at the beginning of the case.  The critical vending

23  treatment by definition is an extraordinary step and remedy

24  that the debtor should take to ensure their economic survival.

25  Generally critical vendors involve goods or inventory necessary

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document      Page 727 of 739

1  for an ongoing business.  The sole supplier of a given product
2  generally satisfies the requirements to be a critical vendor.
3          The motions before the Court today in the three
4  matters that I mentioned have deficiencies that must be
5  amended, supplemented or otherwise before the Court can
6  determine if any creditors meet the requirements with critical
7  vendor status.  The first is that there needs to be a specific
8  list of creditors by name.  One of the things that I noticed is
9  the names set forth aren't even complete names in some
10 instances and we don't know who they are; the amount owed each;
11 and the specific reason why every one of the parties on the
12 lists provides goods or services that are essential and cannot
13 be replaced by another entity.  One of the things that jumps
14 out in my memory, although I don't have it in my notes is I
15 noticed that one of the critical vendors that was listed in one
16 of the cases was a rental car company, which seems to the Court
17 not to be essential because there are other rental car
18 companies.
19         The next area of supplement or amendment that needs
20 to occur with the motions is there is no authority set forth
21 from the 11th Circuit for critical vendor motions.  The request
22 only cites cases from the 1980s and 1990s from New York,
23 Delaware, and Virginia, none of which are relevant in the 11th
24 Circuit and the reasons that's so important is that case law on
25 critical vendorship has varied from jurisdiction to

1  jurisdiction.  I know one jurisdiction, one circuit said the

2  critical vendorship does not exist.  I don't know that that's

3  the 11th Circuit, but I need authority from the 11th Circuit

4  that supports what's being requested here.

5       The third issue is I need, in addition to specific

6  information about individual ones on a national level the

7  reasons why the total in any case it seems two to three percent

8  of the total unsecured claims.  It is generally the case that

9  critical vendor claims are so unique and so specialized that

10  they rarely exceed two or three percent of the total unsecured

11  claims in the case.  In this particular matter I note that in

12  the Rolta Middle East case there appears to be one million

13  dollars in critical vendor claims that are requested which

14  appears to be exorbitant.

15       And then last but not least there is an issue which

16  is related to critical vendorship, but is not a (indiscernible)

17  for the motions and that is are any of the claims that are

18  listed entitled to priority administrative expense status under

19  523(b)(9).  As you recall, anyone who provides services within

20  20 days before the commencement of the case gets a priority

21  under 523(b)(9).  If that is the case then those claims have a

22  special status that has to be taken into account and then a

23  Court determines if there is critical vendor status or not.

24       So in addition to those, the objections by the

25  judgment creditors talk about there's no specificity, no

1  evidence of the critical nature of the claims requested.  There

2  is insufficient cash to make the payments and then it raises

3  another issue which is interesting but not as critical here is

4  the schedules show that there are no operating businesses.  I

5  guess they both go to the criticality of the service or goods.

6  If there's no operating business, then how could it be an

7  essential element necessary to ongoing business?

8            Okay.  Those are the issues that I called and just

9  for the record I set these for status conference, so that those

10 issues could be discussed and addressed before we get actually

11 to a hearing on the motions where the Court will rule.  But I

12 wanted to give all the parties the benefit of the Court's

13 position and I appreciate the judgment creditors also putting

14 in their objection so that we know what we're dealing with.  As

15 it stands now the motions are not in a position where they

16 could be approved, but once again, we're having a status

17 conference on the motions today.  I will reschedule the motions

18 for actual hearing in a moment after we discuss them further

19 and then at that point the Court will rule on the motions.

20            Let me hear from Mr. Saval on behalf of the judgment

21 creditors.  I know I abbreviated the objection that was filed

22 by the judgment creditors, but let me hear from you with regard

23 to any other comments that your clients have?

24            MR. SAVAL:  Your Honor, again, good morning.  This is

25 Daniel Saval.  I believe Your Honor has accurately summarized

1  the gist of our objection to the motions. We believe that they

2  are deficient in an number of ways. So we will reserve our

3  rights in connection with any further supplements or evidence

4  that is in connection with the motions.

5        THE COURT: Okay. Thank you. Mr. Blythe, any

6  comments on these motions? Once again, we're in the status

7  conference phase.

8        MR. BLYTHE: Your Honor, just to echo, I saw the

9  objections by the secured lenders and I thought that a lot of

10  their points were well taken, that the information needs to be

11  fleshed out in further to show what the claims are and why

12  they're critical claims and what Your Honor said I agree with

13  the questions that Your Honor had. Other than that, I don't

14  have anything further.

15        THE COURT: Okay. Before I get to Mr. Maples, does

16  anyone else have any comments or responses to the motions?

17        MR. SPARKS: Your Honor, Dan Sparks. I don't mean to

18  come across the top of Mr. Saval, but we just want to say that

19  we have scheduled a deposition of the representative of the

20  debtor for the 17th of this month and so if you're thinking

21  about an evidentiary hearing it was after that date that might

22  be functional.

23        THE COURT: Well actually, I'm not thinking about an

24  evidentiary hearing because I don't know that an evidentiary

25  hearing would be necessary. If we get to the --

1        MR. SPARKS: That was my second question.

2        THE COURT: -- the question -- yes, no, we're going

3 to have just a hearing because there's so many legal issues

4 here I think I can rule on it without an evidentiary hearing,

5 but I will need additional evidence as far as representations

6 either through an amended motion or declarations. That's what

7 I was thinking though.

8        MR. SPARKS: Thank you, Your Honor.

9        THE COURT: But I think what you're saying, Mr.

10 Sparks, and I do need to know that and that is that you

11 probably should have the hearing after the 17th so you and your

12 clients have additional information for which you could have

13 input into what we do at the continued hearing?

14        MR. SPARKS: Ideally, Your Honor, we would have a

15 declaration in advance that we could use as our -- for

16 discovery purposes, correct. But even if not, we would, in

17 addition to the other things we intend to do at that

18 deposition, I would imagine we would explore the critical

19 vendor allegations and the motions they're seeking, the

20 background for that, yes, sir.

21        THE COURT: Okay. Then maybe what we need to do is

22 have two things. One is a deadline for the debtor to

23 supplement and/or amend its motions so that you have that

24 information before the 17th and then a continued hearing after

25 the 17th.

Case 20-82282-CRJ11    Doc 126    Filed 12/07/20    Entered 12/07/20 23:29:08    Desc
Main Document    Page 732 of 739

1          MR. SPARKS:  I would think that would be excellent,

2    yes, sir.

3          THE COURT:  Okay.  Now, Mr. Maples, let me go to you.

4    A lot has been said in this phase of the status conference.  Do

5    you have any questions, let me start with that, any questions

6    about what the Court said with regard to the issues involving

7    the critical vendor request?

8          MR. MAPLES:  If I might, just summarize them to make

9    sure that I have them all.

10          THE COURT:  Okay.

11          MR. MAPLES:  A more detailed list of the critical

12    vendor by name, by amount and a detailed description of why we

13    consider them to be critical.  Authority from the 11th Circuit,

14    a comparison and a justification for payment of as critical

15    vendors of other unsecured amounts that would exceed two to

16    three percent of the entire unsecured pool; and then on the

17    justification of critical vendors whether any of these vendors

18    would have authority claims under 503.

19          THE COURT:  No, 523 -- I'm sorry, 503 --

20          MR. MAPLES:  Five, twenty-three --

21          THE COURT:  I'm sorry, it's not 523, it's 503 --

22          MR. MAPLES:  It's 503.

23          THE COURT:   -- but it's 503(b)(9) --

24          MR. MAPLES:  Yes, sir.

25          THE COURT:  That's the delivery --

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document     Page 733 of 739

1          MR. MAPLES:  Yeah, the delivery within 20 days.

2          THE COURT:  Correct.

3          MR. MAPLES:  That's the substitute for reclamation,

4 yes.

5          THE COURT:  And the reason that's important is

6 because some Courts have said if they already have the

7 priority, then they're not being treated differently than other

8 unsecured creditors anyway, and, so, therefore, it makes it

9 easier to find them as critical vendors.  That's why that issue

10 is important.

11         MR. MAPLES:  Yeah.  Yes, sir.  I understand that.

12         THE COURT:  And I had said 523, but I meant 503, so

13 you corrected me there appropriately.

14         MR. MAPLES:  Yes.

15         THE COURT:  The other issue thought that's been

16 raised by the judgment creditors that I think you need to add

17 to the list is cash to make for the payments.  If the Court

18 determines they're critical vendor, they meet all the other

19 requirements, how will they be paid?

20         MR. MAPLES:  I would be happy to address that and I

21 intended to address all the objections that were raised by the

22 judgment creditors.

23         THE COURT:  Okay.  Good.  Then, Mr. Maples, do you

24 have any suggestion as to when you will be able to file the

25 amendment and so on before the 17th?  Let me suggest, I'm

**WWW.JJCOURT.COM**

1 looking at my calendar now, how about the 14th?

2          MR. MAPLES:  The 14th is fine.

3          THE COURT:  That's two weeks from today.

4          MR. MAPLES:  Yes, sir.

5          THE COURT:  Well that gives the judgment creditors

6 that information a few days before the 17th, which I think

7 would be helpful.  Now let's have you provide it -- I always

8 like to do it before the end of the day, let's have you provide

9 it by noon on December 14th.

10          MR. MAPLES:  Yes, sir.

11          THE COURT:  Mr. Sparks, is that satisfactory?

12          MR. SPARKS:  Yes, yes, Your Honor, it is and unless

13 Mr. Saval has a different thought, I think it is.

14          THE COURT:  Okay.  Mr. Saval?

15          MR. SAVAL:  That's acceptable on our end, Your Honor,

16 thank you.

17          THE COURT:  Okay.  Good.  Okay, then the next order

18 of business was to pick a hearing date that we can continue the

19 matters once the critical vendor supplement had been filed.

20 We're getting into the Christmas Season very deeply.  I only

21 see one date before Christmas that we can do it and it's

22 pushing that week of Christmas, but let's see if this works.

23 How about December 22nd?  Does that work, Mr. Maples?

24          MR. SAVAL:  That's fine.

25          MR. MAPLES:  Yes, sir.

Case 20-82282-CRJ11   Doc 126   Filed 12/07/20   Entered 12/07/20 23:29:08   Desc
Main Document    Page 735 of 739

1             THE COURT: Okay. Mr. Saval and Mr. Sparks?

2             MR. SAVAL: Yes, Your Honor, this is Daniel Saval --

3             MR. SPARKS: I'm looking --

4             MR. SAVAL: -- it works for me.

5             MR. SPARKS: I'm looking right now, Your Honor. I

6 think it does, if you'll just wait one second. That's a

7 Tuesday.

8             THE COURT: I'll come back, Mr. Blythe?

9             MR. SAVAL: That does work.

10             THE COURT: That works, okay. Mr. Blythe?

11             MR. BLYTHE: Yes, Your Honor, the 22nd, that Tuesday

12 works.

13             THE COURT: Okay. And 10 a.m. I don't anticipate

14 that this will take more than the morning if that long. Either

15 they're going to meet the requirements for critical vendors or

16 not. I see it because it's judge-made law and because it's

17 heavily into the equitable nature of the Court. I think once

18 the information comes in I'll be able to make a decision with

19 input from the judgment creditors if they have no further

20 objection and bankruptcy administrator. So once again, I think

21 December 22nd at 10 a.m. when we will reschedule -- I'm sorry,

22 not reschedule, because it wouldn't be status conference --

23 when we will schedule the hearings on the motions by the three

24 debtors for entry of an order involving critical vendor status,

25 okay.

1          UNIDENTIFIED ATTORNEY:  Yes.

2          THE COURT:  All right.  Is there any other issue or

3  comment that anyone would like to make in connection with this

4  case before we adjourn?

5          MR. MAPLES:  Your Honor --

6          UNIDENTIFIED ATTORNEY:  Your Honor --

7          MR. MAPLES:  Go ahead.

8          THE COURT:  Go ahead, Mr. Maples.

9          MR. MAPLES:  Yes.  Could we also set the motion to

10  modify the operating order at the same time?

11          THE COURT:  I'm sorry, yes.  That's what I intended

12  to do.  Thank you.

13          MR. MAPLES:  Okay.

14          THE COURT:  We will schedule the motions to modify

15  them at the same time.  Yes, I forgot about those.  I'm getting

16  old.

17          MR. MAPLES:  Thank you.

18          THE COURT:  So those two motions will also be set at

19  the same time on the 22nd of January.

20          MR. MAPLES:  Yes.

21          THE COURT:  Okay.  Mr. Sparks, was that you that was

22  going to say something.

23          MR. SAVAL:  It was --

24          MR. SPARKS:  I was not.

25          MR. SAVAL:  -- me, Daniel Saval --

**WWW.JJCOURT.COM**

1          THE COURT:  Oh, Mr. Saval, yes?

2          MR. SAVAL:  -- I just wanted guidance from Your Honor

3    in the event that we seek to file additional papers after

4    reviewing the materials filed by the debtors on the 14th, if

5    there's a date by which you would like to receive them?

6          THE COURT:  Okay, good point.  I'm anticipating that

7    you won't be able to file them though until after your

8    deposition on the 17th.  Is that a reasonable anticipation, Mr.

9    Saval?

10         MR. SAVAL:  Yeah, that is reasonable and I just

11   wanted to, you know, clarify, Your Honor, that the deposition

12   will cover topics that go towards the motion we plan on filing

13   to dismiss the case.

14         THE COURT:  I understand.

15         MR. SAVAL:  Yeah.

16         THE COURT:  So would the end of business on the 18th

17   be too soon for you to file further objection?

18         MR. SAVAL:  Your Honor, that timing should work for

19   us.

20         THE COURT:  Okay.  And the reason I say that is I

21   work over the weekend, so that would give me an opportunity to

22   get it over the weekend and be prepared to go forward.  I have

23   a trial on the 21st so I will need to have looked at whatever

24   you're going to file before I start that trial on the 21st.

25         MR. SAVAL:  Understood, Your Honor.

1          THE COURT:  So any further -- let me say it for the

2   judgment creditors and anyone else, any further objections to

3   the motions for critical vendor status must be filed by 5 p.m.

4   Central Time on December the 18th.  Okay.  Any other issues

5   that need to be brought before the Court in connection with

6   these or any other matters?  If not, thank you, everyone, we

7   are adjourned.

8          THE ATTORNEYS:  Thank you, Your Honor.

9                         * * * * *

10              **C E R T I F I C A T I O N**

11          I, ANNEMARIE DeANGELO, court approved transcriber,

12   certify that the foregoing is a correct transcript from the

13   official electronic sound recording of the proceedings in the

14   above-entitled matter, and to the best of my ability.

15

16   /s/ AnneMarie DeAngelo       DATE:  December 3, 2020

17   ANNEMARIE DeANGELO

18   J&J COURT TRANSCRIBERS, INC.

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**